1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3        BEFORE THE HONORABLE WILLIAM ALSUP, JUDGE

4   ------------------------------)
                                  )
5   SHEILA I. HOFSTETTER,         )
    et al.,                       )
6                                 )
                  Plaintiffs,     )
7                                 )
        v.                        )     No. C 10-1313 (WHA)
8                                 )
    CHASE HOME FINANCE, LLC,      )
9   et al.,                       )
                                  )
10                Defendants.     )     San Francisco, California
                                  )     Thursday, August 12, 2010
11  ------------------------------)        (21 pages)

12

13                 TRANSCRIPT OF PROCEEDINGS

14  <u>APPEARANCES:</u>

15  For PlaintiffS:        Nichols, Kaster, PLLP
                           4600 IDS Center
16                         80 South 8th Street
                           Minneapolis, Minnesota 55402
17                  BY:    PAUL J. LUKAS
                           KAI RICHTER
18
    For Defendants:        Burke, Warren, MacKay & Serritella, PC
19                         330 North Wabash
                           22nd Floor
20                         Chicago, Illinois 60611
                    BY:    STEPHEN RYAN MEINERTZHAGEN
21
                           Ropers, Majeski, Kohn & Bentley
22                         201 Spear Street
                           Suite 1000
23                         San Francisco, California 94105
                    BY:    GEORGE G. WEICKHARDT
24

25

```
1   Thursday, August 12, 2010

2                                                  (8:00 a.m.)

3            (In open court)

4            THE COURT:  Let's call Hofstetter vs. Chase Home

5   Finance, Case Number 10-1313.

6            THE COURT:  Appearances, please?

7            MR. LUKAS:  Good morning, your Honor.  Paul Lukas from

8   Nichols, Kaster & Anderson from Minneapolis here on behalf of

9   the plaintiffs.  Along with me is Kai Richter from Nichols,

10  Kaster.

11           MR. MEINERTZHAGEN:  Steve Meinertzhagen on behalf of

12  defendants J.P. Morgan Chase Bank and Chase Finance.  I'm here

13  with my local counsel, George Weickhardt.

14           THE COURT:  Welcome.  This is a motion by the bank to

15  dismiss, so please go ahead.

16           MR. MEINERTZHAGEN:  All of plaintiffs' claims are

17  based on an erroneous reading of federal flood insurance law.

18  The plaintiffs allege that federal law did not require the

19  Hofstetters to purchase flood insurance and does not require

20  flood insurance beyond the principal balance of any existing

21  loan or credit line.  That's simply wrong, and because it's

22  wrong and contrary to federal flood insurance law, all three of

23  the causes of action they allege in their amended complaint --

24           THE COURT:  So why is it wrong again?

25           MR. MEINERTZHAGEN:  It's wrong because federal
```

1   insurance law requires any property located within a designated

2   flood zone to maintain flood insurance.  And it requires the

3   amount of flood insurance to be based on a number of different

4   criteria with specific regulations addressing the flood

5   insurance minimum requirements for HELOC loans, which is the

6   loan at issue with the Hofstetters.

7          Specifically, the OCC and FEMA -- the OCC regulates

8   national banks such as J.P. Morgan Chase Bank and its

9   subsidiaries like Chase Home Finance -- has issued guidance

10  with respect to HELOCs, and that guidance provides as follows:

11          "For home equity lines of credit, it may be difficult

12  to calculate the amount of insurance for the line since the

13  borrower will be drawing down differing amounts on the line at

14  different times.  A bank may take one of two approaches to

15  comply with purchase requirements for HELOCs."

16          To comply with purchase requirements, your Honor,

17  refers to the NFIA's minimum requirements, so in other words,

18  to meet the minimum requirements for flood insurance, a lender

19  has to do one of two different approaches with respect to

20  HELOCs.  The first approach involves periodic reviews of

21  draws -- but it's not required.  The second approach is as

22  follows:

23          Upon origination, require the purchase of flood

24  insurance based on the total amount of the line, the value of

25  the improved property, or the maximum amount of flood insurance

1   coverage available, whichever is less.

2          This is consistent with guidance that's been issued by

3   FEMA.

4          The FEMA guidance states:  "For loans with approved

5   lines of credit to be used in the future, it may be difficult

6   to calculate the amount of insurance for the loan because the

7   borrower will be drawing down differing amounts on the line of

8   credit at different times.  In those instances, where there is

9   no policy on the collateral" -- in other words, where there is

10  to policy that covers the replacement cost value of the

11  improvements -- "the borrower must at a minimum obtain a policy

12  as a requirement for drawing on the line.  Drawing against an

13  approved line of credit does not require further determinations

14  to be made."

