**United States District Court**
For the Northern District of California

1
2
3
4
5
6                      IN THE UNITED STATES DISTRICT COURT
7                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9
10   SHEILA I. HOFSTETTER, individually, as          No. C 10-01313 WHA
     a representative of the class, and on behalf
11   of the general public,
12                      Plaintiff,                   **ORDER GRANTING IN PART
                                                     AND DENYING IN PART
13        v.                                         DEFENDANTS' MOTION
                                                     TO DISMISS**
14   CHASE HOME FINANCE, LLC, JP
     MORGAN CHASE BANK, N.A., and
15   DOES 1 through 50, inclusive,
16                      Defendants.
                                           /
17
18                              **INTRODUCTION**
19        In this putative class action involving federal flood insurance requirements for home-
20   equity lines of credit, defendants JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC
21   move to dismiss all federal and state claims alleged herein.
22        The core argument presented by defendants is that they were required under the National
23   Flood Insurance Act of 1968 ("NFIA") to purchase $175,000 worth of flood insurance in
24   connection with plaintiff Sheila Hofstetter's home-equity line of credit, resulting in plaintiff being
25   billed $1,575 in insurance premiums.  At the time defendants "purchased" this flood insurance for
26   plaintiff's home, however, the outstanding balance on her line of credit was zero dollars and her
27   *entire* $175,000 credit limit had been suspended by the bank due to the supposed decline in the
28   value of her home.

**United States District Court**

For the Northern District of California

1     Despite these circumstances, defendants — who originated and serviced plaintiff's home-

2   equity line of credit — argue that the NFIA and compliance guidelines required them to purchase

3   $175,000 worth of flood insurance for plaintiff's home and bill the premiums to her, thereby

4   preempting plaintiff's two California state claims.  Defendants further assert, separate and aside

5   from their preemption theory, that none of plaintiff's three claims has been plausibly alleged.

6     As explained in detail herein, this order concludes that the defendants were *not* required

7   under the NFIA and compliance guidelines to purchase $175,000 worth of flood insurance when

8   plaintiff's entire home-equity line of credit had been suspended and there was no outstanding

9   principal balance on the loan.  Based upon this determination, this order rejects defendants'

10   preemption argument.  Nevertheless, as will be shown below, plaintiff has failed to state a

11   plausible claim for relief on some of her state and federal claims.  Accordingly, defendants'

12   motion is **GRANTED IN PART** and **DENIED IN PART**.

13                              **STATEMENT**

14     In connection with the purchase of their home in January 2006, plaintiff Sheila Hofstetter

15   and her husband obtained a $175,000 line of credit from defendant JPMorgan Chase Bank, N.A.

16   ("JPMorgan").  All sums "advanced" under this line of credit were secured by a Deed of Trust

17   signed by the Hofstetters, dated January 30, 2006.  This deed of trust identified JPMorgan "or its

18   successors or its assignees" as the beneficiary, and indicated that all communications to the lender

19   should be sent to the servicer of the loan, defendant Chase Home Finance, LLC ("Chase")

20   (Compl. ¶ 11).  JPMorgan's "Home Equity Line of Credit Agreement and Disclosure Statement"

21   (called the "HELOC Agreement" herein) provided that "[w]e will release the Mortgage when all

22   amounts due under the Mortgage and this Agreement have been paid" (*id.* at ¶ 18).  Chase

23   provided mortgage, financial, and loan management services in connection with the Hofstetters'

24   home-equity line of credit.  The Hofstetters paid a $50 annual fee for these services (*id.* at ¶ 12).

25     With respect to their $175,000 line of credit, the only advance the Hofstetters ever

26   received was an initial disbursement.  This amount was quickly paid back and no further advances

27   on the line were received thereafter (*id.* at ¶ 13).  In 2008, in connection with their home-equity

28   line of credit, the Hofstetters received a letter from JPMorgan stating that due to an alleged

2

United States District Court

For the Northern District of California

decline in the value of their property, it was "suspending future draws against [their] account as of August 16, 2008" and they "will not be able to draw on the line" (*id.* at ¶ 14).  Following the receipt of this letter, the Hofstetters received statements bearing the name "Chase" indicating that their available credit was "$0" (*ibid.*).

One year later, on or about August 11, 2009, Chase advised the Hofstetters in a form letter that their property was located in a Special Flood Hazard Area and that "Federal law requires" that they purchase and maintain flood insurance for the property (*id.* at ¶ 15).  This was followed by a second letter on September 1, 2009, stating that "according to the terms of your mortgage, you are required to maintain continuous flood insurance on your property" (*id.* at ¶ 17).  The letter further advised the Hofstetters that if they did not obtain "adequate" flood insurance coverage, Chase would purchase a $175,000 flood insurance policy for them and charge them $1,575 for the premium.  According to the September 1 letter, this policy would be purchased through an affiliate of Chase and likely would cost more than comparable coverage that could be independently obtained (*id.* at ¶ 19).

Approximately one month later, on or about October 6, 2009, Chase notified the Hofstetters that it had force-placed a flood insurance policy issued by American Security Insurance Company in the amount of $175,000 on their property.  The premium for the insurance — $1,575 — was then added to their loan balance (*ibid.*).  Since the Hofstetters' available credit and loan balance were both zero dollars at the time, this increased their outstanding loan principal to $1,575 (*id.* at ¶ 20).

