1   GEORGE G. WEICKHARDT (SBN 58586)
    ROPERS, MAJESKI, KOHN & BENTLEY PC
2   201 Spear Street, Suite 1000
    San Francisco California 94105
3   Telephone:      (415) 972-6370
    Facsimile:      (415) 972-6301
4   Email:          gweickhardt@rmkb.com

5   LEANN PEDERSEN POPE (admitted *pro hac vice*)
       lpope@burkelaw.com
6   STEPHEN R. MEINERTZHAGEN (admitted *pro hac vice*)
       smeinertzhagen@burkelaw.com
7   ANDREW D. LeMAR (admitted *pro hac vice*)
       alemar@burkelaw.com
8   BURKE, WARREN, MACKAY & SERRITELLA, P.C.
    330 North Wabash Avenue, 22nd Floor
9   Chicago, Illinois 60611
    Telephone:      (312) 840-7000
10  Facsimile:      (312) 840-7900

11  Attorneys for Defendants
    CHASE HOME FINANCE, LLC and JPMORGAN CHASE
12  BANK, N.A.

13                    **UNITED STATES DISTRICT COURT**

14                   **NORTHERN DISTRICT OF CALIFORNIA**

15                        **SAN FRANCISCO DIVISION**

16

17  Sheila I. Hofstetter and Roger Modersbach
    individually, as representatives of the class,
18  and on behalf of the general public,              Case No. CV-10-1313 WHA

19                      Plaintiffs,                   **CHASE HOME FINANCE LLC AND**
                                                      **JPMORGAN CHASE BANK, N.A.'S**
20  vs.                                               **MEMORANDUM OF POINTS AND**
                                                      **AUTHORITIES IN OPPOSITION TO**
21  Chase Home Finance, LLC, JPMorgan                 **PLAINTIFFS' MOTION FOR CLASS**
    Chase Bank, N.A., and DOES 1 through 50,          **CERTIFICATION**
22  inclusive,
                                                      Complaint Filed:  March 29, 2010
23                      Defendants.                   Trial Date:  October 17, 2011

24                                                    Hearing Date:  March 24, 2011
                                                      Hearing Time:  8:00 a.m.
25

26

27

28
                                                              Case No. CV-10-1313 WHA

1

**<u>TABLE OF CONTENTS</u>**

2 SUMMARY OF ARGUMENT ................................................................................................. 1

3 NATIONAL FLOOD INSURANCE ACT .......................................................................... 3

4 SUMMARY OF RECORD EVIDENCE .............................................................................. 5

5 CLASS CERTIFICATION STANDARD ............................................................................ 9

6 ARGUMENT ........................................................................................................................ 10

7
8     I.     CERTIFICATION OF ANY SECTION 17200 CLASS UNDER RULE 23(b)(3) SHOULD BE DENIED. .................................................................. 10

9
        A.     The Massively Overbroad Class Improperly Includes Individuals Not Subject To The Same Flood Insurance Practices As Hofstetter
10             Or Modersbach. .......................................................................................... 10

11         B.     Hofstetter Cannot Adequately Represent A More Limited Class Of Zero/Zero Lender-Placed Borrowers Because She Is Subject To A
12             Senior Lien Defense. ................................................................................. 12

13         C.     Modersbach Cannot Satisfy The Predominance Requirement Of Rule 23(b)(3) Or The Adequacy And Typicality Prerequisites Of
14             Rule 23(a). .................................................................................................. 13

15             1.     Individual Questions Are Required To Determine Whether Each Borrower's Coverage Was "Unfair." ................................................ 13

16             2.     Modersbach Is An Inadequate Class Representative Because He Has No Standing to Assert Any Claims For Restitution Against
17                Defendants. ................................................................................... 17

18     II.     CERTIFICATION OF ANY TILA CLASS UNDER RULE 23(b)(3) SHOULD ALSO BE DENIED. ................................................................ 18

19
        A.     The Proposed Nationwide TILA Class Is Overbroad. ............................... 18

20         B.     Modersbach Cannot Satisfy Rule 23(b)(3) Because Individual Questions Will Overwhelm Any Common Questions On The TILA
21             Claims. ....................................................................................................... 21

22         C.     Hofstetter Is An Inadequate Representative For Any TILA Class Because She Is Not A Member Of The Purported Class And Her
23             Claims Are Not Typical. ............................................................................ 23

24     III.     CERTIFICATION OF A RULE 23(b)(2) CLASS SHOULD BE DENIED ON ALL CLAIMS. ........................................................................... 24

25
        A.     There is no Injunctive Relief Under TILA, so a Rule 23(b)(2)
26             Class Must be Denied. ................................................................................ 24

27         B.     The Section 17200 Claims Also Should Not Be Certified Under Rule 23(b)(2). ........................................................................................... 24

28 CONCLUSION ..................................................................................................................... 25

1

## **TABLE OF AUTHORITIES**

2

**Federal Cases**

3

4  *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000 (9th Cir. 1981) ........................................ 25

5  *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970 (5th Cir. 2000).................................................... 24

6  *Castaneda v. Burger King Corp.*, 264 F.R.D. 557 (N.D. Cal. 2009) ............................................. 10

7  *Christ v. Beneficial Corp.*, 547 F.3d 1292 (11th Cir. 2008) ....................................................... 24

8  *CLN Props., Inc. v. Republic Servs., Inc.*, No. CV-09-1428-PHX-DGC, 2010 WL 4146734
     (D. Ariz. Dec. 13, 2010) ........................................................................................... 22
9
   *County of Santa Clara v. Astra USA, Inc.*, 257 F.R.D. 207 (N.D. Cal. 2009)................................. 13
10
    *Deitz v. Comcast Corp.*, No. C 06-06352, 2007 WL 2015440 (N.D. Cal. Jul. 11, 2007) ................. 13
11
    *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010).............................................. 9, 13
12
    *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429 (C.D. Cal. 2007)............................................... 13
13
    *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)...................................................... 9
14
    *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946 (N.D. Calif. 2009) .................................... 14
15
    *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .................................................. 13, 21
16
    *Harriss v. Pan Am. World Airways, Inc.*, 74 F.R.D. 24 (N.D. Cal. 1977) ................................ 11, 13
17
    *In re Countrywide Fin. Corp. Mortg. Marketing & Sales Practices Litig.*, Nos. 08-md-1988,
18     09-cv-00664, 2010 WL 1691451 (S.D. Cal. Apr. 23, 2010) ............................................... 17
19
    *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............... 18
20
    *In re Wireless Facilities, Inc. Securities Litigation*, 253 F.R.D. 630 (S.D. Cal. 2008) .................... 17
21
    *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572 (N.D. Cal. 2007)................................................. 12
22
    *Lewallen v. Medtronic USA, Inc.*, No. C 01-20395 RMW, 2002 WL 31300899 (N.D. Cal.
23     Aug. 28 2002)...................................................................................................... 25
24
    *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018 (9th Cir. 2003) ................................. 18
25
    *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007), *recons. denied*, 2007
26     WL 4163420 (N.D. Cal. Nov. 26, 2007)...................................................................... 14
27
    *O'Shea v. Littleton*, 414 U.S. 488 (1974)....................................................................... 18
28

*Perrone v. Gen. Motors Acceptance Corp.*, 232 F.3d 433 (5th Cir. 2000) ...................................... 24

*Rink v. Cheminova, Inc.*, 203 F.R.D. 648 (M.D. Fla. 2001) .................................................. 17

*Ruiz v. Stewart Assoc., Inc.*, 167 F.R.D. 402 (N.D. Ill. 1996) ................................................ 11

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159
    (11th Cir. 2010) .................................................................................................. 22

*Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004 (9th Cir. 2002) .............................. 17, 22

*Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369 (N.D. Cal. 2007) .............................................. 11

*Sprague v. General Motors Corp.*, 113 F. 3d 388 (6th Cir. 1998) ............................................. 13

*Sweet v. Pfizer*, 232 F.R.D. 360 (C.D. Cal. 2005) ................................................................... 25

*Van Slyke v. Capital One Bank*, No. C 07-00671 WHA, 2007 WL 3343943 (N.D. Cal. Nov.
    7, 2007) .............................................................................................................. 14

*Watt v. Alaska*, 451 U.S. 259 (1981) ........................................................................................ 20

*Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180 (9th Cir. 2001) .................................. 9

**State Cases**

*Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (1999) .......... 14

*Day v. AT&T*, 63 Cal. App. 4th 325 (1998) ............................................................................. 17

*Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247 (2010) .................................. 14

*Madrid v. Perot Systems Corp.*, 130 Cal. App. 4th 440 (2005) .............................................. 17

**Federal Statutes**

42 U.S.C. § 4001 *et seq.* ............................................................................................................ 3

42 U.S.C. § 4011(a). ................................................................................................................... 3

42 U.S.C. § 4012a(b)(1). ............................................................................................................ 3

**Federal Rules**

Fed. R. Civ. P. Rule 23(a) ...................................................................................................... 9, 13

Fed. R. Civ. P. Rule 23(b) ................................................................................................. passim

**Federal Regulations**

12 CFR § 22.3(a) ................................................................................................. 3

12 CFR § 226.5b ............................................................................................... 19

12 CFR § 226.5b(f)(3) ............................................................................. 18, 19, 20, 21

12 CFR § 226.9 ................................................................................................ 19

74 Fed. Reg. 35,914 ..................................................................................... passim

**Other Authorities**

Alan Wright, *et al.*, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed. 2010) .......................... 10

Office of the Comptroller of Currency, "Flood Disaster Protection" (May 1999) ............................. 3

FEMA, "Mandatory Purchase of Flood Insurance Guidelines "(Sept. 2007) ("FEMA Guidelines") ................................................................................................. 3, 4

*DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

**SUMMARY OF ARGUMENT**

Plaintiffs seek to represent massively overbroad classes of all JPMorgan Chase Bank, NA ("JPMC") and Chase Home Finance, LLC ("CHF") borrowers who were required to purchase flood insurance without making any attempt to tie the class definitions to the two different flood insurance practices challenged by Hofstetter and Modersbach. While Hofstetter claims no flood insurance was required because her credit line and principal balance were both zero (a "zero/zero" borrower), Modersbach had a positive loan balance and available credit when he was required to obtain flood insurance. Unlike Hofstetter, he does not challenge the practice of requiring him to maintain flood insurance equal to his available credit line. Rather, Modersbach challenges the insurance practice change in December 2009 for home equity borrowers that increased his insurance requirement to more than the minimum required by the National Flood Insurance Act ("NFIA"). Rather than propose two subclasses tied to each challenged practice, and attempt to provide some meaningful analysis of whether those subclasses satisfy Rule 23, Plaintiffs vastly overreach with their proposed classes by including thousands of borrowers who were not subject to either challenged practice. The overbroad class definitions doom their motion.

However, even if the Court considers narrower classes consisting of HELOC borrowers whose claims are more typical of Plaintiffs' claims, class certification still should be denied.

Hofstetter's claims are all subject to a unique defense, making her inadequate to represent even the "zero/zero" HELOC borrowers. After this Court ruled Hofstetter was not required to purchase any flood insurance, she disclosed she had a $700,000 first mortgage loan on her property with Bank of America (and no other flood insurance) at the time Defendants lender-placed flood insurance. The existence of that first mortgage loan is critical to her claim that no flood insurance was required. The NFIA requires minimum insurance equal to the lesser of (1) the combined outstanding balance on *all loans* on the property; (2) the replacement cost value ("RCV") of the home; or (3) $250,000, the NFIP maximum. For Hofstetter, the minimum insurance required by the NFIA would be $250,000, which is less than the $700,000 first mortgage balance and her RCV. While Defendants did not know the Bank of America mortgage existed at the time $175,000 of flood insurance was lender-placed, a defense to Hofstetter's individual claim includes the argument that the amount of the lender-placed

*DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

insurance was actually less than the NFIA minimum. Since only zero/zero borrowers without any first lien could claim no insurance was required, Hofstetter cannot adequately represent those borrowers.

Certification of Modersbach's claims should be denied because there is no method – and Plaintiffs offer none – for proving any of his claims on a class-wide basis. Modersbach alleges that the December 2009 change in business practice increasing his insurance requirement to more than the minimum insurance under the NFIA was an "unfair" business practice, and constituted an "adverse change" in credit terms in violation of TILA. His "unfair" argument is tethered to the regulatory agencies' directive that "lenders should avoid creating situations where a building is over-insured." 74 Fed. Reg. 35,914, 35,936 (July 21, 2009) ("Interagency Q&A").[1] Because flood insurance *was* required on his property; the NFIA allows a lender to require *more* than the NFIA minimum flood insurance; and FEMA's "best practice" for lenders is to insure a building to the full replacement cost value, several individual questions must be answered for each borrower in the proposed class to determine if the flood insurance requirement was "unfair."

For example, for each borrower, it must be determined whether Defendants were contractually authorized by the borrower's mortgage or deed of trust to require more than the NFIA insurance minimum. Defendants produced mortgages and deeds of trust for over 75 putative class members in discovery, and those agreements significantly differ regarding flood insurance; indeed many actually require *more than* the NFIA minimum insurance, and expressly allow coverage to the RCV. Other individual questions include the RCV of the borrower's property, the amount of insurance Defendants required, whether the borrower had a first mortgage on the property, whether the required insurance exceeded the NFIA minimum by a few or several thousand dollars, or whether the borrower actually benefited from the insurance coverage through a flood loss. All these issues are relevant to determine whether the insurance requirement for each borrower was "unfair," and the evidence relevant to those issues will be vastly different for each borrower. Recognizing the inherent difficulties of resolving Modersbach's claims on a class basis, this Court stated:

---

[1] Ex. 57 to Declaration of Andrew D. LeMar ("LeMar Decl."; attached hereto as Ex. 1).

This order will, however, comment briefly upon potential hurdles on the horizon with respect to Rule 23 and Modersbach's claim.  While defendants' alleged adherence to FEMA "best practices" and other agency guidelines in its flood insurance practices cannot bar plaintiff's "unfair" business practices claim, it appears highly relevant to whether the flood insurance coverage they required for Mr. Modersbach's HELOC and property was "appropriate" and not "unfair."  In this connection, the specific circumstances surrounding Mr. Modersbach's HELOC – such as whether he had a first mortgage – may significantly impact whether his claims are "typical" of other borrowers.  This order should not be interpreted as taking a position on any Rule 23 issues at this time.  That said, counsel should be mindful of these considerations as class certification approaches.

(Dkt. No. 110 at 20.)

Plaintiffs ignore these considerations in their class brief, and have otherwise fallen far short of satisfying their burden to show their claims can be established on a class-wide basis.  Plaintiffs' motion for certification should be denied in its entirety.

## NATIONAL FLOOD INSURANCE ACT

The NFIA provides the minimum amount of flood insurance to be maintained on a building located in a flood zone, which is the lesser of:  (1) the maximum amount of insurance available under the NFIP, which is $250,000 for a single family dwelling; (2) the full RCV of the home; or (3) the unpaid principal balance ("UPB") or, for HELOCs, the amount of the line of credit at origination. 42 U.S.C. § 4012a(b)(1); 12 C.F.R. § 22.3(a); 74 Fed. Reg. at 35,924; FEMA, "Mandatory Purchase of Flood Insurance Guidelines," 27, 41 (Sept. 2007) ("FEMA Guidelines")[2]; Office of the Comptroller of Currency, "Flood Disaster Protection" at 6 (May 1999).[3, 4]

In 2009, the Office of Comptroller of Currency ("OCC") – which regulates national banks (such as JPMC) and their subsidiaries (such as CHF) – and several other federal agencies governing lending institutions issued interagency guidance regarding flood insurance requirements.  *See* 74 Fed. Reg.

---

[2] Ex. 55 to LeMar Decl.  The Federal Emergency Management Agency ("FEMA") issues guidelines regarding flood insurance, the most recent of which were issued in September 2007.  FEMA is one of the federal agencies authorized to administer and implement the NFIA.  42 U.S.C. § 4011(a).

[3] Ex. 56 to LeMar Decl.

[4] The National Flood Insurance Act of 1968, along with the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, 42 U.S.C. § 4001 *et seq.*, (collectively, the "NFIA"), requires borrowers and lenders to purchase and maintain flood insurance on properties within flood zones.  The NFIA established the National Flood Insurance Program ("NFIP") in order to provide affordable flood insurance coverage in flood prone areas.  *See* 42 U.S.C. 4001(b), 4011(a); 1968 U.S. Code Cong. & Admin. News 2873, 2966–67, 2969.  The Court provided a comprehensive discussion of the NFIA and NFIP, including their history and purpose, in two prior orders.  (Dkt. Nos. 51 at 5-11 and 110 at 17-20.)

