Matthew C. Helland, CA State Bar No. 250451
Helland@nka.com
NICHOLS KASTER, LLP
One Embarcadero Center, Suite 720
San Francisco, CA  94111
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

James H. Kaster, CA State Bar No. 248949
Kaster@nka.com
Paul J. Lukas, MN State Bar No. 22084X
Lukas@nka.com
(admitted **pro hac vice**)
Kai Richter, MN State Bar No. 296545
KRichter@nka.com
(admitted **pro hac vice**)
Rebekah L. Bailey, CA State Bar No. 258551
Bailey@nka.com
(admitted **pro hac vice**)
NICHOLS KASTER, PLLP
4600 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870

Attorneys for Plaintiffs and the Proposed Classes

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sheila I. Hofstetter and Roger Modersbach, individually, as representatives of the classes, and on behalf of the general public,<br><br>Plaintiffs,<br><br>vs.<br><br>Chase Home Finance, LLC, JP Morgan Chase Bank, N.A. , and DOES 1-50, inclusive,<br><br>Defendants. | Case No. CV-10-1313 WHA<br><br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION, AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: March 24, 2011 (8:00 a.m.) |

# NOTICE OF MOTION AND MOTION

Please take notice that Plaintiffs' Motion for Class Certification will be heard on **March 24, 2011 at 8:00 a.m.**, in Courtroom 9 on the 19th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, before the Honorable William H. Alsup.

Pursuant to Federal Rule of Civil Procedure 23 and this Court's Order dated January 18, 2010 [ECF No. 124], Plaintiffs Sheila Hofstetter and Roger Modersbach move for an order certifying the following proposed classes in this action:

1. With respect to Plaintiffs' claim under the Truth-In-Lending Act (Count 1), a Nationwide Class consisting of "all persons who originated a home equity loan or line of credit with JPMorgan Chase Bank, N.A. ("JPM") prior to December 23, 2009 that was secured by residential property in the United States, and were required by JPM or its agents or affiliates to purchase or maintain flood insurance on their property on or after December 23, 2010";

2. With respect to Plaintiffs' claim under California's Unfair Business Practices Act (Count 2), a California Class consisting of "all persons who have or had any loan or line of credit with Defendants JPMorgan Chase Bank, N.A. or Chase Home Finance, LLC (collectively, "Chase") secured by their residential property in the State of California, and were required by Chase to purchase or maintain flood insurance on their property within four years prior to this action's filing date through the date of final disposition of this action."

In addition, Plaintiffs propose a "Force-Placed Subclass" of borrowers within the California Class who had flood insurance force-placed upon them by Defendants.[1]

This motion is based on the points and authorities cited in Plaintiffs' accompanying memorandum of points and authorities; the contemporaneously-filed declarations of Sheila Hofstetter, Roger Modersbach, and Kai Richter; all exhibits attached thereto; the allegations in

---

[1] Plaintiffs also request that the Court appoint them as representatives of the proposed classes, and appoint Plaintiffs' current counsel as class counsel.

-i-

Plaintiffs' Second Amended Complaint, the arguments of counsel; Plaintiffs' forthcoming reply brief and any accompanying papers; and all files, records, and proceedings in this matter.

Dated: 2/17/11                    NICHOLS KASTER, PLLP

                                  By:    s/ Kai Richter
                                         Kai Richter

                                  NICHOLS KASTER, LLP
                                  Attorneys for Plaintiffs and the Proposed Classes

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.    Procedural Background ............................................................................ 3

II.   Factual Background ................................................................................. 3

      A.  Representative Plaintiffs ................................................................ 3

          1. Sheila Hofstetter ....................................................................... 3

          2. Roger Modersbach ..................................................................... 4

      B.  Plaintiffs' Experience Comports with Defendants' Policies and Practices ............ 7

          1. Flood Insurance Policy for Home Equity Customers ................................. 7

          2. Similar or Identical Flood Insurance Policies for Other Borrowers ........... 9

          3. Uniform Application of Flood Insurance Policies .................................. 10

          4. Uniform Administration of Flood Insurance Program Through ASIC ..... 11

          5. Financial Benefits to Chase and/or Its Affiliates .................................... 13

              a.  Commission Income ......................................................... 13

              b.  "Free" Mailing of Form Letters .................................... 14

              c.  Other Financial Incentives ............................................ 15

          6. Exorbitant Cost to Borrowers ................................................. 15

          7. Limited Force-Placed Insurance Coverage ............................... 15

ARGUMENT ...................................................................................................... 16

I.    Standard of Review................................................................................ 16

II.   The Proposed Classes Satisfy the Criteria for Certification.............................. 17

      A.  Rule 23(a) Criteria ...................................................................... 17

          1. Numerosity................................................................................ 17

          2. Commonality............................................................................. 17

          3. Typicality .................................................................................. 19

-iii-

4. Adequacy of Representation ...................................................................... 20

B.  Rule 23(b) Criteria ................................................................................. 21

1. Rule 23(b)(2) Criteria ............................................................................. 21

2. Rule 23(b)(3) Criteria ............................................................................. 23

a.   Predominance .................................................................................... 23

b.   Superiority .......................................................................................... 24

CONCLUSION .................................................................................................. 25

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION, AND
MEMORANDUM OF POINTS AND AUTHORITIES**

1

## <u>TABLE OF AUTHORITIES</u>

2

**<u>Federal Statutes</u>**

3

15 U.S.C. §1647(c) ............................................................................................... 18

4

**<u>Federal Regulations</u>**

5

12 C.F.R. 226.5(b)(f)(3) ....................................................................................... 18

6

12 C.F.R. § 226.9(c)(1)(i) ..................................................................................... 18

7

**<u>Federal Rules</u>**

8

Fed. R. Civ. P. 23(a) ....................................................................................... 1, 17-21

9

Fed. R. Civ. P. 23(b) ........................................................................................ 2, 21-25

10

Fed. R. Civ. P. 23(b)(2) .................................................................................... 21-23

11

Fed. R. Civ. P. 23(b)(3) .................................................................................... 23-25

12

**<u>Cases</u>**

13

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) .................................................. 16

14

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) ................................................... 24

15

*Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171 (9th Cir. 1990) ............. 20

16

*Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010) ..... 16, 18, 19, 20, 21, 22, 23, 24, 25

17

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .................................................. 17

18

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ................................................ 19

19

*Gutierrez v. Wells Fargo Bank, N.A.*, 2008 WL 4279550 (N.D.Cal. Sept. 11, 2008) ....................

20

................................................................................... 16, 17, 19, 20, 23, 24, 25

21

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .................................. 17, 18, 19, 23, 25

22

*Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767 (9th Cir.1996) ............................................ 25

23

*Kay v. Wells Fargo & Co.*, 247 F.R.D. 572 (N.D.Cal. 2007) ........................................... 16, 19, 23

24

*In re LDK Solar Securities Litig.*, 225 F.R.D. 519 (N.D.Cal. 2009) ............................................. 24

25

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d

26

1152 (9th Cir. 2001) ............................................................................................ 23

27

*Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369 (N.D. Cal. 2007) ............................. 19, 20, 24, 25

28

*Smith v. Cardinal Logistics Mgmt. Corp.*, 2008 WL 4156364 (N.D.Cal. Sept. 5, 2008) ............ 25

*Wang v. Chinese Daily News, Inc.*, 623 F.3d 743 (9th Cir. 2010) ..................................... 21, 22, 23

*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) ................................... 24

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION, AND
MEMORANDUM OF POINTS AND AUTHORITIES**

1

**INTRODUCTION**

2      Plaintiffs bring this Motion for Class Certification to provide Chase's borrowers in

3  California and across the country the opportunity to obtain relief from Chase's unfair and

4  unlawful flood insurance requirements and practices.[2]   Specifically, Chase has abused its

5  authority under the National Flood Insurance Program ("NFIP") in at least three ways: (1) Chase

6  unfairly demands levels of flood insurance coverage that are not required by federal law or

7  necessary to protect its interest as lender, in violation of California's Unfair Business Practices

8  Act ("CUBPA"); (2)  Chase went out of its way to increase its flood insurance requirements for

9  home equity borrowers, after-the-fact, in violation of the Truth-in-Lending Act ("TILA"); and (3)

10  Chase unfairly enriches itself by obtaining hefty commissions in return for force-placing flood

11  insurance coverage at its borrowers' expense.

