# Exhibit 1

# In The Matter Of:

*SHEILA I. HOFSTETTER*
*v.*
*CHASE HOME FINANCE, LLC*

_____

*NACK, JEFFREY 30(b)(6)*
*November 10, 2010*

_____

# *CONFIDENTIAL*

**MERRILL CORPORATION**

**LegaLink, Inc.**

920 Second Ave South
Suite 110
Minneapolis, MN 55402
Phone: 877-489-0367

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SHEILA I. HOFSTETTER,          )
individually, as a             )
representative of the class,   )
and on behalf of the general   )
public,                        )
                               )
                Plaintiff,     )
                               )
        -vs-                    )  CV-10-1313 WHA
                               )
CHASE HOME FINANCE, LLC,       )
JPMORGAN CHASE BANK, N.A.,     )
and DOES 1 through 50,         )
inclusive,                     )
                               )
                Defendants.  )

CONFIDENTIAL

        The Rule 30(b)(6) deposition of Chase Home
Finance and JPMorgan Chase Bank, corporate designee,
JEFFREY NACK, taken before CAROL CONNOLLY, CSR, CRR, and
Notary Public, pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, at 330 North
Wabash, Chicago, Illinois, commencing at 8:39 a.m. on the
10th day of November, A.D., 2010.

CONFIDENTIAL
JEFFREY NACK 11/10/2010

```
1        There were present at the taking of this
2   deposition the following counsel:
3   NICHOLS KASTER, LLP by
    MR. KAI RICHTER
4   MR. DONALD NICHOLS and
    MS. REBECCA BAILEY (via telephone)
5   4600 IDS Center
    80 South Eighth Street
6   Minneapolis, Minnesota 55402
    (877) 448-0492
7
        appeared on behalf of the Plaintiffs;
8
9   BURKE, WARREN, MACKAY & SERRITELLA, PC by
    MR. STEPHEN R. MEINERTZHAGEN and
10  MS. LeANN PEDERSEN POPE
    330 North Wabash
11  22nd Floor
    Chicago, Illinois 60611
12  (312) 840-7047
13      appeared on behalf of the Defendants.
14
15        - - - - - -
16
17
18
19
20
21
22
23
24
25
```

```
1   Deposition Exhibit No. 9       69
     (Chase Home Equity Portfolio, AssurTrack Procedures,
2      Revised 7/7/05)
3   Deposition Exhibit No. 10      78
     (Chase HELOC Flood Gap Coverage)
4
    Deposition Exhibit No. 11      82
5    (Assurant Specialty Property, HELOC - Flood Gap)
6   Deposition Exhibit No. 12      83
     (Chase - Rating Rule Changes, M142-WR72645
7      Created 12/7/09)
8   Deposition Exhibit No. 13      91
     (Plaintiff's First Set of Requests to Defendants
9      For Production of Documents and Things)
10  Deposition Exhibit No. 14      101
     (December 13, 2009 Letter to David Hofstetter from
11     Insurance Processing Center)
12  Deposition Exhibit No. 15      101
     (December 24, 2009 Letter to Roger Modersbach from
13     Insurance Processing Center)
14  Deposition Exhibit No. 16      110
     (Assurant Specialty Property - Chase HELOC, Flood
15     Compliance Department, Chase 00412-457)
16  Deposition Exhibit No. 17      113
     (Assurant Specialty Property - Chase HELOC, Flood
17     Compliance Department, Chase 00458-495)
18  Deposition Exhibit No. 18      114
     (Frequently Asked Questions)
19
    Deposition Exhibit No. 19      117
20   (Procedures, Home Equity Insurance, Base Method Force
       Placed Insurance Assessment, Version Date 4/29/10)
21
    Deposition Exhibit No. 20      133
22   (Compliance PLUS Insurance Agency Agreement)
23  Deposition Exhibit No. 21      143
     (Hofstetter California Open End Deed of Trust)
24
    Deposition Exhibit No. 22      143
25   (Modersbach California Open End Deed of Trust)
```

```
1          DEPOSITION OF
            JEFFREY NACK
2         November 10, 2010
3              PAGE
4   EXAMINATION BY
5   Mr. Kai Richter          7
6
7
8         - - - - - - - -
9
10        EXHIBITS MARKED
11              PAGE
12  Deposition Exhibit No. 1       7
     (Plaintiff's Second Amended Notice of Deposition
13     of Chase Home Finance, LLC)
14  Deposition Exhibit No. 2       7
     (Plaintiff's Second Amended Notice of Deposition
15     of JPMorgan Chase Bank, N.A.)
16  Deposition Exhibit No. 3       14
     (Binder of Reviewed Documents)
17
    Deposition Exhibit No. 4       34
18   (Organizational Chart - Escrow Administration)
19  Deposition Exhibit No. 5       42
     (Procedures - Home Equity Flood Compliance,
20    Completing Flood Tracking Vendor Scorecards
      Version Date, 4/30/10)
21
    Deposition Exhibit No. 6       45
22   (Procedures - Home Equity Insurance, Weekly Flood
      Validation, Version, 4/24/10)
23  Deposition Exhibit No. 7       47
     (Procedures for Chase Call Center)
24
    Deposition Exhibit No. 8       65
25   (Assurant Group, Insurance Tracking Services, User
```

```
1   Deposition Exhibit No. 23      146
     (American Security Insurance Company, Residential
2      Flood Policy)
3   Deposition Exhibit No. 24      146
     (Notice of Purchase of Flood Insurance Policy to
4      Roger Modersbach, 7/7/10)
5   Deposition Exhibit No. 25      155
     (Notice of Special Flood Hazard to David Hofstetter,
6      8/11/09)
7   Deposition Exhibit No. 26      159
     (Standard Flood Hazard Determination)
8
    Deposition Exhibit No. 27      162
9    (Hand drawing of the Hofstetter property)
10  Deposition Exhibit No. 28      165
     (Flood Insurance Rate Map, Chase 00269-283)
11
    Deposition Exhibit No. 29      172
12   (Code of Conduct, JPMorgan Chase & Co, May, 2010)
13  Deposition Exhibit No. 30      181
     (Standard and Poor's, Servicer Evaluation, Chase
14     Home Finance)
    Deposition Exhibit No. 31      194
15   (Chase Home Finance, LLC, Customer Service Comments)
16  Deposition Exhibit No. 32      196
     (Chase, Procedures, Home Equity Insurance, Routes -
17     Flood Insurance Dispute, Version, 06/02/10)
18  Deposition Exhibit No. 33      199
     (Most Common used AssurTrack-Monitor Codes List Value)
19
    Deposition Exhibit No. 34      204
20   (January 11, 2010 Letter From David & Sheila
       Hofstetter, To Whom It May Concern)
21
    Deposition Exhibit No. 35      208
22   (February 1, 2010 Letter From Cedric D. McNeal to
       David Hofstetter)
23
    Deposition Exhibit No. 36      212
24   (February 22, 2010 Letter from Justin Miller to
       David & Sheila Hofstetter)
25
```

2 (Pages 2 to 5)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 6

1    Deposition Exhibit No. 37        214
        (Quality Control Review of Flood Dispute Routes Chart)
2
     Deposition Exhibit No. 38        216
3    (May 26, 2010 Letter from Roger Modersbach to
        Chase Home Finance, LLC)
4
     Deposition Exhibit No. 39        217
5    (June 29, 2010 Letter from Katherine Morton to
        Roger Modersbach)
6
     Deposition Exhibit No. 40        229
7    (Home Equity Line of Credit - HELOC, Training
        Handy Packet)
8
     Deposition Exhibit No. 41        229
9    (Assurant Specialty Property - Chase HELOC, Customer
        Care Procedures/Training)
10
     Deposition Exhibit No. 42        233
11   (Stipulated Protective Order)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1                JEFFREY NACK,
2    called as a witness herein, having been first duly sworn,
3    was examined upon oral interrogatories and testified as
4    follows:
5                EXAMINATION
6    By Mr. Richter:
7        Q   Good morning. Mr. Nack, my name is Kai
8    Richter, and with me today is Donald Nichols from our
9    office. We just had a chance to exchange greetings just
10   a moment ago. Both of us represent Sheila Hofstetter and
11   Roger Modersbach in an action they've brought against
12   Chase Home Finance and JPMorgan Chase Bank.
13              Do you understand that you're here to testify
14   on behalf of both of those corporate entities here today?
15       A   Yes, I do.
16              (Exhibit 1 marked as requested)
17              (Exhibit 2 marked as requested)
18       Q   I'm handing you what's been marked as
19   Plaintiff's Exhibits 1 and 2, Plaintiff's Exhibit 1 being
20   Plaintiff's Second Amended Notice of Deposition of Chase
21   Home Finance, LLC pursuant to Federal Rule Civil
22   Procedure 30(b)(6) and Plaintiff Exhibit 2 being the
23   Second Amended Notice of Deposition of Chase Home
24   Finance, LLC -- of JPMorgan Chase Bank.
25              Do you have both of those deposition notices in

Page 8

1    front of you?
2        A   Yes.
3        Q   And do you understand that you're here to
4    testify today on behalf of both corporate defendants on
5    behalf of all of the topics listed in the deposition
6    notices on the second page and third page of each of
7    those two deposition notices?
8        MR. MEINERTZHAGEN:  Object to the form of the
9    question.
10       THE WITNESS:  Yes.
11       MR. MEINERTZHAGEN:  Subject to our objections.
12       MR. RICHTER:  Q  Is anyone else testifying today on
13   behalf of the defendants with respect to those topics?
14       A   I'm sorry. Can you repeat --
15       Q   Is anybody else with testifying on behalf of
16   the defendants with respect to the topics listed?
17       A   Besides myself?
18       Q   Correct.
19       A   No.
20       Q   Since a lot of the questions are the same, I'm
21   going to ask you questions as both the representative of
22   Chase Home Finance and JPMorgan Chase Bank at the same
23   time. Okay?
24       A   Yes.
25       Q   I'm going to assume you're answering on behalf

Page 9

1    of both entities unless you draw a distinction in your
2    answer. Okay?
3        A   Okay.
4        Q   Throughout the deposition I am going to use the
5    term Chase to refer to both Chase Home Finance and
6    JPMorgan Chase Bank. Okay?
7        A   Okay.
8        Q   You'll understand what I mean by that?
9        A   Yes.
10       Q   Unless you draw a distinction between Chase
11   Home Finance and JPMorgan Chase Bank, I'll assume that
12   your answer will apply to both, all right?
13       MR. MEINERTZHAGEN:  Object to the form of the
14   question.
15       THE WITNESS:  Yes.
16       MR. RICHTER:  Q  Finally, if I ask you a question,
17   until you tell me you don't understand the question for
18   some reason, I'm going to assume that you understand the
19   question. All right?
20       A   Yes.
21       Q   Which Chase entity or entities do you currently
22   work for?
23       A   I'm an employee of JPMorgan Chase, an officer
24   of Chase Home Finance.
25       Q   What's your position as an employee of JPMorgan

3 (Pages 6 to 9)

CONFIDENTIAL
JEFFREY  NACK 11/10/2010

Page 10

1  Chase?
2      A  I'm the vice president of the insurance
3  department within Chase Home Finance.
4      Q  Is that your officer position or employee
5  position?
6      A  Employee of JPMorgan Chase, but officer of
7  Chase Home Finance.
8      Q  So when you say you're a vice president of the
9  insurance department of Chase, is that your officer
10  position or your employee position?
11     A  I consider it both the same.
12     Q  What location do you work at?
13     A  I work in Columbus, Ohio.
14     Q  What's the address?
15     A  3415 Vision Drive, Columbus, Ohio, 43219.
16     Q  In your capacity as vice president of the
17  insurance department at Chase, over what functional areas
18  do you have responsibility?
19     A  I have functional responsibilities over the
20  insurance processing areas for all mortgages serviced by
21  Chase Home Finance.
22     Q  Both lines and loans?
23     A  Correct.
24     Q  What are your duties in that position?
25     A  The duties are very broad.  My job is to manage

Page 11

1  the insurance processing area, and that responsibility
2  entails the tracking of insurance products to ensure that
3  the customers' properties are insured for the proper
4  amount.  It also includes the tracking of those policies,
5  the existence of those policies, the customers where we
6  have to pay the policies we're paying for those and where
7  the customers are paying the policies themselves, we're
8  tracking those policies to ensure we're paying for them.
9      Q  How long have you held that position?
10     A  Since 2006.
11     Q  Who was your predecessor?
12     A  Jeff Price.
13     Q  Are you familiar with somebody named Karen
14  Waleri?
15     A  Yes.
16     Q  Did she formerly hold the position you
17  currently hold?
18     A  When I refer to the insurance vice president
19  department, Jeff Price was the previous manager.  I've
20  held the responsibilities for monitoring the insurance
21  functions for our home equity loans and home equity line
22  of credit since 2003.
23     Q  Does Miss Waleri still work for Chase?
24     A  No, she does not.
25     Q  What was her -- was she formerly -- Did she

Page 12

1  formerly work in the insurance area at Chase?
2      A  She did.  She was a supervisor in the home
3  equity insurance department, and she reported to me back
4  in 2003.
5      Q  Who is your boss?
6      A  Terry Smith.
7      Q  What's his position?
8      A  He's senior vice president of escrow
9  administration.
10     Q  That's in the home lending division?
11     A  Chase Home Finance Home Lending, yes.
12     Q  Are all officers of Chase Home Finance also
13  employees of JPMorgan Chase Bank?
14     A  I believe so.  I can only speak for myself.
15     Q  Is it JPMorgan Chase Bank that cuts your
16  checks?
17     A  Yes.
18     Q  Do you hold any other positions with any Chase
19  affiliate other than vice president of the insurance
20  department at Chase?
21     A  No.
22     Q  Did you hold other positions prior to your
23  current position at Chase?
24     A  Yes.
25     Q  What other positions have you held?

Page 13

1      A  I've been the escrow analysis vice president.
2  I've managed the escrow department for our nonprime
3  servicing group.  I've managed the -- what we call our
4  loan boarding, due diligence acquisition team, and I've
5  been other supervisors of other areas too.
6      Q  When did you start working for Chase?
7      A  January of 1993.
8      Q  You've been there roughly 17 years, is that
9  right?
10     A  Correct.
11     Q  Is that your entire working career, or did you
12  have other professional employment before then?
13     A  No.  Entire.
14     Q  What was involved or what duties did you have
15  as the escrow analysis vice president?
16     A  Duties of vice president of escrow analysis
17  involved adhering to the rest of the requirements for
18  State Settlement Procedures Act which are -- there's a
19  lot of requirements, regulations within that law.  Mainly
20  the requirement is to ensure that every escrow account is
21  analyzed annually and is analyzed accurately.
22     Q  Part of what you did in your escrow analysis
23  vice president role was a compliance function, would that
24  be fair to say?
25     A  Correct.

4 (Pages 10 to 13)

Page 14

1    Q   Do you also have a compliance function in your
2  current role as vice president of insurance for Chase?
3    MR. MEINERTZHAGEN:  Object to the form of the
4  question.
5    THE WITNESS:  Part of my duties is to ensure that we
6  are in compliance with the federal regulations.
7    MR. RICHTER:  Q  Have you ever had your deposition
8  taken before?
9    A  No.
10   Q   Have you done anything to prepare for your
11 deposition here today?
12   A  I was here yesterday meeting with my legal
13 representation.
14   Q   Did you review any documents?
15   A  Yes.
16   Q   What documents did you review?
17   A  They should be here.
18   Q   This binder?
19   A  Yes.
20   Q   Can you mark this as Exhibit 3?
21     (Exhibit 3 marked as requested)
22   Q   I'm handing you the black binder that's been
23 marked as Exhibit 3.  Those are the documents that you
24 reviewed in advance of your deposition here today?
25   A  That's correct.

Page 15

1    Q   I'd like you to turn back to the deposition
2  notices, Exhibits 1 and 2 if you could.  I'd like you to
3  take a look at the first topic listed there under matters
4  for examination.  The first item listed is defendant's
5  policies and practices related to flood insurance and the
6  reasons for those policies and practices or any changes
7  to those policies and practices.
8      Do you see that?
9    A  Yes.
10   Q   Do you consider yourself knowledgeable
11 regarding that topic?
12   A  Yes, I do.
13   Q   Does anybody know more about that topic than
14 you at either Chase Home Finance or JPMorgan Chase Bank?
15   MR. MEINERTZHAGEN:  Object to the form of the
16 question.
17   THE WITNESS:  I feel I can answer those questions.
18   MR. RICHTER:  Q  To your knowledge is anybody more
19 knowledgeable about that subject than you are?
20   MR. MEINERTZHAGEN:  Object to the form of the
21 question.
22   THE WITNESS:  Since I deal with this information day
23 in, day out, I feel like I'm as equally knowledgeable as
24 anyone else at Chase on this topic.
25   MR. RICHTER:  Q  What's the basis for your

Page 16

1  knowledge related to topic number 1?
2    A  I've been involved with the responsibility for
3  the flood insurance area for our home equity loans and
4  lines of credit since 2003.  So I've dealt with the
5  changes in the requirements, the meeting with -- going to
6  conferences supported by the FEMA, the NFIP.
7    Q   Tell me about those FEMA conferences.
8    A  The conferences are annual conferences where
9  they discuss a variety of topics involving lenders,
10 insurance agents, variety of different supporting groups,
11 write your own carriers.
12   Q   Have you read Chase's policies regarding flood
13 insurance?
14   A  Yes.
15   Q   Did you have any role in determining those
16 policies?
17   A  Yes, I did.
18   Q   What role did you have in determining those
19 policies?
20   A  My role is working with our legal and
21 compliance and origination areas to determine the
22 appropriate flood insurance policy for Chase Home
23 Finance.
24   Q   So there's also a legal and compliance
25 department at Chase I take it?

Page 17

1    A  Yes.
2    Q   There's also a loan origination group or a line
3  origination group?
4    A  Yes.
5    Q   And your group, the insurance group, the legal
6  and compliance group and the origination group, they
7  would all work together to come up and develop the
8  policies that were eventually implemented with respect to
9  flood insurance, is that right?
10   A  That's correct.
11   Q   And I take it that when those policies were
12 developed, they didn't just come out of thin air, there
13 was dialogue concerning what should go in the policies,
14 right?
15   A  That's correct.
16   Q   Did that dialogue take the form of meetings?
17   A  Yes.
18   Q   What meetings have you had or attended relating
19 to policy development, flood insurance policy development
20 at Chase?
21   A  I can't tell you -- Are you asking me how many?
22   Q   I'm asking you what meetings you recall
23 attending.
24   A  We had -- Throughout my career since 2003,
25 there's been numerous meetings.  I couldn't even count

CONFIDENTIAL
JEFFREY  NACK 11/10/2010

Page 18

1  how many.  Sometimes we have weekly meetings on this
2  topic.
3      Q  Are notes kept of those meetings?
4      A  Not that I'm aware of.
5      Q  Are there meeting agendas?
6      A  Yes, I believe there are.
7      Q  How about meeting minutes?
8      A  I don't recall any.
9      Q  Do you recall drafts of policy language being
10  circulated for consideration at those meetings?
11      A  Drafts meaning e-mails?
12      Q  Let's start with that.  Do you recall e-mail
13  correspondence relating to policy -- flood insurance
14  policy development at Chase?
15      A  Most of the dialogue is in the meeting.  I
16  honestly can't recall any specific e-mails going back
17  that far.
18      Q  As you sit here today, can you say for certain
19  that you've never had an e-mail exchange with anybody in
20  your insurance group or anybody in legal and compliance
21  or anybody in the origination area regarding what Chase's
22  policies should be with respect to flood insurance?
23      MR. MEINERTZHAGEN:  Object to the form of the
24  question.
25      THE WITNESS:  We would have correspondence through

Page 19

1  e-mail.  I just don't recall specifics on this.
2      MR. RICHTER:  Q  Have you looked for that
3  correspondence in your e-mail for purposes of this
4  litigation?
5      A  I don't recall.
6      Q  Has anybody looked on your behalf for e-mail
7  correspondence relating to flood insurance in your e-mail
8  box?
9      A  Not that I'm aware of.
10      Q  I want to go back to a question I asked you a
11  little earlier, which is, whether drafts of policy
12  language was circulated for consideration for your group
13  and the legal and compliance group and the origination
14  group as part of that policy development process.
15      MR. MEINERTZHAGEN:  Object to the form of the
16  question.
17      THE WITNESS:  Drafts, you know, we have a formal
18  policy so there would have been drafts before it was
19  finalized I'm sure.
20      MR. RICHTER:  Q  Did you personally write any
21  e-mails relating to flood insurance policies or what
22  those policies should be as part of this policy
23  development process?
24      A  I'm sure that I did.
25      Q  If I recall your testimony correctly, you said

Page 20

1  that you had been part of the policy, flood insurance
2  policy development process at Chase since 2003, is that
3  right?
4      A  I managed the home equity loans and lines of
5  credit since 2003.  My direct involvement with the
6  policies and procedures with Chase Home Finance was more
7  extensive since 2006.
8      Q  What triggered your more extensive involvement
9  since 2006?
10      A  In 2005 I was managing the escrow analysis
11  department and the home equity loans and lines for
12  insurance, and then in 2006 I took responsibility for all
13  the insurance.
14      Q  As part of this policy development process, is
15  there anybody else from your insurance group that
16  participates in that policy development in deciding what
17  the policies are going to be with respect to flood
18  insurance?
19      A  There's other people that are involved in those
20  meetings, but I would say that I am the deciding factor
21  in those policies and procedures.
22      Q  How about from the legal and compliance group,
23  who is involved from that group as part of the policy and
24  development process?
25      A  I could speak to who is involved in it now.  Do

Page 21

1  you need the names?
2      Q  Yes.
3      A  Art Guja from legal.
4      Q  How do you spell his last name?
5      A  G-U-J-A.
6      From compliance, it's Kathy Strickland.
7      Q  Art is from the legal wing, and Kathy is from
8  the compliance wing?
9      A  Correct.
10      Q  Is Kathy a lawyer?
11      A  I do not believe so.
12      Q  Is Art?
13      A  I believe so, yes, he is.
14      Q  Like you are they the top dog essentially from
15  their group as part of that policy development process?
16      MR. MEINERTZHAGEN:  Object to the form of the
17  question.
18      THE WITNESS:  Yes.
19      MR. RICHTER:  Q  How about on the origination side,
20  who is the lead player there in the flood insurance
21  policy development process?
22      A  I'm sorry.  Could you repeat that?
23      Q  Who is the lead player from the loan
24  origination group with respect to the flood insurance
25  policy development?

6 (Pages 18 to 21)

Page 22

1    A   Anita Learch. I believe it's L-E-A-R-C-H.
2    Q   **Is she a lawyer?**
3    A   I do not believe so.
4    Q   **Let's go on to the second topic, defendants'**
5 **efforts to audit, assess or otherwise determine or**
6 **evaluate compliance with the company policy or federal or**
7 **state law relating to flood insurance, insurance**
8 **requirements or forced placed insurance.**
9        **Do you see that topic?**
10   A   Yes, I do.
11   Q   **Do you consider yourself knowledgeable to**
12 **testify on that topic?**
13   A   Yes, I do.
14   Q   **What's your basis for your knowledge on that**
15 **topic?**
16   A   I would say the exact same answer as far as the
17 previous knowledge as far as the knowledge of the flood
18 insurance program.
19   Q   **Do the same three components, those being**
20 **insurance, legal and compliance and origination, do they**
21 **all look at the compliance aspect as well in terms of**
22 **existing policies once they've been adopted?**
23   A   Yes, they do.
24   Q   **Let's go to the third topic on the Chase Home**
25 **Finance notice: The drafting and content of Chase Home**

Page 23

1 **Finance's form flood insurance notices and other**
2 **communications to customers concerning flood insurance.**
3        **Do you see that?**
4    A   Yes, I do.
5    Q   **I take it you consider yourself knowledgeable**
6 **about that topic?**
7    A   Yes, I do.
8    Q   **What's the basis of your knowledge on that**
9 **topic?**
10   A   Again, my familiarity with the flood insurance
11 requirements and regulations.
12   Q   **Have you played any role in determining or**
13 **developing the language that is used in the form flood**
14 **insurance notices that go out to borrowers?**
15   A   Yes, I do.
16   Q   **Who else plays a role in determining the**
17 **language that's used in those flood insurance notices?**
18   A   The -- myself, the legal and compliance.
19   Q   **Origination?**
20   A   Not origination because these notices are
21 servicing notices.
22   Q   **Now, topic number 3 for the JPMorgan Chase**
23 **deposition notice deals with the form documents at the**
24 **time of origination.**
25        **Do you see that?**

Page 24

1    A   Yes.
2    Q   **Are you familiar with Chase's -- the form**
3 **language in Chase's deeds of trust?**
4        MR. MEINERTZHAGEN:  Are you asking him as a
5 corporate representative or personally?  We're not
6 producing him as a corporate representative on that
7 topic.
8        MR. RICHTER:  Q  Do you understand the question?
9    A   Could you repeat it?
10   Q   **Are you familiar with the language that is**
11 **included in Chase's deeds of trust relating to flood**
12 **insurance?**
13       MR. MEINERTZHAGEN:  Outside the scope of what we're
14 producing this witness to.  He can answer based on his
15 own personal knowledge.
16       THE WITNESS:  I have reviewed -- I have seen the
17 documents.
18       MR. RICHTER:  Q  Are you familiar with them in all
19 50 states or just certain states?
20       MR. MEINERTZHAGEN:  Same objection.
21       THE WITNESS:  I don't have that much knowledge of
22 exact requirements for those documents from originations
23 to answer that question.
24       MR. RICHTER:  Q  So you wouldn't be the right
25 person to ask questions relating to what language is or

Page 25

1 is not included in particular deeds of trust in
2 particular states, is that right?
3        MR. MEINERTZHAGEN:  Same objection.
4        THE WITNESS:  That's correct.
5        MR. RICHTER:  Q  Who would be the best person to
6 ask those types of questions to?
7        MR. MEINERTZHAGEN:  Same objection.
8        THE WITNESS:  I would have -- I would have to defer.
9 I wouldn't be able to give you a name.
10       MR. RICHTER:  Q  Would it be somebody in the loan
11 origination group?
12       A   That's where I would start.
13       MR. MEINERTZHAGEN:  Same objection, and objection to
14 form.
15       MR. RICHTER:  Q  Topic 4 is defendants' electronic
16 and other records pertaining to their customers,
17 including, but not limited to any records or reports
18 relating to flood insurance, insurance requirements or
19 forced-placed insurance or complaints concerning the
20 same.
21       Do you see that?
22       A   Yes, I do.
23       Q   **What knowledge do you have on that topic?**
24       A   Again, I'm very familiar with our processes and
25 procedures that relates to our flood insurance program.

7 (Pages 22 to 25)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 26

1      Q    Are you familiar with what data is stored and
2  kept on file relating to that topic?
3      A    Yes, I am.
4      Q    On topic 5, defendants' communications, files
5  and records relating to Sheila Hofstetter, David
6  Hofstetter and Roger Modersbach.
7          Do you see that?
8      A    Yes, I do.
9      Q    Do you have knowledge on that topic as well,
10  correct?
11     A    Yes.
12         MR. MEINERTZHAGEN:  Object to the form.
13         MR. RICHTER:  Q  Is your knowledge on that topic
14  based simply on the documents that you read in
15  preparation for today's deposition or do you have any
16  personal knowledge on topic 5 beyond that?
17     A    Just my knowledge as what's included in this
18  information, this binder.
19     Q    Did you ever give any personal consideration to
20  Ms. Hofstetter's situation with respect to flood
21  insurance?
22         MR. MEINERTZHAGEN:  Object to the form of the
23  question.
24         THE WITNESS:  Can you explain what you mean by
25  personal?

Page 27

1          MR. RICHTER:  Q  Did you make any determination or
2  evaluation of your own with respect to what Chase's
3  insurance requirements should be with respect to
4  Ms. Hofstetter?
5          MR. MEINERTZHAGEN:  Object to the form.
6          THE WITNESS:  No, I did not.
7          MR. RICHTER:  Q  Have you ever made an evaluation
8  of that post suit?
9          MR. MEINERTZHAGEN:  Object to the form of the
10  question, outside the scope.
11         He can answer in his own personal knowledge.
12         THE WITNESS:  Can you repeat it again.
13         MR. RICHTER:  Q  Sure.  You're aware that
14  Ms. Hofstetter has filed a legal action against Chase
15  relating to its flood insurance requirements for her?
16     A    Correct.
17     Q    And as a result of that legal action, have you
18  gone back through her file and re-examined to determine
19  whether Chase got it right from your own personal
20  perspective and your own personal knowledge?
21         MR. MEINERTZHAGEN:  Object to the form.
22         THE WITNESS:  We followed the appropriate policy.
23         MR. RICHTER:  Q  Let's move on to topic 6:
24  organizational structure and responsibilities of
25  defendants and their flood compliance office, escrow

Page 28

1  administration department, insurance processing center,
2  research department, corporate compliance office and
3  audit department.
4          Do you see that?
5      A    Yes, I do.
6      Q    You consider yourself knowledgeable to testify
7  on that topic?
8      A    Yes, I do.
9      Q    Are you familiar with the organizational
10  structure and responsibilities of each of those groups,
11  those being the flood compliance office, escrow
12  administration department, insurance processing center,
13  research department, corporate compliance office and
14  audit department?
15     A    Yes.
16     Q    What sort of interactions have you had with the
17  flood compliance office?
18     A    The flood compliance -- my understanding that
19  should be flood compliance department is my
20  understanding, that referring to the flood compliance
21  department that reports in to me.
22     Q    Is the flood compliance department part of the
23  insurance group?
24     A    Correct.
25     Q    The escrow administration department, your

Page 29

1  insurance group, is that part of the escrow
2  administration department?
3      A    Escrow administration department is responsible
4  for insurance, tax, escrow analysis.  It's a larger
5  department.  The insurance department that I manage is a
6  department underneath escrow administration.
7      Q    Who is the head of the escrow administration
8  department?
9      A    Terry Smith.
10     Q    The insurance processing center, who runs the
11  insurance processing center?
12     A    The insurance processing center is run by
13  Assurant.
14     Q    I believe you testified previously that your
15  duties as vice president of the insurance group at Chase
16  related to insurance processing, is that correct?
17     A    That's correct.
18     Q    Is there a -- What is the demarcation of
19  responsibilities between your group and the assurance --
20  insurance processing center with respect to insurance
21  processing?
22         MR. MEINERTZHAGEN:  Object to the form of the
23  question.
24         THE WITNESS:  The insurance processing center is
25  responsible for processing the documents and they're

8 (Pages 26 to 29)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 30

1  responsible for a variety of functions for Chase,
2  including they take phone calls, they handle our
3  research.
4      MR. RICHTER:  Q   You said there were a variety of
5  functions.  Any others?
6      A   They also handle our insurance loss trap
7  processing.
8      Q   **In other words, when somebody has a claim?**
9      A   Exactly.
10     Q   **So would it be fair to say Assurant handles the**
11 **ministerial aspects of the insurance processing whereas**
12 **the Chase insurance department handles the policy?**
13     MR. MEINERTZHAGEN:  Object to the form of the
14 question.
15     THE WITNESS:  Chase, we determine what the policy is
16 and make sure that Assurant is adhering to that policy.
17     MR. RICHTER:  Q   Does Assurant play any role in the
18 development of flood insurance policy, or do they just
19 take orders from Chase on that score?
20     A   They -- Assurant takes direction from Chase on
21 the policy.
22     Q   **Do you get feedback from Assurant relating to**
23 **their insurance processing?**
24     MR. MEINERTZHAGEN:  Object to the form.
25     THE WITNESS:  As far as feedback, we do have -- we

Page 31

1  have meetings with Assurant to review their performance.
2  So it's usually the feedback -- providing feedback to
3  Assurant.
4      MR. RICHTER:  Q   Do you get reports from Assurant
5  on a weekly basis?
6      A   Yes.
7      Q   **What type of reports do you receive?**
8      A   There is a long list of reports from --
9      Q   **Tick them off for me.**
10     A   Call center reports, various call center
11 reports, reports on production of all key functions that
12 they're performing, including what I've referenced
13 before, research, insurance processing.  So how many
14 documents that they've received, how many bills they've
15 paid.  There are key service level items we have in our
16 contract.
17     Q   **What are the key service items?**
18     A   There's -- the key service levels,
19 research-wise, we have metrics around the timing of the
20 SLAs for research items as well as timing for document
21 processing which involves when a document comes in, how
22 quickly that document is updated.
23     Q   **What does SLA stand for?**
24     A   Service level agreement.  Variety of service
25 level agreements for our call center as far as average

Page 32

1  speed to answer, abandonment rate, variety of other
2  items.
3      Q   **The next group in topic 6 is the research**
4  **department.  Where are they housed?**
5      A   Research department, there is a main research
6  department within Chase Home Finance that may receive
7  customer correspondence research.  Research could also be
8  handled in each individual department as well if research
9  is directed to them.  So, for example, research is
10 directed directly to Assurant.  So they have a research
11 department within that IPC center that I referenced as
12 far as one of their main areas of responsibilities as the
13 correspondence research.
14     Q   **Topic 7 is the relationship between defendants**
15 **Chase Home Finance and JPMorgan Chase Bank and any**
16 **communications, instructions or feedback from one to the**
17 **other concerning flood insurance, insurance requirements,**
18 **forced-placed insurance or related financial incentives**
19 **or customer complaints.**
20     **Do you see that?**
21     A   Yes, I do.
22     Q   **What's the basis for your knowledge on that**
23 **topic?**
24     A   I'm familiar with the requirements for flood
25 insurance program and any interaction with Chase

Page 33

1  employees regarding that policy.
2      Q   **Chase Home Finance services loans for JPMorgan**
3  **Chase Bank, is that right?**
4      A   That's correct.
5      Q   **Does Chase Home Finance service loans for any**
6  **other bank?**
7      A   I guess as far as other investors, we have
8  other investors servicing on behalf of other investors.
9      Q   **When you say other investors, what do you mean**
10 **by that?**
11     A   I guess I'm referring to more the Fannie Mae,
12 Freddie Mac.
13     Q   **Is Chase Home Finance a wholly-owned subsidiary**
14 **of JPMorgan Bank?**
15     A   Yes.
16     Q   **If somebody has an e-mail account that's**
17 **chase.com, I've seen chase.com and jpmorganchase.com,**
18 **does that mean to draw a distinction between which**
19 **corporate entity they work for?**
20     MR. MEINERTZHAGEN:  Object, outside of the scope of
21 the deposition topics.
22         He can go ahead and answer on his personal
23 knowledge.
24     THE WITNESS:  I don't have any knowledge of why the
25 difference is there.

9  (Pages 30 to 33)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 34

1      MR. RICHTER: Q Does Chase Home Finance service
2   loans for any other bank other than JPMorgan Chase Bank?
3      MR. MEINERTZHAGEN: Object, outside of the scope of
4   the deposition topics.
5      He can go ahead and answer in his own personal
6   knowledge.
7      THE WITNESS: I'm not sure.
8      MR. RICHTER: Q If there is another bank, you're
9   not aware of that?
10     A   I'm not aware of.
11     **Q   In terms of Chase Home Finance's servicing**
12  **function, is Chase Home Finance free to do whatever it**
13  **wants with respect to servicing or does JPMorgan Chase**
14  **Bank pay attention to what's going on with respect to the**
15  **servicing function?**
16     MR. MEINERTZHAGEN: Object to the form of the
17  question.
18     THE WITNESS: Chase Home Finance determines the
19  policies.
20     MR. RICHTER: Q Does JPMorgan Chase Bank review
21  Chase Home Finance's performance?
22     A   I'm not aware of what interaction there is
23  between JPMorgan Chase Bank and Chase Home Finance as far
24  as that topic.
25     (Exhibit 4 marked as requested)

Page 35

1      **Q   Mr. Nack, you have just been handed what's been**
2   **marked as Plaintiff's Exhibit 4 Bates stamped Chase 763.**
3      **Do you have that in front of you?**
4      A   Yes, I do.
5      MR. MEINERTZHAGEN: Can you give me a minute to find
6   it?
7      Okay.  Proceed.
8      MR. RICHTER: Q Do you recognize that document?
9      A   Yes, I do.
10     **Q   And does this show everybody in the escrow**
11  **administration department at Chase as of August 31st,**
12  **2010?**
13     A   This is not of the entire escrow administration
14  department but of the insurance department.
15     **Q   We have gone through your responsibilities.**
16  **Could you give me the rundown of the responsibilities of**
17  **the three people that are shown directly below you on the**
18  **chart, Mr. Miller, Ms. Reitz and Ms. Jones?**
19     A   Sure.  Brett Miller is the assistant vice
20  president of the insurance department.  He has three
21  supervisors under his area, and the main functions is the
22  first one is to provide support to our vendor Assurant,
23  to handle special products and functions that --
24  financial functions of that area.
25     The second group under Heather Little is

Page 36

1   responsible for vendor audits.  That would include
2   auditing Assurant's processes.
3      And the third team under Mr. Miller with loss
4   draft is handling again supporting key aspects of the
5   loss draft insurance claim processing Assurant is
6   performing by providing support for that team.
7      Under Maggie Reitz, she is responsible for the
8   flood department, mostly focused on the mortgage division
9   which would not include our home equity loans or lines of
10  credit.  My interaction is mostly supporting interaction
11  with our flood determination vendors to monitor flood
12  determination mapping.
13     They also handle any disputes regarding flood
14  insurance.  If a customer has a dispute whether in or out
15  of a flood zone, that group would handle that for our
16  mortgage loans.
17     **Q   But not lines?**
18     A   Correct.
19     Rita Jones is assistant vice president of our
20  home equity division which includes our loans and lines.
21  And she has four groups under her.
22     The first one is responsible for the home
23  equity loans, lines of credit that relates to flood
24  insurance, as well as the escrow processing as it relates
25  to the MHA accounts or modifications.  We do modification

Page 37

1   of home equity loan or line of credit, they will handle
2   the escrow portion of that, which is not typical for a
3   loan or line.
4      **Q   What does the acronym MHA stand for?**
5      A   Make -- I don't recall.
6      **Q   Is it called making home affordable?**
7      A   I was going to say that, but I didn't want to
8   be incorrect.  The other group handles our home equity
9   tax which works with our default areas regarding tax
10  delinquencies and default of accounts, and the two groups
11  below are dealing with the tax and escrow analysis
12  functions as it relates to just the loans that are in the
13  modification program and interacting with our vendors as
14  far as payment of taxes and in escrow analysis as far as
15  analyzing escrow accounts for just those accounts that
16  are in that program on our home equity loans and lines.
17     **Q   Now, I notice in the home equity flood group --**
18  **First of all, the top is HC equals ten.  Is that head**
19  **count?**
20     A   Yes.
21     **Q   Then there's a second to bottom, it says open**
22  **and then parentheses, J. Miller.  Does that refer to**
23  **Justin Miller?**
24     A   Yes.
25     **Q   Is he still with Chase do you know?**

Merrill Corporation - Minnesota
877-489-0367                          www.merrillcorp.com/law

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 38

1    A   No, he's not.  He's not in my department.
2    Q   Does he still work for Chase?
3    A   I don't know.
4    Q   You communicate pretty regularly with
5    Mr. Miller and Miss Rice and Ms. Jones?
6    A   Yes, I do.
7    Q   You have weekly meetings?
8    A   We have meetings with respect to activities
9    that we're responsible for.  We have numerous meetings
10   each day.
11   Q   You also communicate by e-mail?
12   A   Yes.
13   Q   Some of those communications would relate to
14   flood insurance?
15   A   Yes.
16   Q   Remind me of the name of your boss then, the
17   head of the escrow administration department.
18   A   Terry Smith.
19   Q   Do you communicate regularly with Terry?
20   A   Yes.
21   Q   How frequently do you meet with him?
22   A   Again, we meet on various topics that cover
23   both my area as well as his overall area.  That's a very
24   general question.
25   Q   Do your communications with Mr. Smith -- do

Page 39

1    they touch on flood insurance from time to time?
2    A   Yes, they do.
3    Q   Do you also exchange e-mails from time to time
4    with Mr. Smith relating to flood insurance?
5    A   Yes.
6    Q   Does Mr. Smith play any role in the development
7    of Chase's policies and practices with respect to flood
8    insurance?
9    A   No.
10   Q   Are you the highest level of signoff in the
11   company with respect to the adoption of those policies
12   and practices?
13   MR. MEINERTZHAGEN:  Object to the form.
14   THE WITNESS:  I'm involved with the group that I
15   mentioned earlier in setting the policies.
16   MR. RICHTER:  Q  Everybody on this organizational
17   chart which has been marked as Plaintiff Exhibit 4, all
18   of them work in Columbus?
19   A   Yes, they do.
20   Q   You all work in the same building, at least
21   those -- let's start with the people in your insurance
22   department.
23   A   Yes, we all work in the same building.
24   Q   Does Mr. Smith also work in the same building?
25   A   Yes, he does.

Page 40

1    Q   Now, you indicated earlier that the flood
2    compliance department was part of your group.  Do I have
3    that right?
4    A   Yes.
5    Q   Where is the flood compliance department?
6    Which box do they fit in on this chart?
7    A   I reference that box both within Maggie's area
8    and in underneath Megan's area.
9    Q   Does the -- You indicated that Maggie's group
10   handles flood insurance disputes on loans.  Does the home
11   equity flood group also handle flood insurance disputes
12   on home equity lines?
13   A   Maggie's group supports our mortgage loans.
14   The -- Megan supports our home equity loans and lines of
15   credit.
16   Q   Do each of their groups handle flood insurance
17   disputes?
18   A   They do, yes.
19   Q   Does Chase have somebody who is called a flood
20   dispute specialist?
21   A   That might be a title for the analyst.
22   Q   Is there a current analyst within your group
23   that holds that title or analysts?
24   A   Can I look here?  I don't --
25   Q   Why don't you take a look at Plaintiff 4.  Is

Page 41

1    there anybody on there that's a flood insurance
2    specialist -- or flood dispute specialist?
3    A   The people in both those departments are
4    familiar with the flood and responsibilities regarding
5    the flood insurance.  As far as their exact title, I
6    don't have -- I don't recall their titles.
7    Q   Are you familiar with somebody named Lynn
8    Bucca?
9    A   Yes.
10   Q   Did she formerly hold that title?
11   A   I don't recall Lynn's exact title.  That was
12   back in -- 5 years ago.  I don't recall her title.  She
13   did work in the insurance department for home equity
14   loans and lines.
15   Q   I notice in each group there's a TL.  Does that
16   stand for team lead?
17   A   Yes, it does.
18   Q   Was Ms. Bucca a team lead or a supervisor at
19   the time that she worked in the home equity flood group?
20   A   I don't recall if Lynn was actually a team lead
21   at that time.  Again it was sometime ago.  I don't
22   recall.  Karen Waleri was the direct supervisor.
23   Q   Does the flood compliance department, do they
24   also conduct flood zone determination audits meaning the
25   A   Flood zone determination audits within the

11 (Pages 38 to 41)

CONFIDENTIAL
JEFFREY NACK 11/10/2010

Page 42

1 accuracy of the flood zone?
2     Q   Correct.
3     A   No, we do not.
4     Q   What is your understanding of the term flood
5 zone determination audit?
6     MR. MEINERTZHAGEN: Object to the form. Lacks
7 foundation.
8     THE WITNESS: There's -- I'd have to -- you're
9 referring to an exact procedure. I need to look at the
10 procedure and title and make sure I'm understanding your
11 question more.
12     (Exhibit 5 marked as requested)
13     MR. RICHTER: Q We're moving on to Chase 728.
14     Do you have Plaintiff's Exhibit 5 in front of
15 you, Mr. Nack?
16     A   Yes, I do.
17     Q   This document is Bates stamped Chase 728 in the
18 lower right-hand corner.
19     Do you see that?
20     A   Yes, I do.
21     Q   You see at the top it says, Each month Chase
22 HE, assume that's home equity, flood compliance,
23 completes an audit of the work completed each month -- by
24 each flood determination vendor.
25     Do you see that?

Page 43

1     A   Yes, I do.
2     Q   Can you tell me what that refers to?
3     A   What this audit is referring to is we have our
4 flood determination vendors provide weekly files -- we
5 send weekly files to our vendor of new accounts that were
6 in our servicing system, and they are responsible for
7 providing back the flood determination information on
8 those accounts. So the audit is to ensure that the
9 vendor is performing that function and they're meeting
10 our key service levels.
11     Q   Is one of those key service levels accuracy?
12     A   We do not perform an accuracy test on the
13 determination. We rely on our vendors to provide that
14 information. They are liable for the accuracy of the
15 data.
16     Q   Who are your vendors for flood determinations?
17     A   We use -- for our home equity loans and lines
18 of credit we use two vendors, MBA -- I do not have -- I
19 only have the abbreviation. I don't know -- is one flood
20 vendor, and the other one is -- they used to be First
21 American but now they're Core Logic Flood.
22     Q   So if the audits don't involve auditing
23 accuracy, what do they involve auditing? What's being
24 audited?
25     A   They're auditing the data to ensure the data is

Page 44

1 being populated and that we receive all of the key
2 information on our servicing system.
3     Q   Could you be a little more specific?
4     A   We're looking for key fields such as the flood
5 zone is populated, that it's populated with the accurate
6 value, ensuring that other key items are included in
7 there, as well as the MAP panel number, the community
8 number, the participation flag.
9     Q   When you say accurate value, by value do you
10 mean the Zone A, AE, X?
11     A   Yes.
12     Q   Parts of the audit term is with respect to
13 whether there's an accurate value for each customer?
14     A   Right. It's populated, that there are no
15 accounts with a blank flood zone.
16     Q   At one point did Chase used to audit flood zone
17 determinations for the accuracy of the flood zone
18 determination itself?
19     A   No.
20     Q   Why not?
21     A   The flood --
22     MR. MEINERTZHAGEN: Object to the form.
23     THE WITNESS: The accuracy of the flood zone is very
24 -- we rely on our vendors. It's a very scientific
25 process. For us to be able to validate that would mean

Page 45

1 that we would have to build the infrastructure to -- that
2 these vendors have done to validate the accuracy.
3 They're all part of the National Flood Determination
4 Association, and they've reviewed the accuracy amongst
5 themselves and that association, and our vendors have
6 very high scores as far as accuracy within the NFDA.
7     MR. RICHTER: Q Does the flood compliance team
8 interact with something called a profitability management
9 team?
10     A   I don't recall that team.
11     Q   Are you familiar with -- an entity called the
12 profitability management team?
13     A   I'm not.
14     Q   Let's mark this plaintiff's 6.
15     (Exhibit 6 marked as requested)
16     Q   Chase 698. Mr. Nack, do you have Chase 698,
17 Plaintiff Exhibit 6, in front of you?
18     A   Yes, I do.
19     Q   Do you see at the top it says, each week the
20 home equity flood compliance team receives a flood
21 validation file from the profitability management team in
22 Phoenix?
23     Do you see that?
24     A   Yes, I do.
25     Q   What does that refer to?

12  (Pages 42 to 45)

Page 46

1    A   One second, please.
2        This is a process that we perform that does not
3    have anything really to do with flood insurance group.
4    It's a function that we work to validate that our coding
5    in our system -- the collateral address is matching some
6    address on VLS.
7    Q   What does VLS refer to?
8    A   It's the servicing system the home equity loans
9    and lines of credit are serviced on.  It's a servicing
10   system.
11   Q   What does the acronym stand for?
12   A   I do not know.
13   Q   Do you know who is the leader of the
14   profitability management team?
15   A   I do not.
16   Q   Prior to seeing this document, were you aware
17   **that persons on your flood compliance team were having**
18   **regular communications with Chase's profitability**
19   **management team?**
20   A   As I mentioned, this process is not related to
21   flood insurance directly.  It's just a process that we
22   perform that is part of assistance for -- must be for
23   this management team group.  I'm not very familiar with
24   this area.
25       MR. RICHTER:  Let's take a short break.

Page 47

1        (Off the record)
2        (Exhibit 7 marked as requested)
3    MR. RICHTER:  Q  Back on the record.
4        Mr. Nack, do you have plaintiff Exhibit 7,
5    Chase 496 to 98 in front of you?
6    A   Yes, I do.
7    Q   Do you recognize that document?
8    A   It's a procedure for our Chase call center.
9    Q   **I'd like you to turn to the second page, Chase**
10   **497.**
11       **Do you see on the left-hand side first thing**
12   **down there's a category:  Disputes about flood**
13   **classification/coverage requirements?**
14   A   Yes.
15   Q   **It says, do not transfer the customer to the**
16   **insurance processing center.**
17       **That's referring to the Assurant insurance**
18   **processing center?**
19   A   Correct.
20   Q   **The IPC does not handle flood zone dispute**
21   **issues.**
22       **Do you see that?**
23   A   Yes.
24   Q   **Is that an accurate statement that the IPC at**
25   **Assurant does not handle flood zone dispute issues?**

Page 48

1    A   That is correct.
2    Q   **The flood zone disputes, that's handled by**
3    **Chase personnel in your group?**
4    A   Correct.
5    Q   **All right.  I want to go back to policies and**
6    **practices, topic number 1.**
7        **Does Chase require all of its home lending**
8    **customers with secured property in a special flood hazard**
9    **area to maintain flood insurance for their property?**
10   A   Yes.  Any property that's in a -- any property
11   secured by real estate that's in a special flood hazard
12   area must have flood insurance.
13   Q   **And I want to be precise with this.  Does the**
14   **customer's dwelling have to fall within the flood zone**
15   **for Chase's flood insurance requirement to kick in or any**
16   **-- or any just -- just a portion of the lot?**
17   A   It is the dwelling.  You cannot obtain flood
18   insurance on it.
19   Q   **If, for example -- if a customer's house fell**
20   **outside of the flood zone, but some part of their lot**
21   **fell inside the flood zone, they wouldn't be required to**
22   **carry flood insurance by Chase, right?**
23   A   That is correct.
24   Q   **And shouldn't be required to carry floor**
25   **insurance by Chase, right?**

Page 49

1        MR. MEINERTZHAGEN:  Object to the form.
2        THE WITNESS:  We can require flood insurance.  Our
3    policy is that if the dwelling is in a special flood
4    hazard area, we will require flood insurance.  If the
5    dwelling is not in a special flood hazard area, we will
6    not require insurance.
7        MR. RICHTER:  Q  With respect to that requirement,
8    the requirement being your dwelling is in, you have to
9    get flood insurance, does it matter whether a borrower
10   has a positive balance on their line or whether the line
11   has been paid in full?
12   A   The policy -- the flood policy for home equity
13   lines of credit require that any loan in special flood
14   hazard area has flood insurance.
15   Q   **So to specifically answer my question, it**
16   **doesn't matter whether the line or loan has a positive**
17   **balance or not, right?**
18   A   That's correct.
19   Q   **And it doesn't matter whether their line is**
20   **open or whether it's been suspended by Chase, right?**
21       MR. MEINERTZHAGEN:  Object to the form.
22       THE WITNESS:  Yeah, the policy is for any account so
23   regardless of -- if it's frozen --
24       MR. RICHTER:  Q  Regardless of individual
25   circumstances?

13 (Pages 46 to 49)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 50

1    A   Correct.
2        MR. MEINERTZHAGEN:  Object to the form.
3        MR. RICHTER:  Q   And that policy is the same
4    regardless of whether it's a loan or a line, right?
5        MR. MEINERTZHAGEN:  Object to the form.
6        THE WITNESS:  That's correct.  Well, let me clarify.
7    Yes, the policy is the same, yes.
8        MR. RICHTER:  Q   It's the same regardless of
9    whether the borrower lives in California or whether they
10   live somewhere else and we're talking about property in
11   another state, right?
12       MR. MEINERTZHAGEN:  Object to the form.
13       THE WITNESS:  Yes, our policy is consistent.
14       MR. RICHTER:  Q   Consistent policy across all
15   borrowers, all properties, nationwide, is that fair?
16       MR. MEINERTZHAGEN:  Object to the form.
17       THE WITNESS:  The policy for our home equity loans
18   and lines of credit is the same.
19       MR. RICHTER:  Q   Are Chase's flood insurance
20   requirements designed to be synonymous with federal
21   requirements or are they intended to be more stringent?
22       MR. MEINERTZHAGEN:  Object to the form.
23       THE WITNESS:  The federal regulations set a minimum
24   standard as well as a maximum standard.  So as long as
25   your policy is between the two, you're in compliance.

Page 51

1        MR. RICHTER:  Q   If a customer procured the minimum
2    required by federal law, would that be okay from Chase's
3    standpoint?
4        MR. MEINERTZHAGEN:  Object to the form.
5        THE WITNESS:  In order for a loan to be originated
6    with Chase, it must adhere to Chase policy.
7        MR. RICHTER:  Q   That's what I'm getting at.  Is
8    the policy to ensure to the federal minimum requirement
9    or is it something beyond that?
10       MR. MEINERTZHAGEN:  Object to the form.
11       THE WITNESS:  The Chase policy is to -- you want --
12   are you asking what the policy is --
13       MR. RICHTER:  Q   Yes.
14       A   Chase home -- for our home equity lines, loan,
15   lines of credit, Chase home policies require floor -- if
16   they're in a special flood hazard area -- if the dwelling
17   is in a special flood hazard area that we require that
18   the loan must be the lesser of the replacement cost value
19   or the maximum available through the NFIP, which is
20   currently 250,000, which is within the minimum and the
21   maximum allowable by the regulations.
22       **Q   What's the minimum allowed under federal**
23   **regulations, do you know?**
24       A   Yes.  The minimum to be in compliance, the
25   flood coverage must be at least the lesser of the total

Page 52

1    outstanding balances of all loans or the replacement cost
2    value or the NFIP maximum, which is 250,000.
3        **Q   If a customer has a home equity line of credit**
4    **and insures their property for the full amount of the**
5    **line -- the full amount that they're able to draw on the**
6    **line, are Chase's interests adequately protected?**
7        MR. MEINERTZHAGEN:  Object to the form.
8        THE WITNESS:  The -- did you say up to the line or
9    loan did you say?
10       MR. RICHTER:  Q   Up to the full amount of the line.
11       A   Our flood policies is not designed towards just
12   looking at Chase's interest.  The policy was designed to
13   look at the interest of the borrower as well as Chase's
14   interest and also through the recommendations within the
15   regulations that stipulate that we should follow the same
16   practice with flood insurance as we do with homeowner's
17   insurance and require replacement cost coverage.
18       **Q   I want to focus on Chase's interests right now.**
19   **If a customer insured their property to the full amount**
20   **that they were able to draw on the line, would Chase's**
21   **interests be adequately protected for that customer?**
22       MR. MEINERTZHAGEN:  Object to the form.
23       THE WITNESS:  No, I don't think -- they would not.
24   The regulations stipulate that in cases of losses, if you
25   only protect the bank's interest, that there are cases

Page 53

1    where you would not be covered if you're only concerned
2    with your interest.
3        MR. RICHTER:  Q   Why wouldn't Chase's interests be
4    adequately protected -- let's say, if a customer had a
5    100,000 line, they had $100,000 worth of flood insurance
6    on the property, and -- how does Chase come out on the
7    short end of the stick?
8        A   If -- using those scenario, we have to factor
9    in what the replacement cost value is on that property,
10   and, if, for example, the replacement cost value was
11   $200,000, and the customer only had $100,000 of flood
12   coverage with a line of credit of 100,000, your example,
13   then at the time of loss, because that property is not
14   fully insured, that the customer losses will be not --
15   will be -- instead of being done on replacement cost
16   value, will be done on actual cash value, which means
17   it's going to take in depreciation.
18       So depending on the specifics of the loss,
19   which obviously we can't forecast what is loss and what
20   is depreciation, the exact number is going to be, but it
21   obviously -- the word depreciation means less than
22   replacement cost.  So you will not receive, in many
23   cases, that full amount.
24       **Q   Let's take a situation, customer's home,**
25   **complete wipe out, and Chase has flood insurance coverage**

CONFIDENTIAL
JEFFREY  NACK 11/10/2010

Page 54

1 on the property.  It's the first listed insured for
2 $100,000, and the customer only has $100,000 line.  Under
3 that situation wouldn't be the payout to Chase be
4 $100,000?
5      MR. MEINERTZHAGEN:  Object to the form.
6      THE WITNESS:  I think again it just depends on --
7 each situation would be different.  You know, it would
8 have to deal with the actual, you know, type of loss and
9 that there are cases where you might -- we can talk about
10 examples, this might pay out, this might not pay out, but
11 in the end, there's always going to be some exposure
12 to -- if you only rely on just the balance that you will
13 be, again as I referenced earlier, the actual cash value
14 would depreciate what the losses are and you will have --
15 customer will receive less in insurance proceeds than it
16 would normally take to replace that, whatever structure
17 is damaged.
18      MR. RICHTER:  Q  I want to make sure we're talking
19 apples to apples.
20      Let's take a situation where -- let's just take
21 Mr. Modersbach's situation.  He's got a line for roughly
22 -- he's drawn roughly 37,000 on it.  The full amount of
23 the line is $100,000.  If his property was insured, as it
24 was at one time, in the amount of $100,000 for flood
25 insurance, let's say his home was a total wipe out, why

Page 55

1 wouldn't Chase get its -- the proceeds back, the $37,000
2 that it's extended to Mr. Modersbach?  Isn't it covered
3 in that situation?
4      MR. MEINERTZHAGEN:  Object to the form.
5      THE WITNESS:  I mean as far as -- like I said
6 earlier, as far as with a total loss, I'm not sure what
7 would be covered.  In a total loss normally as far as if
8 it were, you know, in -- from our experience we see less
9 cases of total losses.  Flooding is not a total loss.
10 It's often some of the other perils.  But -- necessarily
11 from my experience with what we've seen.
12      And the $100,000 maximum, depending on what the
13 loss is, total loss, they're only going to get covered
14 still for portion of whatever was damaged, and, again,
15 it's going to be depreciated from that, that point on.
16      MR. RICHTER:  Q  If the amount of the insurance --
17 let's take a situation where the replacement cost value
18 of the house -- let's say you've got a million dollar
19 home, and even if you went to $250,000 flood insurance in
20 that situation, in that situation the customer's home is
21 not going to get rebuilt if it's a total loss, is it?
22      MR. MEINERTZHAGEN:  Object to form.
23      MR. RICHTER:  Q  From the insurance proceeds?
24      MR. MEINERTZHAGEN:  Same objection.
25      THE WITNESS:  In cases where the replacement cost

Page 56

1 value is over 250,000, obviously that's the maximum that
2 you can obtain through the NFIP.  As a lender we could
3 require more than that amount, but we do not, and so
4 everything above that would be -- is -- what I'm trying
5 to get to is a risk to the bank.
6      MR. RICHTER:  Q  If Chase extends a loan in the
7 amount of $100,000 to a customer, what's Chase's
8 financial interest in the property?
9      MR. MEINERTZHAGEN:  Object to the form.
10      THE WITNESS:  Chase's financial interest to the
11 property?  From what perspective?  From insurance
12 perspective?
13      MR. RICHTER:  Q  From your perspective.
14      MR. MEINERTZHAGEN:  Object to the form.
15      THE WITNESS:  My perspective Chase's interest is to
16 ensure that the structure has the appropriate amount of
17 insurance so in case of damage the property can be
18 rebuilt.
19      MR. RICHTER:  Q  If the property cannot be rebuilt
20 from the insurance proceeds because there's -- the amount
21 of flood insurance coverage is less than the replacement
22 cost value of the property, in that situation can Chase
23 take the proceeds and use it to pay off the balance of
24 the loan or the line?
25      MR. MEINERTZHAGEN:  Object to the form.  It's also

Page 57

1 outside of the scope, but he can testify based on his own
2 personal knowledge.
3      THE WITNESS:  Whenever there's a loss that a
4 customer files an insurance claim with their carrier,
5 they should be listing Chase, Chase Home Finance as the
6 loss payee so we should be included on the insurance
7 claim check.  And part of our responsibilities is to
8 ensure the property is repaired in cases where -- those
9 funds are deposited, you know, on the customer's account,
10 and we monitor those repairs.
11      If the customer chooses to pay off the loan at
12 any point, as long as they have enough funds within those
13 proceeds to do so, you know, with our authority, we'll
14 utilize those funds to pay off the loan.
15      MR. RICHTER:  Q  Let's go back to my earlier
16 example.  You got a million dollar replacement cost
17 house, you only have $250,000 of coverage on the
18 property, that's a total -- that's a total loss.
19      A  Correct.
20      Q  Let's say the customer has drawn $250,000 in
21 that situation.  What happens in a situation, does Chase
22 build one-fourth of the house or does Chase take the
23 $250,000 to pay back its interest in the property?
24      MR. MEINERTZHAGEN:  Object to the form.
25      THE WITNESS:  At that point the 250,000 -- in the

Merrill Corporation - Minnesota
877-489-0367                                    www.merrillcorp.com/law

Page 58

1 scenario the 250,000 would be in -- the process would be
2 we would put that on the account, on the customer's
3 account to monitor for repairs. In this case you're
4 saying that we don't -- you're assuming that they won't
5 rebuild that home, but we would assume that they would
6 rebuild the home. They have the equity in it, they may
7 have to go out and get another loan to build the
8 difference because they obviously have equity in it, in
9 their house maybe, but they're still liable for their
10 balance of their liens.
11 MR. RICHTER: Q If that home is not rebuilt, do
12 the proceeds from the flood policy go to Chase first?
13 A The check goes to the customer, and Chase is
14 listed on the check as a loss payee.
15 **Q So sticking with my example, the million dollar**
16 **home, total wipeout, you got $250,000 flood policy on**
17 **there, and there's $250,000 that's been drawn by the**
18 **customer, the insurance policy then would pay out**
19 **$250,000, right?**
20 A Correct.
21 **Q And in that situation you wouldn't be able to**
22 **use $250,000 to rebuild the home, right?**
23 MR. MEINERTZHAGEN: Object to the form.
24 THE WITNESS: You would be able to utilize that
25 $250,000 to rebuild obviously a portion of that home, you

Page 59

1 know. Your example a million dollar could have $700,000
2 of land value in that balance because your mortgage
3 includes more than just your dwelling. So it's not
4 uncommon to have a million dollar -- loan and the
5 replacement cost value is 3, 400 thousand dollars,
6 especially for loans in a special flood hazard area.
7 MR. RICHTER: Q I understand you have all types of
8 scenarios where you think the house would or could be
9 rebuilt, including the customer coming to Chase and
10 asking Chase for another loan. My question is, if the
11 house is not rebuilt, can Chase take the proceeds to pay
12 off the balance on the loan or the line?
13 MR. MEINERTZHAGEN: Object to the form, outside the
14 scope.
15 THE WITNESS: In that case, in that scenario if the
16 customer authorizes us to pay that off, we would if
17 there's another funds to pay the loan off or line of
18 credit.
19 MR. RICHTER: Q And if the house was not rebuilt,
20 Chase would demand that the customer pay off the loan or
21 the line because there's no longer any dwelling securing
22 the loan, right?
23 MR. MEINERTZHAGEN: Object to the form, outside the
24 scope.
25 THE WITNESS: Again, the money would be deposited.

Page 60

1 As far as demand that they do it, no. The customer --
2 our intention is the customer is to use those funds as
3 they are intended for, which is to rebuild and repair the
4 properties.
5 MR. RICHTER: Q Do you recall any situations in
6 which a property secured -- that secures a Chase home
7 loan or line was insured to the full amount of the loan
8 or the line but yet Chase still suffered a loss?
9 MR. MEINERTZHAGEN: Object to the form.
10 THE WITNESS: I can't speak to any -- I mean I can't
11 speak to any.
12 MR. RICHTER: Q You can't -- As you sit here
13 today, you can't recall one single instance in which a
14 property was insured to the full amount of the loan or
15 the line and Chase came out on the short end of the
16 stick, is that right?
17 MR. MEINERTZHAGEN: Object to the form.
18 THE WITNESS: For individual loan basis, I can't
19 speak from an individual loan basis.
20 MR. RICHTER: Q Has it ever happened?
21 MR. MEINERTZHAGEN: Object to the form, lacks
22 foundation.
23 THE WITNESS: That's a pretty vague question.
24 Again, you'd have to look at every single situation,
25 every single loan that's had a loss and evaluate them.

Page 61

1 So I can't speak to every situation that's occurred on
2 our books forever.
3 MR. RICHTER: Q When a customer closes on a loan
4 or a line, does Chase tell the customer at closing that
5 it requires insurance above the federal minimum --
6 MR. MEINERTZHAGEN: Objection --
7 MR. RICHTER: Q -- for flood?
8 MR. MEINERTZHAGEN: Object to form, outside the
9 scope, lacks foundation.
10 He can testify based on his own personal
11 knowledge.
12 MR. RICHTER: We're getting into speaking objections
13 now.
14 MR. MEINERTZHAGEN: No, that's exactly what I'm
15 entitled to do. I'm entitled to a form objection then
16 make an objection based on scope.
17 MR. RICHTER: Can you repeat the question?
18 (Question read)
19 THE WITNESS: From my understanding the origination
20 disclosure it stipulates what the Chase Home Finance
21 policies are and what the requirements are. I don't
22 recall any reference to what the minimum or the maximum
23 insurance is notated there. It just stipulates what our
24 policy is.
25 MR. RICHTER: Q Does it say anything in the loan or

16 (Pages 58 to 61)

CONFIDENTIAL
JEFFREY NACK 11/10/2010

Page 62

1  line origination documents about insuring the full
2  replacement cost value?
3      MR. MEINERTZHAGEN: Object to the form. It's also
4  outside the scope of what this witness has been preferred
5  to testify about on behalf of the corporate defendants.
6  He can testify based on his own personal knowledge.
7      THE WITNESS: I'm sorry. Can you repeat it?
8      (Question read)
9   A   There are various disclosures, and I can't
10 speak for the origination disclosures to that degree if
11 -- what's inclusive in there. To my knowledge there is a
12 disclosure notice that provides what the coverage amount
13 policy is, which would include our current policy, which
14 is the full replacement cost value or the NFIP maximum is
15 disclosed I believe in the origination document.
16  Q   Has that always been the case?
17      MR. MEINERTZHAGEN: Same objections.
18      THE WITNESS: That policy -- always been that way,
19 is that what your question is? I don't really have
20 historic on the origination documents in there, policies
21 in there and the tracking of their document changes.
22      MR. RICHTER: Q   Has it ever been Chase's policy to
23 allow customers to insure to the principal balance or the
24 amount of the line?
25  A   Yes. For home equity loans and lines of

Page 63

1  credit, the prior policy for an originated loan -- home
2  equity loan or line of credit would take in consideration
3  all of the lesser of the total outstanding balances of
4  all loans or replacement cost value or the maximum for
5  the NFIP of 250,000.
6   Q   So under Chase's old policy, if a customer had
7  a line and insured to the full amount of the line, that
8  was adequate for purposes of the policy, correct?
9   A   No, it would have to factor in all outstanding
10 -- all outstanding balances. So, for example, if it was
11 a second lien home equity line of credit, it would have
12 to factor in insuring that it's -- the first is also
13 included into that calculation. It's the sum of the
14 first -- of all liens, loans.
15  Q   So under Chase's old policy, if the customer
16 insured to the total amount of loans and liens on the
17 property, that would be sufficient from Chase's
18 perspective, correct?
19  A   Not just that factor. You have to factor in
20 all three in your assumption. You're assuming the loan
21 balance is the lesser of those three. It has to be the
22 lesser of those three options.
23      So your example, we can't require a million
24 dollars. We wouldn't require I should say a million
25 dollars on your example previously.

Page 64

1   Q   So just to be clear, if the total outstanding
2  loans and liens on the property was lower than the
3  replacement cost value, and lower than $250,000, if the
4  customer in that situation insured to the total amount of
5  loans and liens, that would have been adequate under
6  Chase's former policy, correct?
7   A   Correct, correct.
8   Q   At the time that that policy was in effect,
9  Chase did not deem that level of coverage to be
10 inadequate or noncompliant with federal law, correct?
11      MR. MEINERTZHAGEN: Object to the form.
12      THE WITNESS: Yes, that requirement that I just
13 referenced is part of the federal regulations. It says
14 it has to be at least the lower of those three options.
15 It would be again within compliance of the minimum
16 standards set forth by the regulations.
17      MR. RICHTER: Q   At the time that the former policy
18 was in effect, Chase didn't believe that that policy was
19 in any way inappropriate, did it?
20      MR. MEINERTZHAGEN: Object to the form.
21      THE WITNESS: At the time that was our policy, but
22 by looking at the September 7th -- September, 2007 FEMA
23 handbook revisions, it referenced and encourages lenders
24 to review their flood insurance program and their
25 policies, and Chase obviously took a look at that and

Page 65

1  made a decision that we should be looking out for the
2  interests of what the intent of the program is.
3      MR. RICHTER: Q Go ahead.
4      MR. MEINERTZHAGEN: Let him finish.
5      THE WITNESS: The intent of the program is that we
6  need to not cover the bank's interest, we have to look at
7  the interests of the borrower, and honestly the interest
8  of the taxpayers because FEMA is a government
9  organization, and when there are losses, the taxpayers
10 are the ones that are out that money.
11      So the program is designed -- the spirit of the
12 program is designed to have insurance, have flood
13 insurance and have the appropriate amount of insurance,
14 and they encourage lenders to look at hazard -- following
15 the same practice with flood insurance as we do with
16 hazard insurance and require replacement cost value.
17      MR. RICHTER: Q When was the change made to
18 increase the flood insurance requirement to the lesser of
19 replacement cost value or $250,000?
20      MR. MEINERTZHAGEN: Object to the form.
21      THE WITNESS: The policy change was made in December
22 of 2009.
23      MR. RICHTER: Q Counsel, I'll be going next to
24 Chase 284.
25      (Exhibit 8 marked as requested)

17 (Pages 62 to 65)

CONFIDENTIAL
JEFFREY NACK 11/10/2010

Page 66

1    MR. RICHTER: Q Mr. Nack, the court reporter has
2  just handed you Plaintiff's Exhibit 8, which is Chase 284
3  through 331.
4        Do you have that in front of you?
5    A  Yes, I do.
6    Q  Do you recognize this document?
7    MR. MEINERTZHAGEN: Do you want to take a chance to
8  look through the whole thing?
9    THE WITNESS: Yes, I do.
10   MR. RICHTER: Q  What is it?
11   A  In -- this is when -- this is a document
12  produced by Assurant. This is when we first went to
13  Assurant for tracking our home equity portfolio. At that
14  time we also had a mobile home portfolio so it's
15  referenced here, which we no longer have anymore. And
16  this is the user requirements document that was used to
17  -- that Assurant used to deal with the interaction
18  between our servicing system and their system and the
19  data flows between it to -- and all the requirements
20  regarding how we tracked policies and so forth, how we
21  convert data from one system to another.
22   Q  I'd like you to turn to page 303, which says
23  waiver rules for MH and HE loans at the top.
24        Do you have that in front of you?
25   A  Yes, I do.

Page 67

1    Q  MH, that's mobile home?
2    A  Yes.
3    Q  And HE, that's home equity?
4    A  Correct.
5    Q  It says: Waiver overview. When a loan is
6  waived no more letters are mailed and forced placement
7  stops.
8        Do you see that?
9    A  Yes.
10   Q  Then further below underneath the grid there's
11  a section called chargeoff.
12        Do you see that?
13   A  Yes.
14   Q  The second sentence there, it says, the loan
15  will be waived or paid out when the balance is zero.
16        Do you see that?
17   A  Yes.
18   Q  So as of the date of this manual, was it
19  Chase's policy not to require flood insurance when the
20  balance on a home equity line of credit was zero?
21   A  No. It's referring to chargeoffs. So the loan
22  is being charged off the system. So in that case -- a
23  default case is when a loan is being charged off and
24  we're bringing obviously the balance down to zero because
25  they're charging off the loan. So they're -- actually

Page 68

1  customer is in default and charged off. Not the same as
2  what you consider an active account where the customer
3  has an active ability to draw on a line or active account
4  I should say.
5    Q  Well, looking up at the grid, underneath loan
6  status, first row there it says paid out. Do you see
7  that? Then there's a column, waived flood, and it says
8  yes.
9    A  Basically on that what we're telling Assurant
10  when the loan is paid off and closed that we would stop
11  tracking the insurance on it. The account is no longer
12  active.
13   Q  That would be when the balance is zero?
14   A  That would be when the -- the balance is zero
15  and the account is closed.
16   Q  By the way, looking back to the first page,
17  Chase 284, it says, prepared by Yolanda Angulo. Am I
18  pronouncing that right?
19   A  Yes, it looks like.
20   Q  Does she work for Chase or Assurant?
21   A  She works for Assurant.
22   Q  But the articulation of the policies in here --
23  she may have prepared this document, but it was based on
24  Chase's requirements for it in this case mobile homes and
25  home equity portfolios, is that right?

Page 69

1    A  That's correct. This is a document they
2  prepare based on direction and guidance from Chase
3  regarding policies.
4    Q  Did Chase review this document after it was
5  prepared by Ms. Angulo?
6    A  This is back prior to my direct involvement so
7  I don't know if I can answer that.
8    Q  Would it be Chase's general practice to review
9  these types of documents that are put together by
10  Assurant and sign off on them after they're prepared?
11   MR. MEINERTZHAGEN: Object to the form.
12   THE WITNESS: Yes, it would be standard for us to
13  review them.
14   MR. RICHTER: Q  Let's look at another one.
15  Starting at 332.
16        (Exhibit 9 marked as requested)
17   Q  Mr. Nack, do you have Plaintiff's Exhibit 9 in
18  front of you, 332 to 368?
19   A  Yes, I do.
20   Q  Does this document summarize Chase's procedures
21  for its home equity portfolio with respect to flood
22  insurance as of the date of the document, July 7th, 2005?
23   MR. MEINERTZHAGEN: Object to the form.
24        Take your time and look at the document.
25   THE WITNESS: This document is the Assurant internal

18 (Pages 66 to 69)

CONFIDENTIAL
JEFFREY  NACK 11/10/2010

Page 70

1  procedures required to perform the functions of the
2  insurance processing functions.
3      MR. RICHTER: Q  As directed by Chase?
4      MR. MEINERTZHAGEN: Object to the form.
5      THE WITNESS: The direction that we provide is the
6  policies -- is their policies to adhere -- this is their
7  internal policies that they are working to perform the
8  functions that we have.
9      MR. RICHTER: Q  I'd like you to turn to page 9 of
10 the document, Chase 340.
11     Do you see there's two boxes on that page?  In
12 the first box, second cell down, there's a header
13 coverage amount.
14     Do you see that?  Do you see that, Mr. Nack?
15 A  In the coverage amount?
16 **Q  Yes.**
17 A  Yes.
18 **Q  Then there's a note -- it says note, at the**
19 **present time no adequacy is being done on the coverage**
20 **amount.  When we first converted Chase, we were doing**
21 **adequacy, however, due to customer noise Chase requested**
22 **that the coverage adequacy letters be discontinued.**
23 **Do you see that?**
24 A  Uh-huh.
25 **Q  Is that true?**

Page 71

1  A   What that's referring to is we were tracking --
2  if they were required of special flood hazard area, at
3  this time we were tracking existence of a flood policy.
4  If the flood coverage amount was insufficient at that
5  time, we were sending a warning letter, and that was it.
6  We were not lender placing any policy if the coverage
7  amount was insufficient.  Because we weren't lender
8  placing, we stopped sending the warning letter.
9  **Q   When did Chase resume lender placement on the**
10 **basis of inadequate coverage levels as Chase saw it?**
11     MR. MEINERTZHAGEN:  Object to the form.
12     THE WITNESS:  I'm sorry.  Can you repeat that?
13     MR. RICHTER: Q  When did Chase resume force
14 placing policies on properties because Chase deemed the
15 level of coverage was inadequate, or the amount of
16 coverage was inadequate?
17     MR. MEINERTZHAGEN:  Object to form.
18     THE WITNESS:  In 2008 we started to lender place any
19 deficient flood insurance amounts.  At that time -- I'm
20 sorry.
21     MR. RICHTER: Q  Are you finished with your answer?
22 A  Yes.
23 **Q   Who decided to stop lender placement in 2005 or**
24 **before 2005?  Let's actually -- let's fix that time**
25 **period.**

Page 72

1      **When did Chase stop doing the lender placement**
2  **on the basis that the coverage amount was deemed to be**
3  **inadequate as determined by Chase?**
4      MR. MEINERTZHAGEN: Object to the form, foundation.
5      THE WITNESS: It's not that we stopped lender
6  placing.  We never lender placed on the gap beforehand.
7  All we were doing is sending a letter notifying the
8  customer that they were insufficient.  This is just
9  referring to a notification warning letter.  Chase did
10 not lender place any gap coverage prior to that.
11     MR. RICHTER: Q  All right.  By gap coverage --
12 When you use the term gap, do you mean that to refer to
13 the difference between the actual amount of coverage on
14 the property and whatever amount Chase determines to be
15 the appropriate amount?
16 A  Correct.
17     **Q   And from as far back as you can go up until**
18 **2008, Chase never force placed gap coverage for**
19 **inadequate flood insurance, is that right?**
20     MR. MEINERTZHAGEN: Object to the form.
21     THE WITNESS: For our home equity loans and lines of
22 credit, we did not gap flood insurance coverage until
23 2008.
24     MR. RICHTER: Q  Was that true for both loans and
25 lines or is it just lines?

Page 73

1      A   No, loans and lines -- loans and lines of
2  credit, yes.
3      **Q   Did you -- Who participated in the decision to**
4  **change that policy or practice and begin lender placement**
5  **of gap coverage?**
6      MR. MEINERTZHAGEN: Object to the form.
7      THE WITNESS: Going back to that year it would have
8  been myself and Art Guja was involved.  In compliance, it
9  might have been a different person in compliance, but I
10 don't recall that far back when someone else may have
11 been involved from the compliance standpoint.  I think it
12 deals with lender placement.  There was nobody from
13 origination.
14     MR. RICHTER: Q  Why did Chase decide to make that
15 change?
16     MR. MEINERTZHAGEN: Object to the form.
17     THE WITNESS: When we issued the gap policy because
18 customers -- we instituted that, the gap coverage in
19 2008, we issued the gap deficiency was only done up to
20 whatever the -- unpaid principal balance was at that
21 time.  So those customers were out of compliance with the
22 regulations.
23     MR. RICHTER: Q  So prior to 2008 there was no
24 force-placed gap coverage, and then beginning in 2008
25 Chase started force placing gap coverage, but only up to

19 (Pages 70 to 73)

Page 74

1  the amount of the customer -- the lesser of the
2  customer's principal balance, replacement cost value or
3  the 250,000, is that right?
4      A  Yes. Just to be specific, the gap coverage for
5  the home equity lines and loans was only up to the unpaid
6  principal balance at that time.
7      Q  So --
8      A  For a line of credit that may have $100,000
9  line of credit and the UPB was 80,000 and the flood
10  coverage was 60,000, we would have gapped the 20,000.
11      Q  Can you read back his answer, again.
12          (Answer read)
13      Q  I'm not sure I understand.  You would have
14  **purchased coverage in the amount of the difference**
15  **between the line and the unpaid principal balance or the**
16  **difference between the unpaid principal balance and the**
17  **existing amount of flood coverage?**
18      A  The difference between the flood insurance
19  policy of $60,000 and the unpaid principal balance of
20  $80,000.  Got it.
21      Q  **At that time you determined that to be the**
22  **appropriate amount of gap coverage, correct?**
23      MR. MEINERTZHAGEN:  Object to the form.
24      THE WITNESS:  That was our -- that was our policy
25  because, again, like I stated, it was not meeting the

Page 75

1  minimum standard set forth by the regulations.  During
2  that time period our flood policy was being reviewed,
3  also at the same time the flood Qs and As by the
4  regulators was out for final revisions and we were
5  waiting on those revisions to come out before we were
6  going to finalize our new flood insurance policy. So we
7  knew we had to change it to at least meet the minimum
8  standards.  It was not our intentional end state.  It was
9  obviously a policy change that we had to make to be in
10  compliance.
11      MR. RICHTER:  Q  You said that that change in 2008
12  came about as a result of discussions between yourself
13  and persons in the legal and compliance department, is
14  that right?
15      A  Correct.
16      Q  **And those discussions, deliberations, they**
17  **didn't just take place verbally, they were documented,**
18  **right?**
19      A  Yeah.  I mean most of our meetings are verbal
20  meetings, conference calls because people are located in
21  Columbus.
22      Q  **That was a pretty big change though, wasn't it?**
23      A  That change wasn't because we knew we had to
24  make that change again to adhere to the compliance
25  regulations and also from our -- reviews with regulators

Page 76

1  and so forth that we knew that Chase had to ensure that
2  our customers had the appropriate amount to meet the
3  minimum standards, but again the flood Qs and As we knew
4  we were going to change our policy in the end state.
5      Q  **Let me ask you a simpler question.**
6          **Did you have written communications with people**
7  **in Chase's legal and compliance group regarding that**
8  **change in 2008 to start lender placing gap policies?**
9      A  I'm sure we had some e-mails back and forth.
10      Q  **Have you searched for those e-mails in**
11  **connection with this suit?**
12      A  I don't recall if I did.
13      Q  **Has anybody searched for them on your behalf?**
14      A  I don't know if they have on my behalf.
15      Q  **Let's go to Chase 349.  Are you there?**
16      A  Yes.
17      Q  **Looking at the bottom there's a header Net**
18  **Balance, Inc.**
19          **Do you see that?**
20      A  Yes.
21      Q  **Underneath there's a note, and the second**
22  **sentence there says, there may be some exceptions where**
23  **the loan is frozen and Chase confirms the loan should not**
24  **be tracked.**
25          **Do you see that?**

Page 77

1      A  Yes.
2      Q  **Was it Chase's policy not to track loans for**
3  **flood coverage if they were -- or lines for that matter**
4  **if they were frozen by Chase as of 2005 the date this**
5  **document was prepared?**
6      MR. MEINERTZHAGEN:  Object to the form.
7      THE WITNESS:  I don't recall having a separate
8  policy for frozen accounts.
9      MR. RICHTER:  Q  Do you interpret this page of this
10  document any other way?
11      MR. MEINERTZHAGEN:  Object to the form.
12      THE WITNESS:  The way I'm reading that note is that
13  if an account is frozen and Chase confirms a loan should
14  not be tracked.  So it's not a blanket statement that all
15  frozen accounts that there is some obligation that
16  Assurant would validate with Chase if they wanted to
17  waive the insurance.
18      MR. RICHTER:  Q  Have there been situations in
19  which Chase has waived flood insurance tracking for loans
20  that are -- lines that are frozen or suspended?
21      MR. MEINERTZHAGEN:  Object to the form, outside the
22  scope.
23      THE WITNESS:  I'm not aware of any situations where
24  that has been done in the past.  It is definitely not the
25  current policy.

20  (Pages  74 to 77)

CONFIDENTIAL
JEFFREY  NACK 11/10/2010

Page 78

1      MR. RICHTER:  Q  Was that -- the application of the
2   policy with respect to frozen loans or lines, was that
3   ever clarified after 2005?
4      MR. MEINERTZHAGEN:  Object to the form.
5      THE WITNESS:  I don't recall any clarification
6   because we don't -- our policy that we have today, in my
7   opinion, hasn't changed as far as frozen lines of credit.
8      MR. RICHTER:  Let's move on to the next one, Chase
9   374 to 386.
10      MR. MEINERTZHAGEN:  Can we take a 5-minute break?
11      MR. RICHTER:  Sure.
12         (Off the record)
13         (Exhibit 10 marked as requested)
14      MR. RICHTER:  Q  Mr. Nack, the court reporter has
15   just handed you Plaintiff's Exhibit 10, Bates number
16   Chase 374 to 386.
17         Do you have that in front of you?
18      A  Yes, I do.
19      Q  Do you recognize this document?
20      MR. MEINERTZHAGEN:  Please take a chance to review
21   it.
22      THE WITNESS:  Yes, I'm familiar with it.
23      MR. RICHTER:  Q  Could you tell me what it is?
24      A  This is the -- the flood gap process for our
25   home equity portfolio, loans, lines of credit that we

Page 79

1   referenced earlier.
2      Q  And the date of this document looks like from
3   the front page it's May 22nd, 2008.
4         Do you see that?
5      A  Yes.
6      Q  Did that coincide with a time that Chase began
7   force placing gap coverage?
8      A  The date of this document I'd have to refer
9   back to the date of the implementation date that you're
10   referring to.  I don't recall the exact implementation
11   date -- this is a procedure when the system directly
12   updated to reflect that.
13      Q  I understand that you may not be able to recall
14   the exact date that the flood gap coverage began to be
15   force placed by Chase in 2008, but is it -- this in the
16   ballpark?
17      MR. MEINERTZHAGEN:  Object to the form.
18      THE WITNESS:  I hate to answer within the ballpark
19   within a definite date, and I don't recall the exact
20   date.
21      MR. RICHTER:  Q  Regardless, it's your testimony
22   that the flood gap coverage began to be force placed in
23   2008?
24      A  Correct.
25      Q  Looking at the second page of the document,

Page 80

1   Chase 375.  At the top do you see where it says Chase has
2   requested that we implement tracking for flood gap
3   coverage for the HELOC portfolio similar to the Chase
4   prime and subprime portfolios?
5         Do you see that?
6      A  Yes.
7      Q  Then further down there's a section called
8   coverage deficiency letter.  Do you see that on the
9   left-hand side?
10      A  Yes.
11      Q  Then in the second paragraph, second sentence,
12   it says, Chase requested the difference to be based on
13   the unpaid principal balance instead of the total line
14   amount.
15         Do you see that?
16      A  Correct.
17      Q  That statement in the May, 2008 document is
18   consistent with your earlier testimony that force-placed
19   coverage -- when force-placed coverage or gap coverage
20   began in 2008, the gap was only based on the unpaid
21   principal balance, correct?
22      MR. MEINERTZHAGEN:  Object to the form.
23      THE WITNESS:  Yes, it was the -- the gap coverage
24   was put in place to ensure that we were meeting the
25   compliance requirements.

Page 81

1      MR. RICHTER:  Q  And principal balance satisfying
2   those compliance requirements, correct?
3      MR. MEINERTZHAGEN:  Object to the form.
4      THE WITNESS:  Actually to meet the minimum standard
5   of the flood regulations we had to implement this flood
6   gap procedure nor -- to ensure that it's at least the
7   minimum of the unpaid principal balance.  Again that was
8   just an interim policy.
9      Q  When Chase adopted its new flood gap procedures
10   in 2008, were they expressly adopted as an interim
11   policy, or is that a label you're now placing on in
12   hindsight knowing they did eventually change?
13      MR. MEINERTZHAGEN:  Object to form.
14      THE WITNESS:  The policy change I'm referring to
15   that way because, you know, based off of our interaction
16   with our, you know -- with the regulators, with the flood
17   Qs and As that had been released, they hadn't been
18   published, but they sent out flood Qs and As based off
19   comments made in there, some comments that -- internal
20   discussion that Chase was looking to adopt a new policy.
21         This policy was to meet the minimum standards,
22   we were -- we wanted to wait until the actual regulators
23   came out with their final version of the final Qs and As
24   before we would adopt the policy.  So we had a period
25   where we didn't want to implement a change only to have a

21 (Pages 78 to 81)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 82

1  policy regulation come up behind after that, and we
2  wanted to wait until that was actually published before
3  we made our change, and that was published in July of
4  2009.
5      Q   Let's go to the next document in the series,
6  387 to 411.
7      (Exhibit 11 marked as requested)
8      Q   Mr. Nack, do you have Plaintiff's Exhibit 11 in
9  front of you, Chase 387 to 411?
10     A   Yes, I do.
11     Q   First of all, the first page, you see where it
12  says Assurant Special Property, HELOC, dash, Flood Gap
13  HELOC, dash, flood gap?
14     A   Uh-huh.
15     MR. MEINERTZHAGEN:  You have to say yes or no.
16     THE WITNESS:  Yes.
17     MR. RICHTER:  Q  In moving in to page 389, looks
18  like it has revised date of February 1, 2009.  Do you see
19  that?
20     A   Yes.
21     Q   Does this document set forth Chase's flood gap
22  policies and procedures as of February 1st, 2009?
23     MR. MEINERTZHAGEN:  Please take a chance to review
24  the document before you respond to the question.
25     THE WITNESS:  This would be Assurant's internal

Page 83

1  procedures to adhere to Chase's policy, and at that time
2  from a HELOC flood gap it was the same as what was
3  referenced in Exhibit 10.
4      MR. RICHTER:  Q  And --
5      A   These are their internal procedures.
6      Q   I'm glad you mentioned that.  That's where I
7  was going next.
8          Why don't you turn to Chase 404.  There's a
9  header, overview.  Do you see that?
10     A   Yes.
11     Q   It says, gap coverage is based on the
12  difference between the policy coverage amount and the
13  unpaid principal balance provided by Chase via Microsoft
14  Excel spreadsheet.
15         Do you see that?
16     A   Yes.
17     Q   And that, as you've just testified, continued
18  to be the policy as of February 1st, 2009, that gap was
19  based on the difference between the coverage amount and
20  the unpaid principal balance, correct?
21     A   That is correct.
22     Q   Moving on to the next exhibit Chase 369 to 373.
23     (Exhibit 12 marked as requested)
24     Q   Mr. Nack, do you have Plaintiff's Exhibit 12 in
25  front of you, Chase 369 to 373?

Page 84

1      A   Yes, I do.
2      Q   Do you recognize this document?
3      A   Yes, I do.
4      Q   What is it?
5      A   This is again Assurant's internal document as
6  it relates to the direction to change our flood policy
7  requirements to the lesser of the replacement cost value
8  of the maximum insurance available by the National Flood
9  Insurance Program.
10     Q   Can you repeat that answer for me?
11     (Answer read)
12     Q   Did you or anybody else at Chase review this
13  document after it was prepared?
14     MR. MEINERTZHAGEN:  Objection, lacks foundation.
15     MR. RICHTER:  Q  Let's start.  In the southwest
16  corner of the first page it says prepared by P. Holler
17  and Y. Angulo.
18         Do you see that?
19     A   That's correct.
20     Q   That's Patty Haller?
21     A   Correct.
22     Q   And Yolanda Angulo?
23     A   Yes.
24     Q   Both of whom work for Assurant?
25     A   Correct.

Page 85

1      Q   And so my next question is, did you or anybody
2  else at Chase review or signoff on this document after it
3  was prepared by Ms. Haller and Ms. Angulo?
4      MR. MEINERTZHAGEN:  Object to the form, lacks
5  foundation.
6      THE WITNESS:  I don't recall any signoff process.  I
7  would imagine it was something we reviewed with Assurant.
8      MR. RICHTER:  Q  Looking at the first page it says,
9  due to recent compliance requirements, Chase needs to
10  change the rating rules for flood and the flood gap
11  lender placed policies.
12         Do you see that?
13     A   Yes.
14     Q   Then turning on to Chase 372, at the very top
15  of the page it says, the new rule is to rate based on the
16  RCV -- that's replacement cost value, right?
17     A   Right.
18     Q   Of the -- of the home, and if unknown, default
19  to the NFIP limit of $250,000.
20         Do you see that?
21     A   Yes.
22     Q   That change I believe you testified earlier was
23  implemented in December of 2009 consistent with the date
24  of this document, correct?
25     A   Correct.

22  (Pages 82 to 85)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 86

1    **Q   Looking back a page to Chase 371, looks like**
2    **there's a target date shown there of December 23rd, 2009**
3    **at the bottom.**
4        A   Yes.
5        **Q   Do you recall whether Chase met that target**
6    **date?**
7        A   It definitely was in the ballpark.  It was in
8    December of 2009.  The exact date -- it was latter part
9    of December.
10       **Q   So as of the latter part of December, Chase**
11   **changed its rules with respect to flood insurance, right?**
12       MR. MEINERTZHAGEN:  Object to the form.
13       THE WITNESS:  Our policy was changed effective that
14   date, yes.
15       MR. RICHTER:  Q  And that change applied regardless
16   of the borrower's individual circumstances?
17       MR. MEINERTZHAGEN:  Object to form.
18       MR. RICHTER:  Q  Is that right?
19       A   The policy was for all home equity loans and
20   lines of credit.
21       **Q   Nationwide?**
22       A   Yes.
23       **Q   Prior to this change did anybody ever speak up**
24   **and say that Chase's existing requirements were**
25   **insufficient or inadequate, the principal balance --**

Page 87

1        MR. MEINERTZHAGEN:  Object --
2        MR. RICHTER:  Q  -- requirement that applied
3    earlier?
4        MR. MEINERTZHAGEN:  Object to the form, outside the
5    scope.
6        Go ahead and answer based on your personal
7    knowledge, if you can.
8        THE WITNESS:  With the revisions of the flood Qs and
9    As, one of the changes that came about from that
10   requirement was that for home equity loans and lines of
11   credits that are in the second need position that you --
12   when you determined sufficiency within the servicing of
13   the loan you had to factor in the outstanding balances of
14   both accounts, of all -- not both accounts, of all liens
15   and what those appropriate balances are.
16       So there was a change to the requirement, a
17   clarification I should say, as to what they referred to
18   the regulators.
19       MR. RICHTER:  Q  I understand that that's your
20   interpretation of the regulations.  My question was, With
21   respect to Chase's prior flood insurance policy, I'll
22   call it the principal balance policy that was in effect
23   prior to December of 2009.  Okay.
24       A   Well -- to clarify that --
25       MR. MEINERTZHAGEN:  Object to the form.  I didn't

Page 88

1    realize it was a question.
2        THE WITNESS:  The procedure we referred to is just
3    on the gapping of lender placement at that time.  So I
4    mean not across the board.  If a customer had a HELOC and
5    they did not have coverage, we would have issued a
6    lender-placed policy up to that line of credit amount.
7        MR. RICHTER:  Q  Or up to the principal balance for
8    a loan?
9        A   Exactly.
10       **Q   That policy prior to December of 2009 of**
11   **requiring insurance only to the principal balance for a**
12   **loan or the equity line amount for a line, at the time**
13   **that that policy was in effect, did anybody come to you**
14   **and say this is insufficient or inappropriate coverage**
15   **requirement?**
16       MR. MEINERTZHAGEN:  Object to the form.  It's
17   outside of the Rule 30(b)(6) topics.
18       THE WITNESS:  We had discussions about the flood
19   policy.  Those discussions continued.  They started --
20   there's not something that starts and stops.  These
21   discussions are ongoing depending upon every situation.
22   For a specific tour in home equity and our HELOCs, we
23   were waiting on again -- with reference to the guidance
24   from the flood Qs and As before we were going to change
25   our policy.  But the policy we enacted in December of

Page 89

1    2009 was the policy that we were looking to change years
2    before.  We have not -- made that change, because we
3    didn't want to make a change to our policy prior to a
4    pend -- a pending guidance from our regulators.
5        MR. RICHTER:  Q  Are you aware of any e-mails,
6    memos, written correspondence, any document prior to
7    December of 2009 indicating that coverage in the amount
8    of the principal balance for a loan or line of credit for
9    a line was an insufficient amount of coverage to protect
10   Chase's interests in a property?
11       MR. MEINERTZHAGEN:  Object to the form.
12       THE WITNESS:  The -- I guess the question -- I would
13   say that our policy would say that there is risk in
14   having that policy, that's why we changed our policy.
15   So --
16       MR. RICHTER:  Q  You said there's risk.  Did
17   anybody raise any fire alarms or red flags prior to
18   December of 2009 saying, oh, my goodness, we're only
19   insuring to the amount of the loan or the principal
20   balance, we're going to lose our shirts?
21       MR. MEINERTZHAGEN:  Object to the form of the
22   question.  It's also seeking testimony outside the scope
23   of the deposition topics identified in the 30(b)(6)
24   notice.
25       You can go ahead and answer based on your own

23  (Pages 86 to 89)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 90

1  personal knowledge.
2      THE WITNESS:  The requirement again going back or
3  looking back at just our interest from a line and loan
4  perspective, going back to probably at least 2007 we
5  started evaluating and reviewing the guidance again from
6  FEMA, from our regulators and what is the right -- what
7  is the intent of this regulation and not look at our
8  interest only.
9      So, yes, you know, that -- those type of
10  discussions have been ongoing for years to move to what
11  we believe is the spirit of the regulation, which is to
12  require insurance on properties to the full replacement
13  cost value to better protect our customers, better
14  protect Chase and better protect the taxpayers.  We have
15  heard that loud and clear over and over again from FEMA.
16      MR. RICHTER:  Q  How has that been communicated by
17  FEMA?
18      A  It's been communicated in -- usually in these
19  conferences they discuss it.  Again the regulations set
20  forth the minimum and the maximum so they're very clear
21  to say this is the minimum, you have to have at least
22  this amount, this is what the maximum is.  Again, it's
23  published in the regulations what -- each lender has to
24  determine what they want to have as their flood policy.
25  I think I'd go so far to even say there's guidance in

Page 91

1  there, they give you guidance.
2      Q  Are you aware that we have issued discovery
3  requests asking for documents relating to the reasons in
4  Chase's flood insurance policies?
5      MR. MEINERTZHAGEN:  Object, outside the scope of the
6  Rule 30(b)(6) deposition notice.
7      THE WITNESS:  I know there's information gathered.
8  What specific information, I don't know.
9      (Exhibit 13 marked as requested)
10      MR. RICHTER:  Q  Mr. Nack, do you have Plaintiff's
11  Exhibit 13 in front of you, Plaintiff's First Set of
12  Requests to Defendants For Production of Documents and
13  Things?
14      MR. MEINERTZHAGEN:  I'm going to object to this line
15  of questioning.  This witness has not been preferred to
16  testify concerning Chase's responses to Plaintiff's
17  Document Requests.
18      He can answer based on his own personal
19  knowledge, if he's able to.
20      MR. RICHTER:  Q  Do you have Exhibit 13 in front of
21  you, Mr. Nack?
22      A  Yes, I do.
23      Q  Have you ever seen this before?
24      MR. MEINERTZHAGEN:  Same objection.
25      THE WITNESS:  I don't recall I've seen it or not.

Page 92

1      MR. RICHTER:  Q  I'd like you to take a look at
2  requests number 23 and 24 on page 6.
3      Request number 23, all documents that relate to
4  any changes to company policies concerning flood
5  insurance.
6      Do you see that?
7      MR. MEINERTZHAGEN:  Same objection.
8      THE WITNESS:  Yes.
9      MR. RICHTER:  Q  Request number 24 is all documents
10  that relate to the reasons for any changes to company
11  policies concerning flood insurance.
12      Do you see that?
13      MR. MEINERTZHAGEN:  Same objection.
14      THE WITNESS:  Yes.
15      MR. RICHTER:  Q  You've testified here today
16  regarding all sorts of reasons that Chase adopted its
17  policies and changed its policies with respect to flood
18  insurance, right?
19      MR. MEINERTZHAGEN:  Same objection.  Object to form
20  as well.
21      THE WITNESS:  Can you repeat the question?
22      MR. RICHTER:  Q  You've testified here today
23  concerning the reasons that Chase adopted its flood
24  insurance policies and changed its flood insurance
25  policies, right?

Page 93

1      A  Correct.
2      Q  Have you looked for any documents that would be
3  responsive to requests 23 or 24 that relate to any
4  changes to company policies or the reasons for any
5  changes to company policies concerning flood insurance?
6      MR. MEINERTZHAGEN:  Object as to form, object as to
7  outside the scope of the Rule 30(b)(6) notice.
8      He can answer based on his own personal
9  knowledge, but not as corporate representative.
10      THE WITNESS:  The documents we've produced as far as
11  the policy changes would be in the procedure documents
12  that we have -- those are the policies that we have on
13  the accounts.  As far as discussions, I don't have
14  recording documents of discussions.
15      MR. RICHTER:  Q  To your knowledge has anybody at
16  Chase looked for e-mails or memoranda or meeting notes or
17  meeting minutes or meeting agendas or anything relating
18  to the reasons that Chase changed its policies relating
19  to flood insurance?
20      MR. MEINERTZHAGEN:  Object to the form of the
21  question.  Outside the scope of the 30(b)(6) deposition
22  notice.
23      THE WITNESS:  I don't know -- I can't answer that
24  question.
25      MR. RICHTER:  Q  I'd like you to take a look at

24  (Pages 90 to 93)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 94

1   request number 11 on page 4.  All communications to or
2   from the Federal Emergency Management Agency, Office of
3   the Comptroller, Currency, or any other government agency
4   or official that relate to federal flood insurance
5   requirements, defendants' flood insurance requirements,
6   whether defendants' flood insurance requirements exceed
7   federal requirements, whether defendants' flood insurance
8   requirements comply with federal or state law, or whether
9   defendants may require customers to maintain flood
10  insurance in excess of their principal balance or
11  available credit line.
12       Do you see that?
13       MR. MEINERTZHAGEN:  Object.  That's outside of the
14  scope of the Rule 30(b)(6) notice, and object to form.
15  The witness can answer based -- in his individual but not
16  as a representative of the corporate defendant.
17       THE WITNESS:  Yes, I do see it.
18       MR. RICHTER:  Q  Have you or anybody else at Chase,
19  to your knowledge, looked for communications with the
20  federal government or any other government body or
21  official that are responsive to request number 11?
22       MR. MEINERTZHAGEN:  Same objection.
23       THE WITNESS:  I don't know.
24       MR. RICHTER:  Q  Let's go back to Exhibit 12.
25       The new rating rules that are discussed on

Page 95

1   Chase -- beginning of bottom of 371 and onto 372, the new
2   rule, the rate based on the replacement cost value of the
3   home, and, if unknown, default to the NFIP limit of
4   $250,000, how many borrowers did that affect?
5        MR. MEINERTZHAGEN:  Object, outside the scope of the
6   Rule 30(b)(6) notice.
7        THE WITNESS:  I would have to go back and look at
8   the numbers from that.  I don't recall what the number
9   was.
10       MR. RICHTER:  Q  Do you know how many borrowers --
11       MR. NICHOLS:  Is there something funny about not
12  providing discovery, Counsel?
13       MR. MEINERTZHAGEN:  Do you want to have a dispute
14  about discovery?  We can meet and confer.  We can have
15  the magistrate decide.  This witness is not being
16  proffered to discuss our discovery responses and,
17  Counsel, are you now going to be participating in this
18  deposition?
19       MR. NICHOLS:  I'm just asking a question --
20       MR. MEINERTZHAGEN:  I'm here with co-counsel.  She
21  hasn't said a word.
22       MR. NICHOLS:  Oh, good.  I don't think there's
23  anything funny about not providing discovery myself, but
24  maybe the judge will find out.  We'll find out.
25       MR. MEINERTZHAGEN:  What do you think is funny

Page 96

1   about -- have you seen plaintiff's discovery responses?
2   We asked for information about the first lien that your
3   plaintiff has, and he won't provide it, and yet that's
4   clearly relevant under the FEMA guidance in terms of the
5   determining appropriate amount of coverage.
6        What's your explanation for that, Mr. Whatever
7   Your Name Is?
8        MR. NICHOLS:  We'll find out.  It will be funny.
9   You will have a good time in front of the judge.
10       MR. MEINERTZHAGEN:  You're a very funny guy.  Keep
11  making jokes.
12       MR. NICHOLS:  I don't think that one is very funny
13  myself.
14       MR. MEINERTZHAGEN:  I'm not sure what you're
15  referring to.  Was anybody laughing in here?
16       MR. NICHOLS:  I thought you just were.  We'll see.
17       MR. RICHTER:  Q  How many --
18       MR. MEINERTZHAGEN:  Are you taking the deposition
19  now or is this a switch?
20       MR. RICHTER:  We're going forward with the
21  questions.
22       MR. MEINERTZHAGEN:  He just makes comments, but you
23  ask the questions?
24       MR. RICHTER:  Stop.
25       MR. MEINERTZHAGEN:  Why don't we have an agreement

Page 97

1   here, you ask the questions, I'll make the objections,
2   the other attorneys won't participate in the deposition,
3   won't disturb it.  Fair enough?
4        MR. RICHTER:  We're going forward.  I'm asking the
5   questions.
6        MR. MEINERTZHAGEN:  That's not an agreement?
7        MR. RICHTER:  Let's --
8        MR. MEINERTZHAGEN:  Let the record reflect that
9   counsel will not agree that only one attorney per side
10  will participate in this deposition.
11       Go ahead.
12       MR. RICHTER:  Q  How many Chase borrowers had
13  sufficient levels of coverage to meet Chase's
14  requirements before December, 2009 that then became
15  insufficient after December of 2009?
16       MR. MEINERTZHAGEN:  Object to the form of the
17  question.  Also object because it's outside the
18  Rule 30(b)(6) topics.  The witness will not be answering
19  on behalf of corporate defendants, but can answer based
20  on his own personal knowledge.
21       THE WITNESS:  Unless I misunderstood you, that's the
22  same question you just asked, and I don't have the
23  number.
24       MR. RICHTER:  Q  Are you able to give any estimate?
25  Hundreds, thousands, tens of thousands, hundreds of

25  (Pages 94 to 97)

Page 98

1  thousands?
2      MR. MEINERTZHAGEN:  Same objections.
3      THE WITNESS:  Well, I think roughly our portfolio
4  for our home equity loans and lines of credit in a flood
5  zone is in the neighborhood of 90,000 accounts total
6  portfolio.
7      MR. RICHTER:  Q  For HELOCs?
8      A  And lines of credit.
9      Q  And lines.  Okay.
10     A  How many had -- When you're saying are affected
11  by this, I can't give you that number.
12     Q  Why don't you go back to Chase 370, requirement
13  number 1, tracking of hazard lines.
14        Do you see that?
15     A  Yes.
16     Q  Did the tracking of hazard lines go into place
17  at or about the same time that the new rating rules to
18  replacement cost value or the National Flood Insurance
19  Program limit went into effect?
20     A  The tracking of hazard lines was something that
21  we had to enact as far as to determine the replacement
22  cost value so that's why that rule was put in place, and
23  I believe it was put in place at the same time it was --
24  as the new flood policy changes.
25     Q  So Chase used as of December, 2009 the amount

Page 99

1  of hazard insurance as the proxy for replacement cost
2  value?
3      A  That's correct.
4      Q  Prior to December, 2009 did Chase track the
5  amount of hazard insurance coverage?
6      MR. MEINERTZHAGEN:  Object to the form of the
7  question.
8      THE WITNESS:  We -- within the servicing
9  organization we did not track the hazard insurance
10  policies for our home equity loans and lines of credit.
11     MR. RICHTER:  Q  And so this first requirement,
12  could you just describe what's going on with the first
13  requirement?
14     MR. MEINERTZHAGEN:  Object to the form of the
15  question.
16     MR. RICHTER:  Q  Let me ask you a different
17  question.
18        Is -- beginning in December of 2009 -- looking
19  at the first item here on page 370, add logic to
20  automatically update collateral flood peril coverage
21  amount field with the hazard policy total limit amount.
22        Do you see that?
23     A  Yes.
24     Q  So is what that is getting at that Chase as
25  this policy change started requiring flood insurance in

Page 100

1  the amount of the hazard policy unless the hazard policy
2  was above $250,000?
3      A  That is correct.
4      Q  And as of December of 2009 added a logic
5  function in its computer system to flag accounts where
6  the hazard policy was -- amount was inconsistent with the
7  flood policy amount?
8      MR. MEINERTZHAGEN:  Object to the form.
9      THE WITNESS:  It was to flag that whatever the
10  hazard policy limits amount were that they we would
11  anticipate that the flood coverage would be equal to that
12  amount, again up to the $250,000 limit.
13     MR. RICHTER:  Q  And at that time, Chase started
14  sending out letters to its borrowers asking them to
15  update their hazard insurance information with Chase, is
16  that right?
17     A  That's correct.  We did send a letter to the
18  borrowers required to provide that information, but
19  typically with home equity loans and lines of credit
20  borrowers and their agents do not provide hazard
21  insurance policy insurance.  So because of that we wanted
22  to send notification to the borrower to advise them it's
23  their responsibility to forward that information to us so
24  we would have that replacement cost value.
25     Q  Let's go to Chase 254.

Page 101

1      (Exhibit 14 marked as requested)
2      Q  Mr. Nack, do you have Plaintiff's Exhibit 14 in
3  front of you, Chase 254?
4      A  Yes, I do.
5      Q  This is a letter to David Hofstetter dated
6  December 13, 2009.
7        Do you see that?
8      A  Yes.
9      Q  It says, Dear David Hofstetter, Our records
10  show we do not have your -- a copy -- Strike that.  Our
11  records show that we do not have your current homeowner's
12  insurance information.  Please ask your insurance agent
13  to mail a copy of your homeowner's insurance declarations
14  page within 30 days to the address shown below.
15        Do you see that?
16     A  Yes.
17     Q  Is this typical with the notices that went out
18  asking people for their hazard coverage levels in
19  connection with the tracking of hazard insurance in
20  December of 2009?
21     A  Yes.  This was the standard letter that was
22  used for those customers that did not provide the
23  homeowner's insurance information already.
24     (Exhibit 15 marked as requested)
25     Q  I'm looking at Exhibit 15.  Do you have that in

CONFIDENTIAL
JEFFREY NACK 11/10/2010

Page 102

1  front of you?
2      A   Yes.
3      Q   This is a letter to Roger Modersbach dated
4  December 24, 2009.
5          Do you see that?
6      A   Yes.
7      Q   Looks like it's basically the same letter as
8  the one that went out to Mr. Hofstetter, do you see that,
9  asking for current homeowner's insurance information?
10     A   Correct.
11     Q   Is this letter also consistent with the flood
12  insurance notice that went out to borrowers in connection
13  with the tracking of hazard insurance?
14     A   You mentioned flood insurance and hazard
15  insurance in the same question. I'm not sure.
16     Q   Is this December 24th, 2009 letter like the
17  earlier letter that we looked at in Exhibit 14 consistent
18  with the notices that went out to borrowers asking them
19  for updated homeowner's insurance information in
20  connection with Chase's tracking of hazard insurance?
21     A   Yes.
22     Q   Is there any part of this -- these were form
23  letters, right?
24     A   Yes.
25     Q   I mean --

Page 103

1      A   I mean -- the same letter was -- should have
2  been sent to every customer. That was -- sent that we
3  didn't have evidence of homeowner's insurance.
4      Q   Is there any language in this form letter
5  indicating that Chase was then going to use that
6  information against the borrower to demand that the
7  borrower increase their flood coverage to the level of
8  hazard coverage?
9      MR. MEINERTZHAGEN: Object to the form.
10     THE WITNESS: There is no reference to flood
11  insurance in this letter.
12     MR. RICHTER: Q  Why not?
13     MR. MEINERTZHAGEN: Object to the form.
14     THE WITNESS: The intent of this letter was to
15  provide the homeowner's insurance information. The
16  changes of the flood insurance letter was a letter that
17  was sent out separately after this letter.
18     MR. RICHTER: Q  Do you think it's fair for Chase
19  to ask borrowers for information without telling the
20  borrower what the information is going to be used for?
21     MR. MEINERTZHAGEN: Object to the form of the
22  question. It's also outside the scope of the
23  Rule 30(b)(6).
24         The witness may answer based on his own
25  personal knowledge but not as corporate representative.

Page 104

1      THE WITNESS: Again us -- Chase asking for the
2  customer to provide homeowner's insurance is a
3  requirement that they should be providing. So -- because
4  we did not have that information, we knew it was critical
5  to our policy we wanted to try to obtain that information
6  from the customer.
7      MR. RICHTER: Q  Do you think it would have been a
8  better practice to tell the customer why this information
9  was being requested?
10     MR. MEINERTZHAGEN: Same objection.
11     MR. RICHTER: Q  And for what purpose it would be
12  used?
13     MR. MEINERTZHAGEN: Same objections, and objection
14  to form.
15     THE WITNESS: If it would have included information
16  regarding it, it would have been one process. We would
17  have had to explain the flood changes as well within this
18  letter and we wanted to give them ample time to provide
19  us the homeowner's insurance information because a lot of
20  people may have no correct amount of coverage to our new
21  requirements so they would have to be subjected to a
22  letter regarding the new flood policy changes because
23  they would have adhered to it. So we were just looking
24  to obtain the necessary information to do the appropriate
25  calculations.

Page 105

1      MR. RICHTER: Q  Did you approve the language of
2  this letter before it went out?
3      A   I usually review the letter so I would have to
4  say I probably did review this letter.
5      Q   Was any consideration given to telling
6  customers in this form letter what the information would
7  be used for?
8      MR. MEINERTZHAGEN: Objection, outside the scope of
9  the Rule 30(b)(6) topics.
10         The witness may answer based on his personal
11  knowledge.
12     THE WITNESS: I don't recall that discussion. Our
13  discussions were more concerned with allowing enough time
14  for the customers to provide the necessary information.
15     MR. RICHTER: Q  Let's go back to Exhibit 12, the
16  December, 2009 policy change document.
17     MR. MEINERTZHAGEN: What's the Bates again?
18     MR. RICHTER: Q  369 to 373.
19     Q   Looking at the second page Chase 370 underneath
20  tracking of hazard lines, do you see where it says, this
21  change affects approximately 60,000 H Chase loans?
22     A   Yes. That's -- that's referring to -- When I
23  say we had about 90,000 accounts, rough numbers, probably
24  60,000 are Heritage Chase accounts, and probably the
25  difference is Heritage Washington Mutual accounts. So

27 (Pages 102 to 105)

Page 106

1    total sum today is close to 90,000. But I would have to
2    validate that number. That's something Assurant had put
3    in here, but I would have to validate that.
4        Q   So did approximately 60,000 borrowers get the
5    form letters we looked in Exhibits 14 and 15?
6        A   I would have to go back to my reporting to see
7    actually how many letters were sent out. I don't recall
8    how many. Again, we did have hazard insurance
9    information for borrowers who did provide it.
10       Q   H Chase, that refers to Heritage Chase?
11       A   Yes.
12       Q   Heritage Chase is all of the loans and lines
13   except for the Washington Mutual loans and lines?
14       MR. MEINERTZHAGEN: Object to the form of the
15   question.
16       THE WITNESS: It's really Assurant's way to
17   determine the Heritage Chase account, and then with the
18   acquisition of Washington Mutual, they were referring to
19   it as Heritage WaMu. Just semantics of terminology and
20   difference where the account came from.
21       MR. RICHTER: Q I want to make sure I understand
22   the semantics. What loans would fall under the Heritage
23   Chase and what loans would fall under the non-Heritage
24   Chase?
25       MR. MEINERTZHAGEN: Object to the form of the

Page 107

1    question.
2        MR. RICHTER: Q And lines.
3        MR. MEINERTZHAGEN: It's outside the Rule 30(b)(6)
4    deposition notice, but the witness can testify based on
5    his own personal knowledge.
6        THE WITNESS: With the merger with Chase and
7    Washington Mutual, all of the home equity lines and loans
8    that Washington Mutual was servicing converted over to
9    the Chase servicing system. So as they converted over
10   Assurant was tracking those policies and just to kind
11   distinguish between any loan that converted over from
12   that conversion with the Heritage WaMu account. Every
13   other account was heritage Chase.
14       MR. RICHTER: Q Moving on to page Chase 371. At
15   the top there's a reference, we expect the volume to be
16   around 1200 loans?
17       Do you see that at Chase 371 of Exhibit 12?
18       A   I see it.
19       Q   What does the 1200 number refer to?
20       A   Well, in item 2, it's referencing the volume of
21   Heritage Chase noncondo loans that have a hazard policy
22   already on the system. That's Assurant's numbers of
23   1200. I'm just reading what's in here. I would have to
24   go back and validate those numbers to confirm the
25   accuracy of them of what's included in this procedure.

Page 108

1        Q   All right. Then further down, step 3, on
2    page 3, Chase 371, toward the bottom, it says, cycle step
3    date equals stagger in groups of 10,000 each week to be
4    mailed on Friday as follows, then they give a bunch of
5    dates there.
6        Do you see that?
7        A   Yes.
8        Q   Those cycle letters that are referred to in
9    this document are the form letters that we looked at in
10   Exhibits 14 and 15 with respect to Hofstetter and
11   Modersbach, correct?
12       MR. MEINERTZHAGEN: Object to the form.
13       THE WITNESS: Yes, that's the letter to request the
14   hazard policy information.
15       MR. RICHTER: Q  Then moving on to page 4 at
16   Chase 372 there's a header, number 3,
17   tracking override for exposed flood lines.
18       Do you see that?
19       A   Yes.
20       Q   What does that refer to?
21       A   This is referring to that that basically the
22   procedure -- it's still referring to the implementation
23   of the new flood policy rule, that we will -- any of the
24   customers that are -- have insufficient flood coverage to
25   the new policy rules that we will give the customers a

Page 109

1    45-day notice and require that they increase their
2    coverage to those new requirements.
3        Q   Then looking at the last page it says, we are
4    expecting the volume to be about 5,000 loans.
5        Do you see that?
6        A   Yes. Again I would have to go back to what the
7    true numbers were. This is just a -- their ideas of
8    projections of what might impact the volume, but
9    depending on the information we received back from the
10   customers and the homeowner's policy and if customers are
11   -- have insufficient coverage, this was something we
12   would have projected or Assurant had projected for us.
13       Q   So based on your interpretation of this
14   document, the document suggests that it would be about
15   5,000 loans that would have insufficient coverage amounts
16   as a result of the policy change in December of 2009?
17       MR. MEINERTZHAGEN: Object to the form.
18       MR. RICHTER: Q That formerly had sufficient
19   coverage amounts?
20       MR. MEINERTZHAGEN: Same objection.
21       THE WITNESS: This target would have been for people
22   who were already potentially in cycle or had some
23   exposure. It's referring to about resetting the cycle
24   back to the new requirements. I believe that's what this
25   is referring to. There was a cutoff of one rule to

28 (Pages 106 to 109)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 110

1  another, we would have people in a certain cycle.
2      MR. RICHTER:  Q  So the 5,000 then would refer to
3  people who would have -- insufficient coverage or who
4  Chase had flagged as having insufficient coverage under
5  -- even under the old policy?
6      A  I believe that's what this volume is.  Any time
7  we implement a change there's going to be people that
8  have -- that are in cycle just like every day.  There's
9  people in cycle of -- based on the rules that are
10  appropriate at a given time and then we implement a new
11  change we have to restart that cycle with that customer
12  to the new rules.  These people could be -- they couldn't
13  provide any insurance and they didn't provide any proof
14  of insurance.
15      Q  I'm going to 412 through 457.
16          (Exhibit 16 marked as requested)
17      Q  Mr. Nack, do you have Plaintiff's Exhibit 16 in
18  front of you, Chase 412 to 457?
19      A  Yes, I do.
20      Q  This is a summary of Chase's flood insurance
21  compliance requirements for HELOCs as of June 29, 2010,
22  is that right?
23      MR. MEINERTZHAGEN:  Object to the form.
24          Please take a chance to review the document
25  before you respond.

Page 111

1      THE WITNESS:  This document is Assurant's internal
2  procedures, and in reviewing this document there are some
3  inconsistencies in what they've written in here with our
4  policy, but the policy was needed here -- the
5  documentation had some inconsistencies.
6      MR. RICHTER:  Q  What inconsistencies did you come
7  across?
8      A  Basically the reference to the unpaid principal
9  balance.
10      Q  Is that at Chase 420 where you came across
11  that?
12      A  Actually any reference to the unpaid principal
13  balance should not be included in any procedures as it
14  relates to our policies.  So our policy had not changed,
15  but the -- this again is Assurant's internal procedure
16  document and there were some, like I said,
17  inconsistencies with the policy.
18      Q  So looking at Chase 420, at number 11 says,
19  verify the new policy coverage amount is equal to or
20  greater than the unpaid principal balance and/or the
21  replacement cost value or NFIP maximum amount.
22          That wouldn't be an example of one of the
23  inconsistencies?
24      A  Correct.
25      Q  I want to turn to Chase 427.  There's an

Page 112

1  example on Chase 427.
2          Do you see that?
3      A  Yes.
4      Q  An example where an individual has hazard
5  coverage of 150,000, unpaid principal balance of zero, a
6  flood insurance policy of $50,000 and the direction is to
7  require gap coverage in amount of $100,000.
8          Do you see that?
9      A  Yes.
10      Q  That example is consistent with Chase's
11  policies post December of 2009, correct?
12      A  Yes.
13      Q  So comparing the 2008 policy to the 2009
14  policy, in 2009 this borrower is deemed underinsured by
15  $100,000, but under the old policy in 2008 they would
16  have been deemed overinsured by $50,000, is that right?
17      MR. MEINERTZHAGEN:  Object to the form.
18      THE WITNESS:  No.  For -- if the unpaid principal
19  balance -- what we don't have here in the example, if
20  this is home equity loan or line of credit in this
21  example.  If the -- if the line of credit was 150,000
22  then the flood policy would need equal 150,000, but the
23  difference between existence of policy if there's no
24  flood insurance policy we require that they get $150,000.
25  If there was outside policy at that point in time we were

Page 113

1  only gapping up to whatever that UPB given exposure was
2  from a gap perspective.  That was our -- I keep referring
3  to as our internal policy.  That's strictly for gap
4  insurance.
5      MR. RICHTER:  Q  Have there been any -- Strike that.
6          Let's go on to Chase 458 to 495.
7          (Exhibit 17 marked as requested)
8      Q  Mr. Nack, do you have Exhibit 17 in front of
9  you, Chase 458 to 495?
10      A  Yes, I do.
11      Q  This is again another summary of the Chase
12  flood compliance procedures as of August 6th, 2010, is
13  that right?
14      MR. MEINERTZHAGEN:  Object to the form.
15      THE WITNESS:  This is a -- another version of
16  Exhibit 16.  It looks like an updated version of
17  Exhibit 16.  Again it's the Assurant procedures.
18      MR. RICHTER:  Q  Have there been any updates to
19  Chase's flood insurance coverage requirements since
20  August of 2010?
21      A  Chase's policies hasn't changed.  The flood
22  policy hasn't changed since December of 2010.  The
23  Assurant procedures, I believe this is the most recent
24  version of the Assurant procedures.
25      Q  So is it your testimony as a corporate

29 (Pages 110 to 113)

CONFIDENTIAL
JEFFREY  NACK 11/10/2010

Page 114

1  representative of Chase Home Finance and JPMorgan Chase
2  Bank that Chase's flood insurance requirements continue
3  to be the lesser of replacement cost value or the
4  $250,000 amount?
5      MR. MEINERTZHAGEN:  Object to the form.
6      THE WITNESS:  Yes, that's our policy still, latter
7  part, end of December of 2009 forward.
8      (Exhibit 18 marked as requested)
9      MR. RICHTER: Q Mr. Nack, the court reporter has
10  handed you Plaintiff's Exhibit 18.
11      Do you have that in front of you?
12      A  Yes, I do.
13      Q  Do you recognize this as a printout from
14  Chase's website?
15      MR. MEINERTZHAGEN:  Take an opportunity to review
16  it.
17      THE WITNESS:  Yes.
18      MR. RICHTER: Q  Included on this website printout
19  are some answers to frequently asked questions relating
20  to, among other things, flood insurance, right?
21      A  Yes.
22      Q  Let's turn to page 11 of 29.
23      Do you have that in front of you?
24      A  Yes, I do.
25      Q  And at the middle of the page there's a

Page 115

1  question, what is the minimum homeowner's and flood
2  insurance required for a single-family dwelling.
3      Do you see that?
4      A  Yes.
5      Q  There's an answer -- there's actually separate
6  answers for hazard and flood.
7      Do you see that?
8      A  Yes.
9      Q  The answer for hazard is replacement costs or
10  100 percent of the insurable value as determined by the
11  insurer.
12      Do you see that?
13      A  Yes.
14      Q  For flood insurance, it says, adequate flood
15  insurance coverage is the lesser, of replacement cost or
16  the maximum available under the NFIP, which is currently
17  $250,000, or the unpaid balance provided that it is a
18  minimum of 80 percent of the replacement cost, correct?
19      A  Correct.
20      Q  Does this document accurately summarize Chase's
21  hazard insurance and flood insurance requirements as of
22  the date of the document, October 21st, 2010?
23      MR. MEINERTZHAGEN:  Object to the form.
24      THE WITNESS:  This document is reflective of the
25  hazard and flood insurance policy for our mortgage

Page 116

1  division.
2      MR. RICHTER:  Q  Why would a different amount of
3  flood insurance be required for mortgage loans as opposed
4  to lines?
5      MR. MEINERTZHAGEN:  Object to form.  Also outside
6  the scope.
7      THE WITNESS:  The mortgage flood insurance
8  requirement, the unpaid principal balance, only
9  difference is the unpaid principal balance is used if
10  it's at least a minimum 80 percent of replacement cost.
11  That's utilized for a number of different reasons.  First
12  of all, in I believe it was April of 2006, Fannie Mae
13  released a change to the servicing guidelines that
14  matched this policy.  So that's why Chase adopted this
15  policy for our mortgage divisions to securitized loans to
16  Fannie Mae so we had to adhere to their servicing
17  requirements.
18      The general principles are exactly the same.
19  The 80 percent replacement cost -- excuse me.  The having
20  80 percent of the replacement cost, the UPB that we
21  insure that the property, if there is damage, it will
22  still be done on replacement cost value.
23      Q  How long has Chase had this rule in effect for
24  mortgage loans, the one referenced on page 11?
25      MR. MEINERTZHAGEN:  Object outside the scope of the

Page 117

1  30(b)(6) notices.
2      Go ahead and answer on your own personal
3  knowledge.
4      THE WITNESS:  It was put in place in 2007.  I don't
5  recall the month.
6      MR. RICHTER: Q  So all of the previous policy
7  documents that we were looking at earlier and we went
8  through the changes, I don't want to go through them all
9  again, were all of those documents specific to home
10  equity lines then?
11      A  Home equity loans and lines of credit.
12      Q  So second loans or lines of credit?
13      MR. MEINERTZHAGEN:  Object to the form.
14      THE WITNESS:  That policy is for our home equity
15  scheduled loans, we have a scheduled balance loan or a
16  line of credit.  If you have originating first prime
17  mortgage, this is the policy we just referenced with the
18  80 percent rule is included on the prime first mortgage.
19      MR. RICHTER:  You want to break for lunch?
20      MR. MEINERTZHAGEN:  Sure.
21      (Off the record)
22      MR. RICHTER: Q  Let's go back on the record.
23      Mark this as Exhibit 19, chase 536.
24      (Exhibit 19 marked as requested)
25      MR. RICHTER: Q Mr. Nack, do you have Plaintiff's

CONFIDENTIAL
JEFFREY NACK 11/10/2010

Page 118

1    Exhibit 19 in front of you, Chase 536?
2        A   Yes, I do.
3        Q   **Do you recognize this document?**
4        A   Yes.
5        Q   **What is it?**
6        A   It is the -- it's an internal Chase procedure
7    that is referencing the billing portion of the premiums
8    and how they are added to the customer's account.
9        Q   **Second bullet down says, policy in compliance**
10   **with federal flood regulations. Chase assesses the**
11   **customer's flood insurance premium to their loan or line**
12   **of credit if the customer failed to provide proof of**
13   **private insurance numbers.**
14       **Do you see that?**
15       A   Yes.
16       Q   **What's meant by that statement?**
17       MR. MEINERTZHAGEN:  Object to the form.
18       THE WITNESS:  It's referencing cases where the
19   customer does not have insurance or adequate flood
20   insurance, that the premium associated with that lender's
21   policy will be assessed to the customer's account.
22       MR. RICHTER:  Throughout the deposition you have
23   used the term lender placed, I have used the term force
24   placed.  They're two different words for the same thing,
25   right?

Page 119

1        A   That is correct.
2        Q   **Going back to the first bullet, second line**
3    **down it says, Chase utilizes a tracking company to track**
4    **flood insurance on home equity accounts serviced on the**
5    **VLS system.  The tracking company is Assurant Group.  The**
6    **insurance company that Assurant Group writes their**
7    **policies through is the American Security Group.**
8        **Do you see that?**
9        A   Yes.
10       Q   **And is it true that Chase utilizes Assurant to**
11   **track flood insurance on home equity accounts for Chase?**
12       A   Yes, that's true.  Assurant tracks our home
13   equity loans and lines of credit.
14       Q   **How long has Assurant performed those functions**
15   **for Chase?**
16       A   For our home equity loans and lines of credit,
17   Assurant has performed those functions since 2002 I
18   believe.
19       Q   **In addition to tracking, Assurant will also**
20   **send out the form flood insurance notice on Chase**
21   **letterhead?**
22       MR. MEINERTZHAGEN:  Object to the form.
23       THE WITNESS:  As far as what notice are you
24   referring to?
25       MR. RICHTER:  The notice of inadequate flood

Page 120

1    insurance.
2        MR. MEINERTZHAGEN:  Object to form.
3        THE WITNESS:  Assurant provides tracking of the
4    policies.  In the event that there is no flood insurance
5    or insufficient flood insurance, Assurant will send out
6    the lender placed letters.
7        MR. RICHTER:  Q  Those letters go out on Chase
8    letterhead, right?
9        A   They do.
10       Q   **Does Chase also receive and process**
11   **correspondence -- Does Assurant also receive and process**
12   **correspondence from Chase home equity customers relating**
13   **to flood insurance?**
14       A   Yes, they do respond to customers.
15       Q   **How was Assurant chosen to perform those**
16   **functions?**
17       MR. MEINERTZHAGEN:  Object to form, outside the
18   scope.
19       The witness can answer based on his personal
20   knowledge.
21       THE WITNESS:  Assurant has been -- has been involved
22   with -- the Assurant relationship going back -- well,
23   Heritage organizations into the early '907s.  As far as
24   the tracking perspective, they provided tracking for us
25   for -- on the mortgage side I think since 2000.  We've

Page 121

1    had a good, long-standing relationship as far as
2    performance.  They're also the larger service provider in
3    this industry.  So the valuation is really based on the
4    size, scale and performance of Assurant over the years.
5        MR. RICHTER:  Q  Were other flood tracking vendors
6    considered?
7        MR. MEINERTZHAGEN:  Same objection.
8        THE WITNESS:  From a -- we've been using -- I
9    couldn't recall the last time that we reviewed -- we
10   reviewed the contract relationship.  We always review and
11   discuss how there are opportunities in other service
12   providers every contract renewal.
13       MR. RICHTER:  Q  When Assurant first started doing
14   the flood tracking for Chase, was that work bid out by
15   Chase at the time or was it just given to Assurant?
16       MR. MEINERTZHAGEN:  Same objection as to form and
17   scope.
18       THE WITNESS:  Specifically for the home equity and
19   the HELOC tracking I wasn't a party to the decision to
20   utilize Assurant for the tracking.  I know there was a
21   previous vendor that was utilized and they weren't
22   performing to our standards which is what caused the
23   change.
24       MR. RICHTER:  Q  Is true that JPMorgan Chase and
25   Company owned over 3.8 million shares in Assurant as of

31 (Pages 118 to 121)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 122

1  the beginning of this year?
2      MR. MEINERTZHAGEN:  Object to the form, lacks
3  foundation.  Outside the scope of the 30(b)(6) topics
4  that this witness is testifying about.  It doesn't relate
5  to any defendants.
6      THE WITNESS:  I have no knowledge.
7      MR. RICHTER:  Q  Does Chase pay Assurant a fee for
8  its flood tracking services?
9      A  Chase does pay Assurant a monthly fee.
10     **Q  How much is that?**
11     A  Currently that fee -- it's 35 cents per loan
12  that Assurant is tracking.  That's the per month fee.
13     **Q  Does Chase have a contract with Assurant for**
14  **those services?**
15     MR. MEINERTZHAGEN:  Object to the form.
16     THE WITNESS:  Yes, we have a contract with Assurant.
17     MR. RICHTER:  Q  What are the terms of that
18  contract?
19     MR. MEINERTZHAGEN:  Object to form, outside the
20  scope.
21     THE WITNESS:  When you say terms, specifically --
22     MR. RICHTER:  Q  I can't ask you a more specific
23  question because I don't have the contract so I can't ask
24  you specific --
25     A  It deals with the services.  It goes into the

Page 123

1  services that Assurant is there to provide, some of the
2  things I referenced earlier, what services Assurant is
3  going to provide.  It includes those key service levels
4  for those specific functions, it includes the reporting
5  that Assurant must provide to us on a weekly, monthly
6  basis to monitor their performance.
7      **Q  I assume the fee is also covered in the**
8  **contract?**
9      MR. MEINERTZHAGEN:  Object to form, outside the
10  scope.
11     THE WITNESS:  Yes, the fee is included.
12     MR. RICHTER:  Q  I'd like you to take a look back
13  at Deposition Exhibit 8.  It's the one that begins at
14  Chase 284 and goes through 331.
15     Do you have that in front of you?
16     A  Exhibit 8?
17     **Q  Yes.**
18     A  Yes.
19     **Q  I'd like you to turn to page 327.**
20     **Do you have that in front of you?**
21     A  Yes.
22     **Q  You see it says service standards there?**
23     A  Yes.
24     **Q  It says, see Exhibits A through H under**
25  **separate cover.**

Page 124

1      **Do you see that?**
2      A  Yes.
3      **Q  Then it goes on and it says, note these**
4  **exhibits are part of the Chase contract.  They cannot be**
5  **changed without Chase's approval.**
6      **Do you see that?**
7      A  Yes.
8      **Q  Is this the contract that you were mentioning**
9  **earlier?**
10     A  This document references going back to 2002, so
11  that would have been referencing the contract at that
12  point in time.  We have renewed that contract since then
13  so I was referring to what would be the most current
14  account.
15     **Q  Does the most current account also have**
16  **exhibits that relate to service standards?**
17     A  Yes, they do.
18     **Q  Does the Chase contract touch upon flood**
19  **insurance and flood insurance requirements?**
20     A  Contract talks about the services that they're
21  going to perform.  I'd have to review the contract
22  specific to the actual policies because policies could
23  change, but the contract is just referencing mostly
24  services that they're performing, not the specifics of
25  how they're going to perform those services or to what

Page 125

1  requirements.
2      **Q  Those services include flood insurance tracking**
3  **services, correct?**
4      A  Yes, they do.
5      **Q  Let's go back to Exhibit 19, Chase 539.  Excuse**
6  **me 536.**
7      **We left off with the sentence the tracking**
8  **company is Assurant Group, and right after that it says,**
9  **the insurance company that Assurant Group writes the**
10  **policies through is the American Security Group.**
11     **How long -- American Security Group, that**
12  **refers to American Security Insurance Company, right?**
13     MR. MEINERTZHAGEN:  Object to the form.
14     THE WITNESS:  Let me look here.
15     MR. RICHTER:  Q  Note the witness is reviewing
16  Deposition Exhibit 3.
17     A  Yes, that's what it's referencing.
18     **Q  How long has American Security Insurance**
19  **Company issued force-placed policies for Chase customers?**
20     A  I would need to look back at -- if the American
21  Security -- if that name was utilized throughout the
22  whole time but as long as we've used the relationship
23  Assurant has issued the lender-placed policies.
24     **Q  Is that an exclusive arrangement?  Are there**
25  **any other insurance companies that issue force-placed**

32 (Pages 122 to 125)

Page 126

1  policies for Chase with respect to flood insurance?
2      A  If Assurant --
3      Q  I'm sorry.  American Security Insurance
4  Company, there any other company other than American
5  Security Insurance Company that issues force-placed
6  policies for Chase relating to flood insurance?
7      A  No, not related to flood insurance.
8      Q  Why not?
9      MR. MEINERTZHAGEN:  Object to form, outside the
10  scope.
11      THE WITNESS:  The actual -- I don't know if I can
12  answer that question -- why we only issue to one carrier.
13      MR. RICHTER:  Q  Has that work ever been bid out?
14      MR. MEINERTZHAGEN:  Same objections.
15      THE WITNESS:  The work meaning the work for --
16  tracking and lender placement.
17      MR. RICHTER:  It's a poor question.  Let me
18  rephrase.
19      Q  Has Chase ever bid out force-placed coverage to
20  see who would offer the best and lowest bid?
21      MR. MEINERTZHAGEN:  Same objections.
22      THE WITNESS:  Only thing I'm aware of -- as we go
23  through contract time with the renewal we will look at
24  other service providers who provide tracking and
25  lender-placed products.

Page 127

1      MR. RICHTER:  Q  Are policies issued by American
2  Security Insurance Company generally more expensive than
3  what a homeowner could procure on his or her own for
4  flood insurance?
5      A  Generally.  It is.  We cite that in our letters
6  to encourage them to get their own insurance for that
7  reason.
8      Q  How much more expensive on average are policies
9  issued by ASIC versus those that a borrower would obtain
10  on the open market?
11      MR. MEINERTZHAGEN:  Object to the form.  Outside the
12  scope.  The witness can testify based on personal
13  knowledge but not on behalf of the defendants.
14      THE WITNESS:  I don't have any direct knowledge of
15  exactly how much more on a given property it is.  Again
16  we realize it is more expensive that's why we again
17  encourage them to obtain their own coverage.
18      MR. RICHTER:  Q  Is it fair to say the ASIC policies
19  are generally significantly more expensive?
20      MR. MEINERTZHAGEN:  Object to the form, outside the
21  scope.
22      THE WITNESS:  Significantly is a vague term so I'm
23  not sure how much more -- significant to one person may
24  not be significant to another.  There are -- in general
25  I'll agree there are more than an outside policy because

Page 128

1  an outside policy is written through the NFIP for the
2  government and the government's premiums are probably
3  below what the market really should be paying.
4      MR. RICHTER:  Q  If the difference was a factor of
5  one that the ASIC policies were double what a customer
6  could procure on the open market, would you agree that is
7  a significant difference?
8      MR. MEINERTZHAGEN:  Object to the form, outside the
9  scope of the 30(b)(6) deposition notices.
10      THE WITNESS:  I would agree anything more -- a
11  dollar more is significant.  It's more than that is.
12  Significant is all in the eyes of the given customer.  It
13  is more, and we -- again that's why we want the customers
14  to obtain their own coverage.  Not just from a premium
15  standpoint but a coverage standpoint because it includes
16  the contents.
17      MR. RICHTER:  Q  If a little old individual borrower
18  can get a policy that is less expensive than what Chase
19  procures, how is that?  I mean it would seem that Chase
20  being a big bank would be able to get a volume discount
21  for these policies.  Why can't it do that for its
22  customers?
23      MR. MEINERTZHAGEN:  Object to the form of the
24  question.  Outside the scope of the 30(b)(6) notice.
25      THE WITNESS:  As far as the premiums associated with

Page 129

1  a lender-placed policies, I don't have any direct
2  involvement with the premiums.
3      MR. RICHTER:  Q  Who -- As the vice president of the
4  insurance group at Chase, do you select the force-placed
5  insurance vendor, in other words, ASIC?
6      A  The -- I mean as far as selecting them, that's
7  part of our contract that -- as far as a tracking of
8  lender placement perspective that we are utilizing
9  Assurant for both services.
10      Q  You said utilizing Assurant for both services.
11  When you say both services, what do you mean?
12      A  Both services from tracking perspective and
13  then if there is -- there is insufficient or lack of
14  lender insurance coverage then they would actually issue
15  the policy as well.
16      Q  In your answer you didn't distinguish between
17  Assurant and ASIC.  Is that because ASIC is a
18  wholly-owned subsidiary of Assurant?
19      A  I'm not exactly aware of the relationship
20  between the two, but I refer to Assurant both from
21  tracking perspective and then issuing the lender-placed
22  policies.
23      Q  In entering into the contract with Assurant
24  does Chase give any consideration to the cost to the
25  borrower of the force-places policies that are issued by

33 (Pages 126 to 129)

CONFIDENTIAL
JEFFREY  NACK 11/10/2010

Page 130

1 ASIC in connection with that contract?
2     MR. MEINERTZHAGEN: Objection to form. Also beyond
3 the scope of the 30(b)(6) notice.
4     THE WITNESS: I don't have any dealings with the
5 actual part of the contract that interacts with anything
6 to deal with the lender-placed program and how that is
7 set up. My responsibilities are more on the tracking
8 side than the policy.
9     MR. RICHTER: Q  Who negotiates the contract or has
10 negotiated the contract with Assurant?
11     MR. MEINERTZHAGEN: Object to the form.
12     THE WITNESS: We have a sourcing department that
13 will be engaged as far as reviewing any contract that's
14 up for renewal, and they will interact with the key
15 business partners for the applicable sections of the
16 contract that apply to the areas.
17     MR. RICHTER: Q  Who -- Is there a person who has
18 spearheaded the negotiations for Chase with Assurant with
19 respect to the Chase flood insurance contract?
20     MR. MEINERTZHAGEN: Object to the form.
21     THE WITNESS: I guess the spearheading would really
22 be the sourcing group -- is the main group that is
23 interacting with the vendor.
24     MR. RICHTER: Q  Who is the leader of the sourcing
25 group?

Page 131

1     A  I don't recall the lady's name we dealt with on
2 this given contract. I don't know if you can classify it
3 as a leader, but she's the one -- she's in the department
4 responsible for who was handling our relationship, but it
5 could be somebody different depending on the next
6 contract.
7     Q  As you sit here today, can you say one way or
8 the other why Chase does not negotiate a better price for
9 its customers on those force-placed policies that are
10 issued by ASIC?
11     MR. MEINERTZHAGEN: Object to form, outside the
12 scope of the 30(b)(6) deposition topics.
13     THE WITNESS: I'm not involved with any of the
14 discussions regarding the actual rates or the premiums.
15 All I'm aware of is the rates are following in each state
16 and approved in each state.
17     MR. RICHTER: Q  So the rates are not a matter of
18 your concern?
19     A  Correct, but as far as my knowledge I know
20 there are rates that are approved in each state. That
21 tends to be a question customers do ask us.
22     Q  Are you aware of Chase ever opening up bids to
23 multiple insurance companies for force-placed coverage
24 for flood insurance?
25     MR. MEINERTZHAGEN: Object to the form, outside of

Page 132

1 the scope of the 30(b)(6) topics.
2     THE WITNESS: My knowledge of the contract only goes
3 back to 2006. So previous to that I know there's been
4 discussions, but I was not involved in the discussions
5 with other companies, but again we have had other
6 companies' proposals to us as far as some of the other
7 competitors along with Assurant. But I was not directly
8 involved with those discussions.
9     MR. RICHTER: Q  Are you aware of any customers who
10 have purchased policies directly from ASIC as opposed to
11 having them force-placed by Chase?
12     A  I mean that is an option for customers so I'm
13 sure we have some customers that will go directly to
14 them.
15     Q  Do you know that for a fact?
16     A  I don't know that for a fact, no.
17     Q  Of the customers who purchased flood insurance
18 on their own in order to meet Chase's requirements, would
19 it be fair to say the overwhelming majority of them, if
20 not all of them, purchased their flood coverage through
21 another company other than ASIC?
22     MR. MEINERTZHAGEN: Object to the form.
23     THE WITNESS: Yes, the way the flood -- the carriers
24 are the ones that are writing the policies on behalf of
25 the NFIP, and there are limited amount of flood insurance

Page 133

1 providers that will do that. That number is very small
2 in comparison to your homeowner's policies. A lot of
3 insurance companies won't write flood insurance policies.
4     MR. RICHTER: Q  Moving on to Chase 764 to 766.
5     (Exhibit 20 marked as requested)
6     MR. RICHTER: Q  Mr. Nack, do you have Exhibit 20,
7 Chase 764 to 766 in front of you?
8     A  Yes, I do.
9     Q  What is this document?
10     MR. MEINERTZHAGEN: Objection. Outside the scope of
11 the testimony that we've offered this witness to testify
12 about because we indicated we have -- we will provide a
13 different witness to testify on this topic.
14     He can go ahead and answer based on his own
15 personal knowledge.
16     THE WITNESS: This is a Compliance PLUS Insurance
17 Agency Agreement, agreement between Chase and JPMorgan
18 Chase Insurance Agency and American Security Insurance
19 Company, Standard Guaranty Insurance Company.
20     MR. RICHTER: Q  Are you familiar with Standard
21 Guaranty Insurance Company?
22     A  I'm not familiar.
23     Q  Is JPMorgan Insurance Agency, Inc. a
24 wholly-owned subsidiary of JPMorgan Chase Bank?
25     MR. MEINERTZHAGEN: Objection, outside the scope of

34 (Pages 130 to 133)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 134

1  what this witness is being proffered to testify about.
2  Another witness will be offered to testify concerning
3  this topic.
4       MR. RICHTER: I'll grant you a standing objection to
5  all the questions on this document.
6       MR. MEINERTZHAGEN: Okay.
7       MR. RICHTER: Q  Go ahead.
8       A  I'm not aware of the relationship -- what that
9  relationship may or may not be.
10      Q  Underneath the recitals there's a reference to
11 a Compliance PLUS insurance program.
12         Do you see that?
13      A  Yes.
14      Q  What is the Compliance PLUS insurance program?
15      A  To me it looks like an agreement between
16 JPMorgan Insurance agency and, referred to as the agent,
17 and the company to authorize, to write under -- to write
18 such insurance premiums that would be similar agreement
19 to write and place lender-placed premiums.
20      Q  You indicated this morning one of your
21 functions as the head of the insurance department at
22 Chase is compliance, right?
23      A  Uh-huh.
24      Q  Independent of what you're reading in this
25 document, do you have any knowledge of what the

Page 135

1  Compliance PLUS insurance program is as it applies to
2  mortgage transactions at Chase Home Finance, LLC?
3      A  When I was referring to compliance I was
4  referring to the flood regulation compliance. Just
5  because the word compliance is used here I wouldn't use
6  that in the same terminology, same definition of the word
7  compliance.
8      Q  Do you have any knowledge of what the term
9  Compliance PLUS insurance program refers to other than
10 what you are reading in this document?
11      A  No.
12      Q  Have you ever seen this document prior to
13 today?
14      A  I have seen this document.
15      Q  When did you first see the document?
16      A  Probably would have seen it somewhere around
17 the negotiations of the contract possibly. I don't
18 recall the exact time.
19      Q  At that time did you ask what is this
20 Compliance PLUS insurance program?
21      A  Again we keep -- my responsibilities aren't to
22 interact with this agreement and the details involved
23 with it. My responsibility was more on the servicing
24 within Assurant.
25      Q  I notice here that the word plus is capitalized

Page 136

1  in Compliance PLUS. Do you have any knowledge as to why
2  that is?
3      A  I do not.
4      Q  Is there a prior version of this agency
5  agreement than this one that's dated January 1st, 2007?
6      A  I believe this contract is a -- contract with
7  Assurant would include this as part of the agreement. So
8  any prior contracts would I believe include the
9  Compliance PLUS agreement as well.
10      Q  Do you know if this agreement dated
11 January 1st, 2007 is it still in effect to the best of
12 your knowledge?
13      A  There is an updated servicing agreement with
14 Assurant. I cannot speak to the compliance agreement if
15 it was updated along with it. I wasn't involved with
16 that agreement, but we did update a servicing agreement
17 with Assurant.
18      Q  What's the most recent version of the servicing
19 agreement with Assurant?
20      A  It's -- the effective date is January, 2010.
21      Q  Looking at the next page, Chase -- actually
22 before we leave there, stay on the first page. Up at the
23 top, JPMorgan Insurance Agency, Inc. is defined as agent.
24         Do you see that?
25      A  Yes.

Page 137

1      Q  Then looking at paragraph 2, last sentence, it
2  says, agent referring to JPMorgan Insurance Agency, Inc.
3  shall be entitled to receive from company, referring to
4  ASIC, a prepaid commission equal to 20 percent of net
5  written premiums.
6         Do you see that?
7      A  Yes.
8      Q  Is it true that JPMorgan Insurance Agency, Inc.
9  receives a 20 percent commission on each force-placed
10 flood insurance policy?
11      MR. MEINERTZHAGEN: Does my objection still stand
12 you're not referring to the document, should --
13      MR. RICHTER: Go ahead.
14      MR. MEINERTZHAGEN: Object. Outside the scope of
15 the testimony for which we're producing this witness.
16      MR. RICHTER: Still stands. We're still on the same
17 document.
18      Q  Go ahead.
19      A  I mean I'm reading this information, that it
20 would be -- it would be the 20 percent from the net
21 written premiums which would be gross written premiums
22 less any premium refunds.
23      Q  Looking to the third point there, fourth line
24 down, it refers to premium refund obligations. That 20
25 percent commission is the premium refund obligation in

Merrill Corporation - Minnesota

CONFIDENTIAL
JEFFREY NACK 11/10/2010

Page 138

1 connection with those force-placed policies, is that
2 right?
3     A   I would just be guessing how the calculation or
4 -- I'm just reading this as far as how I interpret this
5 information. I'm not really an expert on this
6 information. They have refunds coming in every day for
7 placed policies. The gross written premiums would be the
8 premiums minus the refunds that are received.
9     Q   Do you know how much money JPMorgan Insurance
10 Agency, Inc. earns in commissions on force-placed flood
11 insurance policies every year?
12     MR. MEINERTZHAGEN: I'm going to object. It's
13 outside the scope of the 30(b)(6) deposition. Also
14 object to form.
15     THE WITNESS: I do not.
16     MR. RICHTER: Q   Do you know one way or another
17 whether Chase tracks that information?
18     MR. MEINERTZHAGEN: Same objections.
19     THE WITNESS: Based on everything that we track in
20 our company, I would expect that would be tracked
21 somewhere by somebody within JPMorgan Chase. That's just
22 my opinion. I don't have any knowledge of that.
23     MR. RICHTER: Q   Looking at the next page, Chase
24 765, at point 6, paragraph 6, second sentence, it says,
25 this agreement shall be co-terminus, and shall terminate

Page 139

1 currently concurrently, with the Compliance PLUS and
2 insurance agreement dated January 1, 2007 between company
3 and servicer.
4         Do you see that?
5     A   Yes.
6     Q   Are you familiar with that agreement, the
7 Compliance PLUS and insurance agreement? I know you
8 indicated earlier you were not familiar with the
9 Compliance PLUS insurance program.
10     A   The Compliance PLUS insurance agreement is not
11 how I refer to it, but I believe that is -- I don't have
12 the agreement here. I'd have to validate that is the
13 agreement for the services of the flood tracking, but I
14 would have to --
15     Q   But Chase --
16     A   -- validate that -- there's a variety of
17 different names for the agreements in the Chase contract,
18 and they are all very similarly named. I don't have the
19 agreements with me.
20     Q   There's a reference at the bottom to Compliance
21 PLUS insurance program.
22         Do you see that on page 765?
23     A   Which -- what number?
24     Q   The very bottom, attention Compliance PLUS
25 product manager.

Page 140

1     A   Okay.
2     Q   Do you know who that is?
3     A   I do not.
4     Q   Is it true that JPMorgan Insurance Agency has
5 been merged into Chase Insurance Agency?
6     MR. MEINERTZHAGEN: Does my objection stand?
7     MR. RICHTER: Yes.
8     THE WITNESS: I'm not aware of the relationship
9 between those two entities.
10     MR. RICHTER: Q   Would it be fair to say you're not
11 aware of any agreements that may or may not exist between
12 JP Insurance Agency or Chase Insurance Agency on the one
13 hand and Assurant or ASIC on the other hand other than
14 this one we've just gone through?
15     A   That would be correct.
16     Q   And are you aware -- Strike that.
17         Would it also be fair to say you're not aware
18 one way or the other of any agreements that may or may
19 not exist between JPMorgan Insurance Agency, Inc. and
20 Chase Insurance Agency, Inc. on the one hand and
21 JPMorgan Chase Bank or Chase Home Finance on the other?
22     A   That would be true. I'm not involved with
23 those relationships. It's outside the scope of my
24 responsibility.
25     Q   Do you have any knowledge one way or other

Page 141

1 concerning whether Chase Home Finance, JPMorgan Chase
2 Bank or any other Chase affiliate are a party to any
3 other agreement concerning flood insurance or
4 force-placed insurance?
5     MR. MEINERTZHAGEN: Object to the form. Outside of
6 the scope of the 30(b)(6) notice.
7         The witness can answer based on his only
8 knowledge.
9     THE WITNESS: Are you asking me if there's any other
10 agreement besides this one here that involve JPMorgan
11 Chase and Assurant?
12     MR. RICHTER: Why don't you read back the question
13 again?
14     (Question read)
15     THE WITNESS: I would say the only other agreement
16 would be the agreement that includes the services
17 provided as it relates to Assurant and flood insurance
18 tracking, hazard insurance tracking.
19     MR. RICHTER: Q   Are you familiar with defendant's
20 files and records relating to Ms. Hofstetter and Roger
21 Modersbach?
22     MR. MEINERTZHAGEN: Objection with respect to
23 Modersbach. It's outside of the scope of what the
24 witness is going to testify.
25         So with respect to Modersbach, he can testify

Merrill Corporation - Minnesota
877-489-0367                              www.merrillcorp.com/law

CONFIDENTIAL
JEFFREY NACK 11/10/2010

Page 142

1  based on his own personal knowledge.
2      THE WITNESS: I have reviewed both cases.
3      MR. RICHTER: Q  Did Chase discriminate against them
4  with respect to its flood insurance requirements?
5      A  No.
6      Q  Did Chase -- Strike that.
7      They were treated consistently with other
8  borrowers?
9      A  Yes.
10     Q  They received the same form notices, right?
11     MR. MEINERTZHAGEN: Object to the form.
12     THE WITNESS: Again the borrowers had insufficient
13  coverage so not every borrower would have received those
14  notices.
15     MR. RICHTER: Q  Let me ask it a little
16  differently.
17     The form notices that Hofstetter and Modersbach
18  received were consistent with the form notices that were
19  sent to other borrowers, correct?
20     MR. MEINERTZHAGEN: Object to the form.
21     THE WITNESS: With relation to if they had a
22  insufficient flood insurance coverage, those are
23  consistent. The only difference might be if we had the
24  insurance policy they wouldn't have received that first
25  letter asking for the replacement cost value.

Page 143

1      MR. RICHTER: Q  Both Hofstetter and Modersbach
2  were subject to the same flood insurance policies, right?
3      A  That's correct.
4      Q  And both of them signed the same form deeds of
5  trust, correct?
6      A  I would have to look. I did not compare the
7  two to see if they are identical deeds of trusts.
8      Q  Let's take a look at them. Exhibit 21 will be
9  Chase 217 to 225.
10     (Exhibit 21 marked as requested)
11     (Exhibit 22 marked as requested)
12     Q  Mr. Nack, you have Exhibits 21 and 22 in front
13  of you?
14     A  Yes, I do.
15     Q  Exhibit 21 is the Deed of Trust for David
16  Hofstetter and Sheila Hofstetter, right?
17     A  Yes.
18     Q  Exhibit 22 is the Deed of Trust between Chase
19  and Roger Modersbach and Camille Modersbach, correct?
20     A  Correct.
21     Q  Do you see that in the lower left-hand corner
22  of the first page they both have a reference to CALCDT
23  all in caps bold, revised September 14, 2004?
24     A  Yes.
25     Q  Would you agree they are the same form deeds of

Page 144

1  trust?
2      MR. MEINERTZHAGEN: Take your time.
3      THE WITNESS: Based upon review it looks like the
4  same form.
5      MR. RICHTER: Q  Is this form typical of the deeds
6  of trust signed by other California borrowers?
7      MR. MEINERTZHAGEN: Object to the form of the
8  question. It's also outside the scope.
9      He can answer based on his personal knowledge.
10     THE WITNESS: I don't have any direct knowledge of
11  the deed of trusts used, if it's -- if it's used the same
12  for every California borrower.
13     MR. RICHTER: Q  I'd like to -- you to turn to the
14  second page of the document. Paragraph 4 relates to
15  hazard insurance.
16     Do you see that?
17     A  Yes, I do.
18     Q  Did you review that paragraph of the deeds in
19  preparation for your deposition here today?
20     A  Yes.
21     Q  Is there anything in that paragraph or
22  elsewhere in the deed of trust that discloses that the
23  borrower must carry flood insurance to the replacement
24  cost value?
25     MR. MEINERTZHAGEN: Object to the form.

Page 145

1      THE WITNESS: The document doesn't specify the
2  specific policy. It specifies that the insurance that
3  the customer must maintain in the amounts that it appears
4  that we require and that is acceptable to us.
5      MR. RICHTER: Q  Then it goes on and says, if you
6  fail to maintain coverage as required in this section,
7  you authorize us to obtain such coverage as we in our
8  sole discretion determine appropriate to protect our
9  interest in the property, correct?
10     MR. MEINERTZHAGEN: Object to the form.
11     THE WITNESS: Right. It goes on to reference in
12  accordance with Provision 6.
13     MR. RICHTER: Q  Does anything in either
14  paragraph 4 or paragraph 6 refer to replacement cost
15  value -- as of -- what the flood should equal amount of
16  hazard coverage, it should be equal to the FEMA maximum
17  or that it should be taken out to the maximum extent
18  permitted by law, anything in there along those lines?
19     MR. MEINERTZHAGEN: Object to the form.
20     THE WITNESS: There is no reference to those
21  statements in this document.
22     MR. RICHTER: Q  Why not?
23     MR. MEINERTZHAGEN: Object to the form, outside the
24  scope.
25     THE WITNESS: I can't speak to that question as far

37 (Pages 142 to 145)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 146

1  as why the deed of trust does not include the specifics,
2  that specific information regarding flood policy.
3      MR. RICHTER:  Q  Let's talk about the policies
4  themselves for a minute.
5      Are the force-placed policies issued by
6  American Insurance Security Company -- are they all the
7  same form policy for flood insurance?
8      A  I wouldn't be able to answer that as far as the
9  specific form.  It may change because I know states have
10  different regulations for -- I'm not aware of the
11  specifics of different policies so there could be some
12  slight differences based on state requirements.
13      Q  Let's go through the policies then.
14      (Exhibit 23 marked as requested)
15      (Exhibit 24 marked as requested)
16  MR. RICHTER:  Q  Back on the record.
17      You have Exhibits 23 and 24 in front of you,
18  the ASIC documents for Hofstetter and Modersbach?
19      A  Yes, I do.
20      Q  Do you recognize them as the force-placed
21  policies that were taken out for Hofstetter and
22  Modersbach?
23      A  Yes, these are the forced placed policies.
24      Q  I'll have you turn on Exhibit 23 to NKA 33.
25      Do you have that page in front of you?

Page 147

1      A  Yes.
2      Q  Do you see in bottom left-hand corner there is
3  a reference to a form document MSP-R-FL (10/88).
4      Do you see that?
5      A  Yes.
6      Q  Now, turning to the other force-placed flood
7  policy for Modersbach, if you go to the same page for
8  him, there's the same stamp on there.
9      A  Correct.
10      Q  Would you agree that both Hofstetter and
11  Modersbach had identical form flood insurance policies
12  taken out for them?
13  MR. MEINERTZHAGEN:  Take your time.
14      I'm going to object to the form.
15  THE WITNESS:  The forms appear to be the same.  The
16  only difference would be the amount of actual policy
17  itself and the amount of insurance for each carrier and
18  the policy terms and the policy limits.
19  MR. RICHTER:  Q  The difference in the amount would
20  be due to the fact that Hofstetter's policy was forced
21  purchased prior to the policy change in December of 2009,
22  correct, whereas Modersbach's was purchased after that?
23  MR. MEINERTZHAGEN:  Object to the form.
24  THE WITNESS:  At the time of the -- the Exhibit 23
25  of Hofstetter they did not supply any proof of flood

Page 148

1  insurance.  It was issued to $175,000 which was the line
2  of credit amount.
3      With the Modersbach case it was issued after
4  the policy change, and it was issued for $150,000 because
5  they had $100,000 of insurance from outside carriers.
6  MR. RICHTER:  Q  The new policy in effect as of
7  that time post December, 2009 was lesser of replacement
8  cost value or $250,000, which in Modersbach's case was
9  $250,000 resulting in a gap coverage policy of -- for him
10  of $150,000 since he already had $100,000 in coverage,
11  correct?
12      A  That's correct.
13  MR. MEINERTZHAGEN:  Kai, can we take a 5-minute
14  break?
15  MR. RICHTER:  Sure.
16      (Off the record)
17  MR. RICHTER:  Q  Back on the record.
18      Are these force-placed policies by ASIC for
19  Modersbach and Hofstetter -- are they typical of the
20  force-placed policies issued by ASIC for other Chase
21  borrowers?
22  MR. MEINERTZHAGEN:  Object to the form, outside the
23  scope.
24  THE WITNESS:  Again it goes to -- I'm not sure if
25  the form does meet.  Might change depending on state

Page 149

1  requirements.  So I can't speak to if it's exactly the
2  same or there are variations of just the regulations.
3  MR. RICHTER:  Q  You don't know one way or the
4  other?
5      A  I do not.
6      Q  Looking at the one for Hofstetter, Exhibit 23,
7  that NKA 30, it shows Hofstetter is the named mortgagee?
8  MR. MEINERTZHAGEN:  Object to the form.
9  THE WITNESS:  Which question names Hofstetter?
10  MR. RICHTER:  Q  As the named mortgagee.
11  MR. MEINERTZHAGEN:  Object to the form.
12  MR. RICHTER:  Q  Strike that.  It's getting late in
13  the day.
14      It shows Chase Home Finance, LLC as the named
15  mortgagee, correct?
16  MR. MEINERTZHAGEN:  Object to the form.
17  THE WITNESS:  That's correct, it names Chase Home
18  Finance as the name of the insured and David Hofstetter
19  as the additional insured.
20  MR. RICHTER:  Q  There's no other insureds listed
21  there, correct?
22      A  Besides Dave Hofstetter, no.
23      Q  Under this policy, Chase was the number 1
24  position and Hofstetter was in the number 2 position,
25  correct?

38 (Pages 146 to 149)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 150

1    MR. MEINERTZHAGEN: Object to the form.
2    THE WITNESS: Both Chase and the borrower would be
3  listed on the policy. I understand Chase is listed on
4  the policy with the ones that are actually the agent
5  issuing on the policy on the customer's behalf and then
6  listed as the additional insured for that reason.
7    MR. RICHTER: Q  Looking at Exhibit 24, the policy
8  for Modersbach. Again, it shows Chase as the named
9  insured mortgagee and Modersbach as the additional
10  insured, correct?
11    A  Yes, it does.
12    Q   Then turning to the next page of both policies,
13  Exhibits 23 and 24, it shows Chase Home Finance as the
14  first mortgagee, correct?
15    A  Yes.
16    Q   So this -- these policies were not taken out to
17  protect any other mortgagees, correct?
18    A  That is correct.
19    Q   They were not taken out to protect any other
20  lenders than Chase, right?
21    A  That's correct.
22    Q   Then moving on to NKA 34 of the Hofstetter
23  policy and the same page of the Modersbach policy --
24    A  That was 34?
25    Q   Yes. I think it shows as page --

Page 151

1    A  3. Page 9 of 18 at the top.
2    Q   Correct.
3    Looking at -- there's a header conditions, do
4  you see that, then there's some numbers underneath there?
5  Number 1, policy period; 2, other insurance; and 3
6  insurance interest and limited liability.
7    Do you see that?
8    A  Yes.
9    Q   I'd like to focus on number 3. For both of the
10  policies in number 3 it says -- somewhat conveniently for
11  the Modersbach policy there's a line right there. It
12  says the mortgagee's interest is represented by the
13  mortgagor's unpaid balance.
14    Do you see that?
15    A  Yes, I see it.
16    Q   That's -- that language is also in Exhibit 23
17  the Hofstetter policy, correct?
18    A  Yes.
19    Q   Would you expect that that language would also
20  be in the other ASIC force-placed flood policies?
21    MR. MEINERTZHAGEN: Objection, outside the scope of
22  the 30(b)(6) notices.
23    THE WITNESS: I can't say with absolute certainty
24  it's in every document.
25    MR. RICHTER: Q  Are you aware of any ASIC policies

Page 152

1  in which that language is not included?
2    MR. MEINERTZHAGEN: Same objection.
3    THE WITNESS: I don't have any knowledge of it's
4  included or excluded in any policies except the ones I'm
5  looking at here.
6    MR. RICHTER: Q  Then moving on to NKA 36,
7  paragraph 18 is the paragraph regarding cancellation.
8    Do you see that?
9    A  18, yes.
10    Q   It says, subparagraph A, coverage under this
11  policy shall automatically, and without prior notice,
12  cancel when the named insured, mortgagee, no longer has
13  an interest in the described property.
14    Do you see that?
15    A  Yes.
16    Q   So looking at the earlier page we looked at
17  that provides the mortgagee's interest is represented by
18  the mortgagor's unpaid balance, and now looking at this,
19  coverage under this policy shall automatically, and
20  without prior notice, cancel when named insured mortgagee
21  no longer has an interest in the described property.
22    Would you agree that the force-placed coverage
23  for the Hofstetter property was automatically cancelled
24  because her -- she had no unpaid principal balance?
25    MR. MEINERTZHAGEN: Object to the form, outside the

Page 153

1  scope.
2    THE WITNESS: The interest in the property is -- we
3  have interest into the customer's property as long as we
4  have a mortgage with them. So we still had interest as
5  long as the Hofstetters still kept their line of credit
6  open or any account open. It still is an active account
7  where we have to still adhere to the fund regulations.
8  We cannot waive our requirements for flood insurance.
9    MR. RICHTER: Q  But prior to 2008 you did waive
10  your requirements for flood insurance because you did not
11  purchase force-placed gap policies for customers, isn't
12  that right?
13    MR. MEINERTZHAGEN: Object to the form.
14    THE WITNESS: That policy referencing -- mentioned
15  we weren't in compliance with the regulations at that
16  time because we weren't gapping the insurance. We were
17  at one point accepting notifications but not sending
18  lender placing. So we were advising customers that that
19  policy reference that we stopped sending that letter
20  because without -- a letter by itself without actually
21  lender placement isn't in compliance. So until we were
22  in compliance until 2008 for that specific issue and our
23  home equity loans and lines of credit.
24    MR. RICHTER: Q  If Chase wanted to, you could --
25  it could still operate under its 2008 policy and require

Merrill Corporation - Minnesota

877-489-0367                          www.merrillcorp.com/law

Page 154

1 flood insurance to the lesser of the replacement cost
2 value, 250,000 or the amount of the line or principal
3 balance, correct?
4     MR. MEINERTZHAGEN: Object to the form.
5     THE WITNESS: To be in compliance we would have to
6 take into consideration not just the loans of the given
7 line of credit but all loans associated with that
8 account.
9     MR. RICHTER: Q But subject to that caveat --
10     A That would be the minimum requirements at least
11 that meet compliance would be total balance of all liens,
12 all loans, the lesser of that, 250 or the replacement
13 cost value. So our prior policy would not be in
14 compliance with the regulations.
15     **Q Because it didn't take into account other**
16 **loans?**
17     A Correct.
18     **Q But not because it allowed insurance in the**
19 **amount of the principal balance or lines, total amount of**
20 **outstanding loans or liens?**
21     MR. MEINERTZHAGEN: Objection to the form.
22     MR. RICHTER: Q Let me rephrase.
23     There was nothing inconsistent with the 2008
24 policy and federal requirements insofar as the 2008
25 policy allowed for insurance, gave a third option beyond

Page 155

1 replacement cost value and beyond the 250,000 and had the
2 third option for it, the total amount of the line or
3 principal balance?
4     MR. MEINERTZHAGEN: Object to the form.
5     THE WITNESS: Right. In 2008 we were only looking
6 at the individual loan and its balance, not the sum of
7 all those balances within servicing. Effective with the
8 flood Qs and As that were released in 2009 we were now
9 required to take into consideration within servicing all
10 outstanding balances on any account.
11     So, for example, a second lien with $50,000 we
12 couldn't just take into consideration that exposure. We
13 had to find out what other exposure might be out there
14 for the first lien or if it had any multiple second
15 liens.
16     MR. RICHTER: Moving on to Chase 257, 258.
17     (Exhibit 25 marked as requested)
18     **Q Mr. Nack, you have Chase 257 to 258 in front of**
19 **you which has been marked Plaintiff's Exhibit 25?**
20     A Yes, I do.
21     **Q This is a notice of special flood hazard that**
22 **went to Hofstetter on August 11, 2009?**
23     A Yes.
24     **Q Now, at the start it says, the area in which**
25 **your property is located has been identified by the**

Page 156

1 **Federal Emergency Management Agency as a special flood**
2 **hazard area.**
3     **Do you see that?**
4     A Yes.
5     **Q Does this letter identify the map number?**
6     A No, it does not.
7     **Q Does it identify the panel number?**
8     A No, it does not.
9     **Q Does it identify the community number?**
10     A No, it does not.
11     **Q Does it identify the lot or the parcel number?**
12     A No.
13     **Q Why is that information not provided in the**
14 **letter?**
15     MR. MEINERTZHAGEN: Object to the form.
16     THE WITNESS: To most customers that information
17 would not -- most customers would probably not understand
18 what that information is.
19     MR. RICHTER: Q How do you know that?
20     MR. MEINERTZHAGEN: Object to the form.
21     THE WITNESS: The flood insurance, that specific
22 information regarding the flood insurance and the
23 customer's -- you know, the FEMA is responsible for
24 communicating to the borrowers in those areas about these
25 flood map changes, and it's their responsibility to

Page 157

1 notify them of the remapping and the communications. So
2 -- that process can be involved usually sometimes years
3 before these map panels are actually effective. So they
4 have an outreach program that does a lot of the
5 communication, not to every specific borrower, but
6 overall regarding flood map changes.
7     MR. RICHTER: Q You think some borrowers might find
8 that information helpful in -- in verifying or
9 determining whether what they're being told is correct,
10 that they're actually do fall within a special flood
11 hazard area?
12     MR. MEINERTZHAGEN: Object to the form.
13     THE WITNESS: They might, but we do give them more
14 guidance on the second page regarding if they do have any
15 questions regarding it. We give them an option to
16 dispute that back to us if they wish. We give them phone
17 numbers as far as for FEMA to discuss the process if they
18 want to go -- they disagree with us and go through the
19 letter map amendment process.
20     MR. RICHTER: Q Doesn't this letter assume that
21 Chase's reading of the map is correct? In other words, a
22 customer would have no need or reason to request a map
23 amendment if their property was not within the flood zone
24 in the existing map, isn't that right?
25     MR. MEINERTZHAGEN: Object to the form.

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 158

1      MR. RICHTER:  Q  Or to be clear, their dwelling
2   does not within the flood zone in the existing map,
3   correct?
4      MR. MEINERTZHAGEN:  Object to the form.
5      THE WITNESS:  The letter is based off of our flood
6   determination vendor's analysis of those flood maps to
7   determine the properties going in and out of a flood
8   zone.
9      MR. RICHTER:  Q  Are you aware of something called
10  the special flood hazard determination form?
11     A  Yes.
12     Q  Do you also refer to that as a flood elevation
13  certificate?
14     A  No.
15     Q  What's the difference between the two?
16     A  The determination form is generally something
17  that's provided at closing of a mortgage.  It provides
18  that type of information regarding you referenced earlier
19  the map, panel number, the flood zone.
20        An elevation certificate is a -- something that
21  is utilized to -- that FEMA requires for in a lot of
22  cases in determining if a customer is above or below the
23  base flood elevation to determine if the property is in
24  or out of a flood determination, they can take it out.
25     Q  Is it your understanding that lenders are

Page 159

1   required to have a special flood hazard determination
2   form on file for each loan where the secured property --
3   for each loan with secured property?
4      MR. MEINERTZHAGEN:  Object to the form, outside the
5   scope.
6        The witness can go ahead and answer based on
7   personal knowledge.
8      THE WITNESS:  Any time you make, renew or extend a
9   loan you have to obtain a flood determination form.
10  There are some provisions regarding reusing a form based
11  on certain criteria.
12     MR. RICHTER:  Q  Exhibit 26, Chase 216.
13        (Exhibit 26 marked as requested)
14     Q  Mr. Nack, looking at Chase 216, Plaintiff's
15  Exhibit 26.  Do you have that in front of you?
16     A  Yes, I do.
17     Q  And is this a flood hazard determination form,
18  standard flood hazard determination form for the
19  Hofstetter property?
20     A  Yes, it is.
21     Q  And this special -- standard flood hazard
22  determination form indicates that the building is not in
23  a special flood hazard area.
24        Do you see that?
25     A  Yes.

Page 160

1      Q  Does Chase have any other special flood hazard
2   determination forms on file for the Hofstetter property?
3      A  I'm not aware of any other forms.
4      Q  Does Chase -- Go ahead.
5      A  When a map is revised, in the case of
6   Hofstetter and the zone, changes -- we receive that
7   information electronically from our flood determination
8   vendors that updates our servicing system, and in a case
9   where a customer may dispute the flood zone so we give
10  them the information, if they have a dispute, in those
11  cases we will in our response back to the customer, we
12  will research and then provide them the determination
13  form showing this information for the revision and also,
14  generally, if we can, an aerial shot of the property in
15  relation to the flood zone.
16     Q  I've forgotten what the question was.
17        Can you read it back for my own benefit?
18        (Question read).
19     Q  Does Chase have any special flood hazard
20  determination forms on file showing that her property is
21  in a flood zone?
22     MR. MEINERTZHAGEN:  Can you reread the question?
23        (Question read)
24     MR. MEINERTZHAGEN:  Special?
25     MR. RICHTER:  Q  Standard -- I'll -- Does Chase

Page 161

1   have any standard flood hazard determination forms
2   showing that the Hofstetter property is in fact in a
3   flood zone?
4      A  I'm not aware of any flood standard hazard
5   determination form reflecting that.  Our -- I mentioned
6   our servicing system reflects the flood zone as being a
7   special flood hazard area.  The requirement to produce a
8   special hazard determination form at time of revision is
9   not a requirement to provide that, to produce that.
10     Q  What do you base that on?
11     A  Base that on the flood regulations.
12     Q  Can you be more specific?
13     A  The only time this document is required is if
14  you have what's called a triggering event, and a map
15  revision is not a triggering event.
16        Like I mentioned, if somebody does dispute it
17  we can provide this documentation to the customer to
18  provide more clarity on if they do have a dispute the
19  flood zone.
20     Q  Is it typical for Chase to send out notices of
21  special flood hazard without having a special flood
22  hazard determination form on file showing the property is
23  in a flood zone?
24     MR. MEINERTZHAGEN:  Object to the form.
25     THE WITNESS:  The special flood hazard determination

41 (Pages 158 to 161)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 162

1  form is not provided as standard with this example for
2  the Hofstetter's first letter dated August 11.  We do not
3  provide the special flood hazard determination form with
4  that letter.
5      MR. RICHTER:  Q  Let's go to the next exhibit.
6  Chase 270.
7      (Exhibit 27 marked as requested)
8      MR. RICHTER:  Q  Do you have Exhibit 27, Chase 270
9  in front of you, Mr. Nack?
10     A  Yes, I do.
11     Q  This is one of the documents you reviewed in
12  preparation for your testimony here today, correct?
13     A  I believe so.
14     Q  Can you tell me what it is?
15     A  It is listing the Hofstetter's address and
16  showing the -- I guess the location of the property by
17  its -- I guess its legal description by location as far
18  as its latitude and longitude as far as its direction,
19  where that property is located.
20     Q  Is that the trapezoid shape in the document,
21  boundaries of the --
22     A  I would reference -- yes, that -- yes, the
23  trapezoid shape as being the boundaries of the property.
24  Is that your question?  I'm sorry.
25     Q  Yes.

Page 163

1      A  I would take that to be the boundaries, yes.
2      Q  I'd like you to highlight what you believe to
3  be the boundaries of the property in yellow.
4      A  This is what I would believe it to be.
5      Q  Okay.
6      A  It's not a document that I look at every day.
7      Q  Now, does the document also show where the
8  flood zone meets her property?
9      A  Not this document, no.
10     Q  Isn't that what the diagonal lines show?
11     A  This isn't something I'm familiar looking at as
12  far as with that information.  We would have -- our
13  determination with our vendors would have it classified
14  as being the zone -- sometimes it depicts diagonals, but
15  it also includes a zone, which I don't see that
16  referenced here so that would be typical, but I can't say
17  for sure because it doesn't have that in here.
18     Q  So it's typical for these -- for diagonal lines
19  like this to depict the flood zone?
20     A  It can.  It can.  I don't know what that's
21  referencing with 100 percent certainty in this case.
22     Q  Why don't you draw in the area with the
23  diagonal lines in orange.
24     A  You want me to circle where the diagonal lines
25  are?

Page 164

1      Q  Yes, the outer boundaries of what typically is
2  represented to be the flood area.
3      MR. MEINERTZHAGEN:  Object to the form.
4      MR. RICHTER:  Q  Does this -- Thank you.
5      Does this drawing also show where
6  Ms. Hofstetter's dwelling is located?
7      A  Based on this diagram I would classify it would
8  be somewhat rectangular shape.
9      Q  Why don't you highlight that in blue.
10     Thank you.
11     Let me make sure I understand this.  Chase, or
12  Assurant on behalf of Chase, sent out a letter to
13  Hofstetter stating she needed to get flood insurance to
14  protect Chase's interest in the property, even though she
15  didn't owe Chase any money, Chase suspended her line, she
16  was unable to make any draws, the only flood hazard
17  determination form you had on file showed her property is
18  outside the flood zone, and this property appears to show
19  that her dwelling is outside of the flood zone, is that
20  right?
21     MR. MEINERTZHAGEN:  Object to the form.
22     THE WITNESS:  No.  I -- as far as the determination,
23  I don't know if -- this isn't depicted of the flood zone
24  that correlates to the letter that we sent to them.
25     MR. RICHTER:  Q  Do you know whether

Page 165

1  Ms. Hofstetter's dwelling falls within a flood zone?
2      A  According to --
3      MR. MEINERTZHAGEN:  Object to the form.  Outside the
4  scope.
5      THE WITNESS:  According to our records her property
6  is in a required flood zone.
7      MR. RICHTER:  Q  What records?
8      A  The records we received from our flood
9  determination vendor regarding the map revision.
10     Q  The records that were produced to us from the
11  vendor are at Chase 269 through 283.  You already have
12  270.  I'm going to mark the rest of it as Exhibit 28.
13     (Exhibit 28 marked as requested)
14     MR. MEINERTZHAGEN:  Just so I'm clear, it's 269 and
15  271 to what?
16     MR. RICHTER:  To 283.
17     Q  Is there anything in either Exhibit 27 or 28
18  that shows the Hofstetter dwelling in a flood zone?
19     A  This isn't documentation I'm used to reviewing.
20  This is documentation our vendors would be using to
21  determine if property is in or out of the flood zone.  So
22  I'm not able to review this document and answer that
23  question.  Our vendors would have reviewed the map, the
24  map changes and determined if the property was in or out
25  of the flood zone.

42 (Pages 162 to 165)

CONFIDENTIAL
JEFFREY NACK 11/10/2010

Page 166

1     **Q  Based on your own color sketch of 27, it looks**
2 **like somebody determined that the dwelling was outside of**
3 **the flood zone?**
4     MR. MEINERTZHAGEN: Object to the form.
5     MR. RICHTER: Q  Isn't that right?
6     A  I don't know who produced this document.
7     **Q  It was produced by Chase, and Chase we have**
8 **been told received it from Assurant.**
9     MR. MEINERTZHAGEN: Object to the form. It's not
10 Assurant. It's the flood vendor.
11     MR. RICHTER: Q  The flood vendor.
12     A  Do you know when this was produced?
13     **Q  I don't know the exact date.**
14     A  Because this could correlate to the origination
15 flood zone which showed them in C --
16     **Q  No. It was produced this year.**
17     A  This year. Like I said, I've not seen the --
18 this information in the maps were changed and we rely on
19 it, they produce it. So in cases like this, the flood
20 vendor, if this were depicted from the flood vendor, it
21 should be shown in -- if this truly was the flood zone
22 boundaries of it that I circled, which I said that
23 usually depicts it, then the property would be classified
24 -- we have properties like this classified as being where
25 the property lies -- where the loan is in a -- part of

Page 167

1 the flood zone but the dwelling is not, it's usually
2 referenced with a X asterisked, which references partial.
3     **Q  Are you aware of any other documents in the**
4 **Hofstetter file at either Chase or Assurant or the flood**
5 **determination or mapping vendor that would show**
6 **Ms. Hofstetter's property falling in a flood zone or her**
7 **dwelling, sorry, falling in a flood zone?**
8     A  The documentation as far as if you refer to the
9 -- a graphical representation of it, I'm not aware of it.
10     **Q  As you sit here today, can you swear under oath**
11 **that Ms. Hofstetter's dwelling does fall in a flood zone?**
12     MR. MEINERTZHAGEN: Object to the form.
13     THE WITNESS: Based on the information from the
14 flood determination vendor, they're classifying it as
15 being in the required flood zone.
16     MR. RICHTER: Q  Do you have any personal knowledge
17 that would allow you to testify under oath that her
18 dwelling falls in a flood zone?
19     A  I didn't produce the determination myself. I'm
20 just basing it off the accuracy of the data from the
21 flood determination vendor they classify that property as
22 special flood hazard area.
23     **Q  You're assuming, but you don't know, right?**
24     MR. MEINERTZHAGEN: Object to the form.
25     THE WITNESS: That data is -- we trust our vendors

Page 168

1 to make accurate determinations to our properties.
2     MR. RICHTER: Q  But you never -- Chase never
3 audits whether they do those determinations accurately,
4 that's what you testified to earlier this morning, isn't
5 that right?
6     A  That's correct. We do not have an audit of the
7 actual determination. We do review any flood disputes
8 that customers have and review those to -- gives us some
9 indication of any people that have -- usually people have
10 disputes because they need to file a letter of map
11 amendments.
12     **Q  And your testimony earlier was that most**
13 **customers would not find the map and the parcel number,**
14 **that information, helpful at all because it would**
15 **basically be meaningless to them, right?**
16     A  I wouldn't say --
17     MR. MEINERTZHAGEN: Object to form.
18     THE WITNESS: Most customers would have more
19 questions about that information than the knowledge of
20 what that information means, familiarity with that unless
21 they're actually, you know -- if they do have familiarity
22 with that information, they probably already are part of
23 the outreach program from FEMA and trying to understand
24 why their property is going in and out of the flood zone
25 because a part of that is FEMA does give a lot of

Page 169

1 people -- not consistently always in most cases, but does
2 advise customers of the potential that their property
3 could go into a flood zone or more so in a flood zone
4 because they're trying to encourage them to get insurance
5 prior to that.
6     MR. RICHTER: Q  Potential is one thing, but Chase
7 is sending out letters to people saying federal law
8 requires that they get flood insurance because their
9 property, or their dwelling, depends on the letter, is in
10 the flood zone, right?
11     A  That's correct.
12     **Q  In a situation where a customer gets that**
13 **letter, takes it at face value and assumes that Chase**
14 **gets it right when, in fact, the flood determination has**
15 **been made incorrectly, that customer is going to get**
16 **railroaded into purchasing flood insurance when they**
17 **don't, in fact, need to purchase it under federal law,**
18 **isn't that right?**
19     MR. MEINERTZHAGEN: Object to the form, outside the
20 scope.
21     THE WITNESS: From a statutory requirement we're
22 required to if they're in special flood hazard area,
23 they're required to get flood insurance. Obviously in
24 this case where, again, where people are close to get
25 flood boundary lines, they are still at higher risk for

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 170

1  insurance, and, again, from FEMA guidance, you know, they
2  look at everybody is in a flood zone, and they state that
3  over and over again.
4        MR. RICHTER:  Q  Is what Chase is really doing
5  sending flood insurance letters to people who are kind of
6  in the gray area and then just leaving it to the borrower
7  to figure out whether they really do, in fact, or not, in
8  fact, fall in the flood zone?
9        MR. MEINERTZHAGEN:  Objection to the form.
10       THE WITNESS:  No.  Our flood vendors are very close
11  to these maps in relation to where they are, to determine
12  if they're in -- if the property lies within a flood
13  hazard.
14       MR. RICHTER:  Q  I remember that.  You testified --
15  I can't remember your exact words, but it was something
16  along the lines of their wonderful procedures for
17  figuring whether the property falls in a flood zone.
18       MR. MEINERTZHAGEN:  I'm going to object to the form
19  right now.
20       Go ahead.
21       MR. RICHTER:  Q  I was hoping I could find your
22  exact words in my notes, but they're escaping me at the
23  moment.
24       On what do you base your conclusion that
25  Chase's flood determination or flood mapping vendors do a

Page 171

1  fine or wonderful job in terms of getting it right that
2  the dwelling falls in the flood zone?
3        MR. MEINERTZHAGEN:  Object to the form of the
4  question, outside the scope.
5        MR. RICHTER:  Q  What specific procedures do they
6  have in place to make sure they get it right?
7        MR. MEINERTZHAGEN:  Same objections.
8        THE WITNESS:  I mean these determinations are -- our
9  determination vendors have been -- are very active in
10  working with FEMA to read these maps and interpret these
11  maps to the most accurate ability that they can, and I
12  did reference that they do some internal QCs, quality
13  scores between the National Flood Determination
14  Association members and the basis of that and the
15  performance we see from any kind of flood disputes that
16  we do receive from customers that the disputes that the
17  customers have are usually around declarative of not
18  understanding what happened to them, why is they are in a
19  flood zone today, and we provide additional information
20  to them, and we also work with them to get them out of
21  flood zones if they believe that they should not be in
22  one and working through with them through that letter map
23  amendment process.
24       MR. RICHTER:  Q  Do you know what the error rate is?
25       MR. MEINERTZHAGEN:  Objection, outside the scope.

Page 172

1        THE WITNESS:  I think -- I don't have a specific
2  percentage off the top of my head.
3        MR. RICHTER:  Q  Do you know how the flood mapping
4  determination vendors do their job?
5        MR. MEINERTZHAGEN:  Object to the form, outside the
6  scope.
7        THE WITNESS:  They receive the information from
8  FEMA, the map changes, and they use that information, and
9  obviously they're searching loans for Chase specific, all
10  Chase properties that are located within the boundaries
11  to determine what the revision is.  Sometimes the
12  revisions are they stay in, in, out, out, and sometimes
13  there's changes in to out and out to in.  And the actual
14  technical process that they have, I'm aware of it at a
15  high level, but I'm not -- that isn't my expertise as far
16  as performing the map revisions myself.
17       MR. RICHTER:  Q  Let's take a short break for 5
18  minutes.
19       (Off the record)
20       (Exhibit 29 marked as requested)
21       MR. RICHTER:  Q  Back on the record.
22       Mr. Nack, do you have in front of you what's
23  been marked as Plaintiff's Exhibit 29?
24    A  Yes.
25    Q  Is this Chase's code of conduct?

Page 173

1        MR. MEINERTZHAGEN:  Objection, outside the scope of
2  the witness's Rule 30(b)(6) deposition testimony.
3        Take your time and review it.
4        MR. RICHTER:  I'll tie up.  Don't worry.
5        THE WITNESS:  Yes, I believe this is the code of
6  conduct policy.
7        MR. RICHTER:  Q  Have you ever read it?
8     A  Yes, we're required to take training.
9     Q  And the code applies to all Chase affiliates,
10  correct?
11       MR. MEINERTZHAGEN:  Can I have a standing objection
12  to any questions on this document that's outside the
13  scope of the Rule 30(b)(6) deposition?
14       MR. RICHTER:  You are granted a standing objection.
15    Q  Well, I'll make it --
16    A  I don't have the --
17    Q  -- little easier.  Let's go --
18    A  I don't have the pages memorized.
19    Q  Let's go to paragraph 1.1, persons subject to
20  the code of conduct.
21       Do you see where it says, the code applies to
22  employees and directors of JPMorgan Chase and Co. and its
23  direct and indirect subsidiaries?  Do you see that?
24    A  Yes.
25    Q  That would include yourself?

Merrill Corporation - Minnesota

877-489-0367                                www.merrillcorp.com/law

Page 174

1  A  Yes.
2  Q  That would include anybody who works for
3  JPMorgan Chase Bank or Chase Home Finance, correct?
4  A  Anyone that works for us as far as contractors
5  or this says direct and indirect subsidiaries?
6  Q  It would include any employees and directors of
7  JPMorgan Chase Bank or Chase Home Finance, correct?
8  A  Correct.
9  Q  Let's go to page 9, paragraph 5, other business
10  conduct.
11     Do you see that?
12  A  Yes.
13  Q  It says there, We are all expected to conduct
14  the firm's business in accordance with the highest
15  ethical standards respecting the firm's customers and it
16  goes on, and complying with applicable legal and
17  regulatory requirements.
18     Do you see that?
19  A  Yes.
20  Q  Are you familiar with that term of the code?
21  A  Yes, I've just read it now again. I mean I've
22  said I've not memorized this document.
23  Q  And do customers have a right to expect that
24  Chase will conduct its business in accordance with the
25  highest ethical standards respecting the firm's customers

Page 175

1  and complying with applicable legal and regulatory
2  requirements?
3     MR. MEINERTZHAGEN: Object, in addition on the basis
4  of form.
5     THE WITNESS: Yes, I believe that.
6     MR. RICHTER: Q  Let's go to page 11, paragraph
7  5.6.1, fair dealing, respect for human rights. It says
8  there, in addition to strict compliance with applicable
9  laws, rules and regulations, JPMorgan Chase expects its
10  employees and directors to conduct themselves in
11  accordance with general standards of ethical behavior.
12     Do you see that?
13  A  Yes.
14  Q  Goes on, in particular, you should always
15  endeavor to deal fairly and in good faith with the firm's
16  customers.
17     Do you see that?
18  A  Yes.
19  Q  It goes on, it says, it is our policy not to
20  take unfair advantage of others through manipulation,
21  concealment, abuse of privileged information,
22  misrepresentation of material facts or any other unfair
23  dealing practice.
24     Do you see that?
25  A  Yes.

Page 176

1  Q  Did Chase's customers have a right to expect
2  that Chase will conduct itself in accordance with general
3  standards of ethical behavior?
4     MR. MEINERTZHAGEN: An additional objection to form.
5     THE WITNESS: Yes.
6     MR. RICHTER: Q  Did Chase's customers have a right
7  to expect that Chase will always endeavor to deal fairly
8  and in good faith with them as the firm's customers?
9     MR. MEINERTZHAGEN: An additional objection to form.
10     THE WITNESS: Yes.
11     MR. RICHTER: Q  Did Chase's customers have a right
12  to expect that Chase will not take unfair advantage of
13  them through manipulation, concealment, abuse of
14  privileged information, misrepresentation of material
15  facts or any other unfair dealing factors?
16  A  Yes.
17     MR. MEINERTZHAGEN: Same objection.
18     MR. RICHTER: Q  Has anyone done any review or audit
19  of Chase's flood insurance policies to evaluate whether
20  they comply with the code?
21  A  In our policy there isn't a separate board that
22  reviews it for code of conduct. That is something that
23  is made throughout our policy's decisions. That code of
24  conduct is throughout our policy decision-making process.
25  Q  Has anyone ever done an audit of Chase's flood

Page 177

1  insurance policies to evaluate whether they're fair or
2  whether the customer is being required to take out too
3  much insurance?
4  A  Again, when reviewing our flood policy, we are
5  reviewing it for the interest of Chase, the customer and
6  also the taxpayers as it relates to our flood insurance
7  program.
8     You have a second part of the question I think.
9  Can you repeat it?
10     (Question read)
11  A  On your last statement about too much
12  insurance, obviously we never require more insurance than
13  is above the replacement cost value. That's -- or the
14  250 limit so we would max out over and above that for the
15  flood insurance program.
16  Q  Has Chase ever conducted a customer survey
17  regarding flood insurance or force-placed insurance?
18     MR. MEINERTZHAGEN: Object to the form, outside the
19  scope.
20     THE WITNESS: You mean a survey? A survey with
21  whom?
22     MR. RICHTER: Q  Of your customers?
23  A  Customers.
24  Q  Ask them what they think.
25  A  I'm not aware of any survey.

45 (Pages 174 to 177)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 178

1     Q   Has Chase ever solicited its customers'
2   opinions in any way regarding flood insurance or
3   force-placed insurance?
4       MR. MEINERTZHAGEN:  Same objection.
5       THE WITNESS:  I'm not aware of any.
6       MR. RICHTER: Q Did Chase undertake any review of
7   its flood insurance policies or force-placed insurance
8   policies after this lawsuit was commenced?
9       A   As far as reviewing our current policy?
10      Q   Uh-huh.
11      A   No.
12      Q   Has Chase undertaken any review of its flood
13  insurance policies or force-placed insurance policies in
14  response to any other litigation?
15      A   No.
16      Q   Let's go back to the Exhibit 29 at page 2,
17  paragraph 4.  Paragraph 1.4.  Sorry.
18          See it says, questions about the code -- and it
19  goes on -- each line of business and support group has
20  been assigned at least one code specialist, generally a
21  compliance officer to act as a resource for all employees
22  in the area on code-related issues.
23          Do you see that?
24      A   Yes.
25      Q   Who is the code specialist for the insurance

Page 179

1   department?
2       A   I'm not aware of any code specialist.  I don't
3   believe it would be down to the insurance department.
4   It's probably a higher level person regarding home
5   lending would be --
6       Q   Who is the code specialist for escrow
7   administration?
8       A   I'm not aware of who that is.
9       Q   Who is the code specialist for home lending?
10      A   I'm not aware of who that person is off the top
11  of my head.  There is somebody that monitors to ensure we
12  take the necessary training for that code of conduct
13  every year, but that person's name within our compliance
14  group, I'm not -- I don't recall her name.
15      Q   Have you had any communications with any code
16  specialists relating to flood insurance or force-placed
17  insurance policies or practices?
18      A   Not with that specific individual.  Again, it's
19  something that we would consider as far as any policies
20  or procedures that we have.
21      Q   Is there any documentation that you have on
22  file showing that it was, in fact, considered?
23      A   No documentation, just conversations or
24  meetings that we had discussing regarding the policy.
25      Q   Has Chase's code specialist ever done any

Page 180

1   review or audit of Chase's flood insurance policies or
2   force-placed insurance policies to determine whether they
3   comply with the code?
4       MR. MEINERTZHAGEN:  Object to the form, outside the
5   scope.
6       THE WITNESS:  I'm not aware of any.
7       MR. RICHTER: Q  Looking back at the exhibit at
8   page 2, second paragraph in Section 1.4, it says,
9   employees who have questions about the code or other
10  policies and procedures, or about how a particular rule
11  applies in a specific situation, can also contact their
12  manager, their local compliance officer, the legal and
13  compliance department, and it goes on.
14          Who is the designated compliance officer for
15  the insurance department?
16      MR. MEINERTZHAGEN:  Object to the form.
17      THE WITNESS:  From a compliance standpoint Kathy
18  Strickland is the main representative for our compliance
19  department that we interact with on most cases.
20      MR. RICHTER: Q  Have you had any conversations
21  with Ms. Strickland relating to Chase's flood insurance
22  requirements or force-placed insurance practices?
23      A   Yes.  She was in that group along with our
24  legal area and our origination area that we referenced
25  earlier.

Page 181

1       Q   Are you aware that Chase had something called a
2   consumer practices department?
3       A   It's not a group that I recall interacting
4   with.
5       Q   So I take it Chase's consumer practices
6   departments has not done a review or audit of Chase's
7   flood insurance policies or force-placed insurance
8   policies to determine whether they comply with the code
9   or are fair to Chase's customers?
10      MR. MEINERTZHAGEN:  Object to the form, outside the
11  scope.
12      THE WITNESS:  Yes, I'm not aware of what that
13  department has or has not done.
14      MR. RICHTER: Q  Are you familiar with somebody by
15  the name of Stephanie Muddock or Murdick?
16      A   Murdick, no, off the top of my head.
17      (Exhibit 30 marked as requested)
18      MR. RICHTER: Q  Mr. Nack, do you have Exhibit 30
19  in front of you?
20      A   Yes, I do.
21      Q   I'll represent to you this is a document I
22  found online earlier this week while preparing for your
23  deposition here today.  At the top it says S & P
24  referring to Standard and Poor's Servicer Evaluation,
25  Chase Home Finance, LLC.

46  (Pages 178 to 181)

Page 182

1     **Do you see that?**
2     A   Yes.
3     **Q   Are you familiar with Standard and Poor's?**
4     A   I'm familiar, yes.
5     **Q   You find them to be a respected company?**
6        MR. MEINERTZHAGEN:  Objection, outside the scope,
7     objection to form.
8        THE WITNESS:  I don't have knowledge as far as
9     classifying them as being -- having a strong opinion of
10    Standard and Poor's.  I don't really deal with the review
11    part of this exam.
12       MR. RICHTER:  Q   I'd like to you turn to page 5 of
13    24, last paragraph.  It says, Chase's audit plan provides
14    proper controls to safeguard the company and its
15    investors against risk of loss due to noncompliance with
16    investor or regulatory guidelines.  The general auditing
17    department consists of 535 global business auditors, 15
18    of which are responsible for auditing Chase's mortgage
19    operations, 5 auditors in Columbus focused on servicing
20    audits.
21       Do you see that?
22    A   Yes.
23    **Q   Are there five auditors in Columbus who focus**
24    **on servicing audits?**
25       MR. MEINERTZHAGEN:  Object to the form of the

Page 183

1     question.  Also object because the scope of the
2     questioning is outside the 30(b)(6) topics.
3        The witness can answer based on his own
4     personal knowledge, not as corporate representative
5     concerning this document.
6        Can I have a standing objection as to the scope
7     of this document?
8        MR. RICHTER:  You can have a standing objection.
9        MR. MEINERTZHAGEN:  Thank you.
10       THE WITNESS:  I can't validate the numbers of
11    auditors in this document because I didn't put this
12    together.  There are a group of auditors that audit
13    servicing audits, some are in Columbus.
14       MR. RICHTER:  Q  Have they ever conducted an audit
15    of Chase's flood insurance requirements or force-placed
16    insurance practices?
17       MR. MEINERTZHAGEN:  Objection outside the scope.  It
18    was related to the document.
19       THE WITNESS:  We do have Chase internal auditors
20    that will audit our flood insurance program.
21       MR. RICHTER:  Q  What audits do you recall in that
22    regard?
23       MR. MEINERTZHAGEN:  Same objection.
24       THE WITNESS:  We are -- Specifically we have audits
25    from Fannie and Freddie, from internal auditors, from

Page 184

1     private investors, and in almost every case, they're
2     always reviewing our flood insurance policy as well as
3     regulatory auditors.
4        MR. RICHTER:  Q  Are those audits documented?
5        MR. MEINERTZHAGEN:  Same objection.
6        THE WITNESS:  The results of the audit are provided
7     in writing, yes.
8        MR. RICHTER:  Q  Are you aware of any audits
9     relating to the amount of Chase's flood insurance
10    requirements?
11       A   The audit always includes the amount of flood
12    insurance required to ensure that we are following our
13    policy.
14       MR. RICHTER:  Q  Have there been any audits
15    relating to whether Chase's flood insurance policies are
16    consistent with federal guidelines or other legal
17    guidelines?
18       MR. MEINERTZHAGEN:  Objection, outside the scope.
19    Also objection to form.
20       THE WITNESS:  The audits are geared more towards
21    individual loans and auditing individual loans to again
22    validate that they are meeting the expectations of the
23    flood policy whatever the procedure control that the
24    audit is specifically designed to look at.
25       MR. RICHTER:  Q  Are you aware of any audits

Page 185

1     finding exceptions or violations with respect to Chase's
2     flood insurance or force-placed insurance policies and
3     practices?
4        MR. MEINERTZHAGEN:  Object to the form.
5        THE WITNESS:  Again, the audits are at loan level
6     and that -- we always receive satisfactory ratings on all
7     of our reviews, and satisfactory is the highest rating.
8        MR. RICHTER:  Q  Are there ever any audits
9     conducted above the individual loan level relating to
10    flood insurance or force-placed insurance policies or
11    practices?
12       MR. MEINERTZHAGEN:  Object to form.
13       THE WITNESS:  I guess my term audit, we present our
14    audit to the loan level review regarding our flood
15    policy.  Obviously the flood policy has changed over the
16    years.  So that review is done by the policy who I
17    mentioned earlier.  So I would -- if you consider that to
18    be an audit, then we have ongoing audits to review our
19    flood policy discussions over the years.
20       MR. RICHTER:  Q  I'd like you to go down or go to
21    page 6 of 24.  There's some bulleted items there, and I'd
22    like you to focus on the second paragraph after the
23    bulleted items.  It says, an independent QA department
24    consisting of approximately 12 employees reports to the
25    credit risk area and performs servicing reviews.

Page 186

1      Do you see that?
2    A  Yes.
3    **Q   Are you aware of any QA reviews or audits of**
4  **Chase's flood insurance policies or practices?**
5    A  I'd have to validate which department this is
6  referencing.  A lot of our departments are referred to as
7  QA departments.  Exactly what audits that they are
8  performing, I believe this is referring to they are
9  performing audits of our insurance processing functions.
10  Again, this is a loan level review process.
11   **Q   Then after the bullets, next paragraph says, a**
12 **dedicated compliance group consisting of 4 staff members**
13 **who report to the assistant general counsel is**
14 **responsible for servicing compliance reviews affecting**
15 **federal, state and local laws.  The group also provides**
16 **advice as applicable on implementing new regulatory**
17 **requirements to ensure that Chase complies with all**
18 **statutory guidelines.**
19   **Do you see that?**
20   A  Yes.
21   **Q   Other than your conversations with**
22 **Ms. Strickland in connection with developing Chase's**
23 **flood insurance policies, are you aware of any**
24 **after-the-fact audits or reviews of Chase's flood**
25 **insurance policies or force-placed insurance practices?**

Page 187

1      MR. MEINERTZHAGEN:  Object to the form.
2      THE WITNESS:  I'm not aware of any.
3      MR. RICHTER:  Q  Let's talk about customer records
4  for a little bit.
5      Does Chase keep track of customer's principal
6  balance, available credit and credit line?
7    A  Yes.
8    **Q   Does Chase also keep track of whether it**
9  **believes customers' dwellings are in a flood zone?**
10   A  Yes.
11   **Q   Does Chase keep track for those customers for**
12 **whom Chase determines their dwelling is in a flood zone**
13 **the amount of flood insurance they have on their**
14 **property?**
15   A  Any loan that's in a special flood hazard area
16 we require flood insurance to meet our flood zone
17 standards.
18   **Q   Do you keep that information on file?**
19   MR. MEINERTZHAGEN:  Object to form.
20   MR. RICHTER:  Q  Relating to how much insurance
21 coverage, if any, customers have on their property.
22   MR. MEINERTZHAGEN:  Object to form.
23   THE WITNESS:  It's on our servicing system.
24   MR. RICHTER:  Q  Do you also keep track of the
25 premium amounts and deductible amounts and coverage

Page 188

1  limits for the policies that customers have flood
2  insurance policies that customers have?
3    A  We do track the flood insurance carrier, the
4  policy number, the premium associated with it, the
5  deductible is reviewed, but that data is not restored on
6  our servicing system.
7    **Q   So -- But in any event, you have the premium**
8  **data and the total coverage amount data on file for each**
9  **customer, correct?**
10   A  Correct.
11   **Q   That's true regardless of whether they purchase**
12 **their policy independently or whether Chase force places**
13 **it for them, correct?**
14   A  Correct, only case may be is that for a
15 customer who is paying their own flood insurance premium,
16 we may not have the premium amount of what they're paying
17 themselves but just tracking of the policy number and the
18 effective dates of that policy.  The premium amount is
19 more associated when we are escrowing and paying for the
20 bill.
21   **Q   Where is all that information stored?  Is there**
22 **a system that it's on, the VLS system or something else?**
23 **What is it?**
24   A  Well, the information for lines of credit and
25 loans serviced on VLS, the principal balance, the line of

Page 189

1  credit, that information is mainly stored on the VLS
2  system.  The policy information is stored on Assurant's
3  system.
4    **Q   What's called the AssurTrack System?**
5    A  It is.
6    **Q   Does Chase separately have that policy**
7  **information stored somewhere?**
8    A  Not the policy information.  We have access to
9  their system to review and reports and such to get that
10 information so we don't need it on the VLS system for
11 that reason.
12   **Q   You don't need to pick up the phone and call**
13 **somebody from Assurant, you can get it yourself?**
14   A  Correct.
15   **Q   Does Chase also have information on file on**
16 **either AssurTrack or VLS relating to who received flood**
17 **insurance notices and when they were sent out?**
18   A  Assurant's system would have record of the
19 notifications to the customer.
20   **Q   Would Assurant's system also show who was the**
21 **issuer of the flood insurance policies?**
22   A  Yes.
23   **Q   And also flood zone status, correct?**
24   A  Correct.
25   **Q   How about customer complaints relating to flood**

48 (Pages 186 to 189)

Page 190

1  insurance, where are those kept?
2      A   Any customer correspondence -- are you
3  referring to correspondence received, customer complaint
4  correspondence?
5      Q   Well, let's talk about that.  You could have a
6  customer -- we'll start with a customer writing.  Where
7  would that be kept?
8      A   Well, once the correspondence is received, we
9  track that information from the receipt of logging in the
10  customer correspondence, and it is -- the research is
11  performed by -- depending on the situation what dispute
12  it might be -- somebody at Assurant or it could be
13  somebody at Chase responding.  Then once that
14  correspondence is researched, response letter is sent to
15  the customer.
16      Q   So that correspondence, both the incoming
17  correspondence from the customer and the outgoing
18  response letter, in what system is that kept on file?
19      A   It's tracked within an application called
20  Customer Care Workbench.
21      Q   Is that a Chase database?
22      A   It is a Chase application, yes, but it is
23  utilized by Assurant as well.
24      Q   Is that on what's called the MSP system or is
25  that somewhere else?

Page 191

1      A   It's a more of a wrap around system.  It's more
2  based on our customer service center utilizes it to
3  document calls.  But we also use it for tracking research
4  items.  If a call came in, it would work the same way, it
5  wouldn't be logged into that same application, the CCW,
6  and the -- whatever the customer's concern was or
7  question, if the call center representative was not able
8  to answer it, they could open what we call a case within
9  CCW, then it would be responded to by that appropriate
10  department.
11      Q   What's the MSP system?
12      A   The MSP system is the Chase servicing system
13  that is utilized for our mortgage accounts.  It is not
14  utilized for our home equity loans and lines of credit
15  are serviced on our VLS system.
16      Q   Do you know what the acronym stands for?  I've
17  only heard it from Minneapolis, St. Paul.
18      A   It's actually not even not that anymore.  It's
19  now LPS is the new name for the company.  No, I don't
20  know.  I won't guess what LPS is.
21      Q   So on the Customer Service Workbench, what else
22  is on there in addition to customer correspondence?  You
23  said also complaints that came in through calls would be
24  logged on there.  What else is found on the Customer
25  Service Workbench?

Page 192

1      A   It's mainly a tool used by the Chase call
2  center, and it's just -- I guess the best way to describe
3  it is it's an application that takes data from the source
4  servicing system whether that is MSP or VLS and puts it
5  into a more user-friendly application for the call center
6  representatives to review the data for the customer, and
7  also tracks types of calls that come in and so forth, and
8  they document the calls within that system.  Assurant
9  only uses that application for research.
10      Q   Are there research findings memorialized
11  anywhere?
12      A   I guess the research items from findings, but
13  sometimes people are just asking questions within a
14  research.  We do track the volume of research items.
15  We'll monitor the service levels for the appropriate
16  categories.
17      Q   Is hazard insurance information also on the
18  AssurTrack system?
19      MR. MEINERTZHAGEN:  Objection, outside the scope.
20      THE WITNESS:  Yes.  Where just for those -- the
21  properties that we are tracking, the flood insurance will
22  require to obtain the hazard insurance for the
23  replacement cost value.  So if we have that information,
24  the customers have provided it, it will be on the
25  AssurTrack system as well.

Page 193

1      MR. MEINERTZHAGEN:  Withdraw the objection.
2      MR. RICHTER:  Q   Are you aware that both
3  Ms. Hofstetter and Mr. Modersbach sent complaint letters
4  to Chase relating to its flood insurance requirements?
5      A   Yes.
6      Q   Are you aware of similar complaints from other
7  customers?
8      MR. MEINERTZHAGEN:  Object to the form, also outside
9  the scope.
10      THE WITNESS:  I don't review the complaints so I
11  can't say if we received similar ones or not.
12      MR. RICHTER:  Q   Who has the pulse on those kind of
13  customer complaints at Chase?
14      MR. MEINERTZHAGEN:  Same objections.
15      MR. RICHTER:  Q   Who would know that, be able to
16  answer that question?
17      A   Well, if there's -- obviously depends on if the
18  research is, you know, performed, this type of research
19  performed by Chase, you know, supervisor would have
20  knowledge, and if there's any concerns, you know, we have
21  discussions on if there's -- as far as maybe the response
22  to the letters, what typical questions customers may
23  have.
24      Q   Are there any reports generated from the
25  Customer Service Workbench or by other means that roll up

49 (Pages 190 to 193)

CONFIDENTIAL
JEFFREY  NACK 11/10/2010

Page 194

1  the number of complaints by category?
2      A   There is -- It does produce how many items are
3  worked and when they're completed and the service level
4  associated with those completions.  Somebody asks you
5  specific question regarding complaints, we'd have to look
6  at every single case to see if there was actually a
7  complaint or question that's again -- based on our
8  review, our research has not always responded to
9  complaints.
10     Q   I guess what I'm trying to get at is, are there
11  aggregate reports or is aggregate information kept
12  tracked relating to customer complaints?
13     MR. MEINERTZHAGEN:  Object to the form.
14     THE WITNESS:  Yes.  The CCW application produces
15  reports, so items received and items completed based on
16  various categories.
17     MR. RICHTER:  Q  Is one of those categories
18  insurance-flood zone dispute?
19     A   There is a category for flood zone dispute.  I
20  don't recall the exact name, but there definitely is one
21  for flood zone dispute.
22     (Exhibit 31 marked as requested)
23     Q   You have Exhibit 31 in front of you Mr. Nack,
24  Chase 231 to 34.
25     A   Yes, I do.

Page 195

1      Q   I'd like you to turn -- on the first page, you
2  recognize as Chase Home Finance, LLC customer service
3  comments, requested by J. LaRoche.  I assume that's
4  Jacqueline LaRochell?
5      A   I would believe so.
6      Q   With a request date of April 22nd, 2010.  Do
7  you see that?
8      A   Yes.
9      Q   Then there's a line, and looking down about ten
10  lines or so this customer/contact name in capital
11  letters, Sheila I. Hofstetter.
12     Do you see that?
13     A   Yes.
14     Q   I'd like you to turn to page 233.  There's some
15  case number entries there.  Seventh one down,
16  February 22nd, 2010.  It says, auditor -- audited letter
17  sent, route closed.  Then it goes on, route cause,
18  reason: insurance, dash, flood dispute.
19     Do you see that?
20     A   Yes.
21     Q   Is that one code that Chase has on the
22  workbench for complaints?
23     A   Yes, on the workbench there is a category for
24  flood zone disputes.
25     Q   Is -- There's also a source reason code here,

Page 196

1  flood insurance/escrow dispute.
2      Do you see that?
3      A   Yes.
4      Q   Chase also have a code for that as well in the
5  workbench?
6      A   I don't recall seeing that in any reporting
7  based on this source reason code.
8      Q   As the manager of the -- the vice president of
9  the insurance department at Chase, would you -- if you
10  wanted to, could you go to your tech people and say, hey,
11  I'd like you to pull all of the customer flood zone
12  disputes, pull everything coming up under that code
13  within the last, you know -- within this date range?
14     A   Within the Customer Care Workbench we can run
15  -- it has historical reporting so based on that we could
16  run inquiries based on any kind of category.
17     Q   Including flood zone dispute?
18     A   Correct.
19     Q   Let's go to Chase 714.
20     (Exhibit 32 marked as requested)
21     Q   Do you have that in front of you?
22     A   I do.
23     Q   At the top, it says Chase procedures, home
24  equity insurance topic: route/flood insurance dispute
25  version date, June 2nd, 2010, correct?

Page 197

1      A   Correct.
2      Q   What is this a database -- this looks like some
3  type of database printout.  Do you know where this is
4  printed out from, which system?
5      A   It's a Microsoft access database.  It's used by
6  Chase employees.
7      Q   Is this part of the workbench or VLS system or
8  something totally different?
9      A   It's totally different.  This is something
10  inherent to just the flood compliance department.
11     Q   Here -- Look 8 cells down on the left-hand
12  side.  You see there's a field reason for dispute?
13     A   Uh-huh.
14     Q   What is that -- What are the different reasons
15  that are populated within that field?
16     A   I have to validate all the different reasons
17  that would be inclusive in here.  I don't have a list of
18  them in front of me.
19     Q   Would this be another field that you could
20  search if you wanted to find out what customers were
21  complaining about or the reason that they were having
22  flood insurance disputes with Chase?
23     A   Yes.  This -- it's again an access database,
24  but it would do and can produce reporting from that, if
25  needed, to review.

Merrill Corporation - Minnesota

877-489-0367                                    www.merrillcorp.com/law

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 198

1    Q   I think you indicated earlier, I mean, that
2  Chase keeps pretty close tabs on its business, right?
3    MR. MEINERTZHAGEN:  Object to the form.
4    MR. RICHTER:  Q  In your experience.
5    A   I mean, I don't recall saying those exact
6  words, but we keep very close review on information.
7    Q   Would you expect that Chase would be able to
8  pull information relating to how many customers
9  complained about the amount of coverage that was required
10 of them?
11   A   Again, in order to do that you'd have to review
12 every written complaint just to review to that specific
13 type of complaint.  We don't have it broken down to that
14 category with general research.
15   Q   Do you have a reason code or reason for dispute
16 for amount of coverage?
17   A   This database is designed more for the flood
18 determination dispute, not a coverage amount dispute.
19   Q   Do you know that for a fact or are you
20 speculating?
21   A   I know that for a fact.  That's the design of
22 the database.  Typically the disputes in those cases --
23 the coverage disputes will be answered by Assurant, at
24 times Chase employees will answer.  If by chance the
25 correspondence is sent to us, we may just handle it

Page 199

1  ourselves, and then potentially in cases Assurant may ask
2  us to review it and we might respond to that case, but
3  typically the coverage amount questions from the
4  customers would be handled by Assurant. The design of
5  the database is geared toward the flood determination
6  process.
7    Q   Does Chase also have a code for flood gap
8  inquiries?
9    A   Are you speaking to within this database?
10   Q   Within any database.  I can't ask you about
11 specific databases because we haven't gotten one
12 scintilla of electronic data yet.
13   MR. MEINERTZHAGEN:  I'm going to object to the form
14 of the question. Also going to object to the speech.
15   THE WITNESS:  The CCW route categories, there is one
16 for lender-placed insurance. I don't believe there's one
17 separate for just gap insurance.  That would be within
18 the CCW workbench, but I'd have to review the listings to
19 validate.
20     (Exhibit 33 marked as requested)
21   MR. RICHTER:  Q  Exhibit 33 will be Chase
22 Exhibit 761.
23     Do you have that in front of you, Mr. Nack?
24   A   Yes.
25   Q   At the top it says, most common used AssurTrack

Page 200

1  Monitored Codes List Value.
2     Do you see that?
3    A   Yes.
4    Q   Then the sixth one down is gap, flood gap
5  inquiry.
6     Do you see that?
7    A   Yes.
8    Q   Does that refresh your recollection as to
9  whether there is a code in the AssurTrack system for
10 flood gap inquiries?
11   A   This is from our -- looking at this is from our
12 -- Assurant would use this from a call center
13 perspective.  If a customer called in, this is their way
14 to categorize potentially the reason why the customer had
15 contacted us, not correlating to research or complaints
16 but yet just documenting the reason for the call.
17   MR. RICHTER:  Let's take five minutes.
18     (Off the record)
19   MR. RICHTER:  Q  Back on the record.
20     Mr. Nack, you testified earlier that Assurant
21 and Chase share information, database information with
22 one another on the AssurTrack system.
23     Do you recall that?
24   A   Yes, we --
25   MR. MEINERTZHAGEN:  Object to the form.

Page 201

1    THE WITNESS:  We supply information to Assurant for
2  our VLS system regarding the new customers that borne our
3  system and changes to material information that's
4  pertinent to the tracking of the policies.
5    MR. RICHTER:  Q  As you've testified, Assurant
6  handles Chase's flood tracking, correct?
7    A   Correct.
8    Q   And you've testified to other interactions
9  between the two companies, correct?
10   A   Correct.
11   Q   Are there any other relationships between
12 Assurant and Chase that we haven't covered?
13   MR. MEINERTZHAGEN:  Object to the form.  Also object
14 to the extent it seeks information outside the scope of
15 Rule 30(b)(6) deposition topics.
16   THE WITNESS:  What I've described is what Assurant
17 services provide.  We've described what the Assurant
18 group responsible for doing.  So that is our
19 relationship with them.
20   MR. RICHTER:  Q  Are there any persons at Chase who
21 are -- Strike that.
22     Are there any employees or officers of Chase
23 who are also employees, officers or directors of
24 Assurant?
25   MR. MEINERTZHAGEN:  Same objections.

Merrill Corporation - Minnesota

877-489-0367                          www.merrillcorp.com/law

Page 202

1    He can answer based on his own personal
2  knowledge.
3    THE WITNESS: I'm not aware of any, but I have no
4  direct knowledge of the situation.
5    MR. RICHTER: Q  You don't know one way or the
6  other --
7    A  I don't know.
8    Q  -- whether they share management?
9    A  I know that we -- from my department we do not
10  share management.
11    Q  Do Chase and Assurant share any financial
12  accounts?
13    MR. MEINERTZHAGEN: Object to the form.
14    THE WITNESS: By financial accounts, do you mean
15  does Assurant have a bank account at Chase?
16    MR. RICHTER: Q  Bank account or some type of
17  escrow account.
18    A  No. I mean the monetary balances are stored on
19  VLS so the Chase has all the monetary balances on VLS.
20    Q  You testified earlier relating to the flood
21  insurance policy development process at Chase in which
22  you participated, and I think you testified people from
23  legal and compliance participated, and people from
24  origination also participated in that.
25    Do you recall that?

Page 203

1    A  Yes.
2    Q  Do you have any files relating to that policy
3  development and policy change process?
4    A  Files would be mostly via e-mail
5  communications.
6    Q  Anywhere else?
7    A  I mean that's -- Most of our information is all
8  in the computer so it would be via e-mail. The document
9  would be embedded into the e-mail, for example.
10    Q  If Jaime Diamond came into your office tomorrow
11  and said I want to know how we got ourselves into this
12  mess, and, you know, we decided on the policies that
13  we did, where would you look? Would it just be e-mails
14  or would you look somewhere else? Said I want to know,
15  give me every scrap of paper, you've got 48 hours.
16    MR. MEINERTZHAGEN: Object to the form, outside the
17  scope of the deposition topics.
18    He can answer based on his own personal
19  knowledge.
20    THE WITNESS: I think he would look more at the
21  flood insurance policy that we have. That's, you know --
22  our policies are stated online. So we have information
23  as far as what the flood insurance policy is. As far as
24  who approved that policy, we'd tell him who was involved
25  with that policy-making decision.

Page 204

1    MR. RICHTER: Q  Do you have separate electronic or
2  hard copy files relating to meetings?
3    MR. MEINERTZHAGEN: Object to the form.
4    THE WITNESS: I have some hard copy files relating
5  to meetings.
6    MR. RICHTER: Q  What type of meetings do you keep
7  hard copy files on?
8    A  Mainly files that relate to discussions with
9  employees is what I generally keep most of my
10  documentation of. Discuss performance, projects, so
11  forth. I may have some documentation in our actual calls
12  with Assurant, but, again, those are all usually
13  electronically based so it's -- if we need to reference,
14  we will reference the e-mail.
15    Q  To your knowledge have you or anyone else
16  searched your e-mail files or any other e-mail files of
17  any Chase personnel to find any documents responsive to
18  plaintiff's discovery request in this matter?
19    MR. MEINERTZHAGEN: Objection to the form of the
20  question, outside the scope of the 30(b)(6) deposition
21  topics and been asked and answered.
22    THE WITNESS: I don't know.
23    (Exhibit 34 marked as requested)
24    MR. RICHTER: Mr. Nack, do you have Exhibit 34 in
25  front of you, Chase 251 to 253?

Page 205

1    A  Yes, I do.
2    Q  This is Ms. Hofstetter's complaint letter to
3  Chase dated January 11, 2010, is that right?
4    A  That's correct.
5    Q  Even though she intended to send it to Chase,
6  it was received at Assurant, is that right?
7    A  There isn't address -- let me see. Yes, the
8  fax cover sheet shows she faxed it to fax number that is
9  serviced by Assurant. So it went to the Assurant
10  research group.
11    Q  When these complaints -- this type of
12  correspondence comes in and it's received by Assurant,
13  does then Assurant forward that correspondence to Chase?
14    MR. MEINERTZHAGEN: Object to the form.
15    THE WITNESS: If it's something that Assurant is
16  responsible for responding to, they should respond to,
17  they don't forward the correspondence unless it's
18  something that a Chase employee is supposed to answer,
19  and in cases sometimes they may need assistance, but,
20  generally, sometimes customers will have multiple
21  questions about flood insurance and they may have a
22  question about their payment, they would answer to the
23  specific question and forward on the other research item
24  to the appropriate channels.
25    MR. RICHTER: Q  Did Chase receive a copy of this

52 (Pages 202 to 205)

Page 206

1 letter? To be clear, was a copy of this letter forwarded
2 to Chase by Assurant?
3    A It wouldn't be standard -- it wouldn't be
4 typical for a letter like this to be forwarded to Chase.
5 Again, because the complaint is regarding the amount of
6 coverage. Again, sometimes on a case-by-case basis they
7 may forward it to Chase.
8    Q I'd like to you take a look back at Plaintiff's
9 **Exhibit 9, Chase 332 to 368. The AssurTrack procedures**
10 **-- Chase home equity portfolio AssurTrack procedures,**
11 **July 7, 2005. I'd like you to turn to page Chase 342.**
12 **Are you on that page?**
13    A Yes.
14    Q **And that page at the top says flood disputes**
15 **originated by customer.**
16      **Do you see that?**
17    A Uh-huh.
18    Q **Then looking down in the box, step 5 says, fax**
19 **Chase all documents received, plus a copy of the**
20 **collateral screen and the flood rating screen.**
21      **Do you see that?**
22    A Yes.
23    Q **Was it at one time the policy for Assurant to**
24 **fax Chase all flood dispute documents received?**
25    A This is referencing flood disputes. It's

Page 207

1 referencing flood zone disputes.
2    Q **Does Chase do any auditing of Assurant's**
3 **responses to customer complaints other than making sure**
4 **the complaints are responding to within a specific time**
5 **parameter?**
6    A Yes.
7    Q **What type of auditing does Chase do in that**
8 **regard?**
9    A We have an audit of the correspondence that
10 Assurant sends out. It's not just specific to flood but
11 all correspondence that Assurant sends out, and we do a
12 sample of that audit of those correspondence and review
13 the response for not just the timing because the timing
14 is really something that's reported in our system. We
15 know when things are completed and not completed. It's
16 really more tied toward the accuracy of the response, did
17 they answer all the questions that the customer had, did
18 they answer them fully to the extent that they should
19 have to explain the situation to the customer.
20    Q **Looking back at Exhibit 34, Chase 251 to 53.**
21    A Which exhibit?
22    Q **34, the Hofstetter letter.**
23      **Do you know whose handwriting is at the top of**
24 **the document?**
25    A I don't know who put -- who wrote that note.

Page 208

1    Q **There's a -- looks like -- I can't tell if it's**
2 **initials or what, CDD in a circle. Do you see that?**
3    A Yes. Appears to be a C then -- maybe a B and
4 D. I'm not sure.
5    Q **Do you know what that stands for?**
6    A I would guess it's somebody's initials, but
7 just strictly a guess.
8    Q **Do you know what any of the other writing on**
9 **there refers to? I'm assuming FLD/LP would be flood,**
10 **lender-placed.**
11    A Probably shortcut. Potentially they are
12 referencing a case number at the top that should amend to
13 correlate to -- the case number that's on Exhibit 31,
14 they wrote the case number on there, the RFL number --
15 let me look at the -- the RFL number is the policy number
16 of the lender-placed policy.
17    Q **Are you familiar with Cedric MacNeal?**
18    A I know he's an Assurant employee.
19      (Exhibit 35 marked as requested)
20    MR. RICHTER: Q Looking at Chase 249 to 50,
21 Exhibit 35. A letter from Cedric MacNeal to Dave
22 Hofstetter dated February 1, 2010.
23      Do you see that?
24    A Yes.
25    Q **It identifies him as research specialist in the**

Page 209

1 research department. It doesn't say with Assurant.
2    A Assurant -- they reference Chase in the calls
3 and the correspondence.
4    Q **Do they have authority to do that?**
5    A Yes.
6    Q **Do you know how many people work in the**
7 **Assurant research department on Chase matters?**
8    A I don't have an exact number. The number for
9 our home equity loans and lines of credit I imagine is
10 definitely under ten people based on the volume of
11 research items that we have. It's low.
12    Q **Did Chase -- did you or anybody else at Chase**
13 **ever receive a copy of this response letter?**
14    A You mean did the person at Assurant e-mail us a
15 copy or send us a copy?
16    Q **Correct. Either before or after. Either for**
17 **approval or just for your information.**
18    A I'd have to look at the specifics of this
19 account. Typically if it's -- let's see if it's audited
20 by our area.
21    Q **Which exhibit are you looking at?**
22    A I'm sorry. I'm looking at Exhibit 31.
23    Q **The beginning Bates number?**
24    A Which page?
25    Q **Scanning all four pages.**

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 210

1     A   I'll look at Exhibit 3.
2     Q   Let me ask you another question.  What's the
3  flood compliance inbox?
4     MR. MEINERTZHAGEN:  Can he just respond to the prior
5  one?
6     THE WITNESS:  The letter was audited internally by
7  Assurant prior to being sent out, but there was no -- I
8  don't see any reference to the letter being audited by
9  Chase employee.
10    MR. RICHTER: Q   Do you have any knowledge relating
11 to that auditing process at Assurant or any
12 decision-making process at Assurant regarding how to
13 respond to the Hofstetter letter?
14    MR. MEINERTZHAGEN:  Object to the form.
15    THE WITNESS:  As far as what they would have
16 included?  I'm not sure I understand.
17    MR. RICHTER:  Q   Right, how to respond.
18    MR. MEINERTZHAGEN:  Same objection.
19    THE WITNESS:  I mean the response would be that they
20 would follow using our policies of what our requirements
21 are for our accounts that are still active and to
22 determine there's flood insurance on the property they
23 would have responded would have been the appropriate
24 response of why we're maintaining flood insurance on this
25 given property.

Page 211

1     MR. RICHTER: Q   You were looking a moment ago at
2  Exhibit 31, Chase 231 to 34.  I noticed on that exhibit
3  at page Chase 233 there's a reference to correspondence
4  has been saved in the flood compliance inbox.  Could you
5  tell me what the flood compliance inbox is?
6     A   I'm sorry.  Which page were you referencing
7  that comment on?
8     Q   It's Chase 233, maybe about 40 percent of the
9  way down.  It's the entry for February 3, 2010,
10 correspondence has been saved in the flood compliance
11 inbox.
12    A   I think that probably relates to the -- I'm
13 going to have to look to see who made that comment to
14 understand the correlation of the comment to the dispute.
15    Q   Are you familiar with something called the
16 flood compliance inbox?
17    A   Generally the flood compliance inbox is used to
18 -- where Assurant can provide documentation to us or
19 potentially send questions to us.
20    Q   Is that another type of database --
21    A   It's just -- basically instead of e-mail being
22 jeffnack@chase.com it's a flood compliance box where
23 Assurant can route to it, it can go to multiple people
24 that have access to it to answer questions or what have
25 you.

Page 212

1     Q   Is that a shared folder that both Chase and
2  Assurant have access to?
3     A   No, it's something that Assurant pushes to
4  Chase.
5     Q   Does Chase receive everything that goes in the
6  flood compliance inbox?
7     A   Yes.
8     Q   Let's move on to Chase 247 to 248.
9        (Exhibit 36 marked as requested)
10    Q   This is a letter from Justin Miller to David
11 and Sheila Hofstetter dated February 2nd, 2010.
12       Do you see that?
13    A   Yes.
14    Q   And now Mr. Miller, he's actually in the escrow
15 administration department at Chase, is that right?
16    A   That is correct.
17    Q   Is he a member of your team?
18    A   He was at that time.
19    Q   Was at that time.  You said he left.  When did
20 he leave?
21    A   I don't recall the exact date of his departure.
22    Q   Do you remember the circumstances of his
23 departure?
24    A   I think he just had another opportunity,
25 another job he took.  I don't recall if it was within

Page 213

1  Chase or not though.
2     Q   Did you review this letter before it was sent?
3     A   I did not.
4     Q   Do you know who did?
5     A   The letter was reviewed by Jennifer Mendez, and
6  she's also in the insurance department.
7     Q   On the second page of the letter there's a --
8  some mice print down at the bottom there, request to
9  close, must pay premium, dash, 06-09.
10       Do you see that?
11    A   I do.
12    Q   This is a form letter that went out?
13    A   It's not a form letter.  Some of our letters
14 have -- we use for maybe similar responses, we may use a
15 template for consistency responses, but it's always
16 depicted on the given questions and the questions are
17 generally -- have enough variety to them there isn't just
18 one letter that satisfies every individual customer's
19 request.
20    Q   If this letter had been presented to you, would
21 you have approved it?
22    MR. MEINERTZHAGEN:  Object to the form.
23    THE WITNESS:  The information is factual, so I guess
24 I would have approved it.  Probably just as in the
25 research case I tend to want to look at the previous

54 (Pages 210 to 213)

CONFIDENTIAL
JEFFREY  NACK 11/10/2010

Page 214

1  correspondence.  I probably would have reviewed that as
2  well along with this.
3      MR. RICHTER:  Q  Let's go to Chase 782, which will
4  be Exhibit 37.
5      (Exhibit 37 marked as requested)
6      Q  Do you have that in front of you?
7      A  Yes.
8      Q  This is a copy of the document that you were
9  looking at a moment ago to refresh your recollection of
10 who approved the Justin Miller letter.
11     A  Yes, it is.
12     Q  And this form was signed by both Mr. Miller and
13 Ms. Menendez, correct?
14     A  Correct.
15     Q  Then there's -- the third column from the right
16 is headed auditor's notes for corrections and it says --
17 well, first the auditor was Ms. Menendez, correct?
18     A  Correct.
19     Q  And the auditor's notes state, please use
20 request to close, must pay premium letter.
21     Do you see that?
22     A  Yes.
23     Q  And the analyst comments are, I believe my
24 custom letter better answered the customer's questions.
25 I have corrected to use the legal must pay premium

Page 215

1  letter, custom's letter previously approved.
2      Do you see that?
3      A  Yes.
4      Q  What did Mr. Miller's custom letter say?
5      A  I don't have a copy of Mr. Miller's first draft
6  letter.
7      Q  Does Chase have a copy of that letter?
8      A  In most cases that would have been overridden
9  with the final letter.
10     Q  What have you done to search for it, or are you
11 aware of anybody else looking for it?
12     MR. MEINERTZHAGEN:  Objection, outside the scope of
13 the 30(b)(6) notice.
14     You can answer if you know based on personal
15 knowledge.
16     THE WITNESS:  I know from -- that we did try to
17 attempt to collect that letter.  We were unable to locate
18 a draft letter.
19     MR. RICHTER:  Q  Do you know why Ms. Menendez
20 decided to reject Mr. Miller's custom letter?
21     A  Without having the actual draft that Mr. Miller
22 has, I can't answer that question.  I would assume it
23 would be for consistency in response to the customer.
24     Q  Have you asked her?
25     A  No, I have not personally asked her.

Page 216

1      Q  Did anybody other than Ms. Menendez, to your
2  knowledge, review the Justin Miller letter?
3      A  Not to my knowledge.
4      Q  Do you know why the letter was unsigned?
5      A  It would have been an error by Justin.  It
6  should have been signed.
7      Q  Is it possible that he didn't sign the letter
8  because he was uncomfortable with it?
9      MR. MEINERTZHAGEN:  Object to the form.  Outside the
10 scope.
11     THE WITNESS:  No, I don't believe that is the case.
12     MR. RICHTER:  Q  Have you asked him?
13     A  I have not asked him.
14     Q  Did you receive a copy of the Justin Miller
15 letter after it was sent?
16     A  I did not.
17     Q  Do you know if anybody else did?
18     A  No.
19     (Exhibit 38 marked as requested)
20     Q  Mr. Nack, the court reporter has just handed
21 you Exhibit 38, NKA 70 to 72.
22     Do you have that in front of you?
23     A  I do.
24     Q  And do you recognize this as a flood insurance
25 dispute letter from Mr. Modersbach to Chase dated May 26,

Page 217

1  2010?
2      A  Give me a second to read the letter to
3  determine what the complaint is.
4      MR. MEINERTZHAGEN:  Ms. Court Reporter, could you
5  reread the question.
6      (Whereupon, the following was read back:
7      "Q  And do you recognize this as a flood
8      insurance dispute letter from Mr. Modersbach to
9      Chase dated May 26, 2010?")
10     MR. MEINERTZHAGEN:  Object.  This is outside the
11 scope of the 30(b)(6) deposition notice.
12     THE WITNESS:  Yes, it references a letter from
13 Mr. Modersbach relating to the flood gap notice.
14     MR. RICHTER:  Q  Who got the letter?
15     MR. MEINERTZHAGEN:  Same objection.
16     THE WITNESS:  Based on the address it would have
17 been sent to Assurant's address.
18     MR. RICHTER:  Q  Do you know if anybody from Chase
19 received the letter?
20     MR. MEINERTZHAGEN:  Same objection.
21     THE WITNESS:  I don't know if it was forwarded to
22 Chase or not.  Typically it would be handled by Assurant.
23     (Exhibit 39 marked as requested)
24     MR. RICHTER:  Q  Mr. Nack, the court reporter has
25 handed you what's been marked as Exhibit 39.

55 (Pages 214 to 217)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 218

1    Do you have that in front of you?
2    A  I do.
3    Q   This is a response to Mr. Modersbach's inquiry
4  dated June 29th, 2010 signed by Katherine Morton,
5  correct?
6    A  Yes.
7    Q   Ms. Morton is identified as an insurance
8  analyst in the insurance department.
9    Do you see that?
10   A  Yes.
11   Q   Is that your insurance department or is that
12  the Assurant insurance department?
13   A   That person is not -- it's not a Chase -- I
14  don't recall that name as being a Chase employee.  I
15  would have to validate if it was an Assurant employee.  I
16  don't have all the Assurant employees' names memorized.
17   Q   Looking at the letter, third paragraph down, it
18  says, According to the terms in Section 5 of your deed of
19  trust, you are required to keep the improvements now
20  existing or hereafter erected on your property insured
21  against any loss or hazards for which your underwriter
22  requires insurance.
23   Do you see that?
24   A  Yes.
25   Q   We looked at the deeds of trust earlier for

Page 219

1  both Mr. Modersbach and Ms. Hofstetter.  Do you recall
2  that?
3    A  Yes.
4    Q   Would it be fair to say that Section 5 says
5  nothing about insurance whatsoever?
6    A   It should be referencing Section 4.  Section 5
7  is typically the deed of trust referenced for your
8  mortgage documents.  That's why it's referenced in
9  Section 5 in this letter, and it is referenced in
10  Section 4 for Mr. Modersbach's deed of trust.
11   Q   At the end of the paragraph it says, This
12  insurance shall be maintained in the amounts that the
13  lender requires, and your lender's requirements can
14  change during the term of your loan.
15   Do you see that?
16   A  Yes.
17   Q   Does it say anywhere in the deed of trust that
18  the lender's insurance requirements can change during the
19  term of the loan?
20   A   It says in Section 4 -- it says, you shall keep
21  the property insured against loss by fire, hazard,
22  included within the term, extend the coverage and any
23  other hazards including flood or flooding for which we
24  require.  Insurance shall be maintained in the amounts
25  and for the periods we require.  It doesn't specifically

Page 220

1  say the policy, doesn't specify the policy.
2    Q   Doesn't specifically state in the deed of trust
3  that the policy coverage requirements can change, the
4  flood insurance requirements can change, is that right?
5    A   No.  It specifies that whatever the amounts
6  that we deem -- I'll just read it again.  The insurance
7  must be maintained in the amounts and for the periods
8  that we require.
9    Q   It doesn't say what we require can change
10  though, right, or anything along those lines?
11   MR. MEINERTZHAGEN:  Object to the form.
12   THE WITNESS:  It doesn't say it won't change.  It
13  just says what we require.
14   MR. RICHTER:  Q   I believe earlier on this morning
15  you indicated that you had some familiarity with the
16  RESPA, the Real Estate Settlement Procedures Act?
17   A   Correct.
18   Q   Are you also familiar with TLA, the
19  Truth-in-Lending Act?
20   A   Not specifically.
21   Q   Are you aware it is unlawful under TLA to
22  change the terms of a home equity credit plan?
23   MR. MEINERTZHAGEN:  Object to the form.  Also
24  outside the scope.  This witness is not being offered to
25  testify concerning what is or is not under required TLA

Page 221

1  as a deposition topic.
2    THE WITNESS:  I have no recollection of that, TLA.
3    MR. RICHTER:  Q   As the insurance department vice
4  president have you received any training concerning the
5  Truth-In-Lending Act?
6    MR. MEINERTZHAGEN:  Same objection.
7    THE WITNESS:  The Truth-In-Landing Act, not
8  specific.  That's more of a production document.
9    MR. MEINERTZHAGEN:  Take a break.
10   (Off the record)
11   MR. RICHTER:  Q   Back on the record.
12   Who is Rita Hillman?
13   A   Rita Hillman reports to me.
14   Q   What's her position?
15   A   She's assistant vice president over the escrow
16  administration functions on the -- on our home equity
17  loans and lines of credit.  She's on the organization
18  chart we went through earlier.
19   Q   Did she formerly go by a different name?
20   A   Rita Jones.
21   Q   There we go.
22   How about Dan Wheeler, who is he?
23   A   Dan Wheeler is an employee of Chase.
24   Q   What's his position?
25   A   I don't know Dan's exact title, but he

56 (Pages 218 to 221)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 222

1  interacts with Assurant on the -- that document the
2  compliance document we interacted with Assurant on that
3  document.
4      **Q   He's an employee of JPMorgan Chase Bank?**
5      A   I don't want to speak to his employee status as
6  far as the exact relationship -- his title or employment.
7      **Q   How about Andrew Barnes, what's his role with
8  Chase?**
9      A   Andrew, he works for Brett Miller.  So on that
10 organization chart he provides the support functions for
11 Assurant relating to mortgage account not our home equity
12 loans or lines of credit.
13     **Q   Douglas Loop, for the record, are you familiar
14 with him?**
15     A   Yes.
16     **Q   What's his position with Chase?**
17     A   He works in the escrow administration
18 department.
19     **Q   Which box?**
20     A   He does not report into my area.
21     **Q   Robert Resh, R-E-S-H, do you know who he is?**
22     A   I recall the name, but I don't have any
23 interaction with him.  I don't know his title.  He
24 doesn't work in escrow administration.
25     **Q   How about Chuck Pursch, do you know who he is,**

Page 223

1  **P-U-R-S-C-H?**
2      A   Again he does not work in escrow
3  administration.  He does -- I don't know what his exact
4  title is today.
5      **Q   Are you a generally with the job functions of
6  Mr. Resh or Mr. Pursch?**
7      A   I am not.
8      **Q   Are you familiar with something called a
9  pending flood research department?**
10     A   The name does not -- procedure does not ring a
11 bell off the top of my head.  Is it in this document?
12     **Q   You're looking at -- Exhibit 3?**
13     A   Yes.
14     **Q   I think you can find a reference to it at
15 Chase 320.**
16     A   No, I'm not familiar with this report.  It
17 references back to the procedures from 2002.
18     **Q   Do you know one way or the other whether
19 pending flood research reports are still sent to Chase
20 relating to flood disputes or property location
21 discrepancies?**
22     A   No, I don't recall that report exists today.
23     **Q   How about flood billing reports?**
24     A   The flood billing report is referencing the
25 billing report that Assurant sends to Chase, and that

Page 224

1  policy, that procedure does exist, they send us a file of
2  accounts where they're billing Chase to pay for the
3  lender-placed premiums and also the refunds for any
4  applicable refunds.
5      **Q   How about PMS management reports, are those
6  still sent to Chase?**
7      A   I can't say if they're sent to Chase or not.
8  They aren't to anyone that I'm familiar with from my
9  group, myself, anyone from my team.
10     **Q   Are you familiar with something called a gap
11 inquiry report?**
12     A   I have to know the context to where you're
13 referring to because we're talking about procedures for
14 some years.
15     **Q   Take a look at Chase 378 in Exhibit 3.**
16     A   I'm sorry.  Was it on 380?
17     **Q   378.  Gap inquiry report.  A weekly report will
18 track the number of calls related to gap coverage.  This
19 information will be reported to Chase on the management
20 report every week.**
21     A   That would be part of their call center
22 reporting, and we previously looked at a exhibit that
23 looked at common cause call codes.  So it wouldn't be
24 just for gap.  It would be all those items for why
25 customers are contacting Assurant regarding any questions

Page 225

1  that they have.
2      **Q   Is that gap inquiry report -- is it sent to
3  Chase?**
4      A   Yes, that should be part of our -- one of our
5  many reports we receive from Assurant.
6      **Q   Do you review it?**
7      A   I don't review that specific report, no.
8      **Q   What types of reports do you review relating to
9  flood insurance?**
10     A   Again, relating to flood insurance, lot of our
11 reports are holistic, not just regarding flood insurance.
12 So lot of our -- some of our metrics are regarding hazard
13 insurance, flooding insurance.  Some of are collectively
14 inclusive, but specific to our home equity loans and
15 lines of credit, most of the reports that I review are
16 relating to the audits that we do of Assurant's work.  So
17 the audits we do of the processing functions they're
18 responsible for, I'm involved with meetings with them
19 regarding their performance as it relates to those
20 audits, and if there's any key service level items that
21 are falling below acceptable measures, those items are
22 discussed with Assurant, but not reviewing every low
23 level report that Assurant sends us.
24     **Q   You indicated that there are -- Chase has
25 metrics for flood insurance, is that right?**

57 (Pages 222 to 225)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 226

1    MR. MEINERTZHAGEN:  Object to the form.
2    THE WITNESS:  We have metrics for monitoring
3  Assurant's performance.  Inclusive of there would -- an
4  example would be we talked about the routes completed, so
5  CCW routes completed within service level would be a
6  metric that we're measuring that did they accomplish it
7  within that timeframe.
8    Our audits would be inclusive of more than just
9  did they complete it timely, but then the accuracy and
10  the quality of that response would be an example of an
11  audit we would do.  Both of those are put together to
12  produce our score -- some of the items that are produced
13  our score card to Assurant's quality.
14    MR. RICHTER:  Q  Are any Chase employees'
15  compensation tied to force-placed flood insurance?
16    MR. MEINERTZHAGEN:  Object to the form of the
17  question.  It's also outside of the scope.
18    He can answer if he knows.
19    THE WITNESS:  No.
20    MR. RICHTER:  Q  Are you familiar with a flood
21  dispute log as referenced at Chase 365?
22    A  Yes.  This log would be inclusive of when
23  Assurant receives a flood zone dispute.  They will log it
24  and fax that to us to respond.  So that's just the daily
25  log to ensure that if they are sending anything to us

Page 227

1  that they have to send us a -- just cover that fax they
2  send us an e-mail saying we're faxing you two documents
3  with flood zone disputes and we'll match it up against
4  the fax received and ensure that we have all the
5  documentation they sent us.
6    Q  And that flood dispute log continues to be sent
7  to Chase as of the present day?
8    A  I would have to check the current procedure to
9  see if we're still using the log.  This is back in 2005
10  when faxing was more common, and I'm -- lot of cases now
11  we use that flood compliance inbox to receive
12  documentation electronically for better controls.
13    Q  Is there still an ITS management report that's
14  generated?
15    A  I would have to review what that report is.
16  I'm not aware of any report that's called that today.
17  Again, procedures and processes have changed quite a bit
18  since this timeframe.
19    Q  Are you familiar with any management reports
20  relating to flood insurance?
21    A  Management reports that Assurant provides to
22  us?
23    Q  Of any type.
24    MR. MEINERTZHAGEN:  Object to the form.
25    MR. RICHTER:  Q  Let's start with the one Assurant

Page 228

1  may or may not send to your team.
2    A  Assurant does provide reporting around a number
3  of accounts that are being tracked.  They provide
4  information regarding a number of lender-based policies.
5  So there are management reports that Assurant provides
6  that we in turn use for our internal management
7  reporting.
8    Q  How about inquiry and escalated logs, are there
9  still reports kept on that?
10    A  The inquiry is really based on CCW at the time
11  referring back to the 2005 procedure.  So it's very
12  outdated to today's environment.  So we don't use -- we
13  use CCW in place of a lot of the faxing and file exchange
14  back and forth.  So inquiries and escalations would be
15  research items we logged in CCW.
16    Q  Why don't you skip ahead to Chase 620.
17    Do you have it?
18    A  There was a number out of order.
19    Q  Are you familiar with any of the reports listed
20  there?  A lot of them have numbers and letters.
21    A  This would be the -- reports, this is an
22  internal Chase procedure referring to the weekly
23  lender-placed billing process.  So this would be
24  performed by a Chase employee.
25    Q  Do you review any of the reports shown here on

Page 229

1  Chase 620?
2    A  These reports would be reviewed by my
3  supervisor and/or the manager so Megan and/or -- and Rita
4  would be reviewing this work.  The only review I do of
5  this process is the -- generally could be the wiring of
6  the funds to pay for the Assurant lender-placed policies.
7    Q  I'm handing you what has been marked as
8  plaintiff's Exhibit 40 and Exhibit 41.  40 being Chase
9  752 through 754 and 41 being 737 through 749.
10    (Exhibit 40 marked as requested)
11    (Exhibit 41 marked as requested)
12    Q  I'll start with Exhibit 40, Bates numbers Chase
13  752 to 754.  This is home equity line of credit training
14  packet.  Do you see that?
15    A  Yes.
16    Q  Then on the second page, Chase 753, at number
17  57 it says what is the minimum number flood insurance
18  required for Chase customers, and it sets out the current
19  insurance requirement as you described it, the lesser of
20  replacement cost value or $250,000.
21    Do you see that?
22    A  Yes.
23    Q  Who is this Training Handy Packet for, who gets
24  this?
25    A  This would be -- this looks like an Assurant.

58 (Pages 226 to 229)

CONFIDENTIAL
JEFFREY NACK 11/10/2010

---

Page 230

1     **Q It looks like an Assurant documentation, not**
2 **for Chase people?**
3     A Looks like its developed for Assurant people.
4     **Q Do you know what's cut off on number 7, on**
5 **Chase 753? Why would we gap a HELOC customer and then**
6 **when the flood and hazard does not match, and then it**
7 **looks like it gets cut off after that?**
8     A I don't know.
9     **Q Looking at the next Exhibit 41, Chase 737 to**
10 **49, is this also training that's provided to Assurant**
11 **employees, or is this something that Chase personnel also**
12 **get this training?**
13     A This would be something that Assurant put
14 together for their Assurant employees. This is geared
15 more towards the customer care representatives that
16 Assurant are handling the Chase home equity loans and
17 lines of credit accounts.
18     **Q Has anybody told you to preserve your e-mails**
19 **and files relating to flood insurance?**
20     MR. MEINERTZHAGEN: Other than conversations with
21 counsel, you can answer that.
22     THE WITNESS: I'm sorry. Repeat the question, have
23 I preserved?
24     MR. RICHTER: Q Has anybody told you to preserve
25 your e-mails and what other files may exist relating to

---

Page 231

1 flood insurance, flood insurance disputes, things of that
2 nature?
3     A Yes, we received an e-mail to preserve the
4 documents.
5     **Q When?**
6     A I don't have the exact date of when that
7 communication was sent.
8     **Q Have you told your assistant VPs and the people**
9 **that work for you to preserve that stuff?**
10     A I personally didn't tell them.
11     **Q What have you done personally to preserve your**
12 **e-mails and other files relating to flood insurance,**
13 **flood insurance disputes and force-placed insurance?**
14     A Well, my e-mails -- my e-mails don't delete so
15 I don't have to do anything to preserve the e-mails.
16     **Q Is that then true as long as you've held your**
17 **current title?**
18     A Yes. I attempt to store all my e-mails for
19 future references.
20     **Q You indicated your e-mails don't delete so**
21 **they're automatically archived?**
22     A Correct.
23     **Q How long are -- Since when have your e-mails**
24 **automatically been archived, just since the lawsuit, or**
25 **has that just been the case by the nature of your**

---

Page 232

1 **position?**
2     A Well, my -- I don't know if it's nature of my
3 position. It's just something that I retain my e-mails
4 for future references. It doesn't mean I don't delete
5 some e-mails that I receive that I shouldn't get.
6     **Q Have you always had that practice of retaining**
7 **your e-mails?**
8     A Always is too long of a term. I've used it at
9 least the last couple of years.
10     **Q Do you know if your employees, the persons that**
11 **report to you, whether their e-mails have been archived**
12 **or saved or otherwise preserved?**
13     A I do not.
14     MR. RICHTER: Seeing it's now quarter to 6:00, we
15 will suspend this deposition for the time being. It's
16 plaintiff's position that because of defendants' failure
17 to produce multiple types of documents that Mr. Nack has
18 -- relating to subjects upon which Mr. Nack has testified
19 here today that we should have the opportunity to
20 redepose him concerning any documents that are later
21 produced and also concerning any documents that are --
22 were improperly withheld on the basis of privilege. But
23 for the time being, we will suspend the deposition.
24     MR. MEINERTZHAGEN: And it's the defendants'
25 position that the deposition is now terminated. Mr. Nack

---

Page 233

1 has been testifying for almost 9-and-a-half hours. The
2 defendants objected to numerous discovery requests
3 propounded by plaintiff for various grounds, including
4 they were irrelevant information, they were overbroad, et
5 cetera.
6     Plaintiffs had an opportunity to have the court
7 resolve any discovery disputes before proceeding with the
8 deposition, they chose to proceed with it anyway. So
9 defendants' position is that they will not be producing
10 Mr. Nack again for deposition, absent a court order
11 directing them to do so in the future.
12     We'll reserve signature, and under the terms of
13 the protective order in this case, which I have provided
14 the court reporter -- you know, should we mark that as an
15 exhibit? Is that okay, Kai, just so the court reporter
16 has access to it?
17     MR. RICHTER: That's fine.
18     MR. MEINERTZHAGEN: Can you just mark the protective
19 order as the final exhibit here.
20     MR. RICHTER: Which will be Exhibit 42 I believe.
21     (Exhibit 42 marked as requested)
22     MR. MEINERTZHAGEN: If you could simply treat the
23 transcript as confidential, the parties are required to
24 do so for 14 days under the protective order, and within
25 that time defendants will designate portions that are to

---

59 (Pages 230 to 233)

CONFIDENTIAL
JEFFREY   NACK 11/10/2010

Page 234

1  remain confidential, and under the protective order we
2  provide you guidance as to how to then bind the
3  separately the privileged sections.
4      MR. RICHTER:  For the record, the 9-and-a-half hours
5  does not include break time or lunch time or any other
6  adjournment time.
7      MR. NICHOLS:  Does include.
8      MR. MEINERTZHAGEN:  Has the reporter been taking
9  note of the time?  Yes.  Thank you.
10     (Off the record at 5:53 p.m.)
11     - - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 236

1      The undersigned is not interested in the within
2  case, nor of kin or counsel to any of the parties.
3      Witness my official signature and seal as
4  Notary Public in and for Cook County, Illinois on this
5  _____ day of _____, A.D.
6  _____.
7
8
      _____
9      CAROL CONNOLLY, CSR, CRR
       CSR No. 084-003113
       Notary Public
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 235

1  STATE OF ILLINOIS  )
                      ) SS:
2  COUNTY OF C O O K  )
3
4      The within and foregoing deposition of the
5  aforementioned deposition was taken before CAROL CONNOLLY,
6  CSR, CRR and Notary Public, at the place, date and time
7  aforementioned.
8      There were present during the taking of the
9  deposition the previously named counsel.
10     The said witness was first duly sworn and was
11 then examined upon oral interrogatories; the questions
12 and answers were taken down in shorthand by the
13 undersigned, acting as stenographer and Notary Public;
14 and the within and foregoing is a true, accurate and
15 complete record of all of the questions asked of and
16 answers made by the forementioned witness, at the time
17 and place hereinabove referred to.
18     The signature of the witness was not waived,
19 and the deposition was submitted, pursuant to Rule 30 (e)
20 and 32 (d) 4 of the Rules of Civil Procedure for the
21 United States District Courts, to the deponent per copy
22 of the attached letter.
23
24
25

Page 237

1      IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
2
3  SHEILA I. HOFSTETTER,       )
   individually, as a          )
4  representative of the class, )
   and on behalf of the general )
5  public,                      )
            Plaintiff,          )
6                               )
        -vs-                    ) CV-10-1313 WHA
7                               )
   CHASE HOME FINANCE, LLC,     )
8  JPMORGAN CHASE BANK, N.A.,   )
   and DOES 1 through 50,       )
9  inclusive,                   )
            Defendants.         )
10
11     I hereby certify that I have read the foregoing
12 transcript of my deposition given at the time and place
13 aforesaid, consisting of Pages 1 to   , inclusive, and I
14 do again subscribe and make oath that the same is a true,
15 correct, and complete transcript of my deposition so
16 given as aforesaid, and includes changes, if any, so made
17 by me.
18
       _____
19     JEFFREY NACK
20
21 SUBSCRIBED AND SWORN TO before me this
22 _____ day of _____, 2010.
23
   _____
24 Notary Public
25

60 (Pages 234 to 237)

# Exhibit 2

# In The Matter Of:

## *SHEILA I. HOFSTETTER*
### *v.*
## *CHASE HOME FINANCE, LLC, et al.*

---

## *DANIEL WHEELER*
### *January 11, 2011*

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

920 Second Ave South
Suite 110
Minneapolis. MN 55402
Phone: 877-489-0367

                 IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA


SHEILA I. HOFSTETTER,          )
individually, as a             )
representative of the class,   )
and on behalf of the general   )
public,                        )
                               )
                Plaintiff,     )
                               )
         -vs-                  )   CV-10-1313 WHA
                               )
CHASE HOME FINANCE, LLC,       )
JPMORGAN CHASE BANK, N.A.,     )
and DOES 1 through 50,         )
inclusive,                     )
                               )
                Defendants.    )


                        CONFIDENTIAL


        The Rule 30(b)(6) deposition of Chase Home
Finance and JPMorgan Chase Bank, corporate designee,
DANIEL WHEELER, taken before CAROL CONNOLLY, CSR, CRR,
and Notary Public, pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, at 330 North
Wabash, Chicago, Illinois, commencing at 9:03 a.m. on the
11th day of January, A.D., 2011.

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 2

1    There were present at the taking of this
2  deposition the following counsel:
3    NICHOLS KASTER, LLP by
     MR. KAI RICHTER
4    4600 IDS Center
     80 South Eighth Street
5    Minneapolis, Minnesota 55402
     (877) 448-0492
6
       appeared on behalf of the Plaintiffs;
7
8    BURKE, WARREN, MACKAY & SERRITELLA, PC by
     MR. STEPHEN R. MEINERTZHAGEN and
9    MS. LeANN PEDERSEN POPE
     330 North Wabash
10   22nd Floor
     Chicago, Illinois  60611
11   (312) 840-7047
12      appeared on behalf of the Defendants.
13
14      - - - - - -
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       DEPOSITION OF
        DANIEL WHEELER
2       January 11, 2011
3              PAGE
4  EXAMINATION BY
5  Mr. Kai Richter          5
6  Mr. Stephen Meinertzhagen          168
7
8       - - - - - - -
9
10       EXHIBITS MARKED
11                 PAGE
12  Deposition Exhibit No. 43          8
    (March 19, 2010 Letter from Dan Wheeler to John
13   Frobose, CHASE 01816-18)
14  Deposition Exhibit No. 44          25
    (Schedule of Confidential Documents Produced January,
15   2011)
16  Deposition Exhibit No. 45          28
    (Master Services Agreement, Dated 8-31-07,
17   CHASE 01546-01637)
18  Deposition Exhibit No. 46          51
    (Compliance PLUS Insurance Agreement,
19   CHASE 01688-01746)
20  Deposition Exhibit No. 47          87
    (Amended and Restated Schedule 1 to Master Services
21   Agreement, CHASE 01646-01687)
22  Deposition Exhibit No. 48          95
    (Amended and Restated Compliance PLUS Insurance
23   Agreement, CHASE 01747-01807)
24  Deposition Exhibit No. 49          103
    (Compliance PLUS Insurance Agency Agreement,
25   CHASE 01809-01811)

Page 4

1  Deposition Exhibit No. 50          104
   (Agreement of Termination, CHASE 01808)
2
   Deposition Exhibit No. 51          110
3  (Plaintiff's Second Set of Requests to Defendants
    for Production of Documents and Things)
4
   Deposition Exhibit No. 52          126
5  (December 31, 2009 Letter Agreement, CHASE 01812-01815
6  Deposition Exhibit No. 53          152
   (Escrow Administration, Monthly Management Book,
7   January, '10, Home Equity, CHASE 01819-01827)
8  Deposition Exhibit No. 54          152
   (Chase, Assurant Home Equity Scorecard, Monthly
9   Performance Evaluation, CHASE  01828-01843)
10 Deposition Exhibit No. 55          154
   (Chase Consumer Loan Servicing, CHASE 01845-01872)
11
   Deposition Exhibit No. 56          157
12 (January, 2010, HELOC, Monthly Summary,
    CHASE 01873-01891)
13
   Deposition Exhibit No. 57          157
14 (Spreadsheet, CHASE  01892-01913)
15
16    PREVIOUSLY MARKED EXHIBITS
17 Deposition Exhibit No. 1          5
   (Plaintiff's Second Amended Notice of Deposition
18   of Chase Home Finance, LLC)
19 Deposition Exhibit No. 2          5
   (Plaintiff's Second Amended Notice of Deposition
20   of JPMorgan Chase Bank, N.A.)
21 Deposition Exhibit No. 8          42
   (Assurant Group, Insurance Tracking Services, User
22   Requirements)
23 Deposition Exhibit No. 9          42
   (Chase Home Equity Portfolio, AssurTrack Procedures,
24   Revised 7/7/05)
25 Deposition Exhibit No. 20          64

Page 5

1       DANIEL WHEELER,
2  called as a witness herein, having been first duly sworn,
3  was examined upon oral interrogatories and testified as
4  follows:
5        EXAMINATION
6     By Mr. Richter:
7     Q   Good morning, Mr. Wheeler.  I'm Kai Richter.
8  I'm one of the attorneys representing Sheila Hofstetter
9  and Rogers Modersbach in the action that they brought
10  against the Chase defendants in case.
11     Do you understand that you're here to testify
12  in connection with a corporate deposition notice that was
13  served on both of the Chase defendants, those being Chase
14  Home Finance, LLC and JP Morgan Chase Bank, N.A.?
15     A   Yes.
16     Q   I'd like to show you the deposition notices
17  that were served in connection with your appearance as a
18  Rule 30(b)(6) corporate representative today, and these
19  were previously used with Mr. Nack when he testified on
20  certain topics as a corporate representative of the Chase
21  defendants.
22        (Plaintiff's Exhibit 1 tendered to the witness)
23        (Plaintiff's Exhibit 2 tendered to the witness)
24     Q   And before we go any further, when I use the
25  term Chase, I'm going to be referring to both of the

2  (Pages 2 to 5)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 6

1  Chase defendants, those being JP Morgan Chase Bank, N.A.
2  and Chase Home Finance, LLC. Will you understand what I
3  mean if I use Chase in that sense?
4      A   Yes.
5          MR. MEINERTZHAGEN: Can I just wait one second?
6          MR. RICHTER: Q For the record, LeAnn Pedersen Pope
7  has now entered the room as well.
8          Mr. Nack, I'd like you to turn to both of the
9  deposition notices, and I'd like you to take a look at
10 the matters for examination. Do you see they're numbered
11 1 through 10 in both deposition notices?
12     A   Yes. And I'm Mr. Wheeler.
13     Q   I'm sorry. Still have Mr. Nack on the brain
14 apparently.
15         I'd like you to turn to topics 8 and 9. Let's
16 take a look at number 8. The relationship between
17 defendants and American Security Insurance Company, JP
18 Morgan Insurance Agency, Inc., Chase Insurance Agency,
19 Inc., or any other company involved in the purchase,
20 procurement, maintenance, issuance or extension of any
21 flood insurance policy.
22         Do you see that?
23     A   I see that.
24     Q   Do you have knowledge regarding that topic?
25     A   I have knowledge, yes.

Page 7

1      Q   Are you here to testify today on that topic,
2  sir?
3      A   I'm here to testify to my knowledge on that
4  topic.
5      Q   Also topic number 9, the financial incentives
6  to defendants or their affiliates or any insurance
7  company in connection with requiring a force-placing
8  insurance coverage?
9      A   Yes.
10         MR. MEINERTZHAGEN: Kai, I think Mr. Knack actually
11 testified concerning topic number 8, and pursuant to my
12 November 3rd letter, Mr. Wheeler is only being preferred
13 to testify to topic number 9. I understand there's some
14 crossover, so why don't you just proceed and we'll
15 address that if we need to.
16         MR. RICHTER: Q Do you consider yourself qualified
17 to answer questions on behalf of both of those topics?
18         MR. MEINERTZHAGEN: Object to form of the question.
19         THE WITNESS: I consider myself to be qualified to
20 answer questions with respect to item number 9 most
21 definitely, and I have general knowledge of information
22 relative to question 8.
23         MR. RICHTER: Q Which Chase entity or affiliates
24 do you currently work for?
25     A   Currently work for Chase Insurance Agency, Inc.

Page 8

1      Q   Do you work for any other companies in the
2  Chase family of companies?
3      A   No.
4          (Exhibit 43 marked as requested)
5      Q   Mr. Nack, the court reporter has just handed
6  you what's been marked as Plaintiff Exhibit 43, Chase
7  1816 through 1817.
8          Do you have those pages in front of you, sir?
9      A   Yes, and again it's Mr. Wheeler.
10     Q   Mr. Wheeler, you see that these three letters
11 are signed by you on behalf of Chase Home Finance, LLC?
12     A   Yes.
13     Q   Do you also hold a position with respect to
14 Chase Home Finance, LLC?
15     A   I report in to Chase Home Finance.
16     Q   What do you mean by that?
17     A   My boss is Robert Seginini.
18     Q   How do you spell his name?
19     A   S-E-G-I-N-I-N-I. And he is the CFO for
20 servicing and default of Chase Home Finance.
21     Q   You consider him your boss?
22     A   Yes.
23     Q   Is Chase Insurance Agency, Inc. a wholly-owned
24 subsidiary of Chase Home Finance, LLC?
25     A   No.

Page 9

1      Q   Does Chase Home Finance, LLC own a majority
2  stake in Chase Insurance Agency, Inc.?
3      A   No.
4      Q   Who are the officers of Chase Insurance Agency,
5  Inc.?
6      A   I'm an officer of Chase Insurance Agency, Inc.,
7  vice president.
8      Q   Are there any other --
9      A   There are other officers, but I don't know
10 exactly who they would be. I can venture a guess, Dave
11 Barrell. D-A-V-I-D, B-A-R-R-E-L-L.
12     Q   Who sits on the board of directors of Chase
13 Insurance Agency, Inc.?
14     A   I don't know.
15     Q   Which Chase entity cuts your paychecks?
16     A   Chase Insurance Agency, Inc.
17     Q   How long have you worked for Chase Insurance
18 Agency, Inc.?
19     A   Approximately -- little over 12 years. The
20 entities have merged over the years, the names may have
21 changed, but they're one in the same.
22     Q   JP Morgan Insurance Agency, Inc., was that one
23 of the previous names?
24     A   Yes, it was.
25     Q   When did the name change from JP Morgan

3 (Pages 6 to 9)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 10

1 Insurance Agency, Inc. to Chase Insurance Agency, Inc.
2 take place?
3     MR. MEINERTZHAGEN: Object to the form, lack of
4 foundation.
5     THE WITNESS: 12-31-08.
6     MR. RICHTER: Q And does JP Morgan Insurance
7 Agency, Inc. continue to function as a company or has it
8 ceased to exist?
9     A  Would you repeat the question, please?
10    Q   Does JP Morgan Insurance Agency, Inc. continue
11 to exist as a company or does it cease to exist under
12 that name?
13    A  It's been -- it ceases to exist under that
14 name. It was not dissolved. It's merged into Chase
15 Insurance Agency, Inc.
16    Q   Are there any other names than JP Morgan
17 Insurance Agency, Inc. and Chase Insurance Agency, Inc.
18 that the company that you've worked for the last 12
19 years has gone under?
20    MR. MEINERTZHAGEN: Object to the form.
21    THE WITNESS: I don't recall. We --
22    MR. RICHTER: Q  Go ahead.
23    A  We have had other legal agency entities. I
24 cannot speak specific to what they were utilized for, but
25 we have had Chase Manhattan Insurance Agency, Inc. and I

Page 11

1 believe Chase Agency Services.
2     Q   Going back to Deposition Exhibit 43. Have you
3 signed other letters and correspondence in the past on
4 behalf of Chase Home Finance, LLC?
5     A  I may have.
6     Q   In your mind is there anything improper about
7 you signing correspondence on behalf of Chase Home
8 Finance, LLC?
9     MR. MEINERTZHAGEN: Object to the form.
10    THE WITNESS: I don't believe so as a representative
11 of Chase Home Finance.
12    MR. RICHTER: Q  Were you fully authorized by Chase
13 Home Finance, LLC to send these three letters that are in
14 Deposition Exhibit 43?
15    A  Yes.
16    Q   And you're fully authorized on behalf of Chase
17 Home Finance, LLC and JP Morgan Chase Bank, N.A. to
18 testify on behalf of both companies here today, is that
19 right?
20    A  Would you repeat that, please?
21      (Question read)
22    A  Yes.
23    MR. MEINERTZHAGEN: Object to the form.
24    MR. RICHTER: Q  What business address do you work
25 out of?

Page 12

1     A  Currently 812 Robert Dean Drive.
2     Q   Which city?
3     A  Downingtown, Pennsylvania.
4     Q   Have you ever worked out of Columbus?
5     A  No.
6     Q   Over what functional areas do you have
7 responsibility?
8     A  I have responsibility for the lender-placed
9 reinsurance program, lender-placed insurance agreements,
10 structure and negotiations of those agreements.
11    Q   What's the lender-placed reinsurance program?
12    A  We reinsure lender-placed hazard.
13    Q   Is that renewing policies or something else?
14    A  It's something else.
15    Q   Okay. What is the something else?
16    A  The underwriting company in this case Assurant
17 cedes a portion of the premium and losses to our captive.
18    Q   Who is the captive?
19    A  Bank One Insurance Company.
20    Q   That's for hazard only or both hazard --
21    A  That's for hazard only.
22    Q   What are your day-to-day job duties?
23    A  Around the reinsurance program I am responsible
24 for managing that exposure. It's a quarter share
25 reinsurance program so we have a proportionate share of

Page 13

1 losses associated with that program. Strategic planning,
2 forecasting, reconciliation, risk management associated
3 with the reinsurance program, relationship manager with
4 Assurant in this capacity as it relates to the
5 reinsurance program.
6     Q   What responsibilities do you have with respect
7 to flood insurance or lender-placed flood insurance?
8     A  Structuring, negotiating, maintenance of the
9 contracts as they relate to the agency contracts.
10    Q   Who are Chase Insurance Agency's clients or
11 client?
12    A  In the context of the question, I'm not sure
13 that -- well, our clients are our lines of business, and
14 historically it's taken different forms over the course
15 of the years.
16    Q   Lines of business for Chase?
17    A  What we refer to as lines of business, Chase
18 Home Lending, Chase Auto Finance. We don't write
19 business directly within the agency. We're not
20 marketing.
21    Q   In other words, individual homeowners don't
22 come up to Chase Insurance Agency, Inc. and say, I'd like
23 a policy from Chase Insurance Agency, Inc., is that
24 right?
25    A  That's correct, in today's environment. It

4 (Pages 10 to 13)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 14

1  wasn't always like that.
2     Q   So is it fair to say that with respect to flood
3  insurance the only insurance policies that Chase
4  Insurance Agency, Inc. is involved with are lender-placed
5  policies, is that right?
6     A   That's correct.
7     Q   And the only lender that those lender-placed
8  policies are placed on behalf of is Chase, is that right?
9     A   That's correct.
10    Q   Does Chase exercise significant control over
11 the business operations of Chase Insurance Agency, Inc.?
12    MR. MEINERTZHAGEN:  Object to the form.
13    THE WITNESS:  I really don't know how to answer
14 that.
15    MR. RICHTER:  Q   What types of management controls
16 does Chase exercise over Chase Insurance Agency, Inc.?
17    MR. MEINERTZHAGEN:  Object to the form.
18    THE WITNESS:  There are financial oversights for
19 Chase Insurance Agency, Inc. I can't speak to specifics
20 in terms of oversights of Chase Insurance Agency, Inc.
21    MR. RICHTER:  Q   You indicated that -- is it
22 Mr. Barnett or Barrell --
23    A   Barrell.
24    Q   He's also an officer of Chase Insurance Agency,
25 Inc.?

Page 15

1     A   Yes.
2     Q   Does he also report to somebody within Chase
3  Home Finance, LLC?
4     A   I don't believe so.
5     Q   Do you know one way or the other?
6     A   I know who he reports to.  I don't know what
7  line of business that she may be attached to.
8     Q   Who does he report to?
9     A   Corinne Burger.  I believe it's B-U-R-G-E-R.
10    Q   You indicated that Chase exercises financial
11 oversights over Chase Insurance Agency, Inc.  Could you
12 describe those financial oversights for me?
13    MR. MEINERTZHAGEN:  Object to the form.
14    THE WITNESS:  I'm not directly involved in the
15 oversight so I could not explain those.
16    MR. RICHTER:  Q   What did you have in mind?
17    A   The reporting relationships, Corinne Burger is
18 senior executive of finance.  Obviously there's
19 oversights, there's governance, there's legal oversights,
20 there are requirements for statutory filings on an annual
21 basis, they're audited.  I just don't have specific --
22    Q   All of those oversights, financial oversights,
23 governance oversights, legal oversights, audit
24 oversights, all of those are oversights performed by
25 Chase over Chase Insurance Agency, Inc., correct?

Page 16

1     A   Correct.  We also work with -- correct.
2     Q   Who do you also work with?
3     A   Can you be more specific?
4     Q   Well, you stopped your answer in midstream, and
5  you said we also work with and then you stopped, so I'm
6  wondering what you were going to say.
7     MR. MEINERTZHAGEN:  Object to the form.
8     THE WITNESS:  You'd have to take me back to what the
9  question was and when I responded or how I responded to
10 know where you're coming from.
11    MR. RICHTER:  Can you read back that portion of the
12 question and the testimony?
13    (Whereupon, the following was read back:
14    "Q  All of those oversights, financial
15    oversights, governance oversights, legal
16    oversights, audit oversights, all of those are
17    oversights performed by Chase over Chase
18    Insurance Agency, Inc., correct?:
19    "A  Correct.  We also work with -- correct."
20    THE WITNESS:  My reference was simply going to be
21 external -- you know, external audit.  We work with
22 captive management.
23    MR. RICHTER:  Q   You were discussing your reporting
24 relationship with your boss a little while back.  I want
25 to make sure I get this name right.  Is it Mr. Seginini?

Page 17

1     A   Seginini.
2     Q   Which office does Mr. Seginini work out of?
3     A   Columbus.
4     Q   How frequently do you communicate with him?
5     A   At least weekly, sometimes several times a day.
6     Q   What form do those communications take?
7     A   Conference calls, staff meetings.
8     Q   Do you have a regular weekly conference call or
9  something like that?
10    A   Have a weekly staff meeting.
11    Q   Are those telephonic or does everybody get
12 together in the same place?
13    A   They're telephonic.
14    Q   Who participates in the weekly staff meeting?
15    A   Bob's direct reports.
16    Q   Who are?
17    A   I don't know all the direct reports.
18    Q   Would those direct reports also include
19 Mr. Nack?
20    A   No.
21    Q   Are you familiar with any of the persons other
22 than yourself and Mr. Seginini who participate on these
23 conference calls and weekly meetings?
24    A   Yes.
25    Q   Who are you familiar with?

5 (Pages 14 to 17)

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 18

1    A   Mark Stamfer.
2    Q   What's his position?
3    A   Not exactly sure what his title is.  Vice
4  president.
5    Q   For which company?
6    A   Chase Home Finance.
7    Q   Are you familiar with anybody else who
8  participates on the conference calls and weekly meetings?
9    A   Primarily first names, and since I don't reside
10  in Columbus, I don't have a direct working relationship.
11    Q   Are all of the other people who participate in
12  these weekly meetings and conference calls that you are
13  aware of, are they all -- do they all hold positions with
14  Chase Home Finance, LLC?
15    A   To my knowledge, yes.
16    Q   Are there any quarterly or year-end meetings
17  that you also attend?
18    A   There are quarterly meetings of a town hall
19  nature where Bob and his direct reports and their direct
20  reports come together, you know, in -- in a conference
21  call.  There are occasional strategic planning sessions.
22    Q   Do you travel to Columbus from time to time to
23  meet Mr. Seginini or other people from Chase Home
24  Finance, LLC?
25    A   From time to time.

Page 19

1    Q   How often?
2    A   Not on a regular basis.
3    Q   Do you also have e-mail correspondence with
4  Mr. Seginini?
5    A   Yes.
6    Q   Would some of that e-mail correspondence
7  include correspondence relating to flood insurance or
8  business relationships involving flood insurance or
9  contracts involving flood insurance?
10    A   It could.
11    Q   Are there notes kept of the weekly telephonic
12  meetings by yourself or others?
13    A   I believe minutes of the meetings are taken,
14  but I can't be certain.
15    Q   Is there a person who is designated at the
16  meeting to record the minutes of those meetings?
17    A   If there is it would be Susan Kidwell, that is
18  Bob Seginini's administrative assistant.
19    Q   And do those meetings also touch on issues
20  relating to flood insurance?
21    A   Probably not.
22    Q   As you sit here today, can you testify with
23  certainty that none of the meeting discussions have
24  related to flood insurance in any way?
25    A   I can't be 100 percent certain that I would not

Page 20

1  have provided a status of a discussion, but typically
2  that would not take place in the staff meeting.
3    Q   Where would that type of discussion typically
4  take place or how would it take place?
5    A   Between Bob and myself.  We typically during
6  the staff meeting discuss -- as we go around the table
7  discuss things that are of specific interest to all
8  parties, and that's why it would be rare that -- I can't
9  recall a discussion in a staff meeting regarding
10  lender-placed flood.
11    Q   Who are your direct reports?
12    A   I have no direct reports.
13    Q   How many people work for Chase Insurance
14  Agency, Inc.?
15    A   That number has changed over the years.  Today
16  I believe it's -- there might be 11.
17    Q   Was it roughly the same number of people who
18  worked for JP Morgan Insurance Agency, Inc.?
19    A   There would have been more.
20    Q   Who are the 11 people who work for Chase
21  Insurance Agency, Inc.?
22    A   I couldn't name them all.  I could tell you
23  people I work directly with.
24    Q   Let's go with those.
25    A   David Barrell, his administrative assistant is

Page 21

1  Reba Huff.  Pam La Lively, and I can't spell the last
2  name, but Marlene -- I've got it in a iPhone if you want
3  a spelling of the last name, but, otherwise, I can't help
4  you.  It's Marlene P.
5    Q   What are Marlene's functions with Chase
6  Insurance Agency, Inc.?
7    A   I don't know all of her functions.  I work with
8  her in the capacity of the reinsurance programs.  I know
9  she works on statutory filings and account
10  reconciliations, and Pam does as well.
11    Q   Do either of them handle any insurance issues
12  relating to flood insurance?
13    A   They are involved in the receipt of commissions
14  associated with lender-placed flood.
15    Q   Have you ever held any other positions within
16  the Chase family of companies?
17    MR. MEINERTZHAGEN:  Object to the form.
18    THE WITNESS:  I've always been with Chase Insurance
19  Agency.  When I began with the organization, I was in a
20  position to source products, review structure, negotiate
21  some personal insurance contracts, act in a consultive
22  capacity.
23    MR. RICHTER:  Q   At that time when you started, did
24  you perform services or functions in connection with
25  individual homeowners or insureds?

6 (Pages 18 to 21)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 22

1    A   Not directly.
2    Q   When you say when you began you were in a
3 position to source products, review structure and
4 negotiate personal insurance products, could you explain
5 what you mean by those three things?
6    A   There were a number of us that had roles based
7 upon our expertise.  Mine was personal insurance, and so
8 my role -- one of my roles was to seek out vendors,
9 insurance carriers who might be able to provide products
10 to support the bank customers, negotiate the terms of
11 those agreements.
12   Q   Are you a licensed insurance agent?
13   A   No.
14   Q   What's your educational training and
15 background?
16   A   BS in business administration.
17   Q   From where?
18   A   Illinois State University.
19   Q   Have you received any formal education since
20 graduating from Illinois State?
21   A   Not through an educational institution.
22   Q   Have you taken any other types of courses or
23 received any other type of training since graduating from
24 Illinois State?
25   A   Not other than company-sanctioned, you know,

Page 23

1 courses.
2    Q   Have those company-sanctioned courses been in
3 the insurance area?
4    A   Generally not, no.
5    Q   What year did you graduate from Illinois State,
6 by the way?
7    A   1974.
8    Q   If I recall your testimony correctly you said
9 you have been working for Chase Insurance Agency Inc. and
10 its predecessor names for the last 12 years, is that
11 right?
12   A   That's correct.
13   Q   So that would take us back to 1998 or 1999 if
14 I'm doing my math correctly.  What did you do between '74
15 and '98, '99 when you started at Chase Insurance Agency,
16 Inc. or its predecessor?
17   A   I graduated from college, '74, '76, worked for
18 State Farm Insurance as a health underwriter.  And then
19 '76 through 1995 I worked for either Trans America or a
20 company that was spun off from Trans America in both an
21 underwriting capacity and in a marketing capacity, both
22 personal lines.
23       Then from '95 through '98 I worked for Cigna
24 marketing personal lines.  The marketing that took place
25 in all cases was through independent agents.

Page 24

1    Q   When you say personal lines, what do you mean
2 by that?
3    A   Automobile -- personal automobile, personal
4 homeowners.  Fire, personal.  I helped -- I held
5 different capacities at Trans America.  I was -- started
6 out as an underwriter, services supervisor, services
7 manager and went in the field in marketing personal
8 lines, became zone marketing manager and then became
9 director of marketing and sales nationally.
10   Q   Have you ever had your deposition taken before?
11   A   Many years ago.
12   Q   Was that with one of these other companies
13 or --
14   A   Yes, it was.
15   Q   Have you ever had your deposition taken while
16 working at Chase Insurance Agency, Inc. or any of its
17 predecessors?
18   A   No.
19   Q   Have you done anything to prepare for your
20 deposition today?
21   A   Spoken with counsel.
22   Q   Have you reviewed any documents?
23   A   I have reviewed some contractual documents.
24   MR. RICHTER:  Steve, is that the binder of
25 documents?

Page 25

1    MR. MEINERTZHAGEN:  It is.  They're all documents --
2 I can give you or I can give you the index.  It's just
3 all of the contracts.  I'm not even sure he looked at
4 them, but they were available to him.
5    MR. RICHTER:  Let me see.  Let's mark index as
6 Exhibit 44.
7       (Exhibit 44 marked as requested)
8    MR. RICHTER:  Actually, Steve, can you just confirm
9 on the record that Exhibit 44 is the index of the
10 documents to the binder that you and Mr. Wheeler
11 reviewed?
12   MR. MEINERTZHAGEN:  I can confirm that this is the
13 index that goes with the documents that were available to
14 Mr. Wheeler.  I don't believe he did review all of them,
15 but --
16   MR. RICHTER:  Q  Who hired you in your current
17 position?
18   A   Joe Picarello.
19   Q   Can you spell his last name for me?
20   A   I believe it's P-I-C-A-R-E-L-L-O.
21   Q   Did he work for Chase Home Finance, LLC?
22   A   No.
23   Q   Who did he work for?
24   A   Chase Insurance Agency, Inc.
25   Q   Do you currently have a direct report that is

7 (Pages 22 to 25)

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 26

1  somebody that you report to directly within Chase
2  Insurance Agency, Inc.?
3      A   No.
4      Q   Do you consider yourself the head or the leader
5  of Chase Home Insurance Agency, Inc.?
6      MR. MEINERTZHAGEN:  Object to the form.
7      THE WITNESS:  No.
8      MR. RICHTER:  Q   Who do you consider the head or
9  the leader of Chase Home Insurance Agency, Inc.?
10     MR. MEINERTZHAGEN:  Same objection.
11     THE WITNESS:  I would probably say David Barrell.
12     MR. RICHTER:  Q   What office does Mr. Barrell work
13  out of?
14     A   Delaware.
15     Q   What functions does he perform for Chase
16  Insurance Agency, Inc.?
17     A   He's the comptroller.  The role of the
18  individuals in the agency is -- it's financial,
19  accounting, reinsurance.
20     Q   What functions does Chase Insurance Agency,
21  Inc. perform with respect to flood insurance?
22     A   I would say no function.
23     Q   And was that also true of JP Morgan Insurance
24  Agency, Inc.?
25     A   Yes.  Other than what I've already testified

Page 27

1  to.
2      Q   So would it be fair to say that neither Chase
3  Insurance Agency, Inc. or JP Morgan Insurance Agency,
4  Inc. monitor or track flood insurance coverage?
5      A   That is correct.
6      Q   Neither JP Morgan Insurance Agency, Inc. nor
7  Chase Insurance Agency, Inc. issue flood insurance
8  coverage?
9      A   That's correct.
10     Q   Neither JP Morgan Insurance Agency Inc. or
11  Chase Insurance Agency, Inc. obtain insurance coverage?
12     A   That's correct.
13     MR. RICHTER:  Why don't we take 5 minutes.
14     (Off the record)
15     MR. RICHTER:  Q   Back on the record.
16     I believe during your earlier testimony you
17  said you were involved with structuring, negotiating and
18  maintenance of contracts relating to lender-placed
19  insurance.  Do I have that right?
20     A   Yes.
21     Q   In each of those three areas, structuring,
22  negotiating and maintenance, can you give me some more
23  detail in terms of what your duties and functions have
24  been?
25     A   I've been the program manager for close to ten

Page 28

1  years now, and in that capacity, you know, I have been in
2  contact on a regular basis with Assurant and in contact
3  with our servicing team relative to any needs they may
4  have regarding product, regarding service.  So as issues
5  will surface I'll circle back around with Assurant and
6  see what they're able to do for us, what their terms are
7  and then incorporate that into a -- in consult with our
8  legal counsel, incorporate that into our contracts.
9      So based upon need we're able to amend our
10  contracts, we'll negotiate and structure that with
11  Assurant and our legal counsel and then we'll execute
12  those agreements.
13     Q   Let's mark this 45.
14     (Exhibit 45 marked as requested)
15     Q   Mr. Wheeler, the court reporter has just handed
16  you what's been marked as Exhibit 45, Master Services
17  Agreement Between JP Morgan Chase Bank, National
18  Association and American Security Insurance Company and
19  Standard Guaranty Insurance Company dated August 31st,
20  2006 with some attachment schedule -- with an attached
21  Schedule 1 and some exhibits.
22     Do you have that in front of you?
23     A   Yes.
24     Q   Are you familiar with this document?
25     A   I have general knowledge of this document, yes.

Page 29

1  files?
2      Q   Do you have a copy of this document in your
3      A   Yes.
4      Q   How did you obtain it?
5      A   It was likely distributed to me either by
6  Assurant or by our sourcing department.  Our vendor
7  contracts, supply side contracts are retained in
8  sourcing.
9      Q   When you say our sourcing department, where
10  does the sourcing department reside?
11     A   I believe they're in Columbus as well.
12     Q   When you refer to our sourcing department,
13  you're referring to the Chase Home Finance, LLC sourcing
14  department?
15     A   That's correct.  They're a member of the
16  sourcing department assigned to various business lines,
17  but in this case it would be home finance.
18     Q   What was the purpose of this Master Services
19  Agreement?
20     A   The purpose of the Master Services Agreement is
21  really a broad agreement between Chase and the vendors
22  that we do business with outlining basic terms and
23  conditions and the requirements that they must meet of
24  Chase in order to do business with Chase.  And then
25  attached to this agreement is I believe what we call a

8 (Pages 26 to 29)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 30

1   Schedule 1.
2       Q   Is that beginning at page 1604?
3       A   This is Schedule 1 is what we referred to as
4   our outsourcing agreement which defines all of our
5   specific vendor placed requirements, service level
6   requirements, performance penalties, if any, and should
7   contain fee structure based upon services performed, what
8   our fee structure is to pay to Assurant per loan per
9   month.
10      Q   Looking at the first page of this document, it
11  says it's dated August 31st, 2006.
12          Do you see that?
13      A   Yes.
14      Q   Then turning to the next page, Chase 1547, it
15  refers to an agreement effective date of the same date,
16  August 31st, 2006.
17          Do you see that?
18      A   Yes.
19      Q   And was that, in fact, the effective date of
20  this master services agreement?
21      MR. MEINERTZHAGEN:  Object to the form.
22      THE WITNESS:  I believe, yes.
23      MR. RICHTER:  Q   And is this Master Services
24  Agreement still in effect?
25      A   Yes.  It likely has been amended since 2006,

Page 31

1   particularly as respects Schedule 1.
2       Q   I'd like you to turn your attention to the
3   second page of the document, Chase 1547 at Section
4   1.1(A).  It says there, this agreement represents the
5   terms and conditions pursuant to which American Security
6   Insurance Company and Standard Guaranty Insurance Company
7   and their affiliates shall provide services to JP Morgan
8   Chase Bank, National Association and its affiliates.
9           Do you see that?
10      A   Yes.
11      Q   What services were provided pursuant to this
12  agreement?
13      A   This specific agreement would have attached
14  itself to lender-placed program.
15      Q   Including lender-placed flood insurance?
16      A   Correct.
17      Q   Then turning to page 1552, at Section 4.1,
18  third line, it says, supplier will present JPMC -- that
19  refers to JP Morgan Chase Bank, N.A., correct?
20      A   Correct.
21      Q   -- with an invoice for the fees and expenses
22  due and owing pursuant to each schedule for the preceding
23  month.
24          Do you see that?
25      A   Yes.

Page 32

1       Q   And so the payments were made for the services
2   that you've described by JP Morgan Chase Bank, correct?
3       A   The fees were likely paid -- I can't say for
4   certain.  The fees were likely paid by Chase Home
5   Finance.  The check may have been cut by the bank, but I
6   don't have any personal knowledge of the invoicing and
7   payment other than the fees that were assessed.
8       Q   And looking back to Section 1.1 on page 1547,
9   those services were provided to JP Morgan Chase Bank and
10  its affiliates, including Chase Home Finance, LLC,
11  correct?
12      MR. MEINERTZHAGEN:  Object to the form.
13      THE WITNESS:  Where is the reference 1547?
14      MR. RICHTER:  Q   At 1.1(A).
15      A   Yes.  I can't testify with certainty as to what
16  other invoices may have been submitted or paid outside of
17  outsourcing attached to this agreement.
18      Q   The last -- well, on page 1571, before we get
19  to the exhibits and schedule, it shows that the agreement
20  is signed by Heidi M. Carter on behalf of JP Morgan Chase
21  Bank, National Associates.
22          Do you see that?
23      A   I do.
24      Q   Who is she?
25      A   She's in global sourcing, global sourcing

Page 33

1   servicing.  She was directly involved in negotiating a
2   Master Services Agreement with Assurant.
3       Q   That's the global servicing department of
4   JP Morgan Chase Bank?
5       A   Yes.
6       Q   Do you work with her at all or have you ever
7   worked with her?
8       A   I've worked with Heidi, I know Heidi.
9       Q   And what types of things have you worked with
10  her on?
11      A   Contracts.
12      Q   Including this one?
13      A   To a very lesser extent.  More on the outside
14  looking in.  I was involved in some of the meetings.
15  Most of the Master Services Agreement is nonnegotiable
16  with our vendors in terms of what our requirements are.
17      Q   So you were involved in some of the negotiating
18  meetings related to the Master Services Agreement?
19      A   Very few.  I was involved in some of the
20  meetings, and I probably -- going back to '06 I was
21  probably involved in some of the -- as a participant, not
22  as a leader in the negotiations.
23      Q   Who else was involved in the negotiations
24  relating to the Master Services Agreement in addition to
25  Ms. Carter, Mr -- is it Frobose and then yourself?

9 (Pages 30 to 33)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 34

1   A   It would have been legal counsel.
2   Q   Anybody else?
3   A   And there likely were members of the servicing
4   team. I can't testify to, you know, individual meetings
5   or a content, but likely Jeff Madduck and Terry Smith
6   would have been involved in some of those meetings with
7   Heidi. Clearly, with respect to Schedule 1, they would
8   have been directly involved.
9       Q   Let's go to Schedule 1, beginning at page
10  J1604.
11      Do you have that in front of you?
12  A   Yes.
13      Q   Now, this Schedule 1 is an agreement between
14  Chase Home Finance, LLC and American Security Insurance
15  Company and Standard Guaranty Insurance Company, correct?
16  A   Correct.
17      Q   It's also part of the Master Services Agreement
18  between JP Morgan Chase Bank and American Security
19  Insurance Company and Standard Guaranty Insurance
20  Company, correct?
21  A   And their affiliates, yes.
22      Q   What was the purpose of Schedule 1?
23  A   As I mentioned earlier, this represents our
24  outsourcing agreement, defines the functions and services
25  that will be outsourced and performed by the vendor in

Page 35

1   this case, which is Assurant Companies, American Security
2   and Standard Guaranty Insurance Company with respect to
3   the lender-placed programs.  It will include service
4   level requirements, it will include fees associated with
5   the services.  If there were any performance penalties,
6   that will be included.  This represents Chase Home
7   Finance's needs relative to lender placement and the
8   requirements made of Assurant to meet those needs.
9       Q   Now, you use the term Assurant, and the
10  agreement is with ASIC and Standard Guaranty Insurance
11  Company.
12  A   They're affiliated companies of Assurant.
13      Q   Now, this Schedule 1 at the end of paragraph 1,
14  it says it's effective as of January 1, 2007.
15      Do you see that?
16  A   I do.
17      Q   The Master Services Agreement I believe you
18  testified was effective August 31, 2006.  Do you recall
19  that?
20  A   Yes.
21      Q   What were the terms of the servicing
22  arrangement between Chase and Assurant and its affiliates
23  between the August 31, '06 timeframe and the January 1,
24  '07 timeframe?  Were they the same as this Schedule 1 or
25  was there some difference?

Page 36

1   A   They were likely the same as Schedule 1.  The
2   Master Services Agreement was something new that we put
3   in place for all of our vendors.
4       Q   So would it be fair to say then that this
5   Schedule 1 memorialized the parties' existing outsourcing
6   arrangement at that time?
7   A   I would say that's a fair statement, yes.
8       Q   Let's go to Section 3.1 on page Chase 1607.  It
9   says, the servicer shall provide for servicer automated
10  and manual services for the monitoring of acceptable
11  insurance for eligible properties and the processing of
12  insurance documents or data covering mortgage loans to
13  determine whether mortgagors have obtained and are
14  continuing to maintain acceptable insurance as required.
15  A basic description of the services to be provided by
16  supplier includes, but may not be limited to, the
17  following, and then there are some Romanettes, Romanettes
18  1 through 7.
19      Do you see that?
20  A   Yes.
21      Q   Does that Section 3.1 accurately set forth the
22  outsourcing services that were provided by ASIC in
23  connection with Schedule 1?
24      MR. MEINERTZHAGEN:  I'm going to object to the
25  scope.  This witness as I said earlier is being offered

Page 37

1   to testify concerning topic number 9, which is the
2   financial incentives to defendants, their affiliates,
3   and/or any other insurance company in connection with
4   requiring a forced placing insurance coverage on home
5   equity flood loans, and he's not being offered to testify
6   concerning the specifics of the outsourcing that Assurant
7   or its related entities did for Chase.
8       He can go ahead and answer based on his
9   personal knowledge, but not as a corporate representative
10  of the defendants.
11      MR. RICHTER:  Can you read back the question.
12      (Whereupon, the following was read back:
13      "Q  Does that Section 3.1 accurately set
14      forth the outsourcing services that were
15      provided by ASIC in connection with
16      Schedule 1?")
17  THE WITNESS:  Yes.
18      MR. RICHTER:  Q   Then at the end of Section 3.1 it
19  says, additional information detailing these functions,
20  service levels, reporting, responsibilities and
21  accountabilities are set forth in the outsourcing
22  processing service standards in Exhibit A.
23      Do you see that?
24  A   Yes.
25      Q   Then -- that Exhibit A refers to Chase 1613

10  (Pages 34 to 37)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 38

1  through 37, correct?
2      A  Correct.
3      Q  Going back to page 1607, it indicates that
4  among the services that the supplier is to perform --
5  let's start there.  Supplier, that refers to ASIC, is
6  that right?
7      MR. MEINERTZHAGEN:  Same objection.  Outside the
8  scope.
9      THE WITNESS:  Yes.
10     MR. RICHTER:  Q  And one of those functions or
11 services is to determine whether mortgagors have obtained
12 and are continuing to maintain acceptable insurance as
13 required, correct?
14     MR. MEINERTZHAGEN:  Same objection.
15     MR. RICHTER:  Standing objection noted.
16     MR. MEINERTZHAGEN:  Thank you.  On this document?
17     MR. RICHTER:  Noted.
18     THE WITNESS:  Correct.
19     MR. RICHTER:  Q  The term acceptable insurance,
20 that refers to both acceptable flood insurance and hazard
21 insurance, is that right?
22     A  That would be correct.
23     Q  And looking at -- Section 1.9 on the previous
24 page, Chase 1606, the term mortgage loan, that includes
25 not only loans but also home equity lines or loans,

Page 39

1  correct?
2      A  Correct.
3      Q  So under this agreement ASIC was performing
4  outsourcing services with respect to flood and hazard
5  insurance for both loans on a first and second position
6  and loans in -- and home equity lines and loans, correct?
7      A  Correct.
8      Q  The whole gamut?
9      A  Correct.
10     Q  Now, you indicated that ASIC was paid a fee in
11 connection with those services.  Is that fee set forth in
12 Chase 1609, the pricing schedule on Article IV?
13     A  Yes, that's the pricing schedule for those
14 services.
15     Q  And the same price was paid for the services,
16 28 cents per mortgage loan regardless of whether it was
17 in the first or second loan position and whether it was a
18 loan or a line, correct?
19     A  The fee was charged once per loan/line, yes.
20     Q  That fee was 28 cents for both loans and lines
21 per month, correct, per loan or line?
22     A  Per loan or line not per loan and line.
23     Q  So if somebody had both a first mortgage and a
24 second mortgage with Chase, would the fee then be just 28
25 cents for that per month for that particular person or

Page 40

1  would it be 56?
2      A  I can't say with 100 percent certainty.
3      Q  I'm just trying to understand.  You made a
4  distinction, you said per loan or line not per loan and
5  line, and I just want to -- could you explain what you
6  meant by making that distinction, the or versus and
7  distinction?
8      A  We may or may not have the first mortgage but
9  we have the junior lien.  We would pay for the tracking
10 on the junior lien, which would be 28 cents.  If we had
11 the first and the second or the first and junior lien,
12 it's my understanding that we're going to pay once for
13 that.  We may twice, but I don't have -- I can't say with
14 100 percent certainty.
15     Q  Sure.  So let's take a -- a third situation now
16 where somebody else, let's say Bank of America is in the
17 first lien position, Chase is in the second lien
18 position.  What's the tracking and monitoring fee in that
19 situation?
20     A  I believe it's the 28 cents.
21     Q  28 cents.  Okay.  So in that situation does
22 ASIC perform any tracking and monitoring on the first
23 lien loan held by the other bank?
24     A  Yes.
25     MR. MEINERTZHAGEN:  Object to the form.

Page 41

1      MR. RICHTER:  Q  In any event, coming back to the
2  pricing schedule, both the fee and the services were the
3  same for first and second mortgages and for both loans
4  and lines, correct?
5      A  That's correct.
6      Q  Let's turn to page 1606.  The first two at
7  Section 1.12 to a procedures manual.
8          Do you see that?
9      A  I do.
10     Q  What is the procedures manual?
11     A  It's a manual that I've not been involved in
12 developing that manual, but I've seen copies of it.  It's
13 a manual that typically starts with Assurant in terms of
14 what the procedures are.  It's fine tuned by our
15 servicing team and then it's, you know, a document that
16 identifies, you know, all the business rules, all the
17 procedures, the policy around everything that they do.
18     Q  So the procedures manual as indicated here in
19 this Section 1.12 is something that is jointly developed
20 by both ASIC and Chase Home Finance, correct?
21     A  It is.
22     Q  All right.
23     A  And it's fluid.
24     Q  Turning now to what was previously marked as
25 Exhibit 8.

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 42

1        (Exhibit 8 tendered to the witness)
2     Q   Let me give you this copy.  Would that be an
3  example of the procedures manual?
4        MR. MEINERTZHAGEN:  Counsel, will you grant me a
5  standing objection to your line of questioning on the
6  procedures manual as it's outside the scope of what this
7  witness is being offered to --
8        MR. RICHTER:  I will grant you a standing objection.
9  I will not agree with it, but I will grant you your
10  objection.
11       THE WITNESS:  I'm not familiar with this document to
12  comment on it.
13       MR. RICHTER:  Q  Have you ever seen or read any of
14  the procedures manuals?
15    A   I haven't read through the entire manual.
16  Really is an operation manual.
17    Q   Let's see if another document jogs your memory.
18       Now showing you what was previously marked as
19  Exhibit 9.
20       (Exhibit 9 tendered to the witness)
21       MR. MEINERTZHAGEN:  Same stipulation with respect to
22  this?
23       MR. RICHTER:  Yes.
24    Q   Do you have that in front of you?
25    A   I do.

Page 43

1     Q   Would this be an example of the procedures
2  manual or a procedures manual referenced in schedule 1?
3     A   It would have appear to be, but I have no
4  direct knowledge of this.
5     Q   Let's turn back to the Master Services
6  Agreement schedule at page 1608.  I'd like to you focus
7  on Section 3.2.  It says there, the parties relationship
8  managers are authorized to agree on behalf of the parties
9  to revisions to the outsourcing processing servicing
10  standards and/or the procedures manual.
11       Relationship manager, does that refer to you?
12    A   No.  What we're referring to here are
13  operational contracts, the outsourcing contracts, and the
14  relationship manager would be someone whether it be Jeff
15  Nack or someone on that team.
16    Q   Let's go to page 1611.  It says, Article VII,
17  toward the end, says, servicer's relationship manager is
18  Terry Smith?
19    A   Yes.
20    Q   He's at Chase Home Finance, LLC, is that right?
21    A   He is.
22    Q   And supplier's relationship manager is Quantz
23  Bruns-Kyler.
24       Do you see that?
25    A   I do.

Page 44

1     Q   And he's -- I'm not sure if it's he or she with
2  ASIC?
3     A   It's a she.  She's no longer in that capacity.
4     Q   Was she with ASIC?
5     A   She was with Assurant.  I don't know whether or
6  not she was an officer of ASIC or not.
7     Q   Turning back to Section 3.2 on page 1608.
8        Are you familiar with any revisions to the
9  outsourcing processing servicing standards and/or the
10  procedures manual?  Let's start with the servicing
11  standards.
12    A   Would you please repeat the question?
13    Q   Sure.  Are you aware of any revisions to the
14  outsourcing processing servicing standards?
15       MR. MEINERTZHAGEN:  Objection, outside the scope of
16  the deposition.
17       You can go ahead and answer.
18    THE WITNESS:  I do know servicing standards have
19  changed over the period of time since 2007.
20       MR. RICHTER:  Q  To the extent there were revisions
21  in the servicing standards, were you informed of those?
22    A   Likely after the fact.  I was not consulted
23  prior to the procedure -- I'm not involved in the
24  operation so --
25    Q   You would have gotten a copy as like an FYI?

Page 45

1     A   May have.  May not have.  If I was made aware
2  of a change, I may have requested a copy at some point in
3  time.  I don't maintain a file of the procedure manuals.
4     Q   You work with Terry Smith at all?
5     A   I do work with Terry.
6     Q   What sort of things do you work with him on?
7     A   On lender-placed programs.
8     Q   Do you have any meetings or telephone
9  conferences with Mr. Smith?
10    A   I have.
11    Q   Are those regularly held, weekly, monthly, some
12  other type of basis?
13    A   Not regular meetings.
14    Q   You also have e-mail correspondence from time
15  to time with Terry Smith?
16    A   I do.
17    Q   Some of those e-mails relate to flood insurance
18  and lender-placed insurance?
19    A   It would be hard for me to say.
20    Q   How about Jeff Nack, do you have meetings or
21  conferences with Mr. Nack?
22    A   I do.
23    Q   Regarding the same issues as with Mr. Smith?
24    A   Yes.
25    Q   Do you also have e-mails with Mr. Nack

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 46

1  regarding lender-placed issues?
2     A   Yes.
3     Q   Turning to page 1612 of Schedule 1.  That's
4  signed on behalf of Chase Home Finance, LLC by Kim D.
5  Greaves, is that right?
6     A   Yes.
7     Q   Who is she?
8     A   That's a he.  He's no longer in that position,
9  but he was senior vice president, mortgage servicing and
10 default.
11    Q   How long did he hold that position?
12    A   I can't say for certain.
13    Q   During the time Mr. Greaves held that position,
14 did you also have communications with him?
15    A   I did.
16    Q   Would those also take the form of meetings,
17 telephone conferences, e-mails and the like?
18    A   Yes.
19    Q   Was Mr. Greaves involved in the negotiations of
20 Schedule 1?
21    A   I can't say for certain whether or not the
22 servicing team pulled Kim Greaves into those discussions.
23 He clearly, you know, had to sign off on the outsourcing
24 agreement which would have included pricing which would
25 have included all the terms and conditions.

Page 47

1     Q   Who was involved in the negotiations over at
2  Schedule 1?
3     A   It would have been Terry Smith, Jeff Nack,
4  legal counsel, myself.  I'm just thinking who else may
5  have been employed at that point in time, but definitely
6  those individuals.
7     Q   With respect to --
8     A   Hamid Tari, he used to be my boss, he was
9  involved in the 2007.  He's no longer with the
10 organization.
11    Q   What's that name again?
12    A   Hamid, H-A-M-I-D, T-A-R-I.
13    Q   Was he also with Chase Home Finance, LLC?
14    A   He's no longer with the organization.  At the
15 time he was.
16    Q   Now, you testified earlier with respect to the
17 Master Services Agreement that you were involved in the
18 negotiations, some of the meetings, but maybe not as
19 heavily as others were involved in those negotiations.
20 With respect to Schedule 1, were you -- did you have a
21 higher degree of involvement in the negotiations relating
22 to Schedule 1 specifically?
23    A   Yes.
24    Q   Could you describe the negotiations process for
25 me?

Page 48

1     A   My involvement?
2     Q   Yes.
3     A   My involvement primarily around the outsourcing
4  negotiations related to the pricing, tracking fees per
5  loan per month.
6     Q   Were you also involved in the negotiations
7  concerning the services that were performed for that fee?
8     A   In general terms, yes.  The services, the
9  service level requirements, the specific needs were not
10 my call, but I was involved in, you know, the
11 discussions, the dialogue, you know, the negotiations if
12 those folks really needed to get something done and they
13 weren't having a lot of success directly with Assurant, I
14 might have been involved in that.
15    Q   Who had the final call, who made the call on
16 the services that were negotiated in connection with
17 Schedule 1?
18    MR. MEINERTZHAGEN:  Object to the form.
19    THE WITNESS:  Final signoff would have been Kim
20 Greaves, but Terry Smith -- and he relies heavily from an
21 operational standpoint on Jeff Nack.
22    MR. RICHTER:  Q  Were those terms relating to both
23 price and services thoroughly negotiated between Chase on
24 the one hand and ASIC on the other?
25    MR. MEINERTZHAGEN:  Object to the form.

Page 49

1     THE WITNESS:  The services being performed and the
2  needs that had to be met were negotiated by Chase to the
3  extent that these needs had to be met.  The pricing was
4  driven by me and driven by counsel because we have spent
5  a tremendous amount of time over the years ensuring that
6  our outsourcing agreements were separate, stood on their
7  own and had separate pricing and were detached entirely
8  from any agency agreements, any revenue agreements that
9  Chase Insurance Agency may have had with Assurant.
10    We were aware of the fact that, you know, there
11 were allegations in the industry that servicers could pay
12 very little for services being performed, that there may
13 be some allegations of, you know, cash back allegations.
14 We wanted to make certain that we were never subject to
15 those allegations.  So we spent a tremendous amount of
16 time driving the price and vetting the price although
17 it's an inexact process just by nature of the process.
18 Driving the process up, we were paying less than 28 cents
19 when this was executed.  I want to say it was
20 23-and-a-half cents and we made it very clear to Assurant
21 that by we, myself and -- legal counsel and I were on the
22 same page, whatever services were being performed we
23 wanted to pay for those.  We wanted to -- we believe was
24 a fair market value for those services.
25    So I spent a lot of time vetting that with our

13  (Pages 46 to 49)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 50

1  own servicing team to validate information that I may
2  have been getting from Assurant relative to numbers of
3  full-time employees that were dedicated to Chase for
4  specific outsourcing functions, all-in numbers that would
5  include benefits and phone and ancillary services so that
6  we could arrive at a figure that we believed was an
7  equitable figure for Assurant in payment of those
8  services, unlike many others in the industry.  And we
9  believed in so doing that, you know, we were mitigating
10  any kind of, you know, subsidy challenge because we had a
11  stand alone contract and stand alone pricing.  And we've
12  always maintained that posture, at least as long as I've
13  been involved with the program.
14          It comes out of home finance's budget so their
15  focus is on the services, my focus is to make sure we're
16  paying the right amount for the services.  So that's
17  really where I -- I was involved in the negotiations.
18      Q   What allegations of subsidy challenges were you
19  familiar with?
20      A   Just industry challenges, just general comments
21  in the industry of dialogue with, you know, with counsel
22  in years past in terms of, you know, what we've done to
23  mitigate, you know, that kind of challenge is that we've
24  always had this stand alone agreement, we've always been
25  at arm's length between the outsourcing agreements and

Page 51

1  the reinsurance agreements, for example, or for that
2  matter, the agency agreements.
3      Q   If a rebate or some other form of similar
4  subsidy was negotiated by the lender, would that be
5  improper?
6      MR. MEINERTZHAGEN:  Object to the form.
7      THE WITNESS:  Absolutely.
8      MR. RICHTER:  Q  Are there any other persons that
9  were involved in the negotiations process regarding
10  Schedule 1 that you recall other than Mr. Smith,
11  Mr. Nack, yourself and Mr. Greaves from the Chase side?
12      A   Counsel.
13      MR. MEINERTZHAGEN:  Object.  I think it
14  mischaracterizes his testimony.  He also said Hamid Tari.
15      THE WITNESS:  Hamid was directly involved.  I used
16  to report in to Hamid.
17      (Exhibit 46 marked as requested)
18      MR. RICHTER:  Q  Mr. Wheeler, the court reporter has
19  just handed you what's been marked as Exhibit 46, Bates
20  number Chase 1688 through 1746.  Do you have that in
21  front of you?
22      A   I do.
23      Q   Are you familiar with this document?
24      A   I am.
25      Q   And what is it?

Page 52

1      A   It's a Compliance PLUS Insurance Agreement.
2      Q   Involving the same parties as Schedule 1?
3      A   Yes.
4      Q   You also have a copy of this document in your
5  files?
6      A   Yes.
7      Q   Is this a separate agreement from Schedule 1?
8      A   It is.  This is what we refer to as the
9  administrative agreement.
10      Q   Would it be fair to say that Schedule 1 was
11  involved with the insurance tracking and monitoring of
12  existing coverage and this Compliance PLUS Insurance
13  Agreement was involved with the placement of the coverage
14  and then notification of the borrower in advance of
15  placement?
16      A   Schedule 1, you know, included all of the
17  outsourcing functions, and the level is attached to all
18  of those, so it was kind of all encompassing.  And this
19  agreement outlines the specific, you know, business, the
20  eligible properties, the -- to your point, the specific
21  conditions for your placement.
22      Q   With regard to that, specific conditions for
23  placement, that's -- the definition of acceptable flood
24  insurance is in Section 1.1 on Chase 1689, is that right?
25      A   Yes.

Page 53

1      Q   For purposes of this agreement, acceptable
2  flood insurance meant flood insurance naming the servicer
3  or its assign as mortgagee with coverage limits
4  conforming to the standards of the act and the National
5  Flood Insurance Program, is that correct?
6      MR. MEINERTZHAGEN:  I'm going to object to this line
7  of questioning to the extent it's outside the scope of
8  the deposition -- the 30(b)(6) deposition topic that
9  witness is being offered to testify about.  He can answer
10  based upon his personal knowledge.  Were you about to
11  make me an offer I can't refuse?
12      MR. RICHTER:  You have a standing objection on this
13  document as well.
14      Can you read back the question?
15      (Whereupon, the following was read back:
16      "Q  For purposes of this agreement,
17      acceptable flood insurance meant flood
18      insurance naming the servicer or its assign as
19      mortgagee with coverage limits conforming to
20      the standards of the act and the National Flood
21      Insurance Program, is that correct?")
22      THE WITNESS:  I don't see a specific reference to
23  naming a servicer as a mortgagee.
24      MR. RICHTER:  Q  For purposes of this agreement did
25  acceptable flood insurance -- was it acceptable to have

14 (Pages 50 to 53)

Page 54

1  flood insurance with coverage limits conforming to the
2  standards of the National Flood Insurance Act and the
3  National Flood Insurance Program?
4      A   Yes.
5      Q   You were involved in the negotiations of this
6  agreement, is that right?
7      A   I was involved in this agreement.
8      Q   Did you consider that an appropriate definition
9  of acceptable flood insurance?
10     A   I did.
11     Q   And would that be an appropriate definition of
12 acceptable flood insurance regardless of whether the
13 flood insurance is lender-placed or independently
14 procured by the buyer?
15     A   I would say so.
16     Q   Going back to the previous page 1688.  There
17 are some recitals there.
18         Do you see that?
19     A   I do.
20     Q   I'd like you to focus on the fourth paragraph
21 down.  It says, servicer further desires that should
22 acceptable flood insurance not be in place as to any
23 mortgage loan, or should it nonrenew or cancel for any
24 reason, that proper notification be sent to the affected
25 mortgagor stating that lender-placed acceptable flood

Page 55

1  insurance will be obtained upon the failure of the
2  mortgagor to promptly provide evidence of other
3  acceptable flood insurance.
4          Do you see that?
5      A   I do.
6      Q   Was one of the purposes of this agreement to
7  provide for notification from ASIC to the borrower in
8  advance of any coverage that was force-placed?
9      A   I don't think that's the purpose of this
10 agreement.  The procedure manuals, the outsourcing, you
11 know, all covered the specifics.  This defines the
12 eligible properties, when placement will occur.  It's not
13 specifically designed as a precursor to notification to
14 the borrower.  This is an agreement between Chase Home
15 Finance and the program administrator.
16     Q   Okay.  Let's go down to the next -- Are you
17 finished with your answer?
18     A   Yes.
19     Q   Let's go down to the next paragraph underneath,
20 supplier is an insurance carrier --
21     MR. MEINERTZHAGEN:  Are you still in the recitals?
22     MR. RICHTER:  Q  Yes.  -- able to provide flood
23 insurance for real properties as desired by servicer.
24         Do you see that?
25     A   I do.

Page 56

1      Q   Was one of the function -- purposes of this
2  agreement to provide for the actual placement of the
3  lender-placed coverage?
4      A   Yes.
5      Q   I want to go back to the notification issue.
6  Now, when coverage is force-placed or lender-placed,
7  prior to that there are form notifications that go out to
8  the borrower, is that right?
9      MR. MEINERTZHAGEN:  Objection, outside the scope.
10     THE WITNESS:  Borrower disclosures.
11     MR. RICHTER:  Q  Are those disclosures written --
12 provided for by this agreement, Exhibit 46 or the
13 previous agreement, Exhibit 45?
14     MR. MEINERTZHAGEN:  Same objection.
15     MR. RICHTER:  Q  Schedule 1 to Exhibit 45.
16     A   There's reference to the notification process,
17 but there aren't copies of the disclosures.
18     Q   Was ASIC contractually bound to send out
19 notifications to the borrower in advance of force-placing
20 coverage?
21     MR. MEINERTZHAGEN:  Objection, outside the scope.
22     THE WITNESS:  Yes.
23     MR. RICHTER:  Q  Under which contract?
24     A   I would say it's under the administration
25 agreement.

Page 57

1      Q   Exhibit 46?
2      A   Yes.
3      Q   In fact, the outbound notification letters,
4  they're not provided for in Exhibit 45, Schedule 1,
5  correct?
6      A   I don't believe so, that's correct.
7      Q   Now, look at the next to last paragraph in the
8  recitals.  It says, supplier agrees to provide Compliance
9  PLUS Insurance -- agrees to provide its Compliance PLUS
10 Insurance Program to servicer and servicer agrees to
11 accept such program and to pay all premiums pursuant to
12 the terms and conditions of this agreement.
13         Do you see that?
14     A   I do.
15     Q   So under this agreement the servicer was bound
16 -- contractually obligated to send out notices and
17 lender-placed coverage if there was not acceptable flood
18 insurance on the property, correct?
19     A   Correct.
20     Q   And in return for that Chase was obligated to
21 pay for the premiums for force-placed coverage, correct?
22     MR. MEINERTZHAGEN:  Object to the form.
23     THE WITNESS:  The -- as Chase was invoiced, Chase
24 would disburse advanced premiums, yes.
25     MR. RICHTER:  Q  There wasn't a separate fee for

15  (Pages 54 to 57)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 58

1  sending out the notices, correct?
2      A   That's correct.
3      **Q   The cost of the notices was basically built**
4  **into the premium?**
5      A   That's correct.  Well, it was -- it's an
6  operational cost to Assurant.
7      **Q   Which then they recapture through the premiums?**
8      MR. MEINERTZHAGEN:  Object to the form.
9      THE WITNESS:  Where they recapture it, I don't know.
10 I mean it's -- we pay for outsourced services.  Placement
11 is one of those services.
12     MR. RICHTER:  Q  Let's -- now looking at par --
13 Section 1.7 on Chase 1689 through 90, that definition of
14 mortgage loan is consistent with the definition of
15 mortgage loan in Schedule 1, and it refers to both first
16 and second mortgages and home equity lines and loans,
17 correct?
18     A   Yes.
19     **Q   All right.  Let's go to page 1691, Section 2.4,**
20 **authority to obtain Compliance PLUS policies.**
21        **Do you see that?**
22     A   Yes.
23     **Q   First sentence says, servicer represents and**
24 **warrants it has the requisite authority to obtain the**
25 **Compliance PLUS policies covering each eligible property**

Page 59

1  **which contain the types and amounts of coverages**
2  **requested by servicer whether be by virtue of contract,**
3  **statutory or regulatory law or otherwise.**
4        **Do you see that?**
5      A   Yes.
6      **Q   And then next to last sentence it says,**
7  **servicer understands and agrees that its obligation to**
8  **ascertain and monitor its authority to obtain the**
9  **Compliance PLUS policies covering eligible properties**
10 **which contain the types and amounts of coverages as**
11 **requested by servicer is a continuing obligation.**
12        **Do you see that?**
13     A   Yes.
14     **Q   Under the terms of this provision, Section 2.4,**
15 **it was Chase's responsibility to make sure the right**
16 **amount of coverage was obtained, is that right?**
17     MR. MEINERTZHAGEN:  Object to the form.
18     THE WITNESS:  Please restate that or repeat that.
19     MR. RICHTER:  Q  Sure.  Under Section 2.4 of the
20 Compliance PLUS Insurance Agreement, Exhibit 46, it was
21 Chase's responsibility to make sure the right amount of
22 coverage was obtained, right?
23     MR. MEINERTZHAGEN:  Object to the form.
24     THE WITNESS:  Define right amount.
25     MR. RICHTER:  Q  To make sure that acceptable flood

Page 60

1  insurance as defined by the agreement was obtained,
2  correct?
3      A   Correct.
4      MR. MEINERTZHAGEN:  Object to the form.
5      MR. RICHTER:  Q  And to make sure that -- looking
6  again at sentence 2 of Section 2.4, to make sure that the
7  flood insurance contained the amounts of coverages,
8  contained amounts of coverages that were consistent with
9  the contract, that being the definition in Section 1,
10 correct?
11     A   Correct.
12     MR. MEINERTZHAGEN:  Object to the form.
13     MR. RICHTER:  Q  And statutorily or regulatorily or
14 otherwise, correct?
15     A   Correct.
16     **Q   So it was ASIC's job to force place the**
17 **coverage when the standard set by Chase wasn't met, but**
18 **Chase was the one that set the standard, correct?**
19     A   That's correct.
20     **Q   Let's go to page 1706, Section 11.2, subpart C**
21 **at the bottom.  It says, all information received by**
22 **supplier as to whether the location of an eligible**
23 **property is or is not in or near a special flood hazard**
24 **area is based on information obtained from servicer, the**
25 **Federal Energy Management Agency and the mortgagor.  The**

Page 61

1  **information is intended solely for the purpose of**
2  **compliance by servicer with the requirements of the Act.**
3  **The information received by supplier is -- has not been**
4  **and will not be verified for being up to date, its**
5  **accuracy or its completeness.  The information is not a**
6  **substitute for a complete survey of each eligible**
7  **property or obtaining expert opinions as to whether it is**
8  **in a special flood hazard area or as to the advisability**
9  **of securing flood insurance for such eligible property.**
10       **Do you see that?**
11     A   Yes.
12     **Q   Would it be fair to say that under the terms of**
13 **this agreement ASIC was not responsible for insuring the**
14 **accuracy of flood zone determinations?**
15     A   That's correct.
16     **Q   Who was responsible for that?**
17     A   The servicer.
18     **Q   Turning to page 1694 paragraph -- Section 4.1,**
19 **it's actually 1693.  I'm sorry.  Section 4.1.**
20       **Do you have that in front of you?**
21     A   I do.
22     **Q   Okay.  And under the term provision it says the**
23 **term for a period of 3 years, is that right?**
24     A   That's correct.
25     **Q   Was this agreement in fact in place for 3**

16  (Pages 58 to 61)

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 62

1  years, the period from January 1 of '07 through the end
2  of '09?
3  A  Yes.
4  Q  And then going on, same section, next page, it
5  says on the first line there, that servicer shall use
6  supplier as its sole provider of servicer-placed flood
7  insurance for real property.
8  Do you see that?
9  A  I do.
10  Q  Consistent with this term, did Chase use ASIC
11  as its sole provider of servicer-placed flood insurance
12  for real property during the period of this agreement?
13  A  Yes.
14  Q  Has Chase continued to use ASIC as its sole
15  provider since that time?
16  A  ASIC or Standard Guarantee Insurance.  There is
17  -- in the industry no insurance carrier will provide
18  outsourcing services with also not having the insurance
19  placement, and so it's easier for the supplier because of
20  their access to the systems to do both tracking and the
21  placement.  It's just economically not feasible to do one
22  without the other.  There may be very small companies out
23  there that do some outsourcing services, but not a major
24  tier player in the industry simply because the cost
25  associated with the outsourcing.

Page 63

1  Q  Let's go to page 1697, paragraph 6.5, the audit
2  provision.
3  A  Okay.
4  Q  It says there, subpart A, upon servicer's or
5  its auditor's request with reasonable notice, supplier
6  will permit technical regulatory, financial and
7  operational audits.
8  Do you see that?
9  A  I do.
10  Q  Has Chase conducted any regulatory audits of
11  ASIC?
12  A  I couldn't say.
13  Q  Do you know if Chase has conducted any
14  operational audits of ASIC?
15  A  Yes, they have.
16  Q  What type operational audits has it conducted?
17  A  I don't have firsthand knowledge.  The audits
18  are not infrequent, but I don't have any specifics as to
19  the operational audit.
20  Q  Do you know if Chase has ever conducted an
21  audit to determine whether too much coverage was being
22  force-placed or lender-placed?
23  MR. MEINERTZHAGEN:  Objection, outside the scope.
24  THE WITNESS:  I couldn't say.
25  MR. RICHTER:  Q  All right.  Turning to paragraph --

Page 64

1  Section 6.7.  There's a reference to relationship
2  managers there and revisions to the procedures manual.
3  Do you see that?
4  A  I do.
5  Q  Relationship managers, does that refer to the
6  same people as in Schedule 1?
7  A  It would, yes.
8  Q  And procedures manual, that would refer to the
9  same document as referenced in Schedule 1, is that right?
10  A  It should.
11  MR. RICHTER:  Okay.  Let's take a short break.
12  (Off the record)
13  MR. RICHTER:  Q  All right.  Back on the record.
14  Mr. Wheeler, I've just handed you what was
15  previously marked as Plaintiff Exhibit 20, Compliance
16  PLUS Insurance Agency Agreement.
17  (Exhibit 20 tendered to the witness)
18  Q  Do you have that in front of you?
19  A  I do.
20  Q  And for purposes of our discussion regarding
21  this document, I'm just going to use the term agency
22  agreement as shorthand.  Will you understand what I mean
23  by that?
24  A  I will.
25  Q  Are you familiar with this agency agreement?

Page 65

1  A  I am.
2  Q  Did you negotiate it?
3  A  I was -- yes.  I hesitate only because there
4  was not a lot of negotiations.
5  Q  Was this document, this agency agreement --
6  actually let's go to the second page, paragraph 6.  The
7  second sentence it says, this agreement could be
8  coterminous, and shall terminate concurrently with the
9  Compliance PLUS Insurance Agreement of dated January 1,
10  2007 between company and servicer.
11  Do you see that?
12  A  I do.
13  Q  And that Compliance PLUS Insurance Agreement,
14  that's Exhibit 46 that we just went over, right?
15  A  Correct.
16  Q  Was this agency agreement negotiated at the
17  same time as the Compliance PLUS Insurance Agreement?
18  A  It would have been around the same time.  The
19  terms are pretty straightforward so it's --
20  Q  Was there anybody else involved on the Chase
21  side with the negotiations relating to the agency
22  agreement?
23  A  Legal counsel.  We should distinguish between
24  -- definition of negotiations with respect to some of
25  these agreements.  This agency agreement provides for

17 (Pages 62 to 65)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 66

1 payment of commissions to Chase. Legal counsel had full
2 knowledge of the commission arrangement. Their
3 involvement in the negotiations of the contract would
4 have been around the contract terms and conditions.
5     Q    How about anybody else on the Chase side other
6 than you and legal counsel involved in the negotiations
7 process?
8     A    Could have been Hamid Tari.
9     Q    How about Mr. Nack and Terry Smith?
10    A    No, definitely not.
11    Q    Would they have been aware of the commission?
12    A    We never --
13    MR. MEINERTZHAGEN: Object to the form.
14    THE WITNESS: We never address commission
15 arrangements with servicing. There's always been an
16 arm's length between commission before the outsourcing
17 agreements and the revenue agreements or agency
18 agreements.
19    MR. RICHTER: Q    So if we did a search of e-mails
20 and files of Mr. Nack and Mr. Smith and other people at
21 Chase Home Finance, would you expect that there would be
22 nothing in their e-mails and correspondence files and
23 other files relating to the amount of the commission?
24    MR. MEINERTZHAGEN: Object to the form.
25    THE WITNESS: That would be my expectation. Clearly

Page 67

1 they were not involved in negotiating any commission
2 arrangement, nor did they have any input into the agency
3 agreement, nor would they have been provided with copies
4 of the agency agreement.
5     MR. RICHTER: Q    Could you describe the
6 negotiations process relating to the agency agreement?
7     A    What we did with lender-placed flood was to
8 look at what the industry was doing. It's a standard
9 industry-wide practice for an industry to be paid
10 commissions for business written by an insurance carrier.
11 We sought out peer insurance carriers of Assurant, top
12 tier players and also secondary market players to get a
13 sense for what the commission rates were being paid on
14 that line of business.
15     Chase, you know -- our position on this going
16 back to 2007 was that, you know, we wanted no more
17 commission than the average that was being paid in the
18 industry. And the average was around 20 percent. It was
19 as high as 40 percent, 20, 25, some were taking a little
20 bit less, some taking a little bit more, but that's what
21 we based the 20 percent. The 20 percent had been in
22 place prior to 2007 so that was not a newly negotiated
23 rate. We simply said we're going to renew the contracts
24 and, you know, we are going to renew it at 20 percent
25 commission rate.

Page 68

1     Q    Were there drafts of the agency agreement
2 exchanged between the parties prior to its finalization?
3     A    Between JP Morgan Insurance Agency, legal
4 counsel and the other parties to the agreement, yes.
5     Q    And were there also meetings related to the
6 terms?
7     A    Not likely.
8     Q    Telephone conferences?
9     A    Not likely.
10    Q    How about e-mails or correspondence?
11    A    No. There would have been dialogue that I
12 would have had with Assurant and -- very little dialogue
13 around flood commission in 2007, that is, that they have
14 been paying, that's what we agree to have them, you know,
15 pay us with the new term.
16    Q    How far back had that 20 percent commission
17 been in place on force-placed flood policies?
18    A    As long as I've managed the program, so it goes
19 back at least 10 years.
20    Q    That 20 percent premium, that applied on all
21 lender-placed flood policies issued by ASIC for Chase
22 under the Compliance PLUS Insurance Agreement, correct?
23    A    When you say ASIC you're referring to both
24 parties of the agreement, also Standard Guaranty,
25 correct?

Page 69

1     Q    Yes.
2     A    I just want clarity on that. It was not a 20
3 percent premium surcharge -- maybe I misheard you. It
4 was a 20 percent commission that was paid to the licensed
5 agency entity based upon premium writings, 20 percent of
6 the premium writings. It was not an add-on.
7     Q    My question just had to do with which policies
8 did it apply to. So let me rephrase. Did it apply to
9 all of the lender-placed flood policies issued under
10 Exhibit 46, the Compliance PLUS Insurance Agreement?
11    A    Yes, it would have.
12    Q    So again both loans and lines, first and second
13 lien position, the whole universe?
14    A    Yes.
15    Q    How much money did JP Morgan Insurance Agency,
16 and subsequently Chase Insurance Agency, earn per year on
17 force-placed flood commissions in '07, '08, '09?
18    MR. MEINERTZHAGEN: Objection, outside the scope.
19 He can testify to the extent he knows with respect to
20 HELOCs or home equity loans, otherwise, he can testify in
21 his own -- based on his own personal knowledge.
22    THE WITNESS: I couldn't specifically address going
23 back to -- if the year was '06 through '09 for all of
24 flood. For HELOCs and -- that would include loans and
25 lines, in 2009 it was approximately 1.4 million. 2008 it

18 (Pages 66 to 69)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 70

1  was approximately 650,000.  And it would have been
2  probably half of that going back to 2007.
3  MR. RICHTER: Q  So about 300,000?
4  A  Probably close to that.
5  Q  What accounts for the sharp rise in the amount
6  of the commissions?
7  A  We migrated the Heritage-WaMu servicing
8  portfolio that had previously been with Southwest
9  Business Corp, we migrated that to Assurant beginning in
10  November of 2009.  We also changed some of our
11  requirements in 2009 that may have generated more premium
12  based upon the coverage.
13  Q  By the changing of the requirements, are you
14  referring to the change that was made toward the end of
15  '09 to basically provide for either replacement cost
16  value or the NFIP maximum of 250,000 and dropping out the
17  third option for the borrower to obtain coverage in the
18  amount of the principal balance of the outstanding loan
19  or loans?
20  A  That's correct.  It should be noted this goes
21  back to 2007, the agency agreement.  The agency agreement
22  January 1st, 2010 reflects the new commission structure,
23  which is 10 percent for first residential flood, and we
24  were getting paid zero on home equity and we made that
25  decision deliberately because of the change in coverage

Page 71

1  requirements that no longer considered that third option
2  to include the combined UPB of first and junior liens.
3  We didn't want there to be clearly any perception -- even
4  a perception that Chase was benefiting as a result of a
5  requirement that we now believed to be necessary.
6  So effective in 2010 there's zero commissions
7  paid on home equity, and we're still -- the business
8  that's cancelling prior to -- that was written prior to
9  2010 was, if it's being cancelled flat or partially
10  cancelled, we're still returning 20 percent because
11  that's what we got paid, if that makes sense.
12  Q  What do you mean by returning the 20 percent?
13  A  Any time, you know, the -- we get paid when
14  Assurant gets paid.  The commission in transmittal.  It's
15  a monthly transmittal, but if a policy is written for
16  $100, our commission on that policy, you know, under this
17  old agreement would be $20.  If that policy is cancelled
18  flat, we've received $20 that, you know, was not earned
19  so that's returned back to Assurant.  And if there's a
20  partial cancel, then only that portion that was earned
21  would we retain commission on.
22  Q  And the 20 percent commission that's reflected
23  in paragraph 2 of the agreement, numbered paragraph 2 on
24  page 764, is that right?
25  A  Yes.

Page 72

1  Q  And that commission percentage, that applied in
2  all states in which lender-placed policies were issued,
3  is that right?
4  A  It implied in those states that, you know, I
5  believe there could be one state -- I think 20 percent
6  was -- I would say yes without going through all of the
7  files, it was 20 percent across the board.
8  Q  Prior to -- Strike that.
9  During the time that this agency agreement was
10  in effect, were there any force-placed policies issued by
11  ASIC for which JP Morgan Insurance Agency or its
12  predecessors or successors in interest did not receive a
13  20 percent commission?
14  MR. MEINERTZHAGEN:  Object to the form.
15  THE WITNESS:  I simply couldn't say without a
16  thorough audit.  Our expectation is that we would be paid
17  for commission if the premiums were disbursed.
18  MR. RICHTER: Q  What did JP Morgan Insurance
19  Agency and Chase Insurance Agency do to receive those
20  commissions?
21  MR. MEINERTZHAGEN:  Object to the form.
22  THE WITNESS:  We provide any number of different
23  services, you know.  I work in the agency, we've got 10
24  or 11 people that work in the agency.  You know, we
25  managed the program.

Page 73

1  MR. RICHTER: Q  What paragraphs in the agency
2  agreement impose any return obligations on JP Morgan
3  Insurance Agency or Chase Insurance Agency?
4  A  Commission paragraph 3, commissions applicable
5  to premiums refunded shall be recovered by company by
6  offset against commissions new agent and when such offset
7  is not readily available by direct remittance to company
8  by agent.
9  Q  That's the situation you were describing before
10  where the policy is cancelled?
11  A  That's correct.
12  Q  Any other obligations on the company?
13  MR. MEINERTZHAGEN:  Object to the form.
14  MR. RICHTER: Q  Strike that.  On the agent.
15  MR. MEINERTZHAGEN:  Is that a question?
16  MR. RICHTER: Q  Yes.
17  Are there any other obligations imposed on the
18  agent under this agreement?
19  MR. MEINERTZHAGEN:  Object to the form.
20  THE WITNESS:  Obligations, I would say no.
21  MR. RICHTER: Q  So just to be clear, neither JP
22  Morgan Insurance Agency or Chase Insurance Agency, they
23  weren't the ones that would handle correspondence with
24  property owners whose property was insured?
25  A  That's correct.

19 (Pages 70 to 73)

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 74

1 　 Q　They're not like your local State Farm agent or
2 something like that?
3 　 A　No, that's correct.
4 　 Q　They don't -- JP Morgan Insurance Agency and
5 Chase Insurance Agency, they don't handle claims that
6 would come in from property owners if they had flood
7 damage, right?
8 　 A　Not directly, no.
9 　 Q　So neither JP Morgan Insurance Agency or Chase
10 Insurance Agency performed the functions of a typical,
11 you know, agent that you would go to for homeowner's
12 insurance or automobile insurance, that sort of thing?
13 　 A　That's correct.
14 　 MR. MEINERTZHAGEN: Object to the form.
15 　 MR. RICHTER: Q I want to go back to Exhibit 46 for
16 just a second.
17 　 MR. MEINERTZHAGEN: Could you restate the Bates
18 range for that?
19 　 MR. RICHTER: 1688 through 1746.
20 　 Q　I'd like to turn your attention to page 1698,
21 Section 7.1.
22 　 　 Do you see there it says, supplier will treat
23 servicer as supplier's most favored customer or MFC. MFC
24 means a customer of supplier who receives pricing terms
25 net of discounts and rebates which are no less favorable

Page 75

1 than those received by any other similarly situated
2 customer of supplier.
3 　 　 Do you see that?
4 　 A　I do.
5 　 Q　Do the commissions that are earned under
6 Exhibit 20, the agency agreement, factor into this
7 equation for purposes of Section 7.1?
8 　 A　No.
9 　 Q　What discounts and rebates are referenced in
10 Section 7.1?
11 　 A　There are to my knowledge no discounts or
12 rebates. I think it's standard language in our
13 agreement.
14 　 Q　Going back to Exhibit 20, the agency agreement,
15 what were your responsibilities with respect the agency
16 agreement other than the negotiations of the agreement
17 itself?
18 　 MR. MEINERTZHAGEN: Object to the form.
19 　 THE WITNESS: What were my responsibilities with
20 regard to the agency agreement?
21 　 MR. RICHTER: Q Right.
22 　 A　Other than negotiating it, simply executing the
23 agreement.
24 　 Q　Okay. By executing the agreement, what do you
25 mean by that?

Page 76

1 　 A　Just, you know, obtaining the appropriate
2 signatories.
3 　 Q　Did you or have you reviewed any statements or
4 reports relating to the agency agreement?
5 　 A　Please restate that.
6 　 Q　Well, let's go back to par -- numbered
7 paragraph 3 on page 764. There's the reference of
8 statements of premiums due. Have you reviewed any of
9 those statements of premiums due?
10 　 A　Yes, I have.
11 　 Q　Those statements also include figures for the
12 amount of the commission that accrues to the agent under
13 the agreement?
14 　 A　They will.
15 　 Q　Is it based on those statements that you
16 provided me the figures that you did for commissions
17 earned?
18 　 A　Yes, and it includes the refunds as well. So
19 it would be, you know -- new business, renewal,
20 cancellations, both partial and flat, and whether or not
21 a commission was paid or commission was charged back.
22 　 Q　So the 1.4 million figure that you provided for
23 '09 and the other figures you provided for the earlier
24 years, those were commissions on flood insurance only,
25 correct?

Page 77

1 　 A　For home equity, correct.
2 　 Q　Those -- Those figures, were those net figures
3 after any --
4 　 A　Chargebacks?
5 　 Q　Yes.
6 　 A　Yes.
7 　 Q　Do you know what the figures were for nonhome
8 equity lender-placed policies?
9 　 A　Offhand, I don't.
10 　 Q　Would they have been greater?
11 　 A　They would have been greater.
12 　 Q　By a factor of what?
13 　 A　Obviously it would depend upon the year that
14 we're speaking about because we saw a significant growth
15 in the home equity we just spoke about. You know, I can
16 give you maybe an approximate figure that would take out
17 home equity that we probably wrote 40 million premium in
18 or close to it in '09, excluding home equity. So 50
19 million. So --
20 　 Q　8 to 10 million in commissions?
21 　 A　Probably 8 to 10 million.
22 　 Q　Separate and apart from the 1.2 on the home
23 equity?
24 　 A　Correct. That includes the aggregated
25 portfolios.

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 78

1    Q  Okay.  So the 8 to 10 commissions on the 40 to
2  50 in premiums, is that flood premiums?
3    A  Flood premiums.
4    Q  Not hazard?
5    A  Not hazard.
6    Q  Do you also review premium statements and
7  commission statements on the lender-placed on the nonhome
8  equity loans?
9    A  I will, yes.  That information is provided
10  monthly.
11    Q  What are those -- Do they have a name?  Does it
12  just say statement at the top or is there some special
13  name for those statements or reports?
14    A  They're commission statements and it's premium
15  and commissions.  I don't know if there's a specific
16  title.  You know, it's at the policy level detail.
17    Q  Is there a year-end statement that you get that
18  rolls it all up for the year?
19    A  Not usually.  We can request that.
20    Q  Who reviews those premium and commission
21  statements in addition to yourself?
22    A  The young ladies that I mentioned, Pam
23  La Lively and Marlene upon request.  They don't do it as
24  a normal course.  There's a lot of transactions there.
25    Q  Are those commission statements or any of the

Page 79

1  information in those commission statements shared with
2  anybody from Chase Home Finance, LCC or JP Morgan Chase
3  Bank, N.A.?
4    A  No.
5    Q  Are you sure of that to an absolute moral
6  certainty?
7    MR. MEINERTZHAGEN:  Object to the form.
8    THE WITNESS:  If there were an isolated -- if there
9  were an isolated loan that someone was being asked to
10  research a screen print may be done that would include
11  the particulars for the loan, the premium amount.  I
12  don't think it includes the commission amount, but I
13  can't say with 100 percent certainty.  So in the past we
14  have done, you know, on rare occasion research on an
15  individual loan and we'll get, you know, screen prints.
16    MR. RICHTER:  Q  Who owns the shares of Chase
17  Insurance Agency and prior to that JP Morgan Insurance
18  Agency?
19    MR. MEINERTZHAGEN:  Object to the form, lacks
20  foundation, outside the scope.
21    Go ahead and answer if you can.
22    THE WITNESS:  I really can't answer that, but it's
23  -- we're part of a holding company, and we're
24  affiliated -- not the bank but the holding company.
25  JP Morgan Insurance, LLC and they're a subsidiary of

Page 80

1  JP Morgan Chase and Company.
2    MR. RICHTER:  Q  So JP Morgan Insurance Agent --
3  let's start with Chase Insurance Agency.  Chase Insurance
4  Agency, Inc. is a wholly-owned subsidiary of JP Morgan
5  Insurance, LLC?
6    A  Yes.
7    Q  JP Morgan Insurance, LLC is a wholly-owned
8  subsidiary of JP Morgan Chase Company?
9    A  Yes.  What did you reference as the Chase
10  Insurance Agency, Inc. being affiliated with, which
11  company did you reference?  I want to make sure I had
12  that correct.  It's JP Morgan Insurance Holding, LLC.
13    Q  I see.
14    A  I didn't think that was included.  That's why I
15  asked.
16    Q  Let's make sure we get this right one last
17  time.  So Chase Insurance Agency, Inc. is a wholly-owned
18  subsidiary of JP Morgan Insurance Holding, LLC?
19    A  Correct.
20    Q  And JP Morgan Insurance Holding, LLC, is a
21  wholly-owned subsidiary of JP Morgan Chase Co.?
22    A  Correct.
23    Q  And prior to December 31, 2008, the date of the
24  name change, the merger, was JP Morgan Insurance Agency,
25  Inc. a wholly-owned subsidiary of JP Morgan Insurance

Page 81

1  Holding, LLC?
2    A  I couldn't say for certain.  I would expect so.
3    Q  Would it be fair to say that -- if you don't
4  recall the specific holding company for JP Morgan
5  Insurance Agency, Inc. but the fundamentals would be the
6  same as for Chase Insurance Agency, Inc. in that JP
7  Morgan Insurance Agency, Inc. would have a wholly-owned
8  holding company subsidiary which would then be a
9  wholly-owned subsidiary of JP Morgan Insurance Company?
10    A  That would be my opinion.
11    MR. MEINERTZHAGEN:  Objection to the form, outside
12  the scope.
13    MR. RICHTER:  Q  Who generates the commission
14  statements and the reports?  Are those generated by ASIC
15  or are those generated internally by Chase insurance?
16    A  They're generated by Assurant.
17    Q  In addition to the commission statements do you
18  receive or review any correspondence relating to the
19  agency agreement?
20    MR. MEINERTZHAGEN:  Object to the form.
21    THE WITNESS:  Relating to the agency agreement, I
22  would say not offhand, I can't think of any.
23    MR. RICHTER:  Q  Do you have any -- Do you receive
24  or exchange any e-mails with anybody relating to the
25  agency agreement?  Let's start with the period of time

21 (Pages 78 to 81)

CONFIDENTIAL
DANIEL WHEELER — 1/11/2011

Page 82

1  after it went into effect.
2      MR. MEINERTZHAGEN:  Object to the form.
3      THE WITNESS:  You know, possibly with counsel on
4  occasion.
5      MR. RICHTER:  Q  How about before, e-mails relating
6  to the negotiations of the agency agreement?
7      MR. MEINERTZHAGEN:  Same objection.
8      Kai, are you referring to Exhibit 20, the '07
9  agreement, not the subsequent one?
10     MR. RICHTER:  We're not there yet.
11     THE WITNESS:  You know, I can't say for certain.  I
12 would think not.
13     MR. RICHTER:  Q  I believe you testified earlier
14 regarding wanting to keep the commission terms separate
15 from the terms in the Compliance PLUS Insurance
16 Agreement.  Do you recall that?
17     A  Yes, stand alone.
18     Q  And you testified regarding your opinion as to
19 the reasons for keeping those separate.  Do you recall
20 that?
21     A  I do.
22     Q  Did you communicate those reasons to anybody at
23 the time contemporaneously with the negotiations of
24 Exhibit 46, the insurance agreement and the agency
25 agreement, Exhibit 20?

Page 83

1      MR. MEINERTZHAGEN:  Object to the form.
2      THE WITNESS:  There was communication, verbal
3  communication that addressed, you know, that specific
4  issue.
5      MR. RICHTER:  Q  Anything in writing?
6      A  Not that I can -- not that I can recall.
7      Q  Did you consider it significant or important
8  that the terms in Exhibit 46, the insurance agreement, be
9  kept separate from the commission arrangement in the
10 agency agreement, Exhibit 20?
11     MR. MEINERTZHAGEN:  Object to the form.
12     THE WITNESS:  46 is the Compliance PLUS?  We've
13 always considered it to be important to separate the two.
14 For as long as I managed the program.
15     MR. RICHTER:  Q  Sure.  Very important?
16     MR. MEINERTZHAGEN:  Object to the form.
17     THE WITNESS:  Very important to where we discussed.
18     MR. RICHTER:  Q  That's -- that was the question I
19 had, which is, if it was that important why isn't it set
20 forth in writing anywhere that they should be kept
21 separate?
22     MR. MEINERTZHAGEN:  Object to the form.
23     THE WITNESS:  You know, I can't say with 100 percent
24 certainty there's not something out there that, you
25 know -- an e-mail that, you know, could possibly address

Page 84

1  that issue.  I don't believe that there is.  I personally
2  have had dialogue with servicing, I personally have had
3  dialogue with counsel around this -- and I've had
4  dialogue with Assurant around the need to keep this
5  separate, and, you know, legal and Assurant, you know,
6  have always, you know, embraced that and, you know,
7  servicing, you know, has -- has embraced that.  So --
8      MR. RICHTER:  Q  Let's go back to the agency
9  agreement.  Numbered paragraph 8, Chase 765 and it spills
10 over to 766.  The agency agreement designates in
11 paragraph 8 on Chase 766 as you being the person to whom
12 notices are to be sent to agent.
13     Do you see that?
14     A  Yes.
15     Q  Have you received any notices that were sent
16 pursuant to this paragraph 8?
17     A  You know, I would be sent legal drafts of --
18 for terminating the contract, for amending the contract,
19 you know, that's the only time we would get, you know --
20 notifications if there were change in contract terms or
21 conditions that was affected by either amendment or
22 superseded by a new agreement.
23     Q  Did you ever send out any notices in connection
24 with this paragraph 8 to ASIC?
25     A  I don't believe so.

Page 85

1      Q  Now, paragraph 8 designates an unnamed
2  Compliance PLUS product manager as the person to whom
3  notices are to be sent to ASIC.
4      Do you see that?
5      A  I do.
6      Q  Who is the Compliance PLUS product manager for
7  ASIC or who was that person during the period of time
8  this agreement was in effect?
9      A  Likely it was Quantz or Ms. Kyler.
10     Q  Was there a prior version of the agency
11 agreement previous to January 1 of '07?
12     A  I believe there was.
13     Q  Was that memorialized in writing?
14     A  I believe it was.
15     Q  Based on your recollection it also provided for
16 a 20 percent commission, is that right?
17     A  It would have, yes.  Typically our agreements
18 they're concurrent, the terms are, and they run for 3, 4,
19 5 years.  The company preference is a 3-year term.
20     Q  On page -- last page of the agency agreement,
21 Chase 766, is that Mr. Barnett's signature, is that
22 right?
23     A  Barrell.
24     Q  I'm sorry.  That's your signature to the left
25 of his?

22  (Pages 82 to 85)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 86

1    A  It is.
2    Q  Did you have any communications with
3  Mr. Barrell relating to this agreement of the
4  negotiations concerning there agency agreement?
5    A  You know, he was likely advised via phone call
6  with some point in time the commission arrangement would
7  be for this particular period going forward, and there
8  was communication, you know, regarding his execution of
9  this agreement.
10   Q  With it be fair to say he was the guy that
11 signed off, but you were the one who was handling the
12 bulk of the negotiations if not all?
13   A  That's correct, yes.  He was an officer of
14 JP Morgan Insurance Agency, Inc.
15   Q  How about after this agreement went into
16 effect, did you have any communications with Mr. Barrell
17 relating to the agency agreement or the commissions
18 received under the agency agreement?
19   A  I don't recall, but not likely.
20   Q  Who did you deal with on the other side in
21 connection with the negotiations over this agreement?
22 Did you deal directly with Mr. Frobose or was it somebody
23 else?
24   A  No.  It was John Frobose.
25   Q  Anybody else?

Page 87

1    A  No.
2    MR. RICHTER:  All right.  Let's take a break for
3  lunch.
4    (Off the record)
5    (Exhibit 47 marked as requested)
6    Q  All right.  Mr. Wheeler, the court reporter has
7  handed you what's been marked as Exhibit 47, Bates number
8  Chase 1646 through 1687.
9    Do you have that in front of you?
10   A  I do.
11   Q  And are you familiar with this document?
12   A  Yes.
13   Q  Okay.  And is this an amended version of the
14 Schedule 1 document that you were testifying about before
15 the lunch hour?
16   A  It is.
17   Q  Did you also participate in the negotiations
18 relating to this amended and restated Schedule 1 to the
19 Master Services Agreement?
20   A  Only to the extent of the outsourcing fees.
21   Q  And who else participated in negotiations of
22 this agreement from the Chase side?
23   A  It would have been Jeff Nack, Brent Miller,
24 legal counsel.  I'm sure Heidi Carter probably
25 participated.

Page 88

1    Q  All of those people are from Chase Home
2  Finance?
3    A  Yes, and Terry Smith may have been involved as
4  well.
5    Q  So by legal counsel you're referring to inhouse
6  legal counsel?
7    A  Yes.
8    Q  And that's true -- is that true for your prior
9  testimony as well when you were referring to legal
10 counsel participated in negotiations of the various 2007
11 versions of the agreement?
12   A  Yes.
13   Q  And then on the ASIC side, I'm looking at
14 page 1660, it looks like this was also signed by John
15 Frobose?
16   A  That's correct.
17   Q  Anybody else from the ASIC side who was
18 involved in the negotiations relating to this amended and
19 restated Schedule 1?
20   A  Yes.
21   Q  Who else?
22   A  Probably Michael Campbell.
23   Q  Was Mr. Campbell also involved in the
24 negotiations over the 2007 Schedule 1?
25   A  I don't believe so.

Page 89

1    Q  Was anybody other than Mr. Frobose involved in
2  the negotiations relating to the 2007 Schedule 1 on the
3  ASIC side?
4    A  Likely there were others, Ronald Wilson.
5  Probably Quantz -- Quantz Kyler.  With regard to the 2010
6  it would have also -- aside from Michael Campbell it
7  would included Ronald Wilson, probably Vanessa Cook,
8  Kevin Roy.  They like -- I know they were involved in
9  conference calls.
10   Q  Do you know what each of their titles are at
11 ASIC, Mr. Campbell, Mr. Wilson, Ms. Cook and Mr. Roy?
12   A  I don't.  I'd just be guessing.
13   Q  And then who signed this and initialed on this
14 on behalf of Chase, JP Morgan Chase and EMC?
15   A  David Schneider.
16   Q  Who is he?
17   A  He's senior vice president of Chase Home
18 Finance, Mortgage and Servicing, or mortgage servicing.
19   Q  Do you know where he falls in the Chase Home
20 Finance chain of command relative to Terry Smith?  Is he
21 Terry's boss?
22   A  No.  He is Bob Seginini's boss.  Or was at this
23 time.
24   Q  Then who initialed it to the left of
25 Mr. Schneider?

23 (Pages 86 to 89)

Page 90

1    A   I don't recognize the initials.
2    Q   Now, under the amended and restated Schedule 1
3  there was a change in the fee that was -- went to ASIC,
4  is that right?
5    A   That's correct.
6    Q   And looking at page Chase 1653, Article IV, the
7  fee increased from 28 cents per loan to 35 cents per
8  loan, is that right?
9    A   That's correct.
10    Q   And that was for all lines of business, both
11  first and second lien accounts, correct?
12    A   That's correct.
13    Q   And both loans and lines, correct?
14    A   That's correct.
15    Q   Other than that change in the fee, did the
16  rights and responsibilities of the parties remain
17  basically the same?
18    MR. MEINERTZHAGEN:  Object to the form, outside the
19  scope.
20    THE WITNESS:  The servicing standards changed.  I
21  can't address specifically which ones changed, but this
22  contract brings under a single agreement the
23  Heritage-WaMu servicing portfolio and the EMC Mortgage
24  Corporation portfolio under a single agreement.  The
25  decision was made that we would adopt the Chase business

Page 91

1  model for process and procedures, uniform standard forms,
2  disclosures, rates, et cetera, and we would do the same
3  thing with regard to the economic structure, bring every
4  portfolio under one umbrella.
5    MR. RICHTER:  Q   So there was a change in the fee
6  from 28 cents to 35 cents as we've discussed, right?
7    A   Correct.
8    Q   Then another change with this agreement is
9  subsequent to the acquisitions of EMC and WaMu,
10  Washington Mutual, by Chase, they also got swept into the
11  amended Schedule 1, correct?
12    A   Correct.
13    Q   And there were some -- with respect to the
14  servicing standards, is it fair to say that there may
15  have been some nips or tucks here or there with respect
16  to the servicing standards, but the former Chase template
17  from the 2007 Schedule 1 served as the framework for the
18  2010 Schedule 1?
19    MR. MEINERTZHAGEN:  Object to the form.
20    THE WITNESS:  It's hard for me to testify to that.
21  Specifically I would say for the most part, yes, but we
22  did tighten up standards, we did tighten up service
23  levels.  We adopted what some of Heritage-WaMu and/or the
24  Heritage EMC portfolio may have had in place prior.  We
25  kind of took the best of all worlds to the extent that we

Page 92

1  could, and that's what was negotiated with Assurant.  And
2  I was involved in some of that negotiations, just again
3  the periphery, but it was dialogue around what it was
4  that we needed and then a discussion that John and I --
5  John Frobose and I had around the -- what he thought he
6  had originally agreed to and what he's seeing in the new,
7  you know, outsourcing document, which is Schedule 1, and
8  so there was a lot of fine tuning that really involved
9  the servicing team, Jeff Nack and Brent Miller and Terry
10  Smith, to fine tune that to get to where Assurant was
11  comfortable with all of the expectations and any change
12  and resource allocation that needed to be made.
13    Same thing I mentioned when we spoke of the
14  2007 Schedule 1 outsourcing agreement.  We're very
15  careful.  You know -- both myself and legal, we drove the
16  increase from 28 to 35 cents.  We went through a similar
17  process that we went through in 2007 as inexact as it
18  might be but in an attempt to identify not only the
19  existing full-time employees that were attached to these
20  each of these functions but consistent with both
21  migration and also the -- any new service level
22  standards, the number of additional full-time employees
23  that might be attached to that.
24    We also, you know, believed and communicated to
25  Assurant in this process that there was some real

Page 93

1  efficiencies to be gained, you know, by ultimately, you
2  know, having uniform standards and procedures and
3  policies across the board, operating efficiencies to be
4  gained in terms of, you know, collapsing some of what
5  they were doing before, you know, under single umbrella,
6  so some saves in terms of personnel, and came to the
7  conclusion that the 35 cents per loan per month, you
8  know, more accurately represented the actual costs plus
9  potential saves associated with the outsourcing
10  requirements.
11    And, you know, we again made it very clear that
12  this is a stand alone agreement, stand alone pricing, and
13  anything we do with regard to outsourcing will not impact
14  any other agreement, nor will any other agreement with
15  any financial considerations have any impact on the
16  pricing that is set forward in this outsourcing
17  agreement.  And I further communicated to Assurant that
18  if we are requesting additional changes, as will happen
19  from time to time with the outsourcing needs and the
20  needs of our servicing team, that if there's an
21  additional cost associated with that, our expectation is
22  is that we pay for that.
23    MR. RICHTER:  Q   Did Mr. Frobose or anybody from
24  ASIC request an increase in the amount of the fee?
25    A   No.

24  (Pages 90 to 93)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 94

1    Q   So it's your testimony that the increase in the
2  fee was initiated by you?
3    A   By Chase.
4    Q   Who at Chase?
5    A   Myself, legal counsel, Bob Seginini was
6  involved in discussions, and then senior executives
7  ultimately, you know, weighed in on, you know, on those
8  decisions.
9    Q   Other than the change in the fee, sweeping in
10  EMC and WaMu, there any other significant changes that
11  you recall with respect to the amended and restated
12  Schedule 1?
13    MR. MEINERTZHAGEN:  Object to the form, outside the
14  scope.
15    THE WITNESS:  I really couldn't speak to that.  It's
16  more of an operational issue.
17    MR. RICHTER:  Q   On the amended and restated
18  Schedule 1, JP Morgan chase Bank, N.A. is explicitly
19  listed as a party to the agreement whereas on the
20  previous version of the Schedule 1 it wasn't explicitly
21  identified as a party on Schedule 1, although it was on
22  the Master Services Agreement itself.  Do you know what
23  precipitated that change?
24    A   I don't.  I could only guess, and my guess
25  would be that we have some manual processing of some

Page 95

1  commercial flood for the bank, lender-placed, but that's
2  just a guess.  That would have been a legal decision.
3    Q   Then looking at Section 3.3 on page 1652, Terry
4  Smith continued to serve as the relationship manager
5  under the amended agreement, is that right?
6    A   I'm sorry.  What's the reference?
7    Q   Section 3.3 on Chase 1652.
8    A   That's correct.
9    Q   The new relationship manager for ASIC was
10  Vanessa Cook, is that right?
11    A   That's correct.
12    Q   Do you know when she took over the relationship
13  manager duties?  Was it as of 1-1 -- January 1 of 2010 or
14  had her predecessor left before that time?
15    A   Her predecessor left prior to that.
16    Q   Looking at Section 1.10 on page 1648, the
17  definition of mortgage loan continued to apply not only
18  to loans but also to home equity lines, correct?
19    A   That would be correct.
20    Q   Mark this 48.
21    (Exhibit 48 marked as requested)
22    Q   Mr. Wheeler, the court reporter has just handed
23  you what's been marked as Exhibit 58, Bates number Chase
24  1747 through 1807.
25    Do you have that in front of you?

Page 96

1    A   As shown as Exhibit 48?
2    Q   Yes.
3    A   Yes.
4    Q   Are you familiar with this document?
5    A   Yes.
6    Q   What is it?
7    A   It's the -- essentially the flood
8  administrative agreement, and it's bringing in both WaMu
9  and EMC to the agreement.
10    Q   Did you participate in the negotiations
11  relating to this amended and restated Compliance PLUS
12  Insurance Agreement?
13    A   I may be involved in some discussion, but not
14  really negotiations.
15    Q   What do you mean by that, the distinction that
16  you're drawing?
17    A   That was made -- I think I might have mentioned
18  it previously, maybe I did not.  The agreement that we
19  entered into collectively, ourselves and Assurant, was
20  the fact that because we were bringing -- because we were
21  bringing in the Heritage-WaMu and EMC portfolio into the
22  process and the Heritage-Chase business model, that to
23  the extent that we could, we wanted to leave the
24  agreements virtually intact and to make, you know, as few
25  salient changes as possible.  So that was an agreement

Page 97

1  that we entered into prior to any negotiations, and I
2  think we accomplished that by and large.
3    You had asked about the Exhibit 47, the amended
4  and rescheduled Schedule 1.  What changed there were
5  primarily the outsourcing requirements, service level
6  standards, performance penalties, things of that nature,
7  but in terms of the Compliance PLUS, you know, there were
8  very few changes made to the agreement itself other than
9  to bring in the parties to the agreement, and there may
10  have been some other changes that were not, you know,
11  considered to be significant.
12    Q   So fair to say that emphasis on Exhibit 48, the
13  amended and restated Compliance PLUS Insurance Agreement,
14  it was more in the notion of restated than amended?
15    A   That's correct.
16    MR. MEINERTZHAGEN:  Object to the form.
17    MR. RICHTER:  Q   And just quickly to cover some of
18  the restated portions, looking at the recitals, last
19  paragraph on page 1747, also provides for proper
20  notification to be sent to the affected mortgagor stating
21  that lender-placed acceptable flood insurance will be
22  obtained upon the failure of the mortgagor to promptly
23  provide evidence of other acceptable flood insurance, is
24  that right?
25    A   That's correct.

25  (Pages 94 to 97)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 98

1    Q   That was consistent with the earlier agreement,
2 correct?
3    A   Correct.
4    Q   Then the next paragraph on the very next page
5 also provided that the supplier was to provide flood
6 insurance for real properties as desired by the servicer,
7 correct?
8    A   That's correct.
9    Q   And that was consistent with the earlier
10 insurance agreement, correct?
11    A   That's correct.
12    Q   And, again, consistent with the earlier
13 agreement, provide -- the next paragraph -- that the
14 servicer was to pay for these services by paying
15 premiums, is that correct?
16    A   Yes.
17    Q   Okay.  Moving on.  Paragraph 1.8 -- let's see.
18 Next page in the definition of mortgage loan.  That term
19 as it applied in this agreement included not only loans
20 but also included home equity lines consistent with the
21 earlier agreement, correct?
22    A   That's correct.
23    Q   Then moving on, paragraph 2.5 on page 1751,
24 should say Section 2.5 rather, there was the same
25 language in the 2010 insurance agreement placing the

Page 99

1 responsibility on the servicer to make sure it had the
2 requisite authority to obtain the type and amounts of
3 coverage it requested, correct?
4    MR. MEINERTZHAGEN:  Object to the form.
5    THE WITNESS:  Correct.
6    MR. RICHTER:  Q  Moving on to paragraph 4.1 on
7 page 1753.  Consistent with the earlier agreement, Chase
8 was to use ASIC as its sole and exclusive provider of
9 lender-placed flood insurance for real property, correct?
10    A   Correct.
11    Q   And looking now to page 1758, Section 7.1, the
12 agreement had the same type of most favored customer
13 language in there, net of discounts and rebates, correct?
14    A   Correct.
15    Q   Then moving on to Section 11.2 at Chase 1766
16 through 67, specifically 11.2 subpart C, there's the same
17 disclaimer language in there regarding whether the
18 location of eligible property is or is not in or near a
19 special flood hazard area, correct?
20    A   Correct.
21    Q   I want to go back to the definition of
22 acceptable flood insurance.  That's Section 1.1.  In what
23 respects, if any, was this definition of acceptable flood
24 insurance in 1.1 in the 2010 amended and restated
25 insurance agreement different than the definition in the

Page 100

1 2007 Compliance PLUS Insurance Agreement --
2    MR. MEINERTZHAGEN:  Object --
3    MR. RICHTER:  Q -- which is Exhibit 46?
4    MR. MEINERTZHAGEN:  Object to the form, outside the
5 scope.
6    MR. RICHTER:  Q  This is specifically comparing
7 pages Chase 1748 with Chase 1689.
8    MR. MEINERTZHAGEN:  I have an objection to form and
9 to scope.
10    MR. RICHTER:  Noted.
11    THE WITNESS:  Changes -- it amends the definition of
12 acceptable flood insurance.
13    MR. MEINERTZHAGEN:  Q  How so?
14    MR. MEINERTZHAGEN:  Same objection.
15    THE WITNESS:  References coverage limits that are at
16 least equal to those required by the servicer in the Act,
17 in the National Flood Insurance Program, compared to
18 coverages limits conforming to the standards of the Act,
19 the National Flood Insurance program.  Also includes that
20 if coverage is not known then placement will be at the
21 unpaid principal balance or principal balance.
22    And further stipulates that it must meet the
23 servicer's deductible requirements.
24    MR. RICHTER:  Q  And what was the purpose of making
25 that change or those changes?

Page 101

1    MR. MEINERTZHAGEN:  Objection, outside the scope?
2    THE WITNESS:  I couldn't tell you because I wasn't
3 involved in the discussions.
4    MR. RICHTER:  Q  Who was involved in the discussions
5 relating to the changes to this Section 1.1?
6    A   It would have been legal counsel, both Assurant
7 and Chase, and likely include Jeff Nack and Brent Miller
8 as to the acceptability of the definition.
9    Q   Under this definition would it be acceptable if
10 flood insurance was maintained in 2010 for the amount of
11 the last known flood insurance coverage in earlier years?
12    MR. MEINERTZHAGEN:  Object to the form, outside the
13 scope.
14    THE WITNESS:  Would you repeat the question?
15    MR. RICHTER:  Q  Sure.  Under the definition of
16 acceptable flood insurance in Section 1.1, would it be
17 acceptable if flood insurance was maintained in 2010 for
18 the same amount as the last known flood insurance
19 coverage in earlier years?
20    MR. MEINERTZHAGEN:  Same objections.
21    THE WITNESS:  That's not my decision to make.  It's
22 an operational decision that I can't speak specifically
23 to individual circumstances.
24    MR. RICHTER:  Q  Based on the language of
25 Section 1.1, in your opinion, would carrying coverage,

26  (Pages 98 to 101)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 102

1  flood insurance coverage in 2010 equal to the last known
2  coverage amount in 2009 be consistent with the definition
3  of acceptable flood insurance in Section 1.1 of the 2010
4  agreement?
5      A   Yes.
6      MR. MEINERTZHAGEN:  Same objections.
7      MR. RICHTER:  Q  Likewise, if the coverage amount
8  for 2009 was unknown, is it your understanding based on
9  the language of Section 1.1 in the 2010 agreement that
10 coverage in the amount of the borrower's principal
11 balance would be acceptable for purposes of Section 1.1?
12     MR. MEINERTZHAGEN:  Same objections.
13     THE WITNESS:  Yes.
14     MR. RICHTER:  Q  Looking at paragraph 2.3 there's a
15 provision there called waiver of flood insurance,
16 page 1750, which appears to be something that was -- a
17 new section that wasn't included in the 2007 insurance
18 agreement.
19     Do you know why this was added?
20     A   No, I do not.
21     Q   Are there any other changes to the 2010 amended
22 and restated Compliance PLUS Insurance Agreement other
23 than those that we've already discussed that stand out in
24 your mind?
25     MR. MEINERTZHAGEN:  Object to the form, outside the

Page 103

1  scope.
2      THE WITNESS:  No, not without reviewing the
3  documents side by side.
4      MR. RICHTER:  Q  Do you know if Chase has conducted
5  any regulatory audits of ASIC since this amended and
6  restated agreement became effective?
7      A   No, I do not.
8      MR. MEINERTZHAGEN:  Object to the form, outside the
9  scope.
10     MR. RICHTER:  Q  Are you aware of any operational
11 audits since the effective date of the amended and
12 restated insurance agreement?
13     MR. MEINERTZHAGEN:  Same objections.
14     THE WITNESS:  I'm not personally aware of.
15     MR. RICHTER:  Q  There could have been, you're just
16 not aware --
17     A   Exactly.  In fact, I'm pretty sure there was.
18 I just don't have direct knowledge.
19     (Exhibit 49 marked as requested)
20     Q   Mr. Wheeler, the court reporter has just handed
21 you what's been marked as Exhibit 49, Bates number Chase
22 1809 to 1811.
23     Do you have that in front of you?
24     A   Yes.
25     Q   Are you familiar with this document?

Page 104

1      A   Yes, I am.
2      Q   Can you tell me what this is?
3      A   It's a Compliance PLUS Agency Insurance
4  Agreement.  It provides for the payment of commissions to
5  the agency entity, Chase Insurance Agency, Inc.
6      (Exhibit 50 marked as requested)
7      Q   Looking at deposition Exhibit 50, Chase 1808,
8  are you familiar with that document?
9      A   Yes.
10     Q   Can you tell me what it is?
11     A   It's notification of an agreement to terminate
12 the prior Compliance PLUS Insurance Agency Agreement.
13     Q   Okay.  So Exhibit 50, Chase 1808, that's --
14 that states it's effective as of December 31st, 2009 at
15 11:59 p.m., is that right?
16     A   That's correct.
17     Q   So as of -- As of that time the 2007 agency
18 agreement was terminated consistent with the expiration
19 of its 3-year-term and then the new agency agreement,
20 Deposition Exhibit 49 went into effect, is that right?
21     A   That's right.
22     Q   Looking at Deposition Exhibit 50, both you and
23 David Schneider signed that on behalf of JP Morgan
24 Insurance Agency, Inc., is that right?
25     A   Yes.

Page 105

1      Q   Then on behalf of ASIC, it was Mr. Frobose who
2  signed and Mr. Campbell who attested, correct?
3      A   That's correct.
4      Q   Do you know whose initials are next to
5  Mr. Schneider's?
6      A   No, I don't.
7      Q   Did you participate in the negotiations
8  relating to Exhibit 49, the --
9      A   Yes, I did.
10     Q   In looking at page 1811, is that also signed by
11 Mr. Schneider on behalf of Chase Insurance Agency, Inc.?
12     A   Yes, it is.
13     Q   Was the decision to terminate the prior
14 agreement and enter into this new agreement as opposed to
15 simply amending the prior agreement as was done with the
16 other agreements, was that due to the fact that you had a
17 new party, Chase Insurance Agency, Inc., now instead of
18 JP Morgan Insurance Agency, Inc.?
19     A   I don't know specifically other than the fact
20 that it's a lot cleaner to start with a new agreement.
21 Both EMC and WaMu were brought under this agreement.  The
22 commission has changed significantly from the old
23 agreement to this agreement and the Chase legal entity
24 name changed so just a lot cleaner.
25     Q   Could you describe the negotiations process

27 (Pages 102 to 105)

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 106

1  relating to the 2010 agency agreement for me?
2      A   We went through the process that we'd gone
3  through in prior years.  As we entered into the
4  expiration of the prior year's contract, we thoroughly
5  evaluated it in terms of conditions, including the
6  economics of the program.  We reached out to industry
7  contacts to get a good sense of what the prevailing
8  market rate was for commissions on this business, flood
9  commissions that would include Assurant and their
10  clients, and the information that we received was that
11  something south of 20 percent was more of the industry
12  norm, something closer to 15 percent and we, you know,
13  spent a long time looking at the programs, looking at the
14  sensitivity in the marketplace.
15          We made the decision that although our letter
16  of agreement reflected an understanding that we were
17  going to enter into the new agreement at a 15 percent
18  commission rate, we made the decision that we wanted to
19  change that commission and reduce it to 10 percent for
20  all lines with the exception -- all flood lines with the
21  exception of home equity, and home equity we made the
22  decision and communicated that to Assurant that we would
23  accept no commission on home equity lines or loans.  So
24  we felt that 10 percent was fair and reasonable, not
25  excessive, and this was a unilateral decision that Chase

Page 107

1  made, not one that Assurant put on the table.
2          They had no idea that we were going to -- other
3  than possibly in some verbal discussions, that we were
4  going to take commissions down.  They knew that any
5  change that we made would benefit them.  The rates of
6  commission continued to be, you know, up to 25 percent.
7  We just didn't feel comfortable in maintaining either a
8  20 or 15 percent level.
9      Q   Looking at numbered paragraph 6 on page 1810,
10  it says in the last sentence, this agreement shall be
11  coterminous and shall terminate concurrently with the
12  amended and restated Compliance PLUS Insurance Agreement
13  of dated as of January 1, 2010 between company and
14  servicer.
15      Do you see that?
16      A   Yes.
17      Q   Was the 2010 agency agreement that the
18  negotiations related to that agreement take place around
19  the same time as the negotiations relating to the amended
20  and restated 2010 Compliance PLUS Insurance Agreement?
21      A   Yes.
22      Q   And did the 2010 agency agreement apply to all
23  force-placed policies issued in connection with the 2010
24  amended and restated Compliance PLUS Insurance Agreement?
25      MR. MEINERTZHAGEN:  Object to the form.

Page 108

1      THE WITNESS:  All business written effective
2  January 1st, 2010 was affected by this agency agreement.
3      MR. RICHTER:  Q   Now, you mentioned a couple of
4  times during your testimony that there was some type of
5  an exemption for home equity accounts.  Where does it
6  provide for that in the Compliance PLUS Insurance Agency
7  Agreement, Exhibit 49?
8      A   It's not specifically addressed in the agency
9  agreement.
10      Q   Where are you getting that?
11      A   It's my understanding -- well, it's -- it's a
12  decision that we made, and we've communicated it to
13  Assurant and all of our commission statements reflect
14  zero commission on home equity lines and loans, and it
15  was this -- this was legal drafted, you know, the wording
16  so as to not make it convoluted and to make it cleaner in
17  terms of the commission percentage, but the commission
18  is, in fact, zero percent on home equity.
19      Q   Does it say that anywhere in writing?  I know
20  it doesn't say it in here, but anywhere?
21      A   Yes.
22      Q   Where?
23      A   In documents that I have prepared.
24      Q   Have you brought those with you today?
25      A   No.

Page 109

1      MR. RICHTER:  I'll state for the record those
2  documents have not been produced.  You can correct me if
3  I'm wrong.  I haven't heard nothing.  It speaks for
4  itself.
5      MR. MEINERTZHAGEN:  Well, I mean we produced the
6  agreement.  If there's another agreement, I'm not aware
7  of it.
8      MR. RICHTER:  Q   Where is the -- in what documents
9  is the nonproduced zero percent home equity commission
10  agreement reflected?
11      A   It would be in a document that I prepared for
12  discussion with and in consultation with legal counsel,
13  Chase legal counsel and, you know, my boss, Bob Seginini.
14      Q   Have you retained a copy?
15      A   I have a copy.
16      Q   When was that document generated?
17      A   I couldn't give you an exact date.  I couldn't
18  give you an exact date.
19      Q   Was it after January 1, 2010?
20      A   Probably.  It's something that's been under
21  consideration since prior to the end of January of 2009.
22      Q   Was it generated after the first quarter of
23  2010?
24      A   I'm not exactly sure.  I don't want to
25  misspeak, but clearly when we changed the thought process

28 (Pages 106 to 109)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 110

1  from Chase's perspective here, when we changed the
2  process of placement for home equity we revised the
3  minimum regulatory requirement by eliminating the
4  combination of UPB, first mortgage loans and junior
5  liens.  And in so doing that could increase coverage
6  requirements, which in turn could increase premium.
7  Chase's position is that we do not want to even be
8  perceived as changing our process so as to line our
9  pockets.  So we eliminated commission altogether.
10      The change in process, and I don't have an
11 exact date, was December of 2009.  The documents -- there
12 has been dialogue around this entire issue, and the
13 documents that I've produced reflect the decision being
14 made.  So I can't give you, you know, a definitive when
15 that decision or recommendation went forward, and --
16      (Exhibit 51 marked as requested)
17   **Q  Mr. Wheeler, the court reporter has just handed**
18 **you what's been marked as Exhibit 51.  Do you have that**
19 **in front of you?**
20   A  I do.
21   **Q  This is Plaintiff's Second Set of Requests to**
22 **Defendants For Production of Documents and Things.**
23     **Do you see that?**
24   A  I do.
25   **Q  Have you ever seen this prior to today?**

Page 111

1   A  No, I don't recall seeing it before.
2   **Q  I'd like you to turn to page 3, request 3 on**
3  **page 3.  Any and all contracts, agreements, letters or**
4  **memoranda of understanding between Chase and Assurant**
5  **relating, in whole or in part, to flood insurance, flood**
6  **insurance tracking services or force-placed insurance; or**
7  **2, any commissions, financial consideration, in-kind**
8  **compensation or rebates or kickbacks in connection with**
9  **the same.**
10     **Have you looked for documents responsive to**
11 **this request?**
12   A  I've had discussions with outside counsel --
13 MR. MEINERTZHAGEN:  You can't disclose the contents
14 of our conversation.  You can respond to whether or not
15 you've searched for the documents that are requested
16 there.
17 THE WITNESS:  I'm searching for some documents.
18 MR. RICHTER:  Q  Are searching or have searched?
19 MS. PEDERSEN HOPE:  Kai, the documents are all here.
20 I don't know why there's such a shock here.  These are
21 all the agreements, that's what the request asks for,
22 agreements, memoranda of understanding, amendments, which
23 is what you have --
24 MR. RICHTER:  Look, I'm asking the witness a
25 question.

Page 112

1 MS. POPE:  They're not fair questions.
2 MR. RICHTER:  No, they are fair questions because I
3 just heard there was a zero percent commission agreement
4 I've never heard of.
5 MS. POPE:  That's not what he said.
6 THE WITNESS:  I never said.
7 MR. MEINERTZHAGEN:  He never said there was an
8 agreement.
9 THE WITNESS:  There's not a zero percent commission
10 agreement.
11 MR. MEINERTZHAGEN:  You want to have her reread the
12 answer?  You've misconstrued his testimony.
13 MR. RICHTER:  Q  If you say there's not a zero
14 percent commission agreement, that's your testimony.
15     Let's take a look at the next page, request 13.
16 All e-mails, memos, communications, reports and other
17 documents relating to the amount of any commissions
18 received by Chase or its affiliates pursuant to Chase 764
19 to 766, that's the 2007 agency agreement, or any similar
20 agreement.
21     Have you looked for documents responsive to
22 this request?
23 MR. MEINERTZHAGEN:  For the record, I'll state that
24 counsel is reading the request without any reference to
25 the response or the objections.

Page 113

1     Go ahead and answer.
2   THE WITNESS:  I have searched for documents relating
3 to commissions received by Chase or its affiliates.
4 Including communications, e-mails or other documents.
5 MR. RICHTER:  Q  What have you found other than the
6 documents we've gone over earlier today?
7   A  The document that reflects the premiums paid --
8 the premiums written and the commissions paid at zero in
9 the beginning of the year.
10   **Q  What else?**
11   A  Presentation document that I prepared that
12 reflects the home equity commission, zero, and searched
13 e-mails, and I couldn't find any e-mail that specifically
14 addressed commissions.  We purposely have verbal dialogue
15 whether it be with our vendors or internal so I could
16 find no e-mails.
17   **Q  Did you find anything else?**
18   A  No.
19   **Q  Let's take a look at request 10, all e-mails,**
20 **memos, communications and other documents relating to any**
21 **financial incentives or other benefits to Chase or its**
22 **affiliates in connection with force-placed flood**
23 **insurance, tracking of flood insurance or increasing**
24 **Chase's flood insurance requirements.**
25     **Have you looked for documents responsive to**

29 (Pages 110 to 113)

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 114

1  that request?
2      MR. MEINERTZHAGEN:  You have the response to that,
3  Kai, because I believe in response to that we produced
4  all of the agreements.
5      THE WITNESS:  Yeah, I'm just looking at these, the
6  agreements included in here.  I believe the same document
7  that I'm referring to also reflects the increase in
8  Chase's flood insurance requirements.
9      MR. RICHTER:  Q  How about memos, are you aware of
10  any memos relating to --
11      A  No.  Most of our communications are privileged
12  with counsel so we don't have a lot of written documents.
13      Q  Are you an attorney?
14      A  No, but I speak with counsel quite often
15  regarding our programs.
16      Q  Are you aware that Chase has not designated one
17  document generated prior to the inception of this lawsuit
18  as privileged, not one document is on its privilege log?
19      MR. MEINERTZHAGEN:  Object to the form, outside the
20  scope of the deposition.
21          Kai, if you want to interrogate this witness on
22  meet and confer discovery issues, I think that's far more
23  appropriate to be taken up by counsel.
24      MR. RICHTER:  Q  Let's take a look at request
25  number 11.  All e-mails, memos and other documents

Page 115

1  referenced by the court at the September 1, 2010 hearing
2  in this action.
3          I'll just read to you those pages and line
4  numbers:  THE COURT:  Well maybe there are some e-mails.
5  Maybe there's some e-mails that say things like hey,
6  Chase, here's a way to make some more fees.  Why don't
7  you get out there and promote our insurance policy to
8  these people with zero zero balances.  I bet you there
9  are e-mails just like that.  If there aren't, I'd be
10  shocked.  So you get out there and produce those e-mails,
11  produce those memos.
12          Have you looked for any documents responsive to
13  that request?
14      MR. MEINERTZHAGEN:  Object to the form, outside the
15  scope.
16      THE WITNESS:  No.  It's ludicrous.  I'm clearly not
17  aware of any documents that even suggest that.
18      MR. RICHTER:  Q  How about request number 12, all
19  e-mails, memos, communications and other documents
20  relating to the negotiations of the 2007 agency agreement
21  or any similar agreement.
22      A  There are -- it's the same document that we're
23  referring to or like document.
24      Q  Which one are you specifically --
25      A  It really is not a negotiation.  It's a

Page 116

1  decision that Chase made.  Assurant played no part in
2  this.  Assurant didn't request that we lower the
3  commission.
4      Q  When was the decision made?
5      A  The decision was communicated to Assurant
6  probably June of this year.
7      Q  June of 2010?
8      A  Yes.
9      Q  After this lawsuit was filed in March of 2010?
10      A  I don't know when the lawsuit was filed, but
11  I'll say that the discussion began in 2009 with our
12  change in process.  It's just that we don't finalize
13  things and get total signoff until all of the agreements
14  are ready to be executed.
15      Q  Are there any documents that reflect those 2009
16  discussions as you've described?
17      A  I don't know.
18      Q  I'd like you to turn to the last page of the
19  requests for production.  Request 15 is all e-mails,
20  memos, communications and other documents authored by,
21  sent to, copied to or in the files of Dan Wheeler or any
22  other Rule 30(b)(6) witness that are responsive to these
23  requests for production or any of plaintiff's other
24  requests for production.
25          Do I have that right?

Page 117

1      MR. MEINERTZHAGEN:  Object to the form.
2          Do you mean did you read it correctly?
3      MR. RICHTER:  Yes.
4      THE WITNESS:  I think you read it correctly.
5      MR. RICHTER:  Q  Then request number 16, all
6  e-mails, memos, communications and other documents
7  authored by, sent to, copied to or in the files of Dan
8  Wheeler that relate to topic number 9 of Plaintiff's
9  Second Amended Notice of Deposition of Defendants
10  pursuant to Federal Rule of Civil Procedure 30(b)(6).
11          Did I read that correctly?
12      A  Yes.
13      Q  The date of there -- these second set of
14  requests for production is November 24, 2010, right?
15      A  Yes.
16      Q  Can you tell me why the other documents that
17  you've mentioned to me were not produced prior to today?
18      MR. MEINERTZHAGEN:  Object to --
19      MR. RICHTER:  Q  Do you have any explanation for
20  that?
21      MR. MEINERTZHAGEN:  Kai, he provided us some
22  documents --
23      MR. RICHTER:  I want an answer to this question.
24  You make your objection, we're going to get an answer.
25      MR. MEINERTZHAGEN:  I am going to get this on the

30 (Pages 114 to 117)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 118

1   record. We were provided some documents last week. In
2   consultation with Mr. Wheeler, we were informed that they
3   were prepared in consultation with Chase's inhouse
4   counsel. Because we only got those a few days ago, we
5   have not yet logged them, we have not reviewed them in
6   their entirety to determine whether we can -- we have to
7   withhold all of them, whether we can redact portions of
8   them and produce the rest. They aren't many. I think
9   there's four different documents, okay. We will get this
10  addressed shortly, but it hasn't happened yet because, as
11  I said, we just got them last week, and we had
12  Mr. Wheeler searching for additional information relating
13  to them like exactly who they went to.
14      MR. RICHTER: I will say for the record that we are
15  very much reserving our right to call back this witness
16  to discuss documents that were not produced in advance of
17  his deposition.
18      **Q  If we have to do that, Mr. Wheeler, I'm -- I**
19  **regret we're going to have do that, but under the**
20  **circumstances, we are going to reserve our right to do**
21  **that.**
22      **Now, going back to the question that I asked.**
23  **Do you have any explanation as to why the documents that**
24  **you have described were not produced in advance of the**
25  **deposition?**

Page 119

1       MR. MEINERTZHAGEN: Objection. That's -- you're
2   asking him to make a call on something a lawyer decides.
3   He is a corporate designee to testify on a particular
4   topic. You've also noticed him as a fact witness. He's
5   not here to testify concerning the Chase defendants'
6   discovery responses.
7       You want to take that up, you can take it up
8   with counsel as part of the ongoing meeting and
9   conferring process we've been undertaking.
10      MR. RICHTER: Are you instructing the witness not to
11  answer?
12      MR. MEINERTZHAGEN: Repeat the question. I may very
13  well instruct him not to answer the question because it's
14  not a fact question.
15      MR. RICHTER: Why don't you read it back.
16      (Whereupon, the following was read back:
17      "Q Do you have any explanation as to why the
18      documents that you have described were not
19      produced in advance of the deposition?")
20      MR. MEINERTZHAGEN: Go ahead and answer, if you
21  know.
22      THE WITNESS: To the best of my knowledge I had
23  produced the documents that were requested.
24      MR. RICHTER: Q  To your counsel?
25      A  To my counsel. And then the documents that

Page 120

1   were just referenced that were prepared with consultation
2   from our inhouse.
3       MR. MEINERTZHAGEN: Inhouse counsel?
4       THE WITNESS: Yes.
5       MR. RICHTER: Q  How much did Chase Insurance
6   Agency, Inc. earn in commissions in 2010 under the new
7   agency agreement?
8       A  Offhand, I don't know. Home equity, it was
9   negative. Negative 300 some thousand.
10      **Q  For first and second loans?**
11      A  Yes, it was negative -- roughly 300, 400,000 in
12  chargebacks -- zero commission for 2010, but, again, it
13  includes 2010 with any refunds or partials and flat
14  cancels attributed to home equity, lines and loans.
15      **Q  I was trying to get at the nonhome equity**
16  **loans. What is the right term for that by the way?**
17      A  First residential, you know, flood commissions.
18  I can't -- I don't know, and the reason I don't know is I
19  haven't pulled that together. It's information that's
20  out there. The number would be less than the prior year
21  obviously.
22      **Q  I'm trying to get at what falls under the home**
23  **equity bucket, what falls into the other bucket or**
24  **buckets. Home equity -- when you say home equity, are**
25  **you referring to both home equity loans and home equity**

Page 121

1   **lines?**
2       A  Yes.
3       **Q  Okay. Those are loans or lines that are opened**
4   **after the time that somebody already moves into the**
5   **property whereas the other ones are at the time of the**
6   **origination, at the time they move in?**
7       MR. MEINERTZHAGEN: Object to the form.
8       THE WITNESS: Yeah. I asked for a breakdown of all
9   home equity which would include all premiums and related
10  commissions paid to Chase Insurance Agency, Inc. on that
11  business. That's what I received.
12      MR. RICHTER: Q  My question is just a technical
13  one relating to what qualifies as home equity and what
14  qualifies as other. What's your definition of home
15  equity loan or line?
16      MR. MEINERTZHAGEN: Object to the form.
17      THE WITNESS: The home -- the only other flood
18  business that we have are first residential flood and
19  condo flood. Everything else falls into the home equity
20  bucket which would include, you know, flood gap, which is
21  one reason why -- thinking about it, one reason why the
22  premiums increased so dramatically year over year. I was
23  thinking about some of the timing.
24      One of my earlier responses -- and probably the
25  biggest increase was driven by lender placement of flood

31 (Pages 118 to 121)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 122

1  gap.
2      MR. RICHTER:  Q  I think that helps.  Just a
3  follow-up question relating to -- homeowner purchases a
4  house, they get for the 80 percent, then they --
5  they can't afford a 20 percent downpayment so they get a
6  second at the time that they close on the house.  Does
7  that -- that second loan is with Chase, does that fall
8  into the home equity bucket?
9      A  It does.
10     Q  Just to summarize, home equity for purposes of
11 Chase's definition is not first loans, noncondo loans?
12     A  Correct.
13     Q  Did Chase bargain for anything in return for
14 the reduction of the commission from 20 percent to 10
15 percent?
16     A  Absolutely not.
17     Q  It was just a give away?
18     A  It's a give away.  We did ask Assurant if we
19 could pass that on to the consumer.
20     Q  What was their response?
21     A  The base rates are the same for all clients.
22 There's a commission component built into the rate
23 itself, and they're unable to change the base rate for a
24 single client.  It's one or none or it's all or none.
25     Q  Are there e-mails or other written

Page 123

1  communications reflecting that request as you've
2  described to see if that savings could be passed on to
3  the consumer?
4      A  I don't believe so.
5      Q  Did Chase Insurance Agency's responsibility
6  under the 2010 agency agreement remain the same as
7  JP Morgan agency responsibilities under the 2007 agency
8  agreement?
9      MR. MEINERTZHAGEN:  Object to the form.
10     THE WITNESS:  They would.
11     MR. RICHTER:  Q  How about your responsibilities in
12 terms of what you handle in connection with both of those
13 agreements, did they basically remain the same?
14     A  They basically remained the same.
15     Q  So under the new agreement, for example,
16 believe it's at paragraph 8 of the 2010 agreement, all
17 notices are still supposed to be sent to you?
18     A  Correct.
19     Q  Have you received any notices in connection
20 with the 2010 agency agreement?
21     A  No.
22     Q  Have you sent any correspondence or e-mails or
23 notices to ASIC's Compliance PLUS product manager
24 relating to the 2010 agency agreement?
25     A  No.

Page 124

1      Q  Who's the -- their Compliance PLUS product
2  manager, is that Vanessa Cook?
3      A  It likely would be Vanessa Cook.  They leave it
4  open ended because of the change in personnel.  Vanessa
5  Cook is our account executive with Assurant.  So
6  day-to-day operational issues we go through Vanessa.
7  Senior level matters we go directly to either Mike
8  Campbell or Joe Frobose.
9      Q  Have you sent any correspondence or e-mails to
10 anybody else at ASIC relating to the 2010 agency
11 agreement?
12     A  Other than draft agreements, no.
13     Q  How about anybody at Chase Home Finance, LLC or
14 JP Morgan Chase Bank, N.A., have you exchanged any
15 communications, e-mails, correspondence relating to the
16 2010 agency agreement?
17     A  The agreement itself?
18     Q  Uh-huh.
19     A  I don't believe so.
20     Q  How about relating to the commissions under the
21 agreement?
22     A  Other than, you know, a dec that I would have
23 prepared, which is the same thing we're talking about.
24     Q  What do you mean by that?
25     A  It would include, you know, what -- on a going

Page 125

1  forward what the commission structure would be, and it's
2  not -- you know, the dec, you know, was not necessarily
3  prepared to focus on flood.  We're focusing on a number
4  of issues around the program, rate being one.
5      Q  When you say a dec, do you mean a dec --
6      A  Presentation dec.  We refer to them as decs.
7  It would be a document with an executive summary and
8  then, you know, potentially some, you know, financial
9  information, some bullet points.
10     Q  You have prepared something like that relating
11 to the 2010 agreement?
12     A  Not specifically relating to the agreement, but
13 you know, with regard to the 10 percent commission on all
14 flood lines with the exception of home equity that was
15 zero.
16     Q  Is that executive summary -- is that a
17 different document than the ones that you were describing
18 before?
19     A  No, these are all the documents that -- these
20 are ones that have been prepared, you know, with
21 consultation by inhouse counsel and, you know --
22     MS. POPE:  We're talking about the same documents,
23 Kai.
24     MR. RICHTER:  That's what I'm trying to find out
25 from the witness.

32 (Pages 122 to 125)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 126

1    THE WITNESS: I'm just trying to --
2    MR. RICHTER: Q  Do you continue to review the same
3  types of commission statements and reports that you did
4  before in connection with the 2007 agency agreement?
5    A  Yes. The format is different, but simply
6  because I've asked for it.
7    **Q   Are there any new reports or statements that**
8  **you review in connection with the 2010 agreement?**
9    A   They're new only in that they're reformatted
10  and summarized and they include net premiums and
11  collected premiums.
12    (Exhibit 52 marked as requested)
13    **Q   Mr. Wheeler, the court reporter has handed you**
14  **what's been marked as Exhibit 52, Chase 1812 through**
15  **1815.**
16    **Do you have that in front of you?**
17    A  Yes, I do.
18    **Q   Are you familiar with this document?**
19    A  Yes, I am.
20    **Q   What is it?**
21    A  It's a letter agreement that was drafted on
22  December 31st, 2009 that set forth the proposed terms and
23  conditions affecting each of the lender-placed agreements
24  as we entered into good faith negotiations as our
25  existing contracts were expiring. So the intent was to

Page 127

1  have a letter of intent, reference the fact that we are
2  continuing to operate under the current agreements until
3  we reach, you know, final decisions and both parties or
4  all parties will negotiate in good faith to finalize
5  those negotiations within 60 days.
6    **Q   When you say continue to operate under the**
7  **existing agreements, you're referring to the 2007**
8  **agreements, correct?**
9    A   Any agreement that was expiring at the end of
10  2009 which would have been the 2007 agreements.
11    **Q   So looking at the bottom of Chase 1812, it**
12  **refers to the Master Services Agreement dated**
13  **August 31st, 2006, including Schedule 1.**
14    A  Yes.
15    **Q   Then it goes on to the next page, it refers to**
16  **the Compliance PLUS Insurance Agreement dated January 1,**
17  **2007, correct?**
18    A  Correct.
19    **Q   And the Compliance PLUS Insurance Agency**
20  **agreement dated January 1, 2007, correct?**
21    A  That's correct.
22    **Q   Those are the existing agreements and the**
23  **others listed here in the same paragraph?**
24    A  Those were the existing agreements. And the
25  decision that we made between the parties was that there

Page 128

1  would not be any commissions paid to Chase or reinsurance
2  transactions ceded to Chase until such time as these ex
3  -- these agreements had been fully executed.
4    So Chase was accruing on our books a receivable
5  based upon the proposed terms of this 12-31-09 document,
6  and Assurant was accruing on their books a liability for
7  the proposed terms that would be effective January 1st,
8  2010.
9    **Q   All right.  Looking at the first page of the**
10  **letter agreement, 1812, in the middle of the first**
11  **paragraph it says, within 60 days following the date of**
12  **this letter agreement, the parties will negotiate a**
13  **definitive written agreement that will replace the**
14  **existing agreements between the parties and which will be**
15  **based on the proposed agreement terms.**
16    **Do I have that right?**
17    A  Yes.
18    **Q   Are the amended agreements that we touched upon**
19  **and the new agency agreement that we touched upon in your**
20  **earlier testimony, the 2010 agreements, are those the**
21  **definitive written agreements?**
22    A  Yes.
23    **Q   Now, those agreements, they state that they're**
24  **effective January 1, 2010, correct?**
25    A  Correct.

Page 129

1    **Q   But they weren't reached January 1, 2010,**
2  **correct?**
3    A  The final negotiations were not reached, no.
4    **Q   When were those agreements actually reached?**
5    A  I believe all the agreements -- we waited until
6  the agreements were ready for execution, I don't have an
7  exact date, but I believe it was August of 2010. I know
8  it was before September.
9    **Q   I think this brings us back to Exhibit 43,**
10  **Chase 1816 through 18 -- these are -- let's just go**
11  **through them in order.**
12    **Chase 1816, as of March 19th, 2010, you were**
13  **writing to John Frobose on behalf of Chase Home Finance,**
14  **LLC, this letter, correct?**
15    A  That's correct.
16    **Q   You wrote, as of the day of that letter,**
17  **pursuant to a conversation that you had with Mr. Frobose**
18  **that it was the desire of all parties to extend the terms**
19  **of the letter agreement dated December 31st, 2009 for a**
20  **period of 60 days following the date of your letter which**
21  **here is March 19, so continuing on another 60 days beyond**
22  **that, correct?**
23    A  That's correct.
24    **Q   You acknowledged here that the 2007 agreements**
25  **remained in full force and effect, correct, in**

33 (Pages 126 to 129)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 130

1  paragraph 2?
2      A   Yes.
3      Q   Then moving on to the next page, same exhibit,
4  at the conclusion of that 60-day period you wrote again
5  to Mr. Frobose on behalf of Chase Home Finance, LLC,
6  stating the desire of the parties to extend the period
7  for another 60 days, correct?
8      A   Correct.
9      Q   And then on the final page, Chase 1818, you
10 wrote again to Mr. Frobose on July 19th, 2010 stating the
11 desire of all parties to further extend the terms of the
12 2007 agreements -- further extend the terms of the letter
13 agreement for another period of 60 days, is that right?
14     A   That's correct.
15     Q   So the 2010 agreements were actually reached in
16 August of 2010, correct?
17     A   They were executed in 2010.
18     Q   Okay.  They were essentially backdated to
19 January 1 of 2010, is that right?
20     MR. MEINERTZHAGEN:  Object to the form.
21     THE WITNESS:  Yes.  The date that we were focused on
22 -- well, January 1 was going -- is going to be or was the
23 effective date of all the contracts given the expiring
24 contracts that we're operating under month to month until
25 the superseded contracts were executed.

Page 131

1      The urgency behind the execution attached
2  itself to the reinsurance arrangement because we had 9
3  months, you know, to negotiate that in good faith, the
4  terms of the reinsurance so we wanted to make sure
5  everything was executed prior to, and that's why I say
6  August everything was executed.  That's kind of the
7  timeline we're operating under.
8      MR. MEINERTZHAGEN:  Can we take a break now?
9      MR. RICHTER:  Q   One question.
10     No, let's take it.
11     (Off the record)
12     MR. RICHTER:  Q   Back on the record.
13     Q   Mr. Wheeler, when we left off, I believe we
14 were on Deposition Exhibit 52, the letter agreement.
15     Do you still have that in front of you?
16     A   Yes, I do.
17     Q   Okay.  Did you participate in the negotiations
18 relating to this letter agreement?
19     A   Yes, I did.
20     Q   And who else participated on behalf of each
21 side?
22     A   Chase legal counsel, myself, John Frobose with
23 Assurant and his legal counsel.  Bob Seginini.
24     Q   Anybody else?
25     A   Not that I recall.

Page 132

1      Q   Okay.  Now, it look like Mr. Schneider signed
2  it on behalf of Chase Home Finance, LLC.  He's your --
3  He's Mr. Seginini's boss.
4      A   Yes.
5      Q   Mr. Seginini is your boss?
6      A   That's correct.
7      Q   Was he just pretty much the guy to sign off or
8  was he also involved in the negotiations?
9      A   He was the senior executive to sign off and
10 with, you know, all of our major agreements Chase Home
11 Finance, we looked to have a senior executive sign off on
12 the agreements.
13     Q   When you negotiated the various agreements that
14 we've gone over, not just the letter agreement but all of
15 them, to the extent that you played a role in the
16 negotiations process, did you take direction from Chase?
17     MR. MEINERTZHAGEN:  Object to the form.  Chase as
18 you defined it at the very beginning?
19     MR. RICHTER:  Yes.
20     THE WITNESS:  Took direction from legal counsel.
21     MR. RICHTER:  Q   For Chase?
22     A   For Chase.
23     Q   Were there drafts of the letter agreement that
24 were exchanged?
25     A   There likely were.  As I recall, I presented a

Page 133

1  first draft, and legal and I consulted and changes were
2  made.  It was probably exchanged a couple of times.  It
3  was shared with Assurant.
4      Q   Were there also correspondence and e-mails
5  relating to the letter agreement going back and forth
6  between Chase and Assurant/ASIC?
7      A   I don't believe so.
8      Q   You know that for sure or you just can't
9  recall?
10     A   I don't believe so.  This would have documented
11 discussions that had already taken place and agreements
12 already made with Assurant relative to the specifics of
13 the proposed agreement itself.
14     Q   Let's take a look at second page in, Chase 1813
15 at numbered paragraph 2, header, Lender-Placed Flood
16 Insurance Policies.
17     Do you see that?
18     A   Yes.
19     Q   And I think you mentioned something about a 15
20 percent commission earlier.  Do you recall that?
21     A   Yes.
22     Q   And this provision in the letter agreement
23 provided for a 15 percent commission on Compliance PLUS
24 Policies that were issued or renewed on or after
25 January 1, 2010, is that right?

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 134

1    A   Yes, and if you look at this -- the wording of
2  paragraph 2, referencing the commission payable to Chase,
3  we've already begun the discussions of taking the
4  commissions below 15 percent and that's why we've
5  indicated here will not exceed 15 percent, whereas in the
6  wind policies when this was drafted we did not
7  contemplate taking wind down, which we ended up doing.
8         Paragraph 3 references the commission would be
9  payable to Chase Insurance equal to 15 percent.
10 Paragraph 2 indicates commission payable to Chase
11 insurance will not exceed 15 percent. So this goes to
12 the earlier comment that I made that I believe the
13 discussions had already taken place in 2009 to reduce,
14 you know, commissions below this amount, although we had
15 not made a definitive decision.
16    Q   Now, in the -- and that term was known to
17 everybody at Chase, including Mr. Seginini and
18 Mr. Schneider, who was involved in the negotiations and
19 signoff on this letter agreement, the 15 percent
20 commission, correct?
21    MR. MEINERTZHAGEN:  Object to the form.
22    THE WITNESS:  The 15 percent commission on flood,
23 all parties to this letter agreement that were involved
24 in either discussions or negotiations were aware that
25 that is the amount that we were going to accrue for as of

Page 135

1  January 1, 2010 as a receivable.  We didn't bring in the
2  commissions until the agreements were executed.
3     MR. RICHTER:  Q   So for the lender-placed policies
4  that were forced-placed from January 1, 2010 up until
5  August of 2010, they accrued at 15 percent, correct?
6     MR. MEINERTZHAGEN:  Object to the form.
7     MR. RICHTER:  Just let me get there.
8     MR. MEINERTZHAGEN:  You say force-placed, but you're
9  talking about earned, the premium that's earned, right?
10    MR. RICHTER:  I don't think I've used the word
11 earned throughout the entire deposition.  That's your
12 term and we won't be --
13    MR. MEINERTZHAGEN:  You're talking about new
14 business?  If I don't understand, how is he supposed to.
15    MR. RICHTER:  Just object to the form.
16    MR. MEINERTZHAGEN:  All right.  Object to the form.
17 Go ahead and answer.
18    MR. RICHTER:  I don't think -- if you would have let
19 me go on, I don't think this would have been very
20 difficult.  I'm trying to get us out of here before 5:00.
21    Q   During the period from January 1, 2010 to
22 August, 2010, I believe you testified that the
23 commissions accrued at 15 percent, and I want to get at
24 whether they were ultimately paid out at 15 percent or
25 they were paid out at 10 percent.

Page 136

1    A   With the exception of home equity we were
2  accruing commissions at 15 percent.  When the contracts
3  were ultimately executed, they were paid at 10 percent
4  for all flood lines, with the exception of home equity
5  which was paid at zero commission.  We were not accruing
6  for home equity.  Assurant was accruing it as a liability
7  based upon our letter agreement.
8    Q   Is there anything in the letter agreement that
9  indicates that the commissions for home equity loans and
10 lines are to be treated any differently from other types
11 of loans?
12    A   No.
13    Q   Now, I believe you testified earlier that in --
14 you believed it was important to keep the servicing --
15 the outsourcing servicing terms separate from the
16 commission terms, correct?
17    A   Correct.
18    Q   And the letter agreement, they're both in the
19 same document, correct?
20    A   Correct.
21    Q   Paragraph 2 deals with the commission which
22 we've just discussed, and then paragraph 5 deals with the
23 insurance servicing, correct?
24    A   Correct.
25    Q   Paragraph 5 provides that Chase currently

Page 137

1  purchases insurance management services from Assurant
2  pursuant to the terms and conditions of the MSA.  That
3  refers to the master agreement we were discussing
4  earlier, correct?
5    A   Correct.
6    Q   Including Schedule 1 thereto.  Chase and
7  Assurant agree in principle that Assurant will continue
8  to provide services to Chase and extend comparable
9  services in connection with H-WaMu -- that's
10 Heritage-Washington Mutual?
11    A   Correct.
12    Q   -- loans and EMC loans.  I have that right?
13    A   Correct.
14    Q   In fact, in the letter agreement the parties
15 agreed the fee would be 35 cents per mortgage loan per
16 month based upon the standard services provided by
17 Assurant to Chase, correct?
18    A   That's correct under the new agreement, and the
19 30 cents per loan per month was being accrued by Chase
20 Home Finance as a payable, as a liability.
21    Q   And as we went over earlier, the 35 cents per
22 mortgage loan per month was ultimately incorporated into
23 the 2010 Compliance PLUS Insurance Agreement and
24 Schedule 1?
25    A   Schedule 1, that's correct.

35 (Pages 134 to 137)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 138

1     Q   So under the letter agreement Chase's
2  affiliate, Chase Insurance Agency, Inc. was to continue
3  receiving a commission, albeit a reduced one, for
4  lender-placed flood policies, and in turn Chase was to
5  continue to purchase insurance servicing from
6  Assurant/ASIC, correct?
7     MR. MEINERTZHAGEN: Object to the form.
8     THE WITNESS: Placement was continuing, commissions
9  were not being paid. Commissions were being accrued
10  based upon the letter agreement, but no commissions, no
11  revenue was paid to either Chase or Assurant until the
12  agreements were fully executed. And the accrual was
13  based upon with the exception of home equity, was based
14  upon the letter agreement.
15     MR. RICHTER: Q   In the various documents that
16  we've gone over today there's references in many of them
17  to a Compliance PLUS Insurance Program. You are aware of
18  that?
19     A   I'm aware of the Compliance PLUS Program.
20     Q   Okay.
21     A   That's Assurant's flood program.
22     Q   Is that program set forth in a document called
23  Compliance PLUS Insurance Program or something like that?
24     A   I think you've in your -- received the document
25  you produced earlier that was the procedure manual, I

Page 139

1  think there's a reference there to the Compliance PLUS
2  Program. The actual forms that Assurant uses I can't say
3  whether or not it says Compliance PLUS on that or not. I
4  don't recall seeing that.
5     Q   I guess that's what I'm trying to get at. I've
6  seen documents called a procedures manual, I have seen
7  references to a procedures manual. I've seen Schedule 1,
8  seen the Master Agreement, seen the Compliance PLUS
9  Assurance Agreement, seen the agency agreement, but I've
10  never seen something called Compliance PLUS Insurance
11  Program that's been produced in this case.
12     I'm trying to figure out is that a different
13  document -- number 1, whether you know, and, if so, yes
14  or no.
15     A   It's not a document. That's their flood
16  program. That's what they call their flood program. The
17  hazard program is referred to as Hazard Plus, the wind
18  program is Wind Plus, so it's the name for their
19  lender-placed program and the amendments, the agreements,
20  the documents that are attached to it either procedurally
21  or contractually, whether the forms themselves say
22  Compliance Plus, Hazard Plus, I couldn't say for certain.
23  I believe the filings -- I believe the filings that
24  Assurant has, the master policies for these programs I
25  believe have Compliance PLUS.

Page 140

1     Q   The term PLUS when it's used with Compliance
2  PLUS, I've seen it's always capitalized. Have you
3  noticed that as well?
4     A   Probably.
5     Q   Do you know if the plus is an -- do you know
6  what it stands for, is it an acronym for? What is the
7  plus?
8     A   I couldn't tell you. As long as I've managed
9  the program there's been Compliance PLUS and Hazard PLUS.
10     Q   Have you ever asked anyone what's the PLUS for?
11     A   No. Each of the insurance carriers, the ones
12  that write their own private insurance, have got their
13  own programs and filings.
14     Q   And, you know, going back to the agreement that
15  we've touched upon. Master Service Agreement,
16  Schedule 1, the Compliance PLUS Insurance Agreement, the
17  agency agreement, the amended versions of those
18  agreements, the letter agreement, we've talked about all
19  of those here today, right?
20     A   Yes.
21     Q   Were each of those agreements thoroughly
22  negotiated at arm's length?
23     MR. MEINERTZHAGEN: Object to form.
24     THE WITNESS: I don't understand the question. To
25  separate servicing in those negotiations and discussions,

Page 141

1  is that the question?
2     MR. RICHTER: Q   I think my question is more
3  fundamental. Each of the agreements that we've gone
4  over, were those agreements that were reached as a result
5  of arm's length negotiations?
6     MR. MEINERTZHAGEN: Object to the form.
7     THE WITNESS: Were they negotiated effectively on a
8  stand alone basis? Clarify for me --
9     MR. RICHTER: Q   Were they negotiated -- let me ask
10  you this. Maybe it's just a term of art that maybe
11  you're not familiar with or maybe you are. I don't know.
12     Are you familiar with the term arm's length
13  negotiations?
14     A   I guess not because I don't understand where
15  you're coming from in terms of the question. That's why
16  I'm asking for some clarity.
17     Q   Were the agreements that we've gone over
18  earlier today, were they reached as a result of
19  bargaining by two separate sides?
20     MR. MEINERTZHAGEN: Object to the form.
21     THE WITNESS: There was no bargaining involved in
22  negotiations. There was no -- if you're looking at quid
23  pro quo, there was no -- we negotiated the individual
24  contracts based upon the merit of, you know, the programs
25  and what we were looking to achieve, you know. Hazard is

36 (Pages 138 to 141)

CONFIDENTIAL
DANIEL WHEELER – 1/11/2011

Page 142

1  different than flood is different than wind, you know.
2  There wasn't, you know -- I'm not really getting where
3  you're trying to go with this. What we do with one
4  agreement had nothing to do with what we were doing in
5  another agreement be it compensation or anything else.
6      MR. RICHTER: Q I don't want --
7      A I don't know what else to say. We negotiated
8  on the merits of the program and what our needs were, you
9  know, from a servicing perspective.
10     Q Fair enough. Were each of the agreements that
11  were negotiated, were they negotiated on their merits?
12     A Yes.
13     Q Okay. And those agreements include all of the
14  material terms between the parties?
15     A Yes.
16     Q Are there any other agreements between Chase or
17  any Chase affiliate on the one hand and ASIC or Assurant
18  on the other hand relating to flood insurance or
19  force-placed flood insurance?
20     A Other than what we've discussed here today, not
21  to my knowledge.
22     Q Do any of the agreements that we discussed
23  contain terms that put a specific dollar price on the
24  lender-placed policies that are to be issued?
25     A Can you please repeat that?

Page 143

1      (Whereupon, the following was read back:
2      "Q Do any of the agreements that we
3      discussed contain terms that put a specific
4      dollar price on the lender-placed policies that
5      are to be issued?")
6      MR. MEINERTZHAGEN: Object to the form.
7      THE WITNESS: No.
8      MR. RICHTER: Q Why not?
9      A That is included in the borrower disclosures.
10  Notification that is sent to the borrower advising them
11  of their requirement to maintain adequate flood
12  insurance, also provides them with specific premium
13  that's going to be charged, the fact that it's limited
14  coverage. You probably have seen the borrower
15  disclosures.
16     Q Are you aware that the ASIC policies that are
17  lender-placed are generally more expensive than policies
18  that a borrower would be able to obtain on his or her
19  own?
20     MR. MEINERTZHAGEN: Object to the form, outside the
21  scope.
22     THE WITNESS: Lender place in general is typically
23  going to be more expensive than insurance that, you know,
24  one can obtain on their own.
25     MR. RICHTER: Q Do you know how much more

Page 144

1  expensive?
2      A On flood, I don't. I know that the Assurant
3  flood policy it below the NFIP policy, write your own
4  policy by some 30 to 40 cents. I know lender-placed
5  carriers are all pretty close in terms of the rate per
6  hundred because that's something I've looked at.
7      Q When you say by 40 cents, 40 cents per --
8      A The rate is per hundred dollars of coverage. I
9  was going to say we make every effort, you know, to avoid
10  lender placement, not only encouraging the borrower to
11  obtain their own insurance but that the insurance is
12  likely to be cheaper if they purchase it on their own,
13  and the limitations of the coverage, and we send them
14  multiple notices.
15     Q Do you --
16     A We want to avoid lender placement as an
17  organization. Assurant is simply program provided.
18  We're not marketing the product.
19     Q Do you think Chase has any obligation to
20  negotiate a competitive program on lender-placed policies
21  for its customers?
22     A We don't establish the rates. There's one base
23  rate for all clients.
24     MR. MEINERTZHAGEN: Going to get a belated objection
25  to form and to scope.

Page 145

1      THE WITNESS: I mentioned we approached Assurant to
2  see if they could, you know, pass that savings on to onto
3  the borrower. They can't have two separate programs.
4  They're exactly the same with different rate levels.
5  That would be rate discrimination.
6      MR. RICHTER: Q Has Chase ever investigated or
7  conducted any research to determine whether other
8  companies would be capable of issuing comparable
9  coverage, flood insurance coverage to Chase customers at
10  a better price for the customer?
11     MR. MEINERTZHAGEN: Object to the form, outside the
12  scope.
13     THE WITNESS: We've gone through in years passed
14  consistent with the last -- the 2007 agreements, an RFP
15  process, request for proposal. During the course of that
16  proposal is the time when we get the rate information
17  from the carriers, and it was all in line and the rates
18  were all very similar. And when we look at lender-placed
19  carrier, we look at any number of different criteria, the
20  most important probably being the financial stability of
21  that organization, make sure they're around to pay
22  claims. When we look at rates we want to make sure the
23  rates are adequate.
24     MR. RICHTER: Q Who else responded to the 2007
25  request for proposal or the request for proposal I guess

37 (Pages 142 to 145)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 146

1  it would have been 2006?
2      A   I think it was 2005, 2006.  I'm not exactly
3  sure of the timeframe.  It would have been ZC Sterling,
4  it would have been Balboa, SafeCo.  Assurant has since
5  acquired SafeCo's financial institution.
6      Q   Looking at Chase 1815 back in the letter
7  agreement, very last paragraph, it says, Chase looks
8  forward to completing a definitive agreement with
9  Assurant.  We believe that the RFP waiver was key to
10 facilitating a successful negotiations during the very
11 challenging business environment.
12     Do you see that?
13     A   I do.
14     Q   What does that refer to?
15     MR. MEINERTZHAGEN:  Objection, outside the scope.
16     THE WITNESS:  We waived the RFP process in
17 negotiating the new agreement with Assurant.
18     MR. RICHTER:  Q  Why?
19     A   Because everything that was going on within the
20 organization relative to the acquisition, merging of --
21 and migration of the WaMu business and the EMC business,
22 and as that business has migrated it's being done so in
23 phases.  Whenever we looked at an RFP.  We also have to
24 examine the devil we know versus the devil we don't know,
25 and we know what Assurant's capabilities are, not just

Page 147

1  what they tell us they are in terms of their ability to
2  perform and execute.  That was another consideration in
3  waiving the RFP.
4          Assurant has 67 percent market share.  They're
5  clearly the 800 pound gorilla.  Balboa is number 2 with
6  about 24 percent market share, 19 percent of which
7  roughly is Countrywide, so there aren't a lot of options
8  out there today.  Probably their closest competitor would
9  be -- I think it's now Sterling National, the former ZC
10 Sterling, and they were primarily a -- for a very long
11 time -- we did business with them at one time, a nonprime
12 insurance carrier.  It's the resource availability as
13 well.
14     Q   Was any research conducted leading up to the
15 letter agreement or the 2010 series of agreements
16 concerning the cost of the lender-placed policies issued
17 by competitors of ASIC/Assurant?
18     A   No.
19     Q   Under the --
20     A   The process is an ongoing process.  It doesn't
21 happen monthly or necessarily quarterly.  But as part of
22 what I do, you know, I gather market intelligence, I
23 speak with, you know, whether it be counterparts or
24 Assurant peer companies in the contacts I have with those
25 companies to get information relative to rates, relative

Page 148

1  to deductibles, relative to any program nuances, and that
2  information, you know, is also utilized in our decision
3  matrix.
4      Q   Is there any term in any of the agreements, the
5  2007 agreement, the 2010 agreements or the letter
6  agreement that placed any limit on what ASIC could charge
7  for lender-placed coverage?
8      A   No.  We don't set the rates.  The insurance
9  carrier sets the rates and the rates are filed and
10 reviewed and/or approved by the state regulators.  The
11 borrower has an option clearly to go down the street to
12 their independent agent, see if they can provide flood
13 insurance, and then, okay -- if they're in special flood
14 hazard area, they can go to the NFIP and they can be put
15 in contact with an agent that can write a program, you
16 know, using their paper.  Failure to do either will
17 necessitate lender placement.
18     It's not a program that's designed -- it's not
19 a program that's designed to be competitive.  We don't
20 design it.  It's to protect the collateral that's used to
21 secure a loan.
22     Q   Why did Chase change its coverage requirements
23 for home equity loans and lines at the end of '09?
24     MR. MEINERTZHAGEN:  Object to the scope.  It's
25 outside of what this witness is being produced to testify

Page 149

1  to.
2          You can go ahead and answer in your own
3  personal knowledge, if you know.
4          THE WITNESS:  I wasn't involved in a decision and
5  found out about it after the decision was made, but it
6  was based upon -- I do know that it was based upon the
7  complexity of both acquiring and maintaining an accurate
8  first mortgage balance for the life of the loan and
9  because of that the decision was made to eliminate a
10 combined UPB and the calculation of flood coverage,
11 required flood coverage.  And in so doing, you know,
12 that's what put Chase's requirement above the minimum
13 regulatory requirement, NFIP maximum or replacement cost.
14     MR. RICHTER:  Q  Who -- Do you know who
15 participated in the decision to make that change in the
16 insurance requirement?
17     MR. MEINERTZHAGEN:  Objection, outside the scope.
18     THE WITNESS:  I would know some that participated.
19 I don't know all that would have participated.  I didn't
20 participate.  Legal would have been involved, the --
21 servicing team that we talked about, Jeff Nack, Brent
22 Miller, Terry Smith would have been involved in that
23 decision.  They would have presented it to either --
24 again timing, December of '09, it would either have been
25 Kim Greaves or it would have been David Schneider.

38 (Pages 146 to 149)

Page 150

1      MR. RICHTER: Q How did you learn about the change?
2      A   I received -- probably the first notification
3   was probably from Assurant, and then I started
4   questioning the minimum requirements and was provided
5   with a document that broke down what the minimum
6   requirements were for Chase, what they were, the minimum
7   requirements for regulators, what they were for
8   investors, comments that were made as to why we were
9   doing what we were doing.
10     **Q   Was there any e-mail, notice, memo, anything in**
11  **writing that went out from either Chase or Assurant/ASIC**
12  **regarding that change to notify you or other persons?**
13     MR. MEINERTZHAGEN:  Object to the scope.
14     THE WITNESS:  The best way I can answer that is that
15  I learned of that process change after the fact, and as I
16  recall, I first learned about it, as I said, from
17  Assurant when I asked the question regarding flood, you
18  know, specifically what are the business rules, and they
19  may have reached out to servicing and gotten a copy, said
20  it to me. It may have even surfaced initially, you know,
21  with counsel because we began talking about --
22     MR. MEINERTZHAGEN:  I don't want you to go into the
23  substance of communications with counsel.
24     You're talking about inhouse counsel with
25  Chase?

Page 151

1      THE WITNESS:  Yes.
2      MR. RICHTER: Q  Mr. Wheeler, I'm handing you what
3   was previously marked as Plaintiff Exhibit 8, and I just
4   want you to turn for a minute -- this document is Bates
5   number Chase 284 through 331.  I'd like for you to turn
6   just a moment to Chase 320.
7          Mr. Wheeler, do you have page 320 in front of
8   you?
9      A   I do.
10     **Q   All right.  Last row there references PMS**
11  **management reports.  And in that row it says on the**
12  **right, sent by document control department to John**
13  **Marazzo in Delaware and copy to Dan Wheeler.**
14         **Do you see that?**
15     A   I do.
16     **Q   What's a PMS management report?**
17     A   These are reports produced by Assurant.  I'm
18  not familiar with this document.  It's 2002 document.
19  Assurant's tracking services for mobile home equity.  I
20  know what a monthly experience claims paid report is
21  which is the report description.  I think that Assurant
22  may just reference MIS management information system type
23  reports as PMS.
24     **Q   Do you know what the acronym stands for?**
25     A   Again I don't.

Page 152

1      **Q   When you say you are familiar with the monthly**
2   **experience claims paid report, what type of information**
3   **is on there?  Is there any information relating to**
4   **commissions?**
5      A   No.  It's a claims report.  It's by --
6   typically low level, would include property address,
7   insured's name, loss amount.
8      **Q   I want to go through a few other reports to**
9   **determine whether you're familiar with them at all.**
10         (Exhibit 53 marked as requested)
11     **Q   Let's start with Deposition Exhibit 53, monthly**
12  **management book for home equity, Bates number Chase 1819**
13  **through 27.**
14         **Are you familiar with this report at all?**
15     A   No, I'm not.
16     **Q   Let's go on to another one.**
17         (Exhibit 54 marked as requested)
18     **Q   Deposition Exhibit 54, Chase 1828 through 43.**
19         **Do you have that in front of you?**
20     A   I do.
21     **Q   This is the Assurant Home Equity Score Card.**
22  **Are you familiar with this?**
23     MR. MEINERTZHAGEN:  Objection, outside the scope.
24     THE WITNESS:  I don't receive a copy of this.  I'm
25  familiar with what it is.  I think they track -- I think

Page 153

1   servicing tracks Assurant's performance in a number of
2   different categories then attaches a score based upon
3   actual performance and that's --
4      MR. RICHTER: Q  Under schedule -- Exhibit A to
5   Schedule 1?
6      A   I'm guessing.
7      **Q   Why don't you turn to 1836 of this document.**
8   **It's got lender-placed on the left-hand side then scores**
9   **on the right-hand side.  This is a report for January,**
10  **2010.  So just the scores for 2010 are filled in.**
11         **Do you have that page in front of you?**
12     A   I do.
13     **Q   Okay.  And on the left-hand side there's a**
14  **column called criteria.**
15         **Do you see that?**
16     A   I do.
17     **Q   And in both the first and second cells -- in**
18  **the second half of each of those cells in that column it**
19  **says, Chase is responsible for reviewing a random**
20  **selection of loan monthly to ensure compliance to Chase**
21  **policies and procedures as well as regulatory**
22  **requirements.**
23         **Do you see that?**
24     A   I do.
25     **Q   Is that an accurate statement that it -- as**

39 (Pages 150 to 153)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 154

1  written?
2      MR. MEINERTZHAGEN:  Objection, outside the scope.
3      THE WITNESS:  I have no knowledge of that
4  requirement.
5      MR. RICHTER:  Q  Would it be fair to say that
6  Assurant and ASIC do for Chase what Chase asks it to do?
7      A  Yes, that would be fair.
8      Q  Chase follows up and monitors Assurant/ASIC to
9  make sure they're doing exactly what Chase wants them to
10 do?
11     A  They micro manage.
12     MR. MEINERTZHAGEN:  Objection to the form, outside
13 the scope.
14     MR. RICHTER:  Q  Let's go on to another one.
15 Monthly escrow business review, Chase 1845 to 72 which
16 will be marked as Exhibit 55.
17     (Exhibit 55 marked as requested)
18     Q  Do you have -- Mr. Wheeler, do you have
19 Exhibit 55, Chase 1845 through 72 in front of you?
20     A  Yes, I do.
21     Q  This one on the first page it says Core
22 Servicing at the top.
23     Do you see that?
24     A  Yes, I do.
25     Q  Are you familiar with this report?

Page 155

1      A  No, I'm not.
2      Q  I'll just tell you there's a reference in here
3  to something called the MSP Hazard and Flood Functional
4  Advisory Committee.  It's on page 1849.
5      Do you know what that committee is or who
6  serves on it?
7      A  No.  I do not, although it references here Jeff
8  Nack and Brent Miller.
9      Q  Then on page 1856 there's some lender-placed
10 insurance figures.
11     Do you see that?
12     A  Yes.
13     Q  And there's some client numbers, client 465 and
14 156 in the first box and client 589 in the second box.
15     Do you see that?
16     A  Yes, I do.
17     Q  Do you know what those client numbers refer to?
18     A  465 is Heritage-Chase, 156 is -- I'm sorry.
19 Yes.  That's right.  156 is Heritage-WaMu, and 589 would
20 be Heritage-EMC.
21     Q  Do you know if the figures here include home
22 equity?
23     MR. MEINERTZHAGEN:  Objection, outside the scope,
24 lack of foundation.
25     THE WITNESS:  I don't know.  I would assume so.

Page 156

1      MR. RICHTER:  Q  Then turning to page 1867, this is
2  the page headed escrow administration, escalated research
3  team.
4      Do you see that?
5      A  Yes.
6      Q  Then there are some codes on the right-hand
7  side.
8      Do you see that?
9      A  Yes.
10     Q  It's code under executive office issues for
11 insurance, dash, flood gap lender-placed insurance, dash,
12 forced-placed?
13     A  I'm sorry.  I don't see where you're
14 referencing.  I thought we were over here.
15     Q  On the right-hand side, executive office
16 issues, it looks about ten or so down, insurance-flood
17 gap lender placed.
18     A  Okay.
19     Q  Then another couple down insurance-forced
20 placed.
21     Do you see that?
22     A  Yes.
23     Q  Are you familiar at all with the coding for
24 complaints or escalations relating to flood insurance
25 disputes or force-placed insurance disputes?

Page 157

1      A  No, I'm not.
2      Q  Let's move on to another report.
3      (Exhibit 56 marked as requested)
4      Q  Mr. Wheeler, the court reporter has just handed
5  you what's been marked as Exhibit 56, Bates number Chase
6  1873 to 91.
7      Do you have that in front of you?
8      A  I do.
9      Q  Are you familiar with this report at all?
10     A  No, I'm not.
11     Q  Then I'm going to hand you just one more.
12 Class 1892 to 1913 which has been marked Deposition
13 Exhibit 57.
14     (Exhibit 57 marked as requested)
15     Q  Do you have that in front of you?
16     A  I do.
17     Q  Are you familiar with that report?
18     A  No, I'm not.
19     Q  Now, you indicated -- you testified about there
20 was a change in Chase's flood insurance requirements
21 around December of 2008.  Do you recall that?
22     A  Yes, I do.
23     Q  Are Chase's flood insurance requirements the
24 same for all borrowers regardless of where the borrower
25 lives?

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 158

1    MR. MEINERTZHAGEN: Objection, outside the scope.
2    THE WITNESS: To my knowledge, yes.
3    MR. RICHTER: Q   Are Chase's flood insurance
4 requirements the same for all borrowers regardless of the
5 language of the borrower's underlying security
6 instrument?
7    MR. MEINERTZHAGEN: Objection, outside the scope.
8    THE WITNESS: Repeat that please.
9    MR. RICHTER: Q   Are Chase's flood insurance
10 requirements the same for all borrowers regardless of the
11 language of their underlying deed of trust or mortgage?
12    MR. MEINERTZHAGEN: Objection, outside the scope.
13    THE WITNESS: To my knowledge, yes.
14    MR. RICHTER: Let's take a short break. I think we
15 can clean it up and get everybody out of here.
16    (Off the record)
17    MR. RICHTER: Q   Back on the record.
18    **Q   How long have Assurant and ASIC performed their**
19 **current functions for Chase?**
20    MR. MEINERTZHAGEN: Object to the form as to current
21 functions.
22    THE WITNESS: They have been the provider of our
23 lender-placed program and provided outsource functions
24 since at least 2000. The outsourcing may have been a
25 little bit beyond that.

Page 159

1    MR. RICHTER: Q   Not with -- go ahead.
2    A   I just recall I think we had a contract in
3 place that was around 2000, and I think 1990s, we
4 probably had a program with them. We go way back with
5 the organization I guess in different venues and
6 products.
7    **Q   Notwithstanding that fact, Chase still sent out**
8 **a request for proposal in 2007?**
9    A   Or '05 or '06, yes, around that period of time,
10 yes.
11    **Q   But not prior to 2010?**
12    A   Not prior to 2010, that's correct.
13    **Q   Do you know why Assurant and ASIC were**
14 **initially chosen?**
15    A   No, I don't.
16    **Q   Do you know if the servicing and lender**
17 **placement functions were bid out at the time Assurant and**
18 **ASIC were initially chosen?**
19    A   No, I don't. I would expect they were, but I
20 don't know.
21    **Q   Do you know who at Chase decided upon Assurant**
22 **when the decision was made to go with Assurant?**
23    A   I can only speculate. No.
24    **Q   Is it true that Chase owned over 3 million**
25 **shares in Assurant at the beginning of 2010?**

Page 160

1    A   I have no idea.
2    **Q   Would it surprise you?**
3    MR. MEINERTZHAGEN: Object to the form, outside the
4 scope.
5    THE WITNESS: I guess nothing would surprise me.
6    MR. RICHTER: Q   Do Assurant and ASIC perform any
7 other functions for Chase relating to flood insurance
8 other than those we've covered already?
9    MR. MEINERTZHAGEN: Objection, asked and answered.
10    THE WITNESS: Not to my knowledge.
11    MR. RICHTER: Q   You indicated that JP Morgan
12 Insurance Agency merged with Chase Insurance Agency at
13 the end of 2008, correct?
14    A   That's correct.
15    **Q   What precipitated that merger?**
16    A   I don't know.
17    **Q   Is there a written merger agreement?**
18    A   I don't believe so. I believe I requested that
19 and was advised that, you know, there was no such
20 agreement.
21    **Q   Who did you make that request to?**
22    A   I did it through our Delaware operation. I may
23 have inquired through legal counsel as well.
24    **Q   Whether or not there was a written merger**
25 **agreement was there an understood set of terms relating**

Page 161

1 to the merger?
2    A   I haven't seen any document regarding the
3 merger or the name change other than the dates that it
4 took place.
5    **Q   Are you aware of any substantive changes other**
6 **than a name change as a result of that merger?**
7    MR. MEINERTZHAGEN: Object to the form.
8    THE WITNESS: No, I'm not aware.
9    MR. RICHTER: Q   Are you aware that some of the
10 notices that go out to borrowers in connection with
11 force-placed coverage indicate that a licensed affiliate
12 of Chase may obtain a commission in connection with
13 coverage that is force-placed?
14    MR. MEINERTZHAGEN: Objection, outside the scope.
15    THE WITNESS: Yes.
16    MR. RICHTER: Q   And that licensed affiliate is
17 Chase Insurance Agency and previously JP Morgan Insurance
18 Agency, correct?
19    A   That's correct.
20    **Q   What license is referred to in those notices?**
21    MR. MEINERTZHAGEN: Objection, outside the scope.
22    THE WITNESS: There is no specific reference.
23    MR. RICHTER: Q   Do Chase Insurance Agency or JP
24 Morgan Insurance Agency -- did they carry any type of
25 insurance license?

41 (Pages 158 to 161)

Page 162

1    MR. MEINERTZHAGEN: Objection, outside the scope.
2    THE WITNESS: They have to have a license with
3  individual states. I don't know -- I was never involved
4  in the compliance. I did state filings.
5    MR. RICHTER: Q  Are there any licensed insurance
6  agents that work for Chase Insurance Agency or formerly
7  worked for JP Morgan Insurance Agency?
8    MR. MEINERTZHAGEN: Objection, outside the scope.
9    THE WITNESS: Years ago there were a number of
10  licensed agents. We used to have our own agency with
11  licensed P and C agents.
12    MR. RICHTER: Q  How about since 2005?
13    MR. MEINERTZHAGEN: Objection, outside the scope.
14    THE WITNESS: No, not to my knowledge.
15    MR. RICHTER: Q  No licensed insurance agents
16  working for Chase Insurance Agency or JP Morgan Insurance
17  Agency, correct?
18    A  Well, we have licensed agents. I'm sure that,
19  you know, there are employees that hold a license whether
20  it be P and C or life insurance. Whether or not they,
21  you know, are utilized in any capacity, I couldn't tell
22  you. Not employed with Chase Insurance Agency to my
23  knowledge.
24    Q  Do you have any knowledge concerning what, if
25  any, licenses held by Chase Insurance Agency or formerly

Page 163

1  Chase Insurance -- or formerly JP Morgan Insurance
2  Agency?
3    A  No.
4    MR. MEINERTZHAGEN: Objection, outside the scope.
5    THE WITNESS: Legal counsel has been directly
6  involved in licensing.
7    MR. RICHTER: Q  I'm sorry.
8    A  I was saying our legal counsel and former
9  compliance officer make sure licenses are maintained,
10  renewed. I just don't know who those individuals are
11  within the organization.
12    Q  Does Chase Insurance Agency or before that
13  JP Morgan Insurance Agency hold a -- have any type of
14  license agreement with Chase or any company in the Chase
15  family of companies?
16    MR. MEINERTZHAGEN: Object to the form and outside
17  the scope.
18    THE WITNESS: I have no idea.
19    MR. RICHTER: Q  Is Chase Insurance Agency a party
20  to any agreements with JP Morgan Chase Bank or Chase Home
21  Finance or any other Chase affiliate?
22    MR. MEINERTZHAGEN: Objection, outside the scope, to
23  form.
24    THE WITNESS: I have no idea.
25    MR. RICHTER: Q  How about JP Morgan Insurance

Page 164

1  Agency, was it a party to any agreements with JP Morgan
2  Chase Bank, Chase Home Finance or any other Chase
3  affiliate?
4    MR. MEINERTZHAGEN: Same objections.
5    THE WITNESS: Not to my knowledge.
6    MR. RICHTER: Q  To your knowledge was JP Morgan
7  Insurance Agency or is Chase Insurance Agency a party to
8  any other agreements other than those we've previously
9  covered relating to force-placed insurance or flood
10  insurance?
11    A  No.
12    Q  Now, there's a reference in some of the
13  documents to Standard Guaranty Insurance Company. What
14  is SGIC?
15    A  They're one of Assurant's underwriting
16  companies wholly owned by Assurant. They're a party to,
17  I believe, all of the lender-placed Compliance PLUS
18  Agreements along with ASIC.
19    Q  Do they perform different functions than ASIC?
20    A  Not to my knowledge. Just a different
21  underwriting company. I couldn't speak to the states
22  they may write business.
23    Q  Is Chase Home Finance, JP Morgan Bank or any
24  Chase affiliate part of any other agreement other than
25  what we've covered relating to flood insurance or

Page 165

1  force-placed insurance?
2    A  No.
3    Q  Does Chase Home Finance, JP Morgan Chase Bank
4  or any Chase affiliate have any other financial ties to
5  any other party relating to flood insurance or
6  force-placed insurance?
7    MR. MEINERTZHAGEN: Object to the form.
8    MR. RICHTER: Q  Other than what we've covered.
9    A  Not to my knowledge.
10    Q  Has Chase Home Finance, JP Morgan Chase Bank or
11  any Chase affiliate received any other financial
12  compensation relating to flood insurance or force-placed
13  insurance other than what we've already covered?
14    A  No.
15    Q  Has Chase Home Finance, JP Morgan Chase Bank or
16  any Chase affiliate received any nonfinancial
17  consideration or benefits separate and apart from the
18  commissions relating to flood insurance or force-placed
19  insurance?
20    MR. MEINERTZHAGEN: Object to the form, outside the
21  scope.
22    THE WITNESS: Could you repeat that please?
23    MR. RICHTER: Q  Has Chase Home Finance, JP Morgan
24  Chase Bank or any Chase affiliate received any
25  nonfinancial consideration or benefits relating to flood

42 (Pages 162 to 165)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 166

1   insurance or force-placed insurance separate and apart
2   from the commissions?
3       A  Not to my knowledge.
4       MR. MEINERTZHAGEN:  Same objections.
5       MR. RICHTER:  Q  Have you spoken with anybody other
6   than counsel regarding this suit?
7       A  No.
8       Q  **Anybody from Assurant?**
9       A  Only to request commission information on the
10  specific account in question or the plaintiff.
11      Q  **What was the amount of commission earned on the**
12  **Hofstetter account?**
13      A  I couldn't tell you.  My guess is 20 percent on
14  the written amount.  I don't recall that -- I remember
15  producing the document, but I don't recall the amount.
16      Q  **So there's a document that sets forth the**
17  **amount of the commission on the Hofstetter account?**
18      A  It's paid at 20 percent so I think --
19      MR. MEINERTZHAGEN:  Kai, what he was doing is at
20  direction of counsel, it was work product, but it was
21  used to respond to your discovery request where you
22  asked -- where basically you asked us to confirm what the
23  percentage of the commission was on Hofstetter's account.
24  I think it was in response to your first request for
25  documents or interrogatories.

Page 167

1       MR. RICHTER:  Q  Would your expectation be the same
2   with respect to the Modersbach?
3       A  I don't know anything about that.
4       Q  **You testified earlier that you were aware of**
5   **other cases or claims or allegations -- I can't remember**
6   **the exact word that you used -- regarding quid pro quo**
7   **arrangements between banks and insurance servicers or**
8   **issuers of lender-placed policies and then you -- do you**
9   **recall generally --**
10      A  Generally.  I don't have any specific
11  information on any case, just what's been published.
12      Q  **Has Chase been a party to any prior litigation**
13  **involving claims that it was not treating borrowers**
14  **fairly with respect to flood insurance or force-placed**
15  **insurance?**
16      MR. MEINERTZHAGEN:  Object to the form, outside the
17  scope.
18      THE WITNESS:  I have no idea.
19      MR. RICHTER:  Those are all the questions we have at
20  this time subject to our reservation of rights to
21  reconvene this deposition at a later date to question
22  Mr. Wheeler regarding documents that were requested prior
23  to his deposition, but were not produced.
24      MR. MEINERTZHAGEN:  And we will take that issue up
25  when the time is appropriate.  At this point we are

Page 168

1   obviously not agreeing to produce Mr. Wheeler again.
2       I have just a couple point to clarify.
3                   EXAMINATION
4       By Mr. Meinertzhagen:
5       Q  **Mr. Wheeler, at the beginning of your**
6   **deposition you indicate that had you're employed by Chase**
7   **Insurance Agency, Inc., is that correct?**
8       A  That's correct.
9       Q  **Are you also an officer of Chase Home Finance,**
10  **LLC?**
11      A  Yes, I am.
12      Q  **Do you know what title you hold?**
13      A  Vice president.
14      Q  **You said at one point during your testimony**
15  **that the force-placed flood commissions for home equity**
16  **loans from 2009 were higher than they had been for 2008**
17  **and prior years, do you recall that testimony, that Chase**
18  **Insurance Agency received?**
19      A  Yes.
20      Q  **You indicated that one of the reasons was the**
21  **change in the minimum flood insurance requirements that**
22  **Chase put in place in late 2009.**
23          Do you recall that?
24      A  I do.
25      Q  **Now, can you explain to me how if those new**

Page 169

1   **requirements were put in place at the end of 2009 they**
2   **would have resulted in an increased premium or increased**
3   **commission payments to Chase Insurance Agency in 2009?**
4       A  I misspoke.  I was thinking --
5       MR. RICHTER:  Asked and answered.
6       MR. MEINERTZHAGEN:  Q  Go ahead.
7       A  It would have impacted 2010, which it did.  We
8   saw an increase in 2010 as a result of the action taken
9   in 2009, and I think I might have mentioned in the
10  deposition that I believe the reason for the spike in
11  2009 was attributed new procedures implemented for flood
12  gap.
13      Q  **When you say there was an increase in 2010, I**
14  **thought your testimony was that CI didn't make any**
15  **commissions on home --**
16      MR. RICHTER:  Objection, asked and answered.
17      THE WITNESS:  I'm sorry.  Not commissions, but
18  premium.  We saw a spike in premium.  I thought we were
19  talking about premium, both for 2009 and 2010.
20      MR. MEINERTZHAGEN:  That's all I have.
21      MR. RICHTER:  Nothing further at this time.
22      MR. MEINERTZHAGEN:  Signature is reserved.
23          ------
24
25

43 (Pages 166 to 169)

CONFIDENTIAL
DANIEL WHEELER - 1/11/2011

Page 170

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF C O O K )

1  STATE OF ILLINOIS )
                     ) SS:
2  COUNTY OF C O O K )

3

4        The within and foregoing deposition of the

5  aforementioned witness was taken before CAROL CONNOLLY,

6  CSR, CRR and Notary Public, at the place, date and time

7  aforementioned.

8        There were present during the taking of the

9  deposition the previously named counsel.

10       The said witness was first duly sworn and was

11  then examined upon oral interrogatories; the questions

12  and answers were taken down in shorthand by the

13  undersigned, acting as stenographer and Notary Public;

14  and the within and foregoing is a true, accurate and

15  complete record of all of the questions asked of and

16  answers made by the forementioned witness, at the time

17  and place hereinabove referred to.

18       The signature of the witness was not waived,

19  and the deposition was submitted, pursuant to Rule 30 (e)

20  and 32 (d) 4 of the Rules of Civil Procedure for the

21  United States District Courts, to the deponent per copy

22  of the attached letter.

23

24

25

Page 171

1        The undersigned is not interested in the within

2  case, nor of kin or counsel to any of the parties.

3        Witness my official signature and seal as

4  Notary Public in and for Cook County, Illinois on this

5  _____ day of _____, A.D.

6  _____.

7

8

                    _____

9        CAROL CONNOLLY, CSR, CRR
         CSR No. 084-003113
10       Notary Public

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 172

1        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA

2

3  SHEILA I. HOFSTETTER,      )
   individually, as a         )
4  representative of the class, )
   and on behalf of the general )
5  public,                     )
            Plaintiff,         )
6                              )
         -vs-              ) CV-10-1313 WHA
7                              )
   CHASE HOME FINANCE, LLC,    )
8  JPMORGAN CHASE BANK, N.A.,  )
   and DOES 1 through 50,      )
9  inclusive,                  )
            Defendants.        )
10

11       I hereby certify that I have read the foregoing

12  transcript of my deposition given at the time and place

13  aforesaid, consisting of Pages 1 to 172, inclusive, and I

14  do again subscribe and make oath that the same is a true,

15  correct, and complete transcript of my deposition so

16  given as aforesaid, and includes changes, if any, so made

17  by me.

18

                    _____

19                  DANIEL WHEELER

20

21  SUBSCRIBED AND SWORN TO before me this

22  _____ day of _____, 2011.

23

24  Notary Public

25

Merrill Corporation - Minnesota
612-338-1181                                    www.merrillcorp.com/law

# Exhibit 3

# In The Matter Of:

*Sheila I. Hofstetter, et al.*
*v.*
*Chase Home Finance, LLC, et al.*

---

## *MEGAN GROFF*
### *February 8, 2011*

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

920 Second Ave South
Suite 110
Minneapolis. MN 55402
Phone: 877-489-0367

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*   *   *

SHEILA I. HOFSTETTER and

ROGER MODERSBACH, individually,

as representatives of the

classes, and on behalf of

the general public,

      Plaintiffs,

    vs.          CASE NO. CV-10-1313 WHA

CHASE HOME FINANCE, LLC,

JPMORGAN CHASE BANK, N.A.,

and DOES 1-50, inclusive,

      Defendants.

*   *   *

Deposition of MEGAN GROFF, Witness

herein, called by the Plaintiffs for

cross-examination pursuant to the Rules of Civil

Procedure, taken before me, Kathy S. Wysong, a

Notary Public in and for the State of Ohio, at

the offices of Marshall & Morrow, LLC, 111 West

Rich Street, Suite 430, Columbus, Ohio, on

Tuesday, February 8, 2011, at 9:10 a.m.

*   *   *

MEGAN GROFF - 2/8/11

Page 2

```
 1        EXAMINATIONS CONDUCTED      PAGE
 2    BY MR. RICHTER:.....................    6
 3    BY MR. LeMAR:.......................   168
 4    BY MR. RICHTER:.....................   174
 5
 6        EXHIBITS MARKED
 7    (Thereupon, Plaintiffs' Exhibit 58,      7
 8    plaintiffs' amended notice of
 9    deposition of Megan Groff, was
10    marked for purposes of
11    identification.).....................
12    (Thereupon, Plaintiffs' Exhibit 59,     58
13    e-mail string starting with an
14    e-mail from Andrew LeMar to Kai
15    Richter dated 12-15-10; Plaintiffs'
16    Exhibit 60, flood letters effective
17    2006 to 5-28-09 spreadsheet;
18    Plaintiffs' Exhibit 61, CHASE 01325
19    through CHASE 01488, were marked for
20    purposes of identification.)..........
21    (Thereupon, Plaintiffs' Exhibit 62,     103
22    ASRNT0000044 through ASRNT0000058,
23    was marked for purposes of
24    identification.).....................
25
```

Page 3

```
 1    (Thereupon, Plaintiffs' Exhibit 63,     122
 2    CHASE 01543 through 01545, was
 3    marked for purposes of
 4    identification.).....................
 5    (Thereupon, Plaintiffs' Exhibit 64,     134
 6    CHASE 02147, was marked for purposes
 7    of identification.)..................
 8    (Thereupon, Plaintiffs' Exhibit 65,     138
 9    an e-mail from Andrew LeMar to Kai
10    Richter dated 12-10-10, and
11    Plaintiffs' Exhibit 66, CHASE 01319,
12    were marked for purposes of
13    identification.).....................
14    (Thereupon, Plaintiffs' Exhibit 67,     140
15    an e-mail from Andrew LeMar to Kai
16    Richter dated 12-23-10, and
17    Plaintiffs' Exhibit 68, CHASE 01491
18    through CHASE 01505, were marked for
19    purposes of identification.)..........
20    (Thereupon, Plaintiffs' Exhibit 69,     152
21    CHASE 02186 through CHASE 02243, was
22    marked for purposes of
23    identification.).....................
24
25
```

Page 4

```
 1    (Thereupon, Plaintiffs' Exhibit 70,     161
 2    privilege log, was marked for
 3    purposes of identification.)..........
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1    APPEARANCES:
 2      On behalf of the Plaintiffs:
 3         Nichols Kaster, PLLP
 4      By:  Kai Richter
              Attorney at Law
 5           4600 IDS Center
              80 South Eighth Street
 6           Minneapolis, Minnesota  55402
 7      On behalf of the Defendants:
 8         Burke, Warren,
              MacKay & Serritella, P.C.
 9
         By:  Andrew D. LeMar
10            Attorney at Law
              22nd Floor
11            330 North Wabash Avenue
              Chicago, Illinois  60611-3607
12
                    * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Page 6

```
 1            MEGAN GROFF
 2  of lawful age, Witness herein, having been first
 3  duly cautioned and sworn, as hereinafter
 4  certified, was examined and said as follows:
 5            CROSS-EXAMINATION
 6  BY MR. RICHTER:
 7      Q.  Could you please state your name for
 8  the record?
 9      A.  Megan Groff.
10      Q.  Hi, Miss Groff.  My name is Kai
11  Richter.  I represent plaintiffs Sheila
12  Hofstetter and Roger Modersbach in an action
13  that they've brought against JPMorgan Chase Bank
14  and Chase Home Finance.  Are you familiar with
15  that action?
16      A.  I am.
17      Q.  Okay.  When did you first become
18  familiar with that action?
19      A.  I don't recall the exact month.  It's
20  been several months.
21      Q.  Do you recall how you became familiar
22  with the lawsuit?
23      A.  I don't.
24      Q.  Have you spoken with anybody about the
25  lawsuit, other than your counsel?
```

Page 7

```
 1      A.  My managers.
 2      Q.  And who are those persons?
 3      A.  Jeff Nack and Rita Hillman.
 4      Q.  Did Miss Hillman formerly go by the
 5  name Jones?
 6      A.  Yes.
 7          (Thereupon, Plaintiffs' Exhibit 58,
 8  plaintiffs' amended notice of deposition of
 9  Megan Groff, was marked for purposes of
10  identification.)
11  BY MR. RICHTER:
12      Q.  Miss Groff, the court reporter has
13  just handed you what's been marked as
14  Plaintiffs' Exhibit 58.  Do you recognize this
15  as your amended notice of deposition?
16      A.  Yes.
17      Q.  And you understand that you're here
18  today to testify in connection with the
19  deposition notice that's been served in this
20  matter?
21      A.  Yes.
22      Q.  Okay.  Have you ever had your
23  deposition taken before?
24      A.  No.
25      Q.  Well, let me go through just a few
```

Page 8

```
 1  things that I think will help speed the process
 2  along and make it easier for everybody.  First
 3  of all, when I ask a question, it's important
 4  that you answer in words instead of with nodding
 5  your head or shaking your head or with an uh-huh
 6  or an huh-uh.  You're doing a pretty good job
 7  with that already so let's stick with that.
 8  Okay?
 9      A.  Okay.
10      Q.  Second, it's important that we not
11  talk over each other so I'll ask that you wait
12  for me to finish a question before you answer,
13  and likewise I'll wait for you, as best I can,
14  to finish your answer before I ask you a new
15  question, that way the court reporter will be
16  able to take down everything we say today.
17  Okay?
18      A.  Okay.
19      Q.  Third, if I ask a question and you
20  don't understand it for whatever reason, you
21  should feel free to ask me to rephrase the
22  question.  And if you don't, I'll assume that
23  you understand the question.  Okay?
24      A.  Okay.
25      Q.  And then finally, throughout your
```

Page 9

```
 1  deposition I'm going to use the term Chase to
 2  refer to both the defendants in this case, Chase
 3  Home Finance and JPMorgan Chase Bank.  Will you
 4  understand what I mean by that?
 5      A.  Chase as a whole and then Chase Home
 6  Lending, is that --
 7      Q.  Yes.
 8      A.  Yes.
 9      Q.  And if you need to make a distinction
10  between one of the Chase entities or one of the
11  other Chase entities, you should do that in your
12  answer or ask me to rephrase the question.
13  Okay?
14      A.  Okay.
15      Q.  Have you done anything to prepare for
16  your deposition today?
17      A.  I met with my legal representation
18  yesterday.
19      Q.  Okay.  And that's Mr. LeMar?
20      A.  Yes.
21      Q.  Okay.  And how long did you meet with
22  Mr. LeMar?
23      A.  Approximately six hours.  Five, six
24  hours.
25      Q.  Okay.  Did you review any documents?
```

3 (Pages 6 to 9)

MEGAN GROFF - 2/8/11

Page 10

1    A.  We reviewed procedures, management
2  reporting, Assurant procedures.
3    Q.  Okay.  Have you brought those with you
4  here today?
5    A.  No.
6    MR. RICHTER:  Have you brought those
7  with you here today?
8    MR. LeMAR:  No, I don't have them with
9  me.
10    MR. RICHTER:  Okay.  Under the Court
11  supplemental order, any documents that the
12  witness reviewed in advance of her deposition
13  are to be made available at the deposition.
14    MR. LeMAR:  It's all that we've --
15  we've produced all of -- anything that we went
16  over is Bates stamped.
17    MR. RICHTER:  Okay.  Can you give me
18  the Bates ranges for those?  If you can't do it
19  off the top of your head --
20    MR. LeMAR:  I can't do it off the top
21  of my head.
22    MR. RICHTER:  Can you do it over the
23  break?
24    MR. LeMAR:  Yeah, I can e-mail -- I
25  can probably get it by e-mail.

Page 11

1    MR. RICHTER:  Okay.
2  BY MR. RICHTER:
3    Q.  Which Chase entity or entities do you
4  currently work for?
5    A.  Chase Home Lending.
6    Q.  Is that also known as Chase Home
7  Finance?
8    A.  Yes.
9    Q.  What's your title for Chase Home
10  Finance?
11    A.  Operations unit manager.
12    Q.  For which unit?
13    A.  Home equity insurance.
14    Q.  Are your checks cut by Chase Home
15  Lending or are they cut by JPMorgan Chase?
16    A.  JPMorgan Chase.
17    Q.  So would it be -- well, let me ask you
18  this:  Are you -- strike that.
19    And you work here in Columbus?
20    A.  Yes.
21    Q.  And that's at the Vision Drive
22  address?
23    A.  Yes.
24    Q.  What's the number of that address?
25    A.  3415 Vision Drive.

Page 12

1    Q.  Is there a suite number?
2    A.  No.
3    Q.  What are your duties as the operations
4  unit manager for home equity insurance?
5    A.  To oversee all the loans and lines in
6  the home equity portfolio, to ensure that they
7  have adequate insurance, and to ensure that we
8  are staying in compliance with all federal
9  guidelines.
10    Q.  How long have you held that position?
11    A.  Since 2008.
12    Q.  Who was your predecessor?
13    A.  Amanda Trenkamp.
14    Q.  Could you spell her name?
15    A.  T R E N K A M P.
16    Q.  And when did you start in 2008 in your
17  current position?
18    A.  I believe it was March.
19    Q.  What are the names of the -- well,
20  let's start with this:  How many people on your
21  team report to you?
22    A.  There are currently nine.
23    Q.  And what are their names?
24    A.  Kia Clay, Jennifer Menendez, Christine
25  Norvet.

Page 13

1    Q.  How do you spell her last name?
2    A.  N O R V E T.
3    Q.  Okay.
4    A.  Andrew Young, Stacy Dean, Ryan Gregg,
5  Derek Cantor, and Velencia Williams, Belinda
6  Tyler.
7    Q.  Do you currently hold any other
8  positions with Chase?
9    A.  No.
10    Q.  Did you hold any positions with Chase
11  prior to your current position?
12    A.  I was the team lead for the flood
13  compliance.
14    Q.  During what period of time?
15    A.  I want to say late 2006 until I moved
16  to the supervisor position.
17    Q.  And is Miss Menendez the current team
18  lead?
19    A.  Yes.
20    Q.  And has she been the team lead since
21  you left the position and moved into the
22  management position?
23    A.  No.
24    Q.  Who took over the team lead position
25  when you moved into the management position?

4 (Pages 10 to 13)

MEGAN GROFF - 2/8/11

Page 14

1     A.  Maggie Reitz.
2     Q.  **During what period of time did Miss**
3  **Reitz work as a team lead in connection with**
4  **flood compliance for home equity?**
5     A.  She was never a team lead for home
6  equity.
7     Q.  **Okay.  Let me see if I can sort this**
8  **out.  You were the team lead -- what was your**
9  **full title of your team lead position during**
10 **that period that you were a team lead?**
11    A.  Team lead flood compliance on the
12 first mortgage side.
13    Q.  **I see.  And then you moved over to the**
14 **home equity side?**
15    A.  Yes.
16    Q.  **And is Miss Menendez a team lead for**
17 **home equity or first loans?**
18    A.  Yes, she's home equity.
19    Q.  **What were your job functions during**
20 **the time that you were a team lead for flood**
21 **compliance?**
22    A.  To help oversee the staff's work, make
23 sure all exception reports were completed
24 timely, to help ensure that everything was in
25 compliance pertaining to flood.

Page 15

1     Q.  **What were the similarities or**
2  **differences, for that matter, between your prior**
3  **position as a team lead and your current**
4  **position as a manager?**
5     MR. LeMAR:  Object to the form of the
6  question.
7     THE WITNESS:  I mean, pretty much the
8  same responsibilities except for you have the
9  administrative staff.  As a supervisor, you have
10 the administrative staff duties.
11 BY MR. RICHTER:
12    Q.  **Were Chase's flood insurance policies**
13 **and procedures for first loans similar to those**
14 **for home equity lines?**
15    MR. LeMAR:  Object to the form of the
16 question.
17    THE WITNESS:  They were different.
18 BY MR. RICHTER:
19    Q.  **In what ways or way?**
20    A.  They were the same as far as the flood
21 zone policies, I mean, requiring insurance, you
22 know, the one piece, that all stays the same.
23 The coverage requirements were slightly
24 different.
25    Q.  **So between the first mortgage and the**

Page 16

1  home equity, with respect to flood, things were
2  basically the same except for a slight
3  difference with respect to coverage
4  requirements; is that right?
5     MR. LeMAR:  Object to the form.
6     THE WITNESS:  Yes, but I don't recall
7  what the coverage requirements were at that
8  time.
9  BY MR. RICHTER:
10    Q.  **And when you say that, you don't**
11 **recall the coverage requirements -- flood**
12 **insurance requirements for first mortgage**
13 **loans --**
14    A.  Correct.
15    Q.  **-- during the time that you were team**
16 **lead?**
17    A.  Correct.
18    Q.  **Do you know what those coverage**
19 **requirements are now for first mortgage loans?**
20    A.  I do not.
21    Q.  **When you assumed your new role -- or**
22 **your current role as manager -- let me make sure**
23 **I get the title right -- operations unit manager**
24 **for home equity insurance, would it be fair to**
25 **say when you -- was that the first time you**

Page 17

1  learned the home equity flood insurance
2  requirements?
3     A.  Yes.
4     Q.  **And when you learned the home equity**
5  **flood insurance requirements, did you -- I**
6  **assume you didn't have a reaction of oh, my**
7  **goodness, they're totally different than the**
8  **ones for the first mortgage loan --**
9     MR. LeMAR:  Objection to the form of
10 the question.
11    THE WITNESS:  No.
12 BY MR. RICHTER:
13    Q.  **-- is that right?  No, they weren't**
14 **totally different or yes, they were totally**
15 **different?**
16    A.  No, I did not have a reaction that
17 they were totally different.
18    Q.  **Did you hold any positions with Chase**
19 **prior to your team lead position for flood**
20 **compliance for first mortgage loans?**
21    A.  I was an operations senior specialist
22 for flood compliance.
23    Q.  **And did you deal with first mortgage**
24 **loans or home equity loans or both in that**
25 **position?**

5 (Pages 14 to 17)

MEGAN GROFF – 2/8/11

Page 18

1    A.  First mortgage loans.
2        **Q.  And how long did you hold the**
3    **operations senior specialist position?**
4        A.  From October of 2005 to late 2006.
5    I'm not exactly sure what month I became team
6    lead.
7        **Q.  Prior to that did you hold any other**
8    **positions with Chase?**
9        A.  No.
10       **Q.  Could you briefly run through your**
11   **educational background for me?**
12       A.  Just college?  I mean --
13       **Q.  Yeah, why don't we start there.  Any**
14   **post-secondary?**
15       A.  Ohio University.
16       **Q.  Did you graduate with a BA or a BS?**
17       A.  I didn't graduate.
18       **Q.  Have you received any other**
19   **post-secondary training?**
20       A.  No.
21       **Q.  Have you received any legal training**
22   **or paralegal training?**
23       A.  No.
24       **Q.  Do you have an understanding of what**
25   **federal requirements are with respect to flood**

Page 19

1    **insurance?**
2        MR. LeMAR:  Object to the form of the
3    question.
4        THE WITNESS:  I do.
5    BY MR. RICHTER:
6        **Q.  What's your understanding of federal**
7    **requirements relating to flood insurance?**
8        MR. LeMAR:  Object to the form of the
9    question.
10       THE WITNESS:  That's a pretty broad
11   scope.  I mean --
12   BY MR. RICHTER:
13       **Q.  What is your understanding of federal**
14   **requirements with respect to the amount of flood**
15   **insurance that's required on loans of home**
16   **equity lines?**
17       MR. LeMAR:  Object to the form of the
18   question.
19       THE WITNESS:  I'm not as familiar with
20   the exact verbiage of the coverage requirements.
21   BY MR. RICHTER:
22       **Q.  Do you have a general understanding?**
23       A.  The minimum -- the maximum amount
24   required under the NFIP is two hundred and
25   fifty.  That's still a broad scope.

Page 20

1        **Q.  What's your understanding of the**
2    **minimum federal flood insurance requirement for**
3    **loans in lines?**
4        MR. LeMAR:  Object to the form of the
5    question.
6        THE WITNESS:  With respect to the
7    replacement cost value?
8    BY MR. RICHTER:
9        **Q.  With respect to whatever you think it**
10   **is.**
11       A.  I'm not exactly sure what the minimum
12   requirement is.
13       **Q.  Do you handle compliance issues in**
14   **your current role as operations unit manager for**
15   **home equity insurance?**
16       MR. LeMAR:  Object to the form of the
17   question.
18       THE WITNESS:  Yes.
19   BY MR. RICHTER:
20       **Q.  And, of course, you handled compliance**
21   **issues in your former role as a team lead for**
22   **flood compliance on the loan side, correct?**
23       MR. LeMAR:  Object to the form of the
24   question.
25       THE WITNESS:  Yes.

Page 21

1    BY MR. RICHTER:
2        **Q.  In either of those roles did you ever**
3    **undertake to determine what the minimum**
4    **compliance requirement was for flood insurance**
5    **for the amount of coverage?**
6        MR. LeMAR:  Object to the form of the
7    question.
8        THE WITNESS:  I do not make the
9    policies.
10   BY MR. RICHTER:
11       **Q.  That wasn't my question.  My question**
12   **was whether you ever personally undertook any**
13   **efforts to understand what the federal minimum**
14   **flood insurance requirements were with respect**
15   **to amount of coverage either in your current**
16   **compliance role or in your former compliance**
17   **role at Chase?**
18       MR. LeMAR:  Object to the form of the
19   question.
20       THE WITNESS:  Yes.
21   BY MR. RICHTER:
22       **Q.  What did you do in that regard?**
23       MR. LeMAR:  Object to the form of the
24   question.
25       THE WITNESS:  Read the FEMA handbook.

6 (Pages 18 to 21)

MEGAN GROFF — 2/8/11

Page 22

1  That's -- I don't -- there's nothing -- I mean,
2  that's what we use is the FEMA handbook.
3  BY MR. RICHTER:
4      Q.  Do you recall looking at anything else
5  to determine federal minimum flood insurance
6  requirements with respect to amount of coverage?
7          MR. LeMAR:  Object to the form of the
8  question.
9          THE WITNESS:  I don't recall.
10 BY MR. RICHTER:
11     Q.  Did somebody tell you to look at the
12 FEMA handbook or did you decide to do that on
13 your own?
14         MR. LeMAR:  Object to the form of the
15 question.
16         THE WITNESS:  Everyone in our
17 department has a copy of the FEMA handbook.
18 BY MR. RICHTER:
19     Q.  And did you literally go through it
20 and read it page by page or is it just something
21 that Chase makes available to everybody on its
22 first day and people read it if they feel like
23 it sort of a deal?
24         MR. LeMAR:  Object to the form of the
25 question to the extent it calls for speculation.

Page 23

1          THE WITNESS:  It's not required to be
2  read page by page.
3  BY MR. RICHTER:
4      Q.  Regardless, as you sit here today, you
5  don't know what the minimum federal requirements
6  are with respect to amount of flood insurance
7  coverage; is that right?
8          MR. LeMAR:  Object to the form of the
9  question.
10         THE WITNESS:  I cannot recite what the
11 minimum requirements are from the federal
12 handbook.
13 BY MR. RICHTER:
14     Q.  Do you know whether Chase's flood
15 insurance requirements are more stringent than
16 the federal requirements?
17         MR. LeMAR:  Object to the form of the
18 question.
19         THE WITNESS:  I cannot say either way.
20 BY MR. RICHTER:
21     Q.  Are you familiar with the flood
22 insurance notices that are sent to borrowers
23 requesting that they obtain flood insurance
24 coverage or increase their amount of flood
25 insurance coverage?

Page 24

1      A.  Yes.
2      Q.  And in your current managerial role,
3  with respect to flood insurance issues for home
4  equity insurance, do you authorize those notices
5  to be sent out?
6          MR. LeMAR:  Object to the form of the
7  question.
8          THE WITNESS:  Can you be more
9  specific?  Authorize -- can you be more
10 specific?
11 BY MR. RICHTER:
12     Q.  What role do you play with respect to
13 the flood insurance notice letters that are sent
14 to borrowers?
15     A.  To monitor if they are in a special
16 flood hazard area, that the letters are, in
17 fact, being sent out.
18     Q.  So it's your job to make sure that the
19 flood hazard notice letters go out as
20 appropriate, correct?
21         MR. LeMAR:  Object to the form of the
22 question.
23         THE WITNESS:  It's not specifically my
24 job.
25 BY MR. RICHTER:

Page 25

1      Q.  It's part of your job?
2      A.  It's just a part of my job to oversee
3  the whole process.
4      Q.  Including the notice letters; is that
5  right?
6      A.  Be more specific.
7      Q.  You are aware that Chase sends letters
8  to borrowers -- certain borrowers demanding that
9  they meet certain flood insurance requirements,
10 correct?
11         MR. LeMAR:  Object to the form.
12         THE WITNESS:  Yes.
13 BY MR. RICHTER:
14     Q.  And part of your job is making sure
15 that those letters go out, correct?
16         MR. LeMAR:  Object to the extent it
17 misstates prior testimony.
18         THE WITNESS:  We have a vendor that
19 sends our letters out.
20 BY MR. RICHTER:
21     Q.  And that's Assurant or ASIC?
22     A.  Assurant.
23     Q.  And in your role -- your current
24 managerial role, you keep track of what Assurant
25 is doing in that regard, right?

7 (Pages 22 to 25)

MEGAN GROFF - 2/8/11

Page 26

1    A.  I review the reporting.
2    Q.  Have you ever reviewed the language of
3  the letters that they send out?
4    A.  Yes.
5    Q.  And the language of those letters that
6  they send out, those flood insurance notice
7  letters that Assurant sends to borrowers, that
8  language is approved by Chase, correct?
9    A.  Correct.
10    Q.  Who at Chase has approved that
11  language?
12    A.  The final decisions are usually made
13  by my -- between my VP and legal counsel --
14  legal and compliance.
15    Q.  And which VP are you referring to?  Is
16  that Mr. Nack?
17    A.  Yes.
18    Q.  One thing I didn't mention at the
19  beginning, if you need to take a break, just let
20  me know that.
21    A.  Okay.
22    Q.  The only thing I ask is if I have a
23  question pending, I'll ask you to answer the
24  question; but if you need to take a break, feel
25  free to let me know at any time.

Page 27

1         Miss Groff, I've just handed you what
2  was previously marked as Plaintiffs' Exhibit 4.
3  Do you have that in front of you?
4    A.  Yes.
5    Q.  And do you recognize this document?
6    A.  Yes.
7    Q.  What is it?
8    A.  The org tree.  Organization chart.
9    Q.  For the escrow administration
10  department?
11    A.  Yes.
12    Q.  And do you recognize your group on
13  this chart?
14    A.  Yes.
15    Q.  That's the HE flood/MHA insurance
16  projects group; is that right?
17    A.  Yes.
18    Q.  HE, that stands for home equity; is
19  that right?
20    A.  Yes.
21    Q.  What does MHA stand for?
22    A.  Making home affordable.
23    Q.  Is that like loan modifications?
24    A.  Yes.
25    Q.  On firsts or seconds?

Page 28

1    A.  Both.  I'm sorry, can you be more
2  specific?  Are you talking on modifications?
3    Q.  Correct.
4    A.  Firsts.
5    Q.  And you answered both in response to
6  my previous question.  What were you answering
7  both to?
8    A.  My department services, first and
9  second.
10         MR. LeMAR:  Can I ask a clarification
11  question?  Are you referring to home equity --
12  first and second position home equity or first
13  and second mortgages?
14         THE WITNESS:  First and second home
15  equity.
16  BY MR. RICHTER:
17    Q.  Now, the group in this cell that
18  references home equity flood/making home
19  affordable insurance projects, what type of
20  projects does your group work on with respect to
21  flood insurance?
22    A.  There's a wide range of projects.
23    Q.  Can you group them or categorize them
24  for me?
25    A.  System update projects, procedure

Page 29

1  projects, just process projects would probably
2  be the three.
3    Q.  Could you give me some examples of
4  system updates, system-related projects?
5    A.  New fields being added.  That's -- I
6  mean -- the main thing on the system projects is
7  just, you know, updates to the system.
8    Q.  How about procedures projects?
9    A.  Just reviewing of all procedures,
10  making sure procedures are up to date.
11    Q.  And those would include procedures
12  with respect to amount of flood insurance that's
13  required?
14    A.  Amount of flood insurance?  Our
15  process procedures.
16    Q.  You gave a third group, process
17  projects.  What's the difference in your mind
18  between the procedure projects and process
19  projects?
20    A.  Procedure projects are strictly
21  looking at the procedures and making sure that
22  they're up to date, any new ones that need
23  written.
24         Process projects are adding a new
25  process in our department, implementing it.

8 (Pages 26 to 29)

MEGAN GROFF – 2/8/11

Page 30

1    Q.  So would the procedures be the
2  guidelines and the process the implementation of
3  those guidelines?
4       MR. LeMAR:  Object to the form.
5       THE WITNESS:  Yeah, I could -- I
6  guess -- yes.
7  BY MR. RICHTER:
8    Q.  What type of compliance projects have
9  you worked on?
10       MR. LeMAR:  Object to the form.
11       THE WITNESS:  I don't recall a
12  specific compliance project.
13  BY MR. RICHTER:
14    Q.  You indicated earlier that you have
15  some compliance responsibilities in your current
16  manager position.  Do you recall that?
17    A.  Yes.
18    Q.  What are those compliance
19  responsibilities?
20    A.  Making sure that every account in the
21  home equity portfolio has a flood determination,
22  any accounts that are deemed to be in a special
23  flood hazard area are carrying the adequate
24  amount of flood insurance and maintaining that
25  throughout the life of the loan as long as

Page 31

1  they're in a special flood hazard area.
2    Q.  What is an adequate amount of flood
3  insurance coverage?
4       MR. LeMAR:  Object to the form of the
5  question.
6       THE WITNESS:  Can you, I guess, be
7  more specific?
8  BY MR. RICHTER:
9    Q.  Sure.  You indicated that one of your
10  compliance responsibilities was making sure that
11  if a property or dwelling is in a special flood
12  hazard area, that it has adequate flood
13  insurance for the life of the loan.  Do you
14  recall that?
15    A.  Yes.
16    Q.  First of all, do you know whether that
17  adequate flood insurance requirement, does that
18  apply to dwellings or properties?
19    A.  Dwellings.
20    Q.  So if, for example, someone's lot
21  boundary goes into a special flood hazard area
22  but their dwelling is entirely outside the
23  special flood hazard area, they would not be
24  required to carry flood insurance; is that
25  right?

Page 32

1    A.  As long as nothing of the structure
2  was touching the special flood hazard area, it
3  would not be required to be carried.
4    Q.  And should not be required to carry
5  flood insurance, correct?
6       MR. LeMAR:  Object to the form of the
7  question.
8       THE WITNESS:  We do not require it.
9  BY MR. RICHTER:
10    Q.  Now, I want to go back to the issue of
11  adequate flood insurance coverage.  Assuming
12  that someone's dwelling falls within a special
13  flood hazard area, what is the adequate amount
14  of flood insurance coverage?
15       MR. LeMAR:  Object to the form.
16       THE WITNESS:  Can you be more specific
17  as to the requirements you're referring to?
18  BY MR. RICHTER:
19    Q.  What is your understanding of the
20  adequate amount of flood insurance coverage on a
21  property -- or excuse me -- on a dwelling that's
22  in a special flood hazard area?  And if you
23  don't have an understanding, that's fine, too.
24  I mean, you should feel free to say that.
25    A.  For home equity loans Chase requires

Page 33

1  the lesser of the following, NFIP max two fifty
2  or the replacement cost value of the home,
3  whichever is less.
4    Q.  Has that always been Chase's
5  requirement for home equity loans and lines?
6    A.  No.
7    Q.  What was Chase's previous requirement
8  for loans and lines?
9       MR. LeMAR:  Object to the form of the
10  question.
11       THE WITNESS:  I'm going to have to say
12  I don't recall.
13  BY MR. RICHTER:
14    Q.  Do you remember if Chase's
15  requirements prior to December of 2009 allowed
16  borrowers a third option, to ensure the property
17  to the amount of the outstanding principal
18  balance or the amount of line?
19       MR. LeMAR:  Object to the form.
20       THE WITNESS:  Yes.
21  BY MR. RICHTER:
22    Q.  So prior to December of 2009 Chase
23  allowed borrowers three options, NFIP maximum of
24  two fifty, replacement cost value, or the amount
25  of the loan or line, the lesser of those three,

9 (Pages 30 to 33)

MEGAN GROFF - 2/8/11

Page 34

1   correct?
2          MR. LeMAR:  Object to the form.
3          THE WITNESS:  Yes.
4   BY MR. RICHTER:
5       Q.  And now as of -- I should say as of
6   December of 2009, Chase changed its flood
7   insurance requirements to only allow the first
8   two options to the borrower, the lesser of the
9   NFIP maximum of two hundred and fifty thousand
10  or replacement cost value without regard to the
11  amount of loan or the amount of the line,
12  correct?
13         MR. LeMAR:  Object to the form of the
14  question.
15         THE WITNESS:  Yes, the rules were
16  changed in December.
17  BY MR. RICHTER:
18      Q.  Prior to December of 2009 when Chase
19  gave the borrower the third option of insuring
20  to the -- excuse me, insuring to the amount of
21  the loan or the line, that was deemed an
22  adequate amount of insurance coverage by Chase,
23  correct?
24         MR. LeMAR:  Object to the form.
25         THE WITNESS:  At that time.

Page 35

1   BY MR. RICHTER:
2       Q.  And did any facts on the ground change
3   that made that suddenly inadequate after
4   December of 2009?
5          MR. LeMAR:  Object to the form.
6          THE WITNESS:  I don't recall all of
7   the changes that happened that caused our change
8   to our flood insurance requirement.  I don't
9   recall the specific changes.
10  BY MR. RICHTER:
11      Q.  Prior to December of 2009 did anybody
12  ever say to you that insurance coverage in the
13  amount of the loan or line was inadequate
14  somehow?
15         MR. LeMAR:  Object to the form.
16         THE WITNESS:  Not -- I don't recall.
17  Not that I know of.
18  BY MR. RICHTER:
19      Q.  Did you ever tell anybody prior to
20  December of 2009 that you thought flood
21  insurance coverage in the amount of the loan or
22  the line was inadequate?
23      A.  No.
24      Q.  Do you ever recall reading any memos
25  or written correspondence, anything prior to

Page 36

1   December of 2009 saying flood insurance coverage
2   in the amount of the borrower's balance or line
3   was inadequate, insufficient somehow?
4          MR. LeMAR:  Object to the form of the
5   question.
6          THE WITNESS:  I don't recall the
7   specifics of why the decision was made to change
8   our requirements.
9   BY MR. RICHTER:
10      Q.  Nobody at Chase ever shared that with
11  you as the person handling compliance issues for
12  home equity flood?
13         MR. LeMAR:  Object to the form.
14         THE WITNESS:  I don't recall at this
15  time the changes that were made.  I know there
16  were changes, but I don't recall the specifics
17  of those changes as to what led us to change our
18  policy.
19  BY MR. RICHTER:
20      Q.  Sure.  And what I'm wondering is
21  whether anybody ever came to you and said we are
22  making this change for this reason or this set
23  of reasons.  Did anybody ever come to you and
24  tell you why that change was made in December of
25  2009?

Page 37

1          MR. LeMAR:  Objection.  Asked and
2   answered.
3          THE WITNESS:  I knew that the policy
4   was being changed, but I don't remember the
5   specifics of the NFIP rules or federal
6   guidelines.  I don't remember the specifics of
7   what caused us to have to change our
8   requirements.
9   BY MR. RICHTER:
10      Q.  Because nobody ever told you, right?
11         MR. LeMAR:  Objection.
12  BY MR. RICHTER:
13      Q.  It's not faulty memory, it's that
14  nobody ever told you, right?
15         MR. LeMAR:  Object to the form.
16         THE WITNESS:  No, that's -- I'm sure
17  at that time I saw -- knew why they were
18  changing, saw what was changing with the NFIP
19  rules to cause our change, I just don't recall
20  the specifics.
21  BY MR. RICHTER:
22      Q.  Are borrowers with dwellings in a
23  flood zone required to keep their property
24  adequately insured as a term of their mortgage?
25      A.  Yes.

10 (Pages 34 to 37)

MEGAN GROFF - 2/8/11

Page 38

1   Q.  And Chase's definition of what
2   constituted adequate coverage changed as of
3   December 2009, correct?
4       MR. LeMAR:  Object to the form of the
5   question.
6       THE WITNESS:  Can you repeat the
7   question?
8   BY MR. RICHTER:
9   Q.  Did Chase's definition of what
10  constituted adequate insurance coverage change
11  as of December 2009?
12      MR. LeMAR:  Same objection.
13      THE WITNESS:  Yes.
14  BY MR. RICHTER:
15  Q.  With respect to the projects that you
16  work on in your managerial role for home equity
17  flood, have you worked on any litigation-related
18  projects?
19      MR. LeMAR:  Object to the extent it
20  asks for attorney-client privilege
21  communications.
22      THE WITNESS:  Be more specific.
23  BY MR. RICHTER:
24  Q.  Without getting into what projects
25  you've worked on, I just want to know whether

Page 39

1   you've worked on any projects in your current
2   role related to litigation.
3       MR. LeMAR:  Object to the form of the
4   question.
5       THE WITNESS:  Not that I can think of.
6   BY MR. RICHTER:
7   Q.  Have you undertaken any projects at
8   the direction of Chase's in-house counsel?
9       MR. LeMAR:  I'm going to --
10      MR. RICHTER:  It's just a yes or no.
11      MR. LeMAR:  -- object to the extent
12  that it asks for any sort of legal -- I'm
13  sorry -- attorney-client privilege
14  communications.  You can answer yes or no.
15      THE WITNESS:  Yes.
16  BY MR. RICHTER:
17  Q.  Have you worked on projects related to
18  this particular case, the Hofstetter and
19  Modersbach versus Chase case?
20      MR. LeMAR:  Same objection.  You can
21  answer yes or no.
22      THE WITNESS:  Yes.
23  BY MR. RICHTER:
24  Q.  At whose instruction?
25      MR. LeMAR:  I'm going to instruct you

Page 40

1   not to answer to the extent that it calls for
2   attorney-client communications.
3       MR. RICHTER:  It doesn't.
4       MR. LeMAR:  To the extent it does.  If
5   it does --
6       MR. RICHTER:  You can go ahead and --
7   can you repeat the question so the witness can
8   answer?
9       (Record read.)
10      THE WITNESS:  Am I supposed to answer?
11      MR. LeMAR:  If it's not an
12  attorney-client communication or if it was not
13  done at the insistence of counsel, then you can
14  answer.
15      THE WITNESS:  My VP.
16  BY MR. RICHTER:
17  Q.  Mr. Nack?
18  A.  Yes.
19  Q.  Are there records kept of the various
20  projects that you and the members of your group
21  work on?
22      MR. LeMAR:  Object to the form.
23      THE WITNESS:  Maybe -- I guess maybe I
24  need more clarification on project.
25  BY MR. RICHTER:

Page 41

1   Q.  Well, the title of your group is home
2   equity flood/making home affordable insurance
3   projects, correct?
4   A.  Uh-huh.
5   Q.  What does that term projects as stated
6   there mean to you?
7   A.  The majority, system updates.
8   Internal projects within our department.
9   Procedure, maintaining, job aids.
10  Q.  As part of the projects that you work
11  on, do those include answering questions or
12  providing guidance with respect to specific
13  borrower's accounts?
14      MR. LeMAR:  Can you repeat the
15  question?
16      (Record read.)
17      THE WITNESS:  The projects aren't
18  usually customer specific.
19  BY MR. RICHTER:
20  Q.  Would it be fair to say that you also
21  don't typically perform litigation support-type
22  of functions?
23      MR. LeMAR:  Object to the form.
24      THE WITNESS:  No.
25      MR. LeMAR:  Can I get clarification?

11 (Pages 38 to 41)

MEGAN GROFF – 2/8/11

Page 42

1  Was that no, you do not usually perform
2  litigation-specific tasks or that yes, you do
3  usually perform them.
4       THE WITNESS:  I do not usually perform
5  litigation-specific tasks.
6  BY MR. RICHTER:
7       Q.  Now, the projects that you do work on,
8  is there a log or some other type of record of
9  the flood compliance projects that you work on
10 or members of your team work on?
11      A.  We keep track of our projects.
12      Q.  How?
13      A.  Excel.
14      Q.  So there's an Excel spreadsheet of the
15 various projects that your group works on; is
16 that right?
17      MR. LeMAR:  Object to the extent it
18 misstates prior testimony.
19      THE WITNESS:  We keep a log of our
20 projects.
21 BY MR. RICHTER:
22      Q.  Have you worked on any projects
23 relating to the amount of flood insurance that
24 Chase requires, either procedures or processes?
25      MR. LeMAR:  Object to the form.

Page 43

1       THE WITNESS:  I've been involved but
2  not the decision maker.
3  BY MR. RICHTER:
4       Q.  Does everybody in your group work out
5  of the same location in Columbus?
6       A.  Yes.
7       Q.  How frequently do you communicate with
8  one another?  Do you have regular meetings,
9  whatnot?
10      A.  We communicate on a daily basis.
11      Q.  Do you have written communications
12 with your group or is it all verbal?
13      A.  Both.
14      Q.  What sort of communications did you
15 have with persons in your group with respect to
16 the December 2009 policy change with respect to
17 Chase's flood insurance requirements?
18      MR. LeMAR:  Object to the form.
19      THE WITNESS:  I don't recall any
20 specifics.
21 BY MR. RICHTER:
22      Q.  Have you had any communications with
23 persons in your group relating to Miss
24 Hofstetter?
25      MR. LeMAR:  Object to the extent that

Page 44

1  it calls for communications at the instruction
2  of counsel.
3  BY MR. RICHTER:
4       Q.  Persons with your group, not counsel.
5  Have you had any communications with persons in
6  your group relating to Miss Hofstetter?
7       MR. LeMAR:  Can I get a clarification?
8       MR. RICHTER:  You can make an
9  objection.
10      MR. LeMAR:  I'm going to object to the
11 extent that it's -- and instruct you not to
12 answer to the extent that any communication was
13 done as a result of instruction from counsel
14 relating to the litigation.
15      MR. RICHTER:  Can you read back the
16 question?
17      (Record read.)
18      THE WITNESS:  I'm sure, yes.
19 BY MR. RICHTER:
20      Q.  What type of communications have you
21 had with persons in your group relating to Miss
22 Hofstetter?
23      MR. LeMAR:  Same objection.
24      THE WITNESS:  I can't say specific
25 ones.  More gathering material being requested,

Page 45

1  along those lines.
2       MR. LeMAR:  And, again, I'm going to
3  instruct you not to answer to the extent that it
4  relates you were instructed by counsel to obtain
5  documents related to this litigation.
6       THE WITNESS:  Okay.
7  BY MR. RICHTER:
8       Q.  How often do you communicate with Rita
9  Hillman, formerly Jones?
10      A.  On a daily basis.
11      Q.  Are those communications also both
12 verbal and written?
13      A.  Yes.
14      Q.  What types of written communications
15 do you and Rita Hillman share?
16      MR. LeMAR:  Object to the form.
17      THE WITNESS:  That's a broad scope.
18 BY MR. RICHTER:
19      Q.  E-mails?
20      A.  Broad scope of e-mails, yes.
21      Q.  How about memos?
22      A.  No, no memos.
23      Q.  Do you attend any regular weekly
24 meetings or other types of periodic meetings
25 with Miss Jones-Hillman?

12  (Pages 42 to 45)

Page 46

1      A.  Biweekly.
2      Q.  Are there meeting agendas that go out
3  in connection with those meetings?
4      A.  Be more specific.  Go out?
5      Q.  Are there written meeting agendas that
6  are drafted in connection with your biweekly
7  meetings with Rita Jones?
8      A.  Yes.
9      Q.  Are there also minutes of those
10 meetings that are kept?
11     A.  Not that I'm aware of.
12     Q.  Are there any notes taken or kept of
13 those meetings?
14     A.  Not that I know of.
15     Q.  Is there a scribe or a secretary
16 that's appointed to take down notes or minutes
17 at those meetings?
18     A.  No.
19     Q.  Who else attends your biweekly
20 meetings with Miss Jones-Hillman?
21     A.  The other supervisors that report to
22 Rita and our team leads.
23     Q.  So looking at Exhibit 4, it would be
24 the managers and the team leads in the four
25 boxes immediately below her; is that right?

Page 47

1      A.  Yes.
2      Q.  Anybody else?
3      A.  There's another supervisor that's not
4  on this list.
5      Q.  Who is that?
6      A.  Joel Pinnix.
7      Q.  Can you spell the last name?
8      A.  P I N N I X.
9      Q.  And what are her responsibilities?
10     A.  Joel?
11     Q.  Yes.  Is it Joel?  I thought you said
12 Julie.  Sorry.  Joel.  J O E L?
13     A.  Uh-huh.
14     Q.  I see.  Okay.  What are Joel's
15 responsibilities?
16     A.  He supervises the escrow
17 administration check room.
18     Q.  All right.  Do you have any weekly,
19 biweekly, other periodic meetings with Mr. Nack?
20     MR. LeMAR:  Object to the form.
21     THE WITNESS:  No.
22 BY MR. RICHTER:
23     Q.  Do you communicate directly with
24 Mr. Nack from time to time?
25     A.  Yes.

Page 48

1      Q.  How regularly do you communicate with
2  Mr. Nack?
3      A.  Almost on a daily basis.
4      Q.  And is that, again, both verbally and
5  in writing?
6      A.  Yes.
7      Q.  In your current role do you have any
8  interaction with any of the other subgroups, the
9  ones -- the flood subgroup headed up by Miss
10 Reitz or the other subgroups that report to
11 Mr. Miller, or Mr. Miller himself for that
12 matter?
13     MR. LeMAR:  Object to the form of the
14 question.
15     THE WITNESS:  Yes.
16 BY MR. RICHTER:
17     Q.  What type of interaction do you have
18 with the other subgroups?
19     A.  Interactions with Maggie, with our
20 flood vendors.
21     Q.  What do you mean by that?
22     A.  We have biweekly meetings with our
23 vendor -- our flood vendor, CoreLogic.
24     Q.  They're the mapping outfit?
25     A.  They provide our determinations.

Page 49

1      Q.  Do they have any responsibilities with
2  respect to tracking amount of flood insurance
3  coverage?
4      A.  No.
5      Q.  Who participates in those biweekly
6  meetings that you have with Maggie Reitz; is it
7  just you and Miss Reitz or are there other
8  people present?
9      A.  There are other people present.
10     Q.  And in general, who are the other
11 people who are present?  Is it other people from
12 your group, other people from the vendor, both?
13     A.  Both.  All -- other people from
14 Maggie's group, my group, and the vendor.
15     Q.  So these are full group meetings
16 between your group and Mrs. -- Miss Reitz's
17 group and then some additional people attend the
18 meetings from CoreLogic; is that right?
19     MR. LeMAR:  Object to the form.
20     THE WITNESS:  Correct.
21 BY MR. RICHTER:
22     Q.  Do you have any other interactions
23 with Miss Reitz's group or any other
24 communications from time to time with Miss
25 Reitz?

MEGAN GROFF - 2/8/11

Page 50

1    A.  Outside of the flood vendors, no.
2        Q.  Do you have any communications with
3    her or her group relating to Assurant or
4    American Security Insurance Company and the
5    vendor services provided by them?
6        A.  No.
7        Q.  Are there any lawyers in your group?
8        A.  No.
9        Q.  Are there any paralegals in your
10   group?
11       A.  No.
12       Q.  Are there any persons with any type of
13   legal training in your group?
14       MR. LeMAR:  Object to the extent it
15   calls for speculation.
16       THE WITNESS:  Not that I'm aware of.
17   BY MR. RICHTER:
18       Q.  Do you know if anybody else on this
19   chart, Plaintiffs' Exhibit 4, is a lawyer or has
20   any type of legal training --
21       MR. LeMAR:  Object to the form to the
22   extent it calls for speculation.
23   BY MR. RICHTER:
24       Q.  -- or paralegal training?
25       A.  Not that I'm aware of.

Page 51

1        Q.  Do you know if Mr. Nack holds a law
2    degree?
3        MR. LeMAR:  I object to the extent it
4    calls for speculation.
5        THE WITNESS:  I do not know.
6    BY MR. RICHTER:
7        Q.  We were talking a little while back
8    about the December 2009 policy change to drop or
9    eliminate the third option for borrowers that
10   formerly allowed them to insure to the amount of
11   their principal balance or line.  Do you recall
12   that?
13       A.  Yes.
14       Q.  When that change was made, do you
15   recall wondering or asking yourself why that
16   change was being made?
17       MR. LeMAR:  Object to the form.
18       THE WITNESS:  No.
19   BY MR. RICHTER:
20       Q.  Did you give it any thought?
21       MR. LeMAR:  Object to the form.
22       THE WITNESS:  I'm sure I thought about
23   it, and I knew at the time why the change was
24   being made.
25   BY MR. RICHTER:

Page 52

1        Q.  Did you ask anyone at the time?
2        MR. LeMAR:  Object to the form.
3        THE WITNESS:  Be more specific.
4    BY MR. RICHTER:
5        Q.  Did you ask anybody at the time the
6    December 2009 policy change was made why it was
7    being made?
8        MR. LeMAR:  Object to the form.  Asked
9    and answered.
10       THE WITNESS:  I don't recall at the
11   time who I asked or who I talked to about the
12   changes.
13       MR. RICHTER:  All right.  Let's take a
14   short break.
15       (Pause in proceedings.)
16   BY MR. RICHTER:
17       Q.  Are you familiar with something called
18   the flood compliance department?
19       MR. LeMAR:  Object to the form of the
20   question.
21       THE WITNESS:  Yes.
22   BY MR. RICHTER:
23       Q.  Is that a group or set of groups on
24   this chart, Plaintiffs' Exhibit 4, or is that a
25   separate group?

Page 53

1        A.  That would be the group under Maggie
2    Reitz.
3        Q.  And the group that you were formerly a
4    team lead in?
5        A.  Correct.
6        Q.  What sort of compliance issues does
7    that group address?
8        MR. LeMAR:  Object to the form of the
9    question.
10       THE WITNESS:  Flood zone issues.
11   BY MR. RICHTER:
12       Q.  Do they address compliance issues
13   relating to amount of coverage?
14       MR. LeMAR:  Object to the extent it
15   calls for speculation and form.
16       MR. RICHTER:  No, it doesn't.  She was
17   formerly a team lead.
18   BY MR. RICHTER:
19       Q.  Go ahead.
20       MR. LeMAR:  Right, she can -- but to
21   the extent it calls for speculation now.  She's
22   not in that group now.
23       THE WITNESS:  Assurant would handle
24   it.
25   BY MR. RICHTER:

Merrill Corporation - Minnesota
877-489-0367                          www.merrillcorp.com/law

Page 54

1      Q.  Are you familiar with something called
2  the profitability management team?
3      A.  Not really.
4      Q.  Miss Groff, I've just handed you what
5  was previously marked as Plaintiffs' Exhibit 6.
6  It says at the top Chase, procedures, home
7  equity insurance.  Do you see that?
8      A.  Yes.
9      Q.  And then toward the bottom there's a
10  Bates stamp on it, CHASE 00698.  Do you see
11  that?
12      A.  Yes.
13      Q.  Now, underneath the line at the top
14  says introduction, each week, the home equity
15  flood compliance team receives a flood
16  validation file from the profitability
17  management team in Phoenix.  Do you see that?
18      A.  Yes.
19      Q.  Okay.  And your group is the home
20  equity flood compliance team; is that right?
21      A.  Yes.
22      Q.  And you have been heading up that
23  group since before the version date of this
24  document, April 29th, 2010, correct?
25      A.  Yes.

Page 55

1      Q.  So what does the profitability
2  management team refer to here?
3      A.  I do not know the specifics of what
4  that team does.  I'm not --
5      Q.  Do you know what this flood validation
6  file from the profitability management team
7  refers to?
8      A.  I know what the validation file is,
9  but I don't know what exactly the profitability
10  management team does.
11      Q.  What's the validation file -- flood
12  validation file?
13      A.  If there's missing collateral
14  information, such as the state, we get that --
15  we get it on file and we'll make the updates.
16      Q.  Do you have any other communications
17  with the profitability management team?
18      A.  Not that I'm aware of, no.
19      Q.  Do you have any other communications
20  with anybody in Chase out in Phoenix, to your
21  knowledge?
22      A.  Not that I'm aware of.
23      Q.  All right.  I want to go back to
24  Chase's flood insurance requirements for a
25  minute.  Those requirements are the same

Page 56

1  regardless of where the borrower lives; is that
2  right?
3      MR. LeMAR:  Object to the form of the
4  question.
5      THE WITNESS:  Correct.
6  BY MR. RICHTER:
7      Q.  And they're the same regardless of
8  where the borrower's property is located?  It
9  doesn't matter whether the property is in
10  California or any other state, right?
11      MR. LeMAR:  Object to the form of the
12  question.
13      THE WITNESS:  No.
14  BY MR. RICHTER:
15      Q.  And those requirements are the same
16  regardless -- well, since December of 2009,
17  those requirements have been the same regardless
18  of the borrower's line, correct?
19      MR. LeMAR:  Object to the form of the
20  question.
21      THE WITNESS:  Correct.
22  BY MR. RICHTER:
23      Q.  And they've been the same regardless
24  of whether the borrower's line is suspended or
25  not, correct?

Page 57

1      MR. LeMAR:  Object to the form of the
2  question.
3      THE WITNESS:  Yes.
4  BY MR. RICHTER:
5      Q.  And they're the same regardless of
6  whether the borrower has a significant principal
7  balance or even any principal balance, correct?
8      MR. LeMAR:  Object to the form of the
9  question.
10      THE WITNESS:  Yes.
11  BY MR. RICHTER:
12      Q.  The requirements are the same for the
13  borrower regardless of the borrower's individual
14  circumstances, right?
15      MR. LeMAR:  Object to the form of the
16  question.
17      THE WITNESS:  Yes.
18  BY MR. RICHTER:
19      Q.  And to your knowledge, did Chase treat
20  Miss Hofstetter and Mr. Modersbach consistent
21  with how it treated other borrowers with respect
22  to its flood insurance requirements?
23      MR. LeMAR:  Object to the form of the
24  question.
25      THE WITNESS:  Yes.

15 (Pages 54 to 57)

Page 58

1    BY MR. RICHTER:
2        Q.  They're similarly situated to other
3    borrowers in that regard, correct?
4        MR. LeMAR:  Object to the extent that
5    it calls for a legal conclusion.
6        THE WITNESS:  Can you repeat the
7    question?
8    BY MR. RICHTER:
9        Q.  Sure.  We'll move on.  Now, we also
10   talked a little while ago about the notice
11   letters -- the form letters that go out to
12   borrowers advising them of Chase's flood
13   insurance requirements.  Do you recall that?
14       A.  Yes.
15       Q.  Have you produced those notice letters
16   to your counsel?
17       A.  Yes.
18       MR. RICHTER:  Let's go off the record
19   for one second.
20       (Thereupon, Plaintiffs' Exhibit 59,
21   e-mail string starting with an e-mail from
22   Andrew LeMar to Kai Richter dated 12-15-10;
23   Plaintiffs' Exhibit 60, flood letters effective
24   2006 to 5-28-09 spreadsheet; Plaintiffs' Exhibit
25   61, CHASE 01325 through CHASE 01488, were marked

Page 59

1    for purposes of identification.)
2        MR. RICHTER:  All right.  Back on the
3    record.
4    BY MR. RICHTER:
5        Q.  Miss Groff, do you have Exhibits 59,
6    60, and 61 in front of you?
7        A.  Yes.
8        Q.  All right.  I know Exhibit 61 is
9    somewhat voluminous so I'm going to try to go
10   through these as efficiently as I can so bear
11   with me, please.
12       Let's start out with Exhibit 59.  It's
13   an e-mail from Mr. LeMar, your counsel here
14   today, to myself with some other individuals at
15   his firm copied on there, and it says following
16   up on the e-mail below, attached are the form
17   letters used during the class period, CHASE 1325
18   to 1488, as well as a spreadsheet indicating the
19   dates each letter was used and/or revised, and
20   the Bates numbers for each letter and/or
21   revision.  The letters were obtained by Megan
22   Groff from Assurant.  The spreadsheet was
23   prepared by me, referring to Mr. LeMar, with the
24   assistance of Megan Groff.  Do you see that?
25       A.  Yes.

Page 60

1        Q.  All right.  Now, looking at -- well,
2    actually on the attachment line there's a
3    reference to spreadsheet dot PDF and CHASE 1325
4    to 1488 pdf.  Do you see that?
5        A.  Yes.
6        Q.  All right.  And moving on to Exhibit
7    61, do you recognize these as these are the
8    documents Bates numbered CHASE 1325 to 1488?  Do
9    you see that?  Little notations in the bottom
10   right-hand corner there.
11       A.  Yes.
12       Q.  All right.  And do you recognize these
13   form letters as the form letters that you
14   produced to your counsel?
15       A.  Yes.
16       Q.  All right.  And then turning back to
17   Exhibit 60, the spreadsheet, is this the
18   spreadsheet that you assisted Mr. LeMar in
19   preparing?
20       A.  Yes.
21       Q.  And did you have an opportunity to
22   review this spreadsheet?
23       A.  Yes.
24       Q.  Does this spreadsheet adequately -- or
25   excuse me -- accurately catalog which form

Page 61

1    letters you provided to your counsel?
2        A.  Yes.
3        Q.  And does it accurately catalog when
4    those form letters were used and revised and so
5    forth?
6        A.  Yes.
7        Q.  All right.  Just to be clear, how far
8    back did you go in your collection of form
9    letters?
10       A.  I would say 2006.
11       Q.  To the beginning of the year, January
12   1, or somewhere in the middle?
13       A.  I would say to the beginning of the
14   year.
15       Q.  And did Chase also use flood LPI
16   tracking letters and other similar letters prior
17   to January 1, 2006?
18       A.  I'm not sure what they used at that
19   time.
20       Q.  Now, the form letters that you
21   produced and the form letters that are
22   referenced on this spreadsheet, Exhibit 60 and
23   61, those are form letters that were used in
24   connection with home equity accounts; is that
25   right?

16 (Pages 58 to 61)

MEGAN GROFF - 2/8/11

Page 62

1    A.  Yes.
2    Q.  Did you collect -- are there any form
3 letters on this spreadsheet that were used in
4 connection with first mortgage loans?
5    A.  Not that I'm aware of.
6    Q.  And the letters that you collected and
7 that are referenced on this spreadsheet, those
8 would include letters that went out to both home
9 equity line borrowers and home equity loan
10 borrowers, correct?
11    A.  Yes.
12    Q.  All right.  Let's -- I want to focus
13 your attention on the spreadsheet, Exhibit 60.
14 And let's just start at the first page.  In the
15 top left-hand corner there's a reference there
16 to flood letters effective 2006 to May 28th,
17 2009.  Do you see that?
18    A.  Yes.
19    Q.  And then underneath that in bold
20 there's a reference to flood LPI tracking
21 letters.  Do you see that?
22    A.  Yes.
23    Q.  LPI, is that lender placed insurance?
24    A.  Yes.
25    Q.  And underneath there there's a

Page 63

1 letter -- there's a reference to flood one,
2 flood two, and cover.  Do you see that?
3    A.  Yes.
4    Q.  And is it -- we'll get into the
5 specifics of the letters as we go through this;
6 but just as a general proposition, did Chase
7 send out letters in three sets; an initial
8 notice letter to the borrower saying you need to
9 get flood insurance coverage and a second notice
10 letter saying that the borrower still needs to
11 get coverage and then a third letter informing
12 the borrower that a policy had, in fact, been
13 obtained for the borrower providing for flood
14 insurance coverage?  Is that the general -- was
15 that typical for form letters to go out that
16 way, in that sort of triplicate fashion?
17       MR. LeMAR:  Object to the form.
18       THE WITNESS:  Yes.
19 BY MR. RICHTER:
20    Q.  All right.  Let's take a look at the
21 letters referenced here, flood one, flood two,
22 and cover on the first page of this spreadsheet
23 starting with CHASE 1325 to 1326.  So why don't
24 you take a look at Exhibit 61 at 1325 to 26.  Do
25 you have that in front of you?

Page 64

1    A.  Yes.
2    Q.  And referring back to the spreadsheet,
3 is it correct that this form letter, CHASE 1325
4 to 26, was used during the period from 2006 up
5 until it was discontinued on May 28th, 2009?  Is
6 that right?
7    A.  Yes.
8    Q.  And this was -- this letter, this
9 flood one letter that's referenced on this
10 spreadsheet, this would have been a letter that
11 would have gone out and did go out to borrowers
12 as the initial letter in this sort of three
13 stage wave of letters that Chase would typically
14 send out; is that right?
15    A.  Yes.
16    Q.  And at that time, from 2006 up until
17 May 28th, 2009, Chase told the borrower, looking
18 at the fourth paragraph of the letter with the
19 three bullet points, that at a minimum, the
20 flood insurance coverage amount you need to
21 obtain on your flood insurance policy must be
22 equal to the lesser of the following:  The
23 principal balance of the loan, or credit line
24 amount for lines of credit, plus the outstanding
25 principal balance on any existing first mortgage

Page 65

1 loan, or the overall appraised value of the
2 structure securing the loan/line, or the maximum
3 amount of insurance coverage available through
4 the National Flood Insurance Program, two
5 hundred fifty thousand dollar maximum in most
6 cases.  Is that right?
7    A.  Yes.
8    Q.  Now, in looking at flood letter number
9 two in the three stage series of letters, at
10 CHASE 1327 to 28, this is the letter that says
11 final notice.  Do you see that?
12    A.  Yes.
13    Q.  This letter actually provided the
14 borrower with a slightly different set of bullet
15 points.  Do you see that?
16    A.  Yes.
17    Q.  And the bullet points on this final
18 notice letter were first bullet, the principal
19 balance of the loan, or the credit line amount
20 for lines of credit, plus the outstanding
21 principal balance on any existing first mortgage
22 loan provided that the amount -- that this
23 amount is at least eighty percent of the
24 replacement cost of the structure or, second
25 bullet, replacement cost or other similar

17 (Pages 62 to 65)

Page 66

1 verbiage or, third bullet, the maximum amount of
2 insurance coverage available through the
3 National Flood Insurance Program, two hundred
4 and fifty thousand dollars maximum in most
5 cases. Do you see that?
6     A.  Yes.
7     Q.  And then the third letter in the
8 series, CHASE 1329, that's the third letter that
9 would go out in this series of letters that
10 would go to borrowers; is that right?
11     A.  Yes.
12     Q.  Do you know why the first bullet
13 between flood letter one, 1325, is different
14 from the first bullet in flood letter two, CHASE
15 1327?
16     A.  I don't know.
17     Q.  At the time that these letters were
18 going out, is it true that Chase was not force
19 placing gap coverage at that time?
20     A.  I do not recall when we started the
21 gap coverage.
22     Q.  Do you recall if it was around 2008 or
23 2009? Does that sound about right?
24     A.  It would have been in that area, but I
25 do not recall the specific time frame.

Page 67

1     Q.  Looking at the third page of the
2 spreadsheet on Exhibit 60, there's a reference
3 to gap tracking letters there. Do you see that?
4     A.  Yes.
5     Q.  And the origination date of those gap
6 tracking letters, first origination date listed
7 is May 28th, 2009. Do you see that?
8     A.  Yes.
9     Q.  Does that refresh your recollection of
10 around the time when Chase began force placing
11 gap coverage on borrowers?
12     A.  It would have been around that time.
13     Q.  So prior to that time, referring back
14 to the first series of form letters we looked
15 at, CHASE 1325 to 29, would those letters at
16 that time only have gone out to borrowers who
17 had no coverage at all on their property or
18 would they also have gone out to borrowers who
19 had some level of coverage but less than the
20 amount specified in the bullet?
21     A.  Be more specific. Which letters are
22 you referring to?
23     Q.  The letters -- the ones we just looked
24 at, 1325 to 26, 27 to 28, and 29. First three
25 letters referenced on this spreadsheet.

Page 68

1     A.  These would have been to borrowers
2 with no coverage.
3     Q.  And was -- would that be true of all
4 of the flood LPI tracking letters referenced on
5 the spreadsheet?
6     A.  Yes.
7     Q.  So flood LPI tracking letters were
8 letters that went out to borrowers who had no
9 coverage and then once Chase started force
10 placing gap coverage, it would send out the gap
11 letters to borrowers who are deemed to have an
12 insufficient or inadequate level by Chase; is
13 that right?
14         MR. LeMAR:  Object to the form.
15         THE WITNESS:  Yes.
16 BY MR. RICHTER:
17     Q.  All right. Looking back at the
18 spreadsheet, it shows that the first series of
19 flood LPI tracking letters that we were just
20 going over, CHASE 1325 to 26, 1327 to 28, and
21 1329, it shows that all of those letters were
22 discontinued on May 28th, 2009. Do you see
23 that?
24     A.  Yes.
25     Q.  And were those -- was that series of

Page 69

1 flood LPI tracking letters in fact discontinued
2 at that time?
3     A.  Yes.
4     Q.  Okay. Let's go to the second page of
5 the spreadsheet now. This page references some
6 additional flood LPI tracking letters. Do you
7 see that?
8     A.  Yes.
9     Q.  And there are actually -- underneath
10 here not only is there three different letters,
11 flood one, flood two, and cover, but there's
12 also three categories of each of those types of
13 letters, correct?
14         MR. LeMAR:  Object to the form.
15         THE WITNESS:  Yes.
16 BY MR. RICHTER:
17     Q.  So, for example, there's three
18 categories of flood one LPI tracking letters
19 referenced here, three categories of flood two
20 LPI tracking letters, and three categories of
21 the flood LPI cover letters, correct?
22     A.  Yes.
23     Q.  Okay. And those three categories of
24 each of the letters, one category was for Chase
25 Heritage noncondo borrowers, correct?

18 (Pages 66 to 69)

MEGAN GROFF - 2/8/11

Page 70

1    A.  Yes.
2    Q.  Another category was for Wamu Heritage
3  noncondo borrowers, correct?
4    A.  Yes.
5    Q.  And a third category of each of the
6  three letters was for condo borrowers, correct?
7    A.  Yes.
8    Q.  Now, the Chase Heritage noncondo
9  borrowers, those are borrowers who had their
10  loans with Chase prior to the Chase merger with
11  Washington Mutual; is that correct?
12    MR. LeMAR:  Object to the form.
13    THE WITNESS:  Which letter are you
14  referring to?
15  BY MR. RICHTER:
16    Q.  The Chase Heritage noncondo.
17    A.  Yes.
18    Q.  And the Wamu Heritage form letters,
19  those are letters that went to customers who
20  transitioned over from Washington Mutual to
21  Chase when Chase bought out Washington Mutual in
22  2009; is that right?
23    MR. LeMAR:  Object to the form and to
24  the extent that it misstates the circumstances
25  under which Chase acquired Wamu -- certain Wamu

Page 71

1  assets.  You can answer.
2    THE WITNESS:  Repeat the question.
3  BY MR. RICHTER:
4    Q.  I'll rephrase it.  The letters that
5  say Wamu Heritage noncondo in the spreadsheet in
6  the column for comment, those are letters that
7  went out to borrowers that transitioned over
8  from Washington Mutual to Chase at the time that
9  Chase and Washington Mutual joined forces?
10    MR. LeMAR:  Same objection.
11    THE WITNESS:  Yes.
12  BY MR. RICHTER:
13    Q.  And then the third series of each of
14  the three letters, those are letters that would
15  go out to condominium borrowers, correct?
16    A.  Yes.
17    Q.  All right.  I want to focus on the
18  Chase Heritage noncondo flood LPI tracking
19  letters, okay?
20    A.  Yes.
21    Q.  So the first -- the origination date
22  for the first flood insurance letter that would
23  go out to Chase Heritage noncondo borrowers as
24  referenced on the spreadsheet was CHASE 1342 to
25  43; is that correct?

Page 72

1    MR. LeMAR:  Object to form.
2    THE WITNESS:  Yes.
3  BY MR. RICHTER:
4    Q.  Okay.  And looking at Exhibit 61, why
5  don't you take a look at CHASE 1342 to 43.  Do
6  you have that in front of you?
7    A.  Yes.
8    Q.  And is that the letter that went out
9  to the first of the three -- you know, the three
10  letters that would go out to borrowers, the
11  three stage series, is that the first one that
12  would go out to borrowers as of the end of March
13  2009?
14    MR. LeMAR:  Can you repeat that?
15    THE WITNESS:  Repeat the question.
16  BY MR. RICHTER:
17    Q.  Did the form letter, CHASE 1342 to
18  1343, the one that says notice of missing flood
19  insurance information, please read carefully,
20  your attention is required, is that the version
21  of the flood one letter that went to Heritage
22  Chase noncondo borrowers effective May 28th,
23  2009?
24    A.  Yes.
25    Q.  And this letter at CHASE 1343 said

Page 73

1  that at a minimum, the coverage needed on your
2  flood insurance policy must be equal to the
3  lesser of the following:  The maximum amount of
4  insurance coverage available through the
5  National Flood Insurance Program, which is
6  currently two hundred and fifty thousand
7  dollars, or one hundred percent of the full
8  replacement cost value of the dwelling and
9  insurable improvements, or the principal balance
10  of the loan or credit line amount for lines of
11  credit, correct?
12    A.  Yes.
13    Q.  Then looking back at the spreadsheet,
14  the second flood letter in that three stage
15  series of form letters effective May 28th, 2009
16  is Bates number CHASE 1356 through 57; is that
17  right?
18    A.  Yes.
19    Q.  And then looking at Exhibit 61, page
20  CHASE 1357, it provides the borrower with the
21  same three bulleted options, two hundred and
22  fifty thousand dollars or replacement cost value
23  or the principal balance of the loan or credit
24  line amount for lines of credit; is that right?
25    A.  Yes.

Merrill Corporation - Minnesota
877-489-0367                                    www.merrillcorp.com/law

Page 74

1      Q.  And then looking at the flood
2  insurance cover letter for Chase Heritage
3  noncondo borrowers, the last one in that series
4  of form letters effective May 28th, 2009 is
5  CHASE 1372 to 73; is that right?
6      A.  Yes.
7      Q.  And once again, that form letter gave
8  borrowers the same option, two hundred and fifty
9  thousand or replacement cost value or principal
10  balance of the loan or credit line amount for
11  lines of credit, correct?
12      A.  Yes.
13      Q.  Then looking back at the spreadsheet,
14  in the very first row there for the flood one
15  letter, it says that the flood one letter was
16  revised again effective June 18th, 2009.  Do you
17  see that?
18      A.  Yes.
19      Q.  And that letter is at CHASE 1344 to
20  45; is that correct?
21      A.  Yes.
22      Q.  And looking at CHASE 1344 to 45, is
23  that the revised version of the flood one LPI
24  tracking letter that went to Chase Heritage
25  noncondo borrowers effective June 18th, 2009?

Page 75

1      MR. LeMAR:  Object to the form.
2      THE WITNESS:  Yes.
3  BY MR. RICHTER:
4      Q.  And even though the spreadsheet
5  indicates the letter was revised, the bullet
6  point options that were provided to borrowers
7  were still the same as the previous letter, in
8  other words, two hundred and fifty thousand or a
9  hundred percent of the full replacement cost
10  value or the principal balance of the loan or
11  the credit line amount for lines of credit,
12  correct?
13      A.  Yes.
14      Q.  And looking back at the spreadsheet,
15  there was a flood two letter for Chase Heritage
16  noncondo borrowers effective a few days later,
17  June 22nd, 2009.  Do you see that?
18      A.  Yes.
19      Q.  And that's CHASE 1358 to 59, correct?
20      A.  Yes.
21      Q.  It looks like part of this letter is
22  cut off at the top.  Does it look that way to
23  you on 1359?
24      MR. LeMAR:  No.  Were you asking me?
25  I'm sorry.

Page 76

1      THE WITNESS:  I don't think so.
2  BY MR. RICHTER:
3      Q.  There's a sentence ending on 1358 and
4  then there's -- it just starts out with your
5  own, period, on 1359.  Do you see that?
6      A.  Huh-uh.
7      Q.  Strike that.  I'm the one with the bad
8  copy.  All right.  Looking at CHASE 1358 to 59,
9  the flood two letter that was effective June of
10  2009, that also provided borrowers with the same
11  three options, two hundred and fifty thousand or
12  replacement cost value or the principal balance
13  of the loan or credit line amount for lines of
14  credit, correct?
15      A.  Yes.
16      Q.  Then looking at the third letter in
17  the series effective June of 2009, that's at
18  CHASE 1358 -- or excuse me, CHASE 1374 to 75,
19  correct?
20      A.  Yes.
21      Q.  Now, again, as of June 2009, the
22  coverage letter that was going out to Chase
23  Heritage noncondo borrowers spelled out the same
24  three coverage options, two hundred and fifty
25  thousand, replacement cost value, or principal

Page 77

1  balance of the loan or credit line amount for
2  lines of credit, correct?
3      A.  Yes.
4      Q.  And it was the lesser of those three,
5  correct?
6      A.  Yes.
7      Q.  And that was true for all of the
8  letters that we've looked at, the borrower had
9  the option to choose the lesser of the three
10  options that we've been going through?
11      A.  Yes.
12      Q.  All right.  Continuing on with the
13  chart, on page two, Exhibit 60, it shows there
14  was another revision date in August of 2009 for
15  the Chase Heritage noncondo flood LPI tracking
16  letters.  Do you see that?
17      A.  Yes.
18      Q.  All right.  And for the flood one
19  letter for the Chase Heritage noncondo
20  borrowers, that was CHASE 1346 to 47, correct?
21      A.  Yes.
22      Q.  And once again, looking at CHASE 1347,
23  it still provided borrowers the same -- the
24  option of insuring to the lesser of the same
25  three amounts, two hundred and fifty,

20  (Pages 74 to 77)

MEGAN GROFF – 2/8/11

Page 78

1  replacement cost value, or principal balance of
2  the loan or credit line amount for lines of
3  credit, correct?
4      A.  Yes.
5      Q.  And that would have been true as well
6  for both the flood two and the cover letter at
7  the same time, as of August of 2009, correct?
8          MR. LeMAR:  Object to the form.
9          THE WITNESS:  Yes.
10  BY MR. RICHTER:
11      Q.  All right.  And then finally, looking
12  back at the spreadsheet in the comments section,
13  these flood LPI tracking letters, flood one,
14  flood two, and cover, that went to Chase
15  Heritage noncondo borrowers, all of those
16  letters were discontinued effective December
17  23rd, 2009, correct?
18      A.  Yes.
19      Q.  And those letters were replaced with
20  the letters that went out to Wamu Heritage
21  noncondo borrowers, correct?
22      A.  Yes.
23      Q.  So, for example, looking at the
24  spreadsheet page two, first row, flood one
25  letter, looking all the way to the right-hand

Page 79

1  side, comments, it says discontinued 12-23-2009,
2  replaced with WFLDNON1.  Do you see that?
3      A.  Yes.
4      Q.  And then looking down to the next row,
5  second column, it shows the WFLDNON1 letter,
6  correct?
7      A.  Yes.
8      Q.  And the most recent version of that
9  letter shown is CHASE 1350 to 51, correct?
10  That's the last revision date for that letter?
11      A.  Yes.
12      Q.  And now I'd like you to turn to page
13  1350 to 51.  Is this the letter that went to the
14  Chase Wamu Heritage noncondo customers?
15          MR. LeMAR:  Object to the form.
16          THE WITNESS:  Yes.
17  BY MR. RICHTER:
18      Q.  And also went out to the Chase
19  Heritage noncondo borrowers effective December
20  23rd, 2009, correct?
21      A.  Yes.
22      Q.  And this letter, unlike the prior
23  versions of the form letters that we looked at,
24  only provided the borrower with two options
25  instead of three options, correct?

Page 80

1      A.  Yes.
2      Q.  Those options being to insure to two
3  hundred and fifty thousand dollars or
4  replacement cost value, correct?
5      A.  Yes.
6      Q.  But not providing the borrower the
7  option to insure the principal balance or the
8  credit line amount for lines of credit, correct?
9      A.  Yes.
10      Q.  And that change in the flood
11  insurance -- flood LPI tracking letters was
12  consistent with Chase's change in its flood
13  insurance policies effective December 2009,
14  correct?
15          MR. LeMAR:  Object to form.
16          THE WITNESS:  Can you be more specific
17  with that question?
18  BY MR. RICHTER:
19      Q.  Sure.  The reason that Chase changed
20  the language of the flood insurance notice
21  letters that went out to borrowers as of
22  December 23rd, 2009 was that it changed its
23  flood insurance policies effective as of that
24  date to eliminate the option for borrowers that
25  previously allowed them to insure the principal

Page 81

1  balance of their loan or credit line amount for
2  lines of credit, correct?
3          MR. LeMAR:  Object to form.
4          THE WITNESS:  Yes.
5  BY MR. RICHTER:
6      Q.  All right.  Let's take a look at the
7  gap letters which are referenced on the third
8  and final page of this spreadsheet.  Do you see
9  there's a header there on the third page of this
10  spreadsheet, Exhibit 60, where it says gap
11  tracking letters?
12      A.  Yes.
13      Q.  And just like before, with the gap
14  tracking letters, there was a flood one, flood
15  two, and a cover letter, correct?
16      A.  Yes.
17      Q.  And effective from the beginning with
18  the gap tracking letters there were also three
19  versions of each of those types of gap tracking
20  letters, in other words, three versions of the
21  flood one letter, three versions of the flood
22  two letter, and three versions of the cover
23  letter, correct?
24          MR. LeMAR:  Object to form.
25          THE WITNESS:  Yes.

21 (Pages 78 to 81)

MEGAN GROFF - 2/8/11

Page 82

1    BY MR. RICHTER:
2        Q.   And as with the flood LPI tracking
3    letters, those three different versions, there
4    was a version for Chase Heritage noncondo,
5    correct?
6        A.   Yes.
7        Q.   A version for Washington Mutual
8    Heritage noncondo, correct?
9        A.   Yes.
10       Q.   And a version for condo loans,
11   correct?
12       A.   Yes.
13       Q.   Looking at the first flood one letter
14   referenced there for Chase Heritage noncondo
15   borrowers, that letter was -- first started
16   going out on May 28th, 2009, correct?
17       A.   Yes.
18       Q.   And that letter referenced on the
19   spreadsheet is CHASE 1428 to 29, correct?
20       A.   Yes.
21       Q.   And looking at CHASE 1428 to 29, is
22   that, in fact, the first gap letter that would
23   go out to Chase Heritage noncondo borrowers
24   beginning on May 28th, 2009?
25       A.   Yes.

Page 83

1        Q.   And this flood gap letter -- flood one
2    gap letter gave borrowers three options,
3    National Flood Insurance Program maximum of two
4    hundred and fifty thousand or replacement cost
5    value or principal balance of the loan or credit
6    line amount for lines of credit, correct?
7        A.   Yes.
8        Q.   Looking back at the spreadsheet, the
9    flood gap tracking letters for Chase Heritage
10   noncondo borrowers, as with the flood LPI
11   letters, were also revised effective June 18th,
12   2009, correct?
13       A.   Yes.
14       Q.   And the Bates number of that revised
15   letter for the Chase Heritage noncondo borrowers
16   is CHASE 1430 to 31, correct?
17       A.   Yes.
18       Q.   And still as of June of 2009, the gap
19   letter that was being sent to Chase Heritage
20   noncondo borrowers still provided for three
21   options, two fifty or replacement cost value or
22   the principal balance of a loan or credit line
23   amount for lines of credit, correct?
24       A.   Yes.
25       Q.   And then once again, looking at the

Page 84

1    spreadsheet, that flood one letter says it was
2    discontinued on December 23rd, 2009, correct?
3        A.   Yes.
4        Q.   And it was replaced with the gap
5    coverage letter that would go out to the Wamu,
6    or Washington Mutual, borrowers, correct?
7        A.   Yes.
8        Q.   And the most recent version of the
9    flood one letter for Washington Mutual Heritage
10   noncondo borrowers is CHASE 1434 to 1435,
11   correct?
12       A.   Yes.
13       Q.   And that letter was used for the Chase
14   Heritage noncondo borrowers beginning on
15   December 23rd, 2009, correct?
16       A.   Yes.
17       Q.   And that letter, looking at page CHASE
18   1435, only provided the borrower with two
19   options, those being the National Flood
20   Insurance Program maximum of two hundred and
21   fifty thousand or replacement cost value,
22   correct?
23       A.   Yes.
24       Q.   So the changes to the flood one gap
25   tracking letter for non -- Chase Heritage

Page 85

1    noncondo borrowers were essentially the same as
2    the changes to the flood LPI tracking letters
3    for Chase Heritage noncondo borrowers over the
4    same period, correct?
5        MR. LeMAR:  Object to the form.
6        THE WITNESS:  Yes.
7    BY MR. RICHTER:
8        Q.   And the same changes were made for the
9    flood two letters and the cover letters on the
10   gap tracking letters as well, correct?
11       MR. LeMAR:  Object to the form.
12       THE WITNESS:  Yes.
13   BY MR. RICHTER:
14       Q.   And those changes are reflected by the
15   different versions of the flood two and cover
16   letters, the gap tracking letters referenced on
17   page three of this spreadsheet, correct?
18       MR. LeMAR:  Object to the form.
19       THE WITNESS:  Yes.
20   BY MR. RICHTER:
21       Q.   All right.  Let's go back to the
22   spreadsheet at page one.  Underneath the three
23   versions, flood one, flood two, and cover, of
24   the flood LPI tracking letters there's also
25   something referenced here called a renewal

22 (Pages 82 to 85)

MEGAN GROFF - 2/8/11

Page 86

1  letter underneath the header LPI expiring.  Do
2  you see that?
3      A.  Yes.
4      Q.  And I don't want to -- I don't think
5  we have the time even to walk through each and
6  every one of these letters; but just as a
7  general matter, the renewal letters that would
8  go out, those are letters that would go out to
9  customers who were -- Chase was renewing their
10 force placed policy because their existing force
11 placed policy was expiring, correct?
12     MR. LeMAR:  Object to form.
13     THE WITNESS:  Yes.
14 BY MR. RICHTER:
15     Q.  And the coverage options that were set
16 forth in the renewal letters paralleled the
17 coverage options that were set forth in the
18 flood LPI tracking letters, correct?
19     MR. LeMAR:  Object to the form.
20     THE WITNESS:  Be specific.  Which
21 renewal letters are you speaking of?
22 BY MR. RICHTER:
23     Q.  Sure.  We can go through them.  I
24 mean, let's take a look at CHASE 1330 to 31.
25 That's the first renewal letter referenced on

Page 87

1  this spreadsheet, correct?
2      A.  Yes.
3      Q.  1330 to 31 gives three coverage
4  options to the borrower?
5      A.  Yes.
6      Q.  One is principal balance of the loan,
7  or credit line amount for lines of credit, plus
8  the outstanding principal balance on any
9  existing first mortgage loan or, second bullet,
10 the overall appraised value of the structure
11 securing the loan or line or, third bullet, the
12 maximum amount of insurance coverage available
13 through the National Flood Insurance Program,
14 two hundred and fifty thousand maximum in most
15 cases.  Those are the three options provided to
16 the borrower on the first renewal letter on the
17 spreadsheet, CHASE 1330 to 31, correct?
18     A.  Yes.
19     Q.  And those three coverage options are
20 consistent with the flood one letter that was
21 sent to borrowers that we previously went over,
22 CHASE 1325 to 26, correct?
23     A.  Yes.
24     Q.  Then going back to the spreadsheet on
25 Exhibit 60, there are some additional renewal

Page 88

1  letters referenced on page two underneath LPI
2  expiring.  Do you see that?
3      A.  Yes.
4      Q.  And I want to focus on the Chase
5  Heritage noncondo renewal letters.  It shows a
6  renewal letter that had an origination date of
7  May 28th, 2009 at CHASE 1384 to 85.  Do you see
8  that?
9      A.  Yes.
10     Q.  And that renewal letter that went out
11 to borrowers, looking at page CHASE 1385, gave
12 borrowers three options, the NFIP maximum of two
13 hundred and fifty thousand or replacement cost
14 value or the principal balance of the loan or
15 credit line amount for the lines of credit,
16 correct?
17     A.  Yes.
18     Q.  And that was consistent with the flood
19 one letter that -- and for that matter, the
20 flood two and cover letters for borrowers --
21 Chase Heritage noncondo borrowers with the same
22 origination date of May 28th, 2009, correct?
23     A.  Yes.
24     Q.  And, again, this renewal letter for
25 the Chase Heritage noncondo borrowers was

Page 89

1  discontinued on December 23rd, 2009, correct?
2      MR. LeMAR:  Object to form.
3      THE WITNESS:  Yes.
4  BY MR. RICHTER:
5      Q.  And it was replaced with the renewal
6  letter that went to the Washington Mutual
7  Heritage noncondo borrowers, correct?
8      A.  Yes.
9      Q.  Which only provided for the two
10 coverage options, NFIP maximum or replacement
11 cost value, correct?
12     A.  Yes.
13     Q.  All right.  Looking back at the
14 spreadsheet, there's another category of letters
15 called map change, and then there's out to in,
16 in to out, and in to in.  Do you see that on
17 page one?
18     A.  Yes.
19     Q.  What do those three subcategories
20 refer to?
21     A.  Out of the special flood hazard area
22 to in a special flood hazard area, in to out.
23 And in to in is you were in a special flood
24 hazard area and you're still in but maybe the
25 zone changed.

23  (Pages 86 to 89)

MEGAN GROFF - 2/8/11

Page 90

1    Q.  Okay.  And so the out to in letter,
2  the one referenced there on the spreadsheet, is
3  CHASE 1332 to 1333.  Do you see that?
4    A.  Yes.
5    Q.  And that letter at page 1332 gave
6  borrowers three options, principal balance of
7  the loan, or credit line amount for lines of
8  credit, plus the outstanding principal balance
9  on any existing first mortgage loan or, second,
10  the overall appraised value of the structure
11  securing the loan/line or, third, the maximum
12  amount of insurance coverage available through
13  the National Flood Insurance Program, two
14  hundred and fifty thousand maximum in most
15  cases.  Do you see that?
16    A.  Yes.
17    Q.  And that out to in letter, those three
18  options were consistent with the renewal letter
19  that was effective at the same time and
20  consistent with the flood one letter that was
21  effective at the same time, correct?
22    A.  Yes.
23    Q.  And just like those other letters,
24  that out to in letter was discontinued on May
25  28th, 2009, correct?

Page 91

1    A.  Yes.
2    Q.  And looking at the second page --
3  excuse me -- yes, the second page of the
4  spreadsheet, it was replaced with the out to in
5  letter for Chase Heritage noncondo borrowers
6  referenced at CHASE 1398 to 99, correct?
7    A.  Yes.
8    Q.  And that letter at CHASE 1398 to 99
9  gave borrowers three options, the maximum amount
10  of insurance coverage available through the NFIP
11  or replacement cost value or, going on to the
12  next page, 1399, the principal balance of the
13  loan or credit line amount for lines of credit,
14  correct?
15    A.  Yes.
16    Q.  And that was consistent, again, with
17  the changes that were made to the flood one
18  letters and the renewal letters that were made
19  effective May 28th, 2009, correct?
20    A.  Yes.
21    Q.  Now, looking back at the spreadsheet,
22  this out to in letter also was discontinued
23  December 23rd, 2009, correct?
24    A.  Yes.
25    Q.  And was replaced with the version of

Page 92

1  the out to in letter that went to Washington
2  Mutual Heritage noncondo customers, correct?
3    A.  Yes.
4    Q.  Which only provided borrowers the two
5  coverage options, replacement cost value or the
6  NFIP maximum of two hundred and fifty thousand
7  dollars, correct?
8    A.  Yes.
9    MR. RICHTER:  I've got to take a short
10  break.  Five minutes.
11    (Pause in proceedings.)
12    MR. RICHTER:  All right.  Back on the
13  record.
14  BY MR. RICHTER:
15    Q.  Looking at the spreadsheet, Exhibit
16  60, on the last row of the first page there's a
17  reference to something called an insufficient
18  coverage letter.  Do you see that?
19    A.  Yes.
20    Q.  And there's -- the spreadsheet
21  indicates that there's a version of this letter
22  that was originated on December 20th, 2007 at
23  CHASE 1341.  Do you see that?
24    A.  Yes.
25    Q.  And looking at CHASE 1341, this form

Page 93

1  letter, first sentence says your loan or line of
2  credit contract requires you to provide
3  insurance coverage amount equal to your current
4  loan balance or total line amount.  Do you see
5  that?
6    A.  Yes.
7    Q.  And is that true, that Chase's
8  mortgage contracts require borrowers to provide
9  insurance coverage in an amount equal to their
10  current loan balance or total line amount?
11    MR. LeMAR:  Object to the form of the
12  question.
13    THE WITNESS:  I'm not sure.
14  BY MR. RICHTER:
15    Q.  In any event, that's what this letter
16  said, correct?
17    A.  That's what this letter says, yes.
18    Q.  And this letter was going out to
19  borrowers beginning on December 20th, 2007,
20  correct?
21    A.  Yes.
22    Q.  And it was -- later had a revision
23  date, looking at the spreadsheet, Exhibit 60, of
24  May 26th, 2008.  Do you see that?
25    A.  Yes.

24 (Pages 90 to 93)

MEGAN GROFF - 2/8/11

Page 94

1      Q.  And the revised letter is at CHASE
2  1421; is that correct?
3      A.  Yes.
4      Q.  And that revised letter still contains
5  the same language in the first sentence, your
6  loan or line of credit contract requires you to
7  provide insurance coverage amount equal to your
8  current loan balance or total line amount.  Do
9  you see that?
10      A.  Yes.
11      Q.  Then looking at the spreadsheet again,
12  page three, this time at the top there's a
13  reference to an insufficient coverage letter
14  effective May 26th, 2008, CHASE 1421.  Do you
15  see that?
16      A.  Yes.
17      Q.  That's the one we just looked at,
18  right?
19      A.  Yes.
20      Q.  And then it shows that there are
21  subsequent revised editions of that letter dated
22  June 21, 2009, CHASE 1422, and July 7th, 2009,
23  CHASE 1423.  Do you see that?
24      MR. LeMAR:  Object to that.  I think
25  you have one of the dates wrong.  I think you

Page 95

1  said June 21st.
2  BY MR. RICHTER:
3      Q.  June 1st, 2009 and July 7th, 2009 are
4  revised editions of the insufficient coverage
5  letter, correct.
6      A.  Yes.
7      Q.  And those are at CHASE 1422 and 1423,
8  correct?
9      A.  Yes.
10      Q.  And, again, those form letters, both
11  the one at CHASE 1422 and 1423, tell the
12  customer in the first sentence, your loan or
13  line of credit contract requires you to provide
14  insurance coverage amount equal to your current
15  loan balance or total line amount.  Do you see
16  that?
17      A.  Yes.
18      Q.  Have these insufficient coverage
19  letters also been discontinued?
20      A.  I'm not sure.
21      Q.  Do you know why they -- the
22  insufficient coverage letters did not use either
23  the three bullet option or the two bullet option
24  that was used in the other form letters that
25  we've gone over?

Page 96

1      MR. LeMAR:  Objection to form.
2      THE WITNESS:  I don't know why that
3  decision was made.
4  BY MR. RICHTER:
5      Q.  Did you know these letters were going
6  out at the time that they were going out, these
7  insufficient coverage letters?
8      MR. LeMAR:  Object to the form.
9      THE WITNESS:  Yes.
10  BY MR. RICHTER:
11      Q.  Do you know which borrowers would have
12  received the insufficient coverage letter as
13  opposed to the gap letter or the flood LPI
14  tracking letter?
15      A.  I don't recall why this letter was
16  sent.
17      Q.  Looking at the spreadsheet, the
18  insufficient coverage letter with a revision
19  date of July 7th, 2009, that is CHASE 1423, it
20  doesn't show that that coverage letter has ever
21  been discontinued on this spreadsheet; is that
22  right?
23      A.  Yes.
24      Q.  So for all you know, this letter is
25  still going out to customers as of this very

Page 97

1  day?
2      MR. LeMAR:  Object to the form.
3  BY MR. RICHTER:
4      Q.  Is that right?
5      MR. LeMAR:  Object to the form.
6      THE WITNESS:  I don't know if that
7  letter is going out.
8  BY MR. RICHTER:
9      Q.  Looking at the second page of the
10  spreadsheet, Exhibit 60, there's a reference to
11  gap adjustment letters.  Do you see that?  At
12  the bottom.
13      A.  Yes.
14      Q.  Do you know what those gap adjustment
15  letters are, what that refers to?  In other
16  words, what distinguishes them from the other
17  type of letters?
18      MR. LeMAR:  Object to the form.
19      THE WITNESS:  I don't know the
20  specifics around that letter.
21  BY MR. RICHTER:
22      Q.  Okay.  Looking at the gap adjustment
23  letter for Chase Heritage noncondo borrowers, it
24  shows an origination date of September 11th,
25  2008.  Do you see that?

25 (Pages 94 to 97)

MEGAN GROFF - 2/8/11

Page 98

1    A.  Yes.
2    Q.  That's at CHASE 1475 to 76, correct?
3    A.  Yes.
4    Q.  And looking at page 1476, that gap
5   adjustment letter gave borrowers the same --
6   Heritage Chase noncondo borrowers the same three
7   options as in the flood LPI tracking letters and
8   the gap letters that went out at that same time,
9   those three options being NFIP maximum of two
10  fifty, full replacement cost value, or the
11  principal balance of the loan or credit line
12  amount for lines of credit, correct?
13       MR. LeMAR:  Object to the form.
14       THE WITNESS:  Yes.
15  BY MR. RICHTER:
16   Q.  And looking at the spreadsheet, page
17  two, that series of gap adjustment letters was
18  discontinued on December 23rd, 2009, correct?
19   A.  Yes.
20   Q.  And was replaced with a gap adjustment
21  letter for Washington Mutual Heritage noncondo
22  borrowers, correct?
23   A.  Yes.
24   Q.  Which only provided borrowers with two
25  options, the replacement cost value or the NFIP

Page 99

1   maximum, correct?
2    A.  Yes.
3    Q.  Which is reflected at CHASE 1479 to
4   1480, correct?
5    A.  Yes.
6    Q.  Miss Groff, I've just handed you what
7   was previously marked as Plaintiffs' Exhibit 12.
8   Do you have that in front of you?
9    A.  Yes.
10   Q.  This is a document Bates numbered
11  CHASE 369 through CHASE 373, and it says at the
12  top Chase-rating rule changes.  Do you see that?
13   A.  Yes.
14   Q.  And on the very first page of the
15  document it says due to recent compliance
16  requirements, Chase needs to change the rating
17  rules for the flood and the flood gap lender
18  placed policies.  Do you see that?
19   A.  Yes.
20   Q.  And then going on to page CHASE
21  1372 --
22       MR. LeMAR:  372.
23  BY MR. RICHTER:
24   Q.  Excuse me, 372, the fourth page in,
25  looking at the top it says the new rule is to

Page 100

1   rate based on the RCV, replaced cost value, of
2   the home and if unknown default to the NFIP
3   limit of two hundred and fifty thousand,
4   correct?
5    A.  Yes.
6    Q.  Then looking back at CHASE 371,
7   underneath the header new rating rules, it says
8   target date December 23rd, 2009.  Do you see
9   that?
10   A.  Yes.
11   Q.  And that's the same date that Chase
12  discontinued the versions of the flood LPI
13  letters and the flood gap letters and the other
14  letters that gave borrowers the third option of
15  insuring to the principal balance of the loan or
16  credit line amount for lines of credit, correct?
17       MR. LeMAR:  Object to the form.
18       THE WITNESS:  Yes.
19  BY MR. RICHTER:
20   Q.  So, in other words, the
21  discontinuation of those letters reflected a
22  change in Chase's policies, correct?
23       MR. LeMAR:  Object to the form.
24       THE WITNESS:  Can you repeat the
25  question?

Page 101

1   BY MR. RICHTER:
2    Q.  Yes.  In other words, the
3   discontinuation of the flood LPI letters and gap
4   letters and other letters that gave borrowers
5   the three options, including principal balance
6   of the loan or credit line amount for lines of
7   credit, that discontinuation effective December
8   23rd, 2009 was a direct reflection of Chase's
9   change in its flood insurance policies and
10  requirements effective the same date, correct?
11       MR. LeMAR:  Object to form.
12       THE WITNESS:  Yes.
13  BY MR. RICHTER:
14   Q.  All right, Miss Groff, I'm showing you
15  what was previously marked as Plaintiffs'
16  Exhibit 10.  Do you have that in front of you?
17   A.  Yes.
18   Q.  This is a document with Bates numbers
19  CHASE 374 to 386 that says Chase HELOC flood gap
20  coverage at the top, correct?
21   A.  Yes.
22   Q.  And the date of this document is May
23  22nd, 2008, looking at the first page.  Do you
24  see that?
25   A.  Yes.

26 (Pages 98 to 101)

MEGAN GROFF - 2/8/11

Page 102

1    Q.  And it says, looking at the second
2  page, overview, Chase has requested that we
3  implement tracking for flood gap coverage for
4  the HELOC portfolio similar to the Chase prime
5  and subprime portfolios.  Do you see that?
6    A.  Yes.
7    Q.  Chase prime, does that refer to first
8  mortgage loans?
9    A.  Yes.
10    Q.  And subprime refers to subprime first
11  mortgage loans?
12    A.  Yes.
13    Q.  So as of the date of this document,
14  May of 2008, Chase began implementing flood gap
15  coverage, correct?
16    MR. LeMAR:  Object to form.
17    THE WITNESS:  Yes.
18  BY MR. RICHTER:
19    Q.  And the purpose of that was to make
20  its flood tracking and insurance requirements
21  similar to those for first mortgage loans,
22  correct?
23    A.  Yes.
24    MR. LeMAR:  Object to form.
25  BY MR. RICHTER:

Page 103

1    Q.  And just one other question, the date
2  of this document is May of 2008, and I notice on
3  the spreadsheet that it looked like the
4  revision -- that the date that the flood gap
5  letters went into effect -- or the origination
6  date of those letters was May of 2009.  Do you
7  know if there's a typo on one, either the
8  spreadsheet or on this flood gap coverage
9  document?
10    MR. RICHTER:  Counsel, will you
11  double-check that when you get a chance to get
12  back with your client just to make sure we've
13  got the dating right on this spreadsheet?
14    MR. LeMAR:  Okay.
15    MR. RICHTER:  All right.  Why don't we
16  break for lunch.
17    (Pause in proceedings.)
18    (Thereupon, Plaintiffs' Exhibit 62,
19  ASRNT0000044 through ASRNT0000058, was marked
20  for purposes of identification.)
21  BY MR. RICHTER:
22    Q.  Miss Groff, the court reporter has
23  just handed you what's been marked as
24  Plaintiffs' Exhibit 62 with Bates numbers
25  ASRNT44 through 58.  Do you have that in front

Page 104

1  of you?
2    A.  Yes.
3    Q.  I'll represent to you that this
4  exhibit are pages of documents that were
5  produced to our firm by Assurant and American
6  Security Insurance Company in response to a pair
7  of subpoenas that we served on them in this
8  case.
9    The first page of the exhibit
10  references David and Sheila Hofstetter and their
11  loan number.  Do you see that?
12    A.  Yes.
13    Q.  And before I go through the exhibit
14  any further let me just ask you, is this a
15  document -- one of the documents that you
16  reviewed with counsel?
17    A.  Which document?
18    Q.  Exhibit 62.
19    A.  No.
20    Q.  Okay.  And have you seen it prior to
21  today?
22    A.  No.  I guess, be more specific,
23  seen --
24    Q.  Have you seen any of the pages of this
25  exhibit prior to today?

Page 105

1    A.  Some of the system screens on the
2  actual system, not --
3    Q.  All right.  I want to direct your
4  attention to page ending in 55.  Do you see
5  there there's an entry date August 19th, 2010?
6  Do you see that?
7    A.  Yes.
8    Q.  And it says, per Megan Groff/Chase,
9  waive loan from tracking letter cycle.  Do you
10  see that?
11    A.  Yes.
12    Q.  Did you request that Assurant or ASIC
13  take the Hofstetter loan out of the flood
14  insurance tracking?
15    A.  No.
16    Q.  Do you have any idea why this notation
17  would appear here?
18    A.  Ask me the question again.
19    Q.  Did you ask that Assurant waive flood
20  tracking for Miss Hofstetter's loan after the
21  onset of this litigation?
22    MR. LeMAR:  Object to the form.
23    THE WITNESS:  Not the flood tracking.
24  That's not what it says.
25  BY MR. RICHTER:

27 (Pages 102 to 105)

MEGAN GROFF - 2/8/11

Page 106

1    **Q. What does it say?**
2    A. Waive loan tracking letter.
3    **Q. Okay. What does that mean to you?**
4    A. It's not waive from tracking. The
5  letter was waived from being sent.
6    **Q. So Chase is still tracking the flood**
7  **insurance on Miss Hofstetter's loan but just not**
8  **sending her letters telling her about it; is**
9  **that how it works?**
10    MR. LeMAR: Object to form.
11    THE WITNESS: We are tracking the
12  insurance and -- Chase is still tracking the
13  insurance on this account. I don't -- maybe --
14  BY MR. RICHTER:
15    **Q. But no longer sending the flood notice**
16  **letters to Miss Hofstetter, correct?**
17    MR. LeMAR: Object to form.
18    THE WITNESS: We're not sending the
19  notice letters. We're not tracking it as in the
20  per se -- at this point we're tracking it for
21  compliance reasons, not -- I guess --
22  BY MR. RICHTER:
23    **Q. Why was the decision made to waive the**
24  **Hofstetter account from the tracking letter?**
25    MR. LeMAR: Object to the extent that

Page 107

1  it asks for attorney-client communications or
2  any direction from counsel. I instruct you not
3  to answer --
4  BY MR. RICHTER:
5    **Q. You can go ahead and answer.**
6    MR. LeMAR: -- to the extent that it
7  seeks attorney-client communications or
8  direction from counsel.
9    THE WITNESS: I -- I guess I'm still
10  unclear on the question -- on what your --
11  BY MR. RICHTER:
12    **Q. Was there a decision to waive the**
13  **Hofstetter account from flood insurance tracking**
14  **letters on or about August 19th, 2010?**
15    MR. LeMAR: Same objection as before
16  regarding privilege.
17    THE WITNESS: It's being tracked for
18  compliance, not -- so it's being tracked
19  internally to keep -- make sure we're still in
20  compliance with our same guidelines. I guess
21  I'm not --
22  BY MR. RICHTER:
23    **Q. Why don't you turn to two more pages**
24  **in to ASRNT57. Do you see there's an entry date**
25  **of September 13th, 2010?**

Page 108

1    A. Yes.
2    **Q. And it says Megan Groff/Chase**
3  **requested a renewal flood LPI policy effective**
4  **September 25th, 2010 to September 25th, 2011.**
5  **Let's stop there. Is that true?**
6    A. Yes.
7    **Q. You requested that Miss Chase -- Miss**
8  **Hofstetter's force placed policy be renewed**
9  **effective September 25th, 2010, correct?**
10    A. Yes.
11    **Q. Okay. And you requested this time on**
12  **the renewal policy that the coverage amount be**
13  **two hundred fifty thousand dollars, correct?**
14    A. Yes.
15    **Q. Which was seventy-five thousand**
16  **dollars more than the lender placed policy that**
17  **Chase force placed on her in September of 2009,**
18  **correct?**
19    MR. LeMAR: Object to the form of the
20  question to the extent it calls for speculation.
21    MR. RICHTER: Okay.
22    MR. LeMAR: If you know, you can
23  answer.
24    THE WITNESS: I guess rephrase the
25  question. I don't know what -- how I'm -- I

Page 109

1  guess what I'm supposed to be answering.
2    MR. RICHTER: And I will advise,
3  before asking any further questions, Counsel, of
4  the judge's standing order that form objections
5  should be just that, form objections. If you
6  have a privilege objection, make it; but the
7  basis for the form objection should not be
8  stated during the deposition.
9  BY MR. RICHTER:
10    **Q. Now, let me ask you --**
11    MR. LeMAR: I'll instruct counsel not
12  to point at me during the deposition. I
13  understand what objections are and -- what
14  proper objections are. Thank you, though. You
15  may ask your question.
16  BY MR. RICHTER:
17    **Q. You understand that in 2009 before**
18  **this litigation began that Miss Hofstetter -- or**
19  **excuse me -- that Chase force placed a flood**
20  **insurance policy on Miss Hofstetter in the**
21  **amount of a hundred and seventy-five thousand**
22  **dollars in September of 2009, correct?**
23    MR. LeMAR: Object to form.
24    THE WITNESS: Yes.
25  BY MR. RICHTER:

28 (Pages 106 to 109)

MEGAN GROFF - 2/8/11

Page 110

1    Q.  And then one year later, in September
2  of 2010, after the litigation started you
3  renewed or made a request to renew Miss
4  Hofstetter's lender placed policy in the amount
5  of two hundred fifty thousand dollars, correct?
6    A.  Yes.
7    Q.  Which was seventy-five thousand
8  dollars more than the original force placed
9  policy in terms of the coverage law, correct?
10   A.  Yes.
11   Q.  Why did you request to increase the
12 coverage amount by seventy-five thousand dollars
13 on the renewal policy?
14   MR. LeMAR:  I'm going to instruct the
15 witness not to answer to the extent that it
16 calls for attorney-client communications or
17 instructions from counsel.
18   THE WITNESS:  Am I supposed to answer
19 that?
20   MR. LeMAR:  If there are --
21 BY MR. RICHTER:
22   Q.  Yes.
23   MR. LeMAR:  You can answer it if there
24 are no nonprivileged -- if there is a
25 nonprivileged answer to that.

Page 111

1    THE WITNESS:  The requirements changed
2  so upon renewal, they would be -- it would be
3  held to the new requirements.
4  BY MR. RICHTER:
5    Q.  The new requirements being either the
6  NFIP maximum of two hundred and fifty thousand
7  or replacement cost value, those two options,
8  correct?
9    A.  Yes.
10   Q.  So as a result of that policy change,
11 which was made in December of 2009 between the
12 time that the first lender placed policy was
13 issued and the time that the renewal policy was
14 issued a year later, that was the reason that
15 her coverage was hiked by seven hundred -- by
16 seventy-five thousand dollars from one
17 seventy-five to two fifty, correct?
18   A.  Yes.
19   MR. LeMAR:  Object to the form.
20 BY MR. RICHTER:
21   Q.  Looking back at page 57, it says Chase
22 paid two thousand two hundred fifty dollar
23 premium by check.  Do you see that?
24   A.  Yes.
25   Q.  And was that the cost of the renewal

Page 112

1  policy?
2    A.  Yes.
3    Q.  And it goes on, it says, per Chase
4  request, no documentation should be mailed to
5  customer.  Do you see that?
6    A.  Yes.
7    Q.  Why was the decision made not to
8  inform Miss Hofstetter of this force placed
9  coverage?
10   MR. LeMAR:  I'm going to instruct you
11 not to answer to the extent it's asking for an
12 attorney-client communication or instructions
13 from counsel.
14   THE WITNESS:  I don't -- I'm -- I
15 don't -- I'm not sure how to answer the
16 question.  I don't -- what do you --
17 BY MR. RICHTER:
18   Q.  Let me ask you this:  If you were the
19 customer and your lender was taking out force
20 placed coverage on your property, on your
21 dwelling, would you want to know about that?
22   MR. LeMAR:  Object to form and to the
23 extent it calls for a hypothetical.
24   THE WITNESS:  If the premium had been
25 charged to me, yes, I would want to know about

Page 113

1  that.
2  BY MR. RICHTER:
3    Q.  Has that two thousand two hundred and
4  fifty dollar premium been posted to the
5  customer's account?
6    MR. LeMAR:  Object to form.
7    THE WITNESS:  No.
8  BY MR. RICHTER:
9    Q.  Will it be?
10   MR. LeMAR:  Object to the form.
11   THE WITNESS:  I could not make that
12 answer.
13 BY MR. RICHTER:
14   Q.  It's possible that it will be,
15 correct?
16   MR. LeMAR:  Object to form.
17   THE WITNESS:  I cannot answer that.  I
18 don't know.
19 BY MR. RICHTER:
20   Q.  Is it possible that Chase is just kind
21 of lying and just waiting to post that charge to
22 the customer's account after the litigation is
23 over?
24   MR. LeMAR:  Object to the form and to
25 the extent that it's a hypothetical.

29 (Pages 110 to 113)

Page 114

1    THE WITNESS:  I do not know.
2  BY MR. RICHTER:
3    Q.  You think that's fair?
4    MR. LeMAR:  Object to the form.
5    THE WITNESS:  I cannot answer that.
6  BY MR. RICHTER:
7    Q.  Regardless, you can answer and you do
8  know that Miss Hofstetter has never up to this
9  date been informed of the renewal of the force
10 placed flood insurance policy, correct?
11   MR. LeMAR:  Object to form, and object
12 to asked and answered.
13   THE WITNESS:  Not that I'm aware of.
14 BY MR. RICHTER:
15   Q.  In other words, you're not aware of
16 any notice having ever gone out to the customer
17 regarding this force placed renewal policy; is
18 that right?
19   MR. LeMAR:  Object to form.  Asked and
20 answered.
21   THE WITNESS:  No.
22 BY MR. RICHTER:
23   Q.  When you say no, do you mean no notice
24 has gone out to the customer?
25   A.  No notice has gone out to the

Page 115

1  customer.
2    Q.  All right.  The next page, page 58,
3  says banker Susanne Polland, CI, I assume that
4  means called in, to confirm the customer name
5  and property address on the loan, open
6  parenthesis, customer filed a lawsuit against
7  Chase, end parenthesis, and the banker needed
8  info to provide to the account executive.  Do
9  you see that?
10   A.  Yes.
11   Q.  And the entry date of that is November
12 30th, 2010.  Do you see that?
13   A.  Yes.
14   Q.  Who is Susanne Polland?
15   A.  I don't know.
16   Q.  Do you know who the account executive
17 is that's referred to here?
18   A.  I do not.
19   Q.  Were you asked to renew Miss
20 Hofstetter's force placed policy at two hundred
21 and fifty thousand dollars or is that a decision
22 that you made on your own?
23   MR. LeMAR:  Object to form, and object
24 to the extent that it calls for attorney-client
25 communications and/or instructions with counsel,

Page 116

1  in which case I instruct the client not to
2  answer.
3    THE WITNESS:  I was asked.
4  BY MR. RICHTER:
5    Q.  Were you asked by somebody other than
6  your lawyers?
7    MR. LeMAR:  I'm going to object to the
8  extent that -- and instruct her not to answer --
9  BY MR. RICHTER:
10   Q.  Did Mr. Nack ask you?
11   MR. LeMAR:  I'm going to object to the
12 extent that you're asking for -- and instruct
13 you not to answer if this -- if the instruction
14 came from counsel to anyone who might have
15 instructed you.
16 BY MR. RICHTER:
17   Q.  Did Mr. Nack ask you to do that?
18   A.  Yes.
19   Q.  Did you have any response at the time?
20   A.  More specific.
21   Q.  Well, did you have a reaction when he
22 told you to force place the coverage at two
23 fifty?
24   A.  Not that I can recall.
25   Q.  Did you think it was wrong?

Page 117

1    MR. LeMAR:  Object to form.
2    THE WITNESS:  No.
3  BY MR. RICHTER:
4    Q.  Did it make you uncomfortable?
5    MR. LeMAR:  Object to form.
6    THE WITNESS:  No.
7  BY MR. RICHTER:
8    Q.  Did you give it any thought?
9    MR. LeMAR:  Object to form.
10   THE WITNESS:  Yes.
11 BY MR. RICHTER:
12   Q.  Okay.  What thoughts did you have in
13 that regard?
14   MR. LeMAR:  Object to form.
15   THE WITNESS:  I mean, be more
16 specific.  I don't --
17 BY MR. RICHTER:
18   Q.  When Mr. Nack told you to renew the
19 policy at two hundred and fifty thousand
20 dollars, you said you gave it some thought.  My
21 question is, what thoughts did you have in that
22 regard?
23   MR. LeMAR:  Object to the extent that
24 it misstates prior testimony and to form.
25   THE WITNESS:  I don't recall what

MEGAN GROFF - 2/8/11

Page 118

1  specific, you know, thought I gave to the
2  request.
3  BY MR. RICHTER:
4      Q.  Would it be fair to say you were just
5  following orders?
6      MR. LeMAR:  Object to form.
7      THE WITNESS:  Yes and no.  Can you --
8  just following orders --
9  BY MR. RICHTER:
10      Q.  When Mr. Nack asks you to do
11  something, do you typically do it?
12      MR. LeMAR:  Object to the form.
13      THE WITNESS:  Typically, yes.
14  BY MR. RICHTER:
15      Q.  Because he's your boss's boss, right?
16      MR. LeMAR:  Object to form.
17      THE WITNESS:  I don't know how to --
18  I'm not sure how you want me to answer that.
19  BY MR. RICHTER:
20      Q.  Have you and Mr. Nack had any
21  conversations concerning when this -- if or when
22  this two thousand two hundred and fifty dollar
23  premium charge will be billed to the customer?
24      MR. LeMAR:  Object to form.
25      THE WITNESS:  No.

Page 119

1  BY MR. RICHTER:
2      Q.  Do you think it is excessive to bill a
3  customer approximately two thousand dollars for
4  flood insurance when they have no principal
5  balance and their line has been cut off by
6  Chase?
7      MR. LeMAR:  Object to form and to the
8  extent that it calls for a hypothetical.
9      THE WITNESS:  I -- no.
10  BY MR. RICHTER:
11      Q.  You don't think there's anything
12  unfair about that; is that your testimony?
13      MR. LeMAR:  Object to asked and
14  answered.  Object to form.
15      THE WITNESS:  No.
16  BY MR. RICHTER:
17      Q.  Would it be fair to say that Chase has
18  changed its coverage requirements for Miss
19  Hofstetter from a hundred and seventy-five
20  thousand dollars to two hundred and fifty
21  thousand dollars?
22      MR. LeMAR:  Object to form.
23      THE WITNESS:  Repeat the question.
24  BY MR. RICHTER:
25      Q.  Would it be fair to say that Chase

Page 120

1  changed its coverage requirements for Miss
2  Hofstetter from one hundred and seventy-five
3  thousand dollars to two hundred and fifty
4  thousand dollars?
5      MR. LeMAR:  Same objection.
6      THE WITNESS:  Based on the new
7  coverage requirements.
8  BY MR. RICHTER:
9      Q.  So yes?
10      A.  Yes.
11      Q.  But Chase hasn't gotten around to
12  telling her about those new coverage
13  requirements; is that right?
14      MR. LeMAR:  Objection.  Asked and
15  answered.  Object to form.
16      THE WITNESS:  No.
17  BY MR. RICHTER:
18      Q.  All right.  I want to go back to
19  Exhibit 61.
20      MR. LeMAR:  Can we take a thirty
21  second break so I can wrap this sandwich up?
22      MR. RICHTER:  That's fine.
23      (Pause in proceedings.)
24  BY MR. RICHTER:
25      Q.  All right.  Looking at Exhibit 61, why

Page 121

1  don't you take a look at CHASE 1400 to 1401, and
2  at the first paragraph there it says the area in
3  which your property is located has been
4  identified by the Federal Emergency Management
5  Agency as a special flood hazard area.  Do you
6  see that?
7      A.  Yes.
8      Q.  And Miss Hofstetter received a letter
9  like this informing her that her property had
10  been identified by FEMA as a special flood
11  hazard area, correct?
12      MR. LeMAR:  Object to form.
13      THE WITNESS:  Yes.
14  BY MR. RICHTER:
15      Q.  Does this form letter identify any
16  FEMA map number?
17      A.  No.
18      Q.  Does it identify a panel number?
19      A.  No.
20      Q.  Does it identify a community number?
21      A.  No.
22      Q.  Does it identify a lot or parcel
23  number?
24      A.  No.
25      Q.  Why is that information not included

31 (Pages 118 to 121)

MEGAN GROFF - 2/8/11

Page 122

1  in the letter?
2      MR. LeMAR:  Object to form.
3      THE WITNESS:  I don't know.
4  BY MR. RICHTER:
5      Q.  Do you think some borrowers might find
6  that information helpful?
7      MR. LeMAR:  Object to form.
8      THE WITNESS:  I'm not sure.
9  BY MR. RICHTER:
10      Q.  Reading the full first sentence, it
11  says the area in which your property is located
12  has been identified by FEMA as a special flood
13  hazard area using FEMA's flood insurance rate
14  map or flood hazard boundary map.  Do you see
15  that?
16      A.  Yes.
17      Q.  If you were a borrower, would you want
18  to know what map was used to make the
19  determination that your property was in a flood
20  zone?
21      MR. LeMAR:  Object to form.
22      THE WITNESS:  Probably, yes.
23      (Thereupon, Plaintiffs' Exhibit 63,
24  CHASE 01543 through 01545, was marked for
25  purposes of identification.)

Page 123

1  BY MR. RICHTER:
2      Q.  Miss Groff, the court reporter has
3  just handed you what's been marked as
4  Plaintiffs' Exhibit 63.  Do you have that in
5  front of you?
6      A.  Yes.
7      Q.  Do you recognize this document?
8      A.  Yes.
9      Q.  What is it?
10      A.  It looks like a map.
11      Q.  A map showing the special flood hazard
12  area relative to Miss Hofstetter's property at
13  2128 Stone Valley Road; is that right?
14      MR. LeMAR:  Object to form.
15      THE WITNESS:  Yes.
16  BY MR. RICHTER:
17      Q.  And in the diagram on page 1543 the
18  curved area with the lines, I'll refer to it as
19  the shaded area, that's the area that represents
20  the special flood hazard area, correct?
21      A.  I cannot speak to the specifics of
22  this map.
23      Q.  Well, looking at CHASE 1544, the
24  following page, the fax transmittal page from
25  Ken Dahl at the Public Works Department to Miss

Page 124

1  Hofstetter, it says the shaded area on your lot
2  is Zone A.  Do you see that?
3      A.  Yes.
4      Q.  Zone A, that's a special flood hazard
5  area, right?
6      A.  Yes.
7      Q.  Okay.  And then looking back at the
8  chart, that shaded area is in the corner of her
9  property underneath the dwelling or underneath
10  the rectangular area that represents her
11  dwelling, correct?
12      MR. LeMAR:  Object to form.
13      THE WITNESS:  According to this map,
14  yes.
15  BY MR. RICHTER:
16      Q.  So according to this map, the special
17  flood hazard area comes into Miss Hofstetter's
18  lot but does not touch her dwelling, correct?
19      MR. LeMAR:  Object to form.
20      THE WITNESS:  I cannot speak to the
21  validity of this map.
22  BY MR. RICHTER:
23      Q.  And I'm not asking you to.  I'm just
24  asking you according to this map, the special
25  flood hazard area comes into her lot but doesn't

Page 125

1  touch her dwelling, correct?
2      MR. LeMAR:  Object to form.
3      THE WITNESS:  According to this map,
4  yes.
5  BY MR. RICHTER:
6      Q.  Are you aware of any drawings or maps
7  showing the special flood hazard area touching
8  her dwelling?
9      A.  I can -- I cannot speak to what -- any
10  other specific maps and where the structure is
11  located on it.
12      Q.  Have you produced any maps to -- as
13  part of this case showing Miss Hofstetter's
14  dwelling in a special flood hazard area?
15      MR. LeMAR:  Object to the extent she
16  doesn't know what we produced to the other side.
17      THE WITNESS:  I don't know.
18  BY MR. RICHTER:
19      Q.  Now, you produced this exhibit, CHASE
20  1543 to 1545 to counsel, correct?
21      A.  Yes.
22      Q.  Have you produced any maps to -- any
23  other maps to your counsel showing anything
24  different than this?
25      A.  I don't recall.

32 (Pages 122 to 125)

MEGAN GROFF – 2/8/11

Page 126

1   Q.  As you sit here today, do you have any
2   reason to believe that Miss Hofstetter's
3   dwelling itself falls in a special flood hazard
4   area?
5       MR. LeMAR:  Object to form.
6       THE WITNESS:  Repeat the question.
7   BY MR. RICHTER:
8       Q.  Do you have any reason to believe as
9   you sit here today that Miss Hofstetter's
10  dwelling falls in a special flood hazard area?
11      MR. LeMAR:  Same objection.
12      THE WITNESS:  Yes.
13  BY MR. RICHTER:
14      Q.  What do you point to for that
15  conclusion?
16      MR. LeMAR:  Object to form.
17      THE WITNESS:  Flood zone
18  determination.
19  BY MR. RICHTER:
20      Q.  What flood zone determination?
21      A.  It was determined by our vendor that
22  they are in a special flood hazard area.
23      Q.  Is there a special flood hazard
24  determination form showing that her dwelling is
25  in a special flood hazard area?

Page 127

1       A.  Yes.
2       Q.  Have you produced that to counsel?
3       A.  I don't recall.
4       Q.  Is it fair to say you have not seen
5   any maps or diagrams showing Miss Hofstetter's
6   dwelling within a special flood hazard area?
7       MR. LeMAR:  Object to form.
8       THE WITNESS:  I don't recall.
9   BY MR. RICHTER:
10      Q.  You don't recall seeing such a map or
11  diagram?
12      MR. LeMAR:  Object.  Asked and
13  answered.
14      THE WITNESS:  I don't recall -- I
15  don't recall.
16  BY MR. RICHTER:
17      Q.  Are you familiar with a fellow by the
18  name of Justin Miller?
19      A.  Yes.
20      Q.  Is he a former member of your home
21  equity flood team?
22      A.  Yes.
23      Q.  Is he still with Chase?
24      A.  I'm not sure.
25      Q.  He's not on your team anymore?

Page 128

1       A.  No.
2       Q.  Do you know why he left?
3       A.  Another position within Chase.
4       Q.  Miss Groff, I've just handed you what
5   was previously marked Plaintiffs' Exhibit 36,
6   Bates number CHASE 247 and on the other side
7   248.  Do you have that in front of you?
8       A.  Yes.
9       Q.  And this is a letter from Justin
10  Miller, home equity flood compliance analyst to
11  David and Sheila Hofstetter dated February 22nd,
12  2010, correct?
13      A.  Yes.
14      Q.  On the first page, second paragraph
15  and second sentence it says if you choose to
16  close your account, you are required to pay the
17  entire premium of the lender placed flood
18  insurance.  Do you see that?
19      A.  Yes.
20      Q.  And then looking at the second page of
21  the letter, on the bottom right-hand side
22  there's a small font notation there, request to
23  close, must pay premium, dash oh six oh nine.
24  Do you see that?
25      A.  Yes.

Page 129

1       Q.  Is that a form designation for this
2   type of letter?
3       A.  Yes.
4       Q.  So this was a form letter that was
5   sent to Miss Hofstetter and David Hofstetter
6   advising them that if you choose to close your
7   account, you are required to pay the entire
8   premium of the lender placed flood insurance,
9   that was form language?
10      MR. LeMAR:  Object to form.
11      THE WITNESS:  I believe so.
12  BY MR. RICHTER:
13      Q.  Is there a -- I notice on the second
14  page of the letter it's not signed.  Do you see
15  that?
16      A.  Yes.
17      Q.  Do you know why the letter was not
18  signed?
19      MR. LeMAR:  Object to form.
20      THE WITNESS:  Only the copy to the
21  borrower is signed.
22  BY MR. RICHTER:
23      Q.  Are you aware of a different version
24  of this letter that went out to the borrower?
25      A.  Not that I can recall.

33 (Pages 126 to 129)

MEGAN GROFF - 2/8/11

Page 130

1    Q.  Miss Groff, I have just handed you
2  what was previously marked as Plaintiffs'
3  Exhibit 37, Bates number CHASE 00782.  Do you
4  have that in front of you?
5    A.  Yes.
6    Q.  And this document at the top right, it
7  shows Justin Miller as analyst.  Do you see
8  that?
9    A.  Yeah.
10   Q.  And it shows Jennifer Menendez as
11  auditor.  Do you see that?
12   A.  Yes.
13   Q.  She's the team lead that works in your
14  home equity group, correct?
15   A.  Yes.
16   Q.  And this document is signed by both of
17  them and dated February 22nd, 2010, correct?
18   A.  Yes.
19   Q.  Now, looking at the right-hand side,
20  there's a notation there, it says I believe my
21  custom letter better answered the customer's
22  questions.  I have corrected to use the legal
23  must pay premium letter.  Custom letter
24  previously approved.  Do you see that?
25   A.  Yes.

Page 131

1    Q.  What did Mr. Miller's custom letter
2  say?
3    MR. LeMAR:  Object to form.
4    THE WITNESS:  I do not know.
5  BY MR. RICHTER:
6    Q.  Do you know who decided to reject the
7  custom letter that Mr. Miller drafted?
8    A.  Jennifer Menendez.
9    Q.  Did anyone other than Miss Menendez
10  review that custom letter?
11   A.  I do not recall.
12   Q.  You don't remember reviewing the
13  custom letter yourself, I assume?
14   A.  I do not remember.
15   Q.  Does Chase have a copy of the custom
16  letter?
17   A.  No.  Not that I'm aware of.
18   Q.  Have you looked for it?
19   A.  No.
20   Q.  Do you know that it was destroyed or
21  purged?
22   MR. LeMAR:  Object to form.
23   THE WITNESS:  I'm not sure where --
24  what happened to the letter.
25  BY MR. RICHTER:

Page 132

1    Q.  Did you ever receive a copy of the
2  letter that's marked Plaintiffs' Exhibit 36 or
3  any drafts of that letter?
4    A.  I don't recall.
5    Q.  Did you ever ask Miss Menendez why she
6  rejected Mr. Miller's custom letter?
7    A.  I do not recall.
8    Q.  What is Chase's policy with respect to
9  drafts of letters to borrowers in terms of
10  records retention?
11   MR. LeMAR:  Object to form.
12   THE WITNESS:  Be more specific.
13  BY MR. RICHTER:
14   Q.  Is it Chase's policy to destroy drafts
15  of letters or to keep them in the customer file?
16   A.  Any drafts of letters that are sent to
17  the customer are kept.
18   Q.  How about other drafts that are not
19  sent to the customer?
20   A.  Not usually.
21   Q.  Do you remember I asked you a question
22  a little while back about whether you personally
23  thought that Chase had treated Miss Hofstetter
24  fairly?  Do you recall that?
25   A.  Yes.

Page 133

1    Q.  Has anyone at Chase, to your
2  knowledge, done any review or audit of Chase's
3  flood insurance policies and practices to
4  evaluate whether they're reasonable and fair?
5    MR. LeMAR:  Object to form.
6    THE WITNESS:  No, not that I'm aware
7  of or -- that would be higher up than me.
8  BY MR. RICHTER:
9    Q.  Has anyone done any review or audit of
10  Chase's force placed insurance policies to
11  evaluate whether they're reasonable or fair?
12   MR. LeMAR:  Object to form.
13   THE WITNESS:  They've been reviewed.
14  BY MR. RICHTER:
15   Q.  By who?
16   A.  By upper management.
17   Q.  Do you know what the review criteria
18  were?
19   A.  I don't know the specifics.
20   Q.  You don't know whether the review
21  criteria included reasonableness or fairness?
22   MR. LeMAR:  Object to form.
23   THE WITNESS:  I cannot speak to the
24  specifics.
25  BY MR. RICHTER:

34 (Pages 130 to 133)

MEGAN GROFF - 2/8/11

Page 134

1     **Q. Do you think it would be a good idea**
2 **to do that kind of reasonableness or fairness**
3 **review before implementing a policy like this?**
4     MR. LeMAR: Object to form? What
5 policy are you talking about?
6 BY MR. RICHTER:
7     **Q. Chase's force placed flood insurance**
8 **policy.**
9     A. They're reviewed before they're
10 implemented.
11     **Q. Has Chase ever conducted a customer**
12 **survey regarding flood insurance or force placed**
13 **insurance?**
14     A. I do not recall.
15     (Thereupon, Plaintiffs' Exhibit 64,
16 CHASE 02147, was marked for purposes of
17 identification.)
18 BY MR. RICHTER:
19     **Q. All right. The court reporter has**
20 **just handed you what's been marked as**
21 **Plaintiffs' Exhibit 64. Do you have that in**
22 **front of you?**
23     A. Yes.
24     **Q. And this is a document with a Bates**
25 **number of CHASE 2147; is that right?**

Page 135

1     A. Yes.
2     **Q. That document toward the middle**
3 **references a survey relating to wind and flood**
4 **gap insurance. Do you see that?**
5     A. Yes.
6     **Q. What is -- do you know when that**
7 **survey was conducted?**
8     A. I'm not familiar with the survey.
9     **Q. Has Chase ever solicited its**
10 **customers' opinions in any way regarding flood**
11 **insurance or force placed insurance?**
12     MR. LeMAR: Object to form.
13     THE WITNESS: I do not recall.
14 BY MR. RICHTER:
15     **Q. Do you know if Chase undertook any**
16 **review of its flood insurance policies or force**
17 **placed insurance policies after this lawsuit was**
18 **commenced?**
19     MR. LeMAR: Object to form.
20     THE WITNESS: I -- no. I do not
21 recall.
22 BY MR. RICHTER:
23     **Q. Do you know if Chase undertook any**
24 **review of its flood insurance policies or force**
25 **placed insurance policies in response to any**

Page 136

1 other litigation?
2     MR. LeMAR: Object to form.
3     THE WITNESS: I don't know.
4 BY MR. RICHTER:
5     **Q. Are you aware of any other litigation**
6 **relating to the fairness or lawfulness of**
7 **Chase's flood insurance policies or force placed**
8 **insurance policies?**
9     MR. LeMAR: Object to form.
10     THE WITNESS: I -- not that I -- not
11 that I can recall.
12 BY MR. RICHTER:
13     **Q. Are you aware that Chase has something**
14 **called a consumer or customer practices**
15 **department?**
16     A. No.
17     **Q. Are you familiar with -- in fact, I**
18 **think you testified earlier about Chase's legal**
19 **and compliance department. Are you familiar**
20 **with that group?**
21     MR. LeMAR: Object to form.
22     THE WITNESS: Yes.
23 BY MR. RICHTER:
24     **Q. Have you had any communications with**
25 **Chase's legal and compliance department -- let's**

Page 137

1 **just focus on the compliance department piece**
2 **for now. Have you had any communications with**
3 **Chase's compliance compartment relating to flood**
4 **insurance or force placed insurance?**
5     MR. LeMAR: I'm going to object to
6 form and instruct you not to answer to the
7 extent that it asks for attorney-client
8 communications.
9     THE WITNESS: I'm sure I have, yes.
10 BY MR. RICHTER:
11     **Q. Do you recall any specific**
12 **conversations?**
13     MR. LeMAR: Same objection regarding
14 privilege.
15     THE WITNESS: Not specifics.
16 BY MR. RICHTER:
17     **Q. Have you had any communications in the**
18 **ordinary course of business, not as a result of**
19 **litigation, with anybody in Chase's compliance**
20 **department or any compliance officer relating to**
21 **flood insurance or force placed insurance?**
22     MR. LeMAR: I'm going to object to the
23 form and also instruct you not to answer to the
24 extent it asks for communications between you
25 and attorneys.

35 (Pages 134 to 137)

MEGAN GROFF - 2/8/11

Page 138

1    THE WITNESS: Yes.
2  BY MR. RICHTER:
3    Q.  Okay.  What conversations have you had
4  in that regard?
5    MR. LeMAR:  Same objection and
6  instruct you not to answer regarding
7  attorney-client communications.
8    THE WITNESS:  I don't recall
9  specifics.
10    MR. RICHTER:  All right.  Let's take
11  five minutes and I think we can get it wrapped
12  up in the next session.
13    (Pause in proceedings.)
14    (Thereupon, Plaintiffs' Exhibit 65, an
15  e-mail from Andrew LeMar to Kai Richter dated
16  12-10-10, and Plaintiffs' Exhibit 66, CHASE
17  01319, were marked for purposes of
18  identification.)
19  BY MR. RICHTER:
20    Q.  Miss Groff, I've just handed you what
21  was marked as Plaintiffs' Exhibit 65 and
22  Plaintiffs' Exhibit 66.  Do you have those two
23  exhibits in front of you?
24    A.  Yes.
25    Q.  Okay.  Looking at Exhibit 65, this is

Page 139

1  another e-mail from one of Chase's counsel in
2  this case, Mr. LeMar, to myself, again with
3  copies to other Chase lawyers, and looking to
4  the third category down it says attached are the
5  form ASIC insurance declaration pages used in
6  California from 2006 to 2010, CHASE 1319, and
7  then in New York, CHASE 1320, and Pennsylvania,
8  CHASE 1321.  These forms were obtained from
9  Assurant by Megan Groff, operations unit manager
10  in Chase's home finances escrow administration
11  department.  Do you see that?
12    A.  Yes.
13    Q.  All right.  Now, Exhibit 66 is CHASE
14  1319.  Do you see that?
15    A.  Yes.
16    Q.  And this is a declarations page from
17  American Security Insurance Company.  Do you see
18  that?
19    A.  Yes.
20    Q.  And this is the declarations page that
21  was used in California from 2006 to 2010; is
22  that correct?
23    A.  Yes.
24    Q.  And there were no other declaration
25  pages that were used in California, that you're

Page 140

1  aware of, during that period, correct?
2    A.  Not that I'm aware of.
3    (Thereupon, Plaintiffs' Exhibit 67, an
4  e-mail from Andrew LeMar to Kai Richter dated
5  12-23-10, and Plaintiffs' Exhibit 68, CHASE
6  01491 through CHASE 01505, were marked for
7  purposes of identification.)
8  BY MR. RICHTER:
9    Q.  All right.  Looking at Exhibit 67 and
10  68, do you have those in front of you?
11    A.  Yes.
12    Q.  Exhibit 67 is an e-mail from Chase's
13  counsel Mr. LeMar to myself with copies to other
14  Chase lawyers; and looking at the second
15  category down, ASIC form insurance policies, it
16  says in addition to the declaration pages that
17  we previously produced, you asked us to produce
18  the form ASIC force placed policies used in
19  California from 2006 to the present, and in New
20  York and Pennsylvania from 2009 to the present.
21  Those form policies are attached as Chase 1491
22  to 1542.  California is Chase 1491 to 1505.  And
23  then it goes on, these forms were obtained from
24  Assurant by Megan Groff.  Do you see that?
25    A.  Yes.

Page 141

1    Q.  All right.  Looking at Exhibit 68,
2  this is a -- the document bearing the Bates
3  numbers Chase 1491 to 1505, correct?
4    A.  Yes.
5    Q.  And it looks like the last two pages
6  are actually a privacy policy from Assurant,
7  1504 and 1505.  Do you see that?
8    A.  Yes.
9    Q.  But the prior pages, 1491 to 1503,
10  those are the pages that represent the form
11  force placed flood insurance policy that was
12  used in California from 2006 to the present,
13  correct?
14    A.  As far as I know, yes.
15    Q.  And you're not aware of any other form
16  flood insurance policies that were issued by
17  American Security Insurance Company for Chase
18  borrowers in California during that period from
19  2006 to the present, correct?
20    A.  Not that I'm aware of.
21    Q.  All right.  Miss Groff, I'm handing
22  you what was previously marked as Plaintiffs'
23  Exhibit 53.  Do you have that in front of you?
24    A.  Yes.
25    Q.  It is an escrow administration monthly

MEGAN GROFF - 2/8/11

Page 142

1  management book for home equity dated January
2  2010. Do you see that?
3      A.  Yes.
4      Q.  Are you familiar with this monthly
5  management book or report?
6      A.  Yes.
7      Q.  Is this something that is generated in
8  the ordinary course of business by Chase?
9      A.  Yes.
10     Q.  And do you review it in the ordinary
11 course of business?
12     A.  Yes.
13     Q.  What types of things do you review it
14 for?
15     A.  We input the home equity insurance
16 numbers.
17     Q.  And have you reviewed this type of
18 report in the ordinary course of business since
19 you assumed your current management role?
20     A.  I'm sorry.  Repeat the question.
21     Q.  Have you reviewed this monthly
22 management book for escrow administration home
23 equity in the ordinary course of business since
24 you assumed your current management role?
25     MR. LeMAR:  Object to form.

Page 143

1      THE WITNESS:  The home equity
2  insurance pieces, yes.
3  BY MR. RICHTER:
4      Q.  And is the information that is entered
5  into -- the data that's used to generate this
6  report, is it entered accurately, to the best of
7  your knowledge?
8      A.  Yes.
9      Q.  Miss Groff, I've just handed you what
10 was previously marked as Exhibit 54.  Do you
11 have that in front of you?
12     A.  Yes.
13     Q.  This is the Assurant home equity
14 scorecard Bates numbered CHASE 1828 through
15 1843; is that right?
16     A.  Yes.
17     Q.  Is this another type of report that's
18 generated by Chase in the ordinary course of
19 business?
20     A.  I'm not familiar --
21     Q.  Go ahead.
22     A.  I can't speak to the specifics of this
23 and how often --
24     Q.  This is not a report that you review
25 as part of your duties; is that right?

Page 144

1      A.  No.  Yes, that's correct.
2      Q.  Is this a report that you retrieved
3  and produced to counsel from Chase's business
4  records?
5      A.  Yes.
6      Q.  Miss Groff, I've just handed you
7  what's previously been marked as Exhibit 55.  Do
8  you have that in front of you?
9      A.  Yes.
10     Q.  Are you familiar with this report?
11     A.  Yes.
12     Q.  What type of report is it?
13     A.  It's a management report that is
14 completed monthly.
15     Q.  And do you review this report in the
16 regular course of your job duties?
17     MR. LeMAR:  Object to form.
18     THE WITNESS:  The sections that
19 pertain to my department.
20 BY MR. RICHTER:
21     Q.  And have you done that -- have you
22 reviewed these types of monthly reports, the
23 information that pertains to your department,
24 throughout the time that you've held your
25 current management position at Chase?

Page 145

1      A.  Yes.
2      Q.  I'd like you to turn to CHASE 1849,
3  and the fourth item down it references an MSP
4  hazard and flood functional advisory committee.
5  Do you see that?
6      A.  Yes.
7      Q.  What is the MSP hazard and flood
8  functional advisory committee?
9      A.  I am not familiar with it.
10     Q.  And throughout this document there are
11 various charts with various financial
12 information in there.  Do you or your team
13 members play any role in inputting the
14 information that's used to generate this report?
15     A.  Our sections, yes.
16     Q.  There are some client numbers on the
17 various pages, client numbers 465, 156, and 589.
18 Do you know what those client numbers refer to?
19     A.  They're the servicing platforms on the
20 first mortgage side.
21     Q.  Okay.  So 465 is which servicing
22 platform?
23     A.  Chase.
24     Q.  Heritage Chase?
25     A.  Yes.

37 (Pages 142 to 145)

MEGAN GROFF - 2/8/11

Page 146

1      Q.   How about 156?
2      A.   Heritage Washington Mutual.
3      Q.   And then 589?
4      A.   Heritage EMC.
5      Q.   Is there a client number for home
6  equity accounts as well?
7      A.   No.
8      Q.   What sections of this report pertain
9  to the home equity side?
10      A.   CHASE 1858, the top section only.  And
11  CHASE 1870, two lines only.
12      Q.   I see those two lines at the bottom
13  there on CHASE 1870; is that right?
14      A.   1870, yes, only that home equity
15  section at the bottom.
16      Q.   And then it looks like there's a line
17  in the middle, bottom of the middle section.
18      A.   The First American line, yes.
19      Q.   And then above that there's another
20  home equity line, that would also apply, right?
21  In the second box.
22      A.   No.  That isn't something my group
23  updates.
24      Q.   Referring to the Assurant scorecard?
25      A.   Correct.

Page 147

1      Q.   Showing you what's previously been
2  marked as Exhibit 56.  Do you have that in front
3  of you?
4      A.   Yes.
5      Q.   Do you recognize this document?
6      A.   Yes.
7      Q.   Is this a document that is generated
8  in the ordinary course of business by Chase?
9      A.   By Assurant.
10      Q.   And is it reviewed by you in the
11  ordinary course of business?
12      A.   Yes.
13      Q.   All right.  Looking on the third page,
14  CHASE 1875, there's a reference to
15  challenges/issues about halfway down.  Do you
16  see that?
17      A.   Oh.  Yes.
18      Q.   And it says the data reported for
19  HELOC LPI was revised and approved by Megan
20  Groff as of August 12th, 2009.  Do you see that?
21      A.   Yes.
22      Q.   HELOC LPI, that refers to home equity
23  line of credit lender placed insurance, correct?
24      A.   Yes.
25      Q.   And what revision in the reporting

Page 148

1  does this refer to?
2      A.   I do not recall the specifics of what
3  I approved at that time.
4      Q.   Do you know what business challenges
5  or issues precipitated that change in reporting?
6      A.   I'm sorry, repeat the question.
7      Q.   Sure.  Do you know what business
8  challenges or issues triggered that change in
9  reporting?
10      A.   I don't recall the specifics.
11      Q.   And is this report -- do you review
12  the entirety of this report when it comes out
13  every month?
14      A.   No.
15          MR. LeMAR:  Object to form.
16  BY MR. RICHTER:
17      Q.   Is this a monthly report?
18      A.   Yes.
19      Q.   What sections of this report do you
20  review in the ordinary course of your job
21  duties?
22      A.   CHASE 1875 and CHASE 1891.
23      Q.   On CHASE 1891, do you know why some of
24  the data there looks like it's blocked out or
25  redacted?

Page 149

1      A.   The numbers were not available at that
2  time.  The numbers were not being reported at
3  that time.
4      Q.   Then down at the bottom on that page
5  it says effective August 2009, Megan Groff
6  approved the change in the reporting of HELOC
7  LPI format.  Do you see that?
8      A.   Yes.
9      Q.   Looking at that notation in the
10  context of the rest of the data here, does that
11  trigger your memory in terms of what reporting
12  changes were undertaken at your approval in
13  August of 2009?
14      A.   I do not recall the specifics.
15      Q.   Going back to CHASE 1875, it says as
16  of December 10th, 2009 added the force placed
17  policies issued as a category to the historical.
18  Do you see that?
19      A.   Yes.
20      Q.   Why was -- well, that was done at the
21  same time as the -- roughly as the December 2009
22  change in Chase's coverage requirements,
23  correct?
24          MR. LeMAR:  Object to form.
25          THE WITNESS:  Repeat the question.

38 (Pages 146 to 149)

MEGAN GROFF - 2/8/11

Page 150

BY MR. RICHTER:
 Q.   Sure.  This change in reporting as of
December 10th, 2009, that occurred at or about
the same time as the change in Chase's flood
insurance requirements for homeowners --
        MR. LeMAR:  Objection.
BY MR. RICHTER:
 Q.   -- that same month, correct?
 A.   Yes.
        MR. LeMAR:  Object to form.
BY MR. RICHTER:
 Q.   Was the change in the reporting
connected to the change in the flood insurance
requirements?
 A.   I don't recall.
 Q.   Has there been an increase in the
percentage of home equity line customers with
force placed insurance after the December 2009
policy change?
 A.   I would say yes.
 Q.   Okay.  Miss Groff, I've just handed
you what was previously marked as Deposition
Exhibit 57.  Do you have that in front of you?
 A.   Yes.
 Q.   Do you recognize this document?

Page 151

 A.   Yes.
 Q.   And what is this?
 A.   This is part of the business review.
 Q.   Is this also something that you review
in the regular course of your job duties?
 A.   My sections, yes.
 Q.   And those sections are which?
 A.   CHASE 1909, just the bottom two lines.
And on the other side of that same sheet, CHASE
1908, only the top section.
 Q.   Home equity flood research?
 A.   Yes.
 Q.   How about lender placed flood
insurance home equity, the box immediately below
that?
 A.   Yes, both sections.
 Q.   And looking at home equity lender
placed flood insurance, the percentage of loans
with lender placed flood went from zero point
two two percent in December of '09 to zero point
four one percent in January of 2010 following
the December 2009 policy change, correct?
        MR. LeMAR:  Object to form.
        THE WITNESS:  Yes.
BY MR. RICHTER:

Page 152

 Q.   And that's consistent with your
testimony a moment ago that you recalled the
percentage of loans with force placed flood
insurance increasing as a result of the December
2009 policy change, correct?
        MR. LeMAR:  Object to form.
        THE WITNESS:  I want to clarify that
the gap lender placed, not --
BY MR. RICHTER:
 Q.   And does this line refer to gap or is
this just --
 A.   That's lender placed as a whole.
 Q.   Does that include both gap and LPI?
 A.   I cannot say for certain.
 Q.   Any other sections of this report that
you review in the ordinary course of your job
duties?
        MR. LeMAR:  Object to form.
        THE WITNESS:  No.
        (Thereupon, Plaintiffs' Exhibit 69,
CHASE 02186 through CHASE 02243, was marked for
purposes of identification.)
BY MR. RICHTER:
 Q.   Miss Groff, the court reporter has
just handed you what was marked as Exhibit 69.

Page 153

Do you have that in front of you?
 A.   Yes.
 Q.   Do you recognize this document?
 A.   Yes.
 Q.   Can you tell me what it is?
 A.   It's part of the Assurant reporting.
 Q.   And is there a title for this report?
 A.   I do not recall the specific name.
 Q.   Do you review this business
information in the regular course of your job
duties?
        MR. LeMAR:  Object to form.
        THE WITNESS:  Only my sections.
BY MR. RICHTER:
 Q.   Those being which ones?
        MR. LeMAR:  Kai, I think you gave me
too much maybe.  What are the Bates numbers of
these?
        MR. RICHTER:  Should be 2186 through
2242.
BY MR. RICHTER:
 Q.   Are those the pages you have in front
of you, Miss Groff?
 A.   What was the second number?
 Q.   2242 -- 2243?

39 (Pages 150 to 153)

MEGAN GROFF - 2/8/11

Page 154

1    A.  Yes.  CHASE 21 --
2    Q.  CHASE 2189 is one of the pages that
3  you typically review?
4    A.  Only the second section.  CHASE 2190,
5  the bottom three sections -- bottom four
6  sections.  CHASE 2191, that whole page.  It
7  looks like that's all because it went into a new
8  year with the same information.
9    Q.  And then looking at the pages starting
10 with CHASE 2206, that's actually the HELOC
11 monthly summary that we were looking at earlier
12 in Exhibit 56, it just happens to be a different
13 month, correct?
14   A.  Yes.
15   Q.  Does Chase keep records of which
16 borrowers receive which form letters?
17       MR. LeMAR:  Object to form.
18       THE WITNESS:  Yes.
19 BY MR. RICHTER:
20   Q.  And does Chase keep records of how
21 much flood insurance -- well, let's start with
22 this:  Does Chase keep records of whether
23 particular borrowers' dwellings are or are not
24 in a flood zone?
25   A.  Yes.

Page 155

1    Q.  Does Chase keep records for those
2  borrowers who it believes their dwellings are in
3  a flood zone how much flood insurance they
4  carry?
5    A.  Yes.
6    Q.  And does Chase keep records of whether
7  the borrower obtained flood insurance
8  independently or that flood insurance was force
9  placed by Chase?
10   A.  Yes.
11   Q.  All of that data is in Chase's
12 database; is that correct?
13   A.  With our vendor, Assurant.  The
14 insurance piece with our vendor, Assurant.  The
15 flood plans are maintained by Chase.
16   Q.  And Chase has access to that
17 information, correct?
18   A.  Yes.
19   Q.  And also has information relating to
20 the premiums for flood insurance carried by
21 borrowers, correct?
22       MR. LeMAR:  Object to form.
23       THE WITNESS:  Repeat the question.
24 BY MR. RICHTER:
25   Q.  Chase also has data or information

Page 156

1  regarding the premiums for that flood insurance
2  that's carried by borrowers, correct?
3    A.  Yes.
4    Q.  Are you aware that both of the named
5  plaintiffs in this case, Miss Hofstetter and
6  Mr. Modersbach, objected to Chase's flood
7  insurance requirements both verbally and in
8  writing?
9        MR. LeMAR:  Object to form.
10       THE WITNESS:  Yes.
11 BY MR. RICHTER:
12   Q.  Are you aware of similar complaints or
13 objections from other customers relating to
14 Chase's coverage requirements?
15       MR. LeMAR:  Object to form.
16       THE WITNESS:  Yes.
17 BY MR. RICHTER:
18   Q.  Do you know how many complaints Chase
19 receives from customers in a typical year
20 relating to flood insurance or flood insurance
21 requirements?
22       MR. LeMAR:  Object to form.
23       THE WITNESS:  I cannot speak to the
24 specifics of those numbers.
25 BY MR. RICHTER:

Page 157

1    Q.  Are you familiar with Penni Herriott?
2    A.  Yes.
3    Q.  Who is she?
4    A.  She works for Assurant.
5    Q.  What is her position there?
6    A.  She is a supervisor.  I'm not --
7    Q.  How about Amelia Brown, are you
8  familiar with her?
9    A.  Yes.
10   Q.  Who does she work for and what does
11 she do?
12   A.  She works for Assurant and she's
13 another supervisor.
14   Q.  Familiar with Patti Haller?
15   A.  Yes.
16   Q.  She another Assurant person?
17   A.  Yes.
18   Q.  Do you know what her role is over
19 there?
20   A.  I do not know her specific title.
21   Q.  Are you familiar with Cedric McNeal?
22   A.  Yes.
23   Q.  Is he another person at Assurant?
24   A.  Yes.
25   Q.  Do you know his role?

MEGAN GROFF – 2/8/11

Page 158

1    A.  I do not know his specific title.
2    Q.  How about Vida Willingham?
3    A.  Yes.
4    Q.  Another Assurant person?
5    A.  Yes.
6    Q.  Do you know Vida's position?
7    A.  I do not know her specific title.
8    Q.  Vilma Munoz, are you familiar with
9  her?
10    A.  Yes.
11    Q.  She also works at Assurant; is that
12  right?
13    A.  Yes.
14    Q.  Are these all people that you --
15  strike that.
16        Do you have meetings or communications
17  from time to time with these individuals from
18  Assurant?
19        MR. LeMAR:  Object to form.
20        THE WITNESS:  Yes.
21  BY MR. RICHTER:
22    Q.  What types of meetings and
23  communications do you have with them?
24        MR. LeMAR:  Object to form.
25        THE WITNESS:  I cannot speak to the

Page 159

1  specifics.
2  BY MR. RICHTER:
3    Q.  Do you have regular meetings, phone
4  conferences, or the like with personnel from
5  Assurant?
6        MR. LeMAR:  Object to form.
7        THE WITNESS:  Yes.
8  BY MR. RICHTER:
9    Q.  Okay.  What types of meetings or
10  periodic conferences do you have in that regard?
11        MR. LeMAR:  Object to form.
12        THE WITNESS:  Operations meetings.
13  BY MR. RICHTER:
14    Q.  How often are those held?
15    A.  Monthly.
16    Q.  Who is the top person that attends on
17  behalf of Chase?
18    A.  I would have to say either Jeff Nack
19  or Brent Miller.
20    Q.  Who is the top person that attends on
21  behalf of Assurant?
22    A.  Vanessa Cook.
23    Q.  What's her title?
24    A.  I don't know her official title.
25    Q.  Is she like a number one liaison

Page 160

1  between Assurant and Chase?
2        MR. LeMAR:  Object to form.
3        THE WITNESS:  I would say yes.
4  BY MR. RICHTER:
5    Q.  Who are -- if you had to pick the
6  three top liaisons between Assurant and Chase,
7  who would they be on the Assurant side?
8        MR. LeMAR:  Object to form.
9        THE WITNESS:  I'm not sure.
10  BY MR. RICHTER:
11    Q.  Would Patti Haller be one of them?
12    A.  I don't think so.
13    Q.  Are you familiar with Delsi Caba, Mary
14  Myers, Yolanda Angulo, Bruce Vangeest, Ronald
15  Wilson, and Kevin Roy?
16        MR. LeMAR:  Object to form.
17        THE WITNESS:  All but Bruce Vangeest.
18  BY MR. RICHTER:
19    Q.  And all of those individuals that
20  you're familiar with, Delsi Caba, Mary Myers,
21  Yolanda Angulo, Ronald Wilson, and Kevin Roy,
22  they all work for Assurant?
23    A.  Yes.
24    Q.  Do you know any of their specific job
25  functions?

Page 161

1    A.  I do not know their specific titles.
2    Q.  Of the people that we've gone over
3  from Assurant, who do you personally interact
4  with or communicate with the most in the course
5  of your job duties?
6    A.  I would say Vanessa.
7        (Thereupon, Plaintiffs' Exhibit 70,
8  privilege log, was marked for purposes of
9  identification.)
10  BY MR. RICHTER:
11    Q.  Miss Groff, the court reporter just
12  handed you what's been marked as Exhibit 70.  Do
13  you have that in front of you?
14    A.  Yes.
15    Q.  I'll represent to you that this is a
16  privilege log produced by Chase's counsel in
17  connection with this matter.  You ever seen this
18  before?
19    A.  No.
20    Q.  I'd like you to turn to the next to
21  the last page.  The fourth entry from the bottom
22  there there's a reference to Hofstetter fact
23  investigation toward the right-hand side.  Do
24  you see that?
25    A.  Yes.

MEGAN GROFF - 2/8/11

Page 162

1     Q.  Who undertook that fact investigation?
2          MR. LeMAR:  I'm going to instruct the
3   witness not to answer based on work product
4   doctrine.
5          MR. RICHTER:  I'm just asking her who
6   did it, not what they did, why they did it, just
7   who did it.  We're entitled to know that.  It's
8   basic author information.
9   BY MR. RICHTER:
10     Q.  Let me ask you again.  Who undertook
11   that fact investigation?
12          MR. LeMAR:  I'm going to instruct the
13   witness not to answer.  You're not asking who
14   authored it.  You're asking who undertook the
15   fact investigation.
16          MR. RICHTER:  What's the basis for the
17   privilege assertion on that narrow question?
18          MR. LeMAR:  Work product.  It says
19   right there.  You're asking about -- you're
20   asking about privilege log documents.  The
21   reason they're on the privilege log is because
22   they're privileged.
23          MR. RICHTER:  But we're entitled to
24   test the privilege.
25          MR. LeMAR:  And I'm instructing the

Page 163

1   witness not to answer because this is based on a
2   privilege.
3          MR. RICHTER:  Okay.
4   BY MR. RICHTER:
5     Q.  Did you undertake any fact
6   investigation of the Hofstetter account
7   following this lawsuit?
8          MR. LeMAR:  I'm going to instruct you
9   not to answer to the extent that he's asking
10   about attorney-client communications or any
11   instructions from counsel regarding this
12   lawsuit.
13          THE WITNESS:  I'm not sure what that
14   even is.
15   BY MR. RICHTER:
16     Q.  Let me ask you this:  Did you ask to
17   have Mr. Modersbach's file pulled?
18          MR. LeMAR:  I'm going to instruct the
19   witness not to answer based on attorney-client
20   communications and work product doctrine.
21          MR. RICHTER:  Counsel, are you going
22   to allow me to ask any questions of this witness
23   relating to this log to test privilege claims?
24   If you're not, I'm not going to go through it
25   for an hour.

Page 164

1          MR. LeMAR:  You can ask it.  I would
2   be hard-pressed to find -- other than is --
3   other than the question is that your name on
4   there, I'm not sure anything about the substance
5   of these is not privileged, which is why we put
6   them on the privilege log.
7   BY MR. RICHTER:
8     Q.  The row that we were referring to, the
9   Hofstetter fact investigation, there's a
10   reference to a document dot xls and a document
11   dot mail.  Do you see that?
12     A.  Yes.
13     Q.  Have you prepared any spreadsheets in
14   connection with this lawsuit?
15          MR. LeMAR:  I'm going to object and
16   instruct the witness not to answer to the extent
17   that anything was at the instruction of counsel
18   or attorney-client privilege.
19   BY MR. RICHTER:
20     Q.  I'd like you to take a look at the
21   second page to, six rows from the bottom the log
22   references an e-mail from you, Megan L. Groff to
23   yourself, Miss Haller, that is Patti Haller, and
24   Yolanda Angulo at Assurant with copies to Jeff
25   Nack and Rita Hillman.  Do you see that?

Page 165

1     A.  Yes.
2     Q.  And this references Hofstetter's
3   insurance removal.  Do you see that?
4     A.  Yes.
5     Q.  What does that refer to, Hofstetter
6   insurance removal?
7          MR. LeMAR:  I'm going to instruct the
8   witness not to answer based on work product.
9   BY MR. RICHTER:
10     Q.  Looking up another nine rows there's a
11   reference to a mail or e-mail from Jennifer
12   Menendez to funds management checks with a copy
13   to you, Patricia Sexton, Javonna Green, Jude
14   Almeida, and Julie Ryland.  Do you see that?
15     A.  Yes.
16     Q.  And then to the right there's another
17   entry for Hofstetter's insurance removal.  Do
18   you see that?
19     A.  Yes.
20     Q.  With a date of September 10th, 2010,
21   right?
22     A.  Yes.
23     Q.  Which was at or about the same time
24   that the force placed insurance policy was
25   renewed on the Hofstetter account for a higher

42 (Pages 162 to 165)

MEGAN GROFF - 2/8/11

Page 166

1  amount, correct?
2         MR. LeMAR:  Object to the form.
3         THE WITNESS:  Yes.
4  BY MR. RICHTER:
5      Q.  Without getting into the specifics of
6  the communications between you and the other
7  people here, are these communications referring
8  to Hofstetter's insurance removal, do they
9  reflect dialogue on the subject of whether the
10 Hofstetter insurance policy would be renewed or
11 not?
12        MR. LeMAR:  I'm going to instruct the
13 witness not to answer based on work product
14 doctrine.
15 BY MR. RICHTER:
16     Q.  Are you familiar with Dan Wheeler?
17     A.  Vaguely.
18     Q.  Who is he?  What's your understanding
19 of his role?
20     A.  I don't have an understanding of his
21 role.
22     Q.  Do you have an understanding that
23 Chase's -- a Chase affiliate earns a commission
24 on flood insurance policies that are force
25 placed on borrowers?  Are you aware of that?

Page 167

1         MR. LeMAR:  I'm going to object to the
2  form.
3         THE WITNESS:  Repeat the question.
4  BY MR. RICHTER:
5      Q.  Are you aware that a Chase affiliate
6  earns a commission on flood insurance policies
7  that are force placed on Chase borrowers?
8         MR. LeMAR:  Object to the form.
9         THE WITNESS:  I cannot speak to any
10 specifics behind that.  I don't --
11 BY MR. RICHTER:
12     Q.  Are you aware generally, though, of
13 the fact that a Chase affiliate earns a
14 commission when a policy is purchased and force
15 placed on a Chase borrower for flood insurance?
16        MR. LeMAR:  Object to the form.
17        THE WITNESS:  Yes.
18 BY MR. RICHTER:
19     Q.  And are you also aware that force
20 placed flood insurance policies are generally
21 more expensive than a policy that a borrower
22 could obtain on his or her own for the same
23 amount of coverage?
24     A.  Yes.
25        MR. RICHTER:  That's all the questions

Page 168

1  I have for you for today.  Thank you for coming.
2         MR. LeMAR:  I have some follow-up
3  questions.
4             CROSS-EXAMINATION
5  BY MR. LeMAR:
6      Q.  Looking at Exhibit 63, which -- and
7  Chase 1543 which appears to be a map, do you
8  know who prepared that map?
9      A.  I do not.
10     Q.  Do you know whether this map was
11 prepared by FEMA?
12     A.  I do not know where this map
13 originated from.
14     Q.  And looking at the top of the page,
15 this appears to be a fax line.  What is the date
16 of that fax line?
17     A.  February 13th, 2001.
18     Q.  And do you know the approximate date
19 of when the -- Miss Hofstetter's property was
20 deemed by FEMA to be in a flood zone -- I'm
21 sorry, Miss Hofstetter's dwelling?
22        MR. RICHTER:  Object to the form.
23 Mischaracterizes the record.
24        THE WITNESS:  I don't have the
25 specific date with me.

Page 169

1  BY MR. LeMAR:
2      Q.  Has -- do you know whether Miss
3  Hofstetter has ever challenged whether her home
4  was in a flood zone?
5         MR. RICHTER:  Object to the form.
6         THE WITNESS:  I don't recall
7  specifically.
8  BY MR. LeMAR:
9      Q.  Do you know whether Miss Hofstetter
10 has ever contacted Chase regarding her flood
11 zone status?
12     A.  I don't recall specifically.
13     Q.  Going back to Exhibit 61 and CHASE
14 1401.  Can you read the paragraph on the CHASE
15 1401 directly above the second address for Chase
16 Home Finance?
17     A.  If you have documentation that your
18 dwelling and insurable improvements are no
19 longer located in an SFHA, you must provide, at
20 your expense, a letter of map amendment, LOMA,
21 or letter of map revision based on fill, LOMR-F,
22 from FEMA to support your claim.  You may
23 contact FEMA at 877-336-2627 to obtain this
24 information.  Once the LOMA or LOMR-F is
25 received from FEMA, please fax it to Chase at

43 (Pages 166 to 169)

MEGAN GROFF - 2/8/11

Page 170

1    614-422-2796 or you may mail it to.
2        Q.   That's fine.  The address.  Do you
3    know whether -- is it your -- strike that.
4            Is it your understanding that either
5    Sheila or David Hofstetter has ever submitted to
6    Chase a letter of map amendment or a letter of
7    map revision based on fill from FEMA?
8        A.   I don't recall specifically.
9        Q.   What would have happened if they had
10   done that?
11           MR. RICHTER:  Objection.  Calls for
12   speculation.
13           THE WITNESS:  If --
14   BY MR. LeMAR:
15       Q.   What happens when a -- strike that.
16           If a borrower submits a letter of map
17   amendment or letter of map revision based on
18   fill to Chase, what does Chase do?
19           MR. RICHTER:  Objection.  Foundation.
20   Form.
21           THE WITNESS:  It depends on what the
22   LOMA or LOMR-F says.
23   BY MR. LeMAR:
24       Q.   Can you explain that?
25       A.   If it's in the letter of map amendment

Page 171

1    or letter of map revision removal, it removes
2    the structure from the flood zone -- special
3    flood hazard area, then we would submit that to
4    our vendor to have the map of that area
5    re-reviewed to update the determination based on
6    FEMA's decision.
7        Q.   And then what happens after that?
8        A.   A new determination is completed and
9    it would be removed from the requirement of
10   flood insurance.
11           MR. RICHTER:  Speculation.  Form.
12   BY MR. LeMAR:
13       Q.   In any of the documents that
14   Mr. Richter showed you today, did any of those
15   documents reflect that Sheila or David
16   Hofstetter submitted to Chase a letter of map
17   amendment or letter of map revision based on
18   fill?
19       A.   Not that I saw.
20       Q.   Did they -- did any of the documents
21   that Mr. Richter showed you today reflect any
22   indication that the Hofstetters, Sheila and
23   David Hofstetter, have ever submitted any
24   documentation to Chase that seeks to challenge
25   their flood zone determination?

Page 172

1        A.   Not that I saw.
2        Q.   I'm going to go back to Exhibit 69
3    which is CHASE 2188 through 2243, and I just
4    wanted to clarify that some of these reports
5    were prepared before you were in your current
6    position with Chase; is that correct?
7        A.   That's correct.
8        Q.   And you would not have input the
9    information on these reports prior to you
10   entering your current position with Chase; is
11   that correct?
12       A.   That's correct.
13       Q.   So you did not enter anything into the
14   December 2006 or December 2007 reports; is that
15   correct?
16       A.   That's correct.
17       Q.   And finally, I just wanted to clarify
18   something that was said earlier.  I believe
19   Mr. Richter asked you whether Chase keeps
20   records of which borrowers receive which flood
21   insurance letters, and I believe that you said
22   that Chase does keep that so I wanted to clarify
23   that answer.  Does Chase keep records of -- does
24   Chase keep electronic records of which letters
25   are sent to each borrower?

Page 173

1            MR. RICHTER:  Objection.  Asked and
2    answered.
3            THE WITNESS:  We keep electronic
4    records of any letters sent to any borrower.
5    BY MR. LeMAR:
6        Q.   And when you say electronic records,
7    what are you referring to?
8        A.   We image them into a system.
9        Q.   So you keep electronic imaged copies
10   of the letters; is that correct?
11       A.   Yes.
12       Q.   And does Chase keep a log of -- on a
13   customer's account information, a log of which
14   letters were sent to each borrower?
15           MR. RICHTER:  Object to the form.
16           THE WITNESS:  Not an all inclusive
17   log, no.
18   BY MR. LeMAR:
19       Q.   So, for instance, looking at Exhibit
20   61, CHASE 1325, if this letter were sent to a
21   borrower, an electronic image of the letter
22   would be in the borrower's file; is that
23   correct?
24       A.   Should be.
25       Q.   And then on the customer service notes

44 (Pages 170 to 173)

Page 174

1   would there be an entry that shows the code at
2   the bottom -- the letter code for -- that this
3   letter was sent to the borrower?
4       A. Within our vendor's notes.
5       Q. Which notes are those?
6       A. Within the vendor system.
7       Q. It's the vendor --
8       A. The vendor system, yeah. The
9   insurance tracking system with the vendor.
10      Q. So Assurant keeps those records; is
11  that correct?
12      A. Of those letters, yes (indicating).
13      Q. Okay. But Chase does not have a --
14  does not keep the records of which letter codes
15  were sent to each borrower?
16      A. Chase does not, no.
17      MR. LeMAR: That's all, I guess, the
18  clarification I sought.
19      MR. RICHTER: Let me ask you a few
20  more questions.
21      FURTHER CROSS-EXAMINATION
22  BY MR. RICHTER:
23      Q. As one of the nation's largest banks,
24  does Chase keep meticulous records of borrowers'
25  information?

Page 175

1       MR. LeMAR: Object to the form.
2       THE WITNESS: Be more specific.
3   BY MR. RICHTER:
4       Q. Well, I mean, would it be fair to say
5   Chase keeps pretty meticulous records of its
6   borrowers' information?
7       MR. LeMAR: Object to the form.
8       THE WITNESS: I would say yes.
9   BY MR. RICHTER:
10      Q. And to the extent that Assurant keeps
11  records instead of Chase, Assurant's records of
12  Chase borrowers are also available to Chase,
13  right?
14      A. Yes.
15      MR. RICHTER: Okay. Nothing else.
16      MR. LeMAR: Okay. I have nothing
17  else.
18      (Thereupon, signature was not waived.)
19      (Thereupon, the deposition was
20  concluded at 3:58 p.m.)
21
22
23
24
25

Page 176

1       I, MEGAN GROFF, do hereby certify that
2   the foregoing is a true and accurate
3   transcription of my testimony.
4
5
6       _ _ _ _ _ _ _ _ _ _ _ _ _ _
7
8   Dated _ _ _ _ _ _ _ _ _ _ _ _ _ _
9

Page 177

1   STATE OF OHIO      )
2   COUNTY OF MONTGOMERY )  SS: CERTIFICATE
3       I, Kathy S. Wysong, a Notary
4   Public within and for the State of Ohio, duly
5   commissioned and qualified,
6       DO HEREBY CERTIFY that the
7   above-named MEGAN GROFF, was by me first duly
8   sworn to testify the truth, the whole truth and
9   nothing but the truth.
10      Said testimony was reduced to
11  writing by me stenographically in the presence
12  of the witness and thereafter reduced to
13  typewriting.
14      I FURTHER CERTIFY that I am not a
15  relative or Attorney of either party, in any
16  manner interested in the event of this action,
17  nor am I, or the court reporting firm with which
18  I am affiliated, under a contract as defined in
19  Civil Rule 28(D).
20
21
22
23
24
25

Page 178

1          IN WITNESS WHEREOF, I have hereunto
2    set my hand and seal of office at Dayton, Ohio,
3    on this _ _ _ _ day of _ _ _ _ _ _ _ _, 2011.
4
5          _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
           KATHY S. WYSONG, RPR
6          NOTARY PUBLIC, STATE OF OHIO
           My commission expires 12-1-2013
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# Exhibit 4

# In The Matter Of:

*Sheila I. Hofstetter, et al.*
*v.*
*Chase Home Finance, LLC, et al.*

_____

# *MAGGIE REITZ*
### *February 9, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

920 Second Ave South
Suite 110
Minneapolis. MN 55402
Phone: 877-489-0367

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

\* \* \*

SHEILA I. HOFSTETTER and

ROGER MODERSBACH, individually,

as representatives of the

classes, and on behalf of

the general public,

          Plaintiffs,

     vs.              CASE NO. CV-10-1313 WHA

CHASE HOME FINANCE, LLC,

JPMORGAN CHASE BANK, N.A.,

and DOES 1-50, inclusive,

          Defendants.

\* \* \*

Deposition of MAGGIE REITZ, Witness
herein, called by the Plaintiffs for
cross-examination pursuant to the Rules of Civil
Procedure, taken before me, Kathy S. Wysong, a
Notary Public in and for the State of Ohio, at
the offices of Marshall & Morrow, LLC, 111 West
Rich Street, Suite 430, Columbus, Ohio, on
Wednesday, February 9, 2011, at 9:05 a.m.

\* \* \*

MAGGIE REITZ – 2/9/11

Page 2

```
 1        EXAMINATIONS CONDUCTED      PAGE
 2   BY MR. RICHTER:.....................   4
 3   BY MR. LeMAR:.......................   83
 4   BY MR. RICHTER:.....................   86
 5
 6        EXHIBITS MARKED
 7   (Thereupon, Plaintiffs' Exhibit 71,     5
 8   plaintiffs' amended notice of
 9   deposition of Maggie Reitz, was
10   marked for purposes of
11   identification.).....................
12   (Thereupon, Plaintiffs' Exhibit 72,     30
13   an e-mail from Andrew LeMar to Kai
14   Richter dated 1-28-11, and
15   Plaintiffs' Exhibit 73, CHASE 02244
16   through CHASE 02477, were marked for
17   purposes of identification.)..........
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2     On behalf of the Plaintiffs:
 3         Nichols Kaster, PLLP
 4     By: Kai Richter
           Attorney at Law
 5         4600 IDS Center
           80 South Eighth Street
 6         Minneapolis, Minnesota  55402
 7     On behalf of the Defendants:
 8         Burke, Warren, MacKay &
           Serritella, P.C.
 9
       By:  Andrew D. LeMar
10         Attorney at Law
           22nd Floor
11         330 North Wabash Avenue
           Chicago, Illinois  60611-3607
12
                   * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              MAGGIE REITZ
 2   of lawful age, Witness herein, having been first
 3   duly cautioned and sworn, as hereinafter
 4   certified, was examined and said as follows:
 5              CROSS-EXAMINATION
 6   BY MR. RICHTER:
 7        Q.  Could you please state your name for
 8   the record?
 9        A.  Maggie Reitz.
10        Q.  Hi, Miss Reitz.  My name is Kai
11   Richter.  We just had an opportunity to greet
12   each other when you walked in a minute ago.  I'm
13   one of the attorneys representing Roger
14   Modersbach and Sheila Hofstetter in the action
15   that they've brought against JPMorgan Chase Bank
16   and Chase Home Finance.   Are you familiar with
17   that action?
18        A.  Very little.
19        Q.  When did you first become aware of the
20   Hofstetter and Modersbach lawsuit?
21        A.  When I was deposed.
22        Q.  So today?
23        A.  Well, the first time.  I can't
24   remember when it was.  Maybe a month ago.  The
25   first time they sent me the deposition.
```

Page 5

```
 1        (Thereupon, Plaintiffs' Exhibit 71,
 2   plaintiffs' amended notice of deposition of
 3   Maggie Reitz, was marked for purposes of
 4   identification.)
 5   BY MR. RICHTER:
 6        Q.  Okay.  I'm going to hand you what's
 7   been marked as Exhibit 71.  Do you recognize
 8   this as your notice of deposition?
 9        A.  Yes.
10        Q.  And you understand that you're here
11   today to testify in connection with this notice
12   of deposition in the Hofstetter and Modersbach
13   action, correct?
14        A.  Yes.
15        Q.  You ever had your deposition taken
16   before?
17        A.  No.
18        Q.  Have you done anything to prepare for
19   your deposition today?
20        A.  No.
21        Q.  Have you reviewed any documents in
22   preparation for your deposition?
23        A.  No.
24        Q.  Since you haven't had a deposition
25   taken before, let me just go through a few quick
```

2 (Pages 2 to 5)

MAGGIE REITZ - 2/9/11

Page 6

1  ground rules that I think will help expedite the
2  process and make it easier for everyone,
3  including our court reporter.
4        First thing is when I ask you a
5  question, it's important that you answer in
6  words instead of nodding or shaking your head or
7  saying uh-huh or huh-uh, that way our court
8  reporter can take down everything that we say.
9  All right?
10       A.  Okay.
11       Q.  Likewise, it's important that you wait
12 to allow me to finish a question before you
13 begin answering; and likewise, I'll try to wait
14 until you're finished with your answer before I
15 ask you a new question, again, so the court
16 reporter can take down everything that we say.
17 All right?
18       A.  Okay.
19       Q.  And if for some reason, despite my
20 best efforts, I ask you a question that you
21 don't understand, you should feel free to ask me
22 to rephrase the question and I'll be happy to do
23 that.  And if you don't ask me to do that, I'll
24 assume that you understand the question.  Okay?
25       A.  Okay.

Page 7

1        Q.  And then finally, throughout your
2  deposition today I'm going to use the term Chase
3  as shorthand to refer both to JPMorgan Chase
4  Bank and Chase Home Finance.  Will you
5  understand what I mean by that?
6        A.  Yes.
7        Q.  And unless -- if for some reason you
8  need to make a distinction between JPMorgan
9  Chase Bank and Chase Home Finance, you should
10 feel free to do that in your answer; and if you
11 don't, I'm going to understand that your answer
12 will apply to both entities.  Okay?
13       A.  Okay.
14       Q.  Which Chase entity or entities do you
15 currently work for?
16       A.  Chase Home Finance.
17       Q.  And what's your position?
18       A.  I'm an operations unit manager.
19       Q.  For which business unit?
20       A.  I'm not sure exactly what you mean.
21 Can you --
22       Q.  You said you're the operations unit
23 manager.  Which unit are you the manager of?
24 What's the name of your group?
25       A.  Flood compliance.  Sorry.

Page 8

1        Q.  And where do you work out of?
2        A.  Columbus.
3        Q.  What's the address?
4        A.  3415 Vision Drive.
5        Q.  And do all of your team members, the
6  persons in your unit, work out of that same
7  address?
8        A.  Yes.
9        Q.  What are your responsibilities as the
10 operations unit manager for flood compliance?
11       A.  I oversee the department, manage a
12 group of thirteen right now, and we monitor the
13 flood zone data for all loans.
14       Q.  And when you say all loans, does that
15 include first mortgage loans?
16       A.  Yeah, only first mortgage loans.
17       Q.  Do you have flood compliance
18 responsibilities with respect to any other types
19 of loans other than first mortgage loans?
20       A.  No.
21       Q.  And when you say first mortgage loans,
22 are those loans that people take out at the time
23 that they purchase their residence?
24       MR. LeMAR:  Object to form.
25       THE WITNESS:  Yes.

Page 9

1  BY MR. RICHTER:
2        Q.  If somebody subsequently takes out a
3  loan that's in the first position, in other
4  words, they don't have any other liens on their
5  property at the time, let's say they paid their
6  house in cash but they subsequently decide that
7  they want to take some money out of their house
8  and take a loan against the house, would that
9  be -- would that fall underneath your
10 jurisdiction or would that fall underneath the
11 home equity group's jurisdiction, if you know?
12       MR. LeMAR:  Object to form.
13       THE WITNESS:  That would not fall
14 under me.
15 BY MR. RICHTER:
16       Q.  And then how about somebody who takes
17 out a mortgage loan at the time that they
18 purchase their home but it's in the second
19 position, let's say they get the first eighty
20 percent to purchase their house from Bank of
21 America, they put ten percent down, but they
22 need another ten percent to come up with the
23 purchase price from the house and they decide to
24 get that from Chase and they take out a loan for
25 the purchase price of the house but it's in the

3 (Pages 6 to 9)

MAGGIE REITZ - 2/9/11

Page 10

1 second position, would that fall under your
2 jurisdiction or would that be in the home equity
3 group?
4 MR. LeMAR: Object to form.
5 THE WITNESS: I'm not familiar with
6 that process of it, but I don't believe that
7 that would fall under me.
8 BY MR. RICHTER:
9 Q. All right. You said that you monitor
10 flood zone data for the loans that you handle.
11 Do you have any other flood compliance
12 responsibilities or management responsibilities
13 in your role?
14 A. Just monitoring that if they're in a
15 flood zone, that we're tracking insurance. If
16 they're not, we do not. And if there's a
17 dispute, we would process that.
18 Q. Okay. So let me make sure I
19 understand. Your responsibilities include
20 tracking whether somebody -- a borrower is or is
21 not in a flood zone, correct?
22 A. Yes.
23 Q. And if it's determined that their
24 dwelling is in a flood zone, you also track
25 whether they carry flood insurance on the

Page 11

1 property, correct?
2 A. Yes.
3 Q. And in addition, also track the amount
4 of insurance that's carried on the property to
5 determine whether it meets Chase's requirements
6 for amount of coverage, correct?
7 A. I have no involvement in the coverage
8 requirements.
9 Q. Who tracks the amount of coverage that
10 is carried by borrowers in the first -- with
11 first mortgages?
12 MR. LeMAR: Object to form.
13 THE WITNESS: That's tracked by
14 Assurant.
15 BY MR. RICHTER:
16 Q. And Assurant tracks that for Chase,
17 correct?
18 A. Yes.
19 Q. Okay. Now, who at Chase is
20 responsible for making sure that Assurant is
21 tracking amount of coverage properly?
22 MR. LeMAR: Object to form.
23 THE WITNESS: Ultimately my boss.
24 BY MR. RICHTER:
25 Q. That's Mr. Nack?

Page 12

1 A. Yes.
2 Q. And does Mr. Nack delegate any of
3 those responsibilities to you or ask him to
4 assist you with that, that tracking of amount of
5 coverage or monitoring whether Assurant is
6 properly tracking amount of coverage?
7 MR. LeMAR: Object to form.
8 THE WITNESS: No.
9 BY MR. RICHTER:
10 Q. How long have you held your current
11 position?
12 A. My current position, just less than a
13 year.
14 Q. Do you remember the date or month that
15 you started?
16 A. It was March of 2010.
17 Q. And who was your predecessor as
18 manager of the flood compliance?
19 A. Biljana Nasuovska. It's a difficult
20 one to spell. I can spell it for you if you
21 want.
22 Q. That would be great.
23 A. B I L J A N A, and then last name is
24 N A S U O V S K A.
25 Q. Do you know how long she served as

Page 13

1 manager of the flood compliance unit prior to
2 the time that you took over from her?
3 A. I do not know the specifics of how
4 long she was there.
5 Q. You said your group has thirteen
6 people in it?
7 A. Uh-huh.
8 Q. Could you just list them off for me
9 real quick?
10 A. Sure. My team lead is Servando
11 Duarte.
12 Q. Could you spell that name for me?
13 A. Sure. S E R V A N D O. And last name
14 is Duarte, D U A R T E. Marcel and his last
15 name is R E U T E G U I, I think it is. I don't
16 know how to pronounce it.
17 Q. Okay.
18 A. Let's see. Alan LaRochelle,
19 L A R O C H E L L E. Phillip Johnson. Tina
20 Fraser. Kyle Jaccaud, it's J A C C A U D.
21 Let's see. I'm trying to think in
22 order how they sit. Patricia Glover and Jamie
23 West. And then the rest are actually temps
24 right now. We're a little short-staffed.
25 Q. Do you happen to know their names?

4 (Pages 10 to 13)

MAGGIE REITZ - 2/9/11

Page 14

1    A.  Yeah.  Brandy Thompson, Treymane
2  Greer, and Marissa Stefanson.
3    Q.  Anybody else that you recall?
4    A.  Am I short?
5    Q.  I think you listed eleven people.  If
6  my memory serves me correctly, thirteen were in
7  your group.
8    A.  I'm sorry.
9    Q.  I don't know whether the thirteen
10  includes you or not.
11    A.  Gosh, who am I missing?  I know I have
12  one open position that hasn't been filled.
13  Sorry, I'm trying to think who I'm missing.  Oh,
14  Monica.  Monica Daniel.  I'm sorry.
15    Q.  And is she a temp or --
16    A.  No, she's a full-time.  I just missed
17  her name.  Sorry.
18    Q.  Mr. Nack is your boss?
19    A.  Yes.
20    Q.  Is he the person who hired you in your
21  current position?
22    A.  Uh-huh.  Oh, yes.  I'm sorry.
23    Q.  Have you held any other positions with
24  Chase prior to your current position?
25    A.  Prior to that I was the team lead of

Page 15

1  the department.
2    Q.  And over what period of time did you
3  serve as the team lead of the flood compliance
4  unit?
5    A.  From August of 2009 to March of 2010.
6    Q.  What were your duties as team lead?
7    A.  Team lead I performed audits of the
8  work completed by other people on the team,
9  worked directly with the vendor, assigned work.
10    Q.  When you said you worked directly with
11  the vendor, are you referring to the flood
12  mapping vendor?
13    A.  Yes.
14    Q.  CoreLogic?
15    A.  Yes.
16    Q.  Did you hold any other positions with
17  Chase prior to your position as team lead in the
18  flood compliance unit?
19    A.  Prior to that I was an analyst on the
20  team.
21    Q.  Over what period of time?
22    A.  August of 2007 to August of 2009.
23    Q.  During that period of time did you
24  work with or for Megan Groff?
25    A.  She was the team lead on the

Page 16

1  department when I started.
2    Q.  Do you know why Miss Groff moved over
3  to the home equity flood group?
4    A.  It was a promotion.
5    Q.  In that she was moving up from team
6  lead to management?
7    A.  Uh-huh.  Yes.
8    Q.  Prior to working as an analyst in the
9  flood compliance unit did you hold any positions
10  with Chase?
11    A.  No.
12    Q.  Could you briefly summarize any formal
13  education you've received since high school?
14    A.  I graduated from Ohio University in
15  2006.
16    Q.  What degree did you receive?
17    A.  Bachelor of arts degree in psychology.
18    Q.  And between the time that you
19  graduated in 2006 and when you started at Chase
20  in 2007 did you have any other jobs?
21    A.  I taught English in China for a year.
22    Q.  Where at?
23    A.  Shenzhen.
24    Q.  Do you have any formal education or
25  training beyond your bachelor of arts in

Page 17

1  psychology at Ohio U?
2    A.  No.
3    Q.  Have you received any education or
4  training with respect to banking regulations or
5  requirements?
6    A.  Training within Chase when I started.
7    Q.  What type of training did you receive
8  from Chase when you started your current
9  position?
10    A.  Just the formal introduction classes,
11  like introduction to mortgage banking and
12  introduction to escrow.
13    Q.  Did any of those training units cover
14  issues relating to flood insurance?
15    A.  Briefly, if any.
16    Q.  What sort of training did you receive
17  with respect to flood insurance or flood
18  insurance requirements?
19    A.  Well, the -- it isn't my area
20  particularly; but specific to flood, we had
21  training with CoreLogic regarding maps and --
22    Q.  I just handed you what was previously
23  marked as Plaintiffs' Exhibit 4.  Do you have
24  that in front of you?
25    A.  Yes.

Merrill Corporation - Minnesota
877-489-0367                                    www.merrillcorp.com/law

MAGGIE REITZ – 2/9/11

Page 18

1      Q.  Do you recognize this document?
2      A.  Yes, it's an org chart for escrow
3  administration.
4      Q.  And do you see directly underneath
5  Mr. Nack your name is listed there as flood
6  supervisor?
7      A.  Yes.
8      Q.  And that box, that's your flood
9  compliance group; is that right?
10     A.  Yes.
11     Q.  And the date of this document is
12  August 31st, 2010.  Do you see that in the top
13  left-hand corner?
14     A.  Yes.
15     Q.  And the names that are listed
16  underneath yours are those -- the names of the
17  people who were in the flood compliance unit as
18  of that date?
19     A.  Yes.
20     Q.  We were discussing a moment ago some
21  of the projects that you work on in your role as
22  the manager of the flood compliance unit.  Do
23  you recall that?
24     A.  Uh-huh.
25     Q.  Have you --

Page 19

1      A.  Yes.  Sorry.
2      Q.  Have you ever worked on any project
3  relating to -- touching upon legal compliance?
4      MR. LeMAR:  Object to form.
5      THE WITNESS:  I'm trying to think if
6  there was anything specific.  I guess I don't
7  know what -- exactly what you mean.
8  BY MR. RICHTER:
9      Q.  Have you done any auditing or
10  monitoring at any time of the amount of coverage
11  carried by borrowers on first mortgage loans?
12     MR. LeMAR:  Object to form.
13     THE WITNESS:  Auditing of that?
14  BY MR. RICHTER:
15     Q.  Auditing, monitoring, any type of
16  review.
17     A.  I'm not responsible for monitoring
18  that, but I may have been involved in auditing
19  or review for an audit.
20     Q.  What types of coverage or coverage
21  amount audits do you recall undertaking either
22  yourself or as manager of your group or as a
23  team lead?
24     MR. LeMAR:  Object to form, and object
25  to just that it misstates prior testimony.

Page 20

1      THE WITNESS:  Mostly I would be
2  responsible for an audit for pulling flood zone
3  determinations, but I may be asked to assist
4  with pulling flood policies or declaration pages
5  in preparation for an audit but it wouldn't be
6  my responsibility.
7  BY MR. RICHTER:
8      Q.  Have you undertaken or been asked to
9  undertake any projects relating to pending
10  litigation?
11     MR. LeMAR:  Objection to form, and
12  object to -- I'd instruct you not to answer to
13  the extent that it involves any instruction from
14  counsel or attorney-client communications.  You
15  can answer.
16     THE WITNESS:  No.
17  BY MR. RICHTER:
18     Q.  Have you undertaken any projects
19  relating to this case at all?
20     A.  No.
21     Q.  Does your group keep a record of the
22  types of projects that you and your other team
23  members work on?
24     MR. LeMAR:  Object to form.
25  BY MR. RICHTER:

Page 21

1      Q.  Like a log or something of that
2  nature.
3      MR. LeMAR:  Object to form.
4      THE WITNESS:  No.
5  BY MR. RICHTER:
6      Q.  Do you have regular meetings with the
7  persons on your team, whether it be every week
8  or something of that nature?
9      A.  Usually biweekly, but it tends to be
10  monthly.
11     Q.  Are there meeting agendas that are
12  generated in connection with those meetings?
13     A.  I usually create just a simple agenda.
14     Q.  Are there any minutes or notes kept of
15  the meeting?
16     A.  No.
17     Q.  Is there any other type of
18  documentation that's generated in connection
19  with those biweekly meetings involving you and
20  your group?
21     A.  No.
22     Q.  Have you had any communications with
23  members of your group relating to Chase's flood
24  insurance requirements?
25     MR. LeMAR:  Object to form.

6 (Pages 18 to 21)

MAGGIE REITZ - 2/9/11

Page 22

1          THE WITNESS:  With my group?
2    BY MR. RICHTER:
3        Q.  Yes.
4        A.  Yeah, we've talked about it.
5        Q.  What have you discussed in that
6    regard?
7        A.  Ultimately they may have questions
8    about it, but it's --
9        Q.  When you say they, the persons in your
10   group or borrowers?
11       A.  Oh, my team.  People in my group.
12       Q.  Okay.
13       A.  But I would direct them to, you know,
14   Assurant for further guidance.  It's ultimately
15   their responsibility.
16       Q.  Have you had any communications with
17   anybody in your group relating to Miss
18   Hofstetter or her file or Mr. Modersbach or his
19   file?
20       A.  No.
21       Q.  Have you had any communications with
22   your group relating to this case?
23       A.  No.
24       Q.  Do you communicate regularly with
25   Mr. Nack?

Page 23

1        A.  As much as I can, yeah.
2        Q.  What form do those communications
3    take?
4        A.  We have biweekly one-on-one meetings,
5    e-mail, phone calls.
6        Q.  Mr. Nack works out of the same Vision
7    Drive --
8        A.  Yes.
9        Q.  -- location?  In connection with the
10   biweekly one-on-one meetings with you and
11   Mr. Nack, are there any meeting agendas, notes,
12   minutes, documentation?
13       A.  No.
14       Q.  Do you participate in any meetings
15   with Mr. Nack beyond the one-on-one meetings;
16   that is, meetings involving other persons in
17   your group or other persons in other groups or
18   other persons with a vendor?  Any other type of
19   regular group meetings?
20          MR. LeMAR:  Object to form.
21          THE WITNESS:  Yes.
22   BY MR. RICHTER:
23       Q.  What other types of group meetings do
24   you have that involve yourself and Mr. Nack?
25       A.  It could be anything.  Maybe a project

Page 24

1    call or he calls into our -- conference call
2    with CoreLogic, the flood determination vendor.
3        Q.  Do you have -- are any of those
4    meetings or conference calls regularly
5    scheduled, that happen every week, month,
6    quarter, et cetera, or is it just ad hoc?
7        A.  Yes, they're usually scheduled.
8        Q.  Can you summarize for me the regularly
9    scheduled meetings that would involve you and
10   Mr. Nack beyond the biweekly one-on-one meetings
11   that you've already discussed?
12          MR. LeMAR:  Object to form.
13          THE WITNESS:  There's a biweekly
14   CoreLogic call that he sometimes attends.  A
15   weekly project call.  I generally call into some
16   of the Assurant conference calls just to make
17   sure if there were any specific flood zone
18   issues.  He would be on those.
19   BY MR. RICHTER:
20       Q.  Do the calls to Assurant touch on
21   issues beyond flood zone issues?
22       A.  Yeah.
23       Q.  Would those issues also include amount
24   of insurance?
25       A.  Not specifically speaking to that.

Page 25

1    It's more project related.
2        Q.  Could you give me an example?
3        A.  Maybe like a processing system or more
4    of a technical nature.
5        Q.  Would that be the same for the weekly
6    project calls?
7        A.  That would be more of an internal
8    project.
9        Q.  Have you been involved in any internal
10   projects touching upon flood insurance coverage
11   requirements or amount of coverage required?
12          MR. LeMAR:  Object to form.
13          THE WITNESS:  No.
14   BY MR. RICHTER:
15       Q.  Does -- you indicated previously that
16   Mr. Nack is the individual who works with
17   Assurant on issues relating to amount of
18   coverage.  Do you recall that?
19       A.  Yes.
20       Q.  Does anybody else assist Mr. Nack in
21   that function or is that a function he does
22   entirely on his own?
23       A.  No, there's someone else that's
24   responsible for that.
25       Q.  Okay.  Who is that person?

7 (Pages 22 to 25)

MAGGIE REITZ - 2/9/11

Page 26

1    A.  Brent Miller.
2        **Q.  And do -- looking at the chart here,**
3    **do other persons in Mr. Miller's group or who**
4    **report to Mr. Miller assist him and Mr. Nack**
5    **with issues relating to amount of flood**
6    **insurance coverage and tracking that?**
7        MR. LeMAR:  Object to form.
8        THE WITNESS:  They work directly with
9    Assurant and ultimately oversee what they do
10   so --
11   BY MR. RICHTER:
12       **Q.  Do you have any interaction with the**
13   **other groups listed here, that is Mr. Miller's**
14   **group or subgroups or Miss Jones' group or**
15   **subgroups?**
16       MR. LeMAR:  Object to form.
17       THE WITNESS:  Other than we all work
18   under Jeff Nack, we rarely are all in the same
19   place.
20   BY MR. RICHTER:
21       **Q.  Has your group ever worked on any**
22   **joint projects with any of the other groups**
23   **shown here?**
24       MR. LeMAR:  Object to form.
25       THE WITNESS:  Most projects would

Page 27

1    involve all areas so -- it might not be
2    specifically a joint project but it may direct
3    each area -- or involve each area.
4    BY MR. RICHTER:
5        **Q.  Are there any lawyers or paralegals in**
6    **your group?**
7        A.  No.
8        **Q.  Are there any lawyers, paralegals, or**
9    **persons with legal training, to your knowledge,**
10   **shown anywhere else on this chart?**
11       MR. LeMAR:  Object to form.
12       THE WITNESS:  Not that I am aware of
13   in any way.
14   BY MR. RICHTER:
15       **Q.  Do you know whether Mr. Nack is a**
16   **lawyer or has a JD?**
17       A.  I do not know, so if he is, I have no
18   idea.
19       **Q.  Are you generally familiar with**
20   **Chase's flood insurance requirements for first**
21   **mortgage loan customers?**
22       MR. LeMAR:  Object to form.
23       THE WITNESS:  Vaguely familiar, but
24   it's not my responsibility.
25   BY MR. RICHTER:

Page 28

1        **Q.  What do you understand Chase's flood**
2    **insurance requirements for first mortgage loan**
3    **customers to be?**
4        MR. LeMAR:  Object to form.
5        THE WITNESS:  I don't know
6    specifically to be honest.  It's not my -- it's
7    not my area.
8    BY MR. RICHTER:
9        **Q.  Do you know one way or the other**
10   **whether Chase's flood insurance requirements for**
11   **first mortgage loan customers have changed over**
12   **the time that you've worked at Chase?**
13       MR. LeMAR:  Object to form.
14       THE WITNESS:  Not that I'm familiar
15   with.
16   BY MR. RICHTER:
17       **Q.  Who are the individuals at Chase who**
18   **are responsible for setting or determining**
19   **Chase's flood insurance requirements for first**
20   **mortgage loans?  Would that be Mr. Nack?**
21       MR. LeMAR:  Object to form.
22       THE WITNESS:  Yes, ultimately, I
23   think.
24   BY MR. RICHTER:
25       **Q.  Has Mr. Nack ever communicated to you**

Page 29

1    **what those flood insurance requirements are?**
2        MR. LeMAR:  Object to form.
3        THE WITNESS:  Probably at one point,
4    yeah.
5    BY MR. RICHTER:
6        **Q.  What do you recall in that regard?**
7        MR. LeMAR:  Object to form.  Asked and
8    answered.
9        THE WITNESS:  It probably would just
10   be in response to a question maybe.
11   BY MR. RICHTER:
12       **Q.  Did you ever ask him what Chase's**
13   **flood insurance requirements are?**
14       A.  Well, I've seen it specifically in
15   letters and such; but it wouldn't be something I
16   would ask to see from him.
17       **Q.  Are you aware that Chase changed its**
18   **flood insurance requirements for home equity**
19   **customers around December of 2009 to eliminate**
20   **the option for home equity customers to insure**
21   **their account in the amount of their loan**
22   **balance or line?**
23       MR. LeMAR:  Object to form.
24       THE WITNESS:  I have no involvement in
25   home equity accounts so I'm not aware of that.

8 (Pages 26 to 29)

MAGGIE REITZ - 2/9/11

Page 30

1  BY MR. RICHTER:
2      Q.  Yeah, and I understand that.  My
3  question is just whether you were aware of the
4  change on the home equity side or not.
5      A.  I don't -- I'm not aware.
6          (Thereupon, Plaintiffs' Exhibit 72, an
7  e-mail from Andrew LeMar to Kai Richter dated
8  1-28-11, and Plaintiffs' Exhibit 73, CHASE 02244
9  through CHASE 02477, were marked for purposes of
10 identification.)
11 BY MR. RICHTER:
12     Q.  All right, Miss Reitz, the court
13 reporter has just handed you what's been marked
14 as Exhibits 72 and 73.  Do you have those in
15 front of you?
16     A.  Yes.
17     Q.  Okay.  Let's start with Exhibit 72,
18 which is an e-mail from Chase's counsel here
19 today, Mr. LeMar, and myself with copies to
20 various other Chase outside litigation counsel,
21 and it says attached are copies of the form
22 letters sent to nonhome equity borrowers from
23 2006 to the present, CHASE 02244 through 2477.
24 They were obtained by Jeff Nack from Assurant.
25 Do you see that?

Page 31

1      A.  Yes.
2      Q.  Did you assist Mr. Nack in gathering
3  those form letters?
4          MR. LeMAR:  Object to form.
5          THE WITNESS:  No.
6  BY MR. RICHTER:
7      Q.  Do you know who did --
8      A.  No.
9      Q.  -- if anybody?
10     A.  No.
11     Q.  You indicated a few questions ago that
12 you had seen form letters that went out to first
13 mortgage borrowers.  Do you recall that?
14     A.  Yes.
15         MR. LeMAR:  Object to the form.
16 BY MR. RICHTER:
17     Q.  Looking at Exhibit 73, why don't you
18 take a moment just to page through it, and I'd
19 like to know if those form letters are familiar
20 to you.
21         MR. LeMAR:  Object to form.
22         THE WITNESS:  Many of these were used
23 before I even started.  But the more current
24 versions I'm somewhat familiar with.
25 BY MR. RICHTER:

Page 32

1      Q.  Could you give me an example of one
2  that would have been used before you started?
3      A.  This one right here I've never seen
4  before (indicating).  This must have been --
5      Q.  And you're referring to the first page
6  with the number at the bottom right-hand corner
7  of CHASE 02244?
8      A.  Yes.
9      Q.  Okay.  And can you give me an example
10 of one that is currently in use?
11         MR. LeMAR:  Object to the extent it
12 calls for speculation.
13         THE WITNESS:  Most of these at the
14 back I believe are the ones they use currently.
15 BY MR. RICHTER:
16     Q.  Okay.  So we'll just go to the very
17 last one shown there with a Bates number on the
18 bottom right-hand side of 24 -- CHASE 2476
19 through 2477.  Do you have --
20     A.  Yes.
21     Q.  -- that letter in front of you?
22     A.  Yes.
23     Q.  And would this be an example of one of
24 the notice form letters that goes to borrowers
25 currently?

Page 33

1          MR. LeMAR:  Object to the extent it
2  calls for speculation.
3          THE WITNESS:  Yes, I believe so.
4  BY MR. RICHTER:
5      Q.  So looking at the fourth paragraph
6  down, Chase is currently sending form letters to
7  first mortgage borrowers stating that at a
8  minimum, the coverage needed on your flood
9  insurance policy must be equal to the lesser of
10 the following; the maximum amount of insurance
11 coverage available through the National Flood
12 Insurance Program, which is currently two
13 hundred and fifty thousand dollars, or one
14 hundred percent of the full replacement cost
15 value of the dwelling and insurable improvement.
16 Is that right?
17         MR. LeMAR:  I'm going to object to the
18 extent that you misstated these are sent to all
19 first mortgage borrowers.
20         MR. RICHTER:  Let's have the witness
21 testify.
22 BY MR. RICHTER:
23     Q.  Is that consistent with your -- this
24 type of letter is going out to borrowers now
25 with that type of language?

9 (Pages 30 to 33)

MAGGIE REITZ – 2/9/11

Page 34

1    MR. LeMAR: Object to form.
2    THE WITNESS: Not to all.
3 BY MR. RICHTER:
4    Q. Okay.
5    A. This --
6    Q. Which type of borrowers get this
7 letter?
8    A. I wouldn't be responsible for
9 determining which type of letter is sent to
10 which specific loan so I couldn't tell you.
11    Q. But you are aware that at least some
12 Chase first mortgage borrowers are receiving
13 letters with this language, correct?
14    MR. LeMAR: Object to form.
15    THE WITNESS: It could be; but like I
16 said, I'm not responsible for determining which
17 letter is sent so --
18 BY MR. RICHTER:
19    Q. And I understand -- I think I
20 understand what your responsibilities are in
21 your current role. I just want to know what you
22 know. I get the responsibility piece.
23    So my question is just simple, whether
24 you know or just are aware that there are
25 letters going out communicating this information

Page 35

1 to at least some of the first mortgage borrowers
2 that they've got to insure to two hundred and
3 fifty thousand dollars or replacement cost
4 value? Some first mortgage borrowers are
5 getting those types of letters?
6    MR. LeMAR: Object to form, and object
7 to asked and answered.
8    THE WITNESS: I don't believe that
9 would be sent to a first mortgage borrower.
10 BY MR. RICHTER:
11    Q. How do you know that?
12    A. I believe based on this coverage
13 requirement that this would be for a second
14 lien.
15    Q. Do you know if borrowers with
16 condominiums get letters similar to this as
17 well?
18    MR. LeMAR: Object to form.
19    THE WITNESS: I believe the coverage
20 requirement is similar for a condominium.
21 BY MR. RICHTER:
22    Q. In other words, borrowers who use
23 Chase first mortgage to purchase a condominium,
24 they would get letters outlining these two
25 coverage options for them, two hundred and fifty

Page 36

1 thousand or replacement cost value?
2    MR. LeMAR: Object to form, and object
3 to the extent it misstates testimony.
4    THE WITNESS: There's a specific
5 letter for condos, I believe.
6 BY MR. RICHTER:
7    Q. All right. You indicated that the
8 letters toward the back of Exhibit 73 were the
9 ones that you were aware that were going out to
10 first mortgage borrowers. Which letters at the
11 back were you referring to?
12    A. Hold on. I just saw it in here. The
13 letter I'm most familiar with is a zoning
14 letter.
15    Q. Why don't you take a look at the
16 document Bates numbered CHASE 2454. It's toward
17 the end of the stack.
18    A. Okay.
19    Q. Do you have that in front of you?
20    A. Yeah.
21    Q. Okay. So on the lower right-hand
22 corner you see it says Chase 2454, correct?
23    A. Uh-huh.
24    Q. And then in the bottom left-hand
25 corner there's a form letter code there. Do you

Page 37

1 see that?
2    A. Uh-huh.
3    Q. And that code is 2102F1ZIS-1110. Do
4 you see that?
5    A. Uh-huh.
6    MR. LeMAR: Say yes.
7    THE WITNESS: Yes.
8 BY MR. RICHTER:
9    Q. The ZI, does that stand for zone in?
10    A. Yes. As far as I know.
11    Q. And would this form letter be an
12 example of a zone in letter that you're familiar
13 with that is currently going out to first
14 mortgage borrowers?
15    MR. LeMAR: Object to form.
16    THE WITNESS: I believe the S
17 indicates that it would be sent to a second
18 lien.
19 BY MR. RICHTER:
20    Q. All right. So let's go through some
21 of the zone in letters then. Let's start with
22 2346, CHASE 2346. Do you have that in front of
23 you?
24    A. Yes.
25    Q. And this letter at the top says notice

10 (Pages 34 to 37)

MAGGIE REITZ - 2/9/11

Page 38

1   of flood insurance requirement, please read
2   carefully.  Do you see that?
3       A.  Yes.
4       Q.  And then bottom left-hand corner
5   there's a notation there, 2102F1ZI-1110.  Do you
6   see that?
7       A.  Yes.
8       Q.  Is this an example of another zone in
9   letter?
10      A.  Yes.
11      Q.  Okay.  Keep your finger on that one
12  for a minute.  I want to flip to another one.
13      A.  Okay.
14      Q.  Or actually go back to the one we were
15  looking at earlier which was 2454.  And the code
16  on that one that we were looking at earlier had
17  the same code except that there was an S added
18  after the ZI so it was 2102F1ZIS-1110.  Do you
19  see that?
20      A.  Yes.
21      Q.  And it's your testimony that, to your
22  knowledge, that S refers to borrowers in the
23  second lien position?
24      A.  Yes.
25      Q.  I'll give you a couple of stickies so

Page 39

1   you can hold your place on a few letters.  I
2   want to go to a third one.  All right.  Let's go
3   to a third one at 2458.  This letter, like the
4   other two letters, says notice of special flood
5   hazard at the top.  Do you see that?
6       A.  Yes.
7           MR. LeMAR:  Object to the
8   characterization that the other letter says
9   notice of special flood hazard at the top.  2346
10  does not say that.
11  BY MR. RICHTER:
12      Q.  Looking down at the bottom left-hand
13  corner, the code for this notice letter is
14  2102F1ZIC-1110.  Do you see that?
15      A.  Yes.
16      Q.  Do you know what the C stands for?
17      A.  Condo.
18      Q.  All right.  So with respect to Chase's
19  coding arrangement, the form letters that are
20  currently used will have a code at the bottom of
21  the letter, correct?
22      A.  Yes.
23      Q.  And there will be a generic code that
24  will be used?  For example, with the zone in
25  letters the generic code is 2102F1ZI for zone in

Page 40

1   as shown at CHASE 2346; is that right?
2           MR. LeMAR:  Object to form.
3           THE WITNESS:  Yes.
4   BY MR. RICHTER:
5       Q.  And then if the letter goes out to
6   borrowers in the second lien position, there
7   will be an S that appears after that generic
8   code, correct?
9           MR. LeMAR:  Object to form.
10          THE WITNESS:  I believe so, yes.
11  BY MR. RICHTER:
12      Q.  And if it goes out to condo borrowers,
13  there will be a C that follows the generic code,
14  correct?
15          MR. LeMAR:  Object to form.
16          THE WITNESS:  I believe so, yes.
17  BY MR. RICHTER:
18      Q.  And that would be true not just for
19  the zone in letters but for the placement
20  letters, the purchase letters, the other types
21  of letters, correct?
22          MR. LeMAR:  Object to form and to the
23  extent it calls for speculation.
24          THE WITNESS:  I'm not familiar with
25  those letters.  I'm sorry.

Page 41

1   BY MR. RICHTER:
2       Q.  Now, the three zone in letters that we
3   have gone over here so far, CHASE 2346, CHASE
4   2454, and CHASE 2458, all of those have a 1110
5   after the dash in the code, correct?
6       A.  Yes.
7       Q.  All right.  Let's take a look at a few
8   other zone in letters.  And feel free to use the
9   sticky notes to hold your place if need be.
10      A.  Thank you.
11      Q.  Let's start at 2344.  2344, this is
12  another letter at the top that says notice of
13  flood insurance requirement, correct?
14      A.  Yes.
15      Q.  And this one also bears a form
16  notation at the bottom of 2102F1Z1, the same
17  generic code as used on CHASE 2346; is that
18  right?
19          MR. LeMAR:  Object just because it's
20  an I not a 1.
21          MR. RICHTER:  Oh, F1ZI.  I'm sorry.
22          THE WITNESS:  Yes.
23  BY MR. RICHTER:
24      Q.  Now, there is a difference in the code
25  for the form letter on CHASE 2344 in that

11 (Pages 38 to 41)

MAGGIE REITZ - 2/9/11

Page 42

1  following the dash there's a 1009 instead of a
2  1110, which is the number that follows the dash
3  on the very next letter on CHASE 2346; is that
4  right?
5      A.  Yes.
6      Q.  Do you know what the number following
7  the dash represents?
8      A.  I have no idea.
9      Q.  Would that be true for both the 1110
10 number and the 1009 number that follows the
11 dash?
12     MR. LeMAR:  Object to form.
13     THE WITNESS:  I'm sorry, I don't
14 understand the question.
15 BY MR. RICHTER:
16     Q.  Sure.  There are -- well, let's take a
17 look at -- let's take a look at a couple other
18 ones.  Let's take a look at 2452, CHASE 2452.
19 CHASE 2452 says notice of special flood hazard
20 at the top, correct?
21     A.  Yes.
22     Q.  And in that respect is similar to the
23 form letter at CHASE 2458?
24     MR. LeMAR:  Object to form.
25     THE WITNESS:  I have to look at it.

Page 43

1  Hold on.  Yes, it does say the same thing at the
2  top.
3  BY MR. RICHTER:
4      Q.  Okay.  Now, the form letter at CHASE
5  2452 -- strike that.
6          Let's move to 2454.  CHASE 2454 and
7  CHASE 2458 both are notice of special flood
8  hazard letters, correct?
9      MR. LeMAR:  Object to form.
10     THE WITNESS:  Yes.
11 BY MR. RICHTER:
12     Q.  And both letters have a form notation
13 of -- strike that.  Let's try again.
14     MR. LeMAR:  You'll get there.
15 BY MR. RICHTER:
16     Q.  All right.  I'd like you to compare
17 CHASE 2452 with the letter that immediately
18 follows, 2454.  Both of those letters are notice
19 of special flood hazard letters, correct?
20     MR. LeMAR:  Object to form.
21     THE WITNESS:  Yes.
22 BY MR. RICHTER:
23     Q.  And both of those letters contain the
24 form notation 2102F1ZIS, correct?
25     A.  Yes.

Page 44

1      Q.  The only difference in the form
2  notation is that one letter, CHASE 2452, has the
3  numbers 0810 after the dash and the form letter
4  CHASE 2454 has the numbers 1110 after the dash,
5  correct?
6      A.  Yes.
7      Q.  And I will represent to you, without
8  making you go through every single one of these,
9  there are a number of these form notations that
10 contain either an entry of 1110 after the dash
11 or an entry of 0810 after the dash.  Do you know
12 why there is a distinction between those two
13 numbers?
14     MR. LeMAR:  Object to the form.
15     THE WITNESS:  I would assume maybe a
16 revision, but I have no idea to be honest.
17     MR. RICHTER:  All right.  Let's take a
18 short break.
19     (Pause in proceedings.)
20 BY MR. RICHTER:
21     Q.  I want to go back to three of the
22 letters that we were looking at previously, the
23 ones with the Bates numbers CHASE 2346, 2454,
24 and 2458.  These are the form letters that are
25 the zone in letters, correct?

Page 45

1      A.  Yes.
2      Q.  And all of the form letters begin with
3  a notation 2102F1ZI, that's 2346, and then 2454
4  and 2458 begin the same way except they have an
5  S or a C following that designation, correct?
6      A.  Yes.
7      Q.  I want to focus on the first form
8  notation there on CHASE 2346, 2102F1Z1.  You've
9  already testified --
10     MR. LeMAR:  ZI.
11 BY MR. RICHTER:
12     Q.  ZI, sorry.  And you've already
13 testified that your recollection is that ZI
14 refers to zone in?
15     A.  Yes.
16     Q.  And F1, is that for first mortgage, F
17 and the one position?
18     MR. LeMAR:  Objection to the extent it
19 calls for speculation.
20     THE WITNESS:  I believe the F is for
21 flood.  I think.
22 BY MR. RICHTER:
23     Q.  And do you know what the one is for?
24     MR. LeMAR:  Object to the extent it
25 calls for speculation.

MAGGIE REITZ - 2/9/11

Page 46

1      THE WITNESS:  It's the first letter
2  that's sent.
3  BY MR. RICHTER:
4      Q.  I see.  And then are you also familiar
5  with the fact that Chase typically sends out a
6  series of three letters to the borrower, a
7  warning letter telling them they're in a flood
8  hazard area and need to get flood insurance, a
9  second letter reminding them that they need to
10  get flood insurance if they haven't done so
11  already, and then a third letter that actually
12  is force placing a policy on them, that they go
13  out in those series of those three letters?
14      MR. LeMAR:  Object to form and lacks
15  foundation.
16      THE WITNESS:  Yes, I believe there are
17  three letters to notify the borrower.
18  BY MR. RICHTER:
19      Q.  Okay.  So with respect to the zone in
20  letters that we were looking at, 2346, 2454, and
21  2458 were the Bates numbers, these are all
22  letters that a borrower would receive in the
23  first instance telling them that their property
24  is in, hence flood in, in a special flood hazard
25  area, correct?

Page 47

1      MR. LeMAR:  Object to the form.
2      THE WITNESS:  Yes, it is to notify
3  them that they are now in a special flood hazard
4  area.
5  BY MR. RICHTER:
6      Q.  All right.  Let's take a look at three
7  other form letters.  Let's start with CHASE
8  2317 -- or excuse me, CHASE -- no, that's right,
9  CHASE 2317.  This form letter says at the top
10  notice of placement of flood insurance.  Do you
11  see that?
12      A.  Yes.
13      Q.  And it has a notation at the bottom
14  left-hand corner of 2102F2-1110.  Do you see
15  that?
16      A.  Yes.
17      Q.  All right.  Flag that one.  Let's go
18  to another similar one, CHASE 2368.  This also
19  says notice of placement of flood insurance at
20  the top.  Do you see that?
21      A.  Yes.
22      Q.  And in the bottom left-hand corner it
23  has a form letter notation of 2102F2 and then it
24  has an S afterward.  Do you see that?
25      A.  Yes.

Page 48

1      Q.  And then moving on a couple more
2  letters to CHASE 2372, this is also a notice of
3  placement of flood insurance letter, correct?
4      A.  Yes.
5      Q.  And this one has a notation at the
6  bottom 2102F2C.  Do you see that?
7      A.  Yes.
8      Q.  If after a borrower was notified that
9  he or she was in a special flood hazard area
10  once they got the zone in letter but they did
11  not procure flood insurance for their property,
12  would they then get one of these F2 letters,
13  either CHASE 2317, 2368, or 2372?
14      MR. LeMAR:  Object to the form, and
15  object to the extent it calls for speculation.
16      THE WITNESS:  Yes, this would be the
17  next letter that would be sent.
18  BY MR. RICHTER:
19      Q.  Okay.  And then moving on, let's go to
20  another series of letters, the generic, the S
21  designation, and the C designation for the third
22  set of the triumvirate of letters I'll call
23  them.  Let's start at CHASE 2323.  This says
24  notice of purchase of flood insurance.  Do you
25  see that?

Page 49

1      A.  Yes.
2      Q.  And this bears a designation in the
3  bottom left-hand corner of 2102F3.  Do you see
4  that?
5      A.  Yes.
6      Q.  And then moving on to CHASE 2382, same
7  header at the top, notice of purchase of
8  flood -- similar, notice of purchase of flood
9  insurance policy at the top.  Do you see that?
10      A.  Yes.
11      Q.  And that one, Bates number CHASE 2382,
12  has a designation in the bottom left-hand corner
13  of 2102F3 and then has an S designation after
14  it.  Do you see that?
15      A.  Yes.
16      Q.  And then moving on to CHASE 2386.
17  This form letter also says notice of purchase of
18  flood insurance policy.  Do you see that?
19      A.  Yes.
20      Q.  And bears a designation -- form
21  designation of 2102F3C.  Do you see that?
22      A.  Yes.
23      Q.  And then form letters CHASE --
24  beginning at CHASE 2323, 2382, and 2386, would
25  these be the third letter that would go out to

13 (Pages 46 to 49)

MAGGIE REITZ - 2/9/11

Page 50

1    borrowers in the three stage letter process?
2        MR. LeMAR: Object to form, and object
3    to the extent it calls for speculation.
4        THE WITNESS: Yes.
5    BY MR. RICHTER:
6        Q. Each of these third stage letters,
7    beginning at CHASE 2323, 2382, and 2386, these
8    are the letters that advise the borrower that
9    Chase has purchased force placed flood insurance
10   at their expense to insure the property,
11   correct?
12       MR. LeMAR: Object to form.
13       THE WITNESS: Yes, if we still have
14   not received insurance, it would be to notify
15   them of that.
16   BY MR. RICHTER:
17       Q. All right. Now, are you familiar with
18   flood insurance renewal letters that Chase will
19   send out if once the initial force placed policy
20   expires, the policy is then renewed?
21       A. I'm not familiar with those letters.
22       Q. Are you familiar with the term flood
23   gap insurance?
24       A. Yeah.
25       Q. And what does that refer to?

Page 51

1        A. If the coverage is insufficient
2    according to the guidelines.
3        Q. And in those cases, if Chase deems the
4    coverage to be insufficient per its guidelines,
5    it will then -- then the borrower doesn't obtain
6    that amount of coverage, Chase will then force
7    place coverage to make up the difference or the
8    gap, hence the term gap coverage, correct?
9        MR. LeMAR: Object to form.
10       THE WITNESS: Yeah, we're required to
11   insure that they have adequate insurance.
12   BY MR. RICHTER:
13       Q. All right. I'd like you to take a
14   look at three other letters, CHASE 23 -- let's
15   start with CHASE 2332. Do you have that one in
16   front of you?
17       A. Yes.
18       Q. And this one the R E colon line says
19   home mortgage loan, colon, inadequate flood
20   coverage. Do you see that?
21       A. Yes.
22       Q. And then in the bottom left-hand
23   corner of this letter, CHASE 2332, there's a
24   form notation 2102G1-1110. Do you see that?
25       A. Yes.

Page 52

1        Q. And the G notation, that refers to the
2    fact that this is a gap coverage letter?
3        MR. LeMAR: Object to form.
4    BY MR. RICHTER:
5        Q. Is that right?
6        A. I would assume so, yes.
7        Q. And looking at CHASE 2406, this is a
8    letter that also refers to insufficient flood
9    insurance coverage at the top?
10       A. Yes.
11       Q. And then in the bottom left-hand
12   corner there's a notation of 2102G1 and this
13   time it has an S after the G1. Do you see that?
14       A. Yes.
15       Q. And it would be your expectation that
16   this would be a gap letter that would go out to
17   second lien borrowers because of the S
18   designation?
19       A. Yeah, I would assume so.
20       Q. All right. And then looking at a
21   couple more letters in at CHASE 2410. Do you
22   have that in front of you?
23       A. Yes.
24       Q. This also says notice of insufficient
25   flood insurance coverage at the top. Do you see

Page 53

1    that?
2        A. Yes.
3        Q. And this one bears a form notation of
4    2102G1 and then there's a C designation after
5    that. Do you see that?
6        A. Yes.
7        Q. And you would expect that this would
8    be a gap coverage letter that would go out to
9    condo borrowers?
10       MR. LeMAR: Object to form.
11       THE WITNESS: Yes, I would assume so.
12   BY MR. RICHTER:
13       Q. And each of these letters, I'll call
14   them the G1, G1S, and G1C letters, these would
15   be the first letters that would go out to
16   borrowers in the three stage letter process,
17   correct?
18       MR. LeMAR: Object to form.
19       THE WITNESS: Yes, to notify them.
20   BY MR. RICHTER:
21       Q. All right. Let's look at the second
22   gap letters in the series starting at CHASE
23   2336. CHASE 2336, similar to CHASE 2332, refers
24   to inadequate flood coverage in the re: line.
25   Do you see that?

14 (Pages 50 to 53)

MAGGIE REITZ – 2/9/11

Page 54

1    A.  Yes.
2    Q.  And CHASE 2336 in the bottom left-hand
3  corner bears a form notation of 2102G2.  Do you
4  see that?
5    A.  Yes.
6    Q.  And looking at CHASE 2418, CHASE 2418,
7  similar to CHASE 2406, also refers to
8  insufficient flood insurance coverage at the
9  top?
10       MR. LeMAR:  Object to form.
11       THE WITNESS:  Yes.
12  BY MR. RICHTER:
13    Q.  And this form letter bears a
14  designation 2102G2 and then S after that,
15  correct?
16    A.  Yes.
17    Q.  Moving on to CHASE 2423, a couple
18  letters further in, this one bears a form
19  notation of 2102G2C.  Do you see that?
20    A.  Yes.
21    Q.  And would you expect that these G2
22  form letters, G2, G2S, G2C, would be the second
23  set of letters that would go out to borrowers in
24  connection with gap coverage as part of a three
25  stage letter process?

Page 55

1       MR. LeMAR:  Object to form.
2       THE WITNESS:  I believe so, yeah.
3  BY MR. RICHTER:
4    Q.  And to the extent that there are
5  subsequent letters bearing a notation of
6  2102G2C, G2 -- or excuse me, strike that.
7       To the extent that there are
8  subsequent letters that bear the reference
9  2102G3 or G3S or G3C, would you expect those
10  form letters to be the third ones that go out in
11  this series?
12       MR. LeMAR:  Object to form, and object
13  to the extent it calls for speculation.
14       THE WITNESS:  Yes, I believe so.
15  BY MR. RICHTER:
16    Q.  So, for example, CHASE 2430 says
17  notice of purchase of flood insurance policy at
18  the top --
19    A.  Yes.
20    Q.  -- and bears a notation 2102G3S.  Do
21  you see that?
22    A.  Yes.
23    Q.  And the immediately preceding --
24  strike that.
25       And the -- a couple more letters in at

Page 56

1  CHASE 2434 -- do you see that letter?
2    A.  Yes.
3    Q.  It also says notice of purchase of
4  flood insurance policy, correct?
5    A.  Yes.
6    Q.  And this one bears a notation 2102G3C.
7  Do you see that?
8    A.  Yes.
9    Q.  So these letters, CHASE 2430 and 2434,
10  would be ones that you would expect to go out as
11  the third stage of the three stage letter
12  process for gap insurance coverage for second
13  lien borrowers and condo borrowers, correct?
14       MR. LeMAR:  Object to form and to the
15  extent it calls for speculation.
16       THE WITNESS:  I believe so.
17  BY MR. RICHTER:
18    Q.  I'd like you to take a look at CHASE
19  2350.  Do you have that in front of you?
20    A.  Yes.
21    Q.  This one says notice of missing flood
22  insurance information at the top.  Do you see
23  that?
24    A.  No.  2450?
25    Q.  I'm sorry, 2350.

Page 57

1    A.  Okay.  Sorry.  Okay.  Yes.
2    Q.  Do you have 2350 in front of you?
3    A.  Yes.
4    Q.  This one at the top says notice of
5  missing flood insurance information.  Do you see
6  that?
7    A.  Yes.
8    Q.  Have you seen letters like this
9  before?
10    A.  I've seen it.  I'm more familiar with
11  the zone in but --
12    Q.  Okay.  Now, this letter, CHASE 2350,
13  in the bottom left-hand corner bears a notation
14  of 2102F1.  Do you see that?
15    A.  Yes.
16    Q.  And the zone in letters bore the form
17  notation of 2102F1 and then there was a ZI
18  afterward.  Do you recall that?
19    A.  Yes.
20    Q.  Is it fair to say that in the first --
21  the triggering event for borrowers to get the
22  first letter can either be that Chase, through
23  its CoreLogic vendor, determines that the
24  property is now in a flood zone, in which case
25  they get a zone in letter or a ZI letter,

15 (Pages 54 to 57)

MAGGIE REITZ - 2/9/11

Page 58

1  correct?
2      MR. LeMAR:  Object to form.
3      THE WITNESS:  Yes.
4  BY MR. RICHTER:
5      Q.  Or alternatively, Chase, as part of --
6  well, just looking at the text of this letter,
7  2350, as part of a review of its records
8  determines that there's not any flood insurance
9  on the property.  It's always been in a flood
10  zone but they just discovered that there's not
11  any flood insurance; is that right?
12      MR. LeMAR:  Object to form.  Object to
13  the extent it calls for speculation.
14      THE WITNESS:  I'm not familiar with
15  the triggering event for this letter.
16  BY MR. RICHTER:
17      Q.  Okay.  Fair enough.  Would you expect
18  that if Chase had missing flood insurance
19  information, that they would send out a first
20  stage letter as a part of the three stage letter
21  process asking the borrower to demonstrate that
22  the borrower has flood insurance?
23      MR. LeMAR:  Object to form.
24      THE WITNESS:  I'm not sure.
25  BY MR. RICHTER:

Page 59

1      Q.  You indicated that you have some
2  familiarity with this type of letter, the notice
3  of missing flood insurance information letter;
4  is that right?  You've seen it in the past?
5      MR. LeMAR:  Object to the form.
6  Object to the extent it misstates prior
7  testimony.
8      THE WITNESS:  I've seen it, yeah.
9  BY MR. RICHTER:
10      Q.  Okay.  Just looking at the notation at
11  the bottom, 2102F1, and based on what -- seeing
12  these letters in the past, is it your
13  understanding that this notice of missing flood
14  insurance information letter goes out in the
15  first instance, it's a first
16  stage letter and not a stage two or stage three
17  letter?
18      MR. LeMAR:  Object to form.  Object to
19  the extent it calls for speculation.
20      THE WITNESS:  Yeah, I would assume
21  that this would be the first notice.
22  BY MR. RICHTER:
23      Q.  Okay.  And then let's look at a couple
24  other ones at 2354 and 2358.  Let's start with
25  CHASE 2354.  This also is a notice of missing

Page 60

1  flood insurance information form letter,
2  correct?
3      A.  Yes.
4      Q.  And this one in the bottom left-hand
5  corner has a form notation of 2102F1 and then
6  there's an S after it.  Do you see that?
7      A.  Yes.
8      Q.  And then now looking at CHASE 2358,
9  that bears a form designation of 2102F1 and then
10  there's a C -- then there's a C after it,
11  correct?
12      A.  Yes.
13      Q.  All right.  And these three letters,
14  F1, F1S, and F1C, you would expect them to go
15  out in the first instance to borrowers with
16  missing flood insurance information in Chase's
17  records as part of the three stage letter
18  process, correct?
19      MR. LeMAR:  Object to form.  Object to
20  the extent it calls for speculation.
21      THE WITNESS:  I believe so.
22  BY MR. RICHTER:
23      Q.  And your understanding of the S
24  designations and the C designations for these
25  letters following the F1 is the same as your

Page 61

1  understanding for the letters, S meaning in the
2  second lien position and C referring to condo
3  loans?
4      A.  I believe so, yeah.
5      Q.  And would that be true for any form
6  letter where you saw a C after the generic
7  reference and an S -- or an S after the generic
8  reference?
9      MR. LeMAR:  Object to the form.
10      THE WITNESS:  I couldn't say for sure
11  for all of them, but as far as I'm aware.
12  BY MR. RICHTER:
13      Q.  All right.  I'd like you to take a
14  look at CHASE 2328.  Do you have that in front
15  of you?
16      A.  Yes.
17      Q.  Have you seen any letters like this
18  previously?
19      MR. LeMAR:  Object to form.
20      THE WITNESS:  I am not familiar with
21  this letter.
22  BY MR. RICHTER:
23      Q.  All right.  Let's go back to some zone
24  in letters.  I think that's where we started
25  once we got into this whole review of the

16  (Pages 58 to 61)

MAGGIE REITZ - 2/9/11

Page 62

1    letters. And I'd like you to start with CHASE
2    2454. Do you see that?
3        A. Yes.
4        Q. This is a letter that says notice of
5    special flood hazard at the top. It has a
6    notation on the bottom left-hand corner of
7    2102F1ZIS-1110. Do you see that?
8        A. Yes.
9        Q. And based on your prior testimony, you
10   would expect that this would be a zone -- first
11   stage zone in letter that would go out to
12   borrowers in the second lien position, correct?
13       MR. LeMAR: Object to form and asked
14   and answered.
15       THE WITNESS: Did you say not to
16   answer?
17       MR. LeMAR: Oh, no, I said asked and
18   answered. You can answer.
19       THE WITNESS: Yes, I believe so.
20   BY MR. RICHTER:
21       Q. All right. I'd like you to keep a
22   finger or a tab on that and I'd like you to
23   compare it with another letter in Exhibit 61,
24   which I'll represent to you has been produced to
25   us as a set of letters relating to home equity

Page 63

1    accounts. And I'd like you to take a look at
2    Exhibit 61 at the page with the number of CHASE
3    1404.
4        MR. LeMAR: I'm going to object
5    generally to the questions about home
6    equity-related letters or procedures since she's
7    already testified that she has nothing to do
8    with home equity.
9        MR. RICHTER: Standing objection
10   noted.
11   BY MR. RICHTER:
12       Q. All right. The letter with a number
13   of CHASE 1404 has the same title at the top,
14   notice of special flood hazard and availability
15   of federal disaster relief assistance, please
16   read carefully, your attention is required. Do
17   you see that?
18       MR. LeMAR: Object to form. Same as
19   what?
20   BY MR. RICHTER:
21       Q. Same as 2454. In that regard, 2454
22   and Chase 1404 are identical with respect to the
23   title, correct?
24       A. 2454?
25       Q. Yes.

Page 64

1        A. It looks that way, yes.
2        Q. All right. And, in fact, the entire
3    letter, the language of the letter and the --
4    even the portion of the language that is in bold
5    is identical in both of these letters; is that
6    right?
7        MR. LeMAR: Object to form, and object
8    to the extent that it misrepresents that these
9    are identical.
10       THE WITNESS: I have never seen this
11   letter (indicating) so I can't say for sure that
12   it's identical.
13   BY MR. RICHTER:
14       Q. Okay. Take a minute -- I want you to
15   just take a minute to look through them both,
16   take as much time as you like, and tell me if
17   you see any meaningful difference between these
18   two letters?
19       MR. LeMAR: Object to the form.
20       (Witness reviewing documents.)
21       THE WITNESS: They appear to be mostly
22   the same as far as I can tell, quick glance.
23   BY MR. RICHTER:
24       Q. Are you able to identify any
25   differences in the language that's used in the

Page 65

1    letters?
2        MR. LeMAR: Object to the extent that
3    the letters speak for themselves.
4        THE WITNESS: I'm not sure.
5    BY MR. RICHTER:
6        Q. I'll tell you what, I don't want to
7    make it a proofreading exercise. Would it be
8    fair to say that the two letters I've asked you
9    to compare, that is the one beginning at CHASE
10   2454 in Exhibit 73 and the one beginning at
11   CHASE 1404 in Exhibit 61, that those two letters
12   appear to be substantially similar?
13       MR. LeMAR: Object to the form, and
14   object to the extent that the letters speak for
15   themselves. You can compare the letters without
16   asking her whether or not they're the same.
17       THE WITNESS: As far as I can tell,
18   they're fairly similar.
19   BY MR. RICHTER:
20       Q. And these are zone in letters,
21   correct?
22       MR. LeMAR: Object to form. Object to
23   the extent it calls for speculation.
24       THE WITNESS: I can't say for sure
25   that this is a zone in letter. I know that the

Merrill Corporation - Minnesota

877-489-0367                                      www.merrillcorp.com/law

MAGGIE REITZ - 2/9/11

Page 66

1  2454 is a zone in letter, but I can't say for
2  sure about this one (indicating).
3  BY MR. RICHTER:
4     **Q.  Okay.  In any event, right above the**
5  **notation CHASE 1404 there's a notation**
6  **WFLOODIN.DOC-1509.  Do you see that?**
7     MR. LeMaR:  0509.
8  BY MR. RICHTER:
9     **Q.  0509.  Do you see that?**
10    A.  Yes.
11     **Q.  All right.  Let's take a look at one**
12  **of the second stage flood letters, CHASE 2368 in**
13  **Exhibit 73.  And I'd like you to compare that**
14  **second stage flood letter with CHASE 1364 in**
15  **Exhibit 61.**
16     MR. LeMaR:  I'm going to object again
17  to the extent that the documents speak for
18  themselves and if there are any differences or
19  similarities, it's obvious on the face of the
20  document and her testimony is not needed to
21  determine whether or not they're similar or not.
22     THE WITNESS:  Did you say 1364?
23  BY MR. RICHTER:
24    **Q.  Correct.**
25    A.  Okay.

Page 67

1     **Q.  Do the letters beginning at CHASE 2368**
2  **in Exhibit 73 and the letter beginning at CHASE**
3  **1364 in Exhibit 61, do those two letters appear**
4  **to you to be substantially similar?**
5     MR. LeMaR:  Object to form.
6     THE WITNESS:  I have never seen this
7  letter, the 1364, so I can't say for sure that
8  they are similar.
9  BY MR. RICHTER:
10    **Q.  Well, take a minute to review it and**
11  **tell me based on your review of the letter now**
12  **whether you would agree that the letters are**
13  **substantially similar both in form and**
14  **substance.**
15     MR. LeMaR:  I'm going to object to
16  form.  Same objection regarding the documents
17  speak for themselves.
18     (Witness reviewing documents.)
19     THE WITNESS:  Just upon first glance,
20  it appears to be similar.
21  BY MR. RICHTER:
22    **Q.  Okay.  Let's look at the third stage**
23  **flood letters.  I'd like you to take a look at**
24  **CHASE 2382 in Exhibit 73 and I'd like you to**
25  **compare it to Exhibit 61 at CHASE 1378.**

Page 68

1     MR. LeMaR:  Same objection as before.
2  How many more of these letters are we going to
3  go over, Kai?
4     MR. RICHTER:  I don't think it's going
5  to take too long.  It will go much faster if you
6  take me up on the standing objection.
7     MR. LeMaR:  Okay.  It's just kind of a
8  waste of time.
9  BY MR. RICHTER:
10    **Q.  Comparing those two letters, the ones**
11  **beginning at CHASE 2382 in Exhibit 71 and CHASE**
12  **1378 in Exhibit -- strike that.**
13     **Comparing the letters at CHASE 2382 in**
14  **Exhibit 73 with CHASE 1378 in Exhibit 61, those**
15  **third stage flood letters, would you expect --**
16  **well, looking at those, do they appear to be**
17  **substantially similar to you?**
18     MR. LeMaR:  Object to form.
19     THE WITNESS:  Same scenario, never
20  seen this letter, the 1378, so I'm not familiar
21  with it, and I'm not sure that they're fully
22  similar.
23  BY MR. RICHTER:
24    **Q.  Well, take a minute to look at it and**
25  **after you've had a chance to review the home**

Page 69

1  **equity letter and compare it to the other**
2  **letter, tell me whether they appear to be**
3  **substantially similar in form and substance or**
4  **whether you observe any notable differences.**
5     MR. LeMaR:  Object to form.
6     (Witness reviewing documents.)
7     THE WITNESS:  They appear to have
8  similar content.
9  BY MR. RICHTER:
10    **Q.  All right.  Let's take a look at the**
11  **first stage gap letter, CHASE 2406 in Exhibit**
12  **73, and compare it with CHASE 1434 in Exhibit**
13  **61.**
14     MR. LeMaR:  Same objection.
15  BY MR. RICHTER:
16    **Q.  Take a minute to -- or as much time as**
17  **you need to review both of those letters and let**
18  **me know if both of those letters appear to be**
19  **substantially similar.**
20     MR. LeMaR:  Object to form.
21     THE WITNESS:  Once again, I've never
22  seen this letter, the 1434, but from first
23  glance, they appear to be similar.
24  BY MR. RICHTER:
25    **Q.  Okay.  Moving on to the second stage**

18 (Pages 66 to 69)

MAGGIE REITZ - 2/9/11

Page 70

1  gap letter in Exhibit 73, CHASE 2418, I'd like
2  you to compare that with CHASE 1446 in Exhibit
3  61.
4       MR. LeMAR:  Same objection.
5  BY MR. RICHTER:
6       Q.  Why don't you take a minute to review
7  those letters and after you've done that, let me
8  know if those two letters appear to be
9  substantially similar.
10      MR. LeMAR:  Object to form.
11      (Witness reviewing documents.)
12      THE WITNESS:  Wait.  Can you tell me
13 the numbers again?
14 BY MR. RICHTER:
15      Q.  Sure.  2418 in Exhibit 73, comparing
16 that with CHASE 1446 in Exhibit 61.
17      A.  1446?
18      Q.  Correct.
19      A.  They appear to be similar; but like I
20 said, I've never seen this letter, the 1446,
21 so --
22      Q.  All right.  Moving to the third stage
23 gap letter, I'd like you to compare CHASE 2430
24 in Exhibit 73 with CHASE 1459 in Exhibit 61.  Do
25 those two letters appear to be substantially

Page 71

1  similar?
2       MR. LeMAR:  Object to form, and same
3  objection regarding the letters.
4       THE WITNESS:  Same scenario, I've
5  never seen letter 1459; but upon first glance,
6  they appear to be similar.
7  BY MR. RICHTER:
8       Q.  Okay.  And then finally with -- let's
9  take a look at one of the flood one letters,
10 CHASE 2352 in Exhibit 73 --
11      A.  2352?
12      Q.  Correct.  And I'd like you to compare
13 that with CHASE 1348.
14      MR. LeMAR:  Did you say 2352 or 2452?
15      MR. RICHTER:  2352.
16 BY MR. RICHTER:
17      Q.  I'd like you to compare 2352 in
18 Exhibit 73 with CHASE 1348 in Exhibit 61.
19      MR. LeMAR:  Same objections.
20 BY MR. RICHTER:
21      Q.  Do those two letters appear to be
22 substantially similar?
23      MR. LeMAR:  Object to form.
24      THE WITNESS:  Same scenario, I've
25 never seen letter 1348, but they appear to be

Page 72

1  similar upon first glance.
2  BY MR. RICHTER:
3       Q.  All right.  So I don't want to make
4  you go through each and every letter in here --
5       MR. LeMAR:  Thank you.
6  BY MR. RICHTER:
7       Q.  -- so let me see if we can sum this up
8  and be done with this.  I've asked you to
9  compare and contrast seven letters that we just
10 went through, a flood one zone in letter, a
11 flood two letter, a flood three letter, a gap
12 one letter, a gap two letter, and a gap three
13 letter, and then the last one was another flood
14 one letter.
15      MR. LeMAR:  Object to the extent that
16 that misstates what the letters are.
17 BY MR. RICHTER:
18      Q.  All seven of those letters that we
19 reviewed based on your review were substantially
20 similar to the letters in the home equity
21 exhibit, Exhibit 61, correct?
22      MR. LeMAR:  Object to form.
23      THE WITNESS:  Upon brief glance they
24 appear to be so --
25 BY MR. RICHTER:

Page 73

1       Q.  And without looking through each and
2  every scrap of paper in Exhibits 73 and 61,
3  would it surprise you that there are other
4  letters in here, between the two exhibits, that
5  are substantially similar?
6       MR. LeMAR:  Object to form.  Object to
7  the extent it calls for speculation.
8       THE WITNESS:  I'm not familiar with
9  the home equity process so I can't say that I
10 would be surprised about differences or
11 similarities, so I can't answer that.
12 BY MR. RICHTER:
13      Q.  Moving on to a different topic.  Are
14 you familiar with the insurance policies and
15 declarations pages that are issued to borrowers
16 with first mortgage loans or condo loans or
17 loans in the second lien position by American
18 Security Insurance Company?
19      A.  I'm not --
20      MR. LeMAR:  Object to the form.
21      THE WITNESS:  I'm not familiar with
22 that process.
23 BY MR. RICHTER:
24      Q.  Have you ever seen the actual policies
25 themselves?

19  (Pages 70 to 73)

MAGGIE REITZ - 2/9/11

Page 74

1      MR. LeMAR: Object to form. Which
2  policies?
3  BY MR. RICHTER:
4      Q. The American Security Insurance
5  Company policies.
6      A. Maybe documentation that was pulled
7  for an audit possibly.
8      Q. All right. I'd like you to take a
9  look at Exhibit 65 and 66. Do you have those
10 two exhibits in front of you?
11     A. Yes.
12     Q. Looking at Exhibit 65, that's an
13 e-mail from Chase's counsel here today,
14 Mr. LeMar, to myself with copies to other Chase
15 lawyers dated December 10th, 2010. Do you see
16 that?
17     A. Yes.
18     Q. All right. Looking to the third
19 category down, it references a form ASIC
20 insurance policies. Do you see that?
21     A. Yes.
22     Q. And it says attached are the form ASIC
23 insurance declaration pages used in California
24 from 2006 to 2010, and then parentheses says
25 CHASE 1319. Do you see that?

Page 75

1      A. Yes.
2      Q. All right. And then flipping to
3  Exhibit 66, that has a Bates number of CHASE
4  1319. Do you see that?
5      A. Yes.
6      Q. And it's an American Security
7  Insurance Company declaration page, correct?
8      A. I believe so.
9      Q. Is this declaration page consistent
10 with the declaration pages that you would have
11 seen when conducting audits in your group?
12     MR. LeMAR: Object to the form.
13 Object to the extent that it misstates prior
14 testimony.
15     THE WITNESS: It could have looked
16 familiar, but I'm not one hundred percent sure.
17 BY MR. RICHTER:
18     Q. Are you aware of any declaration pages
19 for first mortgage borrowers that are different
20 than this?
21     MR. LeMAR: Object to the form, and
22 object to the extent that she's already
23 indicated she's not familiar with these.
24     THE WITNESS: I'd have to see an
25 example.

Page 76

1  BY MR. RICHTER:
2      Q. And would that be -- the same be true
3  with respect to the policies themselves?
4      MR. LeMAR: Object to form.
5      THE WITNESS: Can you rephrase the
6  question? I'm sorry.
7  BY MR. RICHTER:
8      Q. Sure. Why don't you take a look at
9  Exhibit 68. Exhibit 68 is an American Security
10 Insurance Company policy that Chase's counsel
11 has represented to us was used in California
12 during the period from 2006 to the present. In
13 looking at that Exhibit 68, does that policy
14 appear to be consistent with policies that you
15 may have seen that were force placed on first
16 mortgage borrowers by Chase through American
17 Security Insurance Company?
18     MR. LeMAR: Object to form, object to
19 lacks foundation, and object to the extent it
20 calls for speculation.
21     THE WITNESS: I very rarely ever see
22 policies; however, this does look similar to
23 what I have seen in the past.
24 BY MR. RICHTER:
25     Q. You've worked for Chase now for, what

Page 77

1  is it, about three and a half years?
2      A. Approximately.
3      Q. You're aware Chase is one of the
4  country's largest banks, right?
5      A. Yes.
6      MR. LeMAR: Object to form.
7  BY MR. RICHTER:
8      Q. And in your experience working for
9  Chase, have you found it to be a professionally
10 managed and run organization?
11     MR. LeMAR: Object to form and to the
12 extent it calls for speculation.
13     THE WITNESS: Based on my experience.
14 This is my first business job so I don't have
15 much to compare it to.
16 BY MR. RICHTER:
17     Q. In the course of your job duties you
18 review a fair amount of records, would that be
19 fair to say?
20     MR. LeMAR: Object to speculation --
21 I'm sorry. Object to form.
22     THE WITNESS: Yes.
23 BY MR. RICHTER:
24     Q. Would it be fair to say that Chase has
25 pretty stringent record keeping requirements?

20  (Pages 74 to 77)

MAGGIE REITZ - 2/9/11

Page 78

1       MR. LeMAR: Object to form.
2       THE WITNESS: I'm not one hundred
3   percent sure what you're asking.
4   BY MR. RICHTER:
5       **Q.  Well, let me ask it a different way.**
6   **I mean, would it be fair to say that Chase keeps**
7   **pretty meticulous business records as one of the**
8   **country's largest banks?**
9       MR. LeMAR: Object to form.  Define
10  meticulous.
11      THE WITNESS: As far as I'm aware, I
12  would say we're cautious.
13  BY MR. RICHTER:
14      **Q.  For first mortgage borrowers does**
15  **Chase keep records of the borrowers' principal**
16  **balance?**
17      MR. LeMAR: Object to form.
18      THE WITNESS: It's on our servicing
19  system.
20  BY MR. RICHTER:
21      **Q.  And in order to track borrowers' flood**
22  **insurance, does Chase also keep track of the**
23  **amount of flood insurance that borrowers carry**
24  **through its vendor Assurant?**
25      MR. LeMAR: Object to form.  Object to

Page 79

1   the extent it calls for speculation.
2       THE WITNESS: It would be available on
3   our servicing system if --
4   BY MR. RICHTER:
5       **Q.  And information would also be**
6   **available on the servicing system regarding**
7   **whether borrowers' dwellings or properties are**
8   **in a flood zone, right?**
9       MR. LeMAR: Object to form.
10      THE WITNESS: The flood zone for the
11  property?  Yes, we do hold that on the system.
12  BY MR. RICHTER:
13      **Q.  And it would also be in the system**
14  **whether insurance was force placed on the**
15  **borrower, correct?**
16      MR. LeMAR: Object to form.  Object to
17  the extent it calls for speculation.
18      THE WITNESS: Yes.
19  BY MR. RICHTER:
20      **Q.  And it would also be on the system who**
21  **received any form letters that were sent out by**
22  **Chase or by Assurant on behalf of Chase,**
23  **correct?**
24      MR. LeMAR: Object to form.  Object to
25  the extent it calls for speculation.

Page 80

1       THE WITNESS: It should populate on
2   the system.
3   BY MR. RICHTER:
4       **Q.  Are you aware that one of the issues**
5   **in this lawsuit is that Miss Hofstetter and**
6   **Mr. Modersbach have objected to Chase's flood**
7   **insurance coverage requirement amounts for them?**
8       MR. LeMAR: Object to the form, and
9   object to the extent that she's already said
10  she's not familiar with this lawsuit.
11      THE WITNESS: Yeah, I'm not familiar
12  with any of the details of this lawsuit.
13  BY MR. RICHTER:
14      **Q.  Do you know one way or another whether**
15  **other borrowers have complained or objected to**
16  **Chase regarding its flood insurance coverage**
17  **requirements?**
18      MR. LeMAR: Object to form.  Object to
19  the extent it calls for speculation.
20      MR. RICHTER: That's what we're trying
21  to find out.
22      THE WITNESS: I process -- my group
23  processes disputes based on the zone, but we
24  don't handle anything specific on the coverage
25  requirements.  That would be handled by Assurant

Page 81

1   so --
2   BY MR. RICHTER:
3       **Q.  I believe we briefly discussed earlier**
4   **today the fact that Miss Groff formerly worked**
5   **as a team lead in your group during the period**
6   **of time that you were a -- is it an analyst?**
7       A.  Yes, she was a team lead in the
8   department when I was an analyst.
9       **Q.  And then she moved over to manage the**
10  **home equity flood unit?**
11      MR. LeMAR: Object to the extent that
12  it misstates prior testimony.
13      THE WITNESS: Yes, that's correct.
14  BY MR. RICHTER:
15      **Q.  Has there been any other cross-over**
16  **between your unit and the home equity flood unit**
17  **in terms of personnel either way, either people**
18  **coming from home equity flood to your group or**
19  **vice versa?**
20      MR. LeMAR: Object to form.
21      THE WITNESS: No.
22  BY MR. RICHTER:
23      **Q.  Do you still keep in touch with Megan?**
24      MR. LeMAR: Object to form.
25      THE WITNESS: Yeah.

21 (Pages 78 to 81)

MAGGIE REITZ — 2/9/11

Page 82

BY MR. RICHTER:
1
2    **Q.   Has she ever communicated to you how**
3    **things are going on the home equity side?**
4        MR. LeMAR:  Object to form.
5        THE WITNESS:  No.  Her department and
6    what they do is completely different from mine
7    so --
8    BY MR. RICHTER:
9    **Q.   She ever tell you anything like, oh,**
10   **my goodness, things are so totally different on**
11   **the home equity side, I don't know how I could**
12   **ever manage it all, it's totally different than**
13   **what I was doing before?  Did she ever say that**
14   **or anything like that?**
15       MR. LeMAR:  Object to form.  Object to
16   the extent it's a hypothetical.
17       THE WITNESS:  No.
18   BY MR. RICHTER:
19   **Q.   Based on what -- any conversations**
20   **that you may have had, did it seem like it was a**
21   **pretty smooth transition for her?**
22       MR. LeMAR:  Object to form.
23       THE WITNESS:  They use a different
24   servicing system so I think it was a matter of
25   learning that; but as far as the specifics, I

Page 83

1    know she was very busy so I rarely had contact
2    at that time.
3    BY MR. RICHTER:
4    **Q.   You mentioned previously that you work**
5    **for Chase Home Finance.  Do you recall that?**
6    A.   Yes.
7    **Q.   Does JPMorgan Chase Bank cut your**
8    **checks as an employee?**
9        MR. LeMAR:  Object to the form.
10       THE WITNESS:  I'm not one hundred
11   percent sure.  I have direct deposit so I don't
12   see a check.
13       MR. RICHTER:  Miss Reitz, I think
14   that's all I have for you today.  Thank you very
15   much.
16       THE WITNESS:  All right.
17       MR. LeMAR:  I just have a couple of
18   follow-up questions.
19           CROSS-EXAMINATION
20   BY MR. LeMAR:
21   **Q.   Your group, the flood compliance**
22   **group, is your group responsible for determining**
23   **which borrowers get which form letters?**
24   A.   No.
25   **Q.   Is your group responsible for the**

Page 84

1    codes at the bottom left-hand corner of the form
2    letters that go to borrowers?
3    A.   No.
4    **Q.   Looking at Chase 2358, which you**
5    **previously discussed with Mr. Richter.**
6    A.   Yes.
7    **Q.   This is the letter that the code at**
8    **the bottom is 2102F1C-1110.**
9    A.   Yes.
10   **Q.   And you said that it was your**
11   **understanding that C referred to condominium; is**
12   **that correct?**
13   A.   Yes.
14   **Q.   Do you know whether this letter or**
15   **letters with the C on them are sent to all**
16   **condominium borrowers or whether they are sent**
17   **to condominium borrowers with second mortgages?**
18   A.   I believe it would be triggered based
19   on the property type, but I'm not one hundred
20   percent sure.
21   **Q.   Okay.  And then can you go to 2346,**
22   **which is also part of Exhibit 73.**
23   A.   Yes.
24   **Q.   And this was the letter with the code**
25   2102F1ZI-1110, and can you go down to the -- the

Page 85

1    paragraph below the bulleted points?
2    A.   Yes.
3    **Q.   And what does that paragraph say?**
4    A.   If your secured property is a
5    condominium, co-operative, or time-share that is
6    insured under a master policy issued to the
7    homeowners or condominium association, please
8    contact the association to obtain a copy of the
9    policy and then provide it to us.
10   **Q.   Do you know whether this letter is**
11   **sent to condominium borrowers?**
12   A.   It shouldn't be; but if for any
13   reason -- I think the reason that's in there is
14   if maybe it were a townhouse or a PUD and it was
15   covered by --
16   **Q.   What is a PUD?**
17   A.   A planned unit development.  It's a
18   development type that generally could be covered
19   by a master policy.
20   **Q.   Okay.  Again, just to confirm, your**
21   **group does not send these letters out; is that**
22   **correct?**
23   A.   We do not directly send these letters
24   out.  Based on monitoring of the flood zone, if
25   the flood zone were to change, it would

22  (Pages 82 to 85)

MAGGIE REITZ – 2/9/11

Page 86

1   automatically trigger a letter.  We may add a
2   flood insurance line in order to trigger the
3   letter; but as far as which letter is sent, we
4   have no direct responsibility for that.
5        Q.  Okay.  And your group does not
6   determine how much flood insurance a borrower is
7   required to maintain?
8        A.  No, that is not my group's
9   responsibility.
10        MR. LeMAR:  That's all I have.
11        MR. RICHTER:  I do have just some
12   brief follow-up for you.
13        FURTHER CROSS-EXAMINATION
14   BY MR. RICHTER:
15        Q.  Miss Reitz, I've just handed you what
16   was previously marked as Plaintiffs' Exhibit 18.
17   Do you have that in front of you?
18        A.  Yes.
19        Q.  This is a frequently asked questions
20   printout from the Chase website; is that right?
21        MR. LeMAR:  Objection based on it
22   calls for speculation.
23        THE WITNESS:  I have never seen this
24   before, but that's what it appears to be.
25   BY MR. RICHTER:

Page 87

1        Q.  I'd like you to turn to page eleven
2   with the Bates number of NKA0003568.  Do you
3   have that page in front of you?
4        A.  Yes.
5        Q.  And toward the middle of the page --
6   or actually on the bottom half of the page the
7   document addresses both homeowner's flood
8   insurance -- or excuse me, both homeowner's
9   insurance requirements and flood insurance
10   requirements.  Do you see that?
11        A.  Yes.
12        Q.  And it indicates that adequate flood
13   insurance -- excuse me, adequate flood coverage
14   is the lesser of:  Replacement cost, the maximum
15   available under the NFIP, National Flood
16   Insurance Program, which is currently two
17   hundred and fifty thousand dollars, or the
18   unpaid balance provided that it is a minimum of
19   eighty percent of the replacement cost.  Do you
20   see that?
21        A.  Yes.
22        Q.  And then going on, underneath there's
23   a question, what is the minimum homeowner's, and
24   flood insurance required for condominiums,
25   planned unit developments, PUD we were just

Page 88

1   talking about, and co-operative communities.  Do
2   you see that?
3        A.  Uh-huh.
4        Q.  And then --
5        MR. LeMAR:  Yes?
6        THE WITNESS:  Yes.  Sorry.
7   BY MR. RICHTER:
8        Q.  -- it goes on the following page,
9   NKA3569, it says minimum flood insurance
10   coverage is defined as:  One hundred percent of
11   the insurable value, guaranteed replacement cost
12   or other similar verbiage, or the maximum
13   available under the NFIP, which is currently two
14   hundred and fifty thousand dollars per unit
15   contained there within.
16        A.  Yes.
17        Q.  To the best of your knowledge, is
18   that -- does that accurately set forth the
19   minimum flood insurance coverage for
20   condominiums, PUDs, and co-ops?
21        MR. LeMAR:  Object to form.  Object to
22   the extent it calls for speculation.
23        THE WITNESS:  Yes, I believe according
24   to the NFIP regulations, that's what should be
25   required for a condo.

Page 89

1   BY MR. RICHTER:
2        Q.  And for other borrowers in the first
3   lien position, that is noncondo borrowers,
4   adequate flood insurance coverage would be
5   basically the same requirement except that the
6   borrower would have a third option, to go to
7   eighty percent of the replacement cost if the
8   unpaid principal balance was at least that much,
9   correct?
10        MR. LeMAR:  Object to form.
11        THE WITNESS:  I believe that's true,
12   yes.
13        MR. RICHTER:  Thank you again.  That's
14   all the questions I have for you.  I do want to
15   get on the record that the flood insurance
16   letters in Exhibit 73 were not produced by Chase
17   until January of 2011, well after Mr. Nack's
18   deposition; and for that reason, in addition to
19   the other reasons that we've previously
20   articulated, we do reserve our right to
21   reconvene Mr. Nack's deposition.
22        MR. LeMAR:  And I'd like to get on the
23   record that we objected properly to any -- the
24   production of any documents relating to nonhome
25   equity loans, and we agreed to produce those for

23  (Pages 86 to 89)

MAGGIE REITZ - 2/9/11

Page 90

1    a limited purpose to show that the requirements
2    for nonhome equity loans are not the same as
3    home equity loans, and plaintiffs have never
4    renoticed Mr. Nack's deposition or moved to
5    compel. That's all.
6         (Thereupon, signature was not waived.)
7         (Thereupon, the deposition was
8    concluded at 11:49 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1    STATE OF OHIO          )
2    COUNTY OF MONTGOMERY )   SS: CERTIFICATE
3         I, Kathy S. Wysong, a Notary
4    Public within and for the State of Ohio, duly
5    commissioned and qualified,
6         DO HEREBY CERTIFY that the
7    above-named MAGGIE REITZ, was by me first duly
8    sworn to testify the truth, the whole truth and
9    nothing but the truth.
10         Said testimony was reduced to
11    writing by me stenographically in the presence
12    of the witness and thereafter reduced to
13    typewriting.
14         I FURTHER CERTIFY that I am not a
15    relative or Attorney of either party, in any
16    manner interested in the event of this action,
17    nor am I, or the court reporting firm with which
18    I am affiliated, under a contract as defined in
19    Civil Rule 28(D).
20
21
22
23
24
25

Page 91

1         I, MAGGIE REITZ, do hereby certify
2    that the foregoing is a true and accurate
3    transcription of my testimony.
4
5
6         _____
7
8    Dated _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1         IN WITNESS WHEREOF, I have hereunto
2    set my hand and seal of office at Dayton, Ohio,
3    on this _ _ _ _ day of _ _ _ _ _ _ _ _, 2011.
4
5         _____
6    KATHY S. WYSONG, RPR
     NOTARY PUBLIC, STATE OF OHIO
     My commission expires 12-1-2013
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

24 (Pages 90 to 93)