Pages 1 - 64

United States District Court

Northern District of California

Before The Honorable William Alsup

Sheila Hofstetter, et al.,    )
                              )
            Plaintiff,        )
                              )
    vs.                       )          No. C10-1313 WHA
                              )
Chase Home Financial, LLC,    )
                              )
            Defendant.        )
_____)

                                    San Francisco, California
                                    Thursday, March 24, 2011

### Reporter's Transcript Of Proceedings

**Appearances**:


For Plaintiff:          Nichols Kaster
                        4600 IDS Center
                        80 South 8th Street
                        Minneapolis, Minnesota  55402
                  By:   **Kai Richter, Esquire**
                        **Paul J. Lukas, Esquire**

For Defendant:          Burke Warren MacKay & Seritella, PC
                        330 North Wabash, 22nd Floor
                        Chicago, Illinois  60611
                  By:   **Stephen R. Meinertzhagen, Esquire**

                        Ropers Majeski Kohn & Bentley
                        201 Spear Street, Suite 1000
                        San Francisco, California  94105
                  By:   **George Geoffrey Weickhardt, Esquire**

*Reported By:*          *Sahar Bartlett, RPR, CSR No. 12963*
                        *Official Reporter, U.S. District Court*
                        *For the Northern District of California*

                  (Computerized Transcription By Eclipse)

1  **Thursday**, **March 24**, **2011**                                    **8:00 a.m.**

2                              P R O C E E D I N G S

3           **THE COURT:**  Now we go to another J.P. Morgan Chase

4  case, Hofstetter versus J.P. Morgan case, case No. 10-1313.

5           How many lawsuits is J.P. Morgan Chase in?

6           **(Laughter.)**

7           **THE COURT:**  Just a rhetorical question.

8           All right, time is short.  I need to ask you to

9  focus on the most important things.  And first, please answer

10  the questions that I sent out yesterday.  Make your

11  appearances, and then we'll get right down to it.

12           **MR. MEINERTZHAGEN:**  Steve Meinertzhagen for the

13  defendants, J.P. Morgan Chase and Chase Home Finance.

14           **MR. RICHTER:**  Kai Richter and Paul Lukas for the

15  plaintiffs, Sheila Hofstetter and Roger Modersbach.  And

16  Mr. Modersbach is here today.

17           **THE COURT:**  Great.

18           Welcome, Mr. Modersbach.

19           And?

20           **MR. WEICKHARDT:**  George Weickhardt, also for the

21  defendants, Your Honor.

22           **THE COURT:**  Okay.

23           Let me hear first -- everyone be seated.

24           Let me hear from the plaintiffs, please.  And just

25  ask -- answer my three questions, and then I'll let you say a

1  few things about the rest of the motion.

2          MR. RICHTER:  Your Honor, I believe the question

3  first went to --

4          THE COURT:  Double recovery.

5          MR. RICHTER:  I'll call it the double recovery

6  issue.

7          And we are not seeking damages plus restitution to

8  the extent that we are talking about the same members of the

9  class, we are not trying to double-dip.  I do think it's

10  important to note, though, that the California case law

11  mentions that restitution is different from damages.  So what

12  we are seeking, to the extent that there is a difference, and

13  clearly, they are related concepts, but to the extent there is

14  a difference, we are seeking the greater of the two, damages

15  and restitution.

16          THE COURT:  All right.  I agree that there could

17  conceivably be some difference, but largely, it's an

18  overlapping thing.  And 17200 is restitution only.  There is no

19  damages under 17200.

20          Now, I don't know if you said that there were

21  damages, but today you said it correctly, there is no damages

22  under 17200.

23          MR. RICHTER:  And we have alleged restitution, Your

24  Honor.  And of all the cases I would point the Court to, since

25  we are on the topic, is the *Lockyear versus Fremont Life*

1  *Company*, a case which establishes that across the board

2  restitution may be awarded, even if all of the class members

3  are not harmed.  And I think the California Supreme Court's

4  decision in the *In Re:  Tobacco 2* case is also consistent with

5  that.  So that is the answer to the first question.

6           **THE COURT:**  All right.

7           How about class notice?

8           **MR. RICHTER:**  Class notice:  Three points on that.

9           With respect to the form of the notice, what we

10 propose is a bill insert to the current customers, which is

11 what the Court did in the *Gutierrez* case.  We think that's the

12 most cost effective way to do it because the defendants would

13 be going ahead and sending out the mail, anyway, so it would

14 just be the incremental cost of adding the insert into the

15 bill.

16          **THE COURT:**  Who would pay --

17          **MR. RICHTER:**  We would be willing to pay for that,

18 Your Honor, the marginal costs of the insert.  We think the

19 defendants, since they are sending out the statements, anyway,

20 they -- you know, they already pay for the postage, they

21 shouldn't get a windfall just because the insert is in there.

22          **THE COURT:**  Well, unless the postage goes up because

23 of the weight of the notice.  I don't know, maybe that could

24 happen.

25          All right, but how about people who are not current

1  customers, what would you do for them?

2          **MR. RICHTER:**  Yes, that's a fair question, Your

3  Honor.

4          With respect to that, what we would suggest is a

5  supplemental mailing of the forms.  And we could do that once

6  the defendant provides us the information -- I guess I'm going

7  into the third question now -- necessary for -- to put together

8  that mailing.  We could then go ahead and send that out.

9          **THE COURT:**  And you would pay for that?

10          **MR. RICHTER:**  Yes.

11          **THE COURT:**  Okay.

12          So on the third question I want to get to something

13  that the lawyers sometimes overlook, and that is you just can't

14  have an amorphous definition.  If we have a class, we need to

15  know the exact names of who is in it and who is not in it so

16  res judicata will be -- we will have an exact way to go into

17  the file and say, okay, Joe Jones in Reno, Nevada, at this

18  address, he was a member of the class, he got the notice, he is

19  bound by this judgment, win or lose.

20          The defendants are entitled to that.  We just can't

21  have this open-ended thing.  So we need to be able to find the

22  names and addresses of every potential class member.  So where

23  do you stand on that?

24          **MR. RICHTER:**  We actually requested that information

25  from the defendants at the very start of the case.  Their

1  position on it was, it's premature, you are not going to get

2  this information, no way, no day, not until the day of class

3  certification.  Well, now we're here to that day, and that

4  information should be turned over and should be produced.

5          **THE COURT:**  Well, we would have to send notices.  If

6  we are going to have a class, we need to know exactly who's

7  going to get it, you know, who to send the envelope to.  So

8  it's got to be done if there's going to be a class.  All right,

9  so you don't have that yet, but presumably the defendants do,

10  if we get that far.

11          All right, so you've answered my three questions.

12  What do you say on the point -- I want to turn to the merits

13  now -- the bank raises the point that the individual issues

14  will predominate because the flood insurance -- I'm not saying

15  this -- the problem of the first mortgage as opposed to the

16  second mortgage, these are these home equity loans are all

17  second mortgages, or is that true?  Maybe not.

18          But anyway, there are some first mortgages out

19  there, and some loans may be -- some flood insurance premiums

20  may be okay because -- you see the point?  What do you say to

21  that argument?

22          **MR. RICHTER:**  A number of things, Your Honor.  And I

23  think it would help:  I've pulled some exhibits that are

24  already in the record.  I've shared this with counsel.

25          **THE COURT:**  You promise me they are all in the

1  record?

2          **MR. RICHTER:**  They are all in the record, Your

3  Honor.

4          **THE COURT:**  All right, I'll look at it.

5          If you have a second one of them, hand it to my law

6  clerk.  I appreciate it.  If you don't --

7          **MR. RICHTER:**  I would be happy to give her mine at

8  the conclusion of this hearing.

9          **THE COURT:**  No, no, that won't be necessary because

10  she can have mine.

11          All right, but go ahead, I'm all ears.  I want to

12  see what you have to say on this.

13          **MR. RICHTER:**  Sure.

14          The first point to that, Your Honor, is it's a

15  complete red herring, because none of the flood insurance was

16  purchased in order to protect any first -- any lender in a

17  first lien position.  And it's clear from Chase's admissions in

18  response to our request to admit, which is the first tab, and

19  if you turn to the last page of the first tab, Richter Exhibit

20  11, Request to Admit 18:

21          "Admit that the flood insurance policies force

22  placed by Chase for its home equity line customers do not name

23  any other lender as an insured or beneficiary.  Admitted."

24          Second:

25          "Admit that the second" -- Request to Admit 19:

1          "Admit that the flood insurance policies force

2     placed by Chase for its home equity loan customers do not name

3     any other lender as an insured or beneficiary."

4               *THE COURT:*  Why isn't that the same question?

5               *MR. RICHTER:*  "Admitted."

6          The distinction --

7               *THE COURT:*  What is the distinction between those

8     two questions?

9               *MR. RICHTER:*  Lines versus loans, Your Honor.

10              *THE COURT:*  Oh, I see, all right.  Okay.

11              *MR. RICHTER:*  So then it's underscored by

12    Ms. Hofstetter's policy, which is in the record, which is the

13    second tab, Hofstetter, Exhibit 7.  So here we have the

14    American Security Insurance Company policy that was force

15    placed by Chase.  There is two insureds named on there:  Chase

16    Home Finance and her former husband, Mr. Hofstetter.

17         Now, here is where it gets really interesting:  If

18    you flip the page, it actually shows, "first mortgagee."  And

19    who is listed as first mortgagee?  Chase Home Finance.

20         So now they want to come into court and say, oh, you

21    know, you have to consider the first mortgagee.  And the policy

22    was there and the policy was there to protect the first

23    mortgagee.  And we had to consider all of that; they didn't

24    even acknowledge that Bank of America was the first mortgagee.