15         In other words, you can have a flood insurance policy

16  at the outset and you don't have to reevaluate the policy

17  amounts whenever there is a draw.

18         "Drawing against an approved line of credit does not

19  require further determinations to be made.  For administrative

20  convenience in ensuring compliance with the (minimum)

21  requirements" -- meaning the minimum NFIA requirements -- "a

22  lender may take the following alternative approaches:

23         The first one, again, is monitoring draws and making

24  periodic adjustments --

25         THE COURT:  Can I ask you a question?

1          MR. MEINERTZHAGEN:  Yes.

2          THE COURT:  In this case, when was the flood

3    determination made by the bank?

4          MR. MEINERTZHAGEN:  The flood determination's made by

5    FEMA, and I believe it was in June of 2009.

6          THE COURT:  When was the -- all right.  So when was

7    the equity line of credit established?

8          MR. MEINERTZHAGEN:  2006.

9          THE COURT:  So when it was first established, there

10   was no flood insurance at all, right?

11         MR. MEINERTZHAGEN:  That's correct.  There was no

12   flood insurance required.

13         THE COURT:  And when did they tell her that it was --

14   she had zero dollars available?

15         MR. MEINERTZHAGEN:  When did they tell her?  When did

16   they suspend her credit privileges?

17         THE COURT:  Didn't the bank send her a notice that she

18   had zero dollars available to her?

19         MR. MEINERTZHAGEN:  The bank suspended her credit

20   privileges in 2008.

21         THE COURT:  Okay.

22         MR. MEINERTZHAGEN:  As a result of the -- a decline in

23   the collateral value of the property.

24         THE COURT:  Did she owe any money on it at that point?

25         MR. MEINERTZHAGEN:  I believe the balance was zero at

1    that time.

2              THE COURT:  Zero.  And they were not going to lend her

3    any more money?

4              MR. MEINERTZHAGEN:  Your Honor, it was a temporary

5    suspension.  The suspension is temporary, pursuant both to the

6    tomorrow of her mortgage agreement and pursuant to Reg Z.

7              THE COURT:  Whether it was temporary or not, it was

8    zero at the time.

9              MR. MEINERTZHAGEN:  That's correct.

10             THE COURT:  So as of June, 2009, when the flood thing

11   was determined, it was zero balance and zero credit, right?

12             MR. MEINERTZHAGEN:  Right, but the line remained at

13   175,000.

14             Your Honor, let me review from Reg Z.  Reg Z provides

15   for suspension of credit privileges on HELOCs if there's a

16   decline in the collateral value of the property.  It goes on to

17   provide:

18             "Temporary nature of suspension or reduction.

19   Creditors are permitted to prohibit additional extensions of

20   credit or reduce the credit limit only while one of the

21   designated circumstances exists.  When the circumstance

22   justifying the creditor's action ceases to exist, credit

23   privileges must be reinstated, assuming that no other

24   circumstance permitting such action exists at that time."

25             Under Reg Z, the credit line remains open while credit

1  privileges are suspended, and credit privileges must be

2  reintroduced as soon as the condition that causes the

3  suspension no longer exists.  In other words, as soon as the

4  property value goes up.

5          THE COURT:  All right.  Is this true that the bank is

6  buying this flood insurance from an affiliate?

7          MR. MEINERTZHAGEN:  The forced place was not purchased

8  from an affiliate, your Honor.  No, it's not true.

9          THE COURT:  Who is the insurer then?

10          MR. MEINERTZHAGEN:  Assurity, or ASIC, American

11  Security Insurance Corporation, which I believe is a subsidiary

12  of Assurity.

13          THE COURT:  Is it alleged an affiliate here?

14          MR. LUKAS:  It is alleged as an affiliate.

15          MR. MEINERTZHAGEN:  It's completely independent.

16  J.P. Morgan Chase and Co. is just the holding company of the

17  bank, has no ownership interest in ASIC, your Honor.

18          THE COURT:  All right.  Let's hear from the plaintiff.

19          MR. LUKAS:  Sure, your Honor.  To that point, we've

20  just started discovery; we haven't gotten much from them, as

21  you know from the letter we sent.  But we believe that Chase

22  owns 75 percent of this insurance company.