According to plaintiff, neither the Deed of Trust nor the HELOC Agreement specified the amount of flood insurance that was or would be required, and each of the three letters sent to the Hofstetters indicated that the needed amount of coverage was equal to the "lesser" of (*id.* at ¶ 21) (emphasis added):

- The maximum amount of insurance coverage available through the National Flood Insurance Program (NFIP), which is currently $250,000; or

- 100% of the full replacement cost value of the dwelling and insurable improvements; or

United States District Court

For the Northern District of California

- *The principal balance of the loan or credit line amounts for lines of credit.*

The Hofstetters contacted both JPMorgan and Chase to request that they reverse the flood insurance premium charges, the last attempt being by certified mail on February 23, 2010 (*id.* at ¶ 22). Chase refused to reverse the charges and advised the Hofstetters that closing the account was the only way to prevent further charges for flood insurance premiums. To close their account, however, Chase advised the Hofstetters that they would be required to first pay the outstanding balance of $1,575 on the account (*id.* at ¶ 23). The Hofstetters have refused to pay the $1,575 principal balance on their account and have only paid interest charges to prevent defendants from taking steps to collect on this "debt" and affect their credit rating (*id.* at ¶ 24).

*            *            *

This action was filed in district court under the original jurisdiction provisions of the Class Action Fairness Act (Dkt. No. 1). *See* 28 U.S.C. 1332(d)(2). The class action complaint alleged three claims: (1) violation of the Consumer Legal Remedies Act ("CLRA"), California Civil Code Section 1750 *et seq.*; (2) violation of the Truth in Lending Act ("TILA"), 15 U.S.C. 1601 *et seq.*; and (3) violation of Section 17200 of the California Business and Professions Code (Dkt. No. 26).

Specifically, the complaint alleged that defendants breached their duty of good faith and fair dealing by demanding that she procure flood insurance in excess of her loan balance, by force-placing $175,000 worth of flood insurance coverage on her property when her loan balance and available credit were zero dollars, by charging a $1,575 premium for this insurance to her, and by charging inflated premiums through an affiliate of Chase, all with "no reasonable basis or justification for doing so" (Opp. 5). The complaint also alleged that defendants misrepresented federal flood insurance requirements in the relevant loan documents and in the notice letters they mailed to the Hofstetters prior to force-purchasing $175,000 worth of flood insurance for her property. This order follows a hearing held on August 12, 2010.

**ANALYSIS**.

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face."

4

*Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That said, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ibid.* (citation omitted).  A court, however, must "draw on its judicial experience and common sense" to determine whether a plausible claim for relief has been stated. *Id.* at 1950.

As stated, the core issue in the instant motion is whether defendants were required under the NFIA to purchase $175,000 worth of flood insurance for plaintiff in connection with her home-equity line of credit when her credit privileges had been suspended and she carried no outstanding balance on her loan. *See* 42 U.S.C. 4012a(b).  As explained below, this order concludes that the statutory language, implementing regulations, and agency materials did *not* require flood insurance to be purchased under such circumstances.

**1.    THE NATIONAL FLOOD INSURANCE ACT OF 1968**

The statutory language, implementing regulations, and agency materials addressed herein are best understood in context with the history and purposes of the NFIA.

**A.    History and Purposes of the NFIA**

In 1968, Congress enacted the NFIA in response to a growing concern that the private insurance industry was unable to offer reasonably priced flood insurance on a national basis. *See* 42 U.S.C. 4001(a), (b); *see also Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 387 (9th Cir. 2000).  As such, the NFIA authorized the federal government to establish the National Flood Insurance Program ("NFIP") to provide affordable flood insurance on a national basis and to discourage the construction of new structures in flood prone areas. *See* 42 U.S.C. 4001(b), 4011(a); 1968 U.S. Code Cong. & Admin. News 2873, 2966–67, 2969.  The NFIP is currently carried out under the auspices of the Federal Emergency Management Agency ("FEMA").

Congress quickly expanded flood insurance coverage through the Flood Disaster Protection Act of 1973.  42 U.S.C. 4012a(a), (b).  One of the purposes of this expansion was:

> [To] . . . require the purchase of flood insurance by property owners who are being assisted by Federal programs or by federally supervised, regulated, or insured agencies or institutions in the acquisition or improvement of land or facilities located or to be located in identified areas having special flood hazards.

United States District Court
For the Northern District of California

42 U.S.C. 4002(b)(4).  This was supported by express Congressional findings that:

> (1) annual losses throughout the Nation from floods and mudslides are increasing at an alarming rate, largely as a result of the accelerating development of, and concentration of population in, areas of flood and mudslide hazards;

> \*                    \*                    \*

> (4) Federal instrumentalities insure or otherwise provide financial protection to banking and credit institutions whose assets include a substantial number of mortgage loans and other indebtedness secured by property exposed to loss and damage from floods and mudslides; [and]

> (5) the Nation cannot afford the tragic losses of life caused annually by flood occurrences, nor the increasing losses of property suffered by flood victims, most of whom are still inadequately compensated despite the provision of costly disaster relief benefits.

42 U.S.C. 4002(a)(1), (4)–(5).

Two decades later, Congress enacted the National Flood Insurance Reform Act of 1994, which imposed further obligations on both mortgage originators and servicers with respect to mandatory flood insurance requirements.  Among the 1994 reforms was the addition of a new subsection to the NFIA entitled "Placement of flood insurance by lender."  42 U.S.C. 4012a(e).  This subsection authorized federally regulated lenders and servicers to purchase flood insurance for real property within designated special flood hazard areas when borrowers with loans secured by such property — after being given proper notice and an opportunity to shop for themselves — failed to purchase the minimum amount of flood insurance as required under 42 U.S.C. 4012a(b).

These two subsections are detailed below.