35,914. The Interagency Q&A clarified, among other things, the amount of flood insurance coverage a lender must require when it is a junior lien holder. The Agencies explained that a junior lienholder cannot comply with requirements of the NFIA by requiring insurance in the amount of the outstanding principal balance of the junior lien alone. *Id.* at 35,923-24. Instead,

> [t]he lender must ensure that adequate flood insurance is in place or require that additional flood insurance coverage be added to the flood insurance policy in the amount of the lesser of either the *combined total outstanding principal balance of the first and second loan*, the maximum amount available under the Act (currently $250,000 for a residential building . . .), or the insurable value of the building . . . .

*Id.* at 35,940. (emphasis added.)

Notwithstanding the minimum requirement, lenders are expressly permitted to require more flood insurance than required by the NFIA. The Agencies note:

> *[A] lender can require more flood insurance than the minimum required by the Regulation. The Regulation requires a minimum amount of flood insurance; however, lenders may require more coverage*, if appropriate. . . . [L]enders should avoid creating situations where a *building* is over-insured.

*Id.* at 35,918.[5] (*See also* Dkt. No. 56 at 3 ("Importantly, as explained in the prior order, nothing in the NFIA or its implementing regulations bars lenders from purchasing more than the minimum amount of flood insurance required under the Act.").)

Recognizing that lenders may require more than the NFIA minimum insurance, FEMA Guidelines emphasize that the best practice is to require flood insurance coverage up to the RCV, and that using the UPB alone may not be adequate. *See* FEMA Guidelines at 27 ("A sound flood insurance risk management approach follows the insurance industry practice of insuring buildings to full RCV. Such a risk management strategy meets or exceeds the minimal compliance requirements and is the easiest approach for lenders to implement. Security interests in [Special Flood Hazard Areas ("SFHAs")] should be protected with flood insurance to the full insurable value, to the extent possible under the NFIP."); *id.* at 27-28 ("If the lender opts to protect only its security in the loan, the amount of the policy may be insufficient to cover the cost of repairing the building. By insuring buildings to the full RCV, the lender and borrower are both better protected."); *id.* at 41 ("If the lender

---

[5] The reference to "over-insured" in the Interagency Q&A refers to the situation where the insurance coverage exceeds "the insurable value of the building." 74 Fed. Reg. at 35,918.

opts to protect only its security in the loan (loan balance), the insurance proceeds may be inadequate.").

<h2 style="text-align:center"><u>SUMMARY OF RECORD EVIDENCE</u></h2>

**<u>CHF's Flood Insurance Policies And Procedures.</u>**  CHF services two categories of residential loans owned by JPMC:  (1) home equity; and (2) what it simply refers to as "mortgage."  (Declaration of Jeff Nack ¶ 2 ("Nack Decl."; attached hereto as Ex. 2.))  Home equity includes loans and lines of credit, both of which are secured by the equity in a borrower's home.  (*Id.* ¶ 3.)  A HELOC is an open-end loan with a certain credit limit, and a home equity loan is a closed-end loan where the borrower receives a lump-sum amount at loan origination.  (*Id.*)  Both HELOCs and home equity loans are often in second-lien position.  (*Id.*)  "Mortgage" loans are traditional home loans used to purchase or refinance a home, and are usually in first-lien position. (*Id.* ¶ 4.)

CHF services home equity and mortgage loans on different servicing platforms.  (Deposition of Jeff Nack at 46:7-10, ▮▮▮▮ ("Nack Dep."; Ex. 1 to Declaration of Kai Richter in Support of Plaintiffs' Motion for Class Certification ("Richter Decl")).)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,

Deposition of Megan Groff ▮▮▮▮▮▮▮▮▮ ("Groff Dep."; Ex. 3 to Richter Decl.).) Separate groups within CHF's Escrow Administration department handle flood insurance for home equity and mortgage.  (Nack Dep. at 35:15-37:3, 40:5-15; Groff Dep. at 11:9-14:15, 17:18-18:1.)

As of January 31, 2011, CHF serviced 84,921 HELOCs and home equity loans and 312,034 mortgage loans for which CHF required flood insurance.  (Nack Decl. ¶ 5.)  Both portfolios include loans originated by JPMC, loans originated by Chase Bank USA, N.A. (which is not a party to this case), loans originated by lenders who have merged with JPMC (such as Bank One), lenders whose assets have since been acquired by JPMC (such Washington Mutual Bank), and loans that have been assigned to JPMC by other lenders.  (*Id.*)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

The Interagency Q&A explained that a junior lienholder cannot comply with the requirements of the NFIA by requiring insurance in the amount of the UPB or credit line amount of the junior lien alone.  74 Fed. Reg. at 35,923-24, 35,940.  Question 36 of the Interagency Q&A explains the rule for determining minimum flood insurance:

> 36.   When a lender makes, increases, extends or renews a second mortgage secured by a building or mobile home located in an SFHA, how much flood insurance must the lender require?
>
> Answer:  The lender must ensure that adequate flood insurance is in place or require that additional flood insurance coverage be added to the flood insurance policy in the amount of the lesser of either the *combined total outstanding principal balance of the first and second loan*, the maximum amount available under the Act (currently $250,000 for a residential building and $500,000 for a nonresidential building), or the insurable value of the building or mobile home. . . .  *Given the provisions of NFIP policies, a lender cannot comply with the Act and Regulation by requiring the purchase of an NFIP flood insurance policy only in the amount of the outstanding principal balance of the second mortgage without regard to the amount of flood insurance coverage on a first mortgage.*

*Id.* at 35,940 (emphasis added).  CHF services HELOCs and home equity loans for which the borrower also has a first lien mortgage with another lender (like Hofstetter),

The Interagency Q&A also clarified that "a lender can require *more* flood insurance than the minimum required by the Regulation."  74 Fed. Reg. at 35,918 (emphasis added).



**Hofstetter's Flood Insurance.**   Hofstetter entered into a HELOC Deed of Trust and Agreement for a $175,000 credit line with JPMC in January 2006.  (Exs. 20-21 to LeMar Decl.)  In August 2008, JPMC sent Hofstetter a letter saying that because her home had declined in value, it was suspending future draws against her account.  (Ex. 23 to LeMar Decl.)  In May 2009, FEMA rezoned Hofstetter's property to be in an SFHA.  (Ex. 22 to LeMar Decl.)  On August 11, 2009, CHF informed Hofstetter that because her property was now located in an SFHA, she was required by federal law to maintain flood insurance.  (Ex. 24 to LeMar Decl.)  The letter explained that the minimum amount of

---

[6] CHF's respective letters to home equity and mortgage borrowers are consistent with CHF's varying policies for both types of borrowers.  Mortgage borrowers receive letters indicating three options:  (1) RCV; (2) NFIP maximum; or (3) UPB if the UPB is greater than 80% of the RCV, or at least 80% of the RCV if the UPB is less than 80% of the RCV.  (Ex. 41 to LeMar Decl.)  Prior to December 23, 2009, home equity borrowers received letters indicating three options:  (1) RCV; (2) NFIP maximum; or (3) the UPB/line amount.  (Ex. 40 to LeMar Decl.)  After December 23, 2009, home equity borrowers have received letters indicating two options:  (1) RCV; or (2) NFIP maximum.  (Ex. 39 to LeMar Decl.)

flood insurance she was required to maintain on her property was the lesser of (a) the $250,000 NFIP maximum, (b) the RCV and (c) the UPB of the loan or line amount for lines of credit. (*Id.*)

On September 1, 2009, CHF informed Hofstetter that if she did not provide CHF with proof she had purchased coverage in the amount of $175,000, CHF would lender-place a flood insurance policy on her property. (*Id.*) On October 6, 2009, CHF notified her that because she had not obtained the required insurance, CHF had lender-placed a flood policy in that amount. (*Id.*) At the time, Hofstetter's outstanding HELOC balance was zero, and her credit line had been temporarily suspended. (SAC ¶ 15.)