12      Both the breadth and uniformity of Defendants' flood insurance practices make this an

13  appropriate case for class certification.  *See Gutierrez v. Wells Fargo Bank, N.A.*, 2008 WL

14  4279550, at *13 (N.D. Cal. Sept. 11, 2008) (Alsup, J.) ("[t]he challenged practice is a

15  standardized one applied on a routine basis to all customers" by the bank).  Chase uniformly

16  applies its flood insurance policies "across all borrowers, all properties, nationwide." *Nack Dep.*

17  *at 50:14-18.*    Indeed, it is undisputed that Chase applies the same flood insurance requirements

18  to borrowers "[r]egardless of individual circumstances." *Nack Dep. at 49:24-50:1; Groff Dep. at*

19  *55:23-57:17.*    Accordingly, class certification is clearly appropriate under Rule 23, as the

20  proposed classes are tailored to Plaintiffs' claims and certification will provide borrowers a

21  necessary avenue for redress.

22      Plaintiffs satisfy the requirements of Rule 23(a) because: (1) the proposed classes number

23  in the thousands; (2) Plaintiffs' claims arise from a common set of corporate policies (and across-

24  the-board changes to those policies) that were applied to all class members without regard to their

25  individual circumstances and raise associated common legal questions; (3) the amount of flood

26

---

27  [2]Plaintiffs use the term "Chase" or "Defendants" to collectively refer to Defendants JP Morgan
Chase Bank, N.A. ("JPM") and Chase Home Finance, LLC ("CHF")

28                                          -1-

insurance that Defendants required Plaintiffs to maintain was typical of the amount of flood insurance that Defendants required for other class members; and (4) Plaintiffs and their counsel have adequately represented the interests of the class (as reflected by the progress of the case thus far), and will continue to do so.

Further, with respect to the Rule 23(b) requirements, certification is appropriate under both subsections (2) and (3). Certification of an injunctive class is appropriate under Rule 23(b)(2) because Defendants' insurance requirements apply generally to the class, and class members will continue to be subjected to unfair and unlawful insurance requirements (potentially for many years to come) in the absence of injunctive and declaratory relief.[3] Certification is also appropriate under Rule 23(b)(3) because (1) questions relating to the fairness and lawfulness of Defendants' flood insurance policies and practices predominate over any questions that may apply individually to specific borrowers; and (2) it would not be feasible or economical for individual class members to litigate these common legal issues by themselves against one of the nation's largest banks.

To the extent that Chase now argues that alleged "individualized" issues preclude certification, any such argument rings hollow.[4] Defendants have repeatedly asserted that individualized issues are "irrelevant" to the issues in this case, and the Court's certification analysis in particular. *See ECF No. 69 at 2* ("Specific information relating to other borrowers who may be putative class members . . . is irrelevant to class certification."); *ECF No. 52 at 3* ("Discovery beyond Defendants' procedures for flood insurance, and the number of borrowers, like Plaintiff, . . . is irrelevant to the Court's Rule 23 determination."). Plaintiffs agree with Defendants that individualized circumstances form no bar to certification in this matter. Plaintiffs' motion should be granted.

---

[3] Plaintiffs expressly seek injunctive relief in the SAC. *SAC (ECF No. 112), ¶¶ 87(B), (C), (E).*

[4] Notably, Chase previously asserted that it would not oppose a class of so-called "0/0 borrowers" on numerosity, commonality, or typicality grounds. *See Richter Decl., Ex. 7.* Although it now contends that a larger class of borrowers would be overbroad, its flood insurance policies and practices make no distinction between "0/0 borrowers" and other types of borrowers.

-2-

1

**BACKGROUND**

2   **I.      Procedural Background**

3          Plaintiff Sheila Hofstetter ("Hofstetter") commenced this action on March 30, 2010. *ECF*

4   *No. 1.* On October 29, 2010, this Court issued an order allowing Plaintiff Roger Modersbach

5   ("Modersbach") to join the action as a second named Plaintiff. *ECF No. 110.* In the same order,

6   the Court concluded that Plaintiffs' SAC asserts valid claims against Chase under the TILA and

7   CUBPA. *Id.* Although Chase sought to strike Plaintiffs' class definitions as overbroad, the Court

8   declined to do so at that time. *Id. at 20-21.*

9   **II.     Factual Background**

10          **A. Representative Plaintiffs**

11               **1.  Sheila Hofstetter**

12          Plaintiff Sheila Hofstetter is a resident of Alamo, California. *Hofstetter Decl., ¶ 1.* On

13   January 30, 2006, Hofstetter and her former husband entered into a home equity line of credit

14   agreement ("HELOC Agreement") with JPM, with a credit limit of $175,000. *Id., ¶ 2 & Ex. 1.*

15   At the same time, they also signed a deed of trust in favor of JPM, which contained boilerplate

16   security and insurance provisions. *Id., Ex. 2.* Upon opening this line, Hofstetter made an initial

17   draw of $25,000, but she paid off her balance by the end of 2006 and has not made any further

18   draws against her line. *Hofstetter Decl., ¶ 3.* Moreover, she has no ability to draw additional

19   funds because JPM indefinitely suspended her line on August 16, 2008. *Id., ¶ 4 & Ex. 3.*

20          On August 11, 2009, CHF sent Hofstetter a "Notice of Special Flood Hazard" on behalf of

21   JPM, indicating, for the first time, that her dwelling was located in a Special Flood Hazard Area

22   ("SFHA"). *Hofstetter Decl., ¶ 5 & Ex. 4.* In this notice letter, CHF asserted that "Federal law

23   requires" flood insurance for her property, and further asserted that the required amount of

24   coverage is equal to "the lesser" of:

25          • The maximum amount of insurance coverage available through the

26               National Flood Insurance Program (NFIP), which is currently $250,000; or

27          • 100% of the full replacement cost value of the dwelling and insurable

28   -3-

improvements; or

- The principal balance of the loan or credit line amount for lines of credit.

*Id.*

At the time Hofstetter received this form letter, she thought it had been sent to her by mistake, because she had no principal balance and no available credit, and therefore her minimum amount of coverage was zero according to the third bullet point of the letter. *Hostetter Decl., ¶ 6; see also Hofstetter Dep. at 59:25-60:10; 66:14-67:3.* However, on September 1, 2009, CHF sent Hofstetter a second form letter, indicating that it had force-purchased a flood insurance binder at her expense. *Hofstetter Decl., ¶ 6 & Ex. 5.* Then, on October 6, 2009, CHF sent Hofstetter a third form letter, stating that (1) Chase had purchased a flood insurance policy for her dwelling at cost of $1,575; and (2) "[a] licensed affiliate of Chase was paid a commission in connection with the policy" that was purchased by Chase (*id., ¶ 7 & Ex. 6*).