25         Bank of America was not protected under this policy,

9

1   it's not named as an insured.

2            **THE COURT:**  I'm sorry, in this particular example,

3   which looks like Exhibit F.

4            **MR. RICHTER:**  Exhibit 7.

5            **THE COURT:**  Oh, yeah -- oh, 7, all right.  This is

6   the actual policy issued to your client?

7            **MR. RICHTER:**  Correct.

8            **THE COURT:**  All right.  And so the insured mortgagee

9   was Chase Home Finance.  But on the second page, it does call

10  out first mortgagee.

11           **MR. RICHTER:**  Right.

12           **THE COURT:**  I thought you said that they didn't do

13  first mortgagees.

14           **MR. RICHTER:**  The point, Your Honor, is that they

15  say -- and they are correct, there is a first mortgage on

16  Ms. Hofstetter's property, Bank of America has a first

17  mortgage, but this policy didn't protect Bank of America.

18           **THE COURT:**  All right, so why didn't it say second

19  mortgagee on that page?  Why doesn't it -- I see your point, it

20  absolutely does not say B of A, but I'm just curious, where it

21  says first mortgagee, why didn't it say second mortgagee?

22           **MR. RICHTER:**  Well, that's a very good question I

23  think for Chase.  I think they just weren't paying attention,

24  and they weren't considering any other lender whatsoever.  They

25  were only looking out for themselves.  And they just listed

1    themselves as first mortgagee.

2           Now, if you keep going, Your Honor, to the page with

3    the Bates stamp NKA 34, here is what the policy says:

4           "Conditions, Item 3:  Even if more than one person

5    has an insurable interest in the described dwelling property

6    covered, we shall not be liable for an amount greater than the

7    interest of the persons insured under this policy,"

8    underscoring the fact that Bank of America is -- there is going

9    to be no payout to Bank of America under this policy if

10   Ms. Hofstetter had a flood loss.

11          And, interestingly, it goes on, it says.

12          "The mortgagee's interest is represented by the

13   mortgagor's unpaid balance," which is also interesting

14   because --

15          **THE COURT:**  That would be zero.

16          **MR. RICHTER:**  Right.

17          **THE COURT:**  Okay.

18          **MR. RICHTER:**  And then, to underscore the -- so it's

19   totally a red herring.  These policies weren't taken out to

20   protect first mortgagees.  They weren't requested to protect

21   mortgagees.  When Chase sent out its flood insurance notice

22   letters, those form letters, they said -- they didn't say, oh,

23   go put all of your lender's names -- give us all of your

24   lender's names, just make sure if you get your own policy

25   instead of having one force placed on there just make sure

1    Chase is on there.  We don't care about anybody else, we only

2    care about ourselves, Chase.

3            So, you know --

4            **THE COURT:**  Yes, I want to go through all your

5    exhibits, here.

6            All right, Exhibit 52?

7            **MR. RICHTER:**  Yes.  So turning to the third tab, it

8    just underscores the point.  I mean, defendant's counsel has

9    repeatedly asserted in this case that the individual

10   circumstances of particular borrowers are irrelevant to the

11   claims, and specifically, the Court's Rule 23 determination.

12           And not only that, here in the August 10th letter,

13   they say, "discovery relating to flood insurance requirements

14   for first mortgage loans is outside the scope of permissible

15   discovery under Rule 26 because plaintiff asserts no claims

16   against Chase Home Finance or J.P. Morgan Chase Bank arising

17   out of a first mortgage loan."

18           They haven't produced a single first mortgage loan

19   for any class member.  And they certainly haven't produced any

20   underinsured first mortgage loans for other class members.  The

21   only first mortgage loan that they point to in the entire

22   case -- and I should point out that Mr. Modersbach does not

23   have a first lien, his home equity line is in a first lien

24   position, but the only person that they point to is

25   Ms. Hofstetter.  And they say, oh, well, Mr. Hofstetter, her

```
1    loan with Bank of America was underinsured; well, Bank of
2    America didn't require her to take out a policy, so we had to
3    do it.  Number one, that is not why they did it.  But number
4    two, she is not even in a flood zone.
5              They produced no evidence whatsoever that she is in
6    a flood zone and I think it's very interesting that the only
7    testimony from -- on that point is from their own counsel, and
8    their counsel says look at documents Chase 260-something to
9    280-something, 283.  There is nothing in there.  And, in fact,
10   the one document they take out, they take out document Chase
11   270, which is the document that shows her property is outside
12   of the flood zone.  That's why Bank of America didn't require
13   any flood insurance on Ms. Hofstetter's property.  So, that's
14   point number one.  They didn't consider the firsts.  They
15   didn't say --
16              THE COURT:  Now, I'm confused on one point.
17              You don't have a claim, or maybe you do, but are you
18   asserting a claim on behalf of people who are outside the flood
19   zone but they were required to have insurance, anyway?
20              MR. RICHTER:  Chase makes the determination, they
21   say you are in a flood zone or not.  They send out these notice
22   letters to people that they believe are in a flood zone.
23              So to the extent that Chase's demanding flood
24   insurance and representing to people that they are in a flood
25   zone and asking them to pay for it, those people are members of
```

1     the class.  We are not making allegations that --

2              **THE COURT:**  All right, they may be members of the

3     class, but I thought your claim was that the -- under TILA, it

4     was adverse change in terms of the credit agreement.

5              **MR. RICHTER:**  Correct.

6              **THE COURT:**  And not that they were required to

7     pay -- but they shouldn't have been because they were outside

8     the flood zone.

9              **MR. RICHTER:**  The only point, Your Honor, is that

10    it's just a rebuttal point to their point that Bank of America

11    was underinsured.

12             **THE COURT:**  All right, let's go to your next

13    exhibit.

14             **MR. RICHTER:**  That takes care of it on the --

15             **THE COURT:**  All right.

16             **MR. RICHTER:**  On the issue that you raised.

17             **THE COURT:**  So why don't you make one more point,

18    and then I'm going to hear from the other side.

19             **MR. RICHTER:**  Sure.

20             Why don't we march through the binder, then.

21             The other points --

22             **THE COURT:**  We don't have time to go through the

23    binder.  I'm going to let you have a rebuttal later on, but

24    make one more big point.

25             **MR. RICHTER:**  Yes.

1           On the deeds, that is their other lynchpin defense,

2    and, again, they've told us in discovery the deeds don't

3    matter, you don't have any claims that are based on contracts,

4    so the deeds don't matter.  And then they come in a week before

5    class certification, and all of a sudden the deeds are the

6    cornerstone of their defense.

7           **THE COURT:**  Explain that to me.  I don't understand

8    what you are getting at.  Why would they be the deeds --

9           **MR. RICHTER:**  I'm sorry?

10          **THE COURT:**  Why would they be the cornerstone to

11   anything?

12          **MR. RICHTER:**  Well, it doesn't make any sense to me

13   because they sent out the flood insurance letters representing

14   that their requirements were based on federal law.

15          **THE COURT:**  What is it in the deeds of trust that

16   the defense says is so important?

17          **MR. RICHTER:**  If I understand it correctly, what

18   they are saying is that some borrowers had deeds of trust that

19   required them to insure to replacement cost value, and this is

20   their exhibit, it's at Lamar Exhibit 52.  It's Tab 4, okay?

21          Here is the important point, Your Honor on that:

22   The only deeds that they have come forward with, either in the

23   sample that they produced, or even their own cherry-picked

24   deeds, the only ones they have come forward with that required

25   flood insurance to the full insurable value were WaMu deeds.

1    And those WaMu borrowers are not part of the TILA class.  The

2    TILA class is limited to borrowers with J.P. Morgan Chase Bank

3    originated loans and lines.

4             None of those borrowers, in either the sample or the

5    cherry-picked deeds that Chase produced, none of them had deeds

6    of trust or mortgages that required them to insure the

7    replacement cost value or the National Flood Insurance Program

8    limit.  It's a total red herring.

9             **THE COURT:**  I want to go back to something you said

10   earlier.  But you didn't say it very precisely, so let's make

11   sure I understand it.

12            Are you saying that sometime in discovery you

13   specifically called out deeds of trust and they refused to turn

14   them over?

15            **MR. RICHTER:**  Yes.

16            **THE COURT:**  Show me that document request.  Go

17   ahead.

18            **MR. RICHTER:**  It was in our first set of document

19   requests, Your Honor.

20            **THE COURT:**  What did it say?

21            **MR. RICHTER:**  And interrogatories, for that matter.

22            **THE COURT:**  I'd like to know what it is because you

23   have accused them of stonewalling and then using this at the

24   last minute.

25            **MR. RICHTER:**  Sure.

1        **THE COURT:**  And I'm usually sympathetic to that

2   claim, but I want to make sure you actually did ask for it.

3        **MR. RICHTER:**  Yeah.

4        So let me walk the Court through it.

5        It's Lamar Exhibit 3, which is our first set of

6   interrogatories, Interrogatory 9.  It says.

7        "Identify by Bates Number all versions of

8   defendant's home equity line credit agreement and disclosure

9   statement, deed of trust and other documents..." it goes on,

10  "that contains any disclosures, terms, information or demands

11  relating to flood insurance or insurance requirements."

12       **THE COURT:**  What was the response?

13       **MR. RICHTER:**  A lot of objections that take up a

14  page.  But here is an interesting one:

15       "CHF and J.P. Morgan Chase Bank objects to this

16  interrogatory as overly broad, unduly burdensome, and

17  irrelevant to the claims and defenses of any party because

18  plaintiff does not bring any claims relating to the form of her

19  loan documents."