23          THE COURT:  Which one?

24          MR. LUKAS:  Of Assurity.

25          THE COURT:  Is that true?

```
1              MR. MEINERTZHAGEN:  Absolutely not, your Honor.
2    Assurity does insurance -- provides insurance coverage for
3    numerous lenders.
4              THE COURT:  Well, perhaps, but does Chase have any
5    ownership, directly or indirectly, in the insurance company?
6              MR. MEINERTZHAGEN:  No.
7              MR. LUKAS:  It's American Security Insurance Company,
8    your Honor.  We're doing discovery on it.  It's our
9    understanding it's an affiliate of Chase.
10             THE COURT:  How do you know that?  On what do you base
11   your understanding of that?
12             MR. LUKAS:  Well, we base our understanding on that
13   from the -- one of our clients believes -- did some research
14   and said that J.P. Morgan Chase is the largest shareholder of
15   Assurity, owning 3.8 million shares as of January 2010.
16             THE COURT:  What are you looking at?
17             MR. LUKAS:  What, your Honor?
18             THE COURT:  What are you looking at?
19             MR. LUKAS:  A letter from our client.
20             THE COURT:  Why is your client qualified to do this?
21             MR. LUKAS:  Well, he's not, your Honor.  We don't
22   know -- the point is, it doesn't matter who their -- we think
23   it does matter, and we think we will figure this out.  In fact,
24   we think -- it appears to us from the correspondence that we've
25   gotten -- they haven't given us much -- but from the, where
```

```
1    these letters are going and coming from, we believe they've

2    actually handed -- that this AS, or American Insurance Company

3    is the one sending out these letters on behalf of Chase.  But

4    we haven't been able to do discovery on that.

5              It was our understanding that it was an affiliate

6    company.  If it's not, it doesn't matter, for the legal

7    analysis.  The point is, they're force placing insurance on

8    people for more than the balance due, or even the line of

9    credit available.  And that's --

10             THE COURT:  What do you say to the Reg Z point?  That

11   if, just because a line of credit is suspended, as long as it's

12   in place, it can come back to life later?

13             MR. LUKAS:  It can only come back to life if Chase

14   says it comes back to life, and at that point Chase is

15   certainly in a position to say, Okay, it comes back to life,

16   now you insure.  Instead, they force place an insurance policy

17   on a person who has a zero credit line, a zero balance due, and

18   they force place $175,000 of insurance on her at a $1500

19   premium.  And then when she complains they say, Well, you can

20   close your account.  Just close your account.  She says, Okay,

21   great, I'll close it.  And they say, Well, you have to pay the

22   1575.

23             And that's what they're doing.  And they're doing it

24   to everybody.  Because what happened in '08 is they reduced a

25   bunch of lines of credit to zero or to whatever the balances
```

1   were due.  But then they turned around and force place

2   insurance for the old amount.  These people -- Ms. Hofstetter

3   has no availability.  She could not take this money out unless

4   they opened it back up and they approve it, which it certainly

5   hasn't happened in two years.

6         So, I mean, that's the point.  If you look at the

7   evolution of their argument, your Honor, through their briefs,

8   their first argument is, Well, federal law requires this.  Then

9   you read the brief and they backpedal a little bit and say,

10   Well, federal law allows it, or at least doesn't prohibit it.

11   And then near the end of their last brief they say, Well, we

12   just have the power to do this.  And none of those arguments

13   get them anywhere.

14         Federal law does not require it.  All federal law

15   requires -- federal law requires a minimum.  And that minimum

16   is on the principal balance due.  We know in this case, that's

17   zero.

18         It also requires -- it only requires it if they're

19   making, extending, increasing or renewing lines of credit.

20   They're doing none of those things here.  It may have required

21   it after they did reopen that lien, renewed it, then they would

22   have to force place insurance.  But they don't have to.

23         And then they say, Well, federal law allows us to or

24   doesn't prohibit us to.  But that doesn't help because that's

25   not what they told Sheila and not what they're telling their

1   customers.  They're telling the customers federal law requires

2   we do this.  And it doesn't.

3           THE COURT:  I want to have counsel be very clear on

4   this:  It is true that your notice said that the law requires

5   it?

6           MR. MEINERTZHAGEN:  Requires flood insurance, yes,

7   your Honor.