**A.      42 U.S.C. 4012a(b) and (e)**

During the events underlying this dispute, the minimum requirements for flood insurance under the NFIA, as stated in 42 U.S.C. 4012a(b), were as follows:

> Each Federal entity for lending regulation . . . shall by regulation direct regulated lending institutions not to make, increase, extend, or renew any loan secured by improved real estate or a mobile home located or to be located in an area that has been identified by the Director as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, unless the building or mobile home and any personal property securing such loan is covered for the term of the loan by flood insurance in *an amount at least equal to the*

United States District Court

For the Northern District of California

1

> *outstanding principal balance of the loan or the maximum limit of*
> *coverage made available under the Act with respect to the*
> *particular type of property, whichever is less.*

42 U.S.C. 4012a(b)(1) (emphasis added).  At the time defendants purchased flood insurance for

plaintiff's property, the "maximum limit of coverage made available under the Act" for a single

family dwelling — which is the type of dwelling that secured plaintiff's home-equity line of

credit — was (and still is) $250,000.  42 U.S.C. 4013(b)(2).

With respect to the purchasing of flood insurance by lenders, the NFIA set forth the

following requirements:

> If, at the time of origination or at any time during the term of a
> loan secured by improved real estate or by a mobile home located
> in an area that has been identified by the Director (at the time of
> the origination of the loan or at any time during the term of the
> loan) as an area having special flood hazards and in which flood
> insurance is available under the National Flood Insurance Act of
> 1968, the lender or servicer for the loan determines that the
> building or mobile home and any personal property securing the
> loan is not covered by flood insurance or is covered by such
> insurance in an amount less than the amount required for the
> property pursuant to paragraph (1), (2), or (3) of subsection (b), the
> lender or servicer *shall notify the borrower under the loan that the*
> *borrower should obtain, at the borrower's expense, an amount of*
> *flood insurance for the building or mobile home and such personal*
> *property that is not less than the amount under subsection (b)(1),*
> *for the term of the loan.*

42 U.S.C. 4012a(e)(1) (emphasis added).  The same subsection further stated:

> If the borrower fails to purchase such flood insurance within 45
> days after notification under paragraph (1), the lender or servicer
> for the loan *shall purchase the insurance on behalf of the borrower*
> *and may charge the borrower for the cost of premiums and fees*
> *incurred by the lender or servicer for the loan in purchasing the*
> *insurance.*

42 U.S.C. 4012a(e)(2) (emphasis added).

According to plaintiff, this statutory language unambiguously set the minimum required

amount of flood insurance coverage for plaintiff's home-equity line of credit at zero dollars, since

the "outstanding principal balance of [her] loan" was zero dollars.  *See* 42 U.S.C. 4012a(b)(1)

(emphasis added).  As such, plaintiff asserts that defendants were *not* required — and had no

authority — under the NFIA to purchase $175,000 worth of flood insurance for their property.

Defendants, in rebuttal, point to decades worth of regulatory materials showing that the

"outstanding principal balance" rule does not apply in this manner to home-equity lines of credit. Rather, according to defendants, the regulatory agencies have made clear that for home-equity lines of credit, the total amount of credit *at origination* is the proper measuring stick for the "minimum" required flood insurance under the NFIA.

Neither side is correct.  As will be presently explained, while the federal agencies responsible for promulgating flood insurance regulations under the NFIA do treat home-equity lines of credit differently than traditional "closed end" mortgage loans, they do *not* require a lender to purchase flood insurance for a borrower where the borrower's outstanding principal balance is zero dollars and the lender has indefinitely suspended the borrower's line of credit.

**B.    NFIA Implementing Regulations and Agency Guidelines**

A number of federal agencies — including the OCC, which regulates national banks — are required to promulgate flood insurance regulations under the NFIA.  *See* 42 U.S.C. 4012a(b)(1) (requiring federal agencies that regulate lenders to devise and conform flood insurance regulations pursuant to the Act); 12 C.F.R. Pt. 22 (setting forth flood insurance requirements for national banks and servicers acting on behalf of the bank).

The pertinent OCC regulations during the events in question mirrored the language in the NFIA.  The regulations stated:

> A bank shall not make, increase, extend, or renew any designated loan unless the building or mobile home and any personal property securing the loan is covered by flood insurance for the term of the loan. *The amount of insurance must be at least equal to the lesser of the outstanding principal balance of the designated loan or the maximum limit of coverage available for the particular type of property under the Act.*
>
> *           *           *
>
> If a bank, or a servicer acting on behalf of the bank, determines at any time during the term of a designated loan that the building or mobile home and any personal property securing the designated loan is not covered by flood insurance or is covered by flood insurance in an amount less than the amount required under § 22.3, then the bank or its servicer shall notify the borrower that the borrower should obtain flood insurance, at the borrower's expense, in an amount at least equal to the amount required under § 22.3, for the remaining term of the loan.  *If the borrower fails to obtain flood insurance within 45 days after notification, then the bank or its servicer shall purchase insurance on the borrower's behalf.*

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

> *The bank or its servicer may charge the borrower for the cost of premiums and fees incurred in purchasing the insurance.*

12 C.F.R. 22.3(a), 22.7 (emphases added).  Note well that the regulations apply to both national banks (like JPMorgan) and servicers acting on behalf of the bank (like Chase).

A home-equity line of credit secured by real property in a special flood hazard area is unquestionably a "designated loan" under the NFIA.  *See* 12 C.F.R. 22.2(e).  It has been treated as such by the OCC, the Federal Reserve Board, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the Farm Credit Administration, and the National Credit Union Administration (*i.e.*, the federal agencies that promulgate flood insurance regulations) for eons and, in any event, the parties do not dispute that such loans fall within the scope of the Act.