In September 2010, CHF renewed Hofstetter's lender-placed insurance policy and increased her coverage to $250,000, ███████████████████████████████████████ ████████████████████████████████ However, CHF paid the premium on this renewed policy, so Hofstetter is now receiving free flood insurance. (*Id.* at 113:3-7.)

Prior to the $175,000 HELOC she obtained from JPMC in January 2006, Hofstetter obtained a $705,000 first mortgage on her property. Her first-lien mortgage was originated on April 21, 2005 by GreenPoint Mortgage Funding, Inc. and is currently owned by Bank of America. (Exs. 27-28 to LeMar Decl.) According to documents produced by Bank of America in response to a subpoena, as of January 25, 2011, the UPB on Hofstetter's first mortgage was $704.926.56. (Ex. 27 to LeMar Decl.) Under the terms of her Bank of America Deed of Trust, Hofstetter "shall keep the improvements now existing or hereafter erected on the Property insured against loss by . . . floods . . . . This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires." (Ex. 28 to LeMar Decl.)

**Facts Relating To Modersbach.** Modersbach entered into a HELOC Deed of Trust and Agreement with JPMC in December 2004 in the amount of $100,000. (Exs. 29-30 to LeMar Decl.) Modersbach alleges his current UPB is about $37,000 (SAC ¶ 28), and does not claim his credit line was ever suspended. When he originated his HELOC with JPMC, he also had a first lien mortgage with Wells Fargo with an unpaid principal balance of $550,000, which was paid off on December 30, 2004. (Exs. 17-18, 32-33 to LeMar Decl.)

In May 2009, Modersbach's property was rezoned by FEMA to be in an SFHA.  (Ex. 31 to LeMar Decl.)  As a result, CHF notified Modersbach that he was required to obtain flood insurance in the amount of his $100,000 credit line, which he purchased.  (SAC ¶¶ 29-33.)  Modersbach concedes that this flood insurance was required.  (*See id.*)

On May 13, 2010, ███████████████████████ ███ CHF informed Modersbach he was required to increase his flood coverage by $150,000 for a total coverage amount of $250,000.  (Ex. 34 to LeMar Decl.)  Modersbach disputed CHF's requested increase because he believed CHF was requiring too much insurance on his property.  (SAC ¶¶ 35-39.)  On June 29, 2010, CHF explained he was required to maintain $250,000 in coverage because that was less than his RCV.  (Ex. 35 to LeMar Decl.)  According to Modersbach's homeowner's insurance policy, the insurable value of his dwelling (or RCV) is $696,700.  (Ex. 36 to LeMar Decl.)

CHF initially lender-placed a $100,000 policy in 2009 and then lender-placed the additional $150,000 in 2010, but in both instances, Modersbach subsequently obtained his own flood insurance, the lender-placed policy was canceled, and all lender-placed premiums charged to Modersbach's account were removed.  (SAC ¶¶ 41-43; Nack Decl. ¶¶ 17-19; Ex. 38 to LeMar Decl.)  Modersbach has never paid any portion of any lender-placed premium, nor did he ever pay any interest on any of the lender-placed premiums.  (Nack Decl. ¶ 19.)

## CLASS CERTIFICATION STANDARD

The party "seeking certification must provide facts sufficient to *satisfy* Rule 23(a) and (b) *requirements.*"  *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 599 (9th Cir. 2010) (emphasis in original).   "In turn, the district court must conduct a *rigorous* analysis to determine that the prerequisites of Rule 23 have been met."  *Id.* (*citing Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982)).   Plaintiffs bear the burden of demonstrating that they have met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)."  *See Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

The "district court must analyze underlying facts and legal issues going to the certification questions regardless of any overlap with the merits."  *Dukes*, 603 F.3d at 582.  This Court must specifically examine the elements of Plaintiffs' claims, the *evidence* relevant to prove those claims –

not the unsubstantiated arguments in the class motion – and then determine whether the class claims can be proved on a class-wide basis.  For the reasons discussed below, Plaintiffs' motion for class certification should be denied in its entirety.

<u>ARGUMENT</u>

## I.   CERTIFICATION OF ANY SECTION 17200 CLASS UNDER RULE 23(b)(3) SHOULD BE DENIED.

### A.   The Massively Overbroad Class Improperly Includes Individuals Not Subject To The Same Flood Insurance Practices As Hofstetter Or Modersbach.

Plaintiffs proposed class includes "all persons who have or had any loan or credit line with Defendants JPMorgan Chase Bank, N. A. or Chase Home Finance LLC (collectively, 'Chase') secured by their residential property in the State of California, and were required by Chase to purchase or maintain flood insurance on their property within four years prior to this action's filing date through the date of final disposition of this action."  (Plaintiffs' Motion at i.)  Hofstetter's claims relate solely to CHF requiring lender-placed flood insurance when her credit line and principal balance were zero, but this proposed class definition goes far beyond her alleged claims.[7]  The class includes people with mortgage loans, not HELOCs, who would never be in a position of a zero credit line or principal balance.  The purported class also includes home equity borrowers with an available credit line or principal balance, who were therefore required to maintain flood insurance.  In fact, this Court concluded in a prior discovery order that "claims brought by borrowers who carried a positive principal loan balance and/or had a non-zero available credit line presented different factual and legal questions than zero/zero borrowers like Ms. Hofstetter," and that she "only had standing to bring a claim of 'unfair' business practices on behalf of 'zero/zero' borrowers who, like her, were not required to maintain *any* flood insurance coverage under the NFIA."  (Dkt. No. 110 at 3, 4) (emphasis in original).)  Whether the Court considers the over-inclusiveness of the proposed class from a standing, typicality, or adequacy approach, Hofstetter simply cannot represent a class of borrowers who do not

---

[7] "[T]he class must not be defined so broadly that it encompasses individuals who have little connection with the claim being litigated; rather, it must be restricted to individuals who are raising the same claims or defenses as the representative."  Alan Wright, *et al.*, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed. 2010).  A class definition is impermissibly broad where it includes individuals and conduct that goes beyond the claims raised in the complaint.  *See Castaneda v. Burger King Corp.*, 264 F.R.D. 557, 564 (N.D. Cal. 2009) (Alsup, J.).

have her same claim.[8]  Because the class definition includes all borrowers with flood insurance and not just zero/zero lender-placed borrowers, the proposed class should be denied.

The proposed class is also overbroad as to Modersbach.  Unlike Hofstetter, Modersbach does not dispute that he was required to maintain flood insurance.  Rather, he claims CHF's December 2009 policy change that required him to maintain more insurance than the NFIA minimum was an "unfair" business practice.  But, the proposed class includes everyone who had flood insurance, including people with mortgage loans who were not subject to the change in the home equity flood insurance procedures.  (*Compare* current home equity letter (Ex. 39 to LeMar Decl.) *with* current mortgage letter (Ex. 41 to LeMar Decl.).)[9]  The proposed class also includes home equity borrowers who were not required to maintain more insurance than the NFIA minimum.

████████████████████████████████████████████████  Because the proposed class includes people who were not subject to the same flood insurance practices as Modersbach, his motion to certify that class should be denied.

However, even if the Court determines that more limited classes of borrowers deserve attention, those classes still cannot satisfy the prerequisites of class certification.  Hofstetter cannot represent a class of zero/zero lender-placed borrowers because she is an inadequate class representative and her claims are not typical.  As for Modersbach's claim that requiring more than the NFIA minimum insurance was an "unfair" business practice, the factual determination relevant to that claim for all class members will be so particularized that it will overshadow any common issues.

---

[8] Where a plaintiff proposes an overbroad class definition, a court may deny class certification for want of typicality or adequacy.  *See Ruiz v. Stewart Assoc., Inc.*, 167 F.R.D. 402, 405 (N.D. Ill. 1996) (denying class certification for lack of typicality because the named plaintiff's claims would not prove all of the putative class members' claims); *Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 375-76 (N.D. Cal. 2007) (Alsup, J.) (certifying a narrower class than proposed by plaintiffs out of concern for typicality and manageability of proving liability and damages); *Harriss v. Pan Am. World Airways, Inc.*, 74 F.R.D. 24, 43 (N.D. Cal. 1977) (warning that adequacy of representation is implicated when an overbroad class definition is asserted because such a definition may deprive improperly included class members of their claims if the class claim fails).