Hofstetter objected to Chase's actions in a pair of letters dated January 11, 2010 and February 23, 2010. *Hofstetter Decl, ¶ 8 & Exs. 8-9.* In addition, Hofstetter repeatedly contacted Chase's customer service representatives by phone, in an effort to resolve the issue. *Hofstetter Decl.,¶ 8.* However, Chase insisted that she pay for this force-placed flood insurance. *Hofstetter Decl., ¶¶ 8-10 & Exs. 10-11.* Moreover, Chase secretly renewed her force-placed policy in September of 2010 – this time at the maximum federal coverage level ($250,000) – without Hofstetter's consent and without disclosing that it had done so. *Hofstetter Decl., ¶ 11; Richter Decl., Ex. 30.* Hofstetter has not yet paid the premiums that were incurred as a result of this force-placed coverage. *Id., ¶ 12.* However, because the premiums for the first policy were added to her account balance, she was forced to pay interest charges on those premiums in order to avoid adverse consequences to her credit rating. *Id.* Once she stopped making these interest payments, she began receiving collections notices. *Id., ¶ 12 & Ex. 12.*

### 2. Roger Modersbach

Plaintiff Roger Moderbach is also a resident of Alamo, California. *Modersbach Decl., ¶ 1.* On December 18, 2004, Modersbach and his wife entered into a HELOC Agreement with

-4-

JPM, with a credit limit of $100,000.  *Id., ¶ 2 & Ex. 1*.  In addition, they also signed the same form deed of trust as Hofstetter.  *Modersbach Decl., Ex. 2*.  Upon origination, Modersbach drew $50,000 under his credit line, which he used to pay off an existing loan on the property. *Modersbach Decl., ¶ 3*.  Since that time, he has not received any further draws on his credit line, and has not taken out any other loans or lines of credit secured by his property.  *Id.*  JPM is the only lender that has a security interest in his property.  *Id.*

On August 10, 2009, CHF advised Modersbach, for the first time, that his property was located in a SFHA, and demanded (on behalf of JPM) that he obtain flood insurance for the property.  *Id., ¶ 4 & Ex. 3*.  This letter was identical to the form letter that CHF sent to Hofstetter the very next day, and stated that the needed amount of coverage was equal to the "lesser" of:

- The maximum amount of insurance coverage available through the National Flood Insurance Program (NFIP), which is currently $250,000; or
- 100% of the full replacement cost value of the dwelling and insurable improvements; or
- The principal balance of the loan or credit line amounts for lines of credit.

*Id.*  In addition, CHF also sent Modersbach follow-up form letters on September 1, 2009 and October 6, 2009, which were substantially similar to the form letters that it sent to Hofstetter on the same dates, and force-placed $100,000 worth of flood insurance coverage on his property at a cost of $900 (with a commission going to Chase's "licensed affiliate.")  *Id., ¶ 5 & Exs. 4-5*.

In order to avoid these premium charges, Modersbach elected to purchase his own flood insurance coverage through an independent organization (the California State Automobile Association).  *Modersbach Decl., ¶ 6*.  The cost of this independently-obtained coverage was only $503, nearly $400 less than the force-placed policy.  *Id.*  Chase then cancelled his force-placed policy on October 22, 2009.  *Id.*

At that time, Modersbach believed that he had fully satisfied his flood insurance obligations.  *Modersbach Decl., ¶ 7*.  However, on or about May 13, 2010, while Modersbach's $100,000 flood insurance policy remained in effect, CHF sent a new form letter to Modersbach,

-5-

asserting that "we do not have proof of adequate flood insurance coverage on your property." *Id.,* *¶ 7 & Ex. 6.* This letter further asserted that "you must increase your flood insurance coverage by $150,000", and claimed that Modersbach was required to purchase coverage equal to "the lesser" of the following:

- The maximum amount of insurance coverage available through the National Flood Insurance Program (NFIP), which is currently $250,000; or
- 100% of the full replacement cost value of the dwelling and insurable improvements.

*Id.* Notably, unlike the earlier form letter that CHF sent to Modersbach on August 10, 2009, this letter did *not* include a third bullet option allowing for flood insurance in the amount of "[t]he principal balance of the loan or credit line amount for lines of credit." *Id.*

Upon receiving this form letter, Moderbach promptly called CHF and also wrote to CHF, to object to this increase in Chase's flood insurance requirements. *Id., ¶ 8 & Ex. 7.* However, despite Modersbach's objections, CHF sent another form letter to him on June 3, 2010, indicating that it had purchased a binder placing additional flood insurance on his dwelling. *Id., ¶ 9 & Ex. 8.*[5] Then, on July 7, 2010, CHF sent Modersbach a third form letter, indicating that it had force-placed $150,000 worth of additional coverage for him at a cost of $1,350 (with a commission going to Chase's "licensed affiliate"). *Id., ¶ 12 & Ex. 10.*

In order to rid himself of this force-placed policy and avoid paying further exorbitant charges for force-placed flood insurance, Modersbach increased the coverage on his existing $100,000 flood insurance policy to $250,000, effective July 13, 2010. *Modersbach Decl., ¶ 13.* Modersbach paid $581 for this increased coverage, less than half the $1,350 premium that Defendants charged him. *Id.* CHF then cancelled the second force-placed policy. *Id.*

---

[5] After receiving this second form letter, Modersbach spoke to a company representative on June 19, 2010, who claimed to speak on behalf of JPM's CEO with regard to Modersbach's situation. *Modersbach Decl., ¶ 10.* This company representative asserted that Chase had changed its insurance requirements to federal maximums in *all* cases, without regard to individual circumstances, and further stated that "there is no leeway" with respect to this policy. *Id.*

-6-

### B.  Plaintiffs' Experience Comports with Defendants' Policies and Practices

The experience of the named Plaintiffs was not unique and did not happen by accident. Rather, Chase admits that it treated them "consistently" with other borrowers:

> Q:   Did Chase discriminate against [Plaintiffs] with respect to its flood insurance requirements?
>
> A:   No.
>
> Q:   . . . They were treated consistently with other borrowers?
>
> A:   Yes.

*Nack Dep. at 142:3-9.*  As discussed below, both Hofstetter and Modersbach were subject to the same flood insurance policies as other borrowers.  *Nack Dep. at 143:1-3.*  Moreover, the form notices that they received were "system generated form letters" (*ECF No. 52 at 3*), which were consistent with the notices that were sent to other borrowers.  *Nack Dep. at 142:15-25*; *see also Richter Decl., Exs. 27-29, 33-34*.

### 1.  Flood Insurance Policy for Home Equity Customers

Prior to 2008, Chase did not monitor the adequacy of flood insurance coverage carried by home equity customers in flood zones, and did not force-place coverage on the ground that the existing level of coverage was deemed insufficient.  *Nack Dep. at 70:9-72:23; Richter Decl., Ex. 12 at CHASE 340.*[6]  However, beginning in 2008, Chase started to pay attention to this issue and began to force-place "gap" flood insurance where there were "deficient" coverage amounts.  *Nack Dep. at 71:13-20; 79:21-24; Richter Decl., Ex. 13.*

At first, Chase only required flood insurance coverage up to the borrower's unpaid principal balance for both loans and lines, without regard to whether the amount of the line exceeded the principal balance.  *Nack Dep. at 73:23-74:10 & 80:17-25; Richter Decl., Ex.13 at CHASE 00376* ("The flood gap coverage amount will be based on the UPB amount instead of the total line amount.").  However, in May of 2009, Chase began sending form letters requiring

---

[6] Prior to 2008, Chase only force-placed coverage if there was no evidence that a borrower in a SFHA carried *any* flood insurance.  *Nack Dep. at 87:19-88:6.*

borrowers in flood zones to insure their property to "the lesser" of (1) the NFIP maximum amount ($250,000); (2) full replacement cost value; or (3) the principal balance of the loan *or credit line amounts for lines of credit. Richter Decl., Ex. 29 (see, e.g., CHASE 1428-29).*

Then, later that year, an even bigger change took place.  In December of 2009, Chase admittedly "changed" its flood insurance policy to require coverage equal to the lesser of (1) the NFIP maximum ($250,000); or (2) replacement cost value, without regard to the amount of the borrower's principal balance or line of credit.  *Nack Dep. at 65:17-22; 83:24-84:9, 86:10-14; Richter Decl., Ex. 14.*  At the same time, it "discontinued" using the form letters that had provided borrowers with a third option of insuring to the amount of their home equity loan or credit line, and replaced them with form letters demanding coverage in one of the first two amounts ($250,000 or replacement cost value).  *Richter Decl., Exs. 27-29; Groff Dep. at 78:11-81:4; 83:18-85:19; 88:4-92:8; 97:22-101:12.*