20       **THE COURT:**  What was the -- where can I find that?

21       **MR. RICHTER:**  This is the Lamar declaration, Exhibit

22  3, Interrogatory 9.

23       **THE COURT:**  Exhibit 3, Interrogatory 9, all right.

24       And what was the date of that interrogatory?

25       **MR. RICHTER:**  The date of the response is July 30th,

1    2010.

2                    **THE COURT:**  Okay.

3            Was that ever supplemented?

4            **MR. RICHTER:**  They did supplement by producing, as I

5    mentioned, on the eve of class cert the cherry-picked deeds of

6    trust and mortgages and the documents in the sample.  And

7    that's after we pressed them repeatedly for this documentation.

8            We went -- we have gone to Magistrate Judge

9    Zimmerman at least two times already.

10                   **THE COURT:**  All right.

11           I'll let you make one more point, and then we'll

12   hear from the other side.  And I'll give you a short rebuttal.

13   Go ahead.

14                   **MR. RICHTER:**  I would just -- it's not just

15   Interrogatory 9, it's interrogatory 10:

16           "Identify each member of the proposed class who

17   received each version of the form documents identified by you

18   in response to Interrogatory 11."

19           And if you go on to the document requests, which are

20   Lamar Exhibit 4, Request No. 13 asks for "all nonidentical

21   versions of the form documents identified in Interrogatory

22   No. 9 or your response to Interrogatory No. 9."

23           And then there was also a request --

24                   **THE COURT:**  When you say "on the eve" of this, do

25   you mean two months earlier?  Do you mean one week earlier?

1          **MR. RICHTER:**  No, it's in the record.  I think I put

2    it in with our reply memo --

3          **THE COURT:**  Tell me the date you filed your motion

4    and when you got these.

5          **MR. RICHTER:**  We filed our motion February 17th.

6    And if you look at Exhibit 8 to my second declaration, which

7    was filed March 30th, 11, it shows that the cover e-mail

8    enclosing the deeds from Mr. Lamar, who is one of the opposing

9    counsels in this case, is dated February 10th, 2011, which is

10   one week before we filed our class cert motion papers.

11         **THE COURT:**  Okay, one more point.

12         **MR. RICHTER:**  The other point that I would raise,

13   Your Honor, and it hasn't gotten a lot of attention in the

14   briefing, is the force-placed class.  And it's important to

15   keep in mind that there is two issues in the case:  There is an

16   issue with requiring overinsuring, that is, requiring too much

17   insurance on the property, but there is also an issue with

18   respect to overcharging for flood insurance in any amount.

19   That's what the force-placed subclass is designed to address.

20         Here is how it would work:  You would think Chase

21   would get a volume discount on these force-placed flood

22   insurance policies because they are purchasing them by the

23   bucketful, but the truth is exactly the opposite:  The policy

24   that Mr. -- that was force placed on Mr. Modersbach was two

25   times the cost of the policy that he ultimately independently

1   obtained on his behalf.  And Chase admits in its notice letters

2   that its policies cost "much higher," those are its words.

3           **THE COURT:**  Well, but Chase will come back and say,

4   well, they were on notice that they were going to get gouged.

5   And so they were fully warned upfront, we are going to gouge

6   you if you don't go get it on your own.

7           **MR. RICHTER:**  Well, but that's a question of

8   fairness.  Is it fair -- is that a license to gouge somebody?

9           **THE COURT:**  I don't know.  That is a question of law

10  or maybe for the jury.  But it's not like they hid it from you.

11  Mr. Hofstetter had a clear-cut letter that said, we are going

12  to charge you more than if you go out and buy it on your own.

13          **MR. RICHTER:**  Here is what was hidden, though, and

14  here is -- there is more to this story.

15          Chase had an arrangement with American Security

16  Insurance Company, and here is the sweetheart deal that they

17  cut:  We'll purchase all of our force-placed flood insurance

18  policies from you, you will be the sole provider.  That's in

19  something called the Compliance Plus Insurance Agreement.  That

20  is Exhibit 21 to my declaration, and it's at Section 4.

21          In return, in something called the Compliance Plus

22  Insurance Agency Agreement *(demonstrating quote marks with*

23  *hands)* American Security Insurance Company agreed to give a

24  kickback to Chase.  And from 2007 to 2009, that kickback, or

25  commission, which went to Chase's affiliate, was 20 percent.

1    20 percent:  That is why those costs were inflated, Your Honor.

2              **THE COURT:**  Is this all alleged in your complaint?

3              **MR. RICHTER:**  It's all in there, Your Honor.

4         There are at least a half dozen times in the second

5    amended complaint where we refer to charging borrowers inflated

6    premiums or to the commissions.  It's all over the complaint.

7              **THE COURT:**  So what part was not disclosed?  They

8    did disclose that it would be more expensive; did they also

9    disclose it was an affiliate?

10             **MR. RICHTER:**  They did disclose it was an affiliate,

11   and they disclosed that an affiliate may receive a commission.

12   They didn't say how much the commission was.

13             And regardless of the disclosure issue, Your Honor,

14   it's just plain unfair to gouge borrowers for this insurance.

15   And here is another reason why, The Federal Flood Insurance

16   Guidelines.  Here is what they say, this is at 12 C.F.R. 22.7:

17   They say you can charge the borrowers for this force-placed

18   coverage for costs incurred.

19             Now I mean, I suppose they can come in here and say,

20   well, you know, it doesn't really mean net costs incurred, it

21   means gross costs incurred.  But they weren't charging for

22   costs incurred, they were getting that 20 percent back.

23             And then they say, well, we stopped taking the

24   commissions for lines after 2010, and I don't want to get into

25   a long story about that, we addressed that in the briefing --

1          **THE COURT:**  What do they say on that?

2          **MR. RICHTER:**  Well, they say that they stopped

3    receiving commissions in 2010 because of the changes in the --

4    because they were increasing their flood insurance requirements

5    for borrowers with home equity lines, and they stopped taking

6    the commissions for the lines.  They never said they stopped

7    taking the commissions for the loans, those commission are

8    still in place.

9          Here's what's interesting about that:  First of all,

10   just eight days after the December 23rd policy change, they

11   enter into a letter agreement with American Security Insurance

12   Company -- and this is all in the record -- they enter into a

13   letter agreement providing for commissions of up to 15 percent.

14         That's just eight days after the policy change, so

15   they can't say they were, you know, foreswearing commissions

16   because of the policy change because they were entering into a

17   letter agreement providing for them just days later.

18         Then, when they finally got around to negotiating a

19   new agency agreement, this Compliance Plus Insurance Agency

20   Agreement, for the period from 2010 going forward, they finally

21   reached that agreement.  I don't remember the exact date, but

22   it was sometime in the second half of 2010, August, September,

23   in there.

24         I can't give you an exact date because they

25   backdated the agreement to January 1st, 2010, but even in that

```
 1   agreement, and this is Exhibit 24 to my declaration, the
 2   Compliance Plus Insurance Agency Agreement effective
 3   (demonstrating quote marks with hands) as of January 1, 2010,
 4   provides for a commission of 10 percent of net written premiums
 5   on both loans and lines.  There is no distinction.
 6           So, now, they come in here and they say, well, we
 7   gave up commissions on the lines:  There is no evidence of
 8   that, none.  I -- except Mr. Wheeler's testimony.  He said that
 9   he had some memo, or something like that, that --
10           THE COURT:  Why haven't you gone and taken
11   discovery?
12           MR. RICHTER:  What's that?
13           THE COURT:  Why haven't you gone and taken
14   depositions on this?
15           MR. RICHTER:  I have taken depositions on this, Your
16   Honor.  They have not -- we have asked them, our second set of
17   document requests, which are Exhibit 25 to my declaration, we
18   asked them everything.
19           I mean, I heard the comment about scorched Earth
20   discovery, we had scorched Earth discovery requests on the
21   issue of their financial incentives because we were interested
22   in it, and we knew the Court was interested in it, based on the
23   comments at the September 1st discovery hearing.  And other
24   than producing these Compliance Plus Insurance Agency
25   Agreements and the letter agreements, that's all we got.
```

```
1   That's all we got.

2            And I went through this, about ten pages through

3   Mr. Wheeler's deposition, where I'm asking him questions, did

4   anybody ever show this request to you, did anybody ever show

5   that request to you, did you ever look for this stuff, and the

6   answer was, essentially, no.

7            THE COURT:  What did Judge Zimmerman say about that?

8            MR. RICHTER:  I'm sorry?

9            THE COURT:  Did you bring a motion before

10  Judge Zimmerman?

11           MR. RICHTER:  When we took Mr. -- I would say we are

12  about to.

13           I mean, when we took Mr. Wheeler's deposition, it

14  was shortly before the class cert motion deadline.  And, you

15  know, frankly, we got bogged down in the class certification

16  motion briefing.  But believe it, we are still very interested

17  in that, and we plan to pursue it.

18           THE COURT:  All right.

19           Let me hear from the other side, and then I'll give

20  you a short rebuttal.

21           MR. MEINERTZHAGEN:  Your Honor, would you like me to

22  begin responding to plaintiff's argument, or would you like me

23  to begin with --

24           THE COURT:  Well, let me ask you a few questions.

25           What is the answer to what we were just talking
```

1  about?  When, if ever, did Chase stop taking commissions on

2  these transaction, both as to lines and as to loans?

3            **MR. MEINERTZHAGEN:**  January 1, 2010 for home equity

4  lines and loans.  It still receives -- well, when you say

5  "Chase," Your Honor, neither of the defendants gets any

6  commission.