8           THE COURT:  And do you now say, acknowledge, that

9   that's not true?

10          MR. MEINERTZHAGEN:  No, your Honor.

11          THE COURT:  Let's be clear.  Your argument is:

12  Federal law requires it.

13          MR. MEINERTZHAGEN:  Federal law requires flood

14  insurance on any --

15          THE COURT:  Even in this case.

16          MR. MEINERTZHAGEN:  Even in this case, your Honor.

17          THE COURT:  So if you lose on that, you're not backing

18  up to something like, oh, well, even if it didn't require it,

19  we could have done it anyway?

20          MR. MEINERTZHAGEN:  Your Honor --

21          THE COURT:  Is that your backup argument or not?

22          MR. MEINERTZHAGEN:  Perhaps, but federal law --

23          THE COURT:  Tell me.  Because I'm inclined to rule

24  against you on the main point.  So do you have a backup

25  argument or not?

1        MR. MEINERTZHAGEN:  I do, your Honor.

2        THE COURT:  What is it?

3        MR. MEINERTZHAGEN:  The NFI --

4        THE COURT:  Then you are backpedaling.  You are

5   backpedaling.  In other words, what you told the customer was

6   false.

7        MR. MEINERTZHAGEN:  No, it was not false, your Honor.

8   The NFIA requires flood insurance on any property --

9        THE COURT:  I'll rule on that and nothing else then.

10  Because that's what you tagged this poor woman with was a

11  statement that it was required.

12        MR. MEINERTZHAGEN:  It is.

13        THE COURT:  And I don't think that's true, in her

14  case.

15        MR. MEINERTZHAGEN:  Well, your Honor, I respectfully

16  disagree, based upon the NFIA.

17        THE COURT:  Then you can take it to the Ninth Circuit.

18  Let me ask you this:  Is there an MDL on this pending?

19        MR. LUKAS:  No.

20        THE COURT:  Are there any other cases like this?

21  Because I find every time a bank gets sued on this, they run,

22  try to take it to Florida or someplace else.  That's not

23  happening here.  Last time Chase got sued, they took it

24  somewhere else.  Where did they take it?  Chicago or something.

25  Where is this one going?

1    MR. LUKAS:  I have no doubt they'll try to get it out

2    of here, Judge.  But we have one case identical, or very close

3    case to this in New York, that we just sued out, but with only

4    a New York class.

5        THE COURT:  I'll give the bank one last opportunity.

6        MR. MEINERTZHAGEN:  Your Honor --

7        THE COURT:  I'm inclined against your argument that

8    it's required.  So if you're going to be saying some kind of

9    backup argument like even though it wasn't required and even

10   though we didn't -- we weren't truthful to the customer, we had

11   the power to do it anyway -- tell me what your alternative

12   argument is.

13       MR. MEINERTZHAGEN:  Your Honor, as you've framed it,

14   I'm not sure we have an alternative argument, but let me say

15   that under the NFIA, I'm talking about section 4012a(b)(1), it

16   says:

17       "Each Federal entity for lending regulation, after

18   consultation and coordination with the financial institution

19   examinations council, shall, by regulation, direct regulated

20   lending institutions not to make, increase, extend or renew any

21   loan secured by real estate or a mobile home located or to be

22   located in an area that has been identified by the director as

23   having special flood hazards and in which flood insurance has

24   been made available under the NFIA unless the building securing

25   such loan is covered for the term of the loan by flood

1   insurance in an amount at least equal to the outstanding

2   principal balance of the loan for the maximum limit of coverage

3   made available under the Act with respect to the particular

4   type of property, whichever is less."

5          So the federal statute says, if you're in a flood

6   zone, you have to have flood insurance.

7          Now, if the argument is about the amount of the flood

8   insurance, then certainly I have arguments that justify why the

9   amount was placed at $175,000.  However, if your Honor's

10  position is that Chase could not place flood insurance, I

11  simply disagree and believe that the Court is mistaken in its

12  interpretation of the NFIA.

13         THE COURT:  Well, I'm going to go back and look at

14  your point.  I'm not going to make a ruling yet; I could be

15  wrong.  I'm going to be very clear on this.  This is possibly

16  affecting more than one person.

17         Anything more you want to say on the plaintiff's side?

18         MR. LUKAS:  No, your Honor.  Just that the NFIA

19  clearly says the amount of flood insurance required need not

20  exceed the outstanding principal balance.