The treatment of home-equity lines of credit under the NFIA has also been directly addressed by the agencies.  In a series of published "Interagency Questions and Answers Regarding Flood Insurance," one of the earliest appearing in 1997, the agencies stated:

> 35.     Does a draw against an approved line of credit secured by a building or mobile home, which is located in an SFHA [special flood hazard area] in which flood insurance is available under the Act, require a flood determination under the Regulation?[1]
>
> Answer:  No.  *While a line of credit secured by a building or mobile home located in an SFHA in which flood insurance is available under the Act is a designated loan and, therefore, requires a flood determination before the loan is made, draws against an approved line do not require further determinations. However, a request made for an increase in an approved line of credit may require a new determination, depending upon whether a previous determination was done.*

74 Fed. Reg. 35914, 35940 (July 21, 2009) (emphasis added); *see also* 73 FR 15259*,* 15272 (March 21, 2008); 62 Fed. Reg. 39523, 39525 (July 23, 1997).

A number of points can be gleaned from this guidance provided by the agencies.  *First*, it is clear that before a home-equity line of credit is originated (*i.e.* "made") and a borrower is allowed to draw on the line, a flood determination must be performed.  *Second*, equally clear is that the agencies did not believe that lenders were required to monitor each and every draw on the

---

[1]  A "flood determination" involves making a determination — pursuant to procedures set forth by the Director of FEMA — whether the building or mobile home offered as collateral security for the loan is or will be located in a special flood hazard area in which flood insurance is available under the NFIA.

line once a flood determination was performed and appropriate insurance (if necessary) procured.

*Third*, the agencies expressly noted that increases to a borrower's approved line of credit was an event that could require a new flood determination to be performed.

FEMA's "Mandatory Purchase of Flood Insurance Guidelines" (hereinafter "FEMA Guidelines") contained similar guidance for lenders:

> For loans with approved lines of credit to be used in the future, it may be difficult to calculate the amount of insurance for the loan because the borrower will be drawing down differing amounts on the line of credit at different times. *In those instances where there is no policy on the collateral, the borrower must, at a minimum, obtain a policy as a requirement for drawing on the line.* Drawing against an approved line of credit does not require further determinations to be made.

FEMA Guidelines at 33 (September 2007).[2]

Finally, the OCC itself chimed in on this issue in its "Comptroller's Handbook" for "Flood Disaster Prevention" in May 1999 (hereinafter "OCC Handbook"). Importantly, both the OCC Handbook and FEMA Guidelines contained the following analogous language with respect to the "appropriate amount" of federal flood insurance required for home-equity lines of credit:

> For home equity lines of credit (HELC), it may be difficult to calculate the amount of insurance for the line since the borrower will be drawing down differing amounts on the line at different times. A bank may take one of two approaches to comply with purchase requirements for HELCs:
>
> • Review HELC records periodically (at least annually) so that, as draws are made against the line or repayments are made to the account, the appropriate amount of flood insurance coverage can be maintained; or
>
> • *Upon origination, require the purchase of flood insurance based on the total amount of the line*, the value of the improved property or the maximum amount of flood insurance coverage available, whichever is less.

OCC Handbook at 6 (May 1999) (emphasis added); *see also* FEMA Guidelines at 33.[3] In sum, the agencies recognized that it would be onerous to require banks to continually monitor the ebb

---

[2] The FEMA Guidelines are available at http://www.fema.gov/good_guidance/download/10040 (last accessed on August 15, 2010).

[3] The OCC Handbook is available at http://www.occ.treas.gov/handbook/flood.pdf (last accessed on August 15, 2010).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   and flow of funds actually being drawn on a home-equity line of credit for purposes of

2   compliance with the mandatory flood insurance provisions of the NFIA.  As such, the agencies

3   allowed lenders to simply require the purchase of flood insurance equal to the maximum amount

4   of funds the borrower could theoretically draw on the line.

5           **C.        Flood Insurance Requirements for Home-Equity Lines of Credit**

6           As shown, contrary to plaintiff's argument, the agencies have long believed that the

7   proper measurement of flood insurance required under the NFIA for home-equity lines of credit

8   should *not* be tied solely to the "outstanding principal balance of the loan."  Rather, for home-

9   equity lines of credit, a lender may (and, upon making the loan, *must*) look at the amount of credit

10  actually being extended to the borrower to determine whether flood insurance requirements have

11  been met.

12          This makes perfect sense.  Unlike a traditional mortgage and other forms of closed-end

13  credit where the lender's exposure is capped at the outstanding principal balance, a lender's

14  exposure under a home-equity line of credit (and other forms of open-end credit) may fluctuate

15  wildly as the borrower draws from the line, repays the balance, and draws from the line again.

16  That said, the lender's maximum exposure under a home-equity line of credit will be capped at

17  the credit limit that has been imposed on the borrower — unless, of course, the borrower's

18  outstanding principal balance exceeds that limit.  Recognizing these differences, the agencies

19  expressly approved using the maximum amount the borrower may draw on a home-equity line of

20  credit to gauge the minimum flood insurance requirements under the NFIA.