[9] ████████████████████████████████████████████████

(*E.g.*, Ex. 42 to LeMar Decl.)

**B.**   **Hofstetter Cannot Adequately Represent A More Limited Class Of Zero/Zero Lender-Placed Borrowers Because She Is Subject To A Senior Lien Defense.**

Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class."  Whether the named plaintiffs adequately represent the class involves two inquiries:  (1) whether the named plaintiff and her counsel have any conflicts of interest with other class members and (2) whether the named plaintiff and her counsel act vigorously on behalf of the class.  *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572, 578 (N.D. Cal. 2007).

This Court previously ruled that the NFIA and Agency Guidelines "do *not* require a lender to purchase flood insurance for a borrower where the borrower's outstanding principal balance is zero dollars and the lender has indefinitely suspended the borrower's line of credit."  (Dkt. No. 51 at 8 (emphasis in original).)  Given this ruling, Defendants advised Plaintiffs in October 2010 that they would not oppose certification of a UCL class of zero/zero borrowers who had lender-placed insurance on any grounds other than adequacy, which was reserved until Plaintiffs responded to Defendants' discovery and were deposed.  (Ex. 7 to Richter Decl.)  Hofstetter's discovery responses were critical because whether she had a first mortgage loan was plainly relevant to class certification.

After initially refusing to tell Defendants whether she still had the senior mortgage on her property that existed when she obtained her HELOC in 2006, Hofstetter finally revealed that she still had a first mortgage with Bank of America for $705,000, but no other flood insurance, at the time CHF lender-placed her flood insurance.  (Exs. 11-12 to LeMar Decl.)  The existence of this senior loan is critical to determining whether Hofstetter was required to maintain flood insurance because the NFIA requires junior lien holders to consider the balance of *all loans* on the property when making a flood determination, not just the junior HELOC liens.

Under the NFIA, Hofstetter's minimum flood insurance requirement would be $250,000, which is less than the outstanding balance of all loans on the property or the RCV.  Since CHF lender-placed $175,000 of flood insurance, the issue for Hofstetter's claim is whether it was an unfair business practice for CHF to require Hofstetter to maintain less than the minimum flood insurance under the NFIA.  Because Hofstetter had the Bank of America first mortgage, she has a conflict of interest with zero/zero borrowers who were not required to maintain any insurance according to this Court's

August 16, 2010 Opinion.  As a result, Hofstetter is not an adequate class representative of a zero/zero lender-placed class.

Adequacy of representation in a class action "is perhaps the most critical requirement because the judgment will conclusively determine the rights of absent members." *Harriss v. Pan Am. World Airways, Inc.*, 74 F.R.D. 24, 43 (N.D. Cal. 1977).  If the action is certified, a judgment operates as a res judicata, forever barring zero/zero lender-placed class members from recovering on their UCL claim, if Hofstetter loses her claim as a result of the senior lien defense.[10]

### C.   Modersbach Cannot Satisfy The Predominance Requirement Of Rule 23(b)(3) Or The Adequacy And Typicality Prerequisites Of Rule 23(a).

#### 1.   Individual Questions Are Required To Determine Whether Each <u>Borrower's</u> Coverage Was "Unfair."

To satisfy the predominance requirement, Modersbach must show that "common questions present a significant aspect of the case *and they can be resolved for all members of the class in a single adjudication.*" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (emphasis added).  The test for Rule 23(b)(3) predominance is "far more demanding than the Rule 23(a) commonality analysis." *Deitz v. Comcast Corp.*, No. C 06-06352, 2007 WL 2015440, at *6 (N.D. Cal. Jul. 11, 2007) (Alsup, J.) (internal citations omitted).  To evaluate whether a purported class meets the requirements of Rule 23(b)(3), "[t]he Court must identify the substantive issues raised by the cause of action and then inquire into the proof relevant to each issue." *Id.* (internal citations omitted); *see also Dukes*, 603 F.3d at 593 ("Rule 23(b)(3) requires a district court to formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.") (internal citations omitted).

---

[10]  Hofstetter's claim is also not typical of the claims of other zero/zero lender-placed borrowers because she is subject to a unique defense that places her in direct conflict with the interests of those borrowers.  "The premise of the typicality requirement [in Rule 23(a)(3)] is simply stated:  as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.*, 113 F. 3d 388, 399 (6th Cir. 1998).  Where a major focus of the litigation will be a defense unique to Plaintiff, the typicality requirement is not satisfied.  *See County of Santa Clara v. Astra USA, Inc.*, 257 F.R.D. 207, 214 (N.D. Cal. 2009) (Alsup, J.) ("A named plaintiff's motion for class certification should be denied where there is a real danger that the representative will be preoccupied with defenses unique to it, to the detriment of the class."); *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 435 (C.D. Cal. 2007) ("Plaintiff's claim is not typical because her claims are so unique and subject to particular defenses that litigation of the action is likely to be overwhelmed by addressing her individual claims.").

Modersbach makes absolutely no effort to supply a class-wide method for proving his claims on a class-wide basis. His two paragraph predominance argument is limited to a single conclusory, misleading statement – repeated several times throughout Plaintiffs' brief – that "Chase applied its flood insurance policies '[r]egardless of individual circumstances.'" (Plaintiffs' Brief at 1, 10, 11, 23.)[11] Modersbach does not discuss how the evidence necessary to establish his own "unfair" claim will also establish the class claims. Plaintiff has fallen far short of his burden. When a proper analysis of the factual determinations necessary to resolve the UCL class claims is conducted, it is clear that obstacles to certification loom large. That analysis begins with the law applicable to the UCL claims.

Modersbach alleges that CHF's conduct in increasing his flood insurance coverage to $250,000 violated the "unlawful" and "unfair" prongs of the UCL. The law regarding the "unfair" prong as it relates to consumer actions remains unsettled. *See Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007), *recons. denied*, 2007 WL 4163420 (N.D. Cal. Nov. 26, 2007); *Van Slyke v. Capital One Bank*, No. C 07-00671 WHA, 2007 WL 3343943, at *10 (N.D. Cal. Nov. 7, 2007). The "tethering test" – established by the *Cel-Tech* decision – requires that "the finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy." *Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 186 (1999); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256 (2010). Although the California Supreme Court has not yet addressed whether this "tethering" test applies to consumer allegations of unfair competition, this Court has previously determined that the "tethering" test is in line with the *Cel-Tech* reasoning, and has applied that test in this case and others. *See Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 953-54 (N.D. Calif. 2009). (*See also* Aug. 16, 2010 Order at 20 (Dkt. No. 51).) Modersbach's "unfair" business practices claim is alleged to be tethered to the flood insurance

---

[11] Plaintiffs' reference to Jeff Nack and Megan Groff's deposition transcripts to support the conclusory statement that flood insurance procedures are the same for all borrowers whose loan is serviced by CHF is misleading. (Plaintiffs' Brief at 1, 10, 11, 23.) ████████████████████████████████████████████████████████████████████████████████ ██████████ There is no testimony that flood insurance requirements are the same for all loans CHF services. Likewise, Defendants' responses to Plaintiffs' Requests for Admissions cited by Plaintiffs on pages 10-11 of their Motion relate to *home equity loans only*. (*See* Ex. 11 to Richter Decl.)

*DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

regulatory policy that "lenders should avoid creating situations where a building is over insured." 74 Fed. Reg. at 35,918.[12]

The issue to be determined for Modersbach's unfair claim, therefore, is whether requiring Modersbach to maintain $250,000 of flood insurance – which was more than the NFIA minimum for his particular loan and property – was "unfair." However, simply because Modersbach was required to maintain coverage in excess of NFIA minimum requirements does not mean Modersbach can prevail on his "unfair" claim. As this Court previously determined, "liability for 'unfair' business practices" is not "a foregone conclusion any time a lender requires flood insurance coverage in excess of minimum NFIA requirements." (Dkt. No. 110 at 19.)

> In fact, the regulating agencies have also expressly stated that while "[t]he Regulation requires a minimum amount of flood insurance . . ., lenders may require more coverage, if appropriate." *Ibid.* On this point, the agencies further explained that "[e]ach lender has the responsibility to tailor its own flood insurance policies and procedures to suit its business needs and protect its ongoing interest in the collateral." *Id.* at 35936. In this connection, defense counsel correctly noted at the hearing that FEMA's own guidelines encourage lenders to consider other factors, such as the replacement cost value of the property securing the loan, when determining an "appropriate" amount of flood insurance coverage to impose on borrowers. Defendants also reasonably argued that the presence of a senior lien might be an appropriate consideration for deviating upwards from the NFIA's minimum requirements. Any one of these considerations could potentially be a strong defense against a claim of "unfair" business practices.