Defendants acknowledge that this "put Chase's requirement above the minimum regulatory requirement[.]"  *Wheeler Dep. at 148:22-149:13.*  As this Court previously has determined, federal law does not require flood insurance beyond the greater of a borrower's principal balance or credit line.  *See Order dated Aug. 16, 2010 (ECF No. 51) at 13; Order dated October 29, 2010 (ECF No. 110) at 14.*  Moreover, these increased coverage requirements were unnecessary; Chase's corporate representative, Jeffrey Nack, could not recall a single instance in which Chase suffered a loss under its former policy that allowed customers to insure to the amount of their loan or credit line.  *Nack Dep. at 60:5-19.*  However, Chase adopted the new flood insurance policy anyway, to the detriment of approximately 60,000 home equity borrowers nationwide. *Nack Dep. 105:15-25; Richter Decl, Ex. 14 at CHASE 00370.*[7]

---

[7] Defendants' total portfolio of home equity customers in a flood zone is approximately 90,000 borrowers.  *Nack Dep. at 97:24-98:6.*  However, approximately 1/3 of these customers are former Washington Mutual customers (*id.* at 105:15-106:3), who already were required by Chase (prior to December of 2009) to maintain flood insurance equal to the NFIP maximum or replacement cost value.  *See, Richter Decl. Ex. 28-29 (e.g., CHASE 1348-49).*  These WAMU borrowers are not included in the proposed Nationwide Class.

In addition, Chase changed its flood insurance procedures to *automatically* use the amount of the borrower's hazard insurance coverage (fire, wind, etc.) as a proxy for replacement cost value, and started requiring flood insurance coverage in the amount of the hazard policy unless the hazard policy was above $250,000. *Nack Dep. at 98:25-99:3, 99:24-100:3*. Prior to December of 2009, Defendants made no effort to track hazard insurance coverage levels for customers with home equity loans or lines. *Id. at 99:4-10*. However, after December of 2009, Defendants aggressively began to monitor and gather information on borrowers' hazard insurance policies, for the purpose of matching the level of flood insurance coverage to the level of hazard coverage.[8]

Defendants continue to require all home equity borrowers in SFHAs to carry flood insurance equal to the NFIP maximum or replacement cost value. *Nack Dep. at 113:25-114:7*. Absent a Court order, there is no evidence that Defendants intend to relax this new policy.

### 2.  Similar or Identical Flood Insurance Policies for Other Borrowers

Defendants' flood insurance policies for other types of mortgage borrowers are substantially similar, and in some cases, identical. Regardless of borrower, Chase's flood insurance requirements exceed federal requirements.

For example, borrowers with purchase loans in the second lien position are also required to carry flood insurance in an amount equal to the lesser of $250,000 or replacement cost value.[9] In addition, borrowers with condominium loans are required to insure to the same amount.[10] In fact, the form letters that are sent to second lien borrowers and condominium borrowers regarding

---

[8] For example, in December of 2009, Defendants added a logic function to their computer system to flag accounts with hazard coverage in excess of flood coverage. *Nack Dep. at 100:4-12*. At the same time, CHF sent form letters to home equity customers inquiring about their level of hazard coverage. *Nack Dep. at 101:2-103:3; Richter Decl., Exs. 15-16*. Notably, these letters did not advise borrowers that the information they supplied would be used against them, as a basis for demanding increased flood coverage. *Nack Dep. at 103:4-11*.

[9] *Reitz Dep. at 32:9-35:14; 36:15-37:18; 38:14-24; 52:7-19; 53:21-56:16; 59:23-61:4; Richter Decl., Ex. 34 at, e.g., CHASE 2340, 2354, 2406, 2418, 2454, 2476.*

[10] *Richter Decl., Ex. 18 at 11-12; Reitz Dep. at 86:15-88:25; see also Reitz Dep. at 35:15-36:5, 38:25-39:17, 54:17-56:16; 59:23-61:4; 86:15-88:25; Richter Decl., Ex. 34 at, e.g., CHASE 2423, 2434, 2358, 2458.*

-9-

Defendants' flood insurance requirements are identical, in both form and substance, to the form letters that are sent to home equity borrowers.  *Reitz Dep. at 61:23-72:24; Compare Richter Decl., Ex. 34 at, e.g., CHASE 2454, 2368, 2382, 2406, 2418, 2430, 2352 with Richter Decl., Ex. 29 at, e.g., CHASE 1404, 1364, 1378, 1434, 1446, 1459, 1348.*

Defendants' flood insurance requirements for first mortgage borrowers are also the same, except that borrowers have the option of insuring to 80% of replacement cost value in certain circumstances.  According to Chase's policy for first mortgage borrowers, "[a]dequate flood coverage" is the lesser of: (1) replacement cost; (2) the maximum available under the NFIP ($250,000); or (3) the unpaid principal balance, *provided that it is a minimum of 80% of replacement cost. Nack Dep. at 114:9-116:1; Richter Decl., Ex. 18.*  Thus, the "only difference is [that] the unpaid principal balance is used if it's at least 80% of replacement cost." *Nack Dep. at 116:2-22.*  As Mr. Nack admitted during his deposition, "[t]he general principles are exactly the same." *Id.; see also Richter Decl., Ex. 13* ("flood gap coverage for the Heloc portfolio [is] similar to the Chase Prime and Sub-Prime portfolios"); *Groff Dep. at 101:14-102:12.*

### 3.  Uniform Application of Flood Insurance Policies

Chase uniformly applies its flood insurance policies "across all borrowers, all properties, nationwide[,]" without regard to individual circumstances.  *Nack Dep. at 50:14-18.*   As Defendants admitted through their lawyers and corporate representatives:

- It doesn't matter whether the customer has a loan or a line of credit.  *Nack Dep. at 50:3-7; Richter Decl., Ex. 11 (Request # 1);*

- It doesn't matter whether the customer's line or loan has a positive principal balance. *Nack Dep. at 49:7-18; Richter Decl., Ex. 11 (Request # 7);*[11]

- It doesn't matter whether the customer's line has been suspended by Chase. *Nack Dep. at 49:19-23; Richter Decl., Ex. 11 (Request # 6);*

---

[11] In fact, Chase expressly wrote into its flood insurance policy that borrowers with no principal balance should be required to carry flood insurance.  *See Nack Dep. at 111:25-112:12; Richter Decl., Ex. 17 at CHASE 00427.*

-10-

- It doesn't matter whether the customer lives in California or another state. *Nack Dep. at 50:8-13; Wheeler Dep. at 157:23-158:2; Richter Decl., Ex. 11 (Request ## 8-9);*

- It doesn't matter whether the customer's property is located in California or another state. *Richter Decl., Ex. 11 (Request ## 10-11);*

- Chase applies the same policy "regardless of the language of [the borrower's] underlying deed of trust or mortgage." *Wheeler Dep. at 158:9-13;* and

- "[T]he underlying mortgage agreements and deeds of trust or mortgages are not reviewed . . . before flood insurance notices are sent out in the ordinary course of business." *Richter Decl., Ex. 9.*

In short, Chase's flood insurance requirements are the same "[r]egardless of individual circumstances." *Nack Dep. at 49:24-50:1; Groff Dep. at 55:23-57:17.*[12]

### 4. Uniform Administration of Flood Insurance Program Through ASIC

Chase also uniformly tracks and places flood insurance through a single vendor, American Security Insurance Company ("ASIC").[13]  Chase has entered into three basic types of contracts with ASIC.  Under one set of contracts ("Service Agreements"), ASIC agreed to perform insurance management services for Chase, including "monitoring of Acceptable Insurance . . . to determine whether Mortgagors have obtained and are continuing to maintain Acceptable Insurance as required."  *Richter Decl., Ex. 20 at CHASE 1607; Richter Decl., Ex. 22 at 1650.* Under a second set of contracts ("Placement Agreements"), ASIC agreed to force-place flood insurance for properties as desired by Chase, and to provide "proper notification" to borrowers that lender-placed coverage would be obtained for them in the absence of evidence of acceptable insurance coverage.  *Wheeler Dep. at 56:18-57:19; Richter Decl., Ex. 21 at CHASE 1688; Wheeler Dep. at 97:17-98:16; Richter Decl., Ex. 23 at CHASE 1747-48.*  Finally, under a third set