7            **THE COURT:**  Who was it that got the commissions?

8            **MR. MEINERTZHAGEN:**  Chase Insurance Agency.

9            **THE COURT:**  All right, well, then, when did that

10  entity stop taking commissions on lines and/or loans?

11            **MR. MEINERTZHAGEN:**  January 1st, 2010.

12            **THE COURT:**  For both?

13            **MR. MEINERTZHAGEN:**  Both home equity lines and

14  loans, not first mortgages.  It still gets a commission, I

15  believe it's 10 percent.  But first mortgages are the subject

16  of the practices that the plaintiffs are complaining about

17  here.

18            And I would also submit that receiving a commission

19  isn't anything that is prohibited because it has no effect on

20  the ultimate price of the force-placed insurance.

21            When Chase Insurance Agency stopped receiving a

22  commission January 1st, 2010, it had absolutely no effect on

23  the premium costs that ASIC charges, and that is because ASIC

24  can only change one rate in every state.

25            ASIC doesn't just provide force-placed insurance to

1   Chase Home Finance customers, it provides it to many other

2   lenders.  And it can't have multiple rates for the same

3   coverage --

4           **THE COURT:**  The insurance company that provided the

5   flood insurance, is that an affiliate?

6           **MR. MEINERTZHAGEN:**  No.

7           **THE COURT:**  So was it disclosed -- I thought

8   something was disclosed about an affiliate.  What was it that

9   was disclosed?

10          **MR. MEINERTZHAGEN:**  That an affiliate may receive a

11  commission.

12          **THE COURT:**  All right.

13          **MR. MEINERTZHAGEN:**  Or that an affiliate has

14  received a commission.

15          **THE COURT:**  Okay, let's go to whatever other points,

16  including your main points, about why there should not be --

17  you know, I want to make something clear:  Just because

18  certification occurs does not mean you lose the case.

19          **MR. MEINERTZHAGEN:**  I know, Your Honor.

20          **THE COURT:**  And there have been plenty of cases

21  where class cert has been granted, and then the class loses.

22  So I don't want you to think that because certification may be

23  granted that that means that you lose on the merits, that's a

24  wholly different -- maybe you do, maybe you don't.

25          **MR. MEINERTZHAGEN:**  Your Honor, I appreciate that.

1          **THE COURT:**  But, I mean, let me just ask you -- I'll

2     tell you some of my concerns.

3          It does seem to me that the class, the TILA class,

4     has a legitimate right to go forward as a class because there

5     is a limited number of forms -- everyone was subject to the

6     same type of letter.  And the only thing that you have raised

7     that could possibly be an individualized issue is this thing

8     about the first mortgages.

9          And now I'm inclined to think that's a red herring.

10     And I'm very upset if this is true, that you stonewalled on

11     discovery until one week before the class cert, when they asked

12     for it way before July.

13          **MR. MEINERTZHAGEN:**  Your Honor, can I --

14          **THE COURT:**  Many judges forget about the discovery

15     defalcations, not me, because I practiced for 25 years.  I was

16     the victim of every discovery trick in the book because I did

17     exactly that kind of work that you do and the plaintiffs do

18     here.

19          So I am very sensitive, and I understand thoroughly

20     the gimmick of stonewall, stonewall, stonewall, turn over just

21     enough on the eve of when it counts, and then make it sound

22     like you've been a saint all along when, if what the plaintiffs

23     are telling me, you were the devil.  You were stonewalling,

24     stonewalling, stonewalling, and then whenever it was to your

25     convenience, you decided to turn over a limited number of these

1    first deeds.

2            So I'm not saying I buy that yet, but I'm inclined

3    to buy it unless you can talk me out of it.

4            **MR. MEINERTZHAGEN:**  Okay, Your Honor.

5            **THE COURT:**  All right, so that's your biggest

6    problem.  Go ahead.

7            **MR. MEINERTZHAGEN:**  May I -- I will begin by -- and

8    I appreciate your discussion of how this isn't the decision on

9    the merits at class certification.  And so I'm going to focus,

10   when I get to my argument about the most important parts, why I

11   think class certification here is appropriate.  And I will not

12   touch on the merits unless they overlap with the class

13   certification issues.

14           But let me again, since you seem interested in the

15   issue, with plaintiff's claim that there was stonewalling with

16   respect to the production of the deeds of trust.

17           Now, plaintiffs asked for loan-level information,

18   including all of the loan documents for all members of the

19   putative class.  Now, as you may recall from the second amended

20   complaint, the putative class is alleged to be any mortgage

21   borrower, whether it's a home equity, first mortgage, whatever,

22   serviced by Chase Home Finance in the United States that's in a

23   special flood hazard area.  There is about 500,000 of those.

24   Plaintiffs requested loan-level detailed information and loan

25   documents for all of them.

1          Now, it's true that plaintiffs also asked for the

2     forms of the loan origination documents, and what we told them

3     was that there is no way to identify, there is no coding system

4     to identify each of the forms, you actually have to go and look

5     in each loan file.

6          **THE COURT:**  Well, you were able to do it for

7     purposes of this motion.

8          **MR. MEINERTZHAGEN:**  Well, that's exactly right, Your

9     Honor because --

10         **THE COURT:**  Well, then, why didn't you do it way

11    back then in July whenever they were asking for it?

12         **MR. MEINERTZHAGEN:**  Because when we offered to

13    provide a sampling, Your Honor, which was the only way to

14    effectively do this, they didn't say, okay, let's do the

15    sampling.

16         We made an offer to provide a sampling of documents,

17    it wasn't acceptable to them.  When they finally agreed to it,

18    that's when we produced the sampling.

19         **THE COURT:**  Is any of this in the record under oath

20    someplace so I can read your version under oath?

21         **MR. MEINERTZHAGEN:**  Your Honor, I'm not -- I can

22    tell you this also, there are no pending discovery disputes in

23    front of --

24         **THE COURT:**  That doesn't matter.  If they make a

25    legitimate request that wasn't overbroad and you stonewalled on

```
 1   it --
 2              MR. MEINERTZHAGEN:  Your Honor.
 3              THE COURT:  I don't make them make a motion, that's
 4   too much.
 5              MR. MEINERTZHAGEN:  Well, Your Honor --
 6              THE COURT:  I'll just penalize you, because I'm
 7   going to hold you responsible for the late discovery if I think
 8   that you've stonewalled.
 9              MR. MEINERTZHAGEN:  Your Honor, we made an offer to
10   produce a random sampling --
11              THE COURT:  Where is that in the record?  Is that in
12   the record?
13              MR. MEINERTZHAGEN:  It's not part of class
14   certification, but it's probably still in the record.
15              THE COURT:  No, I mean, on the record of this
16   motion -- maybe I'll give you a chance to supplement tomorrow
17   and tell me what your side of this story is, but this is
18   important to me.  I don't like stonewalling and then flip-flop.
19              Since it's not the record, by noon tomorrow, today
20   is Thursday, by noon tomorrow you can submit your side of this
21   story of the stonewalling.
22              MR. MEINERTZHAGEN:  On the deeds of trust?
23              THE COURT:  Deeds of trust, yeah.
24              MR. MEINERTZHAGEN:  Thank you, Your Honor.
25              THE COURT:  And then I'm going to give until Monday
```

1    at noon for a reply.

2              **MR. MEINERTZHAGEN:**  That's fine, Your Honor.

3              **THE COURT:**  And everything has got to be under oath.

4              **MR. MEINERTZHAGEN:**  Everything will be under oath,

5    Your Honor.  And what it will show is that on December 10th

6    defendants offered to provide a sampling of loan documents; the

7    plaintiffs didn't respond to that offer until December 28th.

8    The following day, the production was made.

9              **THE COURT:**  Maybe.  Maybe, I don't know.

10             **MR. MEINERTZHAGEN:**  What caused that delay in part,

11   Your Honor, was that in order to do the sampling, the

12   plaintiffs then requested a listing of every home equity loan,

13   all 80,000 of them.

14             **THE COURT:**  But if they ask for the forms --

15             **MR. MEINERTZHAGEN:**  But there aren't -- you have to

16   look at the loan files.

17             **THE COURT:**  No, no, no.  If they ask for the forms,

18   that's -- you could have given them the forms, even if it was

19   hard to connect them up with individual files.  You could have

20   given them the forms so they could start seeing the language

21   that was being used.  So you held that hostage to coming up

22   with some bigger agreement.

23             **MR. MEINERTZHAGEN:**  We didn't hold it hostage, Your

24   Honor, we have been producing various forms.

25             **THE COURT:**  Well, when did you produce those forms?

1    One week before this motion.

2              **MR. MEINERTZHAGEN:**  That's when we produced the

3    random sampling of loan documents that the plaintiffs

4    specifically identified to be requested, okay?  We also

5    produced additional forms prior to that.  We will lay it all

6    out, Your Honor.  I'm sorry --

7              **THE COURT:**  Let's go to your other issues because

8    that one we are not going to solve today.

9              **MR. MEINERTZHAGEN:**  Okay.

10             With respect to plaintiff's argument that the --

11   that the first mortgage is a red herring for some reason

12   because the first mortgagee isn't identified as an additional

13   insured or a named insured in the force-placed insurance

14   policies, I would like to address that.

15             **THE COURT:**  What do say to that?

16             **MR. MEINERTZHAGEN:**  What I say to that, Your Honor,

17   is the plaintiffs have a fundamental misunderstanding of how

18   flood insurance works.  It works like hazards insurance:  A

19   claim, a flood claim gets paid for the benefit of the customer.