21         MR. MEINERTZHAGEN:  Your Honor, I will respond to

22  that.  What the NFIA says is is what the minimum is.  Says it

23  has to be at least equal to.  The implementing agencies have

24  specifically stated what the requirement is for lines of

25  credit.  If you look at the OCC regulation, it says one of the

1  things that you can use is the line, the credit line amount.

2  That's exactly what Chase did here.  The credit line was --

3        THE COURT:  But does it make sense to you -- does it

4  make sense to you that the poor of this country and -- the

5  working poor and the ordinary person, trying to make ends meet,

6  should have a line of credit where they're entitled to get not

7  one penny, and the bank can go out there and sock them with

8  this?

9        MR. MEINERTZHAGEN:  Your Honor, the bank is doing this

10  in order to fulfill federal flood insurance policy.

11        THE COURT:  Why didn't they send her a letter and say,

12  If you want to keep this open, you've got to pay this?

13  Otherwise, we're going to close it?

14        MR. MEINERTZHAGEN:  She had 45 days to close it.  She

15  wouldn't have had one cent of insurance premium.

16        THE COURT:  Why didn't you suggest that to her?

17        MR. MEINERTZHAGEN:  We had no idea she wanted to close

18  her line.  Her line can be reopened automatically, as soon as

19  her property value increases.

20        THE COURT:  Why would anyone want to keep it open if

21  they're going to pay flood insurance if she can't get a loan?

22        MR. MEINERTZHAGEN:  Your Honor, for many individual

23  reasons.

24        THE COURT:  Give me one good one.

25        MR. MEINERTZHAGEN:  She wants that credit line to be

1    available to her, and she's planning to appeal, she thinks her

2    property values --

3              THE COURT:  Appeal?

4              MR. MEINERTZHAGEN:  She was going to appeal the --

5              THE COURT:  Why?

6              MR. MEINERTZHAGEN:  To get her line reopened.

7              THE COURT:  Appeal to the bank?  The superbank in the

8    sky?  Where?

9              MR. MEINERTZHAGEN:  It's not a discretionary thing

10   your Honor.  Under Reg Z, Chase is required to reopen the line

11   if certain circumstances apply.  In other words, when the

12   circumstance justifying the creditor's action ceases to exist,

13   credit privileges must be reinstated.  It's not a discretionary

14   thing with Chase.

15             THE COURT:  What is the section that deals with the

16   appeal?

17             MR. MEINERTZHAGEN:  Well, that deals with -- I'm

18   talking about --

19             THE COURT:  You said she might have taken an appeal.

20             MR. MEINERTZHAGEN:  If you look at --

21             THE COURT:  You're saying -- the bank says you get

22   zero.  But she could appeal to somebody else in the bank?

23             MR. MEINERTZHAGEN:  A creditor may require -- may

24   require reinstatement, or request something in writing.

25   Notifies the consumer of this requirement under the notice

1    provided under Section 226.9(c)(3):

2              "Once the consumer requests reinstatement, the

3    creditor must promptly investigate to determine whether the

4    condition allowing the freeze continues to exist.  Under this

5    alternative, the creditor has a duty to investigate only upon

6    the consumer's request."

7              THE COURT:  I didn't hear the word "appeal".

8              MR. MEINERTZHAGEN:  Well, the word "appeal" -- or if

9    you think we're wrong, you can contest it -- is in her mortgage

10   agreement.  However, it's consistent with Reg Z.

11             And I would like to give you the statutory cite for

12   Reg Z, your Honor.  It's 12CFR, Part 226, supplement *i*,

13   paragraph 5b(f)34 --

14             THE COURT:  What were the different Chase entities

15   involved in this transaction?

16             MR. MEINERTZHAGEN:  J.P. Morgan Chase Bank and Chase

17   Home Finance.

18             THE COURT:  So who got a fee out of placing this

19   insurance?

20             MR. MEINERTZHAGEN:  Who got -- neither of them.  An

21   affiliate of -- that's not owned by the bank received a

22   commission.

23             THE COURT:  An affiliate?  Say that again?

24             MR. MEINERTZHAGEN:  A company that's owned by

25   J.P. Morgan Chase and Co. received the commission.

1          THE COURT:  And how much was that commission?

2          MR. MEINERTZHAGEN:  I don't know how much it was, your

3     Honor.

4          THE COURT:  So even if an affiliate's not placing the

5     insurance, somebody else is out there making money off of this

6     at Chase?