21          Plaintiff's construction of 42 U.S.C. 4012a(b)(1) improperly ignores these distinctions,

22  which have been long recognized by the OCC and other federal agencies.  Under plaintiff's

23  proposed rule, a federally regulated lender would only be required under the NFIA to purchase

24  flood insurance sufficient to cover a borrower's "outstanding loan principal."  Thus, upon

25  origination of a $250,000 home-equity line of credit, plaintiff's rule would imply that *no* flood

26  insurance would be required under the NFIA, so long as the borrower has not yet drawn on the

27  line.  This would, of course, leave the lender completely exposed under the loan if the borrower

28  decided to make full use of the line of credit the next day.  Indeed, even if the lender monitored

11

1    every single draw made on the line (a herculean task the agencies have rejected) and took action

2    to obtain the minimum required flood insurance immediately upon each draw, the lender could be

3    exposed for at least 45 days due to the statutory notice period set forth in 42 U.S.C. 4012a(e)(2).

4           This exposure to uninsured losses is exactly what the NFIA mandatory flood insurance

5    provisions were enacted to mitigate.  These provisions were created in response to Congressional

6    findings that "annual losses throughout the Nation from floods and mudslides are increasing at an

7    alarming rate," "the Nation cannot afford . . . the increasing losses of property suffered by flood

8    victims," and "federal instrumentalities provide financial protection to banking and credit

9    institutions whose assets include a substantial number of mortgage loans and other indebtedness

10   secured by property exposed to loss and damage from floods."  42 U.S.C. 4002(a)(1), (4)–(5).

11   Given these findings, Congress amended the NFIA to "require the purchase of flood insurance by

12   property owners . . . being assisted by . . . federally supervised, regulated, or insured agencies or

13   institutions . . . located in identified areas having special flood hazards."  42 U.S.C. 4002(b)(4).

14          There is no doubt that plaintiff's proposed construction would frustrate this purpose and

15   leave many borrowers and federally regulated lenders under-insured and improperly exposed to

16   flood losses.  As such, plaintiff's argument is rejected.  *See Dolan v. Postal Service*, 546 U.S.

17   481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory

18   text, considering the purpose and context of the statute, and consulting any precedents or

19   authorities that inform the analysis").

20          Defendants' proposed construction, however, also misses the mark.  According to

21   defendants, the minimum amount of flood insurance required for a home-equity line of credit

22   under the NFIA is the total amount of the line *at origination*, regardless of whether circumstances

23   surrounding the line have changed.  This also misreads the agency materials cited herein.  While

24   it is true that the OCC Handbook stated that federally regulated lenders may, "*[u]pon origination*,

25   require the purchase of flood insurance based on the total amount of the line," this does not mean

26   that this is an appropriate approach to measuring flood insurance requirements at any time other

27   than "upon origination."  Indeed, the OCC has made clear in other agency materials that "a

28   request made for an increase in an approved line of credit may require a new determination" of

**United States District Court**
For the Northern District of California

1   minimum flood insurance requirements.  This demonstrates that the minimum amount of flood

2   insurance required for home-equity lines of credit is tied not to the total amount of the line at

3   origination (as defendants argue), but to the total amount of credit actually being extended at the

4   time.  *See* 74 Fed. Reg. 35914, 35940 (July 21, 2009); *see also* FEMA Guidelines at 33.

5        Indeed, both the FEMA Guidelines and OCC Handbook recognized that allowing lenders

6   to determine minimum flood insurance requirements based upon the borrower's available credit

7   served the purpose of "administrative convenience in ensuring compliance with the requirements"

8   of the NFIA.  *See* FEMA Guidelines at 33; OCC Handbook at 6.  Thus, by allowing lenders to

9   require flood insurance covering the total amount of the line that the borrower "will be drawing

10  down," the purposes of the NFIA are well served.

11        Although agency guidance documents are never "controlling upon courts by reason of

12  their authority, [they] do constitute a body of experience and informed judgment to which courts

13  and litigants may properly resort for guidance."  *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65

14  (1986) (citation omitted); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000)

15  (stating that "interpretations contained in policy statements, agency manuals, and enforcement

16  guidelines . . . are 'entitled to respect' . . . only to the extent that [they] have the power to

17  persuade") (citation omitted).  The agency documents discussed herein provide persuasive

18  guidance in determining the requirements of lenders under the NFIA.

19        For the reasons set forth above, this order concludes that the minimum flood insurance

20  required under the NFIA for home-equity lines of credit cannot be limited to the outstanding

21  principal balance of the loan.  Rather, as the agencies have explained, the minimum requirements

22  for a home-equity line of credit must take into account:  (1) the maximum amount of funds the

23  borrower may draw on the line at the time a flood determination is made, and (2) the outstanding

24  principal balance of the loan, whichever is greater.[4]  This rule is entirely consistent with the

25  purposes of the NFIA and in accord with the regulations and agency materials governing these

26  requirements.

27

28         [4]  This, of course, would also be subject to other rules and limitations set forth in the NFIA and implementing regulations, such as the current $250,000 cap for single family dwellings.

**United States District Court**
For the Northern District of California

2.      **DEFENDANTS WERE NOT REQUIRED TO PURCHASE $175,000 WORTH OF FLOOD INSURANCE FOR PLAINTIFF'S HOME-EQUITY LINE OF CREDIT**

Turning to the facts of this case, the complaint alleged that defendants suspended plaintiff's entire $175,000 line of credit in August 2008 due to the decline in the value of her home. Plaintiff received statements thereafter from "Chase" indicating that her available credit was "$0." At the time of this suspension, plaintiff had no outstanding principal balance on her loan. In sum, she owed nothing to defendants and could not draw any funds on her line of credit. One year later, however, defendants sent plaintiff a notice that, based upon a flood determination, she was required "at a minimum" to purchase a flood insurance policy within 45 days "equal to the lesser of" (Compl. ¶ 21):

•      The maximum amount of insurance coverage available through the National Flood Insurance Program (NFIP), which is currently $250,000; or

•      100% of the full replacement cost value of the dwelling and insurable improvements; or

•      The principal balance of the loan or credit line amounts for lines of credit.