(*Id.*)

To determine whether other borrowers' insurance requirements were "unfair," the Court must consider (1) whether the borrower was required to maintain insurance in excess of the NFIA minimum; (2) whether the borrower had any other loans secured by the property (since the combined balance of all loans must be considered in determining minimum NFIA amounts); (3) the RCV of the property; (4) the amount of the "overage," if the insurance requirement exceeded the NFIA minimum; and (5) whether the borrower actually benefited from the insurance. The borrower's HELOC agreement is also critical to determine whether Defendants' flood insurance requirements were "unfair," because whether the insurance coverage was contractually authorized is an important

---

[12] Plaintiffs also allege a claim for "unlawful" business practices, which is based on the same facts and theory as their TILA claim. Because the "unlawful" business practices claim is tied to Plaintiffs' TILA claim, the "unlawful" class claim fails to satisfy Rule 23 for the same reasons as the TILA class claim. *See* Part II below.

*DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

consideration to an unfair business practices claim.

Despite the fact that the contract language is critical to the class claims, Plaintiffs ignore the Deeds of Trust for any borrower, other than themselves. That's because the Deeds of Trust in the sampling produced to Plaintiffs contain flood insurance language that is significantly different from Plaintiffs' Deeds of Trust. In fact, many contracts specifically require the borrower to maintain flood insurance in an amount equal to the full insurable value of the building. (*See* Exs. 50-52 to LeMar Decl.) Below is a chart listing each category of insurance language from the loans in the sampling, the number of loans in the sampling with each category, and the percentage of loans with each category[13]:

| Category of Language | Number of Loans | Percentage |
|---|---|---|
| Language identical to Plaintiffs' loans | 10 | 13.5% |
| Language similar, but not identical, to Plaintiffs' loans | 5 | 6.8% |
| Full insurable value of improvements | 25 | 33.8% |
| Lesser of UPB or NFIP maximum | 6 | 8.1% |
| Full amount of credit line, plus UPB of any prior liens, up to NFIP maximum | 8 | 10.8% |
| UPB, plus UPB of any prior liens, up to NFIP maximum | 20 | 27.0% |
| **Requiring coverage equal to the RCV of the building or requiring the coverage amount to take into account the UPB of prior liens** | **53** | **71.6%** |

With a proper class certification analysis, the "potential hurdles" this Court recognized with respect to Rule 23 and Modersbach's claim become road blocks.[14] When common questions cannot

---

[13] Exhibit 52 to the LeMar Declaration contains a more detailed chart showing, for each category, the state in which the property is located, the year the loan was originated, the originating lender, and the Bates numbers for each loan. Of the sampling, four loans were California deeds of trust, three of which required insurance coverage to the dwelling's full insurable value. (*See* Ex. 52 to LeMar Decl.) In addition to the deeds of trusts and mortgages produced as part of the sampling, Defendants produced other deeds of trusts and mortgages, most of which were for loans originated in California. (Ex. 51 to LeMar Decl.) Information regarding these loans is included in a separate chart in Exhibit 52 to the LeMar Declaration. Those loans include the following: (1) a mortgage requiring the borrower "to obtain and maintain Federal Flood Insurance to the extent such insurance is required and is or becomes available"; (2) eleven deeds of trust, all originated in California, requiring borrowers to maintain coverage equal to the building's full insurable value; (3) six deeds of trust and mortgages (five originated in California), requiring coverage equal to the full amount of the credit line plus the UPB of any prior liens (up to the NFIP maximum); and (4) eight deeds of trust and mortgages (four originated in California), requiring coverage equal to the UPB of the loan or line plus the UPB of any prior liens (up to the NFIP maximum). (*See* Ex. 52 to LeMar Decl.)

[14] Because the evidence relating specifically to Modersbach's "unfair" claim does not establish the class claims, Modersbach also does not satisfy the typicality requirement of Rule 23(a)(3). For Moderbach's claims and defenses to be typical, it must be established that proof of his claims will also prove the class claims, which he has not, and cannot, establish for these same reasons. *See In re*

be resolved for all members of the class in a single adjudication, as here, the predominance requirement and superiority requirements are not satisfied and class certification should be denied. *See, e.g., Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1014 (9th Cir. 2002) (upholding denial of certification because where "individual issues predominate, . . . a class action is also not superior"); *In re Countrywide Fin. Corp. Mortg. Marketing & Sales Practices Litig.*, Nos. 08-md-1988, 09-cv-00664, 2010 WL 1691451, at *12 (S.D. Cal. Apr. 23, 2010) (denying class certification where individual issues of reliance predominated).[15]

## 2. Modersbach Is An Inadequate Class Representative Because He Has No Standing to Assert Any Claims For Restitution Against Defendants.

Class certification of any UCL class should also be denied because Modersbach is an inadequate representative of that class. Modersbach seeks restitution and injunctive relief on behalf of the UCL class. (SAC ¶ 85.) Modersbach is not an adequate class representative for the UCL class because he would not be entitled to restitution. Relief under the UCL is limited to restitution and injunctive relief. *See Madrid v. Perot Systems Corp.*, 130 Cal. App. 4th 440, 452 (2005). Restitution under the UCL is limited to return of "those *measurable amounts* which are *wrongfully taken* by areas of an unfair business practice." *Day v. AT&T*, 63 Cal. App. 4th 325, 339 (1998) (emphasis in original). Because any premiums for lender-placed insurance were fully refunded before he joined this case, Modersbach has no claim for restitution under the UCL, and therefore cannot represent a

---

*Wireless Facilities, Inc. Securities Litigation*, 253 F.R.D. 630, 635 (S.D. Cal. 2008) (finding typicality where the proof the named plaintiffs would need to establish their claims would also prove the claims of the class); *but see Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 663 (M.D. Fla. 2001) (named plaintiffs were not typical where individualized nature of the proof of their claims would not prove class members' claims).

[15] Plaintiffs cite to two discovery dispute letters (Dkt. Nos. 52, 69) in arguing that Defendants have "admitted that the individual circumstances of particular borrowers are 'irrelevant' to class certification." (Plaintiffs' Brief at 23-24.) Defendants never took this position, but rather contested discovery Plaintiffs sought that included the identities, addresses, phone numbers, and detailed loan-level information of absent putative class members as inappropriate until at least such time as class certification was decided. (Dkt. No. 52 at 2; Dkt. No. 69 at 2). Indeed, when this Court reviewed Plaintiffs' overbroad requests for such detailed individualized information, it noted that Plaintiffs' counsel were "overreaching in a big-time way" and that "these requests don't look reasonable to me." (Ex. 53 to LeMar Decl. at 15, 27) Defendants produced their written procedures for home equity flood insurance and offered to provide the number of customers meeting certain criteria, which Defendants agreed could be "relevant to determining whether Plaintiff[s'] claims [are] typical [and] whether the class claims are subject to class-wide proof[.]" (Dkt. No. 69 at 2). However, at no time have Defendants ever agreed that the existence of individual issues to prove the class claims are "irrelevant" to whether Plaintiffs meet the certification requirements.

*DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

class asserting claims for a return of lender-placed premiums.  A named plaintiff cannot assert claims on behalf of a class that he lacks standing to assert individually.  *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (citing *O'Shea v. Littleton*, 414 U.S. 488 (1974); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1027 (N.D. Cal. 2007) (Alsup, J.). For this additional reason, Modersbach's motion to certify a UCL class should be denied.[16]

## II.   CERTIFICATION OF ANY TILA CLASS UNDER RULE 23(b)(3) SHOULD ALSO BE DENIED.

### A.   The Proposed Nationwide TILA Class Is Overbroad.

For their TILA claims, Plaintiffs must establish that JPMC violated 12 CFR § 226.5b(f)(3)  by "adversely changing the terms of Plaintiffs' credit plans after origination, without Plaintiffs' consent, by requiring and lender-placing more insurance than appropriate to protect its interest in the property[.]"[17]  (SAC ¶ 71)  Plaintiffs' TILA claims hinge on CHF's December 23, 2009 change in its minimum flood insurance requirements for the JPMC home equity lines and loans it services.