---

[12] Chase's formulaic approach is illustrated by its response to the complaint letters that it received from Hofstetter and Modersbach.  In both cases, it asserted that its flood insurance requirements were justified under "Section Five of your Deed of Trust," even though Section Five has nothing to do with flood insurance.  *Hofstetter Decl., ¶ 9 & Ex. 10; Modersbach Decl., ¶ 11 & Ex. 9; see also Nack Dep. at 218:17-219:10.*

[13] Mr. Nack referred to this vendor as "Assurant."  *Nack Dep. at 129:10-129:22.*  However, Chase's vendor contracts were with ASIC.  *See Richter Decl., Exs. 19-24.*  The difference is not significant, as Assurant and ASIC are affiliated companies.  *See Richter Decl., Ex. 32.*

-11-

of contracts ("Commission Agreements"), ASIC agreed to pay a Chase affiliate ("Affiliate") – Chase Insurance Agency, Inc. ("CIA") and later JPMorgan Insurance Agency, Inc. ("JPMIA") – a commission in connection with each force-placed policy. *Richter Decl., Ex. 19; Richter Decl., Ex. 24.*[14]

The Service Agreements made no distinction between home equity loans/lines and other types of mortgage loans. *Wheeler Dep. at 38:23-40:7; Richter Decl., Ex. 20 at 1606 § 1.9; Richter Decl., Ex. 22 at CHASE 1648 § 1.10.* Under the Service Agreements, Chase paid ASIC the same flat fee for tracking insurance coverage for home equity loans/lines as it did for tracking coverage on first mortgage loans and other types of mortgage loans ($0.28/loan or line from 2007-2009, and $0.35/loan or line thereafter). *Wheeler Dep. at 39:10-22; 41:1-5; Richter Decl., Ex. 20 at 1609; Wheeler Dep. at 90:2-14; Richter Decl., Ex. 22 at CHASE 1653.* Moreover, the definition of "Acceptable Flood Insurance" was the same for all types of loans. *Richter Decl., Ex. 20 at CHASE 1604 § 1.1; Richter Decl., Ex. 22 at CHASE 1647 § 1.1.*

The Placement Agreements also uniformly applied to all types of mortgage loans, including both first mortgage loans and home equity loans/lines. *Wheeler Dep. at 58:12-18; Richter Decl., Ex. 21 at CHASE 1689-90 § 1.7; Wheeler Dep. at 98:17-22; Richter Decl., Ex. 23 at CHASE 1749 § 1.8.* Although ASIC was responsible for force-placing the policies, it was Chase's job to determine the amount of "acceptable" flood insurance coverage, and Chase expressly represented and warranted in the Placement Agreements that it had the "requisite authority" to establish such coverage levels. *Wheeler Dep. at 58:19-60:19; Richter Decl., Ex. 21 at CHASE 1689 § 2.4; Wheeler Dep. at 98:23-99:5; Richter Decl., Ex. 23 at CHASE 1751 § 2.5; see also Nack Dep. at 30:20-21* ("Assurant takes direction from Chase on the policy."). In addition, Chase decided what language was used in the form letters that were sent to borrowers. *Nack Dep. at 23:12-18.*

---

[14] These contracts were each made effective January 1, 2007, and later re-consummated effective January 1, 2010, according to their terms.

-12-

Finally, the Commission Agreements were "coterminous" with the Placement Agreements. *Richter Decl., Ex. 19 at CHASE 00765 § 6; Richter Decl., Ex. 24 at CHASE 1810 § 6.* Under the Commission Agreements, ASIC agreed to provide Chase's designated Affiliate a flat percentage commission for each force-placed policy (20% from 2007-2009 and 10% from 2010 forward). *Richter Decl., Ex. 19 at CHASE 00764 § 2; Richter Decl., Ex. 24 at CHASE 1809 § 2.* This commission applied "across the board" to both loans and lines, in the first and second lien position, in all states nationwide. *Wheeler Dep. at 68:20-69:14; 72:1-7.*

### 5. Financial Benefits to Chase and/or Its Affiliates

As a result of the above contracts, Chase won a number of financial benefits for itself and/or its Affiliate.

#### a. Commission Income

First and foremost, it generated a significant amount of commission income. For example, in 2009, ASIC paid out $1.4 million in commissions on home equity accounts alone. *Wheeler Dep. at 69:15-70:2.* The same year, it also paid out approximately $8-10 million in commissions on force-placed insurance for first mortgage loans. *Id. at 77:7-24.*[15]

In return for these commissions, Chase's Affiliate performs "no function." *Wheeler Dep. at 26:20-27:1; see also id. at 73:1-20.* It does not monitor or track flood insurance coverage, does not issue flood insurance coverage, and does not obtain flood insurance coverage. *Id. at*

---

[15] Although Chase claims that commissions were suspended on home equity accounts beginning in 2010, this claim is inconsistent with the language of the 2010 Commission Agreement. *Wheeler Dep. at 108:3-9; Richter Decl., Ex. 24 at CHASE 01809 § 2.* Moreover, Chase has not produced evidence of any contrary agreement (*Wheeler Dep. at 108:10-109:7*), even though (1) Plaintiffs repeatedly requested this documentation in discovery (*Wheeler Dep. at 110:17-120:2; Richter Decl., Ex. 25*); and (2) the Court specifically directed Chase to turn over this type of documentation at the September 1, 2010 discovery hearing. *Tr. 25 (Sept. 1, 2010)* ("[T]he entire financial relationship between these companies and the placement of this insurance – that should definitely be produced."). In any event, the alleged decision to suspend commissions on home equity accounts conspicuously was not "communicated" to ASIC until June of 2010 – three months after this lawsuit was filed in March. *Wheeler Dep. at 116:4-8.* Further, it is undisputed that Chase continues to earn commissions on force-placed insurance in connection with first mortgage loans under the 2010 Commission Agreement.

-13-

*27:2-12.*  Nor does it communicate with property owners or handle claims.  *Id. at 73:21-74:8.*  In short, it performs none of the typical functions of an insurance agent.  *Id. at 74:9-13.*

Ironically, Chase's Rule 30(b)(6) witness on financial incentives, Dan Wheeler, testified that it would be "absolutely" improper for a lender to negotiate a rebate or subsidy in connection with force-placed insurance coverage.  *Wheeler Dep. at 51:3-7* (Q: "If a rebate or some other form of similar subsidy was negotiated by the lender, would that be improper?" A: "Absolutely.").  Yet, that is exactly what Chase appears to have done.  The Commission Agreements, by their terms, are "coterminous" with the Placement Agreements.  *Richter Decl., Ex. 19 at CHASE 00765 § 6; Richter Decl., Ex. 24 at CHASE 1810 § 6.*  Moreover, the Placement Agreements explicitly provide that ASIC shall treat Chase as its "most favored customer . . . net of discounts and rebates[.]"  *Richter Decl., Ex. 21 at CHASE 1698 § 7.1;  Richter Decl., Ex. 23 at CHASE 1758 § 7.1.*[16]

### b.  "Free" Mailings of Form Letters

These commissions were not the only benefit that Chase received under its series of agreements with ASIC.  In addition, Chase also benefitted because it did not have to pay a fee in connection with the flood insurance notice letters that were sent to borrowers.  Under the Servicing Agreements, the services included in the fee paid by Chase did *not* include generating or mailing flood insurance notice letters.  *Wheeler Dep. at 57:3-6.*  Rather, these mailings were provided for in the Placement Agreements.  *Wheeler Dep. at 56:18-57:2; Richter Decl., Ex. 21 at CHASE 1688; Wheeler Dep. at 97:17-25; Richter Decl., Ex. 23 at CHASE 1747.*  Under the Placement Agreements, Chase did not pay a separate fee to ASIC for generating or mailing these form letters.  *Wheeler Dep. at 54:15-17.*  Instead, the cost of the notices was built into the premium that borrowers paid.  *Wheeler Dep. at 54:18-21.*  This was a significant benefit, as the postage cost of just *one* notice letter would have exceeded the modest fee that Chase paid to ASIC for tracking a loan or line ($0.28 or $0.35).