20   The borrower gets the check, deposits it, and then the lender

21   monitors disbursements to ensure that they are used to pay for

22   the claim.

23             If -- it doesn't matter who's identified in the

24   policy of insurance, the lender who is in the first position

25   always benefits first because they are the ones who have the

1    first lien on the security.

2              Now --

3              **THE COURT:**  Why did they call out any bank?

4              **MR. MEINERTZHAGEN:**  Pardon me?

5              **THE COURT:**  Why do these policies call out any bank?

6    The one I was looking at a minute ago -- let me get it back

7    again.  It called out -- the one for our plaintiff here seems

8    to have called out as a first mortgagee Chase Home Finance.

9              **MR. MEINERTZHAGEN:**  Well, that's --

10             **THE COURT:**  "Named insured mortgagee."

11             **MR. MEINERTZHAGEN:**  Yes, Your Honor.  You have a

12   company --

13             **THE COURT:**  This is the one that your own

14   force-placed company did.

15             **MR. MEINERTZHAGEN:**  Exactly.

16             **THE COURT:**  It's not like they invented the form.

17             **MR. MEINERTZHAGEN:**  Exactly.

18             **THE COURT:**  Your own form says, "named insured

19   mortgagee."

20             **MR. MEINERTZHAGEN:**  Right.

21             **THE COURT:**  And then, "additional insured,

22   David Hofstetter."

23             **MR. MEINERTZHAGEN:**  That's correct.

24             **THE COURT:**  All right, so where does it say anything

25   about what you just said?  Give me your version -- point me to

1      the language --

2              **MR. MEINERTZHAGEN:**  Well, Your Honor, it is the

3      mortgagee, Chase Home Finance is the mortgagee --

4              **THE COURT:**  -- that supports your version.

5              **MR. MEINERTZHAGEN:**  It is the mortgagee.  Chase Home

6      Finance is the mortgagee here.  Chase Home Finance is the

7      entity who is requiring the force-placed insurance to be

8      obtained.  It's the one that obtained the force-placed

9      insurance when Mr. -- when Mr. and Mrs. Hofstetter failed to

10     obtain their own insurance.  So that's why it's the additional

11     named -- or why it's the named insured mortgagee.

12             **THE COURT:**  Look, I mean, you were holding out to me

13     just a minute ago that the money goes to David Hofstetter.

14             **MR. MEINERTZHAGEN:**  Right.

15             **THE COURT:**  Read what it says.

16             **MR. MEINERTZHAGEN:**  Well, Your Honor --

17             **THE COURT:**  It says.

18             "The above named insured mortgagee," which is the

19     bank, "is authorized to act for such additional insured," which

20     is Mr. Hofstetter, "in all matters pertaining to," you know,

21     the insurance.

22             So when American Security Insurance Company pays

23     anything out, they are going to pay it to Chase Home Finance.

24             **MR. MEINERTZHAGEN:**  That is not true, Your Honor,

25     that is not true.  When they pay a claim, it gets paid -- a

```
 1   check is jointly made to the borrower and to Chase Home

 2   Finance.  It then gets deposited into an escrow and disbursed

 3   to the borrower as repairs are made.

 4            THE COURT:  So --

 5            MR. MEINERTZHAGEN:  But this is about the claims

 6   handling process.

 7            THE COURT:  What if there are no repairs made?  What

 8   if they just walk away?

 9            MR. MEINERTZHAGEN:  Well, if they just walk away,

10   there may be an issue with the disbursement, there may not be.

11            But the bottom line is, you don't name the first

12   lien holder because Chase doesn't have that information.

13   That's the reason it says in second lien position lender making

14   the decision the insurance has to be force placed.

15            Now, Ms. Hofstetter had a --

16            THE COURT:  Look, that doesn't make any sense.

17   Think about it:  Let's say that there was a loan to B of A as a

18   first for $1 million, and then there was a second home equity

19   line that Chase issued for $100,000, so Chase comes along and

20   says, okay, we got to have flood insurance, $100,000, the

21   premium is "X."  And they don't bother to find out if there is

22   a first mortgage on it or not.

23            So then the flood comes, and under your theory, that

24   $100,000 is all going to go to the benefit of Bank of America.

25            MR. MEINERTZHAGEN:  It's going to go to the benefit
```

1    of the borrower.

2              **THE COURT:**  Only if they do repairs.

3              But under that scenario, you are not insured at all.

4    If Mr. Hofstetter, under that scenario decides, look, I don't

5    even want to rebuild, I don't want to make any repairs, I'll

6    just take the money.  And then Bank of America says, okay, pay

7    me.  So they pay Bank of America the $100,000, and Chase is

8    saying, why did we ever do that in the first place?  We didn't

9    get anything out of this.

10             **MR. MEINERTZHAGEN:**  They complied with the NFIA,

11   Your Honor.

12             **THE COURT:**  Chase didn't even have this in mind.

13   There is not a stitch of evidence that they were ever thinking

14   about the first mortgage.  In fact, your own interrogatory

15   answers say that.

16             **MR. MEINERTZHAGEN:**  Our interrogatory answers admit

17   that the insurance policies don't identify the first mortgagee.

18             Now, typically a borrower, when they get a cycle

19   letter from Chase telling them to provide proof that they have

20   flood insurance, provide their flood insurance policy that does

21   identify the first mortgagor.

22             This only happens in the force-placed situation,

23   where the borrower does not provide proof of insurance on the

24   first mortgage, or proof of their own flood insurance, whether

25   purchased themselves or provided by their first lender.  But

1  the bottom line is, when you are assessing the amount of

2  appropriate required flood insurance --

3          *THE COURT:*  How are you going to prove that at

4  trial, how are you going to prove the amount of the first?

5  It's going to be your burden.

6          *MR. MEINERTZHAGEN:*  No, it's not, Your Honor.

7          *THE COURT:*  I'm not going to make them prove some

8  out-of-left-field issue that is your burden.

9          *MR. MEINERTZHAGEN:*  Why is that our burden, Your

10  Honor?

11          *THE COURT:*  It's your burden because you're bringing

12  it up.

13          *MR. MEINERTZHAGEN:*  Your Honor --

14          **(Simultaneous colloquy.)**

15          *THE COURT:*  You don't even have the proof to prove

16  it up for anybody.  Maybe one or two you are going to come

17  up -- it will be your burden, it's not their burden to prove

18  that -- this is an issue that has come out of left field.

19          *MR. MEINERTZHAGEN:*  It has not come out of left

20  field, Your Honor.  The 2009 Interagency Q & A said that a

21  second lien holder cannot rely upon the line amount or the

22  unpaid principal balance of a home equity line or loan without

23  taking into consideration the amount of the first mortgage.

24          *THE COURT:*  How come your notice letters didn't say

25  that?

1           **MR. MEINERTZHAGEN:**  Because we have no way of

2     figuring that out, Your Honor.

3           **THE COURT:**  Well, no, you could have asked for the

4     information.  You could have done some work on it.  Instead,

5     you were happy to limit it to your loan.

6           **MR. MEINERTZHAGEN:**  Well, it's true, Your Honor, the

7     only way we could get that information is from the borrower;

8     however, you have an issue of getting responses.  You also have

9     alternatives that are reasonable under the regulations

10    promulgated under the NFIA.

11          Now, in assessing class certification here, Your

12    Honor, the two -- there are really two different challenged

13    practices that the Court should concentrate on.

14          **THE COURT:**  Yes?  What do you think they are?

15          **MR. MEINERTZHAGEN:**  The challenged practices are the

16    ones that Ms. Hofstetter challenges, is requiring a home equity

17    line of credit customer with a zero balance and zero available

18    credit, which is her situation, to maintain any amount of flood

19    insurance.

20          Now, that practice only applies to borrowers with

21    home equity lines of credit.  It can't apply to borrowers with

22    loans, whether home equity loans or first mortgage loans,

23    because they would never have available credit and they would

24    never have a zero balance.  It can only be a situation in a

25    home equity line of credit.

1          Mr. Modersbach challenges a very different practice.

2     The practice that he challenges is the decision in December of

3     2009 for Chase to drop the requirement of the unpaid principal

4     balance or line amount for home equity lines and loans in

5     determining the minimum amount of flood insurance that was

6     required.

7          Now, this practice applied to home equity lines and

8     loans, it did not apply to first mortgages.  Chase's practices

9     with respect to first mortgages continue to this day to

10    include, as one of the criteria, an analysis of the unpaid

11    principal balance.  It's not purely the unpaid principal

12    balance, it's the unpaid principal balance, if it's at least

13    80 percent of the replacement cost value of the building.

14         Now, given these two practices, Your Honor, these

15    two different practices, the proposed classes that plaintiffs

16    identify in their motion for class certification, are not tied

17    in any way to those practices.

18         The California UCL class that they propose consists

19    of all Chase customers with loans or lines, regardless of

20    whether they are home equity or first mortgage loans, who are

21    required to maintain flood insurance in any amount from 2006 to

22    the present.  There is no relationship between that class in

23    either of the challenges, either of the practices that either

24    Ms. Hofstetter or Mr. Modersbach challenges.

25         With respect to the TILA class, Your Honor, it's

1    alleged to consist of all customers with home equity --

2    plaintiffs have somewhat changed it in their reply brief, but

3    all customers with home equity lines originated before December

4    of 2009, which is the date of Chase's change in procedures for

5    home equity, who are required to maintain flood insurance in

6    any amount after 2009.

7          Now, that's not tied in any way to Ms. Hofstetter's

8    challenged practice.  But with respect to Mr. Modersbach's

9    challenged practice, it's massively overbroad because it

10   doesn't seek in any way to distinguish those borrowers who

11   actually paid anything different before the policy change in

12   2009 versus what they paid afterwards.