7          MR. MEINERTZHAGEN:  Your Honor, if you look at the

8     three letters that were sent to the plaintiff, each letter

9     informed her not -- didn't say, We're going to place insurance

10    for you.  Said, Get your own insurance.  If you don't get it,

11    we have to force place it; we have to get it for you.  And if

12    we get it for you, A, an affiliate is going to get a

13    commission; and B, it's going to be much more expensive.  And

14    it explains why it's going to be more expensive.

15         So Chase never -- Chase told the borrower, it said, in

16    one of the letters, and I quote -- I mean, let me read this to

17    you:

18         "If you do not have adequate flood insurance, or if

19    you do not provide us with proof of acceptable coverage within

20    45 days of the date of our first letter to you we will have no

21    choice but to purchase a limited flood policy for you at a cost

22    that is likely to be much higher than you would pay on your

23    own.  If you purchase this insurance, your account will be

24    charged for the premiums due and your monthly payments will

25    increase."

1          MR. LUKAS:  Your Honor, you caught me flat-footed, and

2    now I'm looking at our complaint.

3          The reason we pled it was an affiliate is that's what

4    they told her in the letter, that they're placing it with an

5    affiliate.

6          MR. MEINERTZHAGEN:  No.

7          MR. LUKAS:  And he just admitted they're getting a

8    commission on it and they are charging her interest on the

9    balance due of 1575, so J.P. Morgan is getting money, and --

10   yes, here's what they told her:  This policy will be purchased

11   through an affiliate of Chase and likely would cost more.  And

12   here is a letter, that's where I got it.

13         THE COURT:  Purchased from or purchased through?

14         MR. LUKAS:  The letter says purchased through an

15   affiliate of Chase.  That's where I got that from.  I knew I

16   was flat-footed, but I got it from them, from their letter to

17   her saying it was affiliated with Chase.

18         MR. MEINERTZHAGEN:  Let me tell you exactly what the

19   letter says.

20         THE COURT:  It doesn't say purchased through?

21         MR. MEINERTZHAGEN:  No.  It says --

22         THE COURT:  What does it say?  Tell me what you think

23   it says.

24         MR. MEINERTZHAGEN:  I'll tell you what it says.

25         MR. LUKAS:  Here it is.  Licensed affiliate of Chase.

1        MR. MEINERTZHAGEN:  What page are you on?

2        MR. LUKAS:  Exhibit 5.  It says, If you have to

3   purchase flood insurance -- if we have to purchase flood

4   insurance for you, a licensed affiliate of Chase will receive a

5   commission.  If you do not obtain your own flood insurance,

6   blah, blah, blah.

7        That's where I got "affiliate" from.

8        MR. MEINERTZHAGEN:  A commission, your Honor.  It

9   won't be purchased from an affiliate.

10        It also says, your Honor:  "We strongly recommend that

11   you obtain your own insurance coverage.  This will allow you to

12   choose a policy that meets your needs from a company that you

13   select.  Your choice of an insurance company or agent will not

14   affect our credit decision in any way."

15        THE COURT:  All right.  I see now what it says.

16        All right.  I will take it under submission.  I don't

17   have an answer for you right now.  And I am not necessarily

18   going to rule for the plaintiff here.  I'm going to go back and

19   read these points that they've raised in the argument.  And

20   I'll get an order out soon.

21        MR. MEINERTZHAGEN:  Your Honor, if I could just

22   request that the court pay particular attention to two cases?

23        THE COURT:  Yes.  What are they?

24        MR. MEINERTZHAGEN:  They're cited in both of our

25   briefs.  The plaintiff did not respond to them.

1              THE COURT:  What are they?

2              MR. MEINERTZHAGEN:  The cases are *Custer* and *Hayes*.

3    I'll give you the cites.

4              THE COURT:  I'll find them in your brief.  Okay.

5              Okay.  Got it.  Thank you.

6              (Adjourned)

7                             oOo

8

9

10                     CERTIFICATE OF REPORTER

11

12             I, Connie Kuhl, Official Reporter for the United
     States Court, Northern District of California, hereby certify
     that the foregoing proceedings were reported by me, a certified
13   shorthand reporter, and were thereafter transcribed under my
     direction into written form.

14

15   _____

16                Connie Kuhl, RMR, CRR
                  Friday, August 13, 2010

17

18

19

20

21

22

23

24

25