Plaintiff did not purchase flood insurance for her home.

Based upon these circumstances, this order concludes that defendants were *not* required to purchase flood insurance for plaintiff's property under the NFIA. Despite the supposed fact that plaintiff's home was located in a special flood hazard area, at the time the flood determination was performed, the "outstanding principal balance" and available credit on plaintiff's home-equity line of credit were both zero dollars. Since plaintiff owed the bank nothing and could not draw any funds on the line (and would have had to file and prevail on a written appeal with the bank to have her credit limit reinstated), the bank faced *zero risk* that it would incur uninsured losses under the loan due to flooding. Moreover, the bank's own notice arguably indicated to the Hofstetters that zero dollars of flood insurance was "required," due to her zero dollar principal balance and "available credit." The bank nevertheless purchased a $175,000 flood insurance policy through an affiliate — likely earning a commission in the process — and billed plaintiff for the trouble. This maneuver was *not* required under the NFIA.

**United States District Court**

For the Northern District of California

1    Defendants' arguments to the contrary are unpersuasive.  At the hearing, defendants

2    asserted that plaintiff's $175,000 line of credit was only suspended temporarily pursuant to

3    Regulation Z, and therefore their purchase was required under the NFIA since reinstatement of

4    the credit line was theoretically possible.  *See* 12 C.F.R. 226.5b(f)(3)(vi)(A); *see also* 12 C.F.R.

5    Pt. 226, Supp. I (explaining the temporary nature of such a suspension).  While this order agrees

6    with defendants that federal flood insurance requirements remain applicable following the

7    suspension of a home-equity line of credit, the question presented here is *how much* flood

8    insurance coverage was required under the NFIA.  Based upon the facts as alleged, *zero dollars* of

9    flood insurance were required under the Act for plaintiff's property.

10    Moreover, this order emphasizes that plaintiff would have had to file a written appeal to

11    the bank and establish that the value of her home had sufficiently recovered in value to restore her

12    credit privileges.  Only if the bank agreed with plaintiff's appeal would it then be required under

13    Regulation Z to restore her home-equity line of credit.  At that point, the restoration of plaintiff's

14    available credit from zero dollars to $175,000 could be treated by the bank as a "triggering event"

15    requiring a new flood determination to be performed (and mandatory flood insurance to be

16    measured and purchased) before plaintiff could begin drawing on the line again.  *See* OCC

17    Handbook at 30.  This order rejects defendants' argument that a suspended home-equity line of

18    credit carrying a zero balance should be treated under the NFIA as identical to one where the

19    borrower's credit privileges have not been suspended.

20    **3.**    **FEDERAL PREEMPTION**

21    Given this conclusion, the NFIA does not shield defendants against plaintiff's state claims.

22    *See* 42 U.S.C. 4012a(f)(6) ("Notwithstanding any State or local law, . . . any regulated lending

23    institution that purchases flood insurance . . . on behalf of or as an agent of a borrower of a loan

24    *for which flood insurance is required* shall be considered to have complied with the regulations

25    issued under subsection (b) of this section.") (emphasis added).  Since defendants' purchase of

26    $175,000 worth of flood insurance was *not* required under the NFIA, this provision does not

27    apply.  Defendants have provided no other arguments — besides citing the above language of

28    Section 4012a(f)(6) — to support any other theory of preemption.

United States District Court

For the Northern District of California

1    This order notes, however, that nothing in the NFIA prohibits federally regulated lenders

2    from requiring borrowers to purchase flood insurance in excess of the amount required by the

3    Act.  The agencies have commented, however, that "lenders should avoid creating situations

4    where a building is 'over-insured.'"  74 Fed. Reg. 35914, 35936 (July 21, 2009).  Additionally,

5    the agencies expressly warned lenders that while "there are no penalties for over-insurance under

6    the Act and Regulation[s] . . . *there may be penalties for over-insurance under applicable State*

7    *law*."  *Id.* at 35918 (emphasis added).  In other words, the agencies have clearly contemplated the

8    applicability of state law to situations where a lender exceeds the required flood insurance

9    requirements of the NFIA.  This strongly supports the conclusion that plaintiff's claims are not

10   preempted under the Act.

11       **4.**      **TILA**

12       Congress enacted TILA to "assure a meaningful disclosure of credit terms so that the

13   consumer will be able to compare more readily the various credit terms available to him and

14   avoid the uninformed use of credit[.]"  *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50,

15   53–54 (2004).  As such, the Act requires a creditor to disclose information relating to such things

16   as finance charges, annual percentage rates of interest, and borrowers' rights, and prescribes civil

17   liability for any creditor who fails to do so.  *See* 15 U.S.C. 1631–1632, 1635, 1637–1639, 1640.

18   A claim for damages under TILA, however, is subject to a one-year statute of limitations running

19   runs from "the date of the occurrence of the violation."  15 U.S.C. 1640(e).

20       Plaintiff's TILA claim appears to be grounded in the theory that defendants "failed to

21   clearly, conspicuously, or adequately disclose to the Hofstetters that they would demand [flood

22   insurance] coverage in excess of the Hofstetter's loan balance or available credit" and that

23   "[n]either the Deed of Trust nor the HELOC Agreement specified the amount of flood insurance

24   that was or would be required" (Compl. ¶ 21).  As explained below, these allegations do not state

25   a plausible claim under TILA.