Plaintiffs' proposed nationwide TILA class consists of: "All persons who originated a home equity loan or line of credit with [JPMC] prior to December 23, 2009 that was secured by residential

---

[16] Plaintiffs also fail to offer any class-wide method for proving restitution on a class-wide basis when thousands of putative class members purchased their own insurance. Plaintiffs' claim that "the information necessary to calculate damages can be readily gleaned from Chase's customer database." (Plaintiffs' Brief at 24.) Defendants do not have records of the amount of premiums borrowers paid to their own insurance company for flood insurance, so the process of computing "damages" will not be "a mechanical task," as Plaintiffs claim.

[17] Plaintiffs also assert a TILA claim that JPMC failed to "provide proper notice" it was "amending the terms of the credit plans as described in the deeds of trust" in violation of 12 CFR § 226.9(c).  However, this claim is only in play if Plaintiffs first establish the alleged predicate TILA violation under 12 CFR § 226.5b(f)(3).

property in the United States, and were required by [JPMC] or its agents or affiliates to purchase or maintain flood insurance on their property on or after December 23, [2009.]" (Plaintiffs' Brief at i.)[18] This proposed class is overbroad because it includes all JPMC home equity borrowers with secured residential property located in SFHAs designated by FEMA, regardless of: (1) whether the borrowers held a home equity loan or HELOC; (2) whether the change in CHF's minimum flood requirements had any effect on the amount of coverage CHF required the borrowers to maintain; or (3) the amount of any first mortgage lien to which the JPMC home equity loan or line was subordinate.

*First*, the proposed TILA class is overbroad because it includes "all persons who originated a home equity *loan or line* of credit with" JPMC, but Plaintiffs' alleged TILA claims only apply to home equity lines, not loans. Plaintiffs' TILA claims are based on an alleged "adverse change" of credit terms under 12 CFR § 226.5b(f)(3), and an alleged failure to provide notice of this change under 12 CFR § 226.5b(f)(3). Both provisions are found in Regulation Z's "Subpart B – Open-End Credit," and both are expressly limited in application to open-end credit plans (*i.e.*, credit lines), not loans. *See* 12 CFR § 226.5b ("The requirements of this section apply to open-end credit plans secured by the consumer's dwelling"); 12 CFR § 226.9(c)(1)(i) (limiting scope of notice provision to "home equity plans subject to the requirements of § 226.5b"). Because Plaintiffs' TILA claims can only be based on an adverse change of credit terms under an open-end credit line, their proposed TILA class cannot include borrowers with home equity loans.

*Second*, even though Plaintiffs' TILA claims are based on a theory that JPMC imposed an "adverse change" in credit terms by changing its minimum flood insurance requirements for HELOC borrowers, the proposed class is not limited to borrowers who experienced such a change. Under Plaintiffs' proposed TILA class definition, *all* JPMC HELOC borrowers would be class members so long as JPMC originated their line before December 23, 2009, and required them to maintain *any* amount of flood insurance after that date, regardless of whether there was a change in the amount of flood insurance required. ███████████████████████████████████████

---

[18] Defendants were informed by Plaintiffs' counsel that the TILA class definition should read "December 23, 2009," and not "December 23, 2010," which is an error. (LeMar Decl. ¶¶ 43-44.)

██████████████████████████████████████████████
██████████████████████████████████████████████ Because the proposed TILA class includes

borrowers whose insurance requirements did not change, it includes borrowers who have no claim

under 12 CFR § 226.5b(f)(3) that JPMC "changed the terms" of their "credit plans after origination."

*Third*, even if the proposed class was limited to JPMC borrowers with home equity lines less

than the RCV and $250,000, that class still would be overbroad because it fails to account for the

putative class members' first position mortgages.   Under the NFIA, JPMC's borrowers must have

sufficient flood insurance to cover, at a minimum, both JPMC's secured interest in their HELOCs *plus*

the amount of any first mortgage lien, and there can be no claim under 12 CFR § 226.5b(f)(3) for

requiring them to maintain this amount of flood coverage.   As this Court previously held, if JPMC

"properly complied with the requirements of the NFIA and acted pursuant to its notice and 'force-

purchase' provisions, it cannot be held liable under the TILA for 'changing the terms' of the HELOCs

at issue in this dispute."  (Dkt. No. 110 at 13 (*citing Watt v. Alaska*, 451 U.S. 259, 267 (1981).)  "To

hold that a lender's compliance with the provisions of the NFIA would render it liable for 'change in

terms' under the TILA (under the circumstances presumed herein) would frustrate the intent and effect

of these congressional acts."  (*Id.* at 13.)

The 2009 Interagency Q&A requires a second lien lender to determine minimum flood

insurance based on the UPBs of the *first and second mortgage*.  A borrower with a home equity loan

or line of $50,000 cannot meet the NFIP minimum requirements by maintaining only $50,000 of

flood insurance without taking into account the amount of the first mortgage.  To illustrate the point

that minimum flood insurance requirements cannot be determined based solely on the principal

balance of the second lien, the Interagency Q&A provides the following example:

> *Example* 2:  Lender A, who is not directly covered by the Act or Regulation, makes a
> first mortgage with a principal balance of $100,000 and does not require flood
> insurance.  Lender B, who is directly covered by the Act and Regulation, issues a
> second mortgage with a principal balance of $50,000.  The insurable value of the
> residential building securing the loans is $200,000.  Lender B must ensure that flood
> insurance in the amount of $150,000 is purchased and maintained.  If Lender B were
> to require flood insurance only in an amount equal to the principal balance of the
> second mortgage ($50,000) through an NFIP policy, then its interest in the secured
> property would not be protected in the event of a flood loss because Lender A would

have prior claim on the entire $50,000 loss payment towards its principal balance of $100,000.

74 Fed. Reg. at 35,941, Q&A 36, Example 2.

For a borrower whose first mortgage and JPMC HELOC equal or exceed $250,000, there can be no claim under 12 CFR § 226.5b(f)(3) ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████ ███████████████████████ Because the proposed class includes borrowers with no TILA claims, it is overbroad and class certification should be denied.

**B.    Modersbach Cannot Satisfy Rule 23(b)(3) Because Individual Questions Will Overwhelm Any Common Questions On The TILA Claims.**

To satisfy the predominance requirement under Rule 23(b)(3), Plaintiffs must show that "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022 (internal citation omitted). Here, Modersbach has not, and cannot, demonstrate that his TILA claim is subject to class-wide proof.

To decide the TILA claims, the Court must determine for each HELOC borrower: (1) whether the amount of flood insurance CHF required after December 23, 2009 was greater than the amount required before that date; (2) if so, whether the amount of flood insurance required after December 2009 was more than what was authorized under the borrower's Deed of Trust and under the NFIA; and (3) if so, whether this was an "adverse change in credit terms" under TILA. The evidence required to prove the TILA claims in this case, for each borrower, consists of (a) the terms of each Deed of Trust; (b) the amount of available credit under each HELOC; (c) the RCV of each building; (d) the existence and amount of any first lien mortgage; (e) the amount of flood insurance required before December 2009; and (f) the amount of flood insurance required after December 2009.

The evidence begins with an analysis of each customer's Deed of Trust. Modersbach's Deed of Trust provides: "You shall keep the Property insured against loss by fire, hazards concluded within the term 'extended coverage' and any other hazards, including floods or flooding, for which we require insurance. This insurance shall be maintained in the amounts and for the periods that we require." (Ex. 29 to LeMar Decl.) As discussed earlier, Defendants produced a random sampling of 74 deeds of trust and mortgages that included 30 for home equity borrowers with loans or lines originated by

JPMC.  Five of these contained the same language relating to insurance as Modersbach's Deed of Trust, but 25 contained different language. (Exs. 50, 52 to LeMar Decl.)  For example, eight contained the following language:

> The Real Property is or will be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area. [Grantor/Trustor] agrees to obtain and maintain Federal Flood Insurance, if available, for the maximum amount of your credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the [NFIP], or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

(Ex. 50 to LeMar Decl.)  In the broader random sampling of 74 security instruments for CHF's home equity customers that included both loans originated by JPMC and other lenders, 33.8% of the security instruments contained language requiring customers to maintain coverage in the amount of the RCV.  An example of such a provision is as follows:

> "[Trustor/Grantor] promises . . . To keep the Property and the improvements thereon insured by a company satisfactory to [Beneficiary/Lender] against fire and extended coverage perils, and against such other risks as Beneficiary may reasonable require, in an amount equal to the full insurable value of the improvements and to deliver evidence of such insurance coverage to [Beneficiary/Lender]."