[16]In return, Chase agreed that ASIC would be its "sole and exclusive provider of lender-placed Flood Insurance[.]"  *Richter Decl., Ex. 21 at CHASE 1693-94 § 4.1; Richter Decl., Ex. 23 at CHASE 1753 § 4.1; see also Nack Dep. at 126:3-12; Wheeler Dep. at 62:10-25.*

-14-

### c. Other Financial Incentives

Chase further benefitted from force-placing flood insurance because it holds a significant ownership stake in ASIC's parent company, Assurant. According to documents filed with the Securities and Exchange Commission ("SEC"), JP Morgan Chase & Co. was the "beneficial owner" of 3,829,722 shares in Assurant as of December 2009, an amount representing a 3.2% stake in the company. *Richter Decl., Ex. 35*.[17] Moreover, the same SEC filing reflects that Defendant JPM directly held at least some of these shares. *Id. at 6, Item 7*. Thus, in effect, Chase earned a double-kickback on each force-placed policy: a direct commission under the Commission Agreement and an indirect kickback through its ownership stake in Assurant.

### 6. Exorbitant Cost to Borrowers

Although Chase clearly benefits from force-placing insurance, its borrowers do not. The ASIC policies that Chase purchases for borrowers are more expensive than other types of flood insurance policies. *Nack Dep. at 127:1-128:16; Wheeler Dep. at 143:16-24*. As Chase admits, "it's not a program that's designed to be competitive[.]" *Wheeler Dep. at 148:4-21*.

Notably, Chase did not bother to negotiate the amount of the premium charges for force-placed flood insurance in its contracts with ASIC, even though it took pains to negotiate a specific commission amount for its Affiliate on each policy. *Wheeler Dep. at 142:10-143:17; 144:19-25*. Moreover, Chase did not even put out a request for proposal in connection with its most recent series of agreements with ASIC in 2010, and made no effort to determine whether other issuers of lender-placed coverage offered more affordable coverage. *Wheeler Dep. at 146:6-17; 147:14-18; Richter Decl., Ex. 27*. The premium rates charged to customers simply are not a matter of its concern. *Nack Dep. at 131:7-21*.

### 7. Limited Force-Placed Insurance Coverage

Each of Chase's California borrowers who were issued a force-placed flood insurance policy received the same form policy from ASIC. *Richter Decl., Exs. 32-33; Groff Dep. at 140:9-*

---

[17] Defendant JPM is a wholly-owned subsidiary of JPMorgan Chase & Co. *Id. at 6, Item 7*. CHF, in turn, is a wholly-owned subsidiary of JPM. *Nack Dep. 33:13-15*.

-15-

1    *141:20; Reitz Dep. at 76:8-23.* Under the terms of this policy, Chase was listed as the "Named

2    Insured Mortgagee" and the borrower was listed as an "Additional Insured." *Hofstetter Decl., ¶ 7*

3    *& Ex. 7; Modersbach Decl., ¶ 12 & Ex. 11; see also Nack Dep. at 149:6-150:11.* The policies

4    that borrowers received did not name any other lender as an insured party, even if Chase was in

5    the second lien position. *Richter Decl., Ex. 11 (Request ## 18-19).*

6       Moreover, the form policy makes clear that it does not cover losses in "an amount greater

7    than the Interest of the persons insured under this policy[.]" *Richter Decl., Ex. 32 at CHASE*

8    *01497 (Condition #3).* According to the terms of the policy, "[t]he Mortgagee's Interest is

9    represented by the Mortgagor's unpaid balance," less other amounts. *Id.* Further, the policy

10   provides that "[c]overage under this policy shall automatically and without prior notice, cancel

11   when the Named Insured no longer has an interest in the Described Property[.]" *Id. at CHASE*

12   *1500.* Thus, the force-placed coverage that Chase obtained was admittedly "limited." *See*

13   *Hofstetter Decl., Ex. 6* ("[T]he flood insurance policy that we purchase for you has limited

14   coverage . . ."); *Modersbach Decl., Ex. 10* (same).

15                                 **ARGUMENT**

16   **I.**     **Standard of Review**

17       Under Rule 23, district courts have broad discretion to determine whether a class should

18   be certified. *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 579 (9th Cir. 2010) (quoting

19   *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001)). "[I]n adjudicating a motion for

20   class certification, the district court must take the allegations in the complaint as true as long as

21   those allegations are specific enough to meet the requirements of Rule 23." *Kay v. Wells Fargo*

22   *& Co.*, 247 F.R.D. 572, 574 (N.D. Cal. 2007) (Alsup, J.). In making this determination, "the

23   question is not whether the . . . plaintiffs have stated a cause of action or will prevail on the

24   merits, but rather, whether the requirements of Rule 23 are met." *Gutierrez v. Wells Fargo Bank,*

25   *N.A.*, 2008 WL 4279550, at *13 (N.D. Cal. Sept. 11, 2008) (Alsup, J.) (quoting *Eisen v. Carlisle*

26   *& Jacquelin*, 417 U.S. 156, 177-78 (1974)).

27

28

-16-

**II.     The Proposed Classes Satisfy the Criteria for Certification**

Rule 23(a) establishes four requirements for class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Dukes*, 603 F.3d at 580.  In addition, Plaintiffs must show that they meet at least *one* of the three prongs of Rule 23(b).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).  Both Rule 23(a) and Rule 23(b) are satisfied here.

**A.     Rule 23(a) Criteria**

**1.     Numerosity**

It is undisputed that the proposed classes satisfy the numerosity requirement.  *See Richter Decl., Ex. 8.*  The Nationwide Class includes tens of thousands of Chase home equity borrowers. *See supra* at 8 & n.6.  Approximately 7,000 of these borrowers, including the named Plaintiffs, reside in California, and are also members of the California Class.  *Richter Decl., Ex. 10.*[18]  In addition, the proposed California class includes non-home equity borrowers with secured property in a SFHA (including customers with first mortgage loans, second mortgage loans, and/or condo loans), since Chase applied substantially similar flood insurance requirements to each type of borrower and reaped the same financial benefits on accounts regardless of loan type. Accordingly, there is no reason to second-guess Chase's concession that Rule 23(a)(1) is satisfied here.  *See, e.g., Gutierrez*, 2008 WL 4279950, at *17 (finding plaintiffs satisfied Rule 23(a)(1) where "neither party dispute[d] that plaintiffs . . . fulfilled the numerosity requirement").

**2.     Commonality**

Under Rule 23(a)(2), a class has sufficient commonality if there are "questions of law *or* fact common to the class." *Dukes*, 603 F.3d at 599 (emphasis added).  This requirement is construed "permissively." *Hanlon*, 150 F.3d at 1019.  All questions of fact and law need not be

---

[18] The California Class also includes certain home equity borrowers who are not members of the Nationwide Class, because the limitations period on Plaintiffs' CUBPA claim runs longer.

common to satisfy the rule. *Id.* Rather, "one significant issue common to the class may be sufficient to warrant certification." *Dukes*, 603 F.3d at 599.