13         Now, with respect -- and my time is short, Your

14   Honor, so I will concentrate on the UCL claim, though I think

15   the factors are very similar for the UCL and TILA claims, but

16   for the unfair UCL claim, there has to be a tethering to a UCL

17   policy in order for a finding in unfairness.

18         Here, the plaintiffs have identified the policy

19   under the NFIA, and it's actually under a regulation under it

20   that lenders should avoid creating situations where a building

21   is overinsured.  That's the policy that they are using to

22   tether to their unfair claim.

23         Now, this Court has ruled that issues such as FEMA's

24   own guidance that the best practice is to require insurance,

25   flood insurance up to the replacement cost value of the home,

1   is highly relevant to an unfairness analysis.

2           **THE COURT:** Why doesn't this go to the merits?

3           **MR. MEINERTZHAGEN:** Because, Your Honor, it will go

4   to the merits of each class member's claim, Your Honor, to

5   prove Mr. Hofstetter's claim.

6           Many issues will have to be decided, such as the

7   amount of flood insurance that was required in relation to

8   things like the replacement cost value of his home, the terms

9   of his deed of trust.

10          Now, I know you are concerned about the discovery

11  issue with the deeds of trust, but the bottom line is this,

12  Your Honor:  We produced, at plaintiff's request, 74 different

13  deeds of trusts.  We redacted the borrower information, but

14  they were randomly selected using plaintiff's methodology.

15          Of those 74 deeds of trust for home equity, 53 of

16  them either required the borrower to maintain flood insurance

17  up to the replacement cost value of their home, which is more

18  than the NFI minimum, or in the amount of any available line,

19  any available home equity loan plus the unpaid principal

20  balance of any first mortgage.

21          The Court's going to have to consider those for

22  Mr. Modersbach.

23          **THE COURT:** The greater of or the lesser of?

24          **MR. MEINERTZHAGEN:** Pardon me?

25          **THE COURT:** Did the deeds say the greater of or the

1  lesser of those two things?

2          **MR. MEINERTZHAGEN:**  Different deeds -- some of the

3  deeds of trust said -- said not lesser of, one or the other.

4  There were 25 that said replacement cost value, there were 28

5  that said the line or loan amount plus the amount of any first

6  mortgage.  But the bottom line is, there is no class-wide

7  method of proving any of this.

8          The Court --

9          **THE COURT:**  Well, are there -- I mean, maybe you

10  could have a class where -- this is hypothetical, not this

11  case -- but you could have a class where you have three methods

12  that would cover everyone.  It doesn't have to be the identical

13  method of proof for every single member of the class, as long

14  as you have manageable, say, three, I'm not saying that would

15  be the limit, three class-wide -- not class-wide, three methods

16  of proof that would eventually cover all, every single member

17  of the class, so that would be a fair way to do it.

18          **MR. MEINERTZHAGEN:**  But there wouldn't be three.

19          **THE COURT:**  How many do you think there would be?

20          **MR. MEINERTZHAGEN:**  I can't begin to guess, because

21  let me tell you what the different factors would be, and I'm

22  not a statistician, so I don't know how to turn that into the

23  number of possible different situations, but I would submit

24  that everyone is going to be pretty unique.

25          You have to look at the replacement cost value.  You

1   have to look to see if there was any change in the amount of

2   flood insurance that was required before 2009 and after 2009.

3   You have to look at the existence and the amount of any first

4   mortgage that the borrower had.  And that is not information

5   that Chase has.

6         You have to look at whether, as you indicated in one

7   of your earlier opinions in the case, whether the amount

8   required was a little bit more or a lot more than the minimum

9   requirement under the NFIA.  And you also have to look at

10   whether there was a paid loss.

11         Obviously, if there is a paid loss, you have a

12   fundamental conflict, those people would have to be excluded

13   from the class because they benefited from the practice that is

14   being complained of.

15         ***THE COURT:***  All right, I got to bring this to a

16   close, the court reporter has been going an hour and a half.

17         We are going to take a break.  When we come back,

18   I'll let you make one more point, and then we'll hear from the

19   plaintiff.  And then this will be under submission.  But the

20   court reporter can't go more than 90 minutes.

21         Okay?

22         ***MR. MEINERTZHAGEN:***  Thank you, Your Honor.

23         ***THE COURT:***  Thank you.

24              **(Recess taken at 9:29 p.m.)**

25            **(Proceedings resumed at 9:50 a.m)**

1          **THE COURT:**  All right, one more point by the

2     defense.

3          **MR. MEINERTZHAGEN:**  Your Honor, during the course of

4     this litigation and in response to a directive by Magistrate

5     Judge Zimmerman, the defendant previously agreed that they

6     would not oppose certification of the class of 0/0 borrowers,

7     like Ms. Hofstetter, with lender-placed insurance who had no

8     first mortgage.

9          Now, there would not be any overwhelming individual

10    issues with respect to such a class, but the problem is that

11    Ms. Hofstetter, herself, is an inadequate representative of

12    that class because she has a first mortgage lien, meaning that

13    she's required to have flood insurance on her property.

14         And her claim's atypical because of that and also

15    because, as raised for the first time in plaintiff's reply

16    brief, she now claims that she's not in a special flood hazard

17    area at all.

18         Now, with respect to any claims of Mr. Modersbach, I

19    don't see how a class can be certified, because while he has

20    certain claims, for instance, he can't have a 23(b)(3) claim,

21    or he can't be a 23(b) representative of the UCL claim because

22    there is no restitution, he paid premiums to an insurer of his

23    own choosing, the California State Automobile Association.

24         But with respect to any of his claims, individual

25    issues would completely overwhelm.  There would be no way to

1   have all of the different class members asserting claims based

2   upon this change in procedures in 2009 adjudicated in one

3   proceeding because all of these different factors, like the

4   language in the deeds of trust, the amount of the first

5   mortgage, its existence, the replacement cost value, whether

6   there was a claim, et cetera, all have to be decided separately

7   for each class member.

8           The only other thing I would add, Your Honor,

9   because you said make one point, is that plaintiffs have

10  asserted in their reply that they -- that injunctive relief is

11  available under TILA, it is not.  No (b)(2) class is available

12  under TILA.  And I would be happy to provide the Court with

13  additional authority on that precise point, if you would like.

14          *THE COURT:*  Well, wouldn't declaratory relief be

15  available?

16          *MR. MEINERTZHAGEN:*  Not under TILA, Your Honor.

17          *THE COURT:*  Why not?  Why can't you have a -- you

18  could have a class where the only issue is whether or not there

19  was unlawful change in policy and just declare the rights of

20  the class.

21          *MR. MEINERTZHAGEN:*  All you can get is actual

22  damages.

23          *THE COURT:*  Well, where does it say that?  Is there

24  some District Court decision you are going to give me, or is

25  there a Ninth Circuit decision?

1    **MR. MEINERTZHAGEN:**  There is an Eleven -- one

2  circuit court decision on this issue, and it is cited in our

3  brief.  There are District Court decisions from this district,

4  however, that also support that.

5    **THE COURT:**  All right, the Eleventh Circuit case is

6  what?

7    **MR. MEINERTZHAGEN:**  The Eleventh Circuit case is

8  cited in our brief, Your Honor.  It's -- I'm trying to find the

9  District Court cases.

10    **THE COURT:**  I don't want the District Court cases, I

11  want either Ninth Circuit Supreme Court, and failing that, some

12  Court of Appeals somewhere.

13    **MR. MEINERTZHAGEN:**  The --

14    **THE COURT:**  Or the statute; does the statute

15  specifically say it's not available?

16    **MR. MEINERTZHAGEN:**  The statute doesn't say what's

17  not available, it says what is available, Your Honor.

18    And the Eleventh Circuit case is ***Christ versus***

19  ***Beneficial Corp.***  But it's in our brief; do you want the cite?

20    **THE COURT:**  I don't have your brief, so give me the

21  cite.

22    **MR. MEINERTZHAGEN:**  547 F.3d 1292.

23    **THE COURT:**  That's good enough.

24    **MR. MEINERTZHAGEN:**  Do you want the Northern

25  District cases?

```
 1              THE COURT:  No, no, don't want that.

 2              MR. MEINERTZHAGEN:  Okay.

 3              THE COURT:  All right, I will hear from the other

 4    side.

 5              MR. MEINERTZHAGEN:  Your Honor, if there is just one

 6    point I could raise with respect to the issues in your memo

 7    before --

 8              THE COURT:  All right.  Yes, what do you want to

 9    say?

10              MR. MEINERTZHAGEN:  With respect to the point -- to

11    the class notice, without knowing what that notice is going to

12    look like, I can't say that it makes sense to have it included

13    as simply a billing insert.  And there is a number of reasons

14    for that, one of which you pointed out is that the class, and I

15    don't know until a class is decided and what it is, but there

16    may be customers who no longer have accounts.

17              There is also an issue because bills are often not

18    generated unless a payment is made.  If there is no account

19    activity, a bill won't generate.  So these are issues that are

20    going to have to be considered.  I'm sure we can work something

21    out.

22              THE COURT:  There is another thing that I have

23    noticed in this job, and class action lawyers ought to know

24    this:  It's important that the notice come in an envelope

25    calculated to make sure it will be opened and dealt with.  And
```

1    maybe putting it in a bill is okay in that respect, but I don't

2    think like things that are going to be tossed in the junk pile.

3            **MR. MEINERTZHAGEN:**  Your Honor, our preference would

4    be, we would urge the Court not to require it to be in a

5    billing.