26       *First*, as the complaint acknowledged, plaintiff's home-equity line of credit was obtained

27   over four years ago in January 2006.  Thus, any challenges to "inadequate" disclosures in the

28   terms of her loan regarding defendants' ability to force-place flood insurance are time-barred

United States District Court

For the Northern District of California

1  under 15 U.S.C. 1640(e).  *King v. California*, 784 F.2d 910, 915 (9th Cir.1986) ("[T]he

2  limitations period in Section 1640(e) runs from the date of consummation of the transaction.").

3  While a plausible equitable tolling argument could possibly blaze a path around this obstacle, no

4  such theory was pleaded.  Plaintiff's attempt to raise this theory in her opposition brief cannot

5  properly be credited to defeat a motion to dismiss, which focuses solely upon the adequacy of the

6  claims *as pleaded*.

7          *Second*, TILA states that generally "[a] servicer of a consumer obligation arising from a

8  consumer credit transaction shall not be treated as an assignee of such obligation for purposes of

9  this section unless the servicer is or was the owner of the obligation." 15 U.S.C. § 1641(f)(1).

10  The complaint, however, indiscriminately asserted that both defendants violated TILA, despite

11  the fact that the complaint identified Chase as the company "that services mortgage loans

12  originated by JPM" (Compl. ¶ 6).  Even if this claim were timely, no plausible claim has been

13  alleged against Chase, who was *not* alleged to be the owner, or prior owner, of the loan.

14          For these reasons, plaintiff's TILA claim is **DISMISSED**.

15      **5.    CLRA**

16          Plaintiff's next claim is that defendants' conduct violated the Consumer Legal Remedies

17  Act.  *See* Cal. Civ. Code §§ 1750 *et seq*.  Specifically, plaintiff alleged that she "paid valuable

18  compensation to [d]efendants for mortgage, financial, and loan management services, and

19  received such services for personal, family, and/or household purposes" (Compl. ¶ 36).  The

20  complaint further alleged that defendants violated the CLRA through various acts including

21  "[r]epresenting that [p]laintiff's home equity line transaction conferred rights and remedies on

22  [d]efendants, and obligations on [p]laintiff, which it did not have or involve" and "[e]ngaging in

23  other unfair and deceptive act and practices" (*id.* at ¶ 38).  According to defendants, these

24  allegations failed to identify any qualifying good or service within the scope of the CLRA (Br.

25  13).  This order agrees.

26          The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts

27  or practices undertaken by any person in a transaction *intended to result or which results in the*

28  *sale or lease of goods or services to any consumer*[.]"  Cal. Civ. Code § 1770.  The Act defines

17

"goods" as "tangible chattels bought or leased for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods, and including goods that, at the time of the sale or subsequently, are to be so affixed to real property as to become a part of real property, whether or not severable from the real property," and "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Cal. Civ. Code § 1761(a), (b).

It is entirely unclear — based upon the complaint — what particular "goods or services" defendants intended to sell or actually sold to plaintiff via unfair methods of competition and unfair or deceptive acts or practices. *First*, plaintiffs do not appear to challenge their home-equity line of credit. Indeed, this would not be a valid challenge, since a home-equity loan is not a "good" or "service" under the CLRA. *See, e.g., Berry v. American Express Publishing, Inc.*, 147 Cal. App. 4th 224, 229–30 (2007) (holding that the extension of credit is not a tangible chattel and credit, separate and apart from a specific purchase or lease of a good or service, is not a "service" under the Act). *Second*, while the complaint stated that plaintiff "paid valuable compensation to [d]efendants for mortgage, financial, and loan management services," plaintiff does not appear to challenge the actual servicing of her line of credit by Chase. Furthermore, there are no allegations that these services were sold to her through unfair methods of competition and unfair or deceptive acts or practices.

Instead, this dispute appears to solely be about the $175,000 worth of flood insurance purchased by defendants and billed to plaintiff. This insurance policy is also *exactly* what plaintiff has contended was unlawfully "sold" to her through unfair methods of competition and unfair or deceptive acts or practices.

Flood insurance, however, does not fall within the reach of the CLRA in light of the recent California Supreme Court decision of *Fairbanks v. Superior Court,* 46 Cal. 4th 56, 60–65 (2009). In holding that life insurance did not fall within the reach of the CLRA, the California Supreme Court noted that a life insurance policy was simply a contract of indemnity under which, in exchange for the payment of premiums, the insurer promises to pay a sum of money to the designated beneficiary upon the occurrence of a triggering event — namely, the death of the

1    policy holder.  As such, the life insurance policy was not a "tangible chattel" — and therefore not

2    a "good" — under the CLRA.  Moreover, since an insurer's contractual obligation to pay money

3    under a life insurance policy "is not work or labor, nor is it related to the sale or repair of any

4    tangible chattel[,]" the court held that it was also not a "service" under the CLRA.  *Id.* at 61.

5           While it is true, as plaintiff points out, that the holding in *Fairbanks* was focused "only on

6    life insurance," the rationale underlying the decision applies with equal force to flood insurance.

7    Both types of insurance are contracts of indemnity under which, in exchange for the payment of

8    premiums, the insurer promises to pay a sum of money to the designated beneficiary upon the

9    occurrence of a triggering event — here, property damage caused by a flood.  As such, flood

10   insurance is neither a "good" nor a "service" under the CLRA.