(Ex. 50 to LeMar Decl.)  While none of the security instruments for HELOCs originated by JPMC in the sample contained this exact language, the sample was small and others may.

Just as proving Modersbach's TILA claim starts with the flood insurance provision in his Deed of Trust, proving each putative class member's TILA claim also starts with examining the flood insurance provision in each of their security instruments, which will mostly be different than Modersbach's.  Because this is an individual inquiry for each borrower, individual issues predominate over any common class issues and Plaintiffs can satisfy neither the predominance nor superiority requirements.  *See, e.g., Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171-76 (11th Cir. 2010) (finding that material differences in payment provisions of class members' contracts created individual issues that overwhelmed any common issues and defeated class certification); *Schuetz*, 292 F.3d at 1014 (upholding denial of certification because where "individual issues predominate, . . . a class action is also not superior"); *CLN Props., Inc. v. Republic Servs., Inc.*, No. CV-09-1428-PHX-DGC, 2010 WL 4146734, at *5 (D. Ariz. Dec. 13, 2010) (denying class certification where variations in certain terms of form contracts created individual issues that

predominated over common ones).

Likewise, to prove each class member's TILA claim will require an individual inquiry into the status of any first loan on their property, which is senior to the HELOC lien.  When JPMC originated Modersbach's HELOC, he had a Wells Fargo first mortgage with a balance of approximately $550,000, which he paid off after drawing on his HELOC. (Modersbach Dep. at 32-34, 39 (Ex. 6 to Richter Decl.).)  Defendants learned that Modersbach paid off his first mortgage through discovery in this case, but this information will be needed for each class member to pursue a TILA claim.  Not only do Plaintiffs fail to account for the status of any first position liens for other borrowers, they also provide no explanation for how such lien amounts could be ascertained on a class basis.  This is not a trivial issue,

There is simply no class-wide method of proof for the TILA claim, and Plaintiffs present none. Class certification under Rule 23(b)(3) should be denied.

### C.   Hofstetter Is An Inadequate Representative For Any TILA Class Because She Is Not A Member Of The Purported Class And Her Claims Are Not Typical.

Hofstetter's TILA claim is that JPMC changed the terms of her credit when CHF required her to maintain flood coverage, beginning in September 2009, in the amount of her $175,000 credit line.

, and Hofstetter was not, she is not a member of the TILA class and is inadequate to represent it.  She was required to maintain $175,000 in flood coverage both before and after December 2009, while the class consists of individuals who were required to purchase more insurance.[19]

---

[19] The TILA proposed class definition changed substantially from the SAC (¶2) to Plaintiffs' class motion.  (Plaintiffs' Motion at i.) Hofstetter was included within the class definition in the SAC. However, the TILA class she now moves to certify includes borrowers with a home equity loan prior

### III.   CERTIFICATION OF A RULE 23(b)(2) CLASS SHOULD BE DENIED ON ALL CLAIMS.

#### A.   There is no Injunctive Relief Under TILA, so a Rule 23(b)(2) Class Must be Denied.

Because Plaintiffs fail to distinguish the classes they seek to have certified in their discussion of Rule 23(b)(2), it is unclear whether they are requesting injunctive relief with respect to their proposed TILA class.  However, to the extent they are, certification of a (b)(2) TILA class would be an abuse of discretion because injunctive relief is not an available remedy for their TILA claims.  28 USC § 1640(a).  *See also Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 (11th Cir. 2008) ("because we do not expect congress to 'expressly preclude' remedies, we do not read TILA to confer upon private litigants an implied right to an injunction or other equitable relief such as restitution or disgorgement"), *citing Perrone v. Gen. Motors Acceptance Corp.*, 232 F.3d 433, 439 (5th Cir. 2000).  "Of course, the unavailability of injunctive relief under a statute would automatically make (b)(2) certification an abuse of discretion."  *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 977 n. 39 (5th Cir. 2000).  *See also Christ*, 547 F.3d at 1298 ("Because injunctive relief is not a remedy available under TILA to Christ and the plaintiff class, Rule 23(b)(2) certification under TILA was improper.").

#### B.   The Section 17200 Claims Also Should Not Be Certified Under Rule 23(b)(2).

For the reasons discussed above, the proposed UCL class includes borrowers who were not subject to the same flood insurance practices as Hofstetter or Modersbach, so certification should be denied because the proposed class is overbroad.  (*See* Part I.A above.)  Likewise, neither Hofstetter nor Modersbach satisfies the typicality or adequacy prerequisites of Rule 23(a)(3) and (4), so their request to certify a UCL class under Rule 23(b)(2) should be denied for this additional reason.  (*See* Parts I.B and C(2).)

Certification under (b)(2) should also be denied because Plaintiffs' proposed UCL class fails to meet the cohesiveness requirement of Rule 23(b)(2).  "Even though [Rule 23(b)(2)] does not contain a predominance and superiority requirement, the requisite cohesiveness is lacking where individual

---

to December 23, 2009, who were required to purchase or maintain insurance after December 23, 2009 – thus attempting to capture borrowers who were required to purchase more insurance after December 2009 (like Modersbach). Hofstetter was not required to purchase more insurance after December 2009, so she is not a member of the proposed TILA class. Also, given the fact that Hofstetter's senior loan exceeded $700,000, her $175,000 insurance requirement was less than the NFIA minimum, so she has no claim under TILA for a change in her credit terms.

1   issues predominate." *Lewallen v. Medtronic USA, Inc.*, No. C 01-20395 RMW, 2002 WL 31300899,

2   at *3 (N.D. Cal. Aug. 28 2002) (citations omitted) (rejecting (b)(2) class for same reasons as (b)(3):

3   "individual questions predominate over the common questions"); *see also Sweet v. Pfizer*, 232 F.R.D.

4   360, 374 (C.D. Cal. 2005) ("even though Rule 23(b)(2), unlike Rule 23(b)(3), does not specifically

5   contain predominance and superiority requirements, a class under Rule 23(b)(2) must not be overrun

6   with individual issues.")  As discussed above, individual questions predominate over any common

7   questions, and therefore Rule 23(b)(2)'s cohesiveness requirement is not met here.[20]

8   ### CONCLUSION

9       For all of the foregoing reasons, the Court should deny Plaintiffs' Motion for Class Certification

10  in its entirety.

11  Dated:  March 3, 2011                ROPERS, MAJESKI, KOHN & BENTLEY &

12                                       BURKE, WARREN, MACKAY & SERRITELLA, P.C.

13                                       By:  /s/ LeAnn Pedersen Pope

                                         Attorneys for Defendants

14                                       CHASE HOME FINANCE, LLC and

                                         JPMORGAN CHASE BANK, N.A.

15  09135\00590\829751v1

16

17

18

19

20

21

---

22      [20] Plaintiffs also seek a "Force-Placed Subclass" of borrowers within the California Class who
    had flood insurance lender-placed upon them by Defendants. (Plaintiff's Motion at i). Plaintiffs fail to

23  discuss how this sub-class satisfies Rule 23, other than a single sentence addressing the commonality
    requirement of Rule 23(a)(2), stating, "Plaintiffs also present a common question regarding whether it

24  was 'unfair' for Chase to force-place flood insurance through ASIC at inflated premiums and negotiate
    a commission for its Affiliate, instead of purchasing such insurance at arm's length from other

25  insurance companies." (Plaintiffs' Brief at 19)  When a subclass is proposed, the moving party has the
    burden of establishing all the requirements of Rule 23 are satisfied for the subclass. *Betts v. Reliable*

26  *Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981) ("[E]ach subclass must independently
    meet the requirements of Rule 23 for the maintenance of a class action.").  For this reason alone, the

27  subclass should be denied. Also, while the SAC does mention the purchase of insurance from ASIC at
    "inflated premiums," the UCL claims have always been about whether Hofstetter was required to

28  maintain *any* insurance, not whether the premiums for the lender placed insurance were too high.

*DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*