Here, Plaintiffs share not just one, but many, common questions with other class members. For example, with respect to the Nationwide TILA Class, the common questions include, *inter alia*:

- Whether JPM changed its flood insurance requirements, effective December 23, 2009, for customers with home equity loans or lines originated by JPM;

- Whether this change was required by the National Flood Insurance Act ("NFIA");

- Whether this change violated the TILA or its accompanying regulations, *see* 15 U.S.C. §1647(c); 12 C.F.R. 226.5(b)(f)(3); and

- Whether borrowers were provided mandatory TILA disclosures in connection with this change. *See* 12 C.F.R. § 226.9(c)(1)(i).

With respect to the proposed California Class and their claim under the CUBPA, Plaintiffs also present the following common questions (among others):

- Whether Chase's flood insurance requirements for borrowers with secured property in a SFHA exceed the requirements of the NFIA;

- Whether Chase's form letters to borrowers misrepresented federal flood insurance requirements or deceptively suggested that Chase's flood insurance requirements were mandated by federal law;

- Whether Chase's flood insurance requirements exceed the amount necessary to protect its interest as a secured lender;

- Whether Chase's flood insurance requirements and practices are "unfair"; and

- Whether Chase's flood insurance requirements and practices violate the CUBPA.

In addition, Plaintiffs present other common questions with respect to subgroups of borrowers within the California Class. First, for those members of the California Class who also fall within the Nationwide Class, the questions that are common to Plaintiffs' TILA claim also are common to Plaintiffs' claim for "unlawful" business practices under the CUBPA. Second, with respect to those members of the California Class who had flood insurance force-placed upon them by Chase

-18-

(the "Force-Placed Subclass"), Plaintiffs also present a common question regarding whether it was "unfair" for Chase to force-place flood insurance through ASIC at inflated premiums and negotiate a commission for its Affiliate, instead of purchasing such insurance at arm's length from other insurance companies.[19]

Although Chase likely will attempt to manufacture various individualized issues between borrowers, "Rule 23(a)(2) does not require each member in a class to have identical factual and legal issues surrounding his or her claim." *Gutierrez*, 2008 WL 4279550, at *14; *Kay*, 247 F.R.D. at 575. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Dukes*, 603 F.3d at 599; *Hanlon*, 150 F.3d at 1019. Indeed, the present case is particularly well-suited to class certification because "[t]he challenged practice is a standardized one applied on a routine basis to all customers" by the bank. *See Gutierrez*, 2008 WL 4279550, at *17.

### 3. Typicality

For similar reasons, Plaintiffs also satisfy the typicality requirement of Rule 23(a)(3). Typicality and commonality are similar and tend to merge. *Dukes*, 603 F.3d at 613 (*citing Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; *accord*, *Gutierrez*, 2008 WL 4279550, at *15. Thus, Plaintiffs' claims are typical of the proposed classes because they "arise[] out of the same business practices." *Kay*, 247 F.R.D. at 578.

Although Chase previously has asserted that that Plaintiffs do not have standing to represent non-home equity borrowers,[20] this argument should be rejected. As this Court previously held in another case involving a defendant bank:

---

[19] For each class of borrowers, Plaintiffs also present common questions relating to the appropriate form of injunctive and declaratory relief, and the appropriate basis for calculating monetary relief and/or any penalties that apply.

[20] Only the California Class includes non-home equity borrowers.

-19-

Contrary to defendants, a class representative does not have to have the exact liability claim as all other class members under Article III. Rather, once the class representative establishes his own Article III standing, such that there is a concrete case or controversy, then the issue shifts to whether his claims are sufficiently typical of absent class members such that they would be afforded due process by letting him, in a representative capacity, litigate (and potentially lose) the absent class member claims.

*Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 375 (N.D. Cal. 2007) (*citing Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990)). Numerous cases establish that it is not necessary for every category of persons within a class to be represented by someone within their particular category. *See, e.g., Dukes*, 603 F.3d at 613 ("[B]ecause all female employees faced the same alleged discrimination, the lack of a class representative for each management category does not undermine Plaintiffs' certification goal."); *Siemers*, 243 F.R.D. at 375 ("[T]he claim of lead plaintiff Ronald Siemers is typical of those by other members of the class, including those who bought other 'classes' of the same funds as did he, for they were all victims to a greater or lesser degree of the same undisclosed (alleged) scheme."). The same reasoning applies here.[21]

### 4. Adequacy of Representation

The final requirement under Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." *Gutierrez*, 2008 WL 4279550, at *15. In determining whether this requirement is met, the court must consider: (1) whether the named Plaintiffs and their counsel have conflicts of interest with other class members; and (2) whether the named Plaintiffs and their counsel will act vigorously on behalf of the class. *Id.* Both of these factors weigh in favor of certification here. Defendants have not identified any conflict of interest that would prevent Plaintiffs or their counsel from representing the proposed classes, and at all times, Plaintiffs and their counsel have vigorously prosecuted their claims. Each of the named Plaintiffs complained on their own initiative about Chase's business practices, assisted in

---

[21] "Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." *Dukes v. Wal-Mart Stores, Inc.*, 509 F.3d 1168, 1184 (9th Cir. 2007)

responding to discovery after the case was filed, appeared for their depositions when noticed by Chase, and have now submitted declarations in support of this motion.[22]  *Hofstetter Decl., ¶ 13; Modersbach Decl., ¶ 14.*  Moreover, Plaintiffs' undersigned lawyers have met all case deadlines, have vigorously pursued discovery, have successfully represented Plaintiffs in connection with several motions thus far, and are experienced class action litigators.  *See Richter Decl., ¶¶ 37-44.*

### B.    Rule 23(b) Criteria

Once the initial requirements of Rule 23(a) have been met, "[a] class need satisfy only one of the Rule 23(b) prongs."  *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 753 (9th Cir. 2010) (*citing Dukes*, 603 F.3d at 615 n.38).  Both Rule 23(b)(2) and Rule 23(b)(3) are satisfied here.

### 1.   Rule 23(b)(2) Criteria

Rule 23(b)(2) requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  *Wang*, 623 F.3d at 753.  This standard is clearly met here, given Chase's general application of its flood insurance policies. *See, e.g., Dukes*, 603 F.3d at 598-619 (emphasizing that certified class of Wal-Mart employees was subject to a single set of corporate policies).

Although Plaintiffs seek monetary relief in addition to injunctive relief, this does not defeat their request for class certification under Rule 23(b)(2).  "Claims for monetary relief may be certified as part of a Rule 23(b)(2) class."  *Wang*, 623 F.3d at 753.   For purposes of this subsection of the rule, the relevant question is not whether monetary relief is being sought, but whether the claims for monetary relief "predominate" over the claims for injunctive and declaratory relief.  *Wang*, 623 F.3d at 753; *accord*, *Dukes,* 603 F.3d at 615.[23]  Thus, certification

---

[22]  Both Plaintiffs confirmed during their depositions and again in their declarations that they intend to pursue this matter to its conclusion.  *Hofstetter Dep. at 116:17-19; Modersbach Dep. at 79:17-80:11*; *Hofstetter Decl., ¶ 13; Modersbach Decl., ¶ 14.*

[23]  This "predominance" test marks a clear departure from the "incidental damages standard[,]" which the Ninth Circuit held was "unduly restrictive" because it only permitted certification of claims for monetary relief under Rule 23(b)(2) when they were "incidental to requested injunctive or declaratory relief."  *Wang*, 623 F.3d at 753-54 (*citing Dukes,* 603 F.3d at 616-17).

1  is appropriate under Rule 23(b)(2) as long as the claims for injunctive and declaratory relief stand

2  on "equal footing" with the monetary claims. *Wang*, 623 F.3d at 754.

3          Here, the claims for injunctive relief are substantial, and on par with the claims for

4  monetary relief. Indeed, "[d]efendant's future compliance with the law may be more valuable to

5  the class than the present claims for [monetary relief]." *Wang*, 623 F.3d at 754. For example,

6  Plaintiff Hofstetter's out-of-pocket expenses for flood insurance thus far have been limited to the

7  interest payments she has made on the premiums that were added to the balance of her credit line

8  for force-placed flood insurance. *See supra at 4.* However, if Chase is not enjoined from

9  continuing to demand flood insurance in excess of her principal balance and available credit, she

10  likely will wind up paying thousands of dollars in future premiums for unnecessary and excessive

11  flood insurance coverage. For borrowers like her who were subject to Chase's recent change in

12  its flood insurance requirements as of December of 2009, the horror has only just begun.