6            **THE COURT:**  Well, I'm not going to say yes or no on

7    that -- all right, thank you.

8            Okay, let's hear from plaintiff.

9            Is it true that Modersbach -- Moderzbach did not get

10   force-placed --

11           **MR. RICHTER:**  He did get forced-place, he got

12   force-placed twice.

13           On each occasion after he was force placed, he then

14   went out and took out his own insurance policy so that he

15   wouldn't have to pay the premiums for the Chase inflated --

16           **THE COURT:**  All right, so but he bought his own,

17   they didn't buy it for him?

18           **MR. RICHTER:**  They did, but after they did, he went

19   out and purchased his own policy, and then Chase canceled the

20   force-placed policy.

21           **THE COURT:**  So how was he damaged by that?

22           **MR. RICHTER:**  With respect to the -- he was damaged

23   because he had to incur premium charges when they took him from

24   $100,000 worth of coverage to $250,000 worth of coverage.  He

25   was damaged because he had to pay premiums.

1          **THE COURT:**  Yes, but that's a different claim.

2          You got a class in here that you want for the people

3     who were the victims of the kickbacks.

4          **MR. RICHTER:**  Yes.

5          **THE COURT:**  He is not a victim of a kickback.

6          **MR. RICHTER:**  He did have his premiums refunded.

7     Sheila Hofstetter, however, is the victim of a kickback.

8          **THE COURT:**  All right, but I mean, you said that --

9     you swallowed the words like you don't want to admit it.

10         Modersbach, if he ever paid a kickback, he got it

11    back.

12         **MR. RICHTER:**  Yes.

13         **THE COURT:**  So he's not a proper representative for

14    a kickback class, but maybe Hofstetter is.

15         **MR. RICHTER:**  Yes.

16         **THE COURT:**  All right.  Okay.

17         What other points do you want to make?

18         **MR. RICHTER:**  Sure.

19         First of all, I want to address counsel's assertion

20    that Chase gave up the commission on home equity lines.  And

21    again, they have never given them up on loans.

22         **THE COURT:**  Wait, I just heard him say it.  They

23    gave them up on loans and lines on second mortgages, not first

24    mortgages, but second mortgages.  That's what I heard him say.

25         Right?  Is that true?

1          *MR. MEINERTZHAGEN:*  On home equity.

2          *THE COURT:*  On home equity, okay.

3          You got proof to the contrary?

4          *MR. RICHTER:*  Well, there is a little shifting

5   around here.  First mortgage loans, they have never given them

6   up.

7          *THE COURT:*  True.  That's what he said.

8          *MR. RICHTER:*  Okay.  Now, let me -- I want to

9   address --

10         *THE COURT:*  Are any of these class members -- don't

11  they all have seconds, or are some of them firsts?

12         *MR. RICHTER:*  Some of them are -- well --

13         *THE COURT:*  Hofstetter is first, right?

14         *MR. RICHTER:*  Hofstetter's line of credit is in the

15  second lien position.  Modersbach's line of credit is in the

16  first lien position.

17         So this is right at Mr. Wheeler's deposition, page

18  108, which is Exhibit 2 to my declaration.  I asked him,

19         *"Q.*  Now, you mentioned a couple times

20              during your testimony that there was

21              some type of exemption for home equity

22              accounts; where does it provide for

23              that in the Compliance Plus Insurance

24              Agency Agreement?

25         *"A.*  It's not specifically addressed

```
 1              in the agency agreement.
 2         "Q.   Where are you getting that?
 3         "A.   It's my understanding -- well,
 4          it's a decision that we made.  And we
 5          communicated it to assurant
 6          (phonetic)."
 7          He goes on with his answer.
 8          Another question:
 9         "Q.   Does it say that anywhere in
10          writing?  I know it doesn't say it in
11          here, but anywhere?
12         "A.   Yes.
13         "Q.   Where?
14         "A.   In documents that I have
15          prepared.
16         "Q.   Have you brought those with you
17          today?
18         "A.   No."
19          And we requested those documents, and they never
20     produced them.
21          But here is the interesting part:  If you go to page
22     116 of his deposition.
23         "Q.   Question, when was the" --
24         THE COURT:  Wait, wait, wait.
25          You are going three times as fast as the court
```

```
 1   reporter can take it down.  Slow down.

 2            MR. RICHTER:  Question -- and this goes on to page

 3   116,

 4            "Q.   When was the decision made?

 5            "A.   The decision was communicated to

 6             assurant probably June of this year.

 7            "Q.   June of 2010?

 8            "A.   Yes.

 9            "Q.   After this the lawsuit was filed,

10             in March of 2010?

11            "A.   I don't know when this lawsuit

12             was filed."

13             And then there is a colloquy.

14             THE COURT:  When was it filed?

15             MR. RICHTER:  March of 2010.

16             THE COURT:  But I heard Counsel just tell me that it

17   was January of 2010.

18             MR. RICHTER:  (Throwing hands up.)

19             MR. MEINERTZHAGEN:  May I respond, Your Honor?

20             THE COURT:  All right.

21             What do you have to say to that?

22             MR. MEINERTZHAGEN:  What I have to say is that

23   beginning January 1, 2010, premiums -- no premiums have been

24   paid since then.  They've been accounted for, but no premiums

25   on home equity lines or loans have been taken since then.
```

1          **THE COURT:**  Does that mean they are going to be

2     taking them in the future, and they're just suspending them?

3          **MR. MEINERTZHAGEN:**  No.  They are not taking them

4     going forward.

5          **THE COURT:**  How do you reconcile the June versus

6     January?

7          **MR. MEINERTZHAGEN:**  A final decision that they would

8     not take anything because that's probably when the final

9     agreements were executed.

10         **THE COURT:**  Well, that's guesswork.  I don't know.

11         All right, I see the --

12         **MR. MEINERTZHAGEN:**  I mean, this is truly a merits

13    issue, Your Honor, but we certainly can establish, we will

14    establish that no premiums have been paid in 2010 forward for

15    home equity.

16         **THE COURT:**  Well, maybe they weren't due.  Maybe the

17    quarterly payment hadn't come due yet.  Someone gets on the

18    phone and says, wait, there is this godawful lawsuit, we

19    better -- they think about it, the deposition is about to be

20    taken, they say, we are going to change our mind, we are not

21    going to take those anymore.  As soon as the lawsuit is over,

22    we'll resume.

23         I'm not saying that is what happened, but that is a

24    scenario consistent with what I heard today that would satisfy

25    both sides.

1          **MR. MEINERTZHAGEN:**  Your Honor, that's not the

2    situation that occurred.  However, this has nothing to do with

3    class certification.

4          **THE COURT:**  Why did we get into it, then?

5          **MR. MEINERTZHAGEN:**  You've got me.

6          **THE COURT:**  I don't know.

7          Why did we get into this?

8          **MR. RICHTER:**  It is a merits issue.  And the point

9    is, we should be allowed to go forward with the force-placed

10   class.  It's easily definable, they know who they force-placed

11   on.

12          And there is no question that they were charging

13   commissions for both lines and loans.

14          **THE COURT:**  Are you saying -- by "force-placed," do

15   you mean with their affiliate, or are you saying that they have

16   made them buy the insurance, either one way or the other,

17   through an affiliate or buy their own.

18          What does "force-placed" mean?

19          **MR. RICHTER:**  Force-placed are the policies that

20   Chase purchases for its borrowers when they don't get the

21   policies themselves.

22          **THE COURT:**  All right, so if you buy your own, it's

23   not force-placed?

24          **MR. RICHTER:**  Correct.

25          **THE COURT:**  Okay, I got it.  Even though they are

1    requiring you to buy it, it's not force-placed.

2              So what other points do you want to make?

3              **MR. RICHTER:**  Yes.  On the issue of the first liens,

4    I want to address that.

5              First of all, first liens is totally, utterly

6    irrelevant to the TILA claim.  The TILA claim is that there was

7    a policy of replacement cost value, NFIP maximum, or the loan

8    or line amount prior to December 23rd, 2009.  And after that,

9    it was simply replacement cost value subject to the NFIP,

10   $250,000 limit.

11             Neither the policy before, nor the policy after had

12   anything to do with first liens, it had no bearing whatsoever.

13   It's a total red herring.

14             Second, Chase has come forward with some --

15             **THE COURT:**  Well, let me test you out on that.

16             I don't know, but, I have thought about, well, is

17   there any possible argument that the bank would have for why

18   they deleted that third option?  The third option that got

19   deleted was the maximum limit on the credit line, right?

20             **MR. RICHTER:**  Yes.

21             **THE COURT:**  All right.

22             Is there any evidence in the case that somebody at

23   the bank was sitting at their desk one day looking at the flood

24   regulations --

25             **MR. RICHTER:**  That's a very --

```
 1              THE COURT:  Wait, let me finish.
 2              MR. RICHTER:  Sorry.
 3              THE COURT:  So they are looking at the flood
 4    regulations, and they say, my God, we've been doing this wrong
 5    all these years, we should make them go up to the full
 6    replacement value because what if there is a first on it and we
 7    wind upholding the bag because there is a first on it?  And we
 8    should be making them insure for the full replacement cost
 9    subject only to the $250,000 limit.  So we got to get rid of
10    this third option because that is not -- that's not going to
11    protect us under the flood insurance thing.  And so the whole
12    rationale for this change was to be in more compliance with the
13    flood regulations.
14              Now, I don't know, you know the case:  Surely, you
15    have taken the depositions of the people who made this change,
16    and you know what they say and whether there's documentary
17    evidence to back up whatever the -- but what was the reason
18    that has been given for going from three limitations to two
19    limitations?
20              MR. RICHTER:  Sure, that's the reason they give
21    during the depositions, that they dropped it because it's too
22    hard to track first liens, and they wanted to make sure they
23    had enough flood insurance.
24              THE COURT:  All right.  Are --
25              MR. RICHTER:  But here's the point --
```

1      **THE COURT:**  Wait.  No, I'm interested in this.

2      That's what they say.

3          **MR. RICHTER:**  That's what they say.

4      **THE COURT:**  Is there documents to back that up?

5          **MR. RICHTER:**  Ahh, none.  That's where I was going.

6      **THE COURT:**  All right.

7          **MR. RICHTER:**  We have asked them for documents, all

8   communications, documents, relating to the reasons for their

9   changes in their flood insurance policies.  It's request

10  No. 24.

11     **THE COURT:**  Well, were any given?

12         **MR. RICHTER:**  None.

13     **THE COURT:**  Did you --

14         **MR. RICHTER:**  I'll tell you what we got.

15     **THE COURT:**  No documents in that category?

16      **MR. RICHTER:**  None -- well, you know what they gave

17  us?  They produced to us the interagency Q & A.  No e-mails.

18  No memos.  No nothing.

19         Now, they have said -- to be fair, they have said --

20  and this is after going to Magistrate Judge Zimmerman a couple

21  times -- they said, oh, we'll -- we'll -- now that you've gone

22  a couple of times, we'll start searching for those e-mails.

23         They told us that in December, too, of 2010, we'll

24  start searching for those.  And then they said it again

25  January 7, oh, we'll start searching for those.  I'm still

```
 1   waiting.

 2               It was --

 3               THE COURT:  I want to say something on this.  If we

 4   ever get to a trial, I'm going to let all of this discovery

 5   stuff come in.  And you have to prove it in the normal way, you

 6   put your colleague on the stand.  Here is the way it would go:

 7               Colleague, did we ask for those documents?  Yes.

 8   When did we ask for those documents?  Way back, a year ago,

 9   whatever it is.  Were they produced?  No.  Did you go to

10   Judge Zimmerman?  Yes.  What did they start saying?  They

11   started saying, oh, we're going to look for those e-mails.

12   We're going to look for those e-mails.  Did they ever produce a

13   single e-mail that explained why they made this change?  No.

14   Did they ever produce a single document?  No.

15               Now, I will let that into evidence because I cannot

16   believe -- I know how it works.  There are e-mails.

17               Come up here for a second while I'm thinking about

18   it.

19               MR. MEINERTZHAGEN:  Your Honor --

20               THE COURT:  I want you to tell me:  Have you

21   searched thoroughly, scorched Earth, to get all those e-mails?

22               MR. MEINERTZHAGEN:  No, Your Honor.  We have an

23   e-mail search term protocol that was provided by plaintiffs,

24   and we are working on it.

25               This is not --
```

1          **THE COURT:**  Working on it?  That's the present

2     participle.

3          **MR. MEINERTZHAGEN:**  Your Honor, I'm sorry, but we

4     have been in front of Judge --

5          **THE COURT:**  I'll tell you this, I'm telling you

6     this:  I'm letting this into evidence.

7          **MR. MEINERTZHAGEN:**  That's fine, Your Honor.

8          **THE COURT:**  That you have stonewalled on e-mail

9     discovery -- I can't believe that you -- this is the heart of

10    the case.

11          I mean, I was trying to throw out something that

12    might help you to see if there is a possible good faith basis

13    for going from three to two.  I'm thinking possibly there is,

14    and it may have something to do with the regulations.  I said

15    maybe there is this argument here; now I find out the bank has

16    not produced a single e-mail.

17          **MR. MEINERTZHAGEN:**  Your Honor, I don't know if

18    that's true, but, certainly, discovery is ongoing.  It has not

19    been an issue, I believe, raised in front of Judge Zimmerman.

20          We are going to comply with all discovery --

21          **THE COURT:**  I'm telling you this:  It will not be a

22    defense that you didn't go to Judge Zimmerman.  The jury will

23    hear every word of all of these requests, and it will come out

24    that you didn't have a single e-mail --

25          **MR. MEINERTZHAGEN:**  Well, Your Honor --

1          **THE COURT:**  -- or a single document, a decision memo

2    that --

3          **MR. MEINERTZHAGEN:**  When we first were before

4    Judge Zimmerman, he agreed that it made sense to conduct

5    discovery concentrating initially on the issues that would be

6    relevant to class certification and to concentrate on issues

7    that could only go to the merits after that.

8          **THE COURT:**  All right.  All right.

9          **MR. MEINERTZHAGEN:**  So we will comply --

10         **THE COURT:**  Possibly there is more there, and it

11   will come out fine in the -- at the end of the day.

12         When is the discovery cutoff?

13         **MR. MEINERTZHAGEN:**  June 30th, I believe.

14         **THE COURT:**  Well, it's coming up.

15         I hope you don't plan one week before the discovery

16   cutoff to dump all those e-mails on them and say, well, I guess

17   we don't have time now to depose all those people.

18         **MR. MEINERTZHAGEN:**  No, Your Honor.

19         **THE COURT:**  All right, I'm worn out.  I'll let you

20   make one more point.  What do you want to say?  One more point.

21         Every time this case comes in, I get excited.  You

22   know why?  I figured it out:  I do not like discovery abuse.

23   And I am not accusing anybody yet of discovery abuse, but there

24   is suggestions, and I don't like that.  I wish that the lawyers

25   would give -- turn the evidence over.

1           All right, one more point.

2           MR. RICHTER:  I would just like to refer the Court

3    to two passages in our brief, or of our reply brief.  The first

4    one is at page 3 of the reply brief.  It addresses the 2009

5    Interagency Q & A.  The Interagency Q & A does not give lenders

6    a free pass to take borrowers to replacement cost value or,

7    $250,000, just because they might have to work a little bit to

8    consult with the first lien holder.  What it actually says is,

9    quote.

10          "A junior lienholder should work with the senior

11   lienholder, the borrower, or with both of these parties to

12   determine how much flood insurance is needed," end quote.

13          It also says, quote.

14          "In the limited situation where a junior

15   lienholder" --

16          THE COURT:  That's exactly the point I was trying to

17   figure out during the break.  Please give me the cite to that.

18          MR. RICHTER:  It's the 2009 Interagency Q & A.  It's

19   at 74 Federal Register at pages 35940 to -41.

20          THE COURT:  What is the citation, the volume number?

21          MR. RICHTER:  Seventy-four.

22          THE COURT:  All right.  Thank you.

23          MR. RICHTER:  The other passage I would like to

24   refer the Court to is at page 6 of our reply brief.  This is

25   where we address this whole notion that somehow the Court has

 1   to overlook Chase's flood insurance program.  It's kind of

 2   funny:  We were here talking about Mr. Nack's deposition and

 3   the whole issue of them not disclosing additional witnesses,

 4   and their excuse for it at the time was, well, our insurance

 5   tracking, it's kind of like on auto pilot, there is really

 6   nobody that actually does it, which is kind of true, actually.

 7   I think this is one of the few things we actually agree about

 8   it, it's like an out-of-control auto pilot.

 9           And so they come in here now, and they say, well,

10   we've got this out-of-control auto pilot flood insurance

11   program but, Your Honor, you can't do anything about it, you

12   are powerless.  Well, no, you are not powerless, Your Honor,

13   you can certify -- you can certify an injunctive class under

14   TILA.  We have cited lots of cases for that proposition.  There

15   is a whole treatise section devoted to (b)(2) classes in TILA.

16           The other thing I point out:  They are right that

17   Section 1640 doesn't address one way or the other whether you

18   get injunctive relief, that's true, but I refer the Court to a

19   higher power than the Eleventh Circuit, the Supreme Court of

20   the United States, which says in the ***Califano versus Goldfarb***,

21   *(phonetic)* it's a 1979 Supreme Court case, they say the Court

22   has inherent authority to issue injunctions.  And unless there

23   is a clear statutory mandate that you can't do it, you can

24   issue an injunction.  You can issue an injunction, Your Honor.

25           So, Your Honor, in conclusion, we think there are --

1   we think the TILA class should be certified.  We think the

2   force-placed class should be certified.  There is no issues

3   with defining those classes.  We know who the change people

4   are.  We know who the force-placed people are.

5           If the Court has a concern about the definition of

6   the California class, what we would suggest is we just do it

7   for the current policyholders who are subject to this

8   out-of-control auto pilot policy.  You can certify a (b)(2)

9   class of all current loan customers or line customers in

10  California who are subject to Chase's flood insurance

11  requirements.

12          You could do that and, you know, we could take up

13  the restitution as ancillary relief.  But you can certainly

14  certify a (b)(2) class on the CUBPA.

15          Thanks, Your Honor.

16          **THE COURT:**  All right, I don't have the answer, but

17  I did give you both -- wasn't this the case -- did I give you

18  until noon tomorrow to file something?

19          **MR. MEINERTZHAGEN:**  Yes.

20          **THE COURT:**  Yes, that was on the stonewalling issue.

21  And then plaintiff has until Monday to respond.  And then I'm

22  going to decide what to do here.

23          Well, all right, it's always great to see you both.

24          **MR. RICHTER:**  Thank you.

25          **MR. MEINERTZHAGEN:**  Thank you, Your Honor.

1              (Proceedings adjourned at 9:42 a.m.)

2

3                        ---o0o---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I, Sahar Bartlett, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


**/s/ Sahar Bartlett**

**Sahar Bartlett**, RPR, CSR No. 12963

**Tuesday, March 29, 2011**