11          In sum, the complaint failed to allege a plausible claim that a good or service within the

12   scope of the CLRA was sold or leased to her (or was intended by defendants to be sold or leased

13   to her) through unfair methods of competition and unfair or deceptive acts or practices.  Plaintiff's

14   CLRA claim is therefore **DISMISSED**.

15          **6.    SECTION 17200**

16          Finally, this order turns to plaintiff's claim that defendants' conduct violated Section

17   17200 of the California Business and Professions Code.  Section 17200 prohibits business acts or

18   practices that are "unlawful," "unfair," or "fraudulent."  A violation of each restriction constitutes

19   a separate and independent actionable claim.  *See Cel-Tech Commc'ns, Inc. v. Los Angeles*

20   *Cellular Tel. Co.*, 20 Cal. 4th 163, 179–80 (1999) (citations omitted).

21          This order will address each of plaintiff's Section 17200 allegations separately.

22          **A.    "Unlawful" Business Practices**

23          To state a claim for "unlawful" business practices under Section 17200, a plaintiff "must

24   assert a violation of any other law."  *Id.* at 180.  Where a plaintiff cannot state a claim under any

25   other law, a claim of "unlawful" business practices under Section 17200 cannot be stated either.

26   *See id.* at 182 ("A bar against an action may not be circumvented by recasting the action as one

27   under . . . [S]ection 17200.").

28

United States District Court

For the Northern District of California

19

United States District Court

For the Northern District of California

1    As discussed above, this order has determined that no plausible claims under TILA or the

2    CLRA have been alleged.  As such, plaintiff's claim of "unlawful" business practices must, at this

3    point, be **DISMISSED**.

4    **B.    "Unfair" Business Practices**

5    Even if a practice is not "unlawful" under Section 17200, it may still be "unfair."  *See id.*

6    at 180-81.  In *Cel-Tech*, the California Supreme Court held that conduct is "unfair" between

7    business competitors only if it is "tethered" to some legislatively declared policy or proof of some

8    actual or threatened impact on competition.  *Id.* at 186-87.  Although the California Supreme

9    Court has not yet addressed whether this "tethering" test applies to *consumer* allegations of unfair

10   competition, the undersigned judge has previously found that the "tethering" test is most in line

11   with the reasoning in *Cel-Tech. See Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946,

12   953–54 (N.D. Cal. 2009).

13   The complaint sufficiently cited to two legislatively declared policies to meet the tethering

14   requirement under *Cel-Tech.*  The complaint noted (Compl. ¶ 58):

15           These business practices are contrary to the principle that (i)
             "lenders should avoid creative situations where a building is over-
16           insured", 74 Fed. Reg. 35,914, 35,918 (July 21, 2009) [and] (ii)
             consumers should receive "meaningful disclosure of credit terms",
17           15 U.S.C. § 1601(a).

18   Both of these policies support plaintiff's theory that the HELOC Agreement did not grant

19   defendants the right to purchase flood insurance where such insurance was not required under

20   Federal law, and that defendants' conduct in force-purchasing $175,000 in flood insurance was

21   "in amounts greater than . . . necessary to secure the sums borrowed" (*id.* at ¶ 56).  As such, a

22   claim of "unfair" business practices under Section 17200 has been plausibly stated.  Defendants'

23   motion to dismiss this claim is therefore **DENIED**.

24   **C.    "Fraudulent" Business Practices**

25   Following the passage of Proposition 64, a plaintiff must have "suffered injury in fact and

26   . . . lost money or property as a result of the unfair competition" to have standing to bring a

27   Section 17200 claim.  *See* Cal. Bus. & Prof. Code § 17204.  Where a plaintiff asserts that conduct

28   is "fraudulent" under Section 17200, the plaintiff must also plead actual reliance to meet the

20

1    standing requirements of the statute.  *Morgan v. AT & T Wireless Servs., Inc.*, 177 Cal. App. 4th

2    1235, 1257 (2009).

3         The requirement of actual reliance poses a problem for plaintiff, at least based upon the

4    theory of her claims as pleaded.  While the complaint alleged that various misrepresentations

5    were made by defendants regarding the minimum flood insurance requirements under Federal law

6    and their "right" to purchase flood insurance in excess of these requirements, the facts

7    demonstrate that plaintiff *ignored* these communications and did *not* purchase flood insurance in

8    reliance upon these supposed misrepresentations.  Because plaintiff was not actually deceived

9    into purchasing any flood insurance for her property (despite notices informing her that such

10   insurance was "required"), there are insufficient facts showing that plaintiff "suffered injury in

11   fact and has lost money or property *as a result of*" defendants' alleged "fraudulent" conduct.  *See*

12   Cal. Bus. & Prof. Code § 17204.  Had plaintiff relied upon the supposed false statements that

13   federal law required her to purchase flood insurance for her property, this analysis would be

14   different.  The facts as alleged show, however, that she ignored defendants' notices completely.

15        Since standing under Section 17204 has not been sufficiently pled, plaintiff's claim of

16   "fraudulent" business practices must be **DISMISSED**.  Given this ruling, this order does not need to

17   address whether the heightened pleading requirements under FRCP 9(b) have been met.  *See Vess*

18   *v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-05 (9th Cir. 2003) (noting that allegations of

19   fraudulent conduct under Section 17200 must satisfy heightened pleading requirements).

**CONCLUSION**

21        For the reasons set forth above, defendants' motion to dismiss is **GRANTED IN PART** and

22   **DENIED IN PART**.  Plaintiff will have **FOURTEEN CALENDAR DAYS** to file a motion, noticed on the

23   normal 35-day calendar, for leave to amend the complaint and cure the deficiencies identified

24   herein (with the proposed amended complaint attached as an exhibit).

26        **IT IS SO ORDERED.**

27
     Dated:  August 13, 2010.
28
                                              _____
                                              WILLIAM ALSUP
                                              UNITED STATES DISTRICT JUDGE