13  Likewise, other Chase borrowers subject to 30-year mortgages and other long-term credit

14  arrangements could wind saddled with enormous costs for flood insurance for years to come, in

15  the absence of injunctive and declaratory relief. Moreover, even if such borrowers currently carry

16  a principal balance in excess of $250,000 or the replacement cost value of their home, all

17  borrowers must pay down their loan balance eventually. Therefore, each and every borrower in a

18  SFHA is impacted by Chase's flood insurance requirements, regardless of whether they have

19  suffered a current out-of-pocket loss (or the amount of such loss).

20          Other factors also weigh in favor of class certification under Rule 23(b)(2). For one thing,

21  Plaintiffs' claims for injunctive relief are "closely related" to their claims for monetary relief. *See*

22  *Wang*, 623 F.3d at 754. Moreover, the claims for monetary relief will not require substantial

23  additional proof, as the amount of excess insurance coverage above the minimum federal

24  requirement can be readily calculated on a formulaic basis. *See Dukes*, 603 F.3d at 619 ("awards

25  of backpay do not predominate over the injunctive remedies available because the calculation of

26  back pay generally involves relatively uncomplicated factual determinations and few

27  individualized issues") (citations and internal quotation marks omitted). Further, because

28                                          -22-

restitution is an *equitable* remedy, Plaintiffs' request for restitution under the CUBPA is in no way inconsistent with certifying the class under Rule 23(b)(2).  *See Dukes*, 603 F.3d at 618.

### 2. Rule 23(b)(3) Criteria

In addition, certification is also appropriate under Rule 23(b)(3).  As shown below, common questions "predominate over any questions affecting only individual members," and (2) class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." *Hanlon*, 150 F.3d at 1022.

### a. Predominance

The predominance requirement is satisfied because common questions present a "significant portion of the case" that can be resolved for all class members in a single adjudication.  *See Gutierrez*, 2008 WL 4279550, at *14; *Kay*, 247 F.R.D. at 575.[24]  As noted above, Plaintiffs present several fundamental common questions, including: (1) whether Chase unlawfully changed its flood insurance requirements for home equity borrowers; (2) whether Chase unfairly required flood insurance in amounts greater than required by federal law and greater than necessary to secure the amount of credit extended to borrowers; and (3) whether Chase unfairly profited from force-placing flood insurance at its borrowers' expense.  These common questions predominate because, in each case, "[t]he challenged practice is a standardized one applied on a routine basis to all customers" by the bank.  *See Gutierrez*, 2008 WL 4279550, at *17; *accord*, *Kay*, 247 F.R.D. at 575-76 (legality of kickback payments to lender in connection with mortgage insurance constituted common question that predominated over individual issues).

It is undisputed that Chase applied its flood insurance policies "[r]egardless of individual circumstances." *Nack Dep. at 49:24-50:1; Groff Dep. at 55:23-57:17.*  In fact, Chase's own counsel has admitted that the individual circumstances of particular borrowers are "irrelevant" to class certification. *See ECF No. 69 at 2* ("Specific information relating to other borrowers who may be putative class members . . . is irrelevant to class certification."); *ECF No. 52 at 3*

---

[24] *Accord*, *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (*citing Hanlon*, 150 F.3d at 1019-22).

-23-

1   ("Discovery beyond Defendants' procedures for flood insurance, and the number of borrowers,

2   like Plaintiff . . . is irrelevant to the Court's Rule 23 determination.").   Therefore, any alleged

3   individualized issues do not present an obstacle to class certification here.

4       "The potential existence of individualized damages assessments . . . does not detract from

5   the action's suitability for class certification."  *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d

6   1087, 1089 (9th Cir. 2010)); *accord*, *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The

7   amount of damages is invariably an individual question and does not defeat class action

8   treatment.").   The information necessary to calculate damages can be readily gleaned from

9   Chase's customer database.[25]   *See Dukes*, 603 F.3d at 615 ("Wal-Mart's extensive database

10  containing information on each employee individually . . . would enable a determination of each

11  class member's qualifications for promotion without the need for potentially unmanageable

12  individualized hearings.") (internal citation omitted); *Gutierrez*, 2008 WL 4279550, at *17

13  ("Given the bank's large wealth of computerized account information, this order is confident and

14  so finds that software will be designable to extract the vital elements needed to assess damages

15  and causation.").   Moreover, "the process of computing damages will be virtually a mechanical

16  task."  *Blackie*, 524 F.2d at 905; *In re LDK Solar Securities Litig.*, 225 F.R.D. 519, 529 (N.D.

17  Cal. 2009) (Alsup, J.); *see also Local Joint Exec. Bd. of Culinary/Bartender Trust Fund*, 244 F.3d

18  at 1163 ("the damages for individual class members will entail a straightforward calculation").

19                    **b.  Superiority**

20      Class-wide resolution of the common issues presented by this action also would be

21  superior to alternative methods of adjudication.   The interests of the class would not be served by

22  prosecuting their claims individually, and there is no evidence that any class members have

23  brought similar claims against Chase on an individual basis.  *See* Fed. R. Civ. P. 23(b)(3)(A)-(B).

24

25  [25]It is undisputed that Chase has access to its borrowers' account information, including
26  information regarding (1) principal balance; (2) credit line amount; (3) flood zone status; (4)
    amount of flood insurance; (5) amount of premiums for flood insurance; (6) any force-placed
27  insurance coverage; and (7) which borrowers received which form letters. *Nack Dep. at 187:7-
    189:24; Reitz Dep. at 78:14-80:2.*

28                                    -24-

1   Indeed, a class action is the only feasible means by which individual borrowers can effectively

2   challenge Chase's conduct, given the relatively modest size of their individual claims and the

3   practically unlimited resources that Chase may invest to defend itself.  *See Smith v. Cardinal*

4   *Logistics Mgmt. Corp.*, 2008 WL 4156364, at *11 (N.D. Cal. Sept. 5, 2008) ("As the claims in the

5   present action appear to be relatively small, the interest of the individual Plaintiffs in personally

6   controlling the litigation is similarly small. Such a finding favors certification of the class as a

7   superior method of resolving the dispute."); *accord*, *Hanlon*, 150 F.3d at 1023; *Siemers*, 243

8   F.R.D. at 376.  Therefore, it would be desirable to litigate the issues in this forum on a class-wide

9   basis.  *See* Fed. R. Civ. P. 23(b)(3)(C).

10      Moreover, there is no evidence that class-wide adjudication would be unmanageable.

11  This Court previously has certified several class actions involving defendant banks.   *See*

12  *Gutierrez*, 2008 WL 4279550, at *13-18; *Kay*, 247 F.R.D. at 574-79; *Siemers*, 243 F.R.D. at 373-

13  76.  Certainly, this case is much more manageable than other cases that have been certified in the

14  Ninth Circuit.  *See, e.g.*, *Dukes*, 603 F.3d at 598-619 (approving certification of a "broad and

15  diverse" class of 1.5 million female employees); *Hilao v. Estate of Ferdinand Marcos*, 103 F.3d

16  767, 782-87 (9th Cir.1996) (approving certification of a case with over 10,000 claimants).

17  ## CONCLUSION

18      For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion

19  for Class Certification, and (1) certify the proposed classes, (2) appoint them representatives of

20  the proposed classes, and (3) appoint their counsel as class counsel.

21  Dated: 2/17/11                    NICHOLS KASTER, PLLP

22                                    By:    s/ Kai Richter
23                                           Kai Richter

24                                    NICHOLS KASTER, LLP
25                                    Attorneys for Plaintiffs and the Proposed Classes

26

27

28                                